# EXHIBIT A

NEW YORK STATE EDUCATION DEPARTMENT

------------------------------------------------------------------------ X

In the Matter of the Disciplinary Charges Preferred by

                                   X

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,                                          X          Case No. 29,298

                 "Department,"          X          **OPINION AND AWARD**

                                   X

- against -

                                   X

JEAN RICHARD SEVERIN,

                                   X

                 "Respondent."          X

                                   X

Pursuant to Education Law § 3020-a

------------------------------------------------------------------------ X

**APPEARANCES**

**FOR THE DEPARTMENT**
HOWARD FRIEDMAN, GENERAL COUNSEL TO THE CHANCELLOR
    Michael A. Francis, Esq., of Counsel
    Dana Kim, Esq., of Counsel

**FOR THE RESPONDENT**
MASSENA LAW, P.C.
    Alain Massena, Esq.,

BEFORE: James A. Brown, Esq., Hearing Officer

## BACKGROUND

The Department preferred charges against Respondent, Jean Richard Severin, a tenured teacher recently assigned to the Urban Action Academy within District 18 in Brooklyn, New York ("the school"). By notice dated May 17, 2016, issued by the New York State Education Department, I was appointed to serve as the Hearing Officer. A pre-hearing conference was held on May 24, 2016. On that occasion, the parties addressed matters concerning document production and scheduling.

The hearings were conducted on June 24, 29, July 12, 14, 25 and August 9, 2016 at the offices of the Department of Education in New York, New York. At said hearings, both parties were afforded the opportunity to introduce evidence and argument in support of their respective positions. A stenographic record of the pre-hearing conference and the hearings was taken. The following witnesses testified for the Department: Assistant Principal Jordan Barnett and Principal Steve Dorcely. Respondent called the following witnesses: Superintendent Michael Prayor, UFT Chapter Leader and teacher Mark Satchell, UFT District Representative James Duncan, and the Respondent also appeared as a witness on his own behalf.

At the conclusion of the August 9th hearing, the record was declared closed upon my receipt of the hard copy of the final hearing transcript (which I received on August 15, 2016).

2

## CHARGES AND PARTIES' POSITIONS

**I.    The Charges and Specifications:**

The Specifications against Respondent read as follows:

## SPECIFICATIONS

1)    On or about April 4, 2016, Respondent signed out and left the school building without approval at 12:20 p.m. and did not return to his post assignments (period 7 prep and period 8 law class).

2)    On or about February 5, 2016, Respondent failed to adhere to the school's Cell Phone Policy when he allowed students to use their cell phones during his period 3 class.

3)    On or about December 23, 2015, during period 6, Respondent failed to attend and participate in his Common Planning Meeting with the social studies department.

4)    On or about November 25, 2015, Respondent failed to adhere to school policy and/or written directives from school administrators to keep one set of lights on in the classroom during the viewing of a video or movie.

5)    During the 2015-2016 school year, Respondent, as of December 15, 2015, had failed to attend at least twenty-nine (29) out of thirty-seven (37) mandated professional C6 assignment "Common Planning Time" meetings, on or about the following dates:

1)    Tuesday October 20, 2015
2)    Wednesday October 21, 2015
3)    Thursday October 22, 2015
4)    Tuesday October 27, 2015
5)    Wednesday October 28, 2015
6)    Friday October 30, 2015
7)    Monday November 2, 2015
8)    Wednesday November 4, 2015
9)    Thursday November 5, 2015
10)   Friday November 6, 2015
11)   Monday November 9, 2015
12)   Tuesday November 10, 2015
13)   Wednesday November 11, 2015
14)   Thursday November 12, 2015
15)   Friday November 13, 2015
16)   Monday November 16, 2015

3

17) Tuesday November 17, 2015
18) Wednesday November 18, 2015
19) Thursday November 19, 2015
20) Friday November 20, 2015
21) Monday November 23, 2015
22) Wednesday November 25, 2015
23) Monday November 30, 2015
24) Tuesday December 1, 2015
25) Thursday December 3, 2015
26) Monday December 7, 2015
27) Wednesday December 9, 2015
28) Thursday December 10, 2015
29) Tuesday December 15, 2015

6) On or about November 12, 2015, Respondent left the school building during the school day without signing the Teacher Log in the school's Main Office.

7) On or about November 9, 2015, Respondent failed to follow a directive given by administration to submit his mid-term exam for feedback and review to administration.

8) On or about November 4, 2015, Respondent permitted a student to reenter the school building through exits 1 and 2, instead of entering through the Main Entrance, where the student would have been subjected to scanning.

9) On or about October 23, 2015, Respondent failed to contact the main office and/or an immediate supervisor to inform them of his absence.

10) On or about October 26, 2015, Respondent failed to contact the main office and/or an immediate supervisor to inform them of his absence.

11) On or about November 22, 2015, Respondent failed to follow a directive given by administration to supply period 2 lesson plans for three (3) weeks to administration.

12) On or about September 11, 2015, Respondent failed to follow a directive given by administration to have the following:

   1. a lesson plan readily available upon request of an administrator;
   2. an Instructional Objective followed by a time stamp agenda listing the skills and standards the lesson would be addressing on the board/SmartBoard.

13) On or about June 15, 2015, Respondent failed to follow a directive given by administration to supply Marking Period 3 and 4 Electronic Grades Gathering (EGG) Files by the due date and time, which was June 15, 2015 at 3:00 pm.

4

14) On or about May 29, 2015, Respondent failed to follow a directive given by administration to supply Marking Period 2 Electronic Grades Gathering (EGG) Files by the due date and time, which was May 29, 2015 at 3:00 pm.

15) On or about April 23, 2015, Respondent failed to contact the main office and/or an immediate supervisor to inform them of his absence.

16) On or about February 12, 2015, Respondent failed to have on file three (3) Emergency Lesson Plans.

17) On or about January 5, 2015, Respondent failed to follow a directive given by administration to supply weekly lesson plans to administration.

18) On or about January 5, 2015, Respondent failed to follow a directive given by administration to schedule four (4) instructional support sessions.

THE FOREGOING CONSTITUTES:

- Just cause for Disciplinary action pursuant to Section 3020-a of the Education Law;
- Substantial cause rendering Respondent unfit to perform his obligations properly to the service;
- Neglect of Duty;
- Misconduct;
- Insubordination;
- Conduct unbecoming Respondent's position, or conduct prejudicial to the good order, efficiency, or discipline of the service;
- A violation of the by-laws, rules and regulations of the Chancellor, Department, School or District;
- Just Cause for termination.

II. **The Parties' Positions:**

**The Department's Position:** The Department contends that Respondent engaged in a "pattern of deliberate misconduct by failing to follow school policies and administrators' directives," and that he "stubbornly" claims to be a victim of retaliation after reporting the Principal for "alleged cheating." (Tr. 829). The Department notes that Respondent also filed a Special Complaint, "several weeks after the Respondent had already been served" with

5

disciplinary charges, which was deemed "unsubstantiated or unfounded" in a process "agreed upon by both the UFT and DOE." (Tr. 829-830, 834). In sum, the Department argues that Respondent's "unfounded allegations" against the Principal are "much ado about nothing and a desperate attempt by him to try to cover up and deflect blame for his deliberate insubordination and misconduct." (Tr. 832).

As for the particular Specifications, the Department contends that Respondent exited the school building without approval on April 4, 2016 (Specification 1). In support, the Department cites Respondent's own testimony that he exited early on April 4th and was aware of the "protocol" that "if you set foot off campus, you have to sign out." (Tr. 835). The Department also submits that Respondent "straight up lied" when he explained that he was instructed to only communicate with school secretary Townes. (Tr. 836).

As for Respondent's alleged February 5, 2016 violation of school policy regarding student cell phone usage (Specification 2), the Department relies on the Principal's testimony that he saw students using their cell phones in Respondent's classroom, and also on the students' handwritten statements. (Tr. 836-837). The Department notes that Respondent's co-teacher also received a letter to file in connection with the incident. (Tr. 837).

Regarding Respondent's alleged failure to attend various common planning meetings (Specifications 3 and 5), the Department relies on a sign-in sheet (Department Exhibit 14) showing Respondent's absence on December 23, 2015. As for the other missed common planning meetings from October through December 2015, the Department contends that the disciplinary conferences which Respondent claims were scheduling conflicts "took no more than ten minutes." The Department adds that Respondent was

6

expected, after his disciplinary conferences ended, "to return to or to attend the common planning meeting with his team." (Tr. 842). Also, the disciplinary conferences did not always present potential conflicts because Respondent's UFT Chapter Leader sometimes appeared at the conferences without Respondent. (Tr. 843). As for Respondent's other defense that he didn't always sign in when attending common planning meetings, the Department responds: "He didn't sign in because he didn't attend those meetings, plain and simple." (Tr. 842-843).

The Department also asserts that Respondent turned off all of his classroom lights on November 25, 2015 while his students viewed a video (Specification 4). In support, the Department relies on the Principal's testimony that he viewed Respondent's darkened classroom during a video presentation which appeared to be a "nap session" for some students. (Tr. 844). The Department adds that it "doesn't need to put a teacher on notice for something that is common sense." (Tr. 844).

As for the allegation that Respondent exited the school building on November 12, 2015 without signing the teacher log (Specification 6), the Department relies on the letter to Respondent's file (Department Exhibit 19) in which the Principal states that Respondent was observed leaving the school building and did not sign the teacher log. (Tr. 846-847).

The Department also maintains that Respondent did not follow a directive to submit his midterm exam to administrators for feedback and review on November 9, 2015 (Specification 7). In support, the Department cites the Principal's testimony that he never received the midterm exam from Respondent who received notice of the directive. (Tr. 847). The Department also highlights Respondent's contradictory testimony in which he ultimately explained that his co-teacher submitted the midterm exam to the Principal. (Tr.

7

847-848).

As for the allegation that Respondent permitted a student on November 4, 2015 to reenter the school building through an entrance other than the main entrance (Specification 8), the Department relies on "credible hearsay evidence" including a student's letter. (Department Exhibit 21). The Department also relies on the Principal's testimony that Respondent was observed on camera by an Assistant Principal and was also observed in person by another Principal assigned within the same school building. (Tr. 849).

Regarding the allegations that Respondent failed to contact the main office or supervision to advise of his absences on April 23, October 23 and 26, 2015 (Specifications 9, 10 and 15), the Department maintains that the Faculty/Staff Handbooks (which Respondent admitted that he read) placed Respondent on notice of this reporting obligation. (Department Exhibits 8 and 9; Tr. 850). The Department also notes that the June 12, 2015 letter to Respondent's file (Department Exhibit 26) placed Respondent on additional notice of this reporting obligation. According to the Department, Respondent only admitted that he knew of the reporting requirement when he was confronted, during the hearing, with the June 12th letter. (Tr. 851-852). The Department argues that Respondent's failure to notify the school of his absences "shows a pattern of willful insubordination and a disregard for directives." (Tr. 852-853).

The Department also asserts that Respondent on November 22, 2015 failed to supply period 2 lesson plans for three weeks in violation of a directive he received from A.P. Barnett (Specification 11). The Department notes that Respondent admitted that he failed to provide said plans, and describes his failure as "a continuation of a pattern of willful insubordination and a disregard of his supervisor's directive." (Tr. 854).

8

The Department also submits that Respondent failed on September 11, 2015 to follow directives to have: (a) a lesson plan readily available for administrators; and (b) an Instructional Objective posted on his classroom Smart Board (Specification 12). The Department relies on Principal Dorcely's testimony that he saw no Instructional Objective on Respondent's Smart Board on September 11th and that Respondent failed to produce a lesson plan upon request. (Tr. 856).

As for Respondent's alleged failure to submit his students' grades by their due dates (May 29 and June 15, 2015) (Specifications 13 and 14), the Department largely relies on emails (Department Exhibits 15 and 24) which directed Respondent to submit his missing grades. (Tr. 859). In response to Respondent's testimony that his grades were attached to emails which were timely sent, the Department demanded copies of said emails which were never produced because they "don't exist in the first place." (Tr. 861).

Regarding Respondent's alleged failure to have three Emergency Lesson Plans on file on February 12, 2015 (Specification 16), the Department contends that the rule concerning Emergency Lesson Plans appears in the school Handbook and was "clear." Moreover, school secretary Townes emailed Respondent on January 7, 2015 (Department Exhibit 27) to advise him to replenish his lesson plans. (Tr. 862). According to the Department: "[A]ll teachers know that in case of emergency or if a teacher is absent there have to be at least three Emergency Lesson Plans on file." (Tr. 862).

The Department also argues that Respondent failed to timely provide administrators with his weekly lesson plans on or about January 5, 2015 (Specification 17) which he was instructed to do in an Informal Observation Report (Department Exhibit 28). (Tr. 863). The Department relies on Principal Dorcely's testimony that Respondent failed to provide the

9

lesson plans, and Respondent's own admission that he never submitted said lesson plans. (Tr. 863-864).

The Department also asserts that Respondent failed to comply with the directive to schedule four instructional support sessions with the Principal on or about January 5, 2015 (Specification 18) which he was also directed to do in his Informal Observation Report. (Tr. 865). The Department relies on the Principal's testimony that Respondent failed to timely schedule the sessions, and on school secretary Townes' email to Principal Dorcely (Department Exhibit 29) as proof that Respondent didn't "schedule the four sessions until January 16, 2015" which was "well past the starting date of the week of January 5th which was the deadline." (Tr. 865). The Department underscores that "Respondent's failure... to adhere to the deadline was again another example of his deliberate disregard for an important directive given by an administrator." (Tr. 865).

The Department also addresses the "cooling off" period imposed on both Respondent and the Principal beginning in December 2015. According to the Department, "It wasn't a one-way street.... they were both hostile to each other," and further submits that Respondent was not a "victim" and "does not have clean hands." (Tr. 865-866). Also, the Department contends that Respondent's two witnesses, who represent the UFT and testified about the Principal's relationship to Respondent, were biased. This bias undermined UFT Chapter Leader Satchell's testimony that the Principal made retaliatory statements at the September 8, 2015 staff meeting. According to the Department, Satchell's "job is all about partiality and protecting union members" (Tr. 867) and, at any rate, his testimony about the September 8th meeting differed from Respondent's testimony. (Tr. 869).

10

In sum, the Department argues that "a lot of the directives given here were common sense, were things that the Respondent as a long-time DOE employee has done before." The Department adds that it "cannot rely on this Respondent to conduct himself in a professional and ethical manner. His misconduct demonstrated intentional and willful bad faith toward the Department." (Tr. 872). Finally, the Department notes that "not once did this Respondent demonstrate any remorse or take responsibility for what he did." (Tr. 877). According to the Department, Respondent's lack of remorse indicates that he "can't be rehabilitated and that he's not fit to continue to teach or be employed by the Department." (Tr. 877). The Department seeks the termination of Respondent's employment. (Tr. 879).

**Respondent's Position:** Respondent argues that all of the Specifications should be dismissed. First, Respondent asserts that the Department's case is "full of second and third degree levels of hearsay" and that "direct evidence of any wrongdoing... is missing." (Tr. 778). Second, Respondent contends that the letters to his file and the disciplinary conferences "that gave rise to the allegations in these specifications were conducted by an administration with a vendetta" against him. (Tr. 778). As evidence of the vendetta, Respondent cites the Principal's acknowledgment (which Respondent claims the Principal uttered at the September 8, 2015 staff meeting) that he knew he had been reported to "authorities," and that he was going into "beast mode." (Tr. 777). Respondent also asserts that the Principal subsequently told him: "I'm going to ride you." (Tr. 777). According to Respondent, "every word" uttered by Department witnesses was "tinged with disdain... because he would not take part" in the Principal's scheme to change a Regents grade in the summer of 2014. (Tr. 779).

Respondent also cites A.P. Barnett who testified that the Principal's relationship with

11

Respondent was "toxic" (Tr. 779) but whose credibility, according to Respondent, suffered when she subsequently testified it was "toxic yet professional at the same time." (Tr. 781).

Respondent also argues that the "Specifications do not rise to the level of a 3020-a hearing;" rather, they "could have best been handled in maybe a recommendation or maybe simply a discussion" with him. (Tr. 782). Respondent maintains that once he declined to participate in the Principal's scheme to enable a student to pass the Regents exam, the Principal "knew that he needed to get him out." (Tr. 782). Respondent submits that the Principal was motivated by a need to "make himself look good by boosting the school's passage rates." (Tr. 785).

As for the particulars, Respondent argues that the Department failed to offer any firsthand testimony that he exited the school early on April 4, 2016 (Specification 1) or that his departure impacted the school: "There is nothing in the testimony or evidence that the students were left alone or put in harm's way." (Tr. 786). Also, Respondent maintains that the administration never spoke to "supervisors about [him] signing out," and thus failed to conduct a "full investigation" which was "fair and objective." (Tr. 787).

Respondent also argues that the Department failed to prove that he violated the student cell phone policy on February 5, 2016 (Specification 2), and submits that the students' written statements are mere hearsay which should not be considered. Respondent also maintains that he was outside of the classroom conferencing with a student when the Principal observed student cell phone usage (and that his co-teacher was in the classroom). (Tr. 787-788).

Respondent also addresses his alleged failure to attend the December 23, 2015 common planning meeting and other common planning meetings in October through

12

December 2015 (Specifications 3 and 5). According to Respondent, the meetings weren't actually used for common planning: "Many of these initial meetings in October and November were actually put aside for MOSL planning, MOSL grading, MOSL norming." (Tr. 796). Respondent continues: "it's fair to say that anything but common planning was taking place during the common planning sessions." (Tr. 796). Respondent also contends that he was required to meet with the Principal for "as many as 43 disciplinary meetings" during the scheduled common plan meetings and that he was "unable to split himself in two." (Tr. 790, 792). In addition, one of the "missed" common planning meetings (November 11, 2015) was Veteran's Day and another (November 25, 2015) was cancelled for a scheduled post-Thanksgiving party. (Tr. 795).

Respondent also denies that he committed any violation by turning off the classroom lights for a video presentation on November 25, 2015 (Specification 4). Respondent asks whether this is "subject matter for a disciplinary proceeding" where there are "no allegations that the students were hurt or in any harm or [that] the light being off could give rise to a dangerous situation." (Tr. 793). Respondent urges the use of common sense: "We've all sat in rooms where... the lighting in the room makes it difficult to view a screen." (Tr. 793-794). Respondent continues: "[I]s it more important to follow a directive that was never given and keep all the lights on or is it actually more important for the students to actually be able to see the screen... that has vital information that would be a part of their lesson for that particular day?" (Tr. 794).

Respondent also asserts that the Department failed to prove that he exited the school building on November 12, 2015 without signing out (Specification 6). Respondent denies that he ever exited the building as charged, and argues that the Principal lacked

credibility: "[A]fter realizing during cross-examination that based on his testimony this specification would have to be dismissed he changed his testimony and then said he did" see Respondent exit the building. (Tr. 797).

Respondent also denies that he failed to submit his midterm exam to administrators for their feedback and review (Specification 7). According to Respondent, he couldn't submit a midterm because there was no actual midterm to submit: "[A]t that time of the year... the MOSL was the test that was being administered and [he] bore no responsibility for creating the exam or the contents thereof." (Tr. 798).

Respondent also submits that there is "absolutely no direct evidence" that he permitted a student to reenter the school building through the wrong entrance on November 4, 2015 (Specification 8). (Tr. 799). Respondent notes that the Department never offered any testimony from A.P. Barnett (regarding this Specification) or from the Principal of another school (housed in the same building) who was purportedly present when the incident allegedly occurred. (Tr. 799-800). Respondent also notes that the Department failed to call any student witness and did not produce any video footage to substantiate the Specification. (Tr. 800).

Regarding his alleged failure to notify the main office or his immediate supervisor of his absences on October 23 and October 26, 2015 (Specifications 9 and 10), Respondent contends that he contacted SubCentral in full compliance with the instruction issued in the school's "Daily Docket" email. (Respondent Exhibit 11; Tr. 803).

Respondent contends that his alleged failure to follow a directive to supply period 2 lesson plans for three weeks (Specification 11) must be "viewed through the prism" of his "toxic relationship" with the Principal who had "the power to fabricate" the Specification's

14

allegations. (Tr. 804).

Respondent also argues that his alleged failure to have a lesson plan on September 11, 2015 (Specification 12(1)) is "not the type of Specification that should rise to a 3020-a hearing." (Tr. 804). Respondent explains that he postponed his "scientific revolution" lesson (for which he had a lesson plan) because his co-teacher that day indicated her desire to present a lesson commemorating 9/11. (Tr. 805-806).

As for his alleged failure to follow a directive to timely submit his 2014-2015 grades for marking periods 2, 3 and 4 (Specifications 13 and 14), Respondent again queries whether the charges "rise to the level of a 3020-a hearing?" (Tr. 806). Respondent asserts that he believed that he timely emailed the grades, and that he did so again once he was informed that the grades did not transmit. According to Respondent: "This was a simple technical issue and certainly should not be the subject of any disciplinary action." (Tr. 807).

Regarding his alleged failure to notify the main office or his immediate supervisor of his April 23, 2015 absence (Specification 15), Respondent submits that no evidence exists that his students "were left alone or did not have coverage." (Tr. 807). Respondent also maintains that that he fully complied with the school's Daily Docket instruction to timely contact SubCentral when absent. (Tr. 807-808).

Respondent maintains that other directives he allegedly failed to follow -- having three Emergency Lesson Plans on file on February 12, 2015, and supplying weekly lesson plans and scheduling four Instructional Support sessions on January 5, 2015 (Specifications 16, 17 and 18) -- involved merely "ministerial" acts. Respondent adds that there is "no evidence that the school or the student body were impacted by the alleged conduct." (Tr. 808).

15

Respondent reiterates that he was disciplined "in retaliation for filing the SCI report that Principal Dorcely engaged or attempted to engage in testing irregularities," and that he was supposed "to be protected by the Department from the behavior of his supervisor and the Department failed him." (Tr. 810). Respondent also highlights the "cooling off" period which was imposed on him and the Principal: "This is mind-blowing that the Principal, a person who is in charge of children... has to have a cooling off period from one of the people he is in charge of supervising." (Tr. 813). Respondent adds that the Principal "was so out of control that he violated his supervisor's orders" by terminating the cooling off period before its established January 30, 2016 conclusion. (Tr. 813). Respondent also cites Superintendent Prayor's testimony that Respondent wasn't the only staff member to allege that the Principal engaged in grade changing and harassment. (Tr. 814).

Respondent also cites UFT Chapter Leader Satchell's testimony that the Principal's "hostility" toward Respondent began with the summer of 2014 grade changing incident. Satchell also testified that the Principal stated at the September 8, 2015 staff meeting: "[Y]ou tried to take me down. I'm back and I'm stronger than ever and I'm going to ride you." (Tr. 815). While Respondent acknowledges that Satchell did not know who the target of the threat was, Satchell speculated that the comments were directed at Respondent. (Tr. 815).

Respondent also cites UFT District Representative Duncan's testimony that Urban Action Academy issued 50 of the 85 disciplinary letters issued by the schools under his supervision since December 2015. (Tr. 816). Duncan also testified that the Principal, at the meeting which established the "cooling off" period, nonetheless declared: "I'm still going forward with my 3020-a hearing" against Respondent. According to Respondent, this

16

declaration shows that the Principal "wasn't acting in the best interest of the students, wasn't even acting in the best interest of Urban Action Academy. He was acting in his own interest and that was... getting Respondent thrown out of the school to protect himself." (Tr. 818).

Finally, Respondent emphasizes the timeline of events in order to support his claim of retaliation. Respondent reported his allegations that the Principal was involved in grade changing to SCI in April 2015, and SCI then referred the matter to OSI. Respondent was then interviewed by OSI in mid-June 2015. In early September 2015, the Principal "throws the gauntlet down" and threatens: "[Y]ou tried to take me down. I'm stronger than ever. I'm going to ride you." (Tr. 820). According to Respondent, the Principal followed him to his classroom on September 17, 2015 "taunting him, telling him how this year [he's] done and that he's going to fuck him up this year." (Tr. 821). Respondent maintains that he suffered additional "abuse... with the multiple disciplinary conferences," and adds: "There were over 25 disciplinary letters and without any sort of remedy." (Tr. 821). Respondent asserts that the disciplinary letters were intended to "simply create a paper case where [the Principal] would be able to bring a 3020-a hearing" against him. (Tr. 821).

Respondent, who seeks the dismissal of the Specifications, also argues that "there should be no further penalty" in the event any misconduct is found. (Tr. 823). Citing the importance of progressive discipline in determining penalties, Respondent notes that this hearing represents his "first disciplinary proceeding" and that he has served the Department for "years without incidents." (Tr. 825). Respondent underscores that no evidence exists that his conduct caused harm to students or that students were "in danger of harm or that the efficiency or effectiveness of the school was impacted by his alleged

behavior." (Tr. 826).

## OPINION

**SPECIFICATION 1:** On or about April 4, 2016, Respondent signed out and left the school building without approval at 12:20 p.m. and did not return to his post assignments (period 7 prep and period 8 law class).

This Specification charges Respondent with leaving the school building before the end of the school day without approval. Respondent does not dispute the he left early on April 4th but offers unrebutted testimony that he notified school secretary Townes before leaving. (Tr. 534). Respondent testified that he left early because he felt ill (Tr. 534), and wrote "illness" on the school's Staff Sign Out sheet as the "reason for leaving." (Department Exhibit 3). The record is strangely silent as to the "approval" process for teachers seeking to leave early when ill. While the Faculty/Staff Handbook (Department Exhibit 9) states that a teacher must notify administrators if ill, Respondent is not charged with failure to provide notice. Simply stated, the record is insufficiently developed for a finding that Respondent violated any school rule or policy for obtaining approval before he exited that day. Accordingly, Specification 1 is dismissed.

**SPECIFICATION 2:** On or about February 5, 2016, Respondent failed to adhere to the school's Cell Phone Policy when he allowed students to use their cell phones during his period 3 class.

The Faculty/Staff Handbook prohibits students from using cell phones in school (Department Exhibit 9); so too does another written policy adopted by the school. (Department Exhibit 10). In the letter to Respondent's file dated February 9, 2016, the Principal admonished Respondent for failing on February 5th "to direct students to put away their cell phones during instruction." (Department Exhibit 11).

The Principal and Respondent, who were the only two witnesses to testify about this Specification, offered sharply divergent versions of what happened on February 5th. Respondent contends that while his co-teacher was in the classroom, he was conferencing with a student outside of the classroom when the Principal observed students using their cell phones. The Principal testified that Respondent was "co-teaching with Ms. Burlingame" in the classroom when he made his observation. (Tr. 86). In weighing these competing versions, the balance tips in favor of Respondent largely because of Student S.B.'s written statement that only one teacher was present in the classroom when the Principal made his observation: "The thing was that other students had their phone out, but the teacher didn't seem to mind although we aren't supposed to have them out." (Department Exhibit 12). In the absence of persuasive evidence that Respondent was present in the co-taught classroom when students used their cell phones, I find that Respondent is not guilty of Specification 2 which is hereby dismissed.

**SPECIFICATION 3:** On or about December 23, 2015, during period 6, Respondent failed to attend and participate in his Common Planning Meeting with the social studies department.

Respondent acknowledged that attendance is mandatory at the contractually mandated Common Planning Meetings which were held on a daily basis in Room 101 during period 6. (Tr. 595-596). The Department's proof that Respondent failed to appear at the December 23, 2015 meeting is an attendance sheet dated "12/23/15" which has the notation "abs/did not attend" written next to Respondent's name. (Department Exhibit 14). Respondent's defense that he actually appeared at the December 23rd meeting is undermined by his failure to sign the attendance sheet which four other teachers signed to indicate their presence at the meeting. Accordingly, I find that Respondent is guilty of

19

Specification 3.

**SPECIFICATION 4:** On or about November 25, 2015, Respondent failed to adhere to school policy and/or written directives from school administrators to keep one set of lights on in the classroom during the viewing of a video or movie.

The Department failed to offer any evidence that Respondent was placed on notice, prior to November 25, 2015, that teachers must keep one set of classroom lights on during a video presentation. Accordingly, Respondent, who was attempting to improve the visibility of a short video (Tr. 722), is not guilty of Specification 4 which is hereby dismissed.

**SPECIFICATION 5:** During the 2015-2016 school year, Respondent, as of December 15, 2015, had failed to attend at least twenty-nine (29) out of thirty-seven (37) mandated professional C6 assignment "Common Planning Time" meetings, on or about the following dates:

1)  Tuesday October 20, 2015
2)  Wednesday October 21, 2015
3)  Thursday October 22, 2015
4)  Tuesday October 27, 2015
5)  Wednesday October 28, 2015
6)  Friday October 30, 2015
7)  Monday November 2, 2015
8)  Wednesday November 4, 2015
9)  Thursday November 5, 2015
10) Friday November 6, 2015
11) Monday November 9, 2015
12) Tuesday November 10, 2015
13) Wednesday November 11, 2015
14) Thursday November 12, 2015
15) Friday November 13, 2015
16) Monday November 16, 2015
17) Tuesday November 17, 2015
18) Wednesday November 18, 2015
19) Thursday November 19, 2015
20) Friday November 20, 2015
21) Monday November 23, 2015
22) Wednesday November 25, 2015
23) Monday November 30, 2015
24) Tuesday December 1, 2015
25) Thursday December 3, 2015
26) Monday December 7, 2015

27) Wednesday December 9, 2015
28) Thursday December 10, 2015
29) Tuesday December 15, 2015

As stated above in the Opinion addressing Specification 3, Respondent acknowledged that attendance is mandatory at the daily Common Planning Meetings. (Tr. 595-596). The Department supports this Specification by relying on Common Planning Meeting attendance sheets and the Principal's testimony that Respondent was at school on the dates he is charged with missing the meetings. (Tr. 114).

During the hearing, the Principal acknowledged that certain meetings should not have been charged, including November 11, 2015 (Veteran's Day) and when Respondent actually attended the meetings on November 9, 25, December 10 and 15, 2015. (Tr. 273-274, 286-291). Also, no documentary (or other) proof exists that Respondent missed the October 30 and November 20, 2015 meetings. Accordingly, these seven charged dates are hereby dismissed.

As for the balance of Specification 5, Respondent asserted that he never missed a Common Planning Meeting: "Either I was being disciplined with Mr. Dorcely or Ms. Barnett or when I would walk into those meetings, I didn't sign in. But I was always there." (Tr. 542). As proof of the disciplinary conferences which conflicted with the Common Planning Meetings, Respondent cites the Principal's letters summoning him to attend conferences on October 28, November 10, 13, 17 and 23, 2015. (Respondent Exhibits 2-6).

Respondent's defenses for not appearing at the Common Planning Meetings fail. The Principal's unrebutted testimony was that the disciplinary conferences lasted "no more than ten minutes," and the Principal also testified that Respondent was expected to attend

21

the Common Planning Meetings when the conferences concluded. (Tr. 362-363).

Respondent should have known that he was expected to attend the Common Planning

Meetings, which were mandatory, when the disciplinary conferences ended. Certainly, the

administration explicitly stated its expectation in the November 19, 2015 letter to

Respondent's file which admonishes him for missing Common Planning Meetings on at

least two dates (November 10 and 13, 2015) when Respondent's disciplinary conferences

were also scheduled. (Department Exhibit 18). Also, Respondent's purported failure to sign

the attendance sheets is no defense, especially given his testimony that he was aware of

the "procedure" requiring teachers to "sign on the sign in sheets to document" attendance

at Common Planning Meetings. (Tr. 674). Accordingly, I find that Respondent is guilty of

Specification 5, in part, as outlined above.

**SPECIFICATION 6:** On or about November 12, 2015, Respondent left the school building during the school day without signing the Teacher Log in the school's Main Office.

The Principal, who was the only Department witness to address this Specification,

admitted that he never saw Respondent exit the school building on November 12, 2015.

(Tr. 302). For his part, Respondent denied leaving the school building during the school

day on November 12th. (Tr. 551, 631). In the absence of competent evidence that

Respondent left the school building during the school day on November 12th,

Specification 6 cannot be sustained and is hereby dismissed.

**SPECIFICATION 7:** On or about November 9, 2015, Respondent failed to follow a directive given by administration to submit his mid-term exam for feedback and review to administration.

The Department produced an October 6, 2015 "Daily Docket" email from the school

secretary to teachers, including Respondent, which in part states: "Unit Test and Exams

22

are due to direct supervisor three days before administration." (Department Exhibit 20). The Department also introduced a November 9, 2015 email which in part reads: "Second Request. Dear ELA, Social Studies, Foreign Language and Art Teachers: As noted in the Daily Docket, please submit your midterm for review to your direct supervisor by Monday 9." (Department Exhibit 20).

In a November 9, 2015 email, Respondent responds to the Principal's November 9th email using the subject line "Re: Mid-Term Request." Respondent's email states: "I'm unable to access my midterm as plan. I have made several request to get my laptop without success. Please help me obtain my laptop to access my information." (Department Exhibit 20). One hour later, the Principal sent Respondent another email which states: "Please submit your midterm by the COB as directed." (Department Exhibit 20).

The Principal testified that he did not receive the midterm exam from Respondent (Tr. 122) who never denied failing to provide said exam to administrators for their feedback and review. Rather, Respondent described the midterm exam as a MOSL state exam for which he is not "responsible" for its contents. (Tr. 552). On cross-examination, Respondent added, almost as an afterthought, that his co-teacher submitted the midterm exam to the Principal. (Tr. 604).

I find Respondent's defense to be unconvincing. His November 9th email response to the Principal nowhere states that the midterm was a MOSL exam, and the notion that his co-teacher submitted the midterm exam is oddly inconsistent with Respondent's assertion that there was no exam to submit because it was a state administered MOSL exam. I find that the direction to submit the midterm exam for feedback and review was clear and that Respondent did not comply with the directive. Accordingly, I find that

23

Respondent is guilty of Specification 7.

**SPECIFICATION 8:** On or about November 4, 2015, Respondent permitted a student to reenter the school building through exits 1 and 2, instead of entering through the Main Entrance, where the student would have been subjected to scanning.

The Department, which offered only hearsay evidence to support this Specification, never presented the testimony of a Principal of a different school (housed in the same building as Urban Action Academy) who purportedly witnessed the event, and also failed to have A.P. Barnett, who purportedly watched a video of the incident, address this Specification. In the absence of competent evidence to substantiate this charge (which Respondent denied), Specification 8 is dismissed.

**SPECIFICATION 9:** On or about October 23, 2015, Respondent failed to contact the main office and/or an immediate supervisor to inform them of his absence.
**SPECIFICATION 10:** On or about October 26, 2015, Respondent failed to contact the main office and/or an immediate supervisor to inform them of his absence.

Respondent does not deny that he was absent from school on October 23 and 26, 2015 and that he did not contact the main office or his immediate supervisor to report the absences; rather, Respondent contacted SubCentral to request coverage for the two dates he would be absent. (Tr. 555).

Respondent's defense that he complied with the correct procedure to contact SubCentral cannot prevail given that the 2015-2016 Faculty/Staff Handbook clearly states: "If you are going to be absent, please call your direct supervisor and the school... prior to 6:30 A.M." (Department Exhibit 9). In addition, Respondent had received a June 12, 2015 letter to file for failing to notify the school of his April 23, 2015 absence which referred to the particular reporting requirement in the school Handbook. While Respondent relies on Daily Docket emails, including one dated October 26, 2015 (Respondent Exhibit 11), as

24

proof that he properly contacted SubCentral, the Daily Docket entries can only reasonably be read to supplement the school Handbook's clear and unmistakable reporting requirement. Accordingly, I find that Respondent is guilty of Specifications 9 and 10.

**SPECIFICATION 11:** On or about November 22, 2015, Respondent failed to follow a directive given by administration to supply period 2 lesson plans for three (3) weeks to administration.

In the Informal Observation Report of Respondent's October 29, 2015 lesson, A.P. Barnett describes how she met with Respondent on October 30th and addressed "next steps" which included: "submit your period 2 lesson plans for my review and feedback, by Thursday, November 18, 2015." (Department Exhibit 5). In a December 2nd email to Respondent, A.P. Barnett advises Respondent: "you have not yet submitted your lesson plans for your period 2 class for my review and feedback as directed in your informal observation feedback." A.P. Barnett's December 2nd email continues: "Please submit your period 2 lesson plans to me immediately." (Department Exhibit 5). Respondent admitted that he did not submit the period 2 lesson plans as directed. (Tr. 647). Accordingly, I find that Respondent is guilty of Specification 11.

**SPECIFICATION 12:** On or about September 11, 2015, Respondent failed to follow a directive given by administration to have the following:

1. a lesson plan readily available upon request of an administrator;

2. an Instructional Objective followed by a time stamp agenda listing the skills and standards the lesson would be addressing on the board/SmartBoard.

On September 11, 2015, Respondent's students were taught a lesson about the tragic events of 9/11. According to Respondent's credible testimony, his co-teacher suggested the lesson commemorating 9/11, which was a departure from the scheduled

25

Unit Plan lesson, that September 11th morning.

There is no dispute that teachers are required to have their lesson plans readily available in their classrooms and their Instructional Objective posted on their Smart Boards (Department Exhibit 9), and Respondent admits there was no lesson plan or posted Instructional Objective for the September 11th "substitute" lesson. While Hearing Officers must exercise caution before excusing rule violations, the circumstances herein are extraordinary. I find that Respondent is not guilty of any misconduct, and hereby dismiss Specification 12.

> **SPECIFICATION 13:** On or about June 15, 2015, Respondent failed to follow a directive given by administration to supply Marking Period 3 and 4 Electronic Grades Gathering (EGG) Files by the due date and time, which was June 15, 2015 at 3:00 pm.
> **SPECIFICATION 14:** On or about May 29, 2015, Respondent failed to follow a directive given by administration to supply Marking Period 2 Electronic Grades Gathering (EGG) Files by the due date and time, which was May 29, 2015 at 3:00 pm.

Electronic Grades Gathering ("EGG") is a system used by teachers to submit their grades to administrators for processing student report cards. (Tr. 164). Respondent acknowledged the importance of timely submitting grades. (Tr. 657). Respondent also acknowledged that he knew of the May 29th deadline for submitting his marking period 2 EGG files, and that he missed the May 29th deadline because his grades did not transmit as an email attachment. (Tr. 708-709).

I find that it was incumbent on Respondent, once he admitted missing the May 29th deadline, to demonstrate the actual submission date as a part of his "technical malfunction" defense. In the absence of any such evidence, what's left is Respondent's admission that he missed a known "important" deadline for submitting his marking period 2 grades.

Accordingly, I find that Respondent is guilty as charged in Specification 14.

I also find that Respondent's defense regarding marking periods 3 and 4 fails. Respondent acknowledged that he was aware of the June 15th deadline (Tr. 697) and yet did not attempt to send the grades until June 17th, two days after the deadline. (Tr. 700). It bears noting that Respondent never produced his emails (which the Department requested, Tr. 734-735) in an effort to demonstrate that he timely submitted his grades. In light of Respondent's admission, and A.P. Barnett's June 23rd email which states that she had not received Respondent's marking period 3 and 4 grades as of June 23, 2015 (Department Exhibit 24), I find that Respondent is guilty of Specification 13.

**SPECIFICATION 15:** On or about April 23, 2015, Respondent failed to contact the main office and/or an immediate supervisor to inform them of his absence.

Respondent does not deny that he was absent from school on April 23, 2015. Respondent also acknowledges that he contacted SubCentral to report his absence and not the main office or an immediate supervisor. (Tr. 568). Respondent's defense that he believed it was correct procedure to contact SubCentral cannot prevail given that the 2014-2015 Faculty/Staff Handbook clearly states: "If you are going to be absent, please call your direct supervisor and the school... prior to 6:30 A.M." (Department Exhibit 8). While Respondent offers no documentary evidence of any pre-April 23rd direction to contact SubCentral, any such direction could only reasonably be read as supplementing the unmistakable Handbook rule which requires a teacher to make contact with the school and an immediate supervisor. Under the circumstances, I find that Respondent is guilty of Specification 15.

**SPECIFICATION 16:** On or about February 12, 2015, Respondent failed to have on file three (3) Emergency Lesson Plans.

School secretary Townes sent Respondent an email on January 7, 2015 which, in part, reads: "Please be advised that your emergency lesson plans have been used during your absence on 1/6/15 & 1/7/15. Please be sure to replenish your (3) emergency lesson plans upon your return." (Department Exhibit 27; Tr. 714). The Principal provided the only evidence intended to show Respondent's noncompliance with Townes' directive. He identified his April 27, 2015 letter to file stating that Respondent failed to produce the emergency lesson plans as of a February 12th meeting. (Department Exhibit 27). For his part, Respondent denied failing to replenish the three emergency lesson plans as charged. (Tr. 716).

I find that the Department failed to substantiate this Specification. The Principal's testimony, regarding this Specification, was primarily about his April 27th letter to file which is dated ten weeks after Respondent allegedly failed to replenish his Emergency Lesson Plans at the February 12th meeting. This ten-week lapse of time raises legitimate questions about the accuracy of the April 27th letter which was the sole proof offered by the Department in support of this Specification. Without additional evidence that Respondent failed to timely submit the three emergency lesson plans, Specification 16 cannot be sustained and is hereby dismissed.

**SPECIFICATION 17:** On or about January 5, 2015, Respondent failed to follow a directive given by administration to supply weekly lesson plans to administration.
**SPECIFICATION 18:** On or about January 5, 2015, Respondent failed to follow a directive given by administration to schedule four (4) instructional support sessions.

Respondent's Informal Observation Report for his December 22, 2014 lesson is signed by both the Principal and Respondent on January 5, 2015. (Department Exhibit 28).

The Report contains the following directions issued by the Principal:

>1. See Ms. Townes, School Secretary to schedule four (4) planning sessions with me during your prep to assist you with integrating the appropriate content standards, UDL, and DI strategies into your daily lesson for period 7.

>2. Submit your period 7 lesson plans for the week every Monday for review, feedback, and support until further notice.

(Department Exhibit 28). The undisputed testimony is that Respondent never submitted his lesson plans (Tr. 188, 719), and thus violated the above direction. Accordingly I find that Respondent is guilty of Specification 17.

As for the scheduling of the four Instructional Support sessions, the Principal acknowledged that Respondent did schedule the sessions (Tr. 355), and school secretary Townes' January 16th email confirms that the sessions were scheduled. (Department Exhibit 29). Given that the Principal issued no deadline for scheduling the Instructional Support sessions, I find that the scheduling of the sessions no later than 11 days after the directive is not misconduct. Accordingly, I find that Respondent is not guilty of Specification 18 which is hereby dismissed.

## PENALTY

The following Specifications have been sustained: 3, 5 (in part), 7, 9, 10, 11, 13, 14, 15 and 17.

The following Specifications have been dismissed: 1, 2, 4, 6, 8, 12, 16 and 18.

Respondent is a long-term employee who began his employment with the Department as a substitute teacher in 1996. (Tr. 440). He was hired as a Social Studies teacher at Urban Action Academy, and began working at the school during the summer of 2014. (Tr. 359, 446). There is no evidence of any prior disciplinary penalties in

29

Respondent's record.

Respondent has been found guilty of failing to: attend Common Planning Meetings, submit a midterm exam for feedback and review, contact the main office and an immediate supervisor when absent, supply lesson plans to administrators, and timely provide marking period grades. In so doing, Respondent engaged in misconduct.

In deciding the appropriate penalty, I am aware of the truly dysfunctional relationship between the Principal and Respondent which A.P. Barnett characterized as "toxic." Superintendent Prayor also described the extraordinary "cooling off" period which limited the Principal's contact with Respondent for a part of the 2015-2016 school year. While I am mindful of the relationship, an administrator's animus does not necessarily equate to a respondent's innocence. Once misconduct is found, penalties are determined by traditional factors such as: the seriousness of the misconduct, respondent's years of service and prior disciplinary history if any.

Herein, the unmistakable thread running through Respondent's misconduct is his stubborn noncompliance with his administrators' directives. I am aware of Respondent's long tenure and unblemished disciplinary record. I also note the Department's failure to sufficiently demonstrate how Respondent's misconduct adversely impacted the school or its students. For the reasons stated above, and based on the totality of the evidence, I impose a pay fine on Respondent in the amount of $2,000.00, and I so award.

## AWARD

1. Respondent, Jean Richard Severin, is guilty of Specifications 3, 5 (in part), 7, 9, 10, 11, 13, 14, 15 and 17.

2. Respondent, Jean Richard Severin, is not guilty of Specifications 1, 2, 4, 6, 8, 12, 16 and 18.

3. The proper penalty is a pay fine in the amount of $2,000.00 to be deducted in equal amounts from Respondent's pay over a period of twelve (12) months.

Dated: New York, New York
      September 9, 2016

JAMES A. BROWN, Esq.
Hearing Officer

I, JAMES A. BROWN, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Opinion and Award.

Dated: New York, New York
      September 9, 2016

JAMES A. BROWN, Esq.
Hearing Officer

31