# EXHIBIT B

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
JEAN RICHARD SEVERIN
Section 3020-a Education Law Proceeding (File #29,298)


DATE:            May 24, 2016

TIME:            9:30 a.m. to 10:30 a.m.

LOCATION:        NYC Department of Education
                 Office of Legal Services
                 100 Gold Street, Third Floor
                 New York, NY 10038

BEFORE:          JAMES A. BROWN, ESQ.
                 HEARING OFFICER

APPEARANCES:   FOR THE COMPLAINANT:
                 MICHAEL A. FRANCIS, ESQ., of Counsel
                 NYC Department of Education
                 Office of Legal Services
                 49-51 Chambers Street
                 New York, NY  10007
                 Telephone:  (212) 374-6741
                 Mfrancis11@schools.nyc.gov


               FOR THE RESPONDENT:
                 JENNIFER HOGAN, ESQ., of Counsel
                 Office of Richard E. Casagrande
                 52 Broadway, 9th Floor
                 New York, New York 10004
                 Telephone: (212) 533-6300
                 jhogan@nysutmail.org

Sheet 2

Table of Contents

OPENING STATEMENT
NAME:            PAGE:
WITNESS EXAMINATION
NAME:            PAGE:
CLOSING STATEMENT
NAME:            PAGE:
EXHIBITS
RESPONDENT        DESCRIPTION        I.D.  IN EV.
1    Demand for bill of particulars,    5    5
      request for production of
      documents
DEPARTMENT OF EDUCATION  DESCRIPTION      I.D.  IN EV.

1
2
3
4
5
6
7
8
9
10
11
12

2

**4**

JEAN RICHARD SEVERIN - 5/24/16
1
2      [ON THE RECORD, Awaiting Respondent
       and Department]
3      THE HEARING OFFICER:  We're back on
4      the record in this matter.  I will note that we
5      are joined by the Department's counsel.  If you
6      could kindly note your appearance.
7      MR. MICHAEL FRANCIS:  For the
8      Department of Education, Michael A. Francis.
9      THE HEARING OFFICER:  And the
10     Respondent is also now present with us.  Good
11     morning to Dr. Severin.
12     DR. JEAN SEVERIN:  Good morning.
13     THE HEARING OFFICER:  Does the
14     Department of Education, in fact, have a copy of
15     the demand for bill of particulars, request for
16     production of documents?
17     MR. FRANCIS:  Yes, I do.
18     THE HEARING OFFICER:  I would like to
19     have this in the record as Respondent's Exhibit
20     1.  Is there any objection, Mr. Francis?
21     MR. FRANCIS:  None from the
22     Department.
23     THE HEARING OFFICER:  All right.  So
24     Respondent's Exhibit 1 is in evidence.
25

**3**

1      JEAN RICHARD SEVERIN - 5/24/16
2      (The hearing commenced at 9:30 a.m.)
3      THE HEARING OFFICER:  Good morning.
4      My name is James A. Brown.  I'm the Hearing
5      Officer duly appointed pursuant to New York
6      State Education Law Section 3020-a, its rules
7      and regulations, as well as the contractual
8      provisions by and between the United Federation
9      of Teachers and the New York City Department of
10     Education.  We are here today for a prehearing
11     conference in the matter of Jean Severin, SED
12     Case Number 29,298.  If we could kindly note our
13     appearance.
14     MS. JENNIFER HOGAN:  Good morning.
15     For the Respondent, Law Office of Richard
16     Casagrande, by Jennifer Hogan of counsel.  I
17     have been informed that my Respondent is delayed
18     in traffic, and I apologize.  But he is on his
19     way and should be here shortly.
20     THE HEARING OFFICER:  And while we
21     also await for the appearance of the
22     Department's attorney, let's go off the record.
23     Thank you.
24     [OFF THE RECORD, Awaiting Respondent
25     and Department]

**5**

1      JEAN RICHARD SEVERIN - 5/24/16
2      [Whereupon Respondent Exhibit 1 is
3      admitted into evidence]
4      THE HEARING OFFICER:  What I'd like to
5      do at this prehearing conference, which is my
6      practice throughout, is to have the Department
7      go through the demand paragraph by paragraph,
8      just identifying the paragraph number, and let
9      us kindly know what the Department's position
10     is.  If at any time the Respondent wishes to be
11     heard in response to the Department's position,
12     please speak up.  And I'll also, of course, give
13     the Respondent, at the conclusion, an
14     opportunity to be heard as well.  Mr. Francis,
15     turning your attention to Respondent's Exhibit
16     1, if you could begin with paragraph 1.
17     MR. FRANCIS:  With respect to all
18     specifications, paragraph 1, "Identify all
19     witnesses the Department intends to call to give
20     testimony during its case; and for each witness
21     identify all allegations to which the witness
22     will testify; for each such witness state his or
23     her relationship to the Department, i.e.,
24     investigator, student, parent of student, etc."
25     With respect to paragraph 1, the witness list

6

JEAN RICHARD SEVERIN - 5/24/16
will be provided before trial. With respect to
the request for the relationship of said witness
to the Department, we will provide that
information as well at trial. Number 2,
paragraph number 2, "Produce copies of any and
all documents which the Department intends to
introduce as exhibits in this proceeding." The
Department agrees to provide such information.
Paragraph 3, "Produce copies of all
correspondence, statements, notes, pictures,
memoranda, tape recordings, videotapes, reports,
and documents referring to the incidents alleged
in the specifications." The Department agrees
to the extent that such items exist. Paragraph
number 4, "Produce copies of all school records
of those students whom the Department intends to
call as witnesses, including but not limited to
each student's cumulative records, guidance
reports, attendance records, disciplinary
records, admission records, special education
records, anecdotal files, records supplied from
other schools or other institutions which the
students may have attended, and psychological
and social work records." The student records--

7

JEAN RICHARD SEVERIN - 5/24/16
the Department's position is that the student
records will be provided to the Arbitrator for
an in-camera inspection, and the Department will
be guided by the Arbitrator's decision. Number
5, "Produce for inspection and copying all files
and documents referring to Respondent maintained
by the administrator of Urban Action Academy
District 18 or the Department." With respect to
number 5, the Department's position is as
follows. Respondent is entitled to request his
personnel file directly from the school. Should
Respondent require assistance in obtaining such
records, the Department will assist with a phone
call or an email to the school to assist.
      MS. HOGAN:  May I respond?
      THE HEARING OFFICER:  Certainly.
      MS. HOGAN:  So, at this time, that
request has been made, and it's my understanding
the personnel file has not yet been provided.
And so if Department's counsel could assist in
making that request and to have the principal
inform the Respondent as to when the personnel
file will be available for pick up, I'd
appreciate that.

8

JEAN RICHARD SEVERIN - 5/24/16
      MR. FISHER:  No problem.  Number 6,
"Produce copies of any and all written policies,
guidelines, directives, contracts, rules, and
regulations which are relevant to the
allegations as described in the specifications,
and provide copies of any and all receipts or
acknowledgements indicating that Respondent
received such written policies, guidelines,
directives, contracts, rules, or regulations."
The Department's position is that the Respondent
has been provided school handbooks and
regulations at the beginning of each school
year, as are all pedagogues.  Acknowledgements
of receipt of such documents will be provided.
Number 7, "Produce copies of any and all
exculpatory evidence or information regarding
the allegations in the specifications."  The
Department is unaware of any exculpatory
evidence in this matter.  However, should such
evidence present itself, the Department will
provide Respondent with same pursuant to the
rules of discovery.  Number 8, "Provide copies
of all records and reports pertaining to the
Respondent in the possession of the Office of

9

JEAN RICHARD SEVERIN - 5/24/16
Special Investigation of the Department,
including but not limited to all reports,
summaries, notes, memoranda, correspondence, and
communication, including communication sent
and/or received by electronic mail, original
interview notes, typed reports, chronological
reports, statements, affidavits, photographs,
tape recordings, video recordings, and all other
writings." Said records will be provided unless
deemed attorney work product.  Number 9,
"Provide copies of all records and reports
pertaining to the Respondent in the possession
of the Special Commission of Investigations,
including but not limited to all reports,
summaries, notes, memoranda, correspondence, and
communications, including communications sent
and/or received by electronic mail, original
interview notes, typed reports, chronological
reports, statements, affidavits, photographs,
tape recordings, video recordings, and all other
writings." Said records will be provided unless
deemed attorney work product.
      THE HEARING OFFICER:  Number 10
appears to be the same as number 9, but it

10

1    JEAN RICHARD SEVERIN - 5/24/16
2    applies to the Office of Equal Opportunity.
3            MR. FRANCIS:  Would the Arbitrator
4    like me to read the entire paragraph?
5            THE HEARING OFFICER:  No.
6            MR. FRANCIS:  It's understood that
7    this pertains to the Office of Equal
8    Opportunity.  And the Department's response to
9    number 10 is said records will be provided
10   unless deemed attorney work product.  Number 11,
11   "Identify all individuals who investigated the
12   conduct alleged in the specifications and
13   provide all recommendations, reports, memoranda,
14   correspondence, notes, and all other records
15   received or produced in the investigations."
16   The Department will identify said individuals
17   alleged in the specifications, reports--
18           THE HEARING OFFICER:  [Interposing]
19   All right.  Let's just go off the record for a
20   moment.
21           [OFF THE RECORD, Sidebar]
22           [ON THE RECORD, Sidebar]
23           THE HEARING OFFICER:  Mr. Francis.
24           MR. FRANCIS:  I'll reread number 11
25   for continuity purposes of paragraph number 11.

11

1    JEAN RICHARD SEVERIN - 5/24/16
2    "Identify all individuals who investigated the
3    conduct alleged in the specifications and
4    provide all recommendations, reports, memoranda,
5    correspondence, notes, and all other records
6    received or produced in the investigation."  The
7    Department will identify said individuals
8    alleged in the specifications and reports and
9    pursuant to and according to the rules of
10   discovery.  Paragraph number 12, "Specify the
11   identity of any persons who were present during
12   the course of the alleged conduct or whom the
13   Department believes may have observed the
14   conduct alleged; to those so present, please
15   provide names, addresses, and phone numbers."
16   With respect to number 12, paragraph number 12,
17   the Department will identify said individuals
18   alleged in the specifications and reports and
19   pursuant to and according to the rules of
20   discovery.  With respect to addresses and phone
21   numbers, it's the Department's position that
22   addresses and phone numbers of all persons
23   affiliated with the school, the names and
24   addresses will be that of the school itself.
25   With respect to other witnesses that may be from

12

1    JEAN RICHARD SEVERIN - 5/24/16
2    SCI, OEO, OSI, the same will apply for their
3    office address and phone number.  Paragraph
4    number 13 with respect to Specification number
5    1, "Identify every witness who observed the
6    alleged incidents set forth in this
7    specification and provide his or her address and
8    phone number."  With respect to Specification
9    number 1, the specifications themselves
10   articulate Respondent's... Withdrawn.  With
11   respect to this request, the Department will
12   identify witnesses who observed the alleged
13   incidents set forth in this specification, and
14   the witness that will testify, his address and
15   phone number will be presented, or provided,
16   rather, as the name and address, the address and
17   phone number at the school.  Paragraph number 14
18   with respect to Specification 1, paragraph
19   number 14, "Identify all individuals who
20   investigated the conduct alleged in the
21   specifications and provide all recommendations,
22   reports, memoranda, correspondence, notes, and
23   all other records received or produced in that
24   investigation."  With respect to this request,
25   the Department will provide the requested

13

1    JEAN RICHARD SEVERIN - 5/24/16
2    information, save student information that will
3    be provided to the Arbitrator for an in-camera
4    inspection.  And the addresses of the witnesses
5    shall be the address of the school.  Of course,
6    all of the above will be guided by the rules of
7    FERPA with respect to students.  In addition,
8    the specifications are clear as to what is
9    alleged, and the information will be gleaned at
10   trial from the witnesses.  Number 15, "Provide
11   Respondent's teaching schedule for April 4th,
12   2016."  That will be provided as part of our
13   discovery.  With respect to Specification number
14   2, paragraph 16, "Identify every witness who
15   observed the alleged incidents set forth in this
16   specification and provide his or her address and
17   phone number."  The Department will provide a
18   witness list that sets forth, that will present
19   evidence that's set forth in Specification
20   number 2.  The names and addresses, of course,
21   will be the school.  The address and phone
22   number will be the address and phone number of
23   the school.  Number 17, "Identify all
24   individuals who investigated the conduct alleged
25   in the specification and provide all

14

JEAN RICHARD SEVERIN - 5/24/16
1  JEAN RICHARD SEVERIN - 5/24/16
2  recommendations, reports, memoranda,
3  correspondence, notes, and all other records
4  received or produced in that investigation."
5  The Department will provide such information
6  unless such documents are deemed work product,
7  attorney work product. Number 18, "Identify the
8  students referred to in the specification." The
9  names of the students will be provided redacted
10  to… Withdrawn. The names of the students will
11  be identified after an in-camera inspection of
12  the students' names and records by the
13  Arbitrator. And the Department will be guided
14  by the Arbitrator's decision.
15        MS. HOGAN: May I respond to that?
16        THE HEARING OFFICER: Certainly.
17        MS. HOGAN: So this request simply
18  asks for the identity of the students referred
19  to in the specification and not for any
20  additional student records pertaining to those
21  students. And the request is relevant and
22  material to the Respondent's defense of the
23  charge which indicates that the Respondent
24  failed to adhere to the cell phone policy when
25  he allowed students to use cell phones. And so

15

1  JEAN RICHARD SEVERIN - 5/24/16
2  the identity of the students is germane to the
3  discovery request. And I request that the
4  information be provided without an in-camera
5  inspection.
6        THE HEARING OFFICER: Mr. Francis, why
7  is an in-camera inspection needed with regard to
8  just the identities of the students?
9        MR. FRANCIS: The Department will
10  provide such information.
11        THE HEARING OFFICER: Thank you.
12        MR. FRANCIS: Number 19, "Provide the
13  class roster for the class of students referred
14  to in the specifications." Now, with respect to
15  number 19, a class roster will be provided that
16  identifies the students named in the request
17  for, in paragraph 18. The class roster for
18  those individuals who did not witness anything
19  will be redacted.
20        MS. HOGAN: So I have a response to
21  that as well. So this request asks for the
22  class roster of every student in the class
23  concerning the specification--I'm sorry--
24  concerning Specification 2. And so that is,
25  that information is relevant to the Respondent's

16

1  JEAN RICHARD SEVERIN - 5/24/16
2  defense, and it's relevant in terms of a
3  discovery request and no redaction should occur
4  by the Department. The entire roster should be
5  provided to the Respondent so that he can
6  properly defend against the charges. That
7  roster may include witnesses who could
8  articulate that there's no violation of the cell
9  phone policy or that students in that class did
10  not use the cell phone policy. And so, simply
11  for discovery purposes, that information is
12  relevant and germane to the request.
13        MR. FRANCIS: I'll be guided by the
14  Arbitrator's decision in this request.
15        THE HEARING OFFICER: I'm going to
16  direct the Department to disclose the class
17  roster. It strikes me as a standard requested
18  discovery.
19        MR. FRANCIS: And the Department will
20  adhere to the Arbitrator's decision. Number 20,
21  "Provide the school's cell phone policy referred
22  to in the specification." The Department will
23  provide such documentation to the extent that it
24  exists. With respect to Specification 3,
25  "Identify every witness who observed the alleged

17

1  JEAN RICHARD SEVERIN - 5/24/16
2  incident set forth in this specification and
3  provide his or her address and phone number."
4  The Department will provide the witness list
5  pertaining to Specification number 3. The name,
6  rather, the address and phone number shall be
7  that of the school wherein this common planning
8  meeting occurred. Paragraph number 22 with
9  respect to Specification number 3, "Identify all
10  individuals who investigated the conduct alleged
11  in this specification and provide all
12  recommendations, reports, memoranda,
13  correspondence, notes, and all other records
14  received or produced in that investigation."
15  Such information will be provided to the
16  Department except that information which is
17  deemed attorney work product. With respect to
18  Specification 4, paragraph number 23, "Identify
19  every witness who observed the alleged incident
20  sort forth in this specification and provide his
21  or her address and phone number." The
22  Department will provide a witness list to the
23  Respondent. The name, rather, the address and
24  phone number will be that of the school.
25  Paragraph number 24 with respect to

18

1    JEAN RICHARD SEVERIN - 5/24/16
2    Specification number 4, "Identify all
3    individuals who investigated the conduct alleged
4    in this specification and provide all
5    recommendations, reports, memoranda,
6    correspondence, notes, and all other records
7    received or produced in that investigation."
8    The Department will provide such information
9    except that information which the Department
10   determines to be attorney work product.  Number
11   25, "Provide the school policy and written
12   directives referred to in the specifications."
13   The Department will provide such information.
14   With respect to Specifications 5, 6, and 7,
15   "Identify every witness who observed the alleged
16   incident set forth in this specification and
17   provide his or her address and phone number."
18   The witness list will be provided to Respondent.
19   The address and phone number shall be that of
20   the school.  Number 27, "Identify all
21   individuals who investigated the conduct alleged
22   in this specification and provide all
23   recommendations, reports, memoranda,
24   correspondence, notes, and all other records
25   received or produced in that investigation."

19

1    JEAN RICHARD SEVERIN - 5/24/16
2    Such information will be provided by the
3    Department except that information that the
4    Department determines to be attorney work
5    product.  With respect to Specification 8,
6    paragraph 28, "Identify every witness who
7    observed the alleged incident set forth in this
8    specification and provide his or her address and
9    phone number."  The identity of such witnesses
10   will be provided to Respondent.  The address and
11   phone number shall be that of the school.
12   Paragraph 29 with respect to Specification 8,
13   "Identify all individuals who investigated the
14   conduct alleged in this specification and
15   provide all recommendations, reports, memoranda,
16   correspondence, notes, and all other records
17   received or produced in that investigation."
18   The Department will provide the names of
19   individuals--will identify all individuals who
20   investigated the conduct alleged in this
21   specification and will provide that which is
22   requested except that information that the
23   Department determines to be attorney work
24   product.  Paragraph 30 with respect to
25   Specification 8, "Identify the students referred

20

1    JEAN RICHARD SEVERIN - 5/24/16
2    to in the specification."  The Department will
3    provide that information.  Now, just as a
4    caveat, the Department will provide that
5    information to the extent that it is available
6    to the Department from the school, from the
7    administrators, or principals, or other
8    individuals at the school.  With respect to
9    Specifications 9, 10, and 15, "Identify every
10   witness who observed the alleged incident set
11   forth in this specification and provide his or
12   her address and phone number."  The Department
13   will provide the names--will identify these
14   witnesses.  The names, the address, rather, and
15   phone numbers will be that of the school.
16   Paragraph 32, "Identify all individuals who
17   investigated the conduct alleged in the
18   specification and provide all recommendations,
19   reports, memoranda, correspondence, notes, and
20   all other records received or produced in that
21   investigation."  The Department will provide the
22   identity of these individuals and provide the
23   documents requested except for those documents
24   deemed attorney work product.  Paragraph 33,
25   "Provide Respondent's time cards for dates

21

1    JEAN RICHARD SEVERIN - 5/24/16
2    referred to in the specifications."  The
3    Department will provide the time cards for the
4    dates referred in the specifications.  With
5    respect to Specifications 11, 12, 13, 14, 16,
6    17, and 18, paragraph 34, "Identify every
7    witness who observed the alleged incidents set
8    forth in this specification and provide his or
9    her address and phone number."  The identity of
10   these witnesses will be provided.  The address
11   and phone number will be that of the school.
12   Paragraph 35, "Identify all individuals who
13   investigated the conduct alleged in this
14   specification and provide all recommendations,
15   reports, memoranda, correspondence, notes, and
16   all other records received or produced in that
17   investigation."  The Department will provide the
18   identity of these individuals and provide these
19   reports except those documents that the
20   Department determines to be attorney work
21   product.  Paragraph 36, "Identify the directives
22   referred to in the specification."  The
23   Department, through its witnesses, will provide
24   the directives referred to in these
25   specifications at trial.

22

1    JEAN RICHARD SEVERIN - 5/24/16
2         MS. HOGAN:  So may I respond that?
3         THE HEARING OFFICER:  Certainly.
4         MS. HOGAN:  To the extent that there
5    are any written directives, the Respondent
6    requests that those written directives be
7    produced.  I understand that the Department's
8    response is that the testimony will identify the
9    directives, but, to the extent that there's
10   anything produced in writing, I'd request that
11   in discovery.
12        MR. FRANCIS:  The Department will
13   comply with that request.  Should there be
14   written directives, that will be provided.
15   Paragraph 37, "Identify the administrators
16   referred to in this specification."  The
17   Department will provide that information.
18        THE HEARING OFFICER:  Would the
19   Respondent like to be heard at this time?
20        MS. HOGAN:  No.
21        THE HEARING OFFICER:  At this time,
22   during the prehearing conference, it's really up
23   to the Hearing Officer to address the issue of
24   scheduling.  I know that there is at least one
25   other case ahead of this one.  So it's hard for

23

1    JEAN RICHARD SEVERIN - 5/24/16
2    me to know with any precision when we can, in
3    fact, schedule this case.  I know and trust that
4    the parties will continue to communicate with
5    the Hearing Officer as we approach the first day
6    of hearing in this matter in order that we can
7    all be on the same page as to when this case
8    will, in fact, start.  Unless there's anything
9    else that needs to be addressed, I will deem
10   this prehearing conference to be concluded.
11   Thank you all.  Let's go off the record.
12        (The hearing adjourned at 10:30 a.m.)

24

CERTIFICATE OF ACCURACY

I, Melissa Strickland, do hereby certify that the
foregoing typewritten transcript of proceedings in the
matter of New York City Department of Education v. Jean
Richard Severin, File No. 29,298 was prepared using the
required transcription equipment and is a true and
accurate record of the proceedings to the best of my
ability. I further certify that I am not connected by
blood, marriage or employment with any of the parties
herein nor interested directly or indirectly in the matter
transcribed.
Signature: _____
Date: _____ __ __May 31, 2016__ _____

25

Student Index

None

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
JEAN RICHARD SEVERIN
Section 3020-a Education Law Proceeding (File #29,298)


DATE:            June 24, 2016

TIME:            12:00 p.m. to 17:00 p.m.

LOCATION:        NYC Department of Education
                 Office of Legal Services
                 100 Gold Street, 3rd Floor
                 New York, NY 10038

BEFORE:          JAMES BROWN, ESQ.
                 HEARING OFFICER

APPEARANCES:    FOR THE COMPLAINANT:
                 MICHAEL FRANCIS, ESQ., of Counsel
                 NYC Department of Education
                 Office of Legal Services
                 49-51 Chambers Street
                 New York, NY  10007
                 Telephone:  (212) 374-6741
                 mfrancis@schools.nyc.gov

                FOR THE RESPONDENT:
                 ALAIN MASSENA, ESQ., of Counsel
                 Office of Richard E. Casagrande
                 52 Broadway, 9th Floor
                 New York, New York 10004
                 Telephone: (212) 533-6300
                 avm@massenalaw.com

Table of Contents
            O P E N I N G   S T A T E M E N T                     1
NAME:                      PAGE:                                   2
M. Francis                 5                                       3
            W I T N E S S   E X A M I N A T I O N                  4
NAME:                      PAGE:                                   5
J. Barnett                                                        6
Direct                     33                                     7
Voir Dire                  36                                     8
Direct                     38                                     9
Voir Dire                  39                                    10
Cross                      49                                    11
Re-Direct                  71                                    12
Re-Cross                   72                                    13
S. Dorcely                                                       14
Direct                     74                                    15
Voir Dire                  81                                    16
Direct                     82                                    17
Voir Dire                  97                                    18
Direct                     98                                    19
Voir Dire                  100                                   20
Direct                     100                                   21
Voir Dire                  117                                   22
Direct                     119                                   23
            C L O S I N G   S T A T E M E N T                     24
NAME:                      PAGE:                                  25
            E X H I B I T S
RESPONDENT        DESCRIPTION        I.D.   IN EV.

JEAN SEVERIN - 06/24/16                          29
    (The hearing commenced at 12:00 p.m.)
    [Background noise]
    THE HEARING OFFICER:  Good morning, my name is James K. Brown or I should say good afternoon.  I am the Hearing Officer duly appointed pursuant to New York pursuant to New York State Education Law Extension 3020(a) Rules and Regulations as well as a contractual provisions by and between United Federation of Teachers and New York City Department of Education.  We are here today for a first day of hearing in the matter of Jean Richard Severin, SED File No. 29298.  If we could kindly note our appearances beginning on my left?
    MR. MICHAEL A. FRANCIS:  Before the Department of Education, Michael A. Francis.
    MR. ALAIN MASSENA:  For the respondent, Jean Richard Severin, Alain Massena, M-A-S-S-E-N-A.
    THE HEARING OFFICER:  And I understand the respondent's also on the floor with us.  Is that correct?
    MR. MASSENA:  That is correct.
    THE HEARING OFFICER:  All right.

Table of Contents
DEPARTMENT OF EDUCATION  DESCRIPTION          I.D.   IN EV.    1
1     Specifications                    29     30               2
2     Chancellor's Regulations          30     30               3
3     Sign-out Sheet                    35     39               4
4     Disciplinary Letter to File       41     42               5
5     Disciplinary Letter and           44     47               6
      Informal Observation Report                               7
      by Barnett                                                8
6     Handwritten Notes for Informal    44     48               9
      Observation Dated 10/29/15                               10
      For Dr. Severin                                          11
7     Daily Docket                      77     79              12
8     Faculty Handbook                  80     82              13
      For 2014-2015                                            14
9     Faculty Handbook for 2015-2016    80     82              15
10    Cellphone Policy                  83     84              16
11    Principal Dorcely's Documentation 86     86              17
      From Disciplinary Meeting                                18
12    Statement from Students Regarding 88     93              19
      Cellphone Policy                                         20
13    Daily Attendance Sheet Dated      94     95              21
      2/5/16 for Global Studies                                22
14    Attendance Sheet for Common       96     98              23
      Planning Room 101 Dated 12/23/15                         24
15    Disciplinary Letter               99    100              25
16    Email to Severin Lights Off In   102    103
      Classroom
17    Email From Dorcely Regarding     105    110
      Common Planning Time Structure
18    Three Disciplinary Conference    113    115
      Letters Regarding Absence
      For Common Planning Time
19    Disciplinary Letter Regarding    117    117
      Not Signing Out on Staff
      Sheet
20    Disciplinary Meeting Letter      122    130
      Requesting Mid-Term

JEAN SEVERIN - 06/24/16                          30
While we wait the Department's first witness in this matter, let's now go off the record, thank you.
    [OFF THE RECORD]
    [ON THE RECORD]
    THE HEARING OFFICER:  Okay.  Let's go on the record.  Okay, so we're back on the record in this matter, and I will note that the respondent has joined us.  Good afternoon to you Dr. Severin.
    DR. JEAN SEVERIN:  Good afternoon, sir.
    THE HEARING OFFICER:  As a preliminary matter, it's understanding that the Department would like to at this time offer a couple of documents into evidence, Mr. Francis?
    MR. FRANCIS:  That's correct, thank you.  First and foremost, the next step the Specifications we move into evidence.  There's copy for the arbitrator, and I have a copy for the respondent acknowledges that -- [00:01] Department's 1.
    THE HEARING OFFICER:  Okay.  Is there any objection to Department 1 going into

31

JEAN SEVERIN - 06/24/16
1   evidence?
2   
3        MR. MASSENA:  No objection.
4        THE HEARING OFFICER:  All right.  So
5   Department 1 is in evidence.
6        MR. FRANCIS:  In addition, Department
7   would like to introduce into evidence at this
8   time the Chancellor's Regulation 84-12, and I
9   have a copy for the arbitrator and a copy for
10  respondent.
11       THE HEARING OFFICER:  Is there any
12  objection to Department's 2 as being admitted
13  into evidence?
14       MR. MASSENA:  No objection.
15       THE HEARING OFFICER:  All right.  So
16  Department 2 is now in evidence.  Any other
17  documents at this time?
18       MR. FRANCIS:  Not at this time.
19       THE HEARING OFFICER:  Would the
20  Department like to make an opening statement?
21       MR. FRANCIS:  Yes.  At this juncture,
22  we're -- [00:03] on the 18 Specifications in
23  Department's 1 in evidence, and I will just read
24  the specifications.
25       THE HEARING OFFICER:  Well, the

32

JEAN SEVERIN - 06/24/16
1   Specifications are in evidence.  I don't mean to
2   interrupt, so I don't think that you need to
3   read them into the record.  They're now in
4   evidence as Department's 1.
5        MR. FRANCIS:  The Department intends
6   to prove beyond preponderance of evidence 18
7   charges against the respondent, Jean Severin.
8   The Department will introduce a number of
9   witnesses that will support these charges.  We
10  will hear from Ms. Jordan Barnett who is the
11  Assistant Principal.  We will hear from Steven
12  Dorsey [phonetic] who's the Principal, and we
13  will identify the IT Specialist who will
14  introduce certain evidence in this case.  At the
15  end of Department's case, the Department will
16  ask you, the arbitrator, to find for the
17  Department on each and every specification that
18  we shall prove, and at the end of the day, we
19  ask that in terms of penalty for these, we just
20  ask that the respondent be terminated.
21       THE HEARING OFFICER:  Okay.  Thank you
22  very much.  Would the respondent at this time
23  like to make an opening?
24       MR. MASSENA:  Respectfully, the

33

JEAN SEVERIN - 06/24/16
1   respondent reserves the right to make up his
2   opening prior to -- [00:01].
3        THE HEARING OFFICER:  Understood.
4   Let's go off the record while we get the
5   Department's witness.
6        [OFF THE RECORD]
7        [ON THE RECORD]
8        THE HEARING OFFICER:  With everyone's
9   consent, let's go back on.  All right, Mr.
10  Francis, I see the Department has its first
11  witness for this afternoon.  If you could kindly
12  introduce to us?
13       MR. FRANCIS:  At this time, the
14  Department calls Assistant Principal, Jordan
15  Barnett.
16       THE HEARING OFFICER:  Okay.  And if
17  you could spell your name for us, Ms. Barnett.
18       MS. JORDAN BARNETT:  Jordan, J-O-R-D-
19  A-N, Barnett, B-A-R-N-E-T-T.
20       THE HEARING OFFICER:  Thank you.  If
21  you could raise your right hand.  Do you
22  solemnly swear or affirm to tell the truth at
23  this proceeding?
24       MS. BARNETT:  Yes, I do.

34

JEAN SEVERIN - 06/24/16
1        THE HEARING OFFICER:  Mr. Francis, --
2   [00:01].
3        MR. FRANCIS:  Yes, thank you.
4   DIRECT EXAMINATION
5   BY MR. FRANCIS
6        Q.  Ms. Barnett, would you please tell the
7   Arbitrator whom you're employed by.
8        A.  I'm employed by the New York City
9   Department of Education.
10       Q.  And how long have you been so employed?
11       A.  Since August, 2006.
12       Q.  Okay.  And what schools have you worked at?
13       A.  I'm worked at August Martin High School.  I
14  worked at John Adams High School, Middle School 226
15  and current Urban Action Academy.
16       Q.  And how long have you been at Urban Action
17  Academy?
18       A.  This is the end of my third year.
19       Q.  Okay.  And what is your title at Urban
20  Action Academy?
21       A.  I'm the Assistant Principal.
22       Q.  And what are your duties and
23  responsibilities as an assistant principal?
24       A.  I supervise the guidance department,

35

```
1          BARNETT - DIRECT - FRANCIS
2   special education department, compliance and
3   instruction, ESL, foreign language, all operations
4   including attendance, policies, anything to do with
5   the main office--what else is there--testing
6   coordinator, and I believe that might be it.
7       Q.  Okay.  Do you know of an individual by the
8   name of Jean Severin?
9       A.  Yes.
10      Q.  And how do you know Jean Severin?
11      A.  He's one of our teachers at Urban Action
12  Academy.
13      Q.  Okay.  And how long have you known
14  respondent Jean Severin?
15      A.  Two years.
16      Q.  Okay.  As part of your duties and
17  responsibilities, are you also responsible for doing
18  observations formal and/or informal observations of
19  teachers?
20      A.  Yes, for instruction, yes.
                                          th
21      Q.  And on or about April 4 , 2016, did there
22  come a time when as the respondent, Severin left the
23  school facility?
24      A.  Yes.
25      Q.  Approximately what time did he leave the
```

36

```
1          BARNETT - DIRECT - FRANCIS
2   facility?
3       A.  It was period six, so that was about 12:20.
4       Q.  Okay.
5           MR. FRANCIS:  And I have in my hand a
6   one-page document that I ask be marked
7   Department's 3 for identification.  I have a
8   copy for the arbitrator and have a copy for the
9   respondent.
10          THE HEARING OFFICER:  All right.  So
11  I'm going to mark this as Department 3 for
12  identification.
13      Q.  Now with respect to Department's 3, do you
14  recognize Department's 3 for identification?
15      A.  Yes.
16      Q.  And what do you recognize it to be?
17      A.  This is our staff sign-in sheet for Urban
18  Action Academy--
19      Q.  [Interposing] Okay.
20      A.  --sorry, our sign-out sheet.
21      Q.  Okay.  Now with respect to this data sign-
22  out sheet, does respondent Severin's name and/or
23  signature appear on the document?
24      A.  Yes.  It appears fifth line from the
25  bottom.
```

37

```
1          BARNETT - DIRECT - FRANCIS
2       Q.  Okay.  And what time is indicated on the
3   sign-out sheet for respondent Severin?
4       A.  12:20.
                                          th
5       Q.  And that's on April 4 , correct?
6       A.  Yes, that's correct.
7       Q.  All right.
8           MR. FRANCIS:  I'd ask that
9   Department's 3 for identification be moved into
10  evidence at this time.
11          MR. MASSENA:  Brief opportunity to
12  voir dire?
13          THE HEARING OFFICER:  Absolutely.
14          MR. MASSENA:  Thank you.
15  VOIR DIRE EXAMINATION
16  BY MR. MASSENA
17      Q.  Assistant Principal, Barnett--
18      A.  [Interposing] Yes.
19      Q.  --my name is Alain Massena.  I represent
20  the Dr. Severin.  I'm just going to ask you a few
21  questions.  How is this staff sign-out sheet how is
22  it maintained?
23      A.  It's maintained in a binder in the main
24  office.
25      Q.  Okay.  And by whose responsibility is it to
```

38

```
1          BARNETT - VOIR DIRE - MASSENA
2   maintain the school sign-out sheet?
3       A.  The school secretary.
4       Q.  Okay.  And what is the school's secretary's
5   name?
6       A.  Beverly Townsend.
7       Q.  Okay.  And it's Ms. Townsend's
8   responsibility to make sure that this is in order?
9       A.  Yes.
10      Q.  And there's no opportunity to fabricate or
11  any opportunity, well, there's no opportunity to
12  fabricate?  That's Ms. Townsend's responsibility?
13      A.  Yes.
14      Q.  Okay.
15          MS. MASSENA:  I object to this being
16  offered into evidence.
17          THE HEARING OFFICER:  On what grounds,
18  sir?
19          MR. MASSENA:  There hasn't been a
20  proper foundation.
21          THE HEARING OFFICER:  Mr. Francis?
22          MR. FRANCIS:  There is a proper
23  foundation that has been laid.
24          THE HEARING OFFICER:  Is the
25  Department offering this document Mr. Francis as
```

39

```
1        BARNETT - VOIR DIRE - MASSENA
2    a business record?
3           MR. FRANCIS:  That's correct.
4           THE HEARING OFFICER:  All right.  Why
5    don't you lay a foundation for that, and I'll
6    revisit this.
7    DIRECT EXAMINATION
8    BY MR. FRANCIS
9        Q.  Is staff sign-out sheet kept in the
10   ordinary course of business of the school?
11       A.  Absolutely.
12       Q.  Is the writing on this document
13   contemporaneously done when the teacher sign the
14   document?
15       A.  Yes.  It's done as they sign out.
16       Q.  And is that done in the ordinary course of
17   business of at the school?
18       A.  Yes.
19       Q.  Is the document maintained at the school in
20   the ordinary course of business at the school?
21       A.  Yes, it is.
22          MR. FRANCIS:  At this time, I'd ask
23   that the Department's 3 for identification be --
24   [00:01] into evidence as a business record at
25   this time.
```

40

```
1        BARNETT - DIRECT - FRANCIS
2           THE HEARING OFFICER:  Mr. Massena,
3    I'll allow you to be heard if you like.
4    VOIR DIRE EXAMINATION
5    BY MR. MASSENA
6        Q.  In maintaining this document, Assistant
7    Principal Barnett once again it's not your
8    responsibility.  Is that correct?
9        A.  I oversee the school secretary.
10       Q.  How do you do so?
11       A.  I'm her supervisor.
12       Q.  Okay.  And how often do you oversee her?
13       A.  Every day, I'm in charge of operations.
14   She's part of the operational team as far as the
15   daily ongoings of the day, and this is one of her
16   responsibilities.
17          MR. MASSENA:  I'll withdraw the
18   objection at this time.
19          THE HEARING OFFICER:  All right.
20   Department 3 is in evidence.
21   DIRECT EXAMINATION
22   BY MR. FRANCIS
23       Q.  In addition to your duties and
24   responsibilities, are you also required to perform
25   the formal and/or informal observations of teachers?
```

41

```
1        BARNETT - VOIR DIRE - MASSENA
          BARNETT - DIRECT - FRANCIS
2        A.  Yes.
3        Q.  And how often is that done?
4        A.  That's done regularly.  I'm going to say it
5    could be monthly or bi-monthly.  It depends.  A
6    teacher may select to have four observations be
7    selected at the end of the year, or they select six
8    observations, so we do based on what they select.  So
9    it could be monthly, could be bi-monthly.
10       Q.  With respect to specification one--let's
11   refer to specification one as that is on or about
12   April 4 , 2016, it indicates that the respondent
13   signed out and left the school building without
14   approval at 12:20 p.m. and did not return at this
15   post assignments period seven prep and period eight
16   law class, and it shows you the sign-out sheet which
17   is now in evidence as Department's 3 in evidence.  As
18   a result of the respondent Severin signing out of the
19   building and not returning, did you have a what is
20   called a disciplinary meeting with respondent
21   Severin?
22       A.  Yes.
23       Q.  And was that meeting held on April 13 ,
24   2016?
25       A.  Yes, it was.
```

42

```
1        BARNETT - DIRECT - FRANCIS
2        Q.  Okay.  And is that meeting memorialized in
3    any way?
4        A.  Yes, it is.
5        Q.  Okay.  I'm going to show you what is now
6    marked Department's 4 for identification.
7           MR. FRANCIS:  And I have copy for the
8    arbitrator, and I a copy for the respondent.
9           THE HEARING OFFICER:  Okay.  So I'll
10   mark this as Department's Exhibit 4 for
11   identification.
12       Q.  And I'm going to show you Department's 4
13   for identification and ask you if you recognize this
14   document.
15       A.  Yes, I recognize.
16       Q.  And what do you recognize it to be?
17       A.  This is a disciplinary letter to file.
18   This is how I memorialized our disciplinary meeting
19   that I wrote.
20       Q.  Okay.  And is that your signature towards
21   the bottom of the Department's 4 for identification?
22       A.  Yes, I signed this.
23       Q.  And also, is there another signature at the
24   bottom of Department's 4 for identification?
25       A.  Yes.  The second signature is.
```

43

```
 1        BARNETT - DIRECT - FRANCIS
 2    Q.  And whose signature is that?
 3    A.  Dr. Severin.
 4    Q.  And I see that there's a date next to the
 5  signature of respondent, and what date is that?
                                        th
 6    A.  That is April 14 , 2016.
 7    Q.  Okay.
 8        MR. FRANCIS:  I ask that Department's
 9  4 for identification be moved into evidence at
10  this time.
11        MR. MASSENA:  No objection.
12        THE HEARING OFFICER:  Department 4 is
13  in evidence.
14    Q.  I draw your attention to specification 11
                                        nd
15  which indicates on or about November 22 , 2015
16  respondent failed to follow directly given by
17  administration by period 211 plans for three weeks to
18  administration.
19        MR. FRANCIS:  I have in my hand --
20  [00:01] documents for which I have a copy for
21  the arbitrator and a copy for respondent.
22        THE HEARING OFFICER:  Okay.  I have
23  marked as Department's Exhibit 5 for
24  identification.
25    Q.  As part of your duties and
```

44

```
 1        BARNETT - DIRECT - FRANCIS
 2  responsibilities, are you also responsible formal
 3  and/or informal observations?
 4    A.  Yes.  I'm responsible for both.
 5    Q.  Okay.  Did you in fact do an informal
                                        th
 6  observation of respondent Severin on October 29 ,
 7  2015?
 8    A.  Yes.
 9    Q.  Did you take notes during your observation?
10    A.  Yes, I did.
11    Q.  Okay.  I'm going to show you what I asked
12  to be marked Department's 5--
13        THE HEARING OFFICER:  [Interposing] 5
14  is this document already handed up.
15    Q.  --Department's 6 for identification.  Do
16  you recognize--
17        MR. FRANCIS:  [interposing] I have
18  copy for arbitrator, and I also have a copy for
19  the respondent.
20        THE HEARING OFFICER:  I will mark this
21  latest document as Department Exhibit 6 for
22  identification.
23    Q.  Do you recognize Department 6 for
24  identification?
25    A.  Yes.
```

45

```
 1        BARNETT - DIRECT - FRANCIS
 2    Q.  And what do you recognize it to be?
 3    A.  These are my handwritten notes from the
 4  informal observation for Dr. Severin.
 5    Q.  Is that for the observation that occurred
 6  on, excuse me, the observation that was on October
                                        th
 7  29 , 2015.  Is that correct?
 8    A.  That's correct, yes.
 9  [Background noise]
10    Q.  I'm going to show you also Department's 5.
11        THE HEARING OFFICER:  Let's go off the
12  record for a moment.
13        [OFF THE RECORD]
14        [ON THE RECORD]
15        THE HEARING OFFICER:  Let's go back
16  on.
17    Q.  This is Department's 5 for identification.
18  I'm going to show you 5 for identification.  Do you
19  recognize these documents?
20    A.  Yes, I do.
21    Q.  And what do you recognize those documents
22  to be?
23    A.  The one on top this is a disciplinary
24  letter from myself to Dr. Severin following a
25  disciplinary meeting.  Beneath that is the informal
```

46

```
 1        BARNETT - DIRECT - FRANCIS
 2  observation written report that I wrote with
 3  feedback.
 4    Q.  And I see at the bottom of the last page of
 5  Department's 5 for identification, I see certain
 6  signatures at the bottom of the document, correct?
 7    A.  Correct.
 8    Q.  Whose signature appears there dated
                                        th
 9  December 15 , 2015?
10    A.  The first signature is teacher's signature,
11  Dr. Severin, and the second signature is my
12  signature.
13    Q.  Okay.  At this time, I'd also like for you
14  to look at this page of Department's 5 for
15  identification.  Do you recognize that document?
16    A.  Yes.
17        THE HEARING OFFICER:  What document
18  are you showing the witness, counsel?  I'm
19  confused.
20        MR. FRANCIS:  I'm sorry.
21        THE HEARING OFFICER:  It's okay.
22        MR. FRANCIS:  Department 6.
23        THE HEARING OFFICER:  That's not 6 as
24  I have it.  I have documents that are stapled
25  together.
```

47

```
 1        BARNETT - DIRECT - FRANCIS
 2            MR. FRANCIS: It's 5.
 3            THE HEARING OFFICER: Yeah, well, also
 4   I have something that you haven't made reference
 5   to that I think you handed to me perhaps
 6   mistakenly which is an email, so let's go off
 7   the record, so we can try to straighten this
 8   out.
 9            [OFF THE RECORD]
10            [ON THE RECORD]
11            THE HEARING OFFICER: Let's go back on
12   the record. Do you want to offer this into
13   evidence now?
14            MR. FRANCIS: Yes.
15            THE HEARING OFFICER: All right. So
16   let's do that on the record, and we'll hear
17   whatever objections if any you have. Are we on?
18   Okay, have we been on all this time, so we're
19   back on the record, and it's my understanding
20   that the Department at this time would like to
21   offer Department 5 into evidence. Is that
22   correct?
23            MR. FRANCIS: That is correct.
24            THE HEARING OFFICER: Okay. Mr.
25   Massena?
```

48

```
 1        BARNETT - DIRECT - FRANCIS
 2            MR. MASSENA: No objection, Your
 3   Honor.
 4            THE HEARING OFFICER: All right. So
 5   Department 5 a multi-page document is now in
 6   evidence.
 7       Q.  With respect to Department's 5 in evidence,
 8   did you direct the respondent Severin to supply you
 9   or to schedule with you a date in time so that you
10   can offer him a support in his lesson plan
11   development?
12       A.  Yes.
13       Q.  Okay. Is that memorialized through emails?
14       A.  Yes. It is.
15       Q.  Okay. And I show you Department's 5 in
16   evidence. Are those the emails that you sent to
17   respondent Severin asking him to meet with you--
18       A.  [Interposing] Yes.
19       Q.  --and set up a time for -- [00:02] for
20   development to proceed?
21       A.  Yes.
22       Q.  Okay, thank you. And that is in support of
23   specification 11.
24            [Background noise]
25            MR. FRANCIS: I think I have not moved
```

49

```
 1   Department's 6 into evidence. I ask that
 2   Department's 6 be moved into evidence at this
 3   time.
 4            THE HEARING OFFICER: Okay, Mr.
 5   Massena.
 6            MR. MASSENA: Just a moment to take a
 7   look with my client, Your Honor?
 8            THE HEARING OFFICER: Sure.
 9            MR. MASSENA: Thank you.
10            THE HEARING OFFICER: Um-hum.
11            [Background noise]
12            MR. MASSENA: No objection.
13            THE HEARING OFFICER: All right.
14   Department's 6 is in evidence.
15            MR. FRANCIS: Nothing further at this
16   time for this witness.
17            THE HEARING OFFICER: Okay. Let's go
18   off the record for a moment.
19            [OFF THE RECORD]
20            [ON THE RECORD]
21            THE HEARING OFFICER: Let's go on the
22   record -- [00:02]. All right, so we're going to
23   just take a short break before cross-examination
24   commences. Thanks very much. Let's go back off
```

50

```
 1   the record.
 2            [OFF THE RECORD]
 3            [ON THE RECORD]
 4            THE HEARING OFFICER: And we're back.
 5   Mr. Massena, would you like to commence with
 6   your cross-examination?
 7            MR. MASSENA: Yes, -- [00:01].
 8   CROSS-EXAMINATION
 9   BY MR. MASSENA
10       Q.  Okay. Assistant Principal Barnett my
11   name's Alain Massena. I represent Dr. Severin. I'm
12   going to ask you a few questions. If you have any
13   trouble with the questions I'm asked you, just ask me
14   to repeat them. I'll be more than happy to do so.
15   Ms. Barnett, how long have you known Principal
16   Dorsey?
17       A.  Known Principal Dorsey since 2009 to
18   present.
19       Q.  Okay. And how did you meet Principal
20   Dorsey?
21       A.  We were working at John Adams together.
22       Q.  What was his role at John Adams at
23   the time that you met him?
24       A.  He was the assistant principal.
```

51

BARNETT - CROSS - MASSENA

1
2 Q. Okay. And what was your role?
3 A. I was the guidance counselor.
4 Q. And how did your relationship with him
5 progress?
6 MR. FRANCIS: Objection, relevance.
7 THE HEARING OFFICER: What you mean by
8 relationship?
9 MR. MASSENA: Their physical
10 relationship.
11 THE HEARING OFFICER: Okay. No, I'll
12 permit the question -- [00:02].
13 A. Okay. How did it progress? He was an
14 assistant principal who became a principal. I was a
15 guidance counselor who became an assistant principal
16 at 226. After John Adams, I went to 226, and once he
17 became a principal, he asked that I come on as one of
18 his assistant principals.
19 Q. Okay. And when was that?
20 A. I came I'd say August--this is three ago,
21 so this is 2016--2013.
22 Q. And as the assistant principal to Principal
23 Dorsey, what do you consider your primary role to be
24 as his assistant principal?
25 A. As far as my responsibilities--

52

BARNETT - CROSS - MASSENA

1
2 Q. [Interposing] To him?
3 A. --I supervise guidance team. I supervise
4 special ed compliance and instruction, ESL, foreign
5 language, operations, attendance, test coordinator,
6 so I'm considered his right hand person.
7 Q. So you're considered his right-hand
8 person. Is that correct?
9 A. Um-hum.
10 Q. Is it fair to say that it's responsibility
11 to support his agenda. Is that correct?
12 MR. FRANCIS: Objection.
13 THE HEARING OFFICER: Overruled.
14 A. It's my responsibilities to support his
15 goas.
16 Q. Okay. And to follow through on objectives
17 that he would like to get accomplished in the school.
18 Is that fair to say?
19 A. Yes.
20 Q. Okay. And when he's not available to
21 follow through on a particular item, you step in. Is
22 that correct?
23 A. That's correct.
24 Q. And to the best of your ability, is it fair
25 to say you act in a manner that's consistent with how

53

BARNETT - CROSS - MASSENA

1
2 he would act?
3 A. Yes.
4 Q. Okay. Now is it fair to say that over the
5 course of the last two years, that you've had--
6 withdrawn. Is it fair to say that within the last
7 two years you've had a significant amount of contact
8 with Dr. Severin?
9 A. That's fair to say.
10 Q. And is it fair to say that it's been
11 somewhat more so than some of the other teachers in
12 your school?
13 A. No.
14 Q. Now how would you describe your
15 relationship with Dr. Severin?
16 A. Professional relationship, teacher-
17 supervisor. I think that's all I can really say.
18 It's a professional relationship, and I'm a
19 supervisor.
20 Q. How would you describe the relationship
21 between Dr. Severin and Principal Dorsey?
22 A. Again, Dr. Severin and Principal Dorsey,
23 Principal Dorsey's actually Dr. Severin's direct
24 supervisor, so they have more interaction than I have
25 so professional.

54

BARNETT - CROSS - MASSENA

1
2 Q. You've had an opportunity to see them
3 interact. Is that correct?
4 A. Yes, I have.
5 Q. Okay, over the last few years?
6 A. Two years.
7 Q. Two years. And is it fair to say that at
8 certain times that relationship has been toxic?
9 A. It's fair to say.
10 Q. So it's gone beyond just professional. Is
11 that correct?
12 A. No.
13 Q. Now at some point in time, you were
14 investigated by SCI. Is that correct?
15 A. No.
16 MR. FRANCIS: Objection.
17 THE HEARING OFFICER: Mr. Massena,
18 what is the relevance?
19 MR. MASSENA: The relevance Your Honor
20 is that it's our position that many of these
21 specifications are based on a violation of --
22 [00:02].
23 THE HEARING OFFICER: Okay. So this
24 is SCI investigation that you're making
25 reference to in your question to this witness

55

BARNETT - CROSS - MASSENA
1   has something with respondent, your client?
2
3           MR. MASSENA:  Yes.
4           THE HEARING OFFICER:  All right.  I'm
5   going to overrule the objection.
6           MR. MASSENA:  Thank you.
7       Q.  Did there come a time within the last two
8   years that you were investigated by Michael Romano or
9   questioned by Michael Romano?
10      A.  I was never investigated.
11      Q.  You were questioned?
12      A.  Yeah.
13      Q.  Okay.  Did you appreciate being questioned?
14      A.  I don't mind being questioned.  It's part
15  of the job.
16      Q.  Okay.  And the line of this question was in
17  regards to the relationship between Principal Dorsey
18  and Dr. Severin.  Is that correct?
19      A.  No.  That wasn't the investigation.  That
20  wasn't the purpose of the investigation.
21      Q.  Okay.  So the investigation did involve
22  Principal Dorsey and Dr. Severin.  Is that correct?
23      A.  It didn't involve Dr. Severin as far as I
24  know directly.  I could assume it was Severin, but I
25  was never told that this Dr. Severin.

56

BARNETT - CROSS - MASSENA
1
2       Q.  Okay.  So why don't you tell us about that
3   investigation?
4           MR. FRANCIS:  Objection and I move to
5   strike this testimony.
6           THE HEARING OFFICER:  -- [00:02].
7           MR. FRANCIS:  Grounds of an SCI
8   investigation -- [00:02] already testified that
9   she was not the subject of any investigation,
10  and therefore, she can't comment on an
11  investigation that she was not a part of.
12          THE HEARING OFFICER:  Well, we don't
13  know whether she can or cannot comment on it.  I
14  think the purpose of the line of questioning is
15  find out what this witness knows.  There's been
16  a proffer made by counsel that the respondent
17  had a part to play presumably in this complaint.
18  When you say investigation, is that what's I'm
19  hearing?
20          MR. MASSENA:  Yes.
21          THE HEARING OFFICER:  Okay.  So I'm
22  going to overrule the objection, and we'll hear
23  the testimony.
24      Q.  You can answer the question.
25      A.  The investigation that I was questioned on

57

BARNETT - CROSS - MASSENA
1
2   was regarding two regents, regarding one students and
3   whether or Mrs. Beverly or any teachers who were
4   asked--it was actually any teachers were asked to
5   change grades or student recorded answers on the
6   regents.  That's what I was asked about.
7       Q.  Okay.  And one of the questions you were
8   asked specifically was whether Principal Dorsey asked
9   the teacher to change a grade.  Is that correct?
10      A.  Yes.
11      Q.  Okay.  And do you recall when you were made
12  a part of this investigation?
13          MR. FRANCIS:  Objection, witness has
14  already testified that she was not a subject or
15  part of the investigation.  She was only
16  questioned.
17          THE HEARING OFFICER:  Well, that's
18  what I heard, and then, the witness also made
19  reference to generally an investigation, but
20  it's not my understanding from the witness'
21  testimony that she was not the subject of the
22  investigation but nonetheless was questioned by
23  SCI.  That's my understanding, so if you want to
24  continue.
25      Q.  Ma'am, do you recall when you were

58

BARNETT - CROSS - MASSENA
1
2   questioned?
3       A.  I cannot recall clearly, but I'm going to
4   say it's within a year, so it could be around or
5   January or February.
6       Q.  Of 2014 or 2015?
7       A.  2015, December and maybe January, February,
8   2016.  I can't recall clearly, but it's definitely
9   this school year, and it's mid-school year.
10      Q.  And to your knowledge, do you know whether
11  or not Principal Dorsey was also questioned in
12  regards to this investigation?
13      A.  I believe he was.
14      Q.  Did the information or the news of this
15  investigation spread throughout the school?  Do you
16  know if other teachers knew about the investigation?
17      A.  I believe other teachers were questioned
18  about this investigation as well.
19      Q.  Now you indicated in reference to
20  specification 1 that based on the information that
21  you have, Dr. Severin failed to sign out, correct,
22  okay.
23      A.  No, that's not correct.
24      Q.  I'm sorry, did sign out.  Is that correct?
25      A.  Yes.

59

```
1        BARNETT - CROSS - MASSENA
2        Q.  What is the protocol for teachers who are
3   signing out prior to the end of their work day?
4        A.  Teachers who are assigning out prior to
5   their work day.  If you're leaving, and you still
6   you're on as far as your work day, you need to get
7   approval from an administration, so that we're aware
8   that you need to be covered.  And then, you can sign
9   out in the sign-out book.
10       Q.  Who is notice supposed to be given to?
11       A.  From a teacher--
12       Q.  [Interposing] Yes.
13       A.  --to sign out?  Their direct supervisor
14  unless there's an issue.  You can speak to any
15  administrator.
16       Q.  So that notice is typically given to their
17  direct supervisor?
18       A.  Unless there's an issue -- [00:02] another
19  administrator.
20       THE HEARING OFFICER:  Just keep your
21      voice up, please.
22       MS. BARNETT:  Oh, sorry.
23       Q.  And you stated earlier that Dr. Severin's
24  direct supervisor was Principal Dorsey.  Is that
25  correct?
```

60

```
1        BARNETT - CROSS - MASSENA
2        A.  That's correct.
3        Q.  Okay.  And do you recall whether or not
4   Principal Dorsey was the subject of that
5   investigation that we spoke about earlier?
6        A.  No.  He was the subject.  As far as I know,
7   I think the investigation was of how the regents
8   whether or not Mr. Dorsey asked to have student
9   report interest changed.
10       Q.  Could you repeat that -- [00:02]?  I didn't
11  -- [00:02].  Could you repeat that?
12       A.  Whether or not Principal Dorsey asked to
13  have student answers changed on the regents.
14       Q.  Okay.  And you also said Principal Dorsey
15  is Dr. Severin's direct supervisor.  Is that correct?
16       A.  Um-hum.
17       Q.  Okay.  And, again, if you know--but I
18  believe you said, and please correct if my memory's
19  incorrect--you stated earlier during cross-
20  examination that you assume that Dr. Severin had made
21  the complaint, is that correct, or you didn't know?
22       A.  I didn't say I assume that.
23       Q.  Okay.
24       A.  That's not what I said.
25       Q.  Okay, just wanted to clarify.  Now so the
```

61

```
1        BARNETT - CROSS - MASSENA
2   protocol is to speak to a direct supervisor, correct?
3        A.  Um-hum.
4        Q.  Okay.
5        THE HEARING OFFICER:  You have to say
6      yes or no.
7        MS. BARNETT:  I'm sorry.
8        A.  Yes, that's correct.
9        Q.  And now within the last two years, had Dr.
10  Severin ever asked you whether--withdrawn.  What's
11  the protocol for when a teacher's child is sick, and
12  they have to leave the school early?
13       A.  You speak to a supervisor, and let the me
14  know what's going on, and you just get clearance.
15  And you just sign out.
16       Q.  Okay.
17       A.  And then that way we will cover your
18  classes.
19       Q.  What's the protocol is a teacher falls ill?
20       A.  If a teach them self falls ill, you still
21  have to speak to a supervisor, so that we are aware
22  that we have to give an emergency coverage.
23       Q.  Um-hum.
24       A.  And then, you sign out, and that's it.
25       Q.  Okay.  Now do you recall a time within the
```

62

```
1        BARNETT - CROSS - MASSENA
2   last two years with Dr. Severin indicated to you that
3   he just received a call that his child is sick?
4        A.  Yes.  Actually, no, he didn't tell me his
5   child was sick.
6        Q.  Okay.  What did he tell you?
7        A.  He told me that he had to go to his child's
8   school.
9        Q.  Okay.  What did you take that to mean?
10       A.  Just what it is.  That's my job to
11  interpret.  It took it as he had to go to the child's
12  school.
13       Q.  Okay.  And you denied his request to go to
14  his child's school.  Isn't that correct?
15       A.  I did not.
16       Q.  You did not deny that request?
17       A.  No.
18       Q.  Do you know whether or not Dr. Severin was
19  allowed to go to his child's school?
20       A.  I don't know.
21       Q.  Did you care?
22       MR. FRANCIS:  Objection.
23       THE HEARING OFFICER:  Sustained.
24       [Background noise]
25       Q.  Regarding specification 1, when did you
```

63

BARNETT - CROSS - MASSENA

2 become aware that Dr. Severin supposedly signed
3 himself out?  When did you become aware of that?
4      A.  After he left the building.
5      Q.  Okay.  How did you become aware of that?
6      A.  The secretary who's responsible for the
7 book let me know.
8      Q.  Okay.  Did you attempt to reach Dr. Severin
9 by cellphone?
10      A.  No, I did not.
11      Q.  Did you do any sort of investigation
12 to determine why he had left the school?
13      A.  I alerted the principal who is his direct
14 supervisor.
15      Q.  Okay.  And do you know what if any action
16 was taken to cover the eighth period class?
17      A.  We had to pull teachers in.  We had to
18 quickly figure who was going to cover without --
19 [00:02] other teachers' contract.
20      Q.  Okay.  But the last was covered.  Is that
21 correct?
22      A.  Yeah, we had to.
23      Q.  And the seventh period prep that's a not a
24 class, right, correct?
25      A.  No.  But it is a paid instructional

64

BARNETT - CROSS - MASSENA

2 assignment.
3      Q.  Okay.  Was there ever an inquiry as to Dr.
4 Severin as to why he had to leave that day if he did
5 leave that day?
6      A.  He left that day.
7      Q.  Did you see him leave?
8      A.  I saw him sign out.  I saw his signature
9 where he signed out.  He wrote 12:20 on the sign-out
10 sheet.
11      Q.  He saw him sign?
12      A.  I saw his signature.
13      [Crosstalk]
14      A.  I didn't him sign myself to watch him, I
15 didn't see him sign.  I saw the sign-in sheet after
16 he left--
17      Q.  [Interposing] Okay.
18      A.  --when the secretary alerted me.
19      Q.  So this is a yes or no question.  Did you
20 see him sign the sheet?
21      A.  No.
22      Q.  Okay.  And did you see him leave the
23 building?
24      A.  No.
25      Q.  Did you observe video of him leaving the

65

BARNETT - CROSS - MASSENA

2 building?
3      A.  No.
4      Q.  Okay.  So you did not see him leave the
5 building.  Is that correct?
6      A.  No, I did not.
7      Q.  Thank you.  And, again, you did not inquire
8 as to why he left if he left, correct?
9      A.  So the way I inquired what I did was a
10 disciplinary meeting.
11      Q.  Um-hum.
12      A.  And the purpose of a disciplinary meeting
13 is to provide a teacher or a staff member the
14 opportunity to explained whatever they are being
15 accused of.
16      Q.  Okay.  Were you upset with Dr. Severin at
17 this disciplinary meeting?
18          MR. FRANCIS:  Objection.
19          THE HEARING OFFICER:  Were you upset.
20 Mr. Massena, what is the relevance of what her
21 state of mind or emotion was?
22          MR. MASSENA:  To demonstrate Your
23 Honor that this is a toxic environment, that
24 these allegations that are being put forward
25 are--

66

BARNETT - CROSS - MASSENA

2          THE HEARING OFFICER:  [Interposing]
3 I'm going to stop you there.  Otherwise, I'm
4 going to have to ask the witness to step out.
5 Mr. Francis, do you want to be heard on this in
6 a brief, succinct way?
7          [Background noise]
8          MR. FRANCIS:  It's irrelevant.
9          THE HEARING OFFICER:  No.  I'm going
10 to overrule the object and permit the question.
11 You can answer.
12      A.  No.
13      Q.  Okay.  Now I'd like to draw your attention
14 to speciation 11, okay.  Now you indicated earlier
15 that Principal Dorsey is the direct supervisor for
16 Dr. Severin.  Is that correct?
17      A.  That's correct.
18      Q.  And how is it that you came to observe Dr.
19 Severin's class on October 29 , 2015?
20      A.  Okay.  There's two ways.  As an
21 administrator, I do have the right to observe any
22 teacher in the building, but I'm direct supervisor.
23 That's my right, and secondly, the superintendent,
24 Mr. Dorsey's supervisor directed--even though Mr.
25 Dorsey's his direct supervisor he ask that I take on

67

```
 1       BARNETT - CROSS - MASSENA
 2   the responsibility as a direct supervisor also to be
 3   fair to also say, okay, well, if Mr. Dorsey's
 4   observing him, we also need to get a different lens
 5   of observation.  So he's not the only observing him
 6   and giving him observations and giving him ratings to
 7   give an opportunity to have a different lens in the
 8   classroom, so I was that other lens.
 9       Q.  Okay.
10       A.  And that was the directive of the
11   superintendent.
12       Q.  Okay.  Was that because Principal Dorsey
13   had become biased towards Dr. Severin?
14           MR. FRANCIS:  Objection, calls for
15   speculation.
16           THE HEARING OFFICER:  No, overruled.
17       A.  Had he become biased as far as his
18   instruction?
19       Q.  No.  Biased towards Dr. Severin as a whole?
20       A.  I'm not aware.
21       Q.  Are you aware that there was a cooling off
22   period that had been set by the superintendent
23   between Principal Dorsey and Dr. Severin?
24       A.  Yes.  So that's actually what I'm talking
25   about.  That's what it's called it was called a
```

69

```
 1       BARNETT - CROSS - MASSENA
 2   responsible and must get observed, so I don't agree
 3   with the verbiage related to emotional attachment.  I
 4   just think that's the verbiage that the
 5   superintendent chose to use 'cause that's not actual
 6   deal in limbo.
 7       Q.  Now you had indicated that he failed to
 8   follow directions given by administration this
 9   applied period two lessons plans.
10       A.  Yes.
11       Q.  Okay.  Had you ever received a request from
12   Dr. Severin regarding a laptop that he had his
13   lessons plan saved on?
14       A.  Yes.
15       Q.  Okay.  Could you share that with the
16   arbitrator?
17       A.  Okay.  So Dr. Severin asked for the laptop,
18   and there're that are DOE property.
19       Q.  Um-hum.
20       A.  They're collected at the end of every year.
21   You are not guaranteed the same laptop back unless
22   you actually did not turn it in and kept it which you
23   can do.  As long as you fill out paperwork, you can
24   keep the laptop over the summer.  That's not a
25   problem.  Dr. Severin apparently turned in his
```

68

```
 1       BARNETT - CROSS - MASSENA
 2   cooling period.
 3       Q.  Um-hum.
 4       A.  But he had me go in and assume some of
 5   those responsibilities and Mr. Dorsey not go into the
 6   classroom.
 7       Q.  So it's your interpretation a cooling off
 8   period means that emotions are at a high pitch.  Is
 9   that fair?
10           MR. FRANCIS:  Objection.
11           THE HEARING OFFICER:  It's cross-
12   examination.  Counsel can ask the question.
13       A.  No, I don't agree.
14       Q.  Fine, you don't agree, so cooling off
15   period does that mean that both parties need some
16   time apart.  Is that a fair description of a cooling
17   off period?
18       A.  I just don't agree with the verbiage time
19   apart.  It just sounded it's an emotional situation,
20   and it was not emotional.  It's more of a
21   professional situation where as far as instruction,
22   Mr. Dorsey did his observations.  He gave him
23   feedback.  He asked me to go in instead because the
24   superintendent told him cooling off period, but
25   everyone has to be supervised.  And everyone's still
```

70

```
 1       BARNETT - CROSS - MASSENA
 2   laptop, and another teacher may have had it, so he
 3   made the request to the secretary and myself.  I'm
 4   not sure if he made the request to Mr. Dorsey, but I
 5   do recall getting the email, and he had to find the
 6   laptop.  The laptop it's not our responsibility that
 7   you get back the same one.  They're not guaranteed.
 8   It's not your personal laptop.  It's to the school.
 9       Q.  You are aware that his lesson plans were
10   saved on that laptop.  Is that correct?
11       A.  That's what he stated.  He did tell me
12   that.
13       Q.  Okay.  And to this day, he still hasn't
14   received that laptop.  Is that correct?
15       A.  I don't know.  To my knowledge, I don't
16   know.
17       Q.  Okay.  And do you know whether or not an
18   attempt was made to transfer his files from that
19   laptop and provide it to him through a separate
20   media?
21       A.  No, I don't know.
22       Q.  Okay.  To your knowledge that was not done,
23   correct?
24       A.  To my knowledge, I don't know.  I'm not
25   going to say it wasn't done to my knowledge, but I
```

71

1    BARNETT - CROSS - MASSENA
2  don't know.
3     Q.  Okay.  But you do know that he did not
4  receive the laptop?
5        MR. FRANCIS:  Objection, asked and
6  answered.
7     A.  I don't know.
8  [Background noise]
9        THE HEARING OFFICER:  Well, typically,
10 the way this process works is you respond to
11 questions.  I didn't hear any objection, so it's
12 sort of hard for me to intervene, but as a
13 general matter--
14       MR. MASSENA:  [Interposing] --
15 [00:02].
16       [Background noise]
17       THE HEARING OFFICER:  You just respond
18 to questions asked of you.
19       MR. MASSENA:  Just one moment, Your
20 Honor.
21       THE HEARING OFFICER:  Sure.
22       MR. MASSENA:  Can I just have five
23 minutes with my client?
24       THE HEARING OFFICER:  Absolutely, I'll
25 take a short break.  Let's go off the record.

72

1    BARNETT - CROSS - MASSENA
2        MR. MASSENA:  Thank you.
3  [OFF THE RECORD]
4  [ON THE RECORD]
5        THE HEARING OFFICER:  All right.  So
6  we're back on the record.  Any additional
7  questions, Mr. Massena.
8        MR. MASSENA:  No additional questions
9  for this witness.
10       THE HEARING OFFICER:  Any re-direct?
11       MR. FRANCIS:  Brief.
12       THE HEARING OFFICER:  Okay.
13 RE-DIRECT EXAMINATION
14 BY MR. FRANCIS
                                    th
15    Q.  You indicated on or about April 4 , 2016
16 when respondent Severin signed out and left the
17 building without approval.  Is that correct?
18    A.  Yes.
19    Q.  Did he return to the building?
20    A.  No, he did not.
21    Q.  As per instruction, did he notify any
22 administrator that he was leaving the building?
23    A.  No, he did not.
24       MR. FRANCIS:  I have nothing further.
25       THE HEARING OFFICER:  Any additional

73

1    BARNETT - RE-DIRECT - FRANCIS
2  from respondent?
3        MR. MASSENA:  Very brief.
4        THE HEARING OFFICER:  Sure.
5  RE-CROSS-EXAMINATION
6  BY MR. MASSENA
7     Q.  Ms. Barnett, in your disciplinary letter--
8        MR. FRANCIS:  [Interposing] Objection,
9  beyond the scope of re-direct.
10       THE HEARING OFFICER:  Well, I haven't
11 heard the question, counsel, so I'm going to
12 allow Mr. Massena [00:01] the question.
13    Q.  In your disciplinary letter, you stated
14 that for some reason you added the you smirk and did
15 not reply.  Do you know why you added that?
16    A.  Yes, I do.  I added that because in the
17 disciplinary letter we record what happened during
18 the disciplinary meeting, and that's what happened
19 during the disciplinary meeting.
20    Q.  And you felt that was necessary to add that
21 comment?
22    A.  Yes.
23       MR. MASSENA:  Nothing further.
24       THE HEARING OFFICER:  Mr. Francis?
25       MR. FRANCIS:  Nothing further.

74

1    BARNETT - RE-CROSS - MASSENA
2        THE HEARING OFFICER:  Okay.  That
3  means you're excused as a witness.
4        MS. BARNETT:  Thank you.
5        THE HEARING OFFICER:  I thank you very
6  much for your participation.  I sometimes tell
7  witnesses that these are ongoing proceedings,
8  and so you're instructed not to discuss your
9  testimony.  Thanks so much.  Let's go off the
10 record.
11       [OFF THE RECORD]
12       [ON THE RECORD]
13       THE HEARING OFFICER:  Let's go on the
14 record.  Mr. Francis, I see the Department has
15 its next witness.  If you could kindly introduce
16 him to us.
17       MR. FRANCIS:  Yes.  At this time, the
18 Department calls Principal Steven Dorsey.
19       THE HEARING OFFICER:  Principal, if
20 you could kindly spell your name for us?
21       MR. STEVE DORCELY:  First name is
22 Steve, S-T-E-V-E.  Last name is Dorsey, ''D,'' as
23 in ''David,'' O-R-C-E-L-Y.
24       THE HEARING OFFICER:  Okay.  Raise
25 your right hand.  Do you solemnly swear or

1    BARNETT - RE-CROSS - MASSENA
2    affirm to tell the truth in this proceeding?
3        MR. DORCELY: Yes, I do.
4        THE HEARING OFFICER:  Mr. Francis,
5    your witness.
6        MR. FRANCIS:  Thank you.
7    DIRECT EXAMINATION
8    BY MR. FRANCIS
9    Q.  Principal Dorcely, would you please tell
10   the arbitrator by whom are you employed?
11   A.  I'm employed by the New York City
12   Department of Education.
13   Q.  And how long have you been so employed?
                                            th
14   A.  This actually is my 24 year.
15       THE HEARING OFFICER:  Just keep your
16   voice up if you would in part so that the
17   recorder can pick up your testimony.  Also, I am
18   sitting in front of the HVAC system, and it
19   creates ambient noise, so if you could just keep
20   your voice up, that would be helpful.  Thank
21   you.
22   Q.  And what were your assignments during those
23   24 years of service?
24   A.  For ten years I served as a school aid,
25   computer coordinator, substitute teacher.  This was

1        DORCELY - DIRECT - FRANCIS
2    at Professional Performing Arts High School, a 6
3    through 12 high school.  Following that assignment, I
4    served for three years at LaGuardia Arts.  Following
5    that assignment, I think transitioned to an Assistant
6    Principal, so I did that for six years.  And to my
7    current assignment, this is my third year as
8    Principal of Urban Action Academy.
9    Q.  And what are your duties and
10   responsibilities as principal of this Urban Action
11   Academy?
12   A.  Foremost is to ensure that the students'
13   needs in terms of academic achievement, to make sure
14   that there's order, there's safety, and that not only
15   do I meet the chancellor's framework for great
16   schools but to ensure that my kids graduate on time.
17   Q.  And do you have administerial [phonetic]
18   responsibilities with respect to the various teachers
19   under your guidance?
20   A.  Yes.  So this year I purposely took the
21   assignment to supervise the social studies
22   department, so my responsibility is the supervision
23   for directly for the social studies, English
24   department, budgeting operations and also supervising
25   assignment principals.

1        DORCELY - DIRECT - FRANCIS
2    Q.  Now with respect to pre-semester
3    instructions, are there any specific instructions
4    that are given to teachers and staff members at the
5    beginning of every semester?
6    A.  Yes.  So the beginning of the year,
7    September 8 we meet with the faculty, all staff.  We
8    go over the faculty handbook.  In addition to that,
9    staff aware that on a daily basis the communication
10   method is via email.  We send out something that's
11   called a daily docket.  In addition to that, I'm able
12   to call morning announcements where I do the pledge.
13   In addition to that, I inform staff of specific
14   things that will be due, so I do that daily.
15       MR. FRANCIS:  -- [00:01] in the six-
16   page document that I ask to be marked
17   Department's 7.
18       MR. MASSENA:  -- [00:02]?
19       THE HEARING OFFICER:  Let's go off the
20   record.
21       [OFF THE RECORD]
22       [ON THE RECORD]
23       THE HEARING OFFICER:  Let's go back on
24   the record.  We're back on the record, Mr.
25   Francis.

1        DORCELY - DIRECT - FRANCIS
2        MR. FRANCIS:  Thank you.  I have in my
3    hand a six-page document that I ask to be marked
4    Department's 7 for identification.  I have a
5    copy for the arbitrator and a copy for the
6    respondent.
7        THE HEARING OFFICER:  Okay.  I'll mark
8    this as Department's Exhibit 7 for
9    identification.
10       [Background noise]
11   Q.  You indicated on direct examination that
12   you advise or give a preliminary pre-semester
13   instruction to teachers and staff members.  I ask
14   that you look at Department's 7 for identification.
15   Do you recognize that document?
16   A.  Yes.
17   Q.  And what is that document?
18   A.  So that is a sample of a daily docket that
19   goes out to all the staff members which specifies
20   specifically reminders of student policy including --
21   [00:02] expectation for the year, and one last piece
22   is it covers this faculty hand book, so at each end
23   point, we'll go from A all the way through Z just a
24   reminders to the staff.
25   Q.  And this is distributed via email.  Is that

79

DORCELY - DIRECT - FRANCIS

1  correct?
2
3      A.  That is correct.
4      Q.  All right.  Now are the faculty staff
5  handbooks provided to the teachers and staff members
6  as well?
7      A.  That is correct.
8      Q.  And was that done for 2014-2015 school
9  year?
10     A.  Yes.
11         MR. FRANCIS:  I ask that Department's
12  7 for identification be moved into evidence --
13  [00:01].
14         MR. MASSENA:  Objection, Your Honor,
15  on as to relevancy.  I'd ask for an offer of
16  proof as to what specifications does this daily
17  docket email go to prove or disapprove.
18         [Crosstalk]
19         MR. FRANCIS:  It's not specific to a
20  specification.  However, it goes to notice that
21  the respondent is on notice as to certain
22  protocol that has to be followed, i.e. leaving
23  the school, notifying administrators that you
24  are leaving the school.  And it goes to general
25  instruction to the teachers by giving them

80

DORCELY - DIRECT - FRANCIS

1  notice of their responsibilities, and that's the
2  relevance of the Department 7.
3         THE HEARING OFFICER:  Okay.  Let's go
4  off the record for a moment.
5         [OFF THE RECORD]
6         [ON THE RECORD]
7         THE HEARING OFFICER:  Hang on, so
8  we're back on the record.  There was some off
9  the record discussions during which it was
10  decided by the Department that it was going to
11  offer simply the page of what was previously
12  marked as Department's 7 for identification, so
13  Department's 7 for identification is now a
14  single page document.  Is there any objection
15  Mr. Massena to Department's 7 going into
16  evidence?
17         MR. MASSENA:  No, Your Honor.
18         THE COURT:  Okay.  So Department's 7
19  is now admitted into the record as Department's
20  7.
21
22         MR. FRANCIS:  Thank you.
23         THE HEARING OFFICER:  Um-hum.
24     Q.  You indicated also in your direct testimony
25  that a faculty staff handbook is distributed to each

81

DORCELY - DIRECT - FRANCIS

1  teacher and staff.  Is that correct?
2
3      A.  That is correct.
4         MR. FRANCIS:  All right.  I have two
5  documents that I'd be marked Department's 8 and
6  9 respectively for identification, and I have a
7  copy for respondent.  And I have a copy for
8  respondent.  And the second Department's 9 for
9  identification, and I have a copy of
10  Department's 9 for the arbitrator, and I have a
11  copy of Department's 9 for the respondent.
12         THE HEARING OFFICER:  All right.  So I
13  have two handbooks before me.  I've marked the
14  2014-2015 handbook as Department's 8 for
15  identification and the 2015-2016 handbook as
16  Department Exhibit 9 for identification.
17     Q.  I'd ask you to look at Department's 8 and
18  Department 9 for identification, and can you tell the
19  arbitrator do you recognize them?
20     A.  Yes.  Department 8 is the handbook that I'm
21  drafting with the staff which highlights all the
22  policies and expectations for that school year, and
23  Department 9 is the same updated, made some changes.
24  It also highlights the expectation that we expect
25  from all staff, and they each have to sign for it.

82

DORCELY - DIRECT - FRANCIS

1         MR. FRANCIS:  I ask that Department 8
2  and 9 be offered into evidence.
3         [Background noise]
4         MR. MASSENA:  Just a brief voir dire,
5  Your Honor.
6         THE HEARING OFFICER:  Sure.
7      VOIR DIRE EXAMINATION
8  BY MR. MASSENA
9      Q.  Principal Dorcely--am I pronouncing your
10  name correctly--
11     A.  [Interposing] Yes.
12     Q.  --okay, Principal Dorcely--and you may have
13  said this on direct, but how exactly are these
14  distributed to the teachers the binder?
15                                          th
16     A.  September 8  teachers come in and they sign
17  for it, and you review it as faculty.
18     Q.  Okay.
19     A.  And we identify the key elements, and then,
20  they sign for it.
21     Q.  Okay.  And then--
22     A.  [Interposing] That's a signed--
23     Q.  [Interposing] That's a signature, okay.
24         MR. MASSENA:  No further questions,
25  Your Honor.

83

1  DORCELY - VOIR DIRE - MASSENA
2         THE HEARING OFFICER:  Objection?
3         MR. MASSENA:  No objection.
4         THE HEARING OFFICER:  This is
5  Department 8 and Department 9 are both in
6  evidence.
7         MR. FRANCIS:  Thank you.
8         THE HEARING OFFICER:  Um-hum.
9  DIRECT EXAMINATION
10  BY MR. FRANCIS
11     Q.  Now I want to direct your attention to what
12  has been admitted into evidence as Department's 1
13  which is the specification.  I'm going to show you a
14  copy thereof, and I'm going to direct your attention
15  to specification 2.
16     [Background noise]
17     Q.  Okay.  In specification 2, it indicates
18  that on or about February 5 , 2016 respondent failed
19  to adhere to the school cellphone policy, and when
20  you allow students to use their cellphones during his
21  period three class.  Is that correct?
22     A.  That is correct.
23         MR. FRANCIS:  I have in my hand a one-
24  page document that I ask be marked Department's
25  10 for identification.

84

1  DORCELY - DIRECT - FRANCIS
2         THE HEARING OFFICER:  You have copies
3  for counsel?
4         MR. FRANCIS:  I have a copy for the
5  arbitrator, and I have a copy for respondent.
6         THE HEARING OFFICER:  All right.  I'm
7  going to mark this as Department's Exhibit 10
8  for identification.
9         MR. FRANCIS:  Department 10.
10     Q.  I ask you to take a look at Department's 10
11  for identification, and let me know whether or not
12  you recognize that document.
13     A.  Yes.  This is our cellphone policy that was
14  cemented by the SLT which voted on it the School --
15  [00:01] Team, and it was adopted by Urban Action
16  Academy.
17     Q.  Okay.  And specifically, what is the school
18  policy regarding cellphones?
19     A.  So cellphone use as -- [00:02] and said the
20  use of cellphones, computer devices or portable
21  entertainment systems, they can bring it--
22         MR. MASSENA:  [Interposing] Objection.
23         THE HEARING OFFICER:  Hold on, there's
24  an objection.  Yes?
25         MR. MASSENA:  He's reading.

85

1         THE HEARING OFFICER:  Okay.  And it's
2  also not in evidence yet.
3     [Crosstalk]
4     Q.  Just a look at it, and do you recognize the
5  document?
6     A.  It's the cellphone policy.
7         MR. FRANCIS:  And at this time, I'm
8  asking that Department's 10 for identification
9  be moved into the record.
10         MR. MASSENA:  No objection.
11         THE HEARING OFFICER:  Okay.
12  Department 10 is now in evidence.  Mr. Francis,
13  can we get a timeframe when this policy was in
14  effect for this witness?
15         MR. DORCELY:  I'm thinking a year in
16  September.
17         THE HEARING OFFICER:  Of what year?
18         MR. DORCELY:  2015-2016 school year.
19         THE HEARING OFFICER:  Thank you.
20     Q.  Again, I refer you to specification number
21  two on Department's 1 evidence regarding an incident
22                                    th
23  that occurred on February 5 , 2016.  Please tell
24                                                 th
25  Arbitrator Brown what occurred on February 5 , 2016.
         A.  On that particular day, I was walking the

86

1  DORCELY - DIRECT - FRANCIS
2  halls, and I observed into Dr. Severin's room 128
3  that students were using their cellphones, and he was
4  co-teaching with Ms. Burlingame.  I walked into the
5  classroom.  I confiscated the full cellphones, and
6  then, I took them with me to my office.
7         THE HEARING OFFICER:  Tell us the name
8  again of the teacher who the respondent's co-
9  teaching with if you could spell the name for
10  the record.
11         MR. DORCELY:  Ms. Burlingame, B-U-R-L-
12  I-N-G-A-M-E, game.
13         THE HEARING OFFICER:  Thank you.
14     Q.  And as a result of the confiscation of the
15  cellphones in violation of the cellphone policy, was
16  there a disciplinary conference held with the
17  respondent?
18     A.  Yes.
19         MR. FRANCIS:  I ask this document be
20  marked Department's 11 for identification, which
21  I have a copy for the arbitrator.
22         THE HEARING OFFICER:  I'll mark this
23  as Department 11 for identification.
24         MR. FRANCIS:  And a copy for
25  respondent.

87

DORCELY - DIRECT - FRANCIS

1    Q.  I'd ask that you look at Department's 11
2  for identification, and please tell if you recognize
3  that document.
4    A.  Yes, I do.
5    Q.  What do you recognize it to be?
6    A.  I wrote it and with Dr. Severin's
7  signature, and the date that we met for disciplinary
8  conference.
9    Q.  Okay.  So I see that there's a signature.
10  Is that Dr. Severin's signature?
11    A.  Yes.
12    Q.  And do you recognize the respondent
13  Severin's signature to be such?
14    A.  Yes, I do.
15    Q.  And I see there's a signature underneath
16  your sincerely.  Whose signature is that?
17    A.  That is my signature.
18        MR. FRANCIS:  I'd ask that Department
19  11 be moved into evidence at this time.
20        MR. MASSENA:  Just one moment, Your
21  Honor.
22        THE HEARING OFFICER:  Um-hum.
23        MR. MASSENA:  No objection, Your
24  Honor.

88

DORCELY - DIRECT - FRANCIS

1        MR. FRANCIS:  Thank you.
2    Q.  Now Department's 11 in evidence is an
3  organization of the disciplinary conference that you
4  had with respondent Severin.  Is that correct?
5    A.  That is correct.
6    Q.  Okay.  In addition to the Department's 11,
7  did you take any statements from any students
8  regarding the specification involving the cellphone?
9    A.  Yes, I did.
10    Q.  And who did you take statements from?
11    A.  I obtained from the four students, I'm
12  sorry, three students.  One student was discharged.
13    Q.  Okay.
14        MR. FRANCIS:  I have in my hand a
15  three-page document of which I have copies for
16  the arbitrator and a copy for the respondent.
17        THE HEARING OFFICER:  And we'll mark
18  this as Department's 12 for identification.
19        [Background noise]
20        MR. FRANCIS:  I ask that these three
21  documents marked as Department's 12 for
22  identification.
23        THE HEARING OFFICER:  They're marked
24  as such.

89

DORCELY - DIRECT - FRANCIS

1    Q.  And I'm showing to the witness Mr. Dorcely.
2  Do you recognize these documents?
3    A.  Yes, I do.
4    Q.  And what do you recognize those to be?
5    A.  These are statements from the students.
6    Q.  And I see that there are signatures at the
7  bottom of the documents?
8    A.  That is correct.
9    Q.  And whose signatures are at the bottom of
10  the documents?
11    A.  First one is Student A student Urban Action
12  Academy, and the second student at Urban Action
13  Academy Student B, and then, the last statement is
14  from Andre Perry, student at Urban Action Academy.
15  And the content of the statement that reference that
16  the incident that occurred with the cellphones.
17  Then, I took those students' cellphones during Dr.
18  Severin's class.
19        MR. FRANCIS:  I ask that Department's
20  12 be admitted into evidence at this time.
21        MR. MASSENA:  Objection, Your Honor, I
22  understand that hearsay is generally admissible
23  during these hearings.  However, in this
24  particular case, I will call it Department's 12A

90

DORCELY - DIRECT - FRANCIS

1  and number 12(2) and Department 12(3) are all
2  signed on different dates when the testimony by
3  Principal Dorcely that he brought them into his
4  office on the date that the cellphones
5  supposedly taken.
6        THE HEARING OFFICER:  Um-hum.
7        MR. MASSENA:  And then, in addition to
8  that, Your Honor, as to Department's 11A the
9  first statement by Student A--
10        [Crosstalk]
11        MR. MASSENA:  --121 there are portions
12  of the statement that are not relevant towards
13  this hearing.  It's not relevant towards proving
14  any of the specifications.  Therefore, I would
15  ask that, that portion be redacted, and that
16  portion would begin after the law, anything else
17  is against the law anything after that I would
18  object to as not being relevant.
19        [Crosstalk]
20        MR. MASSENA:  With respect to
21  Department 12(1), we had a conference--
22        THE HEARING OFFICER:  [Interposing] Is
23  it an agreement?
24        MR. MASSENA:  --we had an agreement to

91

DORCELY - DIRECT - FRANCIS
1  redact that portion.
2  THE HEARING OFFICER:  Okay.  So that's
3  easy.  I know that's not the extent of your
4  objections, but certainly, with regards to the
5  first page of Department 12, I will subject to
6  hearing further objections and making a final
7  ruling, I will redact from the word also through
8  the end of the paragraph.
9  MR. MASSENA:  Thank you.
10  MR. FRANCIS:  May I speak to the other
11  portion of his objection?
12  THE HEARING OFFICER:  Well, let's hear
13  the balance of the objection, and then, we'll
14  come back 'cause it may be -- [00:02].
15  MR. FRANCIS:  Okay.
16  MR. MASSENA:  And, overall, Your
17  Honor, as to hearsay regarding these statements,
18  the best evidence obviously would be the
19  testimony of the students.  We don't know under
20  what circumstances the students provided these
21  statements.  Whether they were pressure, where
22  they were cajoled or coerced to make these
23  statements, we have no idea, so obviously,
24  again, understanding that hearsay is generally

92

DORCELY - DIRECT - FRANCIS
1  admissible during these hearings, the best
2  evidence would be the testimony of the students
3  as opposed to these written statements which
4  come from various dates and times, Your Honor.
5  THE HEARING OFFICER:  Mr. Francis.
6  MR. FRANCIS:  Yes.  Respondent's
7  attorney incorrectly stated what the witness'
8  testimony was.  His testimony was that the
9  phones themselves were confiscated on February
10  5 , 2016.  He did not say that the statements
th
11  were taken on that date.
12  THE HEARING OFFICER:  Okay.  Let me
13  make a ruling on any and all of this.
14  MR. FRANCIS:  And if I may be
15  permitted to--
16  THE HEARING OFFICER:  [Interposing]
17  Yes, of course.
18  MR. FRANCIS:  --ask the witness
19  regarding the various statements.
20  THE HEARING OFFICER:  It's not
21  necessary.
22  MR. FRANCIS:  Okay.
23  THE HEARING OFFICER:  Okay.  So I have
24  before me Department's 12 which is three pages.

93

DORCELY - DIRECT - FRANCIS
1  I'm hearing objections raised by respondent as
2  to the various different dates on all three
3  pages.  That's not grounds to object to the
4  admissibility of the document.  Certainly, it
5  may be subject matter that respondent wishes to
6  cross-examine the witness on, but it's not a
7  basis to exclude this document from the record.
8  As to the issue of hearsay, counsel correctly
9  notes that hearsay is admissible in this forum.
10  That is not necessarily one and the same as
11  saying or arguing that hearsay alone is
12  sufficient to substantiate any given
13  disciplinary charge.  For the purpose of the
14  question of the admissibility of the document, I
15  do recognize that it is clearly hearsay, and
16  having made that observation, I'm going to admit
17  Department 12 into the record because precisely
18  the reasons stated by counsel hearsay is
19  admissible is in the forum.  Yes?
20  [Crosstalk]
21  MR. MASSENA:  One more thing as to the
22  statement of Student C which is the third
23  statement by a student in Department's 12, my
24  reading is that this entire document should be

94

DORCELY - DIRECT - FRANCIS
1  stricken.  As best as I can do to read the
2  handwriting of the student, I don't believe this
3  speaks at all to a cellphone being taken, so I
4  believe the entire statement should be stricken
5  actually should be not admitted.
6  THE HEARING OFFICER:  All right.  And
7  the basis is the relevance.  There's nothing
8  contained in the third page of this document
9  that is any way relevant to the charges and
10  specifications.  Do you want to be heard on
11  that, Mr. Francis?
12  MR. FRANCIS:  I will remove page 3 of
13  12 from consideration for evidence.
14  THE HEARING OFFICER:  Okay.  So
15  Department 12 is now in evidence.  It is a two-
16  page document.  Mr. Francis, you can continue.
17  MR. FRANCIS:  Okay.  I have in my hand
18  a one-page document that I'd like to be marked
19  as Department's 13 for identification, and I
20  have a copy for the arbitrator as well as a copy
21  for respondent.  Thank you.
22  THE HEARING OFFICER:  Okay.  I'm going
23  to mark this as Department 13 for
24  identification.

95

DORCELY - DIRECT - FRANCIS
1
2     Q.  And I show you what's marked Department's
3  13 for identification.  Would you please tell the
4  arbitrator whether or not you recognize the document?
5     A.  Yes.  That is daily attendance.
6     Q.  And for what date is that daily attendance
7  sheet?
                                                     th
8     A.  That is for February 5 , period three.
9     Q.  Okay.  And the names of the students that
10  appear on Department's 12 in evidence, do they appear
11  on Department's 3 for identification?
12     A.  Yes, they were present.
13     Q.  Okay.  And that document represents an
14  attendance sheet for students that were present that
15  day.  Is that correct?
16     A.  Correct.
17     Q.  And what classroom is that for?
18     A.  That is for room 128 and global studies.
19     Q.  And whose classroom is that?
20     A.  Dr. Severin.
21        MR. FRANCIS:  And I ask that
22  Department's 13 for identification be moved into
23  evidence at this trial.
24        MR. MASSENA:  No objection.
25        THE HEARING OFFICER:  Department 13 is

96

DORCELY - DIRECT - FRANCIS
1
2  in evidence.
                                                     th
3     Q.  So therefore, on February 5 , 2016, the
4  respondent failed to adhere to the school's cellphone
5  when he allowed the students mentioned in
6  Department's 12 in evidence indicates that he
7  violated that policy.
8        MR. MASSENA:  Objection, leading.
9        THE HEARING OFFICER:  Yeah, sustained.
10     Q.  Okay.  I direct your attention to
11  Department's 1 for identification copy of which I'm
12  showing you, and I direct your attention specifically
13  to specification number 3.
14     A.  Yes.
15     Q.  Okay.
16        MR. FRANCIS:  I have in my hand a one-
17  page document that I ask be marked Department's
18  14 for identification of which I have a copy for
19  arbitrator, and I also have a copy for
20  respondent.  Thank you.
21        THE HEARING OFFICER:  I will mark this
22  as Department's 14 for identification.
23     Q.  I ask you to look at Department's 14 for
24  identification.  Do you recognize that document?
25     A.  Yes.  I recognize the Department.

97

DORCELY - DIRECT - FRANCIS
1
2     Q.  What do you recognize it to be?
3     A.  This is our attendance sheet for common
4  planning time, period six for room 101 where the
5  social studies and ESL teachers are planning.
6     Q.  And does it have certain signatures on
7  Department's 14 for identification?
8     A.  Yes.
9     Q.  Does Dr. Severin's signature appear on
10  Department's 14 for identification?
11     A.  No.
12     Q.  And what does that indicate to you?
13     A.  He did not attend common planning time.
14     Q.  And was he required to do so?
15     A.  Yes, part of his C6 assignment.
16        THE HEARING OFFICER:  Say that again.
17        MR. DORCELY:  Part of his circle of
18  six assignment.
19        THE HEARING OFFICER:  Circle of six?
20        MR. DORCELY:  Correct, yes.
21     Q.  And at the bottom of Department's 14 for
22  identification, there appears to be a supervisor.
23     A.  Yes.
24     Q.  The supervisor's signature is that correct?
25     A.  That is correct.

98

DORCELY - DIRECT - FRANCIS
1
2     Q.  And whose signature is that?
3     A.  That is my signature.
                                                     rd
4     Q.  Okay.  And it's dated December 23 , 2015,
5  correct?
6     A.  That is correct.
7        MR. FRANCIS:  I'd ask that
8  Department's 14 be moved into evidence at this
9  time.
10        MR. MASSENA:  Brief voir dire?
11        THE HEARING OFFICER:  Sure.
12  VOIR DIRE EXAMINATION
13  BY MR. MASSENA
14     Q.  Principal Dorcely, did you take this
15  attendance?
16     A.  The sign a binder, so I'm there, I'm
17  present.
18     Q.  How do you know that you were present on
                rd
19  December 23 , 2015 as a common planning assignment?
20     A.  'Cause it's my signature.
21     Q.  Is it your practice to be present?
22     A.  Yes, most of them.
23     Q.  Most of them, but you're not able to make
24  all of them, correct?
25     A.  No.  I do make it.  They won't my

99

```
1        DORCELY - VOIR DIRE - MASSENA
2    signature, so if I'm not there, don't have my
3    signature.
4        Q.  The ones that you're not able to make don't
5    have your signature?
6        A.  It has my AP signature.
7        Q.  Okay.  So it's either you or the AP?
8        A.  That is correct.
9        Q.  So it's your testimony that you took this
10   record, correct?
11       A.  Yes.
12           MR. MASSENA:  Nothing further, Your
13   Honor.  No objection.
14           THE HEARING OFFICER:  Department 14 is
15   in evidence.
16   DIRECT EXAMINATION
17   BY MR. FRANCIS
18       Q.  As a result of the respondent Severin
19   absent himself from the meeting, was there any action
20   taken, and was it memorialized?
21       A.  Yes.
22           MR. FRANCIS:  I have in my hand a one-
23   page document that I asked be marked
24   Department's 15 for identification.  I have a
25   copy for arbitrator, and I have a copy for
```

101

```
1        DORCELY - DIRECT - FRANCIS
2           THE HEARING OFFICER:  Certainly.
3    VOIR DIRE EXAMINATION
4    BY MR. MASSENA
5        Q.  How do you recognize this to be a
6    disciplinary letter?
7        A.  'Cause a union representative is present,
8    and it states the employee signed it, and this would
9    be part of the official file.
10       Q.  Okay.  Were you present for this
11   disciplinary meeting?
12       A.  No.  I was not present for this meeting.
13           MR. MASSENA:  Nothing further, Your
14   Honor.
15           THE HEARING OFFICER:  Okay.
16           MR. MASSENA:  No objection.
17           THE HEARING OFFICER:  Hearing no
18   objection, Department 15 is in evidence.
19   DIRECT EXAMINATION
20   BY MR. FRANCIS
21       Q.  Again, I direct your attention to
22   Department's 1 in evidence, and I direct your
23   attention specifically to specification number 4.
24       A.  Specification 4 indicates Dr. Severin's
25   failure to follow the directive of keeping light on
```

100

```
1        DORCELY - DIRECT - FRANCIS
2    respondent.
3        Q.  I'd ask that you look at Department's 15
4    for identification, and please tell the arbitrator if
5    you recognize that document.
6           THE HEARING OFFICER:  I've marked it
7    as Department 15 for identification.
8        A.  Yep, that's -- [00:02] Assistant Principal,
9    Barnett identifying Dr. Severin as not being present
                                                      rd
10   during the common planning time on December 23 .
11           MR. MASSENA:  Objection, Your Honor,
12   he's reading.  I don't believe it was entered
13   into evidence yet.
14           THE HEARING OFFICER:  It wasn't.  It's
15   not in evidence.  It's marked for
16   identification, and I believe counsel's
17   essentially asking the witness if he can
18   identify the document, and your answer is?
19           MR. DORCELY:  This is a disciplinary
20   letter.
21           THE HEARING OFFICER:  Okay.
22           MR. FRANCIS:  At this time, I ask that
23   Department 15 for identification be moved into
24   evidence.
25           MR. MASSENA:  Brief voir dire.
```

102

```
1        DORCELY - DIRECT - FRANCIS
2    during his class instruction.
3        Q.  And what was the basis for this particular
4    violation of the school policy and/or written direct
5    from a school administrator?
6        A.  So on a previous date, it was observed with
7    Principal Colley [phonetic] that Dr. Severin's
8    classroom was pitch dark.  As a result of that, I
9    memorialized an email to Dr. Severin informing him of
10   he must keep a light on.
11       Q.  Okay.
12           MR. FRANCIS:  I show what is marked
13   now Department's 16 for identification.  It's a
14   two-page document, and I ask you to look at
15   Department's 16 of which I have copy for the
16   arbitrator as well as a copy for respondent.
17           THE HEARING OFFICER:  Okay.  I've
18   marked it as Department's 16 for identification.
19       Q.  Do you recognize Department's 16 for
20   identification?
21       A.  Yes.
22       Q.  I sent Dr. Severin this email acknowledging
23   what I've observed and -- [00:02] what the
24   superintendent and deputy superintendent as well
25   included in the email Assistant Principal, Barnett,
```

103

DORCELY - DIRECT - FRANCIS

and a directive I've given also in this email that
there was a principal walk-through, so multiple
principals in a building following a superintendent
meeting.

Q.   And could you please now tell the
arbitrator what your observation was.

A.   My observation was when we walked past Dr.
Severin's classroom, Room 128, all lights were off,
and there were a video playing on the screen.
Students heads were down, and my principal colleagues
stopped -- [00:02] attention were drawn.  We walked
towards the back of the classroom, and we just tried
to acknowledge what's happening.  Again, pitch dark,
kids' heads were down.  No instruction going on.

MR. FRANCIS:  I'd ask that
Department's 16 for identification be moved into
evidence at this time.

MR. MASSENA:  Just a moment,
arbitrator.

THE HEARING OFFICER:  I'm sorry?

MR. MASSENA:  Just a moment,
arbitrator.  Thank you.

THE HEARING OFFICER:  Sure.

MR. MASSENA:  No objection, Your

104

DORCELY - DIRECT - FRANCIS

Honor.

THE HEARING OFFICER:  Department 16 is
in evidence.

Q.   I would direct your attention again to
Department's 1 in evidence specifically specification
5 which indicates that during the 2015-2016 school
year respondent as of December 15, 2015 failed to
attend at least 29 out of 37 mandated professional C6
assignment common planning time meetings on or about
the following dates as listed in Department's 1 in
evidence.

A.   Yes.  This refers we have implemented a
th
policy on October 15  where all staff were advised of
common planning time and specific rooms they were
attend.  Dr. Severin was assigned to Room 101 with
social studies department and ESL, and he was present
but did not attend any of those common planning time
meetings.  Dr. Severin could be found in his room,
lights off, foot on the desk.

MR. MASSENA:  Objection -- [00:02]--

THE HEARING OFFICER:  [Interposing]
Witness is addressing specification 5.
Continue.

A.   Those dates are the dates that he missed

105

DORCELY - DIRECT - FRANCIS

common planning time.

Q.   All of these dates, correct?

A.   Yes, all of those October 20th--

[Crosstalk]

THE HEARING OFFICER:  They're stated
in Department 1, specification 5, 1 through 29.

[Background noise]

MR. FRANCIS:  I have in my hand a two-
page document marked Department's 17 for
identification of which I have a copy for the
arbitrator.  I apologize, it's actually a four-
page document.

THE HEARING OFFICER:  Okay, no
problem.

MR. FRANCIS:  And -- [00:02] of which
I have copy for the--

[Background noise]

THE HEARING OFFICER:  Let's go off the
record for a moment.

[OFF THE RECORD]

[ON THE RECORD]

THE HEARING OFFICER:  All right.  So I
have before me now a four-page document in which
I marked for identification as Department's

106

DORCELY - DIRECT - FRANCIS

Exhibit 17, Mr. Francis?

MR. FRANCIS:  Yes.  And I've also
provided a copy of Department's 17 for
identification to the respondent.

Q.   I'd ask you to take a look at Department's
17 for identification, and please let the arbitrator
know if you recognize that item, and what do you
recognize it to be?

A.   Yes.  That's an email that was sent by me
th
on Tuesday, October the 13  advising the staff about
the common planning time structure including each of
the teacher's assignment where I expect them to be.
In this case here, the social studies department and
ESL I advise them to be in Room 101 during their
professional assignment, the math, science and health
Room 102, and then the English, foreign language and
art in Room 104.

Q.   So that is the directive that was given to
all of the teachers including respondent Severin.  Is
that correct?

A.   Yes.  This was after my consultation with
the UFT, so UFT -- [00:01] we've met--

MR. MASSENA:  [Interposing] Objection,
non-responsive.

107

1   DORCELY - DIRECT - FRANCIS
2           THE HEARING OFFICER:  It did seem to
3   go astray.  Mr. Francis, go on.
4           MR. FRANCIS:  Yes.
5       Q.  With respect to Department 17 for
6   identification, what is the UFT Chapter Leader Mr.
7   Satchel involved in this -- [00:01]?
8       A.  Yes, he was.
9       Q.  Could you please tell arbitrator what his
10  involvement was.
11      A.  His involvement was we met to devise this
12  plan where we'll be meeting in specific rooms, in
13  addition to that the consultation committee members
14  from the UFT.
15      Q.  And with respect with the notification to
16  appear as designated as respondent Severin was he
17  sent this email?
18      A.  Yes, he was.
19      Q.  And does his name appear on the list of
20  teachers and/or staff members who are required to
21  participate in this plan?
22      A.  Yes.
23      Q.  Okay.
24          MR. FRANCIS:  Let the record that the
25  witness is pointing to the second name on

108

1   DORCELY - DIRECT - FRANCIS
2   Department 17 for identification, and at this
3   time, I ask that Department 17 for
4   identification be moved into evidence.
5           THE HEARING OFFICER:  Mr. Massena?
6           MR. MASSENA:  Objection, Your Honor,
7   specifically this is being offered for evidence
8   on -- [00:01] specification numbers 5 indicating
9   that Dr. Severin failed to go to or attend for
10  common planning time meetings.  This particular
11  document does not refer to when, at what time
12  these common planning meeting is indicated
13  generally that various groups of teachers are to
14  go to or to attend the common planning time
15  meeting.  It doesn't indicate the dates or the
16  times, and then, more specifically Your Honor as
17  to page three and four, these are not relevant.
18  As relevancy I don't see relevant on pages three
19  and four, Your Honor.
20          THE HEARING OFFICER:  Let's take it
21  piece mail.  With regard to the absence of any
22  stated date or time, I don't know quite frankly
23  if the Department is offering Department 17 to
24  address that issue.  Certainly, there appears to
25  my eyes to be a location Room 101, and that's

109

1   DORCELY - DIRECT - FRANCIS
2   all.  I think you're right counsel there is no
3   reference as best I can tell to any date or time
4   for these common planning times as they're call,
5   but in my estimation and my ruling is it's not
6   grounds to exclude these first two pages from
7   evidence.  Now with regard to pages three and
8   four, Mr. Francis, can you help educate us as to
9   what their relevance is?  Are they mistakenly
10  attached to the first two pages?  It's almost
11  appears as though page three begins mid-sentence
12  and does not flow from page two.
13          MR. MASSENA:  And if I can also point
14  out to Your Honor, the first pages at the very
15  least have the initials of SB which I'm going to
16  assume stand for Principal Dorcely whereas the
17  next two pages seem to be from Beverly Townsend,
18  and again, and they don't agree to be the same
19  document or let's say an email.  And more
20  importantly they're not relevant to the issue of
21  common planning time and attendance at common
22  planning time.
23          THE HEARING OFFICER:  I think Mr.
24  Francis would likely agree that pages three and
25  four--

110

1   DORCELY - DIRECT - FRANCIS
2           MR. FRANCIS:  [Interposing] I would
3   likely agree.
4           THE HEARING OFFICER:  --yeah, they are
5   not necessarily a part of the first two pages,
6   so we just separate pages three and four.
7           MR. FRANCIS:  That would be
8   appreciated.
9           THE HEARING OFFICER:  Okay.  So I'm
10  going to do that.  I'm going to ignore this
11  regarding pages three and four which means that
12  Department's 17 is now a two-page document.  It
13  is an email which appears to be addressed to
14  various different staff members including the
15  respondent.  There's a reference to common
16  planning time.  There's a reference to different
17  teams and locations for these meetings, and I'm
18  going to admit Department's 17 as a two-page
19  document into evidence.
20          MR. FRANCIS:  Thank you.  Okay, so 17
21  is in evidence.
22          THE HEARING OFFICER:  Um-hum.
23          MR. FRANCIS:  Can we go off the
24  record, please?
25          THE HEARING OFFICER:  Sure, let's go

111

DORCELY - DIRECT - FRANCIS

1
2 off the record.
3         [OFF THE RECORD]
4         [ON THE RECORD]
5         THE HEARING OFFICER:  Let's go back
6 on.  Mr. Francis.
7         MR. FRANCIS:  Multi-page document that
8 I asked to be marked Department's 18 for
9 identification and which I have a copy for the
10 arbitrator and a copy for the respondent.
11         [Background noise]
12         THE HEARING OFFICER:  Okay.  I'll mark
13 this as Department's 18, but I think I was maybe
14 handed additional papers or more pages than
15 respondent's.  Let's go off the record and do a
16 comparison.
17         [OFF THE RECORD]
18         [ON THE RECORD]
19         THE HEARING OFFICER:  Back on the
20 record.
21         MR. FRANCIS:  I have in my hand a 47
22 page document that I ask to be marked
23 Department's--
24         THE HEARING OFFICER:  [Interposing]
25 18.

112

DORCELY - DIRECT - FRANCIS

1
2         MR. FRANCIS:  --18 for identification
3 of which I have a copy for the arbitrator as
4 well as a copy for respondent.
5         THE HEARING OFFICER:  All right.  I'm
6 going to mark this as Department's Exhibit 18
7 for identification.
8         Q.  Let the record reflect that I'm showing the
9 witness Department's 18, 47-page document.  Would you
10 please look at those documents, and let the
11 arbitrator know if you recognize those documents and
12 what you recognize them to be.
13         THE HEARING OFFICER:  Let's go off the
14 record again.
15         MR. FRANCIS:  Yeah.
16         [OFF THE RECORD]
17         [ON THE RECORD]
18         THE HEARING OFFICER:  Let's go back on
19 the record.  Okay, I have before me a document I
20 marked for identification as Department's
21 Exhibit 18.  I am now told that it is 46 pages.
22 We've discarded one of the pages.  Mr. Francis,
23 your witness.
24         Q.  Yes.  Would you please tell Arbitrator
25 Brown what Department's 18 for identification

113

DORCELY - DIRECT - FRANCIS

1
2 consists of?
3         A.  Department 18 is three disciplinary
4 meetings referring to Dr. Severin's failure to attend
5 common planning time followed by the exact dates of
6 the sign-in sheet for the common planning time in
7 Room 101.
8         THE HEARING OFFICER:  I have
9 duplicates still, Mr. Francis.  My first and
10 fourth page are the same, so this is still not
11 organized properly, and the only thing I can
12 think of we can do to make this meaningful is go
13 off the record, give this back to you and ask
14 you just to more carefully go through this and
15 assemble the document again.  Let's go off the
16 record.
17         [OFF THE RECORD]
18         [ON THE RECORD]
19         THE HEARING OFFICER:  Okay.
20 Apparently, this document Department Exhibit 18
21 is now 44 pages.
22         MR. FRANCIS:  That's correct.
23         THE HEARING OFFICER:  We've discarded
24 two additional pages that were duplicates.  Mr.
25 Francis.

114

DORCELY - DIRECT - FRANCIS

1
2         MR. FRANCIS:  Yes.
3         Q.  I'd ask you to look at Department's 18 for
4 identification, and please explain to the arbitrator
5 what those documents represent.
6         A.  Okay.  Document represent three
7 disciplinary letters for Dr. Severin regarding the
8 dates he was absent for common planning time.  These
9 are the attendance sheet, followed by last two pages
10 is Dr. Severin's timecard to indicate that he was
11 present.
12         Q.  He was at school on the dates that these
13 common planning meetings were held.  Is that correct?
14         A.  That's correct.
15         Q.  And as a result of his failure to attend
16 the common planning meetings, was a disciplinary
17 conference held for respondent Severin?
18         A.  Yes.
19         Q.  And is that the first several pages of the
20 Department's 18 for identification?
21         A.  Yes, the first five pages are the
22 disciplinary meetings.
23         Q.  So let the record be clear there are three
24 disciplinary conferences held for the 29 absences out
25 of 37 mandated professional C6 common planning times

115

DORCELY - DIRECT - FRANCIS
1
2  meetings. Is that correct?
3     A.  That's right.
4           MR. FRANCIS:  At this time, I'd ask
5  that Department's 18 for identification be moved
6  into evidence at this time.
7           MR. MASSENA:  Objection, Your Honor,
8  I'm going probably going to need about 10, 15--
9           [Crosstalk]
10          THE HEARING OFFICER:  You need some
11  time to review the document with your client?
12          MR. MASSENA:  Yeah.
13          THE HEARING OFFICER:  All right.
14  Let's go off the record.
15          [OFF THE RECORD]
16          [ON THE RECORD]
17          THE HEARING OFFICER:  Let's go back on
18  the record, okay, so Department 18 has been
19  offered into evidence.  Respondent and counsel's
20  had an opportunity to review the document.  What
21  sayeth you, Mr. Massena, any objection?
22          MR. MASSENA:  No objection, Your
23  Honor.
24          THE HEARING OFFICER:  Okay.  So
25  Department 18 is in evidence.

116

DORCELY - DIRECT - FRANCIS
1
2     Q.  Okay.  Indicating again Department's 18
3  being in evidence, would you please address what
4  these documents are beginning with the first few
5  pages, and indicate what the subsequent pages are?
6     A.  The first few documents scheduled
7  disciplinary hearings regarding Dr. Severin's absence
8  for common planning time for C6, and the dates and
9  months are recorded on each of the disciplinary
10  letters.  It's followed by the attendance for Room
11  101, and the last two pages are the timesheet for Dr.
12  Severin's attendance.
13     Q.  And the timesheets that you're referring to
14  Department's 18 in evidence, what does that represent
15  or indicate?
16     A.  That indicate the three months from
17  October, November and December of Dr. Severin's
18  attendance sheet.
19     Q.  -- [00:03] that attendance sheet that
20  respondent Severin was in fact at the school and not
21  absent on those -- [00:03].  Is that correct?
22     A.  That is correct.
23     Q.  Thank you.  I direct your attention to
24  Department's 1 in evidence and specifically
25  specification 6.

117

DORCELY - DIRECT - FRANCIS
1
2           MR. FRANCIS:  I have in my hand a
3  three-page document and a copy for the
4  arbitrator and a copy for respondent.
5           THE HEARING OFFICER:  Of course, I
6  have a three-page document which I'll mark for
7  identification as Department's Exhibit 19.
8     Q.  Let the record reflect that I'm showing
9  Principal Dorcely Department's 19 for identification.
10  Please indicate whether or not you recognize the
11  document.
12     A.  Yes.  This is disciplinary letter issued to
13  Dr. Severin with my signature and Dr. Severin's
14  signature followed by a sign-in sheet which
15  indicating Dr. Severin did not sign the -- [00:02].
16          THE HEARING OFFICER:  I'm sorry,
17  didn't hear the last part of -- [00:02].
18          MR. DORCELY:  Did not sign the teacher
19  -- [00:01] in the office when he left the
20  building.
21          THE HEARING OFFICER:  Thank you.
22          MR. FRANCIS:  At this time, I ask that
23  Department's 19 which is marked for
24  identification be entered into evidence at this
25  time.

118

DORCELY - DIRECT - FRANCIS
1
2           MR. MASSENA:  Objection, Your Honor,
3  just one moment, please.
4           THE HEARING OFFICER:  Sure.
5           MR. MASSENA:  Thank you.
6           [Background noise]
7           MR. MASSENA:  Just a few questions
8  brief voir dire.
9           THE HEARING OFFICER:  Certainly,
10  please proceed.
11  VOIR DIRE EXAMINATION
12  BY MR. MASSENA
13     Q.  Principal Dorcely, first regarding
14  Department's 19 the disciplinary letter, I notice
15  that Dr. Severin's signature is on this letter.  Did
16  you observe Dr. Severin sign document?
17     A.  No.  The letter to file?
18     Q.  The letter to file?
19     A.  No, I did not.
20     Q.  And Dr. Severin was not present at this
21  meeting, correct?
22     A.  He received a disciplinary letter from his
23  UFT.
24     Q.  Okay.  However, he was not present at this
25  meeting, correct?

119

1     DORCELY - VOIR DIRE - MASSENA
2         A.   Not during the disciplinary meeting, that
3     is correct.
4             MR. MASSENA:  Just one moment, Your
5     Honor.
6         Q.   And as to the staff sign-out sheet, who
7     maintains the staff sign-out sheet?
8         A.   It's kept in the main office by my office.
9         Q.   Okay.  How far away is that from your
10    office?  You said in your office or by your office?
11        A.   Main office.
12            [Crosstalk]
13        Q.   Okay.  And whose responsibility is it to
14    maintain the staff sign-out sheet?
15        A.   Our Secretary, Ms. Townsend, my assistant
16    principal to the school advisor.
17        Q.   Okay.  And how is it maintained?
18        A.   Staff sign a log if they go in and out, and
19    then, we collect it every day.
20            MR. MASSENA:  Just one moment, Your
21    Honor.
22            THE HEARING OFFICER:  Yes, sure.
23            MR. MASSENA:  We'll step out for a
24    moment.
25            THE HEARING OFFICER:  We'll go off the

120

1     DORCELY - VOIR DIRE - MASSENA
2     record.
3             [OFF THE RECORD]
4             [ON THE RECORD]
5     DIRECT EXAMINATION
6     BY MR. FRANCIS
7         Q.   I'd ask you to look at Department 19 in
8     evidence, and specifically is it related to
9     specification six which indicates on the top November
10    12 , 2015 respondent left the school building during
11    the school day without signing the teacher log in the
12    school's main office, and I ask you to take a look at
13    the staff's sign-out sheets for that particular date
14    and ask you to peruse it.  And tell me arbitrator
15    whether or not respondent Severin signed out of the
16    school on the staff sign-out sheet on November 12 ,
17    2015.
18        A.   No.  The sheet indicated Dr. Severin did
19    not sign out.
20            THE HEARING OFFICER:  Can you show me
21    where that is?  I can't find it.
22            [Background noise]
23            MR. DORCELY:  The second page
24    beginning on 11/12 just if you look at the
25    dates.

121

1     DORCELY - DIRECT - FRANCIS
2             THE HEARING OFFICER:  I see the dates.
3             MR. DORCELY:  To November 12 on the
4     first page, Mr. Filo [phonetic] is the first
5     November 12 signing out--
6             THE HEARING OFFICER:  [Interposing]
7     All right.
8             MR. DORCELY:  --followed by Mr.
9     Norris, Ms. Vicare, and if you look at the
10    second page followed by Mr. Lewin, Norris,
11    Lewin, Fiala [phonetic].
12            [Crosstalk]
13            THE HEARING OFFICER:  I see, so it's
14    not a situation were you have--well, okay.
15            MR. DORCELY:  Yes.
16            THE HEARING OFFICER:  You don't have
17    time in either, okay.  Thank you for that
18    clarification.
19            MR. DORCELY:  You're welcome.
20        Q.   Now direct your attention to Department's 1
21    in evidence specifically specification 7.  Would you
22    take a look at that specification which -- [00:02] on
23    or about November 9 , 2015 respondent failed to
24    follow directive given by administration to submit
25    his mid-term exam for feedback and review to

122

1     DORCELY - DIRECT - FRANCIS
2     administration.
3         A.   So this specification the way the system we
4     have is communicate with the staff via the daily
5     docket, and we instruct the staff to submit their
6     mid-term for review and support.  In this case, Dr.
7     Severin was advised to submit his mid-term for review
8     and support.  I never received it.
9         Q.   And was that document memorialized in any
10    way?
11            MR. FRANCIS:  I have in my hand a
12    seven-page document.
13            [Background noise]
14            THE HEARING OFFICER:  Let's go off the
15    record.
16            [OFF THE RECORD]
17            [ON THE RECORD]
18            THE HEARING OFFICER:  Let's go on the
19    record.  Okay, Mr. Francis.
20            MR. FRANCIS:  I have in my hand eight-
21    page document that I ask to be marked
22    Department's 20 for identification.  I have a
23    copy for the arbitrator as well as a copy for
24    respondent.
25            THE HEARING OFFICER:  Okay.  So I'll

123

```
1        DORCELY - DIRECT - FRANCIS
2        mark this as Department's 20 for identification.
3        Q.  Let the record reflect I'm showing the
4    witness Department's 20 for identification.  Please
5    peruse those documents, and please tell the
6    arbitrator if you recognize this document, and what
7    do you recognize them to be?
8        A.  Yes.  This is a disciplinary meeting letter
9    signed by and signed by Dr. Severin, and it includes
10   an email requesting mid-terms to be submitted to a
11   direct supervisor, in the case that would be me.  In
12   addition to that, correspondence between Dr. Severin
13   and I requesting his mid-term.
14            THE HEARING OFFICER:  Requesting what?
15            MR. DORCELY:  His mid-term for review.
16       Q.  That being a mid-term exam?
17       A.  Mid-term exam that is correct.
18       Q.  All right.  And as a result of his failure
19   to provide you with as you being his direct
20   supervisor, could you memorialize the fact that he
21   did not submit to you his mid-term tests scores
22   rather.  Could you memorialize disciplinary meeting
23   that you had?  First of all, did you have a
24   disciplinary meeting?
25       A.  Yes, I had a disciplinary--
```

124

```
1        DORCELY - DIRECT - FRANCIS
2        Q.  [Interposing] And did you memorialize that
3    in what?
4        A.  Yes.  I had a disciplinary meeting the fact
5    that Severin was absent in capacity, so this chapter
6    chair noted that he was advised by Dr. Severin to
7    attend on his behalf, and he has no comment.
8        Q.  Okay.  And is that Department's 20 for
9    identification that first page?
10       A.  Yes.
11       Q.  And the subsequent pages on Department's 20
12   -- [00:02] is what?
13       A.  The instructions to the daily docket
14   informing all staff that mid-terms are due and to be
15   submitted to direct supervisor followed by my
16   correspondence with Dr. Severin.
17       Q.  And would you please articulate what that
18   correspondence -- [00:01]?
19       A.  To please submit his mid-term -- [00:02]
20   directly to me, and Dr. Severin's response for my
21   request.
22       Q.  And what was his response?
23       A.  His response was I have the laptop he's
24   looking for.
25            MR. FRANCIS:  I'd ask that
```

125

```
1        DORCELY - DIRECT - FRANCIS
2    Department's 20 for identification be moved into
3    evidence at this time.
4            THE HEARING OFFICER:  Any objection?
5            MR. MASSENA:  Just one moment, Your
6    Honor.
7            THE HEARING OFFICER:  Excuse me?
8            MR. MASSENA:  Objection, Your Honor,
9    but just one moment.
10            THE HEARING OFFICER:  Would you like
11   to go off the record?
12            MR. MASSENA:  Yes.
13            THE HEARING OFFICER:  Let's go off the
14   record.
15            [OFF THE RECORD]
16            [ON THE RECORD]
17            THE HEARING OFFICER:  -- [00:02].
18            MR. MASSENA:  Yes.
19            [Background noise]
20            THE HEARING OFFICER:  Mr. Massena?
21            MR. MASSENA:  No objection to the
22   Department 20 as to the disciplinary letter
23   dated November 19 , 2015.  No objection to
24   Department 20 related to the email
25   correspondence between Principal Dorcely and Dr.
```

126

```
1        DORCELY - DIRECT - FRANCIS
2    Severin.  However, I do have an objection as to
3    Department 20 the date of the email
4    correspondence is Monday, November 9 .  However,
5    I do have an objection to Department 20 email
6    correspondence to what appears to be the entire
7    school staff.  I do have an objection as to
8    relevancy.
9            THE HEARING OFFICER:  Okay.  Mr.
10   Francis, there's an objection being raised to
11   four pages of this document appears to be an
12   email dated October 6  or at least begins that
13   way.  The objection is being raised on the
14   grounds of relevance.  What is the Department's
15   position?
16            MR. FRANCIS:  The relevance of the
17   email is noticed to the respondent to provide
18   specifically the mid-term examination.
19            THE HEARING OFFICER:  What page are
20   you on of this four-page document?
21            MR. FRANCIS:  I'm looking at the first
22   page--
23            THE HEARING OFFICER:  [Interposing]
24   Okay.
25            MR. FRANCIS:  --which is sent to
```

127

DORCELY - DIRECT - FRANCIS
2  indicating respondent, and his name appears
3  first in the document.
4        THE HEARING OFFICER:  Okay.
5        MR. FRANCIS:  And there are directives
6  on the attachment of the email which indicates
7  that he is supposed to comply with the
8  directive.
9        THE HEARING OFFICER:  Now which
10  directive that's the question?
11        [Crosstalk]
12        MR. FRANCIS:  The directive is to
13  provide--
14        THE HEARING OFFICER:  [Interposing] As
15  I read specification seven, the allegation is--
16  hang on--that respondent failed to follow
17  directive given by administration to submit his
18  mid-term exam.
19        MR. FRANCIS:  That's correct.
20        THE HEARING OFFICER:  And, again,
21  respondent's objecting to these four pages on
22  grounds of relevance.  Tell me where these four
23  pages where there's any reference to the mid-
24  term exam?
25        MR. FRANCIS:  If you look at the first

128

DORCELY - DIRECT - FRANCIS
2  page of the email at the bottom--
3        THE HEARING OFFICER:  [Interposing]
4  Okay.
5        MR. FRANCIS:  --MOSL make-up exams
6  will be given on Thursday, October 8 , 2015.
7        THE HEARING OFFICER:  Okay.
8        MR. FRANCIS:  End of unit assessments
9  are due one week in advance of administration
10  for review and support by your direct
11  supervisor.
12        THE HEARING OFFICER:  All right.
13  You're going to have to do better than that if
14  you're going to make the case that that's the
15  mid-term exam.  You're going to have to elicit
16  that testimony from the witness because it says
17  here as I read it make-up exam.  I don't know
18  that that's one in the same as the mid-term exam
19  that's referenced in the specific charge.
20        Q.  I'd ask the witness to look at Department's
21  20 for identification.
22        [Crosstalk]
23        THE HEARING OFFICER:  And ask the
24  witness to look at these four pages in
25  particular.

129

DORCELY - DIRECT - FRANCIS
2        A.  So for page one that's the disciplinary
3  meeting held absent of Dr. Severin.
4        THE HEARING OFFICER:  All right.
5  That's not in dispute.  It's really the next
6  four pages.
7        A.  Page number two is where to our daily
8  docket we send to all staff advising him of updates
9  what's expected, and this one here is the end of unit
10  assessments due one week to the administration and
11  due to me for review and support.
12        THE HEARING OFFICER:  But the question
13  if I may principal is what in these four pages
14  reference the mid-term exam that the respondent
15  is being charged for failing to provide to
16  administration?
17        MR. DORCELY:  Well, it says end of
18  unit assessment.
19        THE HEARING OFFICER:  Is that the mid-
20  term exam?
21        MR. DORCELY:  We see the same language
22  -- [00:02] due to your direct supervisor for
23  review and feedback.  That's the connection.
24        THE HEARING OFFICER:  All right.  I
25  don't know that you need to go further unless

130

DORCELY - DIRECT - FRANCIS
2  you have issues.
3        MR. DORCELY:  Can I also point --
4  [00:02] the following page which is page two on
5  the email?
6        THE HEARING OFFICER:  Okay.
7        MR. DORCELY:  It says also unit test
8  and exams due to direct supervisor three days
9  before administration.
10        THE HEARING OFFICER:  Tell me where
11  you are?
12        MR. DORCELY:  That is on the top page
13  where it says scope and sequence right
14  underneath it.  It says unit test and exam.
15        THE HEARING OFFICER:  I don't think
16  I'm on the same page.  No, I think they're just
17  in the wrong order, okay.  I'm with you now.
18  Say it one more time.
19        MR. DORCELY:  So it says on the
20  following page it says unit test--
21        THE HEARING OFFICER:  [Interposing]
22  Oh, I see.
23        MR. DORCELY:  --and exams due to
24  direct supervisor three days before
25  administration.

131

DORCELY - DIRECT - FRANCIS

1
2      THE HEARING OFFICER:  All right.  And
3  it's your sworn testimony principal that this
4  reference to unit tests and exams due is one in
5  the same as the ''mid-term exam'' which respondent
6  is alleged to have failed to give to the
7  administration?
8      MR. DORCELY:  That is correct.
9      THE HEARING OFFICER:  Okay.  If that's
10  your testimony, okay.
11      MR. MASSENA:  My objection still
12  stands.  However, I understand that the Court
13  may deem is admissible into evidence, and the
14  Court will decide the weight of the evidence.
15      THE HEARING OFFICER:  Absolutely, what
16  the principal has done is establish the
17  foundation to establish relevance subject to
18  cross-examination, and obviously, at some point,
19  I suspect without knowing that I'm going to hear
20  from the respondent himself, but on the narrow
21  issue of the admissibility of the document,
22  Department 20 is in evidence.  All right, given
23  the time of day, we are going to conclude
24  today's hearing.  We're going to reconvene on
                    th
25  June 29  at 10:00 a.m. sharp.  Until then

132

1      JEAN SEVERIN - 06/24/16
2  everyone have a wonderful weekend.  Thank you.
3      MR. MASSENA:  Thank you.
4      MR. FRANCIS:  Thank you.
5      (The hearing adjourned at 17:00 p.m.)

133

CERTIFICATE OF ACCURACY

I, Jessica M. McDonald, do hereby certify that the foregoing typewritten transcript of proceedings in the matter of New York City Department of Education v. Jean Richard Severin, File No. 29298 was prepared using the required transcription equipment and is a true and accurate record of the proceedings to the best of my ability. I further certify that I am not connected by blood, marriage or employment with any of the parties herein nor interested directly or indirectly in the matter transcribed.

Signature:

Date:_____June 30, 2016_____

134

Student Index

Anisha John, Student ''A''
Sidney Wary, Student ''B''
Andre Perry, Student ''C''

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
JEAN RICHARD SEVERIN
Section 3020-a Education Law Proceeding (File #29,298)


DATE:                    June 29, 2016

TIME:                    10:00 a.m. to 5:00 p.m.

LOCATION:                NYC Department of Education
                         Office of Legal Services
                         100 Gold Street, 3rd Floor
                         New York, NY 10038

BEFORE:                  JAMES BROWN, ESQ.
                         HEARING OFFICER

APPEARANCES:    FOR THE COMPLAINANT:
                         MICHAEL FRANCIS, ESQ., of Counsel
                         NYC Department of Education
                         Office of Legal Services
                         49-51 Chambers Street
                         New York, NY  10007
                         Telephone:  (212) 374-6741
                         mfrancis11@schools.nyc.gov

                FOR THE RESPONDENT:
                         ALAIN MASSENA, ESQ.
                         Massena Law P.C.
                         305 Broadway, Suite 1001
                         New York, NY 10007
                         Telephone:  (212) 766-1700
                         avm@massenalaw.com

Sheet 2

## Table of Contents

O P E N I N G   S T A T E M E N T

NAME:                          PAGE:

[None]

W I T N E S S   E X A M I N A T I O N

NAME:                          PAGE:

S. Dorcely:
   Direct (cont.) by Francis       139
   Voir Dire by Massena            146
   Direct (cont.) by Francis       151
   Voir Dire by Massena            158
   Direct (cont.) by Francis       162
   Voir Dire by Massena            166
   Direct (cont.) by Francis       170
   Voir Dire by Massena            178
   Direct (cont.) by Francis       183
   Voir Dire by Massena            186
   Direct (cont.) by Francis       187
   Voir Dire by Massena            196
   Direct (cont.) by Francis       200
   Cross by Massena                202

C L O S I N G   S T A T E M E N T

NAME:                          PAGE:

[None]

E X H I B I T S

| RESPONDENT | DESCRIPTION | I.D. | IN EV. |
| --- | --- | --- | --- |
| 2 | Summons letter to disciplinary meeting, Principal Dorcely, 10/20/15 | 268 | 270 |
| 3 | Summons disciplinary letter, Principal Dorcely, 11/10/15 | 275 | 277 |
| 4 | Summons to disciplinary conference, | 278 | 279 |

---

138

JEAN RICHARD SEVERIN - 06/29/16

1
2       (The hearing commenced at 10:00 a.m.)
3    THE HEARING OFFICER:  Good morning.
4 My name is James A. Brown.  I am the Hearing
5 Officer appointed pursuant to New York State
6 Education Law Section 3020-a, its rules and
7 regulations, as well as the contractual
8 provisions by and between the United Federation
9 of Teachers and the New York City Department of
10 Education.  We are here today in the matter of
11 Jean Richard Severin, SED File Number 29,298.
12 This is a continuing matter; if we could kindly
13 note our appearances beginning on my left.
14    MR. MICHAEL FRANCIS:  For the
15 Department of Education, Michael A. Francis.
16 Good morning.
17    MR. ALAIN MASSENA:  For the
18 Respondent, Alain Massena.
19    THE HEARING OFFICER:  Okay.  I'll note
20 for the record that the Respondent is also here
21 present with us.  While we await the
22 Department's first witness this morning, let's
23 go off the record.  Thank you.
24    [OFF THE RECORD, Waiting for witness
25 0:00:42]

---

## Table of Contents

Principal Dorcely, 11/13/15
| | | | |
| --- | --- | --- | --- |
| 5 | Summons letter, Principal Dorcely, 11/17/15 | 281 | 281 |
| 6 | Summons to disciplinary meeting, Principal Dorcely, 11/23/15 | 284 | 284 |

| DEPARTMENT OF EDUCATION | DESCRIPTION | I.D. | IN EV. |
| --- | --- | --- | --- |
| 21 | Documents regarding fire drills, Principal Dorcely, 5 pages | 144 | 151 |
| 22 | Document concerning meeting, Principal Dorcely regarding absences | 152 | 155 |
| 23 | Summary of disciplinary conference, Principal Dorcely, regarding lesson plans | 156 | 162 |
| 24 | Summary discipline meeting and documentation, Principal Dorcely, regarding submitting grades, 9 pages | 163 | 169 |
| 25 | Summary of disciplinary meeting, Principal Dorcely, regarding submitting grades, 3 pages | 171 | 176 |
| 26 | Summary of disciplinary meeting, Principal Dorcely, regarding absence on 4/23/15, 3 pages | 177 | 183 |
| 27 | Disciplinary meeting, Principal Dorcely, regarding emergency lesson plans, 2 pages | 185 | 187 |
| 28 | Summary of disciplinary meeting, Principal Dorcely, with copy of observation, regarding period seven lesson plans, 5 pages | 189 | 192 |
| 29 | Summary of meeting, Principal Dorcely, regarding scheduling support sessions, 2 pages | 194 | 196 |

---

139

JEAN RICHARD SEVERIN - 06/29/16

1
2    [ON THE RECORD, Waiting for witness
3 0:00:42]
4    THE HEARING OFFICER:  So, let's go
5 back on the record.  Mr. Francis, I see that the
6 Department had called again the Principal to
7 continue with his direct examination.  I want to
8 remind you, Principal, that you are still under
9 oath.  Mr. Francis, it's your witness.
10    MR. FRANCIS:  Thank you.
11 DIRECT EXAMINATION (CONT.)
12 BY MR. FRANCIS
13   Q.  I am going to direct your attention to,
14 again, Department's Number 1, in evidence,
15 specifically Specification number eight.  On or about
16 November 4th, 2015, what occurred?
17   A.  On November 4th, we had a fire drill.  And
18 during the fire drill, the procedure is everyone
19 vacates the building.  Adults, students, they leave
20 to the nearest exit.  In this particular case, I was
21 notified by Principal Michelena, from a school for
22 information, media, and technology--
23    MR. FRANCIS:  I'm sorry, Your Honor.
24 That was Principal...?
25    MR. DORCELY:  Michelena.

140

```
 1        DORCELY - DIRECT - FRANCIS
 2              MR. FRANCIS:  --Michelena.
 3        MR. DORCELY:  From 18 K617.  That's
 4   the school's DBN.
 5        THE HEARING OFFICER:  Just keep your
 6   voice up, please.
 7        MR. DORCELY:  Eight K617 is her
 8   school's DBN.
 9   A.   And she informed me--
10   Q.   [Interposing] What is DBN?
11   A.   The school number so you can identify the
12   school.
13   Q.   Is it housed in the same campus?
14   A.   On the same campus, correct.  So, she's on
15   the second floor.  She informed me that she observed
16   Dr. Severin, when returning to the building--
17        [Crosstalk]
18        MR. MASSENA:  [Interposing] Again,
19   Your Honor, I would object to this testimony.  I
20   understand that hearsay is admissible, but now
21   we're moving into triple hearsay so--
22        [Crosstalk]
23        THE HEARING OFFICER:  [Interposing]
24   Okay, well it does--it does sound like hearsay
25   testimony.  At this point, I'd like the witness
```

142

```
 1   here, and this ambient noise.  Sometimes it
 2   makes it difficult for me to hear.
 3        MR. DORCELY:  Okay, sorry.
 4        THE HEARING OFFICER:  I can move you
 5   up here.  You seem comfortable, so if you could
 6   just try your best to speak up a little bit.
 7        MR. DORCELY:  Okay.
 8        THE HEARING OFFICER:  Thank you.
 9   A.   So, I just want to--Principal Michelena,
10   which her school is 18 K642, it's on the second
11   floor, had informed me that she observed that Dr.
12   Severin, during the end of the fire drill, permitting
13   the students to come in.  I obtained a written
14   statement from the youngster that indicated that it,
15   in fact, did happen.  And I had a disciplinary
16   hearing with Dr. Severin as a result.
17   Q.   Now, is--are all teachers and staff members
18   informed about the school policy regarding the entry
19   and exit from schools, not only in fire drills, but
20   entry into the school during when they first come to
21   the school?
22   A.   Yes.
23        MR. MASSENA:  Objection leading.
24        THE HEARING OFFICER:  Sustained.
```

141

```
 1        DORCELY - DIRECT - FRANCIS
 2   to be permitted just to finish his testimony
 3   response to the question.  Then I'll--we can
 4   revisit this, and I'll make a ruling.  I don't
 5   know if the Principal, as a result of this other
 6   Principal making this report to him, took any
 7   specific steps or actions.  That's really what I
 8   want to hear--
 9        MR. DORCELY:  [Interposing] Yes,
10   that's--
11        THE HEARING OFFICER:  --if, in fact,
12   that's what happened.
13        MR. DORCELY:  That's what took place--
14        THE HEARING OFFICER:  [Interposing]
15   All right.
16        MR. DORCELY:  --as a result of what
17   was observed, including observing the camera one
18   and two, where Dr. Severin allowed students to
19   enter the building back, and it also includes
20   the students--
21        [Crosstalk]
22        THE HEARING OFFICER:  [Interposing]
23   You got to speak slower on the record.  Let me
24   just explain.  Let me take a moment just to
25   explain.  I've got this ventilation system back
```

143

```
 1        DORCELY - DIRECT - FRANCIS
 2   Q.   What instruction is given to teachers and
 3   staff members regarding school safety?
 4   A.   At the beginning of the year, September 18,
 5   we had the AP of Security, AP Alton [phonetic], who
 6   explained the process of the fire drill, and the
 7   expectation regarding fire drill, and we are mandated
 8   to do six fire drills--eight fire drills per year.
 9   And for the September 8 fire drill--I mean
10   explanation by AP Alton, this is the first day when
11   all of the staff come back.  Dr. Severin was present
12   during that process.
13   Q.   And did Dr. Severin sign an attendance
14   sheet in noting that if he was present?
15   A.   Yes.
16   Q.   And that is Department--finally, did you,
17   in fact, do a disciplinary conference with Respondent
18   Severin in regard to him allowing the student to
19   enter the building?
20   A.   Yes.
21   Q.   Okay.
22        MR. FRANCIS:  So, I have in my hand a
23   five page document that I ask be marked
24   Department's 20 for identification.  I have a
25   copy for the Arbitrator, and I have a copy for
```

144

```
1          DORCELY - DIRECT - FRANCIS
2          Respondent.
3          THE HEARING OFFICER:  All right, I
4     think we're up to Department 21, and I'll mark
5     it as such for identification.  I have as
6     Department's 20--
7          [Crosstalk]
8          MR. FRANCIS:  [Interposing] That's
9     correct.  You're correct, my error, Department's
10    21 for identification.  Let the record reflect
11    that I am showing the witness Department's 21
12    for identification.
13         Q.   Could you look at those pages and tell the
14    Arbitrator what each page represents?
15         A.   The first page is the actual summary of the
16    meeting on November 9th.  The second is--include my
17    signature and Dr. Severin's signature.
18         Q.   And it's dated.  Is that correct?
19         A.   That is correct, yes.  It's dated from Dr.
20    Severin's signature on 11/25.  The third page is the
21    student's, Student "A", who was permitted to enter
22    outside of the main.  It's her statement.
23         Q.   Did she sign the statement?
24         A.   Yes, she did.
25         Q.   And did she date the statement?
```

145

```
1          DORCELY - DIRECT - FRANCIS
2          A.   Yes, she did.  The fourth page is the sign
3     in sheet of the staff during September 8th, when they
4     received instruction by not just me, but also AP of
5     Instruction--I mean AP of Security, Mr. Alton,
6     regarding the policy and procedures for fire drill.
7          Q.   And does Respondent Severin's signature
8     appear on the attendance sheet?
9          A.   Yes.
10         Q.   And can you indicate which of the pages his
11    signature appears?
12         A.   The signature appeared on page two, beneath
13    Mr. Satchel's [phonetic] signature.
14         MR. FRANCIS:  At this time, I ask that
15    Department's 21 for identification be moved into
16    evidence at this time.
17         MR. MASSENA:  Objection, Your Honor,
18    and just one moment to speak with my client.
19         THE HEARING OFFICER:  Sure.  Let's go
20    off the record.
21         MR. MASSENA:  Thank you, Your Honor.
22         MR. FRANCIS:  Before we do--
23         [Crosstalk]
24         THE HEARING OFFICER:  [Interposing]
25    No, well let's go off the record.
```

146

```
1          DORCELY - DIRECT - FRANCIS
2          [OFF THE RECORD 0:07:59]
3          [ON THE RECORD 0:07:59]
4          THE HEARING OFFICER:  Let's do that.
5     Let's go back on.  Mr. Massena, you've had an
6     opportunity to review Department's Exhibit 21
7     with your client.  Is there any objection?
8          MR. MASSENA:  Yes, Your Honor.  Well,
9     actually just some brief Voir Dire, Your Honor.
10         THE HEARING OFFICER:  Please.
11         MR. MASSENA:  Thank you.
12    VOIR DIRE
13    BY MR. ALAIN MASSENA
14         Q.   Good morning, Principal Dorcely.
15         A.   Good morning.
16         Q.   Just a few questions.  Regarding what has
17    been marked for identification as Department's 21 for
18    identification, on the third page of Department's 21,
19    there is a letter purportedly signed by Student "A".
20    Am I pronouncing the name correctly?
21         A.   Student "A".
22         Q.   Student "A".
23         A.   Yeah.
24         Q.   So, this is a document that you claim this
25    student signed, correct?
```

147

```
1          DORCELY - VOIR DIRE - MASSENA
2          A.   That's a document that the student signed.
3          Q.   And wrote, correct?
4          A.   The student wrote it.
5          Q.   And who was present when the student wrote
6     this document?
7          A.   Assistant Principal Barnett.
8          Q.   Okay.  And she--did Mr. Barnett, in any
9     way, confirm that the student wrote this document?
10         A.   Confirmed.
11         Q.   Where is that?  Is that on the document?
12         A.   Those are not--when the student signed the
13    statement, you have to observe it.  There is no other
14    place to put that.
15         Q.   Okay.  So, it's you and Principal--and
16    Assistant Principal Barnett alone in the room with
17    the student, correct?
18         A.   The student signed the document in our
19    presence, correct.
20         Q.   Okay.  And no one else is in the room.
21         A.   The student and AP Barnett.
22         THE HEARING OFFICER:  Say it louder,
23    please.
24         A.   The student and the Assistant Principal, AP
25    Barnett.
```

148

DORCELY - VOIR DIRE - MASSENA

```
1          DORCELY - VOIR DIRE - MASSENA
2          Q.   And yourself.
3          A.   I'm not present.
4          Q.   Oh, you were not present--
5   [Crosstalk]
6          Q.   Okay.  Okay, and you were not present when
7   this was signed, okay.
8          MR. MASSENA:  Okay.  Your Honor, I
9   would object to 21 being--21, specifically page
10  three, being moved into evidence, Your Honor.
11         THE HEARING OFFICER:  Would you like
12  to be heard on this, Mr. Francis?
13         MR. FRANCIS:  Certainly.  It is a
14  statement written by the student, who was the
15  student that was allowed to enter the building,
16  observed on camera and observed by a Principal.
17  The student, it's in her handwriting, as
18  testified by the Principal.  The student signed
19  the document.  This also can be entered in as a
20  business record, as it's kept in the ordinary
21  course of business.  And it is a relevant
22  document, because it supports a Specification
23  and a violation of the school safety rules and
24  regulations.
25         [Crosstalk]
```

149

DORCELY - VOIR DIRE - MASSENA

```
1          DORCELY - VOIR DIRE - MASSENA
2          MR. MASSENA:  [Interposing] Yes, Your
3   Honor.  Well again, Principal Dorcely was not
4   present when this document was generated.  This
5   document is not necessarily a document that's
6   kept in the normal course of business.  It's not
7   a document that's maintained by Principal
8   Dorcely.  If anyone were to testify as to moving
9   this into evidence, I believe it would be
10  Assistant Principal Barnett, who obviously the
11  Department has the ability to recall as a
12  witness if they so choose to.
13         THE HEARING OFFICER:  Why, Mr.
14  Francis, are you attaching this third page to
15  the first two pages?
16         MR. FRANCIS:  Because it goes directly
17  to the disciplinary meeting that was held with
18  Assistant Principal Jordan Barnett, as well as
19  Mark Satchel, the representative, to discuss the
20  allegations of professional misconduct.
21         THE HEARING OFFICER:  Does the two
22  page letter that appears as the first two pages
23  of Department 21, make any reference to the
24  student statement?
25         MR. FRANCIS:  Yes.
```

150

DORCELY - VOIR DIRE - MASSENA

```
1          DORCELY - VOIR DIRE - MASSENA
2          THE HEARING OFFICER:  Tell me where.
3          MR. FRANCIS:  Let me show you.  You
4   were then asked about the student, Student
5   "A's", statement that said--
6          MR. MASSENA:  [Interposing] What
7   paragraph?
8          MR. FRANCIS:  This is paragraph one,
9   two, three, four.  You were then asked about the
10  Student, Student "A's", statement that said
11  Brother Severin told me I could go with him, so
12  I could get my phone at the end of the fire
13  drill.
14         THE HEARING OFFICER:  What I am going
15  to do is, I am going to admit this entire five
16  page document, since I only heard an objection
17  with regard to page three, into evidence.  I am
18  going to overrule the objection, but I again
19  just want to make very clear what the
20  Department, I believe, already knows and that is
21  simply this, that this Hearing Officer is not
22  going to find the Respondent guilty of any
23  particular Specification based on hearsay
24  evidence alone.  To the extent that page three
25  is attached and made reference to, excuse me, to
```

151

DORCELY - VOIR DIRE - MASSENA

```
1          DORCELY - VOIR DIRE - MASSENA
2   the extent that page three is made reference to
3   in the disciplinary letter to file, which
4   appears as the first two pages, I will admit it
5   into the record as a unified document; but
6   again, my position on hearsay is clear in this
7   forum.  So, Department 21 is in evidence.
8          [Whereupon Department of Education's
9   Exhibit 21 is admitted into evidence]
10         MR. FRANCIS:  And again, the
11  Department reserves the right to recall
12  Assistant Principal Barnett if need to.
13         THE HEARING OFFICER:  Certainly,
14  that's your right.
15  DIRECT EXAMINATION (CONT.)
16  BY MR. FRANCIS
17         Q.   Now again, I direct your attention to
18  Department's Number 1, in evidence, specifically
19  Specifications nine and ten.  What occurred on or
20  about October 23rd, 2015, and on or about October
21  26th, 2015?
22         A.   As will be required by all staff members,
23  when they're absent, they are to contact a direct
24  supervisor, including my secretary, Ms. Townes
25  [phonetic].  In this particular case, on the twenty
```

152

DORCELY - DIRECT - DORCELY

1
2  third as well as the twenty sixth, we did not get any
3  information that Dr. Severin was going to be absent,
4  which resulted in us scrambling for subs.
5       Q.   And when you say subs, are you referring to
6  substitute teachers?
7       A.   That is correct.
8       Q.   Okay.
9            MR. FRANCIS:  I have in my hand a one
10  page document that I ask be marked Department's
11  22 for identification.  I do have a copy for the
12  Arbitrator.  I do have a copy for Respondent.
13           THE HEARING OFFICER:  Okay.  So, I'll
14  mark this as Department's Exhibit 22 for
15  identification.
16           MR. FRANCIS:  Thank you.
17       Q.   I show you Department's Number 22 for
18  identification.  Do you recognize the document?
19       A.   Yes.
20       Q.   And what do you recognize it to be?
21       A.   This is a document of a meeting that was
22  held.  This also referenced the instance of not
23  advising us of absences was noted in this write up.
24  And during my conversation question with Dr. Severin,
25  he did indicate that--no, I think from this here, it

153

DORCELY - DIRECT - DORCELY

1
2  is his signature, but he did indicate that he did not
3  want any conversation in reference to his absence on
4  the twenty third or the twenty sixth.
5       Q.   I also ask that you look at these two
6  additional pages for Department's 22 for
7  identification.  Do you recognize those documents?
8            THE HEARING OFFICER:  Do we have
9  those?
10           MR. FRANCIS:  Yes.
11           THE HEARING OFFICER:  Okay.
12           MR. FRANCIS:  No, I have it.  I have a
13  copy of it for you.
14           THE HEARING OFFICER:  Okay.  So, while
15  the Respondent has it, I'm sorry, while the
16  witness, forgive me, has it in his hands, maybe
17  you can give copies to counsel and myself.
18  Let's go off the record for a moment, please.
19           [OFF THE RECORD 0:15:58]
20           [ON THE RECORD 0:15:58]
21           THE HEARING OFFICER:  Okay, so let's
22  go back on the record.  Mr. Francis?
23       Q.   And again, I ask you if that's your
24  signature at the bottom of Department's 22 for
25  identification.

154

DORCELY - DIRECT - DORCELY

1
2       A.   Yes, it is.
3       Q.   And does there appear to be another
4  signature at the bottom of Department's 22 for
5  identification?
6       A.   Yes.  It's Dr. Severin's.
7       Q.   Okay.
8            MR. FRANCIS:  I ask at this time that
9  Department's 22 for identification be admitted
10  into evidence.
11           THE HEARING OFFICER:  Any objection?
12           MR. MASSENA:  Just one moment.
13           THE HEARING OFFICER:  Yeah, sure.
14           MR. MASSENA:  Thank you.
15           THE HEARING OFFICER:  Would you like
16  to go off the record?
17           MR. MASSENA:  Yes, please.
18           THE HEARING OFFICER:  Let's go off the
19  record.
20           [OFF THE RECORD 0:16:28]
21           [ON THE RECORD 0:16:28]
22           THE HEARING OFFICER:  All right, let's
23  go back on.
24           MR. MASSENA:  No objection, Your
25  Honor.

155

DORCELY - DIRECT - DORCELY

1
2            THE HEARING OFFICER:  All right, so
3  Department 22 is in evidence.
4            [Whereupon Department of Education's
5  Exhibit 22 is admitted into evidence]
6            MR. FRANCIS:  And it's a one
7  page document.
8            MR. FRANCIS:  That's correct.  And I
9  am going to ask that we go off the record one
10  time so I can consult with--not consult with,
11  but have a conversation with the--with my--
12           THE HEARING OFFICER:  [Interposing]
13  Sure.
14           MR. FRANCIS:  --with Respondent's
15  counsel.
16           THE HEARING OFFICER:  So, let's go off
17  the record for that purpose.
18           [OFF THE RECORD 0:16:54]
19           [ON THE RECORD 0:16:54]
20           THE HEARING OFFICER:  Okay, let's go
21  back on the record.  Mr. Francis?
22           MR. FRANCIS:  Yes.
23       Q.   And I direct your attention to
24  Specification 12.  What occurred on or about
25  September 11th, 2015?

156

DORCELY - DIRECT - DORCELY

1
2    A.    On September 11th, my colleagues and I were
3  doing a walk through the building, going into class
4  rooms.  And during that time, we entered in Dr.
5  Severin's class room with his co-teacher.  And during
6  that time, Dr. Severin did not have, and his co-
7  teacher, a lesson plan readily available, or no
8  instructional objectives on the board as a result.
9    Q.    And as a result of that observation, did
10 you take any action with respect to a disciplinary
11 conference?
12   A.    That is correct.
13         MR. FRANCIS:  I have in my hand a two
14 page document that I ask be marked Department's
15 23 for identification.  I have a copy for the
16 Arbitrator, and I have a copy for Respondent.
17         THE HEARING OFFICER:  Okay.  So, I'll
18 mark this as Department's 23 for identification.
19         MR. FRANCIS:  Let the record reflect
20 that I am showing the witness Department's 23
21 for identification.
22   Q.    I ask you to tell the Arbitrator if you
23 recognize that document.
24   A.    Yes.
25   Q.    And what do you recognize it to be?

157

DORCELY - DIRECT - DORCELY

1
2    A.    It is a summary of our disciplinary
3  conference, and also a summary of the walk through
4  that was conducted between my Assistant Principal, AP
5  Barnett, and Dr. Howell.  And when we entered the
6  class room, and again, there was no lesson plan
7  readily available, or as well as a summary of Dr.
8  Severin's comment during that discipline meeting.
9    Q.    As you look at page two for Department's 23
10 for identification, I see that there are signatures
11 at the bottom of page two.  Whose signatures are
12 those?
13   A.    One is my signature, followed by Dr.
14 Severin, including a statement, a written statement
15 by him.
16   Q.    Okay.
17         MR. FRANCIS:  At this time, I ask that
18 Department's 23 for identification be moved into
19 evidence.
20         THE HEARING OFFICER:  Any objection?
21         MR. MASSENA:  Yes, Your Honor.  Just
22 may we go off the record for a moment?
23         THE HEARING OFFICER:  Sure.
24         MR. MASSENA:  Okay.
25         [OFF THE RECORD 0:19:37]

158

DORCELY - DIRECT - DORCELY

1
2         [ON THE RECORD 0:19:37]
3         THE HEARING OFFICER:  On the record.
4  Any objection to Department 23?
5         MR. MASSENA:  Just a brief Voir Dire,
6  Your Honor.
7         THE HEARING OFFICER:  Sure.
8         MR. MASSENA:  Okay.
9  VOIR DIRE
10 BY MR. ALAIN MASSENA
11   Q.    Principal Dorcely, this document that has
12 been moved into--or has been identified for--has been
13 marked for identification as Respondent's 23--
14         THE HEARING OFFICER:  [Interposing]
15 Department 23.
16   Q.    --Department's 23, when was this document
17 generated?  If your recollection, if you recall, when
18 was the document generated without looking at the
19 document?
20         THE HEARING OFFICER:  Yeah, if you
21 don't know, you can say I don't know, or I don't
22 remember and then we'll go from there.
23   A.    When it was printed or...?
24   Q.    When was it generated, once again, without
25 looking at the document.

159

DORCELY - VOIR DIRE - MASSENA

1
2    A.    I don't recall.
3    Q.    Okay.  And did you type this document up
4  personally, or did someone else type the document--
5    A.    [Interposing] I type all my letters.
6    Q.    Okay.  And does someone review the letter,
7  or does someone proof read the letter?
8    A.    No.
9    Q.    Okay.  And once the document is generated
10 by you, how is it--how is it kept?  In what database
11 is it kept?
12   A.    It's not.  It's printed out and given to
13 Dr. Severin.
14   Q.    Okay.  And how many copies are made?
15   A.    Two copies.
16   Q.    Okay.  And where do the two copies go?
17   A.    One goes to Dr. Severin for signature.  He
18 -- [00:01] returns it, and one goes to me for file.
19   Q.    Okay.  And is that your procedure with all
20 such documents such as this?
21 [Crosstalk]
22   A.    --yes, I give--it would be either my
23 secretary will give it to them, or in his mailbox,
24 but the document is generated by me.
25   Q.    Now on the second page of what has been

160

```
1           DORCELY - VOIR DIRE - MASSENA
2    marked for identification as Department's Number 23,
3    there is a handwritten--a handwritten note.  Is that
4    note written by you?
5         A.  No.
6         Q.  Okay.  Who is that note written by?
7         A.  That is Dr. Severin.
8         Q.  Okay.  And you observed him write that
9    note?
10        A.  It returned to me signed by Dr. Severin
11   with this.
12        Q.  Okay.  And what does that note say?
13        A.  It says, I can't make out his handwriting.
14        Q.  Well, you--
15   [Crosstalk]
16        Q.  So, you said you don't recognize the
17   handwriting.
18        A.  But it's given back to me from Dr. Severin
19   though.
20        Q.  Okay.  And you said you do or do not
21   recognize the handwriting?
22        A.  You asked me what's at the bottom--
23        Q.  [Interposing] Yes.
24   [Crosstalk]
25        Q.  Yes.
```

162

```
1    some point in time?
2         A.  No, this was part of the Specification.
3         Q.  Okay.  Did you turn these documents over to
4    Mr. Francis at some point in time between the time
5    that you generated it and today?
6         A.  All the documentation that is here was
7    given to the Department.
8         Q.  Okay.
9             MR. MASSENA:  No objection, Your
10   Honor.
11            THE HEARING OFFICER:  All right.  So,
12   Department 23 is in evidence.
13            [Whereupon Department of Education's
14   Exhibit 23 is admitted into evidence]
15            MR. FRANCIS:  Okay.
16   DIRECT EXAMINATION (CONT.)
17   BY MR. FRANCIS
18        Q.  Again, I direct your attention to
19   Department's Number 1 in evidence, specifically
20   Specification number 13.  What occurred on or about
21   June 15th, 2015?
22        A.  So during that time, we are requesting
23   grades, particularly for marking three, and marking
24   period four, so we can finalize the graduation
25
```

161

```
1           DORCELY - VOIR DIRE - MASSENA
2         A.  Reading it.  Would you like me to read it?
3         Q.  Yes, please.
4         A.  This is an accurate summary.
5         Q.  Accurate or inaccurate?
6         A.  This is--this is an, and I see accurate.
7         Q.  And you don't see anything before accurate,
8    the word accurate, as in I-N, inaccurate?
9         A.  No.  It says this is an, A-N, and then it
10   says inaccurate summary of the meeting?
11        Q.  Mm hmm.
12        A.  Oh, I should have--I showed you a copy of
13   the lesson plan.
14        Q.  Okay.
15        A.  R-S, initialized.
16        Q.  And R-S initialized, that's for Richard
17   Severin?
18        A.  I would assume, correct.
19        Q.  Okay.  And upon receiving this, what did
20   you do with this?
21        A.  Put it in the file.
22        Q.  Okay.  And upon--and then how did the--this
23   document find its way to us today?
24        A.  It's presented as Specification.
25        Q.  Did you turn this over to the Department at
```

163

```
1           DORCELY - DIRECT - FRANCIS
2    decision.  In this case here, Dr. Severin did not
3    submit his grades in a timely manner.
4             MR. FRANCIS:  I have in my hand a nine
5    page document that I ask be marked Department's
6    Number 24 for identification.  I have a copy for
7    the Arbitrator, and I have a copy for
8    Respondent.
9             THE HEARING OFFICER:  Okay.  So, we'll
10   mark this as Department's 24 for identification.
11            MR. MASSENA:  And, Your Honor, may we
12   just go off the record briefly?
13            THE HEARING OFFICER:  Yeah, we're
14   doing a lot of that--
15   [Crosstalk]
16            THE HEARING OFFICER:  Okay, let's do
17   it again.  Let's go off the record.
18            [OFF THE RECORD 0:25:20]
19            [ON THE RECORD 0:25:20]
20            THE HEARING OFFICER:  Go back on the
21   record.  All right, I have the document before
22   me.  I have marked it for identification as
23   Department 24.
24            MR. FRANCIS:  Let the record reflect
25   that I am showing Principal Dorcely Department's
```

**164**

```
1              DORCELY - DIRECT - FRANCIS
2         24 for identification.
3         Q.   And I ask that you look at those documents
4    and let me know if you recognize them.
5         A.   The first page is a summary of the
6    discipline meeting held with Dr. Severin.  As noted
7    also, this is the second time this incident of not
8    submitting his EGG file occurred.
9         Q.   And could you please tell the Arbitrator
10   what an EGG file is?
11        A.   Electronic grading system, where all
12   teachers submit their grades, so we can process
13   students' report cards.  In this case here, the
14   urgency was it was Regents, and following Regents for
15   graduation decisions.  The second page is a
16   correspondence, through our system we have with our
17   daily docket, where we inform our staff, please be
18   advised, looking ahead, these are the things that are
19   due, to give them advance--advance information of
20   let's get these things ready.  In this case, the
21   second document is dated on June 5th, a daily docket
22   sent out by the secretary informing all the staff of
23   the grades are due.  The third page is a continuation
24   of that document, more specifically with the specific
25   dates when the EGG files are due.  The fourth page is
```

**165**

```
1              DORCELY - DIRECT - FRANCIS
2    a correspondence with Dr. Severin, informing him that
3    his EGG files have not been received.  The fifth page
4    is a continuation of that correspondence.  Page
5    number six, number six a correspondence, again with
6    Dr. Severin, for his marking period four grade, where
7    he is being advised to please submit the grade, and
8    his correspondence with my Assistant Principal, and I
9    am cc'd on that exchange.  The seventh page is
10   similar.  And the page number eight is my Assistant
11   Principal, Ms. Barnett.  I am cc'd on it, including
12   in this case here, because it's an urgent matter, we
13   have to make decisions, the UFT Chapter Leader is
14   also included in that correspondence, requesting the
15   grade, the marking period grade.  And then the final
16   page is an email sent of high importance to Dr.
17   Severin, informing him that we need, again, we need
18   your marking period grades, and I am cc'd on that
19   exchange as well.
20             MR. FRANCIS:  At this time, I ask that
21        Department's 24 for identification be moved into
22        evidence.
23             MR. MASSENA:  Just brief Voir Dire,
24        Your Honor.
25             THE HEARING OFFICER:  Certainly.
```

**166**

```
1              DORCELY - VOIR DIRE - MASSENA
2              VOIR DIRE
3    BY MR. ALAIN MASSENA
4         Q.   As to the second page of the--what has been
5    marked for identification as Department's Number 24,
6    you indicated that this page reflects when the grades
7    are due?
8         A.   No, this is the correspondent email--
9         Q.   [Interposing] Okay.
10        A.   --to all the staff, including Dr. Severin.
11        Q.   Okay.
12        A.   That's the system we have.
13        Q.   And how is this--how is this--this is sent
14   out every day?
15        A.   It's a daily docket, yeah, it's called
16   every day.
17        Q.   Okay.  And it's sent by whom?
18        A.   By Ms. Townes, the secretary.
19        Q.   Okay.  And do you receive--does Ms. Townes
20   receive some sort of correspondence that the
21   individuals attached to this email have actually
22   opened or ever actually seen this correspondence?
23        A.   What, a read receipt?
24        Q.   Yes, a read receipt.
25        A.   Yes, we have read receipts.
```

**167**

```
1    DORCELY - VOIR DIRE - MASSENA
2         Q.   Do you have a copy of that read receipt?
3         A.   No, it's not here.
4         Q.   Okay.
5         A.   But the entire school gets this, and this
6    is also I make morning announcements as well.
7         Q.   Well just, Principal Dorcely, just one
8    moment, please.  Again, the question was is there a
9    read receipt that comes with this email?  Yes or no.
10        A.   This daily docket is sent to every single
11   staff member.
12        Q.   Okay once again--
13             THE HEARING OFFICER:  [Interposing]
14        Just listen to the question and then answer
15        specifically the question asked of you, please.
16        Q.   Does the send of this email receive a read
17   receipt for the recipients of this email upon the--
18   upon the recipient opening or receiving the email?
19        A.   For this case, no.
20        Q.   Okay.  And again, it's the people's
21   position that this particular document is--represents
22   notice to Dr. Severin.  Is that correct?
23        [Crosstalk]
24        Q.   The Department's position.
25        [Background conversation]
```

168

DORCELY - VOIR DIRE - MASSENA

1    Q.   Is that the Department's position?
2    A.   That's correct.
3    Q.   Okay.
4         MR. MASSENA:  Your Honor, we object to
5    the daily docket coming into evidence.
6         THE HEARING OFFICER:  Okay.  Now, this
7    is, I think, it was represented a nine page
8    document.  Are there any other pages within
9    Department 24 which the Respondent is objecting
10   to?
11        [Background conversation]
12        MR. MASSENA:  No, Your Honor.
13        THE HEARING OFFICER:  Okay.  So, the
14   only pages you're bringing to my attention, for
15   the purpose of your objection, are pages two and
16   three, and which have been described as the
17   daily docket.  Mr. Francis, do you want to be
18   heard on this before I make a ruling?
19        MR. FRANCIS:  Briefly.
20        THE HEARING OFFICER:  Sure.
21        MR. FRANCIS:  The daily docket is sent
22   to the--every teacher on a daily basis.  Doctor,
23   excuse me, Respondent Severin, Richard, is the
24   first name on the list of many individuals who

169

DORCELY - VOIR DIRE - MASSENA

1    the email is sent to on a daily basis.  And as
2    such, this is relevant to the fact that he's on
3    notice to present the documentation as
4    requested.
5         THE HEARING OFFICER:  Okay.  I am
6    going to admit this entire document, including
7    pages two and three of daily docket,
8    specifically into evidence.  There's an
9    indication on page two that the Respondent was a
10   recipient of this daily docket two page email.
11   I am going to operate under the presumption that
12   the email was indeed sent to the Respondent.
13   Now, if it turns out that the Respondent
14   testifies that his--that he, if indeed, at the
15   appropriate time, the Respondent testifies that
16   he did not said document, certainly I will hear
17   that testimony and any arguments attendant to
18   that; but I am going to, at this time, admit the
19   entire nine page document into evidence.
20   Department 24 is in evidence.
21        [Whereupon Department of Education's
22   Exhibit 24 is admitted into evidence]
23   DIRECT EXAMINATION (CONT.)
24   BY MR. FRANCIS

170

DORCELY - DIRECT - FRANCIS

1    Q.   Again, I direct your attention to
2    Department's Number 1 in evidence, specifically
3    Specification number 14.  What, if anything, occurred
4    on or about May 29th, 2015?
5    A.   Similar to the request for the marking
6    period grades for three and four, we experienced the
7    same behavior for marking period number two, where we
8    also requested the EGG file, so that we can generate
9    student grades.
10        THE HEARING OFFICER:  I just want to
11   note for the record that EGG file is spelled E-
12   G-G, all capital letters.
13        MR. FRANCIS:  Thank you for that.
14        MR. DORCELY:  And it stands for
15   electronic grade--
16        THE HEARING OFFICER:  [Interposing]
17   Gathering.
18        MR. DORCELY:  --gathering, yeah.
19   Q.   Was the failure to submit marking period
20   two EGG files documented in any way?
21   A.   Yes.
22   Q.   And how was that documented?
23   A.   It led to, based on the failure, a
24   disciplinary meeting with Dr. Severin, for his

171

DORCELY - DIRECT - FRANCIS

1    failure to submit his marking period two grade.
2         MR. FRANCIS:  I have in my hand a
3    three page document that I ask be marked
4    Department's Number 25 for identification.  I am
5    handing a copy to the Arbitrator, and I am
6    handing a copy to Respondent.
7         THE HEARING OFFICER:  All right, we'll
8    mark this as Department 25 for identification.
9         MR. FRANCIS:  I ask that Principal
10   Dorcely look at Department's 25 for
11   identification.
12   Q.   And please tell the Arbitrator if you
13   recognize the document, and if you do, what do you
14   recognize it to be.
15   A.   On the first page, it's a summary of my
16   disciplinary meeting with Dr. Severin.  In this
17   particular case, Dr. Severin had waived his right for
18   union representation, and I have attached.  And also
19   attached is an excerpt from the handbook, indicating
20   on page 37 the procedures for submitting his EGG
21   file.  On page number two, it's my signature, as well
22   as Dr. Severin's.  On page number three, it's
23   correspondence with Dr. Severin.  In this case here,
24   I emailed Dr. Severin with the date and time,

172

DORCELY - DIRECT - FRANCIS

1          DORCELY - DIRECT - FRANCIS
2    indicating that I have not received his EGG file and
3    it's 7:03 p.m. and the EGG file was due by 3:00 p.m.
4       [Background conversation]
5       MR. FRANCIS:  At this time, I ask that
6    Department's 25 for identification be moved into
7    evidence.
8       MR. MASSENA:  Okay.  I would simply
9    ask that--I would object to the third page, the
10   first portion of the third page, which is an
11   email from Mr. Dorcely to Principal--I'm sorry,
12   from Dr. Severin to Principal Dorcely, that that
13   portion of the email correspondence be redacted
14   as not relevant to--not relevant to the
15   testimony involved.
16      THE HEARING OFFICER:  Okay, Mr.
17   Francis?  It seems, to my eyes, to be an
18   unrelated matter.
19      MR. FRANCIS:  Well, permit me to
20   question the witness on that particular issue.
21      THE HEARING OFFICER:  Okay.
22      Q.  I see that there is an email from
23   Respondent Severin to yourself regarding this re
24   missing grades.  Is that--how is that email relevant
25   to the Specification that we're discussing?

173

DORCELY - DIRECT - FRANCIS

1          DORCELY - DIRECT - FRANCIS
2       THE HEARING OFFICER:  No, if I may,
3   Mr. Francis, I think, as I have heard
4   Respondent's counsel argue, and correct me if
5   I'm correct, Mr. Massena, you were referring to
6   the part that appears below good morning Mr.
7   Dorcely--
8      MR. MASSENA:  [Interposing] Correct,
9   Your Honor.
10      THE HEARING OFFICER:  --and appears
11   basically to be two lines.  So, if you could
12   take a look at that, Mr. Francis, and see if you
13   agree that it's not relevant, in which case it
14   should be redacted, or if you have some other
15   position.
16      MR. FRANCIS:  Again, I would ask the
17   witness whether or not the--
18      THE HEARING OFFICER:  [Interposing]
19   Okay.
20      MR. FRANCIS:  --first email is
21   relevant to the Specification that we're
22   discussing.
23      THE HEARING OFFICER:  Okay.  Why don't
24   you go ahead and do that then?
25      Q.  Would you take a look at the first

174

DORCELY - DIRECT - FRANCIS

1          DORCELY - DIRECT - FRANCIS
2    paragraph and read it, and please inform the
3    Arbitrator whether or not if that email is relevant
4    to the Specification that we're discussing.
5      A.  In this case, it seems it's in the same
6    body of correspondence, so in a response, missing
7    grade, the conversation became about missing grades,
8    where he indicated, Dr. Severin, that he is not able
9    to report to work.  So, it's on that same
10   correspondence.  So, now you can respond to an email
11   and then...
12      THE HEARING OFFICER:  Does it pertain,
13   if you know, Principal, to the specific
14   Specification at issue, namely Specification
15   four, which charges the Respondent with failing
16   to follow a directive to supply marking period
17   two electronic grade gathering files by a
18   certain due date.
19      MR. FRANCIS:  I would argue, if I may-
20  -
21      THE HEARING OFFICER:  [Interposing]
22   Yeah.
23      MR. FRANCIS:  --I would argue that it
24   is part of the narrative.
25      [Crosstalk]

175

DORCELY - DIRECT - FRANCIS

1          DORCELY - DIRECT - FRANCIS
2      MR. FRANCIS:  I'm indicating that his
3   email to Principal Dorcely indicates he can't
4   report to work, which is probably--
5      THE HEARING OFFICER:  [Interposing]
6   Well, let's not do probably, all right.  Let's
7   just find out from the witness what his
8   testimony is regarding this and then we'll go
9   from there.
10      MR. DORCELY:  I would say they do
11   interconnect.
12      THE HEARING OFFICER:  Okay.
13      MR. DORCELY:  That's why it's all in
14   one page.
15      THE HEARING OFFICER:  What I am going
16   to do is I am going to overrule the objection if
17   that's the only objection being raised with
18   regard to Department 25.  I am going to admit
19   the document as is.  If it turns out, in my
20   review of the document and my consideration of
21   the evidence, I determine that it's not
22   relevant, you can rest assured that I will
23   disregard those two lines; but I think for the
24   purpose of efficiency at this juncture, I am
25   going to admit the entire document, but keep in

176

```
 1        DORCELY - DIRECT - FRANCIS
 2        mind the objection raised by Respondent.
 3        Department 25 is in evidence.
 4              [Whereupon Department of Education's
 5        Exhibit 25 is admitted into evidence]
 6              MR. FRANCIS:  Thank you.  Can we go
 7        off?
 8              THE HEARING OFFICER:  Sure, let's go
 9        off the record.
10              [OFF THE RECORD 0:40:08]
11              [ON THE RECORD 0:40:08]
12              THE HEARING OFFICER:  Let's go back on
13        the record.  Okay, we're back on.
14        Q.    I want to direct your attention to
15        Department's Number 1 in evidence, specifically
16        Specification number 15.  What occurred on or about
17        April 23rd, 2015?
18        A.    On April 23rd, we began to notice a similar
19        pattern of not notifying me myself as the direct
20        supervisor, or Ms. Townes, of absences.  In this case
21        here, Dr. Severin failed to advise us that he was not
22        going to be at work, resulting in us looking for a
23        substitute teacher.
24        Q.    And was that documented in any way?
25        A.    Yes.  It led to a disciplinary meeting
```

177

```
 1        DORCELY - DIRECT - FRANCIS
 2        again.
 3              MR. FRANCIS:  I have in my hand a
 4        three page document that I ask be marked
 5        Department's 26 for identification.  I have a
 6        copy for the Arbitrator, and I have a copy for
 7        Respondent.
 8              MR. MASSENA:  Thank you.
 9              THE HEARING OFFICER:  Okay.  So, we'll
10        mark this as Department 26 for identification.
11              MR. FRANCIS:  Thank you.  Let the
12        record reflect that I am showing Principal
13        Dorcely the three page document marked
14        Department's 26 for identification.
15        Q.    I ask that you take a look at those
16        documents and tell the Arbitrator if you recognize
17        those documents, and if so, what do you recognize
18        them to be.
19        A.    This is a summary of my disciplinary
20        meeting for Dr. Severin, in addition to Dr. Severin
21        waiving to union representation.  During our meeting,
22        I informed Dr. Severin of his absence, how did he
23        respond, and he made a note here, and that is my
24        signature on the second page, dated April 2015.  That
25        is the documentation of Dr. Severin's April's time
```

178

```
 1        DORCELY - DIRECT - FRANCIS
 2        card, both the front and the back.  And the third
 3        page indicate that twenty third, where is says no
 4        contact, no show.
 5              MR. FRANCIS:  At this time, I'd ask
 6        that Department's 26 for identification be moved
 7        into evidence.
 8              THE HEARING OFFICER:  Any objection?
 9              MR. MASSENA:  Just brief Voir Dire,
10        Your Honor.
11              THE HEARING OFFICER:  Sure, go ahead.
12        VOIR DIRE
13        BY MR. ALAIN MASSENA
14        Q.    The second and third pages of what has been
15        marked for identification as Department's 26, what
16        are those--the second and third page, what are those
17        again?
18        A.    Dr. Severin's April time card of 2015.
19        Q.    Okay.  And how do you know that to be the
20        case?
21        A.    It says April 2015.  It's his time card.
22        Q.    It says what, I'm sorry?
23        A.    It's Dr. Severin's time card.
24        Q.    Okay.  And I said how do we know--how do we
25        know it to be his time card again?  Because it says
```

179

```
 1        DORCELY - VOIR DIRE - MASSENA
 2        his name you said?
 3        A.    Yes.
 4        Q.    Okay.  And what date is this in reference
 5        to?
 6        A.    The April 23rd absence.
 7        Q.    Okay.  And is there any date on these time
 8        cards?
 9        A.    Yes, if you turn to the second and third
10        page.  It's both the front and the back.
11        Q.    Okay.  And where is the date indicated on
12        these time cards?
13        A.    Do you have the third page?
14        [Crosstalk]
15              THE HEARING OFFICER:  --in the fact
16        that you have offered a second page--
17              MR. MASSENA:  [Interposing] Okay.
18              THE HEARING OFFICER:  --Mr. Francis.
19        Let me just ask.  Is this intentional or is
20        this--
21              [Crosstalk]
22              MR. FRANCIS:  --front and back of the
23        month--
24              [Crosstalk]
25              THE HEARING OFFICER:  [Interposing]
```

---

**180**

DORCELY - VOIR DIRE - MASSENA

2         Oh, I see, forgive me. And I think the witness
3 did make that clear.
4         MR. FRANCIS: Yes.
5         THE HEARING OFFICER: I'm sorry,
6 continue.
7         MR. MASSENA: Okay.
8         Q. So, it's your testimony that this is the
9 front and back of the entire month of April. Is that
10 correct?
11         A. That is correct.
12         Q. Okay. So, the first--the first document--
13 the first page is not in reference to April 23rd. Is
14 that correct?
15         A. The first letter is a summary of our
16 discipline meeting.
17         Q. No, I'm sorry, I apologize. The first--the
18 second page is not in reference to April 23rd. Is
19 that correct?
20         A. No. It's in reference to April.
21         Q. Okay. So, the second page is the only page
22 that speaks to April 23rd. Is that correct?
23         THE HEARING OFFICER: The second page-
24 -
25         [Crosstalk]

---

**181**

DORCELY - VOIR DIRE - MASSENA

2         MR. MASSENA: --the second page of the
3 time card. Thank you. Thank you, Your Honor.
4         A. Yes, the third page referenced the April
5 23rd absence.
6         Q. Okay.
7         MR. MASSENA: So, I would object to
8 the first page being moved into evidence.
9         THE HEARING OFFICER: The first page
10 of the time card.
11         MR. MASSENA: The first page of the
12 time card.
13         THE HEARING OFFICER: That's the basis
14 for your objection. Mr. Francis?
15         MR. FRANCIS: And basically the
16 objection is...?
17         THE HEARING OFFICER: What is--on
18 what grounds?
19         MR. MASSENA: On the grounds that it's
20 not relevant to the Specification of April 23rd,
21 2015.
22         THE HEARING OFFICER: Mr. Francis?
23         MR. FRANCIS: The relevance is that
24 this is one card. It's a front and back as
25 testified to by Principal Dorcely. It's

---

**182**

DORCELY - VOIR DIRE - MASSENA

2 basically one document.
3         THE HEARING OFFICER: Okay.
4         MR. MASSENA: But then I would argue
5 that any--any markings on the first page of the
6 time card be redacted. It's not relevant and
7 not viewable by the Arbitrator.
8         THE HEARING OFFICER: Any thoughts?
9         MR. FRANCIS: That part is that it's
10 one document. The twenty third is clearly
11 marked that he was absent, no call, no--with N-
12 C, N-S.
13         THE HEARING OFFICER: Okay. Unless
14 there is any objection--other objections to
15 Department 26, I am going to admit it into
16 evidence. I can easily disregard one page of
17 the two page time card. To the extent it
18 represents the front of the time card and page
19 three, or the second page of the time card,
20 represents the back of the card, it's
21 essentially one document photocopied over two
22 pages. The relevant information, based on what
23 I'm hearing from the Department, is that which
24 appears on page three, or the second page of the
25 time card. That's where my focus will lie.

---

**183**

DORCELY - VOIR DIRE - MASSENA

2 Department 26 is in evidence.
3         [Whereupon Department of Education's
4 Exhibit 26 is admitted into evidence]
5 DIRECT EXAMINATION (CONT.)
6 BY MR. FRANCIS
7         Q. Now again, with respect to Department's 26
8 now in evidence, look at the third--the second page
9 of the time card on the date of April 23rd. I see
10 there is writing there. Could you please tell the
11 Arbitrator what that writing represents?
12         A. Yes. When a staff member is absent, we
13 make a notation, in this case here, that indicates
14 that the N-C, the no contact.
15         Q. Okay.
16         THE HEARING OFFICER: And below that?
17         MR. DORCELY: It's N-S, no show.
18         THE HEARING OFFICER: Thank you.
19         MR. FRANCIS: Thank you.
20         Q. I, again, direct your attention to
21 Department's Number 1 in evidence, specifically
22 Specification 16. What occurred on or about February
23 2nd, 2015?
24         A. On February, this would be the second term
25 of the school year, the second 90 days of school.

184

DORCELY - DIRECT - FRANCIS

1    And in this case, we ask all staff members, teachers,
2    to refer--to get their lesson plans to renew whatever
3    they use.  In this case here, we have yet to receive
4    Dr. Severin's three emergency lesson plans for that
5    second term.
6         Q.   Now, could you please explain to the
7    Arbitrator what an emergency lesson plan is?
8         A.   If a teacher is absent, we have to have on
9    file, it's part of my handbook, that they must have
10   on record three emergency lesson plans so we can
11   quickly utilize their lesson plans for any of the
12   subs, so there is no disruption in the continuity of
13   instruction.
14        Q.   And when you indicate subs, is that in
15   reference to a substitute teacher?
16        A.   That is correct.
17        Q.   Now, was this failure to have three
18   emergency lesson plans documented in any way?
19        A.   Yes.  It was documented through a
20   disciplinary conference with Dr. Severin for his
21   failure.
22        Q.   Okay.
23             MR. FRANCIS:  I have a two page in my
24   hand that I'd ask be marked Department's number

185

DORCELY - DIRECT - FRANCIS

1    27 for identification.  I have a copy for the
2    Arbitrator.  I am handing that over at this
3    time.  And I have a copy for Respondent, and I
4    am handing that over at this time.
5             [Crosstalk]
6             THE HEARING OFFICER:  So, we'll mark
7    this as Department 27 for identification.
8             MR. FRANCIS:  Thank you.
9         Q.   I ask that you look at Department's 27 for
10   identification.  Do you recognize this two page
11   document, and if so, what do you recognize it to be?
12        A.   This document is a summary of a
13   disciplinary conference with Dr. Severin and the
14   District representative, Mr. Charlie Turner
15   [phonetic].  In this particular case, I asked Dr.
16   Severin, we have yet to receive his emergency lesson
17   plan, and his response.  And it's cited on the
18   handbook, particular what's expected, and that Dr.
19   Severin neglected his duties.  It includes my
20   signature.  It also includes Dr. Severin's signature
21   on the first page.  On the second page, it's a
22   correspondence, and this is in January which is still
23   in term one, where we are informing staff about
24   having emergency lesson plans available.  In this

186

DORCELY - DIRECT - FRANCIS

1    case here, the secretary, Ms. Townes, is informing
2    Dr. Severin that he has used up his emergency lesson
3    plans as a result of his absence, and to please
4    replenish three more.
5             MR. FRANCIS:  I'd ask that
6    Department's 27 for identification be moved into
7    evidence at this time.
8             MR. MASSENA:  Okay, just some brief
9    Voir Dire regarding page two of what is
10   Department's Number 27 marked for
11   identification.
12            THE HEARING OFFICER:  Sure, please.
13   VOIR DIRE
14   BY MR. ALAIN MASSENA
15        Q.   As to the second page of what's been marked
16   for identification as Department's Number 27,
17   Principal Dorcely, this email is an email that was
18   sent from Ms. Townes, who is the secretary, correct?
19        A.   That's correct.
20        Q.   To Dr. Severin, is that correct?
21        A.   Correct.
22        Q.   Okay.  And to your knowledge, does the
23   sending of this email include a read receipt?
24        A.   No, to my knowledge, no.

187

DORCELY - VOIR DIRE - MASSENA

1         Q.   Okay.  Okay, so there is no way to
2    authenticate whether or not this document was
3    actually received by Mr.--by Dr. Severin.  Is that
4    correct?
5         A.   We discussed it during our meeting.
6         Q.   Okay.
7         A.   It's referenced with his union rep.
8         Q.   Okay.  Well, this is not cross examination,
9    but again based on this email, there is no
10   documentation that Dr. Severin received this
11   document, correct?
12        A.   Other than him--the email generated, no, no
13   receipt.
14        Q.   Okay.
15             MR. MASSENA:  Okay, no objection, Your
16   Honor.
17             THE HEARING OFFICER:  Okay.  So,
18   Department 27 is in evidence.
19             [Whereupon Department of Education's
20   Exhibit 27 is admitted into evidence]
21   DIRECT EXAMINATION (CONT.)
22   BY MR. FRANCIS
23        Q.   I direct your attention again to
24   Department's Number 1 in evidence, specifically

---

**188**

DORCELY - DIRECT - FRANCIS

1 Specification number 17. What occurred on or about
2 January 5th, 2015?
3
4  A. On January 5th, which was I conducted an
5 observation of Dr. Severin, and in that observation I
6 had given Dr. Severin a directive, because he was
7 showing he needed support with his planning, to
8 submit his lesson plan for my support, and Dr.
9 Severin failed to provide me with the requested
10 document.
11  MR. MASSENA: Your Honor, once again,
12 I would ask that the witness not read from--
13  [Crosstalk]
14  THE HEARING OFFICER: [Interposing]
15 Sure. It's a better practice, and in fact,
16 that's what's expected that you'll testify
17 independent of any documents unless you're
18 directed to a document, based on your inability
19 to recall events. So, if you could just turn
20 over what's in front of you. Thank you very
21 much, Principal. Okay, continue, please.
22  A. I did not receive the lesson plan to
23 support Dr. Severin, following an observation where
24 it was documented that please to submit those lesson
25 plans for support.

---

**189**

DORCELY - DIRECT - FRANCIS

1
2  MR. FRANCIS: I have in my hand a five
3 page document that I ask be marked Department's
4 28 for identification. I have a copy for the
5 Arbitrator, and I am handing it over. And I
6 have a copy for Respondent, and I am also
7 handing that over to Respondent.
8  THE HEARING OFFICER: So, we're going
9 to mark this as Department 28 for
10 identification.
11  MR. FRANCIS: I'd ask that the
12 Principal look at Department's 28 for
13 identification.
14  Q. And tell the Arbitrator if you recognize
15 the document and what you recognize it to be.
16  A. This is a summary of my disciplinary
17 meeting with Dr. Severin and the District rep,
18 Charlie Turner, where it is cited that Dr. Severin
19 was directed to submit his period seven lesson plans
20 specifically for every Monday for review, feedback,
21 and support and it had to be due by the fifth of
22 January, 2015. And it includes Dr. Severin's
23 signature. On the second page, this is the
24 observation. And in the observation, it includes the
25 notes for the observation. And if you turn to one,

---

**190**

DORCELY - DIRECT - FRANCIS

1
2 two, the last page, it is the directive, beginning
3 with in addition you are directed to. In this case
4 here, number two says to submit his period seven
5 lesson plan for feedback and support. And it
6 includes my signature and Dr. Severin's signature.
7  MR. FRANCIS: I would ask that
8 Department's 28 for identification be moved into
9 evidence at this time.
10  MR. MASSENA: Okay, objection, Your
11 Honor, just a moment to confer with my client.
12  THE HEARING OFFICER: Sure, we'll go
13 off the record.
14  MR. MASSENA: Thank you.
15  [OFF THE RECORD 0:55:22]
16  [ON THE RECORD 0:55:22]
17  THE HEARING OFFICER: Go back on the
18 record. Is there any objection to Department
19 28?
20  MR. MASSENA: Yes, Your Honor. As to
21 Department 28, the Respondent objects to the
22 entire performance evaluation document, dated
23 December 22nd, 2014. This is not a competency
24 case. This is a neglect of duty, misconduct,
25 insubordination case, conduct unbecoming case.

---

**191**

DORCELY - DIRECT - FRANCIS

1
2 The only portion that's relevant in the
3 evaluator form, the Annual Professional
4 Performance Review evaluator form, is line
5 number two on the last page of the document,
6 which indicates submit your period seven lesson
7 plans for the week every Monday for review,
8 feedback, and support until further notice. I
9 believe that's the only relevant portion of the
10 evaluation form, the class room observation
11 evaluation form. That's, yeah, I believe that
12 line is the only relevant portion of the
13 observation, class room observation form, not
14 only for Specification 17, but for the entire
15 proceeding, Your Honor.
16  THE HEARING OFFICER: Okay, Mr.
17 Francis, do you want to be heard?
18  MR. FRANCIS: Yes. The observation
19 report is one entire document. It references a
20 directive that was given to the Respondent, and
21 the Respondent failed to follow that directive.
22  THE HEARING OFFICER: Okay. The
23 Department is making the argument it's just one
24 entire document.
25  MR. FRANCIS: That's correct.

**192**

```
 1          DORCELY - DIRECT - FRANCIS
 2               THE HEARING OFFICER: There's really
 3    no basis to segregate out the last page.
 4          MR. FRANCIS: That is correct.
 5          THE HEARING OFFICER: I am very
 6    sensitive to the issue being raised by
 7    Respondent. I agree this is not an incompetence
 8    case. Having said that, to the extent that the
 9    last page of the observation report is
10    apparently relevant to the Department's case, I
11    am going to admit the entire document, but you
12    can rest assured, that the Respondent can rest
13    assured that I am not going to be paying any
14    attention to any part of the document, other
15    than that which is relevant. At this point, it
16    seems to be simply the last page, line two.
17    Department 28 is in evidence.
18               [Whereupon Department of Education's
19    Exhibit 28 is admitted into evidence]
20               MR. MASSENA: So, Your Honor, so for--
21               THE HEARING OFFICER: [Interposing]
22    Sure.
23               MR. MASSENA: --obviously for
24    clarification for the Respondent, as far as the
25    Department's Number 28, it's being admitted into
```

**193**

```
 1          DORCELY - DIRECT - FRANCIS
 2    evidence, and as far as the class room
 3    observation evaluator form, the evaluator form
 4    is being admitted into evidence as it relates to
 5    line two on the last page.
 6               THE HEARING OFFICER: Just for that
 7    reason only.
 8          MR. MASSENA: Okay.
 9               THE HEARING OFFICER: To the extent
10    that there are any other ratings in there, they
11    are of no interest to me, of no moment, and at
12    any rate, from my perspective, not finalized.
13    We have not had an opportunity to address it,
14    nor would be in this forum, given the nature of
15    this particular case. I am only accepting it
16    because it's just one complete document. There
17    is no point in pulling it apart. I can, as the
18    Hearing Officer, easily disregard, and will
19    disregard, that which is not relevant to this
20    proceeding. It will have no influence on the
21    outcome of this proceeding. Mr. Francis?
22          MR. FRANCIS: Yes, thank you.
23          Q.   I direct your attention to Specification
24    18, which is on Department's 1 in evidence. And
25    would you please tell the Arbitrator what occurred on
```

**194**

```
 1          DORCELY - DIRECT - FRANCIS
 2    or about January 5th, 2015?
 3          A.   On January 5th--
 4    [Crosstalk]
 5               THE HEARING OFFICER: [Interposing]
 6    Okay, good, okay. Can you continue?
 7          A.   So, on January 5th, Dr. Severin again, in
 8    that observation dated December 22nd, was directed to
 9    schedule support sessions, so I can support him in
10    his professional practice, and his failure to do
11    that, again, a pattern of just deliberate disregard
12    to directives.
13          Q.   And was that document--was that documented
14    in any way?
15          A.   Yes.
16          Q.   And how was it documented?
17          A.   In a disciplinary meeting on January 5th.
18               MR. FRANCIS: I have in my hand a two
19    page document that I am going to ask be marked
20    Department's 29 for identification. I have a
21    copy for the Arbitrator.
22               THE HEARING OFFICER: Okay, we'll mark
23    this as Department 29.
24               MR. FRANCIS: And I have a copy for
25    Respondent.
```

**195**

```
 1          DORCELY - DIRECT - FRANCIS
 2               MR. FRANCIS: And I ask that the
 3    witness take a look at Department's 29 for
 4    identification.
 5          Q.   Do you recognize this document?
 6          A.   Yes.
 7          Q.   And what do you recognize it to be?
 8          A.   This is a document where a summary of a
 9    meeting with the District rep, in this case Charlie
10    Turner, regarding Dr. Severin's failure to my
11    directive that was based on the observation on
12    December 22nd, to schedule four support sessions with
13    me beginning January 5th. The first page also
14    includes Dr. Severin's response, as well as his
15    signature. And on the second page, it is a
16    correspondence with my secretary, Ms. Townes, to Dr.
17    Severin, regarding the new schedule that would have
18    to be--from the first meeting.
19               MR. FRANCIS: I'd ask that
20    Department's 29 for identification be moved into
21    evidence at this time.
22               THE HEARING OFFICER: Any objections?
23               MR. MASSENA: Okay he had mentioned--
24    just brief Voir Dire.
25    VOIR DIRE
```

196

```
 1          DORCELY - VOIR DIRE - MASSENA
 2     BY MR. ALAIN MASSENA
 3       Q.   You had mentioned, during your testimony,
 4   regarding the response.  Where is the response,
 5   regarding Dr. Severin's response to this email?
 6            MR. FRANCIS:  Objection, that's a
 7   mischaracterization of the witness' testimony.
 8            THE HEARING OFFICER:  I'm not sure I
 9   follow.  You were saying--you were asking for a
10   document--you're asking if there is any
11   response?
12            MR. MASSENA:  I'll withdraw--
13            THE HEARING OFFICER:  [Interposing]
14   I'm not sure I follow.
15            MR. MASSENA:  I withdraw my objection,
16   Your Honor.
17            THE HEARING OFFICER:  Okay.
18            MR. MASSENA:  I withdraw my objection.
19            THE HEARING OFFICER:  All right.  So,
20   Department 29 is in evidence.
21            [Whereupon Department of Education's
22   Exhibit 29 is admitted into evidence]
23            THE HEARING OFFICER:  I have a
24   question for you, Principal, for clarification.
25   What is an instructional support session?
```

197

```
 1          DORCELY - VOIR DIRE - MASSENA
 2            MR. DORCELY:  It is a meeting, where I
 3   am meeting with a teacher, to provide them
 4   support in an area of they receive ineffective
 5   or developing.
 6            THE HEARING OFFICER:  You would meet
 7   with the teacher in this case?
 8            MR. DORCELY:  Correct, in this case,
 9   yeah, I would be meeting with Dr. Severin.
10            THE HEARING OFFICER:  All right.  And
11   I also notice that your April 27th, 2015,
12   letter, Department 29, includes the following
13   reference.  You were directed in your
14   observation report, dated December 22nd, 2014.
15   Is that the same observation report, counsel, I
16   am directing this now to counsel, that appears
17   in Department 28?
18            MR. FRANCIS:  That's correct.
19            THE HEARING OFFICER:  So, are you
20   asking this Arbitrator, after I made my previous
21   ruling, to expand my consideration of this
22   document to include something other than line
23   two in Department 28, because I had limited my
24   consideration of the document previously to that
25   line and that line only.
```

198

```
 1          DORCELY - VOIR DIRE - MASSENA
 2            MR. FRANCIS:  Again, the--please,
 3   could you repeat your question?
 4            THE HEARING OFFICER:  Not a problem.
 5   When we were--when I was ruling on the
 6   admissibility of Department 28, Respondent had
 7   made a valid objection that there were certain
 8   parts of this document that were not relevant to
 9   this proceeding.  While I agree with Respondent,
10   I nonetheless admitted the entire document,
11   because it's one document.  It's one unified
12   document, and I attempted to reassure Respondent
13   that I would not consider, and would in fact
14   disregard all other parts of Department 28,
15   pages one through I believe it's four, with the
16   exception, with the exception of line two.  And
17   I'm asking the Department now if it was just for
18   me to reconsider that ruling in light of
19   Specification 18, Department's 29?
20            MR. FRANCIS:  I would ask that the
21   Arbitrator renew his decision with respect to
22   Department's 28 in evidence, and ask that the
23   entire four page observation, Annual
24   Professional Performance Review, be considered
25   by the Arbitrator and--
```

199

```
 1          DORCELY - VOIR DIRE - MASSENA
 2            THE HEARING OFFICER:  [Interposing]
 3   All right.  I am not going to do that but what
 4   I--I am not going to do that.  I am not going to
 5   reconsider that part of my ruling.  I will,
 6   however, simply note that on the last page, the
 7   fourth page of the observation report, in line
 8   one, there is some reference to the school
 9   secretary to schedule four planning sessions
10   with me.  I don't know if that has any relation
11   to Specification 18 in Department's Exhibit 29.
12            MR. FRANCIS:  The relevance is that
13   there is an email from the secretary to
14   Principal Dorcely, and Respondent Severin is
15   cc'd on it, which is instructing, since the
16   secretary forms the schedule, these are the four
17   dates that he was supposed to--
18            THE HEARING OFFICER:  [Interposing]
19   Let's go off the record for a moment.
20            [OFF THE RECORD 1:05:50]
21            [ON THE RECORD 1:05:50]
22            THE HEARING OFFICER:  Go back on the
23   record.  Okay, so based on some off the record
24   communications between me and counsel, it has
25   been--I am deciding now that with regard to
```

**200**

DORCELY - VOIR DIRE - MASSENA

```
1          DORCELY - VOIR DIRE - MASSENA
2      Department 28, I will disregard all of the--all
3      of the observation report, with the exception of
4      both lines one and two on page four.  Mr.
5      Francis, it's still your witness.
6          MR. FRANCIS:  Yes.  I am going to go--
7      may we go off the record--
8          [Crosstalk]
9          THE HEARING OFFICER:  [Interposing]
10     Sure, let's go off the record.
11         [OFF THE RECORD 1:06:59]
12         [ON THE RECORD 1:06:59]
13         THE HEARING OFFICER:  Let's go back on
14     the record.  Any additional questions for the
15     Principal?
16         MR. FRANCIS:  Yes.
17         THE HEARING OFFICER:  Mm hmm.
18     DIRECT EXAMINATION (CONT.)
19     BY MR. FRANCIS
20         Q.   As a result of the conduct, rather
21     misconduct, of the Respondent as delineated in
22     Specifications one through 18, how did this affect
23     the school?
24         A.   The impact of the deliberate misconduct by
25     Dr. Severin had really impacted not only the staff,
```

**202**

```
1          DORCELY - DIRECT - FRANCIS
2      everyone is set, let's go back on the record.
3          MR. Massena, are you ready to proceed with cross
4      examination?
5          MR. MASSENA:  Yes, I am.
6          THE HEARING OFFICER:  Great.
7      CROSS EXAMINATION
8      BY MR. MASSENA
9          Q.   All right, good afternoon, Principal
10     Dorcely.  As you have already heard, my name is Alain
11     Massena.  I represent the Respondent in this matter.
12     So, I have a few questions for you.  If you need me
13     to repeat any of them, I am more than happy to do so.
14     If you don't understand them, I am more than happy to
15     repeat them.  Okay.  Principal Dorcely, could you
16     just tell us a little bit about your teaching
17     background, about your background in DOE?
18         A.   This is my twenty fourth year in the DOE.
19     I was a school aide.  I spent ten years--
20         Q.   [Interposing] Okay.
21         A.   --in Professional Performing Arts, where I
22     was--
23         [Background noise papers shuffling]
24         Q.   [Interposing] I'm sorry, if you could, ten
25     years...?
```

**201**

```
1          DORCELY - DIRECT - FRANCIS
2      but it really created a very toxic environment, where
3      teachers, during the common planning time, were
4      always stating that how does the Dr. Severin get to be in
5      his class room -- [00:01] not participating in school
6      related professional assignment.  It also had a major
7      impact on the kids, particularly with the Global
8      Regents, where the passing percentage was--it just
9      also, all of the structures you create as a
10     Principal, to service kids, and to see it--the
11     deliberate and at times just uncalled behavior, was
12     very striking, and it really impacted the school in
13     great, great, great proportion.
14         THE HEARING OFFICER:  Anything
15     additional?
16         MR. FRANCIS:  Nothing further.
17         THE HEARING OFFICER:  All right, given
18     the time, let's go off the record.  We're also
19     going to provide sufficient time for Respondent
20     to prepare cross examination.
21         [OFF THE RECORD, Lunch and prepare for
22     cross 1:08:47]
23         [ON THE RECORD, Lunch and prepare for
24     closing 1:08:47]
25         THE HEARING OFFICER:  Okay.  If
```

**203**

DORCELY - CROSS - MASSENA

```
1          DORCELY - CROSS - MASSENA
2          A.   In Professional Performance Arts High
3      School.
4          Q.   Okay.  And where is that located?
5          A.   That's 328 West 48th Street.
6          Q.   Okay.
7          A.   Where I was a school aide, a computer
8      coordinator, a substitute teacher.  I taught three
9      years at Professional Performance Arts.
10         Q.   As a substitute teacher.  Is that correct?
11         A.   That is correct.
12         Q.   Okay.
13         A.   After that, I served three years in
14     LaGuardia Arts High School--
15         Q.   [Interposing] When you say you served three
16     years, you served three years as what?  In what--
17         [Crosstalk]
18         A.   --technology, as the Director of
19     Technology.
20         Q.   Okay.
21         A.   At LaGuardia Arts.  Then I transitioned to
22     an Assistant Principal, where I also taught research
23     as an Assistant Principal, and I researched seminar.
24         Q.   And at what point in time did you become
25     Principal of Urban Action Academy?
```

204

DORCELY - CROSS - MASSENA

1
2      A.   The 2013-2014 school year on June 17th.
3      Q.   This June 17th, describe to us that
4  process.
5      A.   I was an Assistant Principal for six years,
6  transitioned by the Superintendent asked me to serve
7  in that capacity as Principal.  And I am New York
8  State certified as a building leader by the New York
9  City Department of Education, and I have my
10 certification in New York City as well as an
11 Assistant Principal and Principal.
12     Q.   Okay, but you do not have certification as
13 a teacher.  Is that correct?
14     A.   I have certification as a substitute
15 teacher.
16     Q.   As a substitute teacher.
17     A.   That's correct.
18     Q.   So, you have never been certified as a
19 teacher.
20     A.   No.
21     Q.   Okay.  So, you pretty much went from school
22 aide to substitute teacher to Assistant Principal.
23     A.   Director of Technology, computer
24 coordinator, then Assistant Principal.
25     Q.   Okay.  Okay, so is it--is it fair to say

206

DORCELY - CROSS - MASSENA

1
2      Q.   Okay.  Well, if you could answer this in a
3  yes or no, if you can, is this something that you
4  wanted?
5      A.   Absolutely.
6      Q.   As I said, if you have any difficulty with
7  my questions, just ask me to repeat them.  I am more
8  than happy to do so.  Now, you are not tenured yet.
9  Is that correct?
10     A.   No, not yet.
11     Q.   Okay.  When are you up for tenure?
12     A.   Decisions will be made this month.
13     Q.   This month, okay.  Could you describe to us
14 the process of becoming tenured?
15     A.   You're a Principal for three years, and you
16 go through an evaluation, and you have to meet your
17 PPO goals.  I have been rated as an effective
18 Principal for the past three years, so tenure
19 decision is made exclusively by the Superintendent.
20     Q.   Okay.  So, is it fair to say you're under a
21 great deal of stress at this particular point in
22 time?
23     A.   No.
24          MR. FRANCIS:  Objection.
25          THE HEARING OFFICER:  Sustained.

205

DORCELY - CROSS - MASSENA

1
2  that, you know, this is something you have worked
3  very hard for to become a Principal?  Is that
4  correct?
5      A.   Yeah, education with the Bank Street
6  College, I have my certification.
7      Q.   Okay.
8      A.   I have two Master's Degrees.
9      Q.   Master's in what?
10     A.   Education, leadership.  I have a Master's
11 in--a B.S. in criminal justice, majored in forensics
12 and policing, and a Bachelor's Degree in criminal
13 justice, and currently a doctoral student in
14 educational leadership at Stage [phonetic].
15     Q.   Educational leadership, correct?
16     A.   Correct.
17     Q.   Okay.  So once again, you have worked--you
18 have worked to get to this position.  Is that your--
19 is that fair to say?
20     A.   In education, correct.
21     Q.   Okay.  And this was a goal of yours,
22 becoming a Principal.  Is that fair to say?
23     A.   I was promoted.
24     Q.   So, this is not something that you wanted?
25     A.   It's a promotion, so I'm excited.

207

DORCELY - CROSS - MASSENA

1
2      Q.   So, you said the decision will be made
3  sometime this month?
4      A.   Will be notified by the Superintendent.  I
5  just got my rating.  I was rated again, three years
6  in a row, as an effective Principal.
7      Q.   Okay.  Now, you--you obviously know the
8  Respondent, correct?
9      A.   Yes, I know Dr. Severin.
10     Q.   Okay.  And you are--you hired Dr. Severin.
11 Is that correct?
12     A.   The Hiring Committee and I hired Dr.
13 Severin.
14     Q.   Okay.  And that was in 2014, correct?
15     A.   Open Market that would be August of 2014.
16     Q.   Okay.  And Dr. Severin was referred to you.
17 How did you come to hire Dr. Severin?
18     A.   Dr. Severin was referred to me by Assistant
19 Principal Michelle Williams [phonetic].
20     Q.   And when you say Assistant Principal,
21 Assistant Principal of Urban Action Academy?
22     A.   No.  She was an ATR.  It means she was
23 assigned for me for the year.
24     Q.   And why was she assigned to you?
25     A.   The rotation of Department of Education.

208

DORCELY - CROSS - MASSENA

Q.   Now, and you said she was referred to you by--Dr. Severin was referred to you by Ms. Williams, correct?

A.   That's correct.

Q.   Okay.  And what was the referral?

A.   I have a Social Studies teacher.  He used to be my teacher.  I know there is a need here for Social Studies.  And she made a recommendation and sent us his resume.

Q.   Okay.  And based on her recommendation, you hired Dr. Severin, correct?

A.   No, based on the recommendation of our Hiring Committee.

Q.   Mm hmm.  And what do you mean by that?

A.   I have about--we have a Hiring Committee.  It consists of teachers at the school, and when we meet we select candidates for interviews.

Q.   Okay.  And what was the initial for the-- what was his initial position when you hired him?

A.   Social Studies.

Q.   Now, at some point in June of 2014, withdrawn.  Describe to us the early relationship with Dr. Severin.

A.   Very professional.  I was very excited.

209

DORCELY - CROSS - MASSENA

He'd be joining my team.  The Hiring Committee was very excited.  This was without us having his profile yet.  It was just based on his resume.

Q.   Okay.  And you were looking forward to him working as a part of your team, correct?

A.   As a Social Studies teacher, correct.

Q.   Okay.  And then, withdrawn.  And then the relationship began to change.  Is that correct?

A.   No.

MR. FRANCIS:  Objection, a broad time.

THE HEARING OFFICER:  So, you're objecting to the form of the question?

MR. FRANCIS:  To the form of the question.

THE HEARING OFFICER:  Okay.

MR. FRANCIS:  Too broad.

THE HEARING OFFICER:  Okay.

Q.   I am referring to June of--I am referring to September of 2014.  Did the relationship begin to change?

A.   No, it was a professional relationship.

Q.   Okay, all right.  I'd like to draw your attention to June--actually May of 2015.  May, on or about May or June of 2015, do you recall being

210

DORCELY - CROSS - MASSENA

questioned by--

MR. FRANCIS:  [Interposing] Objection, is it May or is it June?

THE HEARING OFFICER:  You say in or around May or June of 2015, continue.

Q.   Do you recall being questioned by the--by SCI?

A.   Around May or June, at the end of the school year, SCI did pay a visit to the school.

Q.   Okay.  And they, they spoke to you, correct?

A.   Very briefly, correct.

Q.   And they asked you a series of questions.  Is that correct?

A.   Yes.

Q.   Okay.  And these series of questions were regarding allegations of attempting to change a student's grade, correct?

A.   I learned about that from Dr. Severin.

Q.   Okay.  When you say you learned of that by Dr. Severin, what do you mean by that?

A.   During a disciplinary meeting with Dr. Severin, he indicated in a disciplinary meeting that we're having this meeting because you are upset that

211

DORCELY - CROSS - MASSENA

I reported you to SCI.  That Dr. Severin's statement, which I--it's in the write up.

Q.   When did you first learn that Dr. Severin reported you to SCI?

A.   Dr. Severin.

Q.   That was the first time you heard of it.

A.   He informed me of that, that is the reasons why we're having this meeting, because I reported you to SCI.

Q.   And this was done during the disciplinary meeting?

A.   That is correct.

Q.   Do you recall which disciplinary meeting that was?

A.   I think it was in--definitely around June.  The disciplinary was about either May or June, but during that hearing--during that meeting he indicated that.

Q.   Okay.  And it's your testimony before this tribunal that you had no knowledge of this pending SCI investigation prior to Dr. Severin sharing this information with you.

A.   I learned of that SCI investigation from Dr. Severin, following where SCI did also come to the

212

```
1              DORCELY - CROSS - MASSENA
2    school as well with the questioning.
3        Q.   And what--how were you--what allegations
4    were you made aware of?
5        A.   Dr. Severin made me, during the
6    disciplinary meeting, that I am upset because he--he
7    indicated that I am upset because he reported me to
8    SCI.  When SCI came to the building, they were asking
9    about testing.
10       Q.   And what did they ask you about?
11       A.   Testing allegations that Dr. Severin
12   referenced in our discipline meeting.
13            THE HEARING OFFICER:  I'm sorry, what
14       did you say?  Testing allegation--
15       [Crosstalk]
16            THE HEARING OFFICER:  Your voice
17       trails off.
18            MR. DORCELY:  Testing allegation that
19       I forced to change a student grade.
20            THE HEARING OFFICER:  Mm hmm, thank
21       you.
22       Q.   How did you take this information?
23       A.   It's allegation.
24       Q.   How did you take it?
25       A.   I laughed about it.
```

214

```
1              DORCELY - CROSS - MASSENA
2        the objection, continue.
3            MR. MASSENA:  Okay.
4        Q.   So, this allegation you said is still
5    pending, correct?
6        A.   It's an SCI open investigation.
7        Q.   Okay.  And is it fair to say that this
8    allegation could somehow affect your career as a
9    Principal?
10       A.   No, it's an allegation.
11       Q.   No, I understand that, but the results of
12   the investigation, let's say the results of the
13   investigation, is it fair to say that it could
14   somehow affect your career as a Principal?
15            MR. FRANCIS:  Objection, it calls for
16       speculation.
17            THE HEARING OFFICER:  Sustained.  And
18       I also think it's argumentative.  I understand
19       the issue, counsel.
20            MR. MASSENA:  Okay.
21       Q.   Approximately how many teachers are at
22   Urban Action Academy?
23       A.   This year?
24       Q.   This year and also 2014-2015 academic year.
25       A.   I have expanded from 21 to now about 24.
```

213

```
1              DORCELY - CROSS - MASSENA
2        Q.   And you don't take these allegations
3    seriously?  Now, let me ask you.  This investigation
4    by SCI, is this somewhere--are these--is this
5    investigation somewhere placed in your file as a
6    Principal?
7        A.   No.
8        Q.   No?
9        A.   I believe the allegations of the testing is
10   actually still pending.
11       Q.   Okay.
12            MR. FRANCIS:  Objection, so much as
13       there is a pending SCI investigation, and the
14       instruction on--regarding talking about it to
15       any individuals, would preclude him from talking
16       about a pending investigation.
17            THE HEARING OFFICER:  What instruction
18       are you referring to, counsel?
19            MR. FRANCIS:  The instruction that's
20       given to every person that, quote unquote, may
21       or may not be a subject of an investigation, or
22       a participant in the investigation, they are
23       told not to discuss a pending investigation with
24       anybody.
25            THE HEARING OFFICER:  I'm overruling
```

215

```
1              DORCELY - CROSS - MASSENA
2        Q.   Okay.  So, you began with 21 in 2014, of
3    2015, so now you have 24 teachers.  Is that correct?
4        A.   That is, yeah.
5        Q.   Okay.  And of those 24 teachers, have any
6    of those teachers been--are any of those teachers
7    under a 3020-a?  Have you preferred any of those
8    teachers to a 3020-a hearing?
9            MR. FRANCIS:  Objection relevance.
10            THE HEARING OFFICER:  What is the
11       relevance, counsel?
12            MR. MASSENA:  Well, I would ask--
13       [Crosstalk]
14            THE HEARING OFFICER:  [Interposing]
15       Okay.  You're going to have to get used to this.
16       We're going to ask you again to step outside.
17       We're going to probably be doing that
18       periodically.  So, thank you.
19            [Background conversation]
20            MR. MASSENA:  Your Honor, the
21       relevance is that obviously, as the Court is
22       probably, that Your Honor has probably
23       ascertained, is that we're of the position that
24       Principal Dorcely has singled out--singled out
25       Dr. Severin, the Respondent, and therefore I
```

216

DORCELY - CROSS - MASSENA

2 think it is relevant to have an idea of how many
3 other teachers are under 3020-a proceedings.
4 THE HEARING OFFICER: I am not sure I
5 entirely follow. I mean I will from Mr.
6 Francis--
7 MR. MASSENA: [Interposing] Yes.
8 THE HEARING OFFICER: --in a moment,
9 but if in fact a theory of the Respondent is, is
10 that he's been singled out, how does the
11 question what other teachers have you brought
12 charges against, how is that relevant?
13 MR. MASSENA: It's relevant in that if
14 Mr.--if Principal Dorcely is the only teacher
15 that he's brought 3020-a hearings--
16 [Background conversation]
17 THE HEARING OFFICER: Did he get the
18 name wrong?
19 MR. FRANCIS: No, I thought he was
20 referring to the Respondent.
21 THE HEARING OFFICER: No, he said the
22 Principal brought charges against--
23 [Crosstalk]
24 MR. MASSENA: Yeah, against
25 Respondent, I think it, again, it can be--it can

---

217

DORCELY - CROSS - MASSENA

2 go towards that he is being singled out if he is
3 the only teacher.
4 THE HEARING OFFICER: I can't draw
5 that inference from that, counsel. You're
6 asking me--
7 [Crosstalk]
8 MR. MASSENA: [Interposing] I can ask
9 you to draw that inference--
10 [Laughter]
11 [Crosstalk]
12 THE HEARING OFFICER: You could ask me
13 to draw that inference, but I am going to
14 sustain the objection.
15 MR. MASSENA: Fair enough, Your Honor.
16 THE HEARING OFFICER: Yeah, let's
17 bring the Principal back. There's no way I
18 could possibly draw that inference. Let's bring
19 the Principal back.
20 MR. MASSENA: Okay.
21 Q. Okay. So, I'll withdraw the last question.
22 So, Principal Dorcely, Dr. Severin made you aware of
23 these--of the fact that he had reported you to SCI in
24 June of 2014.
25 [Background conversation]

---

218

DORCELY - CROSS - MASSENA

2 Q. In June of 2015, is that correct?
3 A. Between May or June at one of our
4 disciplinary meetings.
5 Q. Okay.
6 A. I'm not exactly sure of the actual date,
7 and he did made a reference that the reason why we
8 are having a disciplinary meeting is because I
9 reported you to SCI.
10 Q. Now, you recall having, in September of
11 2015, you recall having a meeting with staff,
12 correct? With staff members, is that correct?
13 A. The beginning the first day?
14 Q. Yes.
15 A. Yes, we have a meeting--
16 [Background noise papers shuffling]
17 Q. Okay. And in that meeting, do you recall
18 stating to Mr. Severin that you are going to ride
19 him?
20 A. Absolutely not true.
21 Q. Okay. Do you also recall saying that you
22 are going into beast mode, and that no matter how
23 many complaints are made against you, you just get
24 stronger?
25 A. That's absolutely not true.

---

219

DORCELY - CROSS - MASSENA

2 THE HEARING OFFICER: Let's just stop
3 there. You said going into...?
4 MR. MASSENA: Beast mode.
5 THE HEARING OFFICER: Beast.
6 MR. MASSENA: Yeah.
7 THE HEARING OFFICER: Thank you. I'm
8 sorry, please continue.
9 MR. MASSENA: Okay.
10 Q. So that's it's your testimony that that's
11 not true.
12 A. It's not just my testimony. It's also the
13 Department of Education's findings--
14 Q. [Interposing] Well--
15 [Crosstalk]
16 Q. --I'm just asking about your testimony.
17 A. I'm just sorry, a report just came out.
18 Q. I am asking about your testimony.
19 A. Sorry, okay.
20 Q. Principal Dorcely, let me ask you a
21 question now.
22 A. Sure.
23 Q. Do you feel the need to add more than
24 what's part of the--what's asked of you in this case?
25 [Crosstalk]

220

```
1           DORCELY - CROSS - MASSENA
2               MR. FRANCIS:  Objection.
3           THE HEARING OFFICER:  Sustained.
4       Let's not get into this colloquy with the
5       witness.  You just continue to ask your
6       questions.
7               MR. MASSENA:  Sure.
8           THE HEARING OFFICER:  Let's make a
9       record.
10      Q.   Okay.  Principal Dorcely, there came a
11  point in time where you had a meeting with the
12  Superintendent, the UFT representative for the
13  school, and Dr. Severin in 2015--in academic 2015-
14  2016 year.  Is that correct?
15      A.   That is correct.  There was a meeting.
16      Q.   Okay.  And in that meeting, it was agreed
17  that there would be what's called a cooling off
18  period.  Is that correct?
19      A.   That meeting was taking place between
20  myself--
21      Q.   [Interposing] Yes.
22      A.   --the Chapter Leader, the District leader,
23  Dr. Severin, the Superintendent and one more person,
24  which was the borough person who was there--
25      [Background noise papers shuffling]
```

221

```
1           DORCELY - CROSS - MASSENA
2       A.   And during that meeting, it was suggested
3   that there should be a cooling off period between
4   myself and Dr. Severin, and then Dr. Severin will be
5   transferring February 1st.
6       Q.   Okay.  Was there, in fact, a cooling off
7   period?
8       A.   The cooling off period that was suggested
9   to me, I will be the direct supervisor of Dr.
10  Severin, meaning my observations would stop.
11      Q.   Did your observations stop?
12      A.   Yes.
13      Q.   Okay, but you continued to follow Dr.
14  Severin throughout the school, is that correct--
15      [Crosstalk]
16      Q.   --even during this cooling off period?
17          THE HEARING OFFICER:  Hang on, there
18      is an objection.  What's the nature of the
19      objection?
20          MR. FRANCIS:  It calls for testimony,
21      withdrawn.  There is no foundation for the
22      question.
23          THE HEARING OFFICER:  I don't have a
24      problem with that.  I am overruling the
25      objection.  I'm just not, from my perspective,
```

222

```
1           DORCELY - CROSS - MASSENA
2       quite clear what you mean by following.  So, why
3       don't you rephrase the question, please?
4           MR. MASSENA:  Okay.
5       Q.   Do you recall when this cooling period was
6   instituted, cooling off period was instituted?
7       A.   We have met in December, with those parties
8   I noted, and it was agreed upon that the Principal,
9   myself, would not conduct observations.  There was no
10  set time.
11      Q.   Okay.  And what did you believe was to be
12  the length of the cooling off period?
13      A.   There was a collective understanding that I
14  would not observe Dr. Severin in his class room, his
15  practice, but I can still continue, and held him
16  accountable, for his discipline leader.
17      Q.   Okay.  I'd like to draw your attention to
18  Specification two, okay, in the Department's Exhibit
19  Number 1, where you say on or about February 5th of
20  2016, Respondent failed to adhere to the school cell
21  phone policy, when he allowed students to use their
22  cell phones during his period three class.  Now, was
23  this--was this incident, that's referred to in
24  Specification two, was that an incident that you
25  yourself observed?
```

223

```
1           DORCELY - CROSS - MASSENA
2       A.   No.  It was an incident that I observed
3   along with, who was I with, I was with someone that I
4   don't recall.  I know I was with someone.  I observed
5   that incident.  That is correct.
6       Q.   Okay.  And isn't it true that when you
7   approached Mr.--Dr. Severin's class room on February
8   6th--February 5th of 2016, that Dr. Severin was
9   actually outside of the class room speaking to a
10  student at that time?
11      A.   Absolutely not true.
12      Q.   And that actually, and do you recall that
13  the, withdrawn.  Who was the co-teacher at that time?
14      A.   Ms. Burlingame.
15      Q.   Okay.
16      A.   I entered the class room.
17      Q.   You entered into the class room.  And the
18  co-teacher was inside the class room.
19      A.   That is correct.
20      Q.   And Dr. Severin was outside of the class
21  room.
22      A.   Inside the class room both.
23      Q.   Okay.  However, you only disciplined Dr.
24  Severin in reference to this particular incident.
25      A.   Incorrect.
```

224

```
 1          DORCELY - CROSS - MASSENA
 2      Q.  Okay.
 3      A.  Both teachers got disciplined.
 4      Q.  Both teachers were disciplined?
 5      A.  That is correct.
 6   [Background conversation]
 7      Q.  And you said that was teacher Fennigan
 8   [phonetic]?
 9      A.  Ms. Burlingame.
10      Q.  Burlingame, okay.  And again--
11          THE HEARING OFFICER:  [Interposing]
12   Can we get a spelling of that name?
13          MR. DORCELY:  Yes, B-U-R-L-I-N-G-M-A--
14   I'm sorry, game, so Burlingame, so B-U-R-L-I-N-
15   G-A-M-E.
16          THE HEARING OFFICER:  Thank you very
17   much.
18          MR. DORCELY:  You're welcome.
19          MR. MASSENA:  Okay.  And I ask that,
20   once again, as the witness is testifying, that
21   he not refer to documents before.
22          THE HEARING OFFICER:  I think you
23   understand that concept now.
24          MR. DORCELY:  I was thinking of the
25   name.
```

225

```
 1          DORCELY - CROSS - MASSENA
 2          [Crosstalk]
 3          THE HEARING OFFICER:  Yeah, that's
 4   fine, but it's just a good general rule to be
 5   reminded of.
 6          MR. DORCELY:  So I'll close my eyes
 7   when I'm responding.
 8          [Laughter]
 9          THE HEARING OFFICER:  Go ahead.
10          MR. FRANCIS:  I just want to, if I
11   may--
12          THE HEARING OFFICER:  [Interposing]
13   Sure.
14          MR. FRANCIS:  --the Respondent
15   attorney directed with witness' attention to
16   Specification two, which is Department's 1 in
17   evidence.
18          THE HEARING OFFICER:  That's true.  I
19   don't know if he meant directing him to the
20   paper copy, or just in general directing his
21   attention to what's contained in Specification
22   two, but let's move on.  Your point is
23   understood.
24          MR. FRANCIS:  Okay.
25      Q.  Now, was co-teacher Burlingame brought up
```

226

```
 1          DORCELY - CROSS - MASSENA
 2   on 3020-a, brought up on a 3020-a hearing?
 3      A.  No, she was disciplined for having
 4   students' cell phone in the class room, along with
 5   Dr. Severin.
 6      Q.  Okay.  And how was she disciplined?
 7      A.  She got a letter to file just like Dr.
 8   Severn.
 9      Q.  And you spoke with students, correct,
10   regarding this?
11      A.  When I came into the class room, I
12   confiscated four cell phones.
13      Q.  Okay.  Were the students upset that you
14   confiscated their cell phones?
15          MR. FRANCIS:  Objection, relevance?
16          THE HEARING OFFICER:  Sustained.
17      Q.  You obtained statements from the students,
18   correct?
19      A.  Yes, I did.
20      Q.  Prior to obtaining the statements from the
21   students, did you return their cell phones to them?
22      A.  Students were given back their cell phone
23   after signing the cell phone policy.  I mean they
24   know the cell phone policy.  They were given that.
25      Q.  Okay.  And once again, the question is,
```

227

```
 1          DORCELY - CROSS - MASSENA
 2   actually withdrawn.  The students came into your--the
 3   students were summoned into your office.  Is that
 4   correct?
 5      A.  I confiscated their cell phone.
 6      Q.  Okay.  And what is the process for a
 7   student getting back their cell phone?
 8      A.  It means on the offense, if it's first,
 9   second, or third.
10      Q.  Okay.  What is--what if it's the first
11   offense?
12      A.  They usually get their cell phones back.
13      Q.  The second offense?
14      A.  The process is if it's the second offense,
15   a parent meeting -- [00:01] by our code, the cell
16   phone policy.
17      Q.  Okay and third offense.
18      A.  Then it's subject to them not to have a
19   cell phone, again, for probably a day or a couple of
20   days.
21      Q.  So Student "B", do you know whether or not
22   it was her first offense, second offense, or third
23   offense?
24      A.  I'm unaware if there was.
25      Q.  And what about as to Student "C", do you
```

228

DORCELY - CROSS - MASSENA
1
2  know if it was her first, second, or third?
3      A.  I'm unaware.
4      Q.  Okay.  And do you recall whether or not
5  they received their cell phones prior to signing
6  these statements that have been admitted into
7  evidence as Department's Number 12 or after?
8      A.  They signed the statements after.
9      Q.  Okay.  And what--how do you--how do you
10  memorialize that as to when they received their cell
11  phones?
12      A.  Please rephrase that question.
13      Q.  Okay, I will.
14  [Background conversation]
15      Q.  Do you provide the students with a receipt
16  when you return their cell phones to them?
17      A.  Yes, some students get a--they do get
18  something when they get a cell phone.
19  [Crosstalk]
20      A.  Yes, some students do get.  If I take the
21  cell phone for me, I confiscate it, and I put it
22  right in my desk.
23      Q.  Okay.  And prior to returning the cell
24  phone, you provide them with a receipt, correct?
25      A.  A conversation with them, correct, just a

229

DORCELY - CROSS - MASSENA
1
2  conversation with the students.
3      Q.  And then a receipt.
4      A.  Then the cell phone.  Here, you know about
5  our cell phone policy.
6      Q.  And then the receipt.
7      A.  They get their cell phone.
8      Q.  Well when I say receipt, what I--
9          THE HEARING OFFICER:  [Interposing]
10  Yeah, no, that's fine.  Just listen to the
11  question.  He's asking about specifically a
12  receipt, so you have to, you know, it may be a
13  yes or a no answer.  So, just listen to the
14  question and we'll move along much--
15          [Crosstalk]
16          MR. FRANCIS:  --between receipt paper
17  or otherwise, and receiving their cell phone.
18          THE HEARING OFFICER:  I hear you.  If
19  you don't understand the question, that's
20  another option.  In addition to yes or no, you
21  can say I don't answer.  But I just think that
22  we'll move through the afternoon's testimony at
23  a better clip more efficiently if you just
24  listen the question and answer it as to the best
25  of your ability directly.  Counsel?

230

DORCELY - CROSS - MASSENA
1
2          MR. MASSENA:  Sure.
3      Q.  Professor, Principal Dorcely, when I say do
4  the children receive a receipt, I am referring to
5  receipt, R-E-C-E-I-P-T-S, receipts.
6      A.  I believe they do.
7      Q.  They do.  And that, what--in what form is
8  that receipt given?
9      A.  The Dean's Department would give them a
10  receipt that--for cell phones and they're handed
11  back.
12      Q.  Okay.
13      A.  With along with the cell phone policy.
14      Q.  And is a copy of the receipt kept in the
15  school's--does the school keep a copy of the receipt?
16      A.  From the Dean's Department, the answer is
17  yes.
18      Q.  Okay.  So, to your knowledge, did Student
19  "B" receive a receipt when her cell phone was
20  returned to her?
21      A.  No, she did not.
22      Q.  And did Student "C" receive a receipt when
23  her cell phone was returned to her?
24  [Phone ringing]
25      A.  No.

231

DORCELY - CROSS - MASSENA
1
2      Q.  Okay.  So other than your testimony, there
3  is no written proof that these students signed this
4  document prior to receiving their cell phones, is
5  that correct?
6      A.  Please rephrase that.
7      Q.  Sure.  Other than your--other than your
8  testimony here today, and withdrawn.  Your testimony
9  was that the students received their cell phone prior
10  to writing these documents--prior to writing these
11  statements.  Is that correct what's been moved into
12  evidence as Department's 12?
13      A.  Students did receive their cell phone.
14      Q.  Okay.  Now, I understand as soon as they
15  received their cell phone.  My question to you is was
16  the statement and the cell phone returned at the same
17  time?
18      A.  No.
19      Q.  Were the cell phones returned prior to or
20  after--
21      A.  [Interposing] Prior.
22      Q.  --the statements?  Prior to the statements
23  be written.  However, the students were aware that
24  you wanted a statement.  Is that correct?
25      A.  That is correct.

232

```
1            DORCELY - CROSS - MASSENA
2       Q.   And the students were aware that writing
3   the statement was a contingent of receiving their
4   cell phones back.  Is that correct?
5       A.   Incorrect.
6       Q.   I'd like to direct your attention to
7   Specification number four, or actually withdrawn.
8   Prior to moving to Specification number four,
9   regarding Specification number three, are there video
10  cameras in the hallways outside of Dr. Severin's
11  Social Studies class?
12      A.   There's surveillance throughout the
13  building.
14      Q.   There's surveillance throughout the
15  building.
16      A.   Correct.
17      Q.   And to your knowledge, does the
18  surveillance--would the surveillance capture you
19  entering into Dr. Severin's class, the manner in
20  which the camera is positioned?
21      A.   It's a clear view of the hallways.
22      Q.   Okay.  And do you know how long the video
23  feed is kept on the surveillance cameras?
24      A.   No, I do not.
25      Q.   Okay.  You don't know if it's a 30 day loop
```

233

```
1            DORCELY - CROSS - MASSENA
2   or a 90 day loop or...
3            THE HEARING OFFICER:  Is that a yes or
4       a no?
5            MR. DORCELY:  No.
6       Q.   Okay.  Now I'm moving to Specification
7   number four.  You indicated that, in Specification
8   number four, indicates that on or about November 25th
9   of 2015, the Respondent failed to adhere to the
10  school policy or written directives from school
11  administrators to keep one set of lights in the class
12  room during the viewing of a video or movie.  Now,
13  and this is also something that you claim that you
14  observed yourself.
15      A.   That is correct.
16      Q.   Now, let me ask you, Principal Dorcely, how
17  many class rooms are there in your--in your building-
18  -in your school, Urban Action Academy?
19      A.   For my floor?
20      Q.   Yes, if you could give us the layout of
21  your school.
22            MR. FRANCIS:  Objection, relevance.
23            THE HEARING OFFICER:  Overruled.
24      There's an allegation here about keeping lights
25      on, and I'll permit the question.
```

234

```
1            DORCELY - CROSS - MASSENA
2       A.   Nineteen to twenty one.
3       Q.   Nineteen to twenty one class rooms, okay.
4   Are they located all on one floor, or are they
5   located on multiple floors?
6       A.   One floor, one wing.
7       Q.   I'm sorry, what was that?
8       A.   One long wing.  It's an L shape.
9       Q.   Oh it's, what, just one wing of a floor.
10      A.   Correct.
11      Q.   Oh.  And how often do you patrol the
12  floors?
13      A.   Every day.
14      Q.   Every day, and how many times a day?
15      A.   Throughout the day.
16      Q.   And is it your practice to visit each class
17  room?
18      A.   Yes.
19      Q.   Okay.  And definitely a practice to visit
20  Dr. Severin's class room.
21            MR. FRANCIS:  Objection,
22      argumentative.
23            THE HEARING OFFICER:  Well, he just
24      said he makes it a practice to visit all the
25      class rooms.  That presumably includes
```

235

```
1            DORCELY - CROSS - MASSENA
2   Respondent's class room, so I am going to
3   sustain the objection.
4            MR. MASSENA:  Okay.
5       Q.   Now, when you arrived at--do you recall
6   what time you arrived at Dr. Severin's class on
7   November 25th of 2015?
8       A.   No.
9       Q.   No, okay.  You don't recall if it was
10  during the early part of the day or the latter part
11  of the day, correct?
12      A.   It's hard, no, I don't recall, no.
13            THE HEARING OFFICER:  Just keep your
14      voice up.
15            MR. DORCELY:  No, I don't recall.
16            THE HEARING OFFICER:  Let's just go
17      off the record for a second.
18            [OFF THE RECORD 1:40:44]
19            [ON THE RECORD 1:40:44]
20            THE HEARING OFFICER:  Let's go back on
21      the record.  I'm sorry, counsel, please
22      continue.
23            MR. MASSENA:  Sure.
24      Q.   You don't recall whether it was earlier in
25  the day or later in the day, correct?
```

236

```
 1        DORCELY - CROSS - MASSENA
 2       A.   No, I don't recall.
 3       Q.   Okay.  And it's your testimony that as you
 4   walked by, you noticed that the lights were off in
 5   the class room, correct?
 6       A.   As I did the walk through, yes.
 7       Q.   Okay.  And how long were you observing the
 8   class?
 9       A.   I immediately saw the lights were off.
10       Q.   Okay.  And what did you do?
11       A.   I stopped.
12       Q.   And what did you do next?
13       A.   I looked in the class room, and I was with
14   my fellow Principal colleagues.
15       Q.   Okay.  And when you say Principal
16   colleagues, who are you referring to?
17       A.   There were about three other Principals
18   with me.
19       Q.   Mm hmm.  Who were they?
20       A.   They are CSA District Chairs.
21       Q.   And CSA again stands for?
22       A.   Counsel for Supervision and Administration.
23       Q.   Okay.  And you don't recall their names?
24       A.   Yes.  I was with Principal Estevez
25   [phonetic].  I was with Assistant Principal
```

238

```
 1   correct?
 2       A.   More than that.
 3       Q.   Okay, but also several students were paying
 4   attention to the video as well, correct?
 5       A.   I did not see that.
 6       Q.   You did not see that, or you did not--
 7   [Crosstalk]
 8       A.   [Interposing] Because I looked at the front
 9   of the room.
10       Q.   --want to see that?
11            MR. FRANCIS:  Objection argumentative.
12            THE HEARING OFFICER:  No, it's
13   sustained.
14            MR. MASSENA:  Okay.
15       Q.   So, you were--you did not wait for
16   the lights to turn on, correct?
17       A.   I saw the lights were off.  We went to the
18   back and looked again.  I made personal contact with
19   Dr. Severin.  He saw that I looked into the class
20   room, like he saw me.
21       Q.   Okay.  And so, you don't know exactly how
22   long the lights were off.  Is that correct?
23       A.   No.
24       Q.   Okay.  And you don't know if they were--if
25
```

237

```
 1        DORCELY - CROSS - MASSENA
 2   Antoinette [phonetic].
 3       Q.   Okay.  And they were there for what
 4   particular reason?
 5       A.   They were at a CSA meeting with the
 6   Superintendent.
 7       Q.   Okay.  So, as you saw the lights were off,
 8   what action, if any, did you take at that particular
 9   moment?
10       A.   We stopped.  We looked at the room.  We
11   went to the back of the room and saw it was pitch
12   dark and kids had their heads down, and there was a
13   video playing.
14       Q.   Okay.  Do you recall what the video was?
15       A.   No, I do not.
16       Q.   Okay.  And did you remain to see at what
17   point in time the lights come on?
18       A.   No.  I was by that--we were by that door, I
19   would say, for a good maybe one to two minutes just
20   like looking.  Dr. Severin that I was looking,
21   because he made contact with me.
22       Q.   Okay.
23       A.   From the front of the room.
24       Q.   Now, you made a point to mention that one
25   or two students had their heads down.  Is that
```

239

```
 1        DORCELY - CROSS - MASSENA
 2   they were just off for those two minutes that you
 3   were observing the class, and they were on
 4   immediately prior and immediately after.
 5            MR. FRANCIS:  Objection, it calls for
 6   speculation.
 7            THE HEARING OFFICER:  Overruled.
 8       A.   What was the question?
 9       Q.   The question is, your testimony is that you
10   observed that the lights off in this class room for
11   approximately one to two minutes.
12       A.   Right.
13       Q.   However, you have no way to know when the
14   lights were turned off.  Is that correct?
15       A.   Well, I made contact with Dr. Severin.
16       Q.   That's not the question, Principal Dorcely.
17   You have no way to know when the lights were turned
18   off.  Is that correct?
19       A.   No.
20       Q.   Okay.  And you have to know when the lights
21   were turned on.  Is that correct?
22       A.   No.
23            MR. FRANCIS:  Objection, it calls for
24   speculation.  There is no testimony or
25   foundation that the lights were ever turned on.
```

240

```
 1        DORCELY - CROSS - MASSENA
 2              THE HEARING OFFICER:  Overruled.
 3        Q.   And then you left.
 4        A.   We left.
 5        Q.   Okay.  And then you decided to follow
 6   disciplinary note--or a disciplinary letter then to
 7   Mr.--against Dr. Severin.  Is that correct?
 8        A.   That resulted in a correspondence the same
 9   day it happened.
10        Q.   Okay.
11        A.   Which followed a disciplinary meeting.
12        Q.   Okay.  Have you ever heard of a counseling
13   memo?
14        A.   Yeah, I'm familiar with that term.
15        Q.   Describe to us what a counseling memo is.
16        A.   A counseling memo is when you admonish the
17   staff member for doing something that could be
18   considered a letter to file.  So, the option is you
19   go to letter to file to make sure that the behavior
20   never happens again.
21        Q.   Okay.  Now, a counseling memo--under what
22   circumstances are a counseling memo normally given?
23        A.   There is no certain way it is given.  It
24   is, again, it's where there's a letter to file, a
25   counseling memo is an option if the behavior is such
```

241

```
 1        DORCELY - CROSS - MASSENA
 2   that warrants a discipline meeting, you go for the
 3   discipline meeting.
 4        Q.   Okay.  I'm having trouble understanding
 5   you, and it's probably just me.  So, there are no
 6   circumstances where a counseling memo is given?  Is
 7   that your testimony?
 8        A.   You can give a counseling memo.
 9        Q.   Okay.  It's at the--
10        A.   [Interposing] Discretion of the Principal.
11        Q.   It's at the discretion of the Principal,
12   and one moment.  And based on your discretion, you
13   believe that this particular offense warranted a
14   disciplinary letter as opposed to a counseling memo.
15   Is that correct?
16        A.   That is correct.
17        Q.   You have been a Principal for how long?
18        A.   Three years.
19        Q.   And you were an Assistant Principal for how
20   long again?
21        A.   Six years.
22        Q.   You've seen counseling memos given to
23   teachers before.  Is that correct?
24        A.   Rarely.
25        Q.   Okay.  And it's your estimation that this
```

242

```
 1        DORCELY - CROSS - MASSENA
 2   particular offense, as you call it, could not be
 3   handled with a counseling--could not be handled with
 4   a counseling memo.
 5        A.   That is because--
 6        Q.   [Interposing] Well the question is, again,
 7   it's your position that this could not be handled
 8   with a counseling memo.  Yes?
 9        A.   That is correct.
10        Q.   And by November 25th of 2015, you'd already
11   been made aware that there was an investigation that
12   was pending regarding these allegations that Dr.
13   Severin made against you.  Is that correct?
14        A.   Say it again, by when?
15        Q.   By November of 2015.  You were made aware,
16   withdrawn, to ahead and answer the question.
17        A.   Between May or June from the disciplinary
18   meeting that I had with Dr. Severin, he informed me
19   of that.  In addition to that, SCI did visit the
20   school.
21        Q.   And November comes after June.  Is that
22   correct?
23        A.   Correct.
24        Q.   So, when you made this--when you used your
25   discretion to have this disciplinary--have this
```

243

```
 1        DORCELY - CROSS - MASSENA
 2   disciplinary letter put to Mr.--to Dr. Severin's
 3   file, that was after June.
 4        A.   Yes.
 5        Q.   After you had been investigated.
 6        A.   Yes.
 7        Q.   Okay.  I'd like to draw your attention to--
 8             MR. FRANCIS:  [Interposing] Just note
 9   my objection as to characterization of the
10   witness being, quote unquote, investigated.
11             THE HEARING OFFICER:  Well, it was my
12   understanding from the testimony that he was the
13   subject of an investigation.  Isn't that
14   correct, Principal?
15             MR. DORCELY:  Yes.
16             THE HEARING OFFICER:  Thank you,
17   continue.
18             MR. MASSENA:  Okay.
19        Q.   Specification number--I'd like to draw your
20   attention to Specification number three.
21             MR. FRANCIS:  And I withdraw my
22   objection.
23             THE HEARING OFFICER:  Okay.
24        Q.   On or about December 23rd, and you may feel
25   free to look at Exhibit Number 1, Department's
```

244

DORCELY - CROSS - MASSENA

1  Exhibit Number 1--
2  [Crosstalk]
3  THE HEARING OFFICER:  You have
4  permission to look at the document any time
5  counsel directs you to a document.
6  Q.   On or about December 23rd of 2015, during
7  period six, Respondent filed to attend and
8  participate in his common planning meeting with the
9  Social Studies Department.
10  [Background conversation]
11  Q.   Principal Dorcely, what time--what time is
12  period six?  At what time does period six begin?
13  A.   Twelve fifteen.
14  Q.   And at what time does period six, one
15  second--
16  [Background conversation]
17  Q.   And at what time, 12:15, correct?
18  A.   It begins at 12:15.
19  Q.   And at what time does it end?
20  A.   Twelve fifty four.
21  Q.   Okay.  Does this particular period have any
22  significance in the teacher's day, more so than any
23  other period?
24  A.   It's their C-6 assignment.

---

246

DORCELY - CROSS - MASSENA

1  what's been marked into evidence as Department Number
2  14.  Do you recognize that?
3  A.   Yes.
4  Q.   Okay.  What do you recognize it to be?
5  A.   That is my--this is the attendance sheet
6  for Room 101.
7  Q.   Okay.  What does the word power standard
8  mean?
9  A.   That is where we are looking at a
10  particular standard.
11  Q.   Mm hmm, okay.  And were you present at this
12  meeting?
13  A.   I signed it.
14  Q.   Well, the question, again, were you
15  present?
16  A.   Sure, absolutely, I did the narrative.
17  Yes, I signed it.  I was present.
18  Q.   Okay.  And when you say power standard,
19  what does that mean?
20  A.   We're looking at the Common Core standards,
21  where teachers are meeting to identify the key
22  standards so they can start addressing it in lessons
23  and units.
24  Q.   Okay.  And this meeting is held in Room

---

245

DORCELY - CROSS - MASSENA

1  Q.   Okay, their C-6 assignment.  And what other
2  types of events happen during that period?
3  A.   Planning.
4  Q.   Planning.
5  A.   It's for common planning time, yeah.
6  Q.   Okay.
7  THE HEARING OFFICER:  Can you just
8  give us a definition of C-6?
9  MR. DORCELY:  Circle of six
10  assignment, where it's contractual that teachers
11  do a period of professional assignment.
12  THE HEARING OFFICER:  Thank you very
13  much.
14  MR. MASSENA:  Thank you.
15  [Background conversation]
16  THE HEARING OFFICER:  Let's go off the
17  record for a moment.
18  MR. MASSENA:  Oh, sure, thank you.
19  [OFF THE RECORD 1:50:10]
20  [ON THE RECORD 1:50:10]
21  THE HEARING OFFICER:  Let's go back.
22  Let's go back on the record.
23  MR. MASSENA:  Thank you.
24  Q.   Principal Dorcely, I'd like to show you

---

247

DORCELY - CROSS - MASSENA

1  101.  Is that correct?
2  A.   Yes.
3  Q.   Okay.  And Ms. Fequiere is also absent from
4  this meeting.  Is that correct?
5  MR. FRANCIS:  Objection, relevance.
6  THE HEARING OFFICER:  No, overruled.
7  You can pursue this.
8  A.   She's absent, yeah.
9  Q.   Okay.  Was she provided with a disciplinary
10  letter as well for being absent?
11  A.   I'm not--
12  MR. FRANCIS:  [Interposing] Objection,
13  relevance.
14  THE HEARING OFFICER:  No, overruled--
15  [Background noise papers shuffling]
16  THE HEARING OFFICER:  --and I'll
17  permit it.
18  Q.   Okay, you don't recall.  Is that your
19  answer?
20  A.   I'm not sure if her absent--absent from the
21  common planning time or absent for the day?
22  Q.   Absent from the common planning.
23  A.   I would have to see her records.
24  Q.   Well, the question is do you know?

**248**

DORCELY - CROSS - MASSENA

```
1                DORCELY - CROSS - MASSENA
2         A.  No.
3         Q.  As you sit here today.
4                MR. FRANCIS:  Objection asked and
5    answered.
6                THE HEARING OFFICER:  Well to make
7    sure, it seemed like there were two questions
8    that are folded into one.  Are you--is the
9    question before the witness now whether or not
10   he knows if this particular teacher was given a
11   letter to file or otherwise disciplined?
12               MR. MASSENA:  That's the only
13   question.
14               THE HEARING OFFICER:  That's the only
15   question and the answer is?
16               MR. MASSENA:  In regards to this being
17   absent from the common planning.
18               THE HEARING OFFICER:  On December
19   23rd, 2015.  Principal, your answer?
20        A.  Can you rephrase that?
21        Q.  Do you know whether or not the--the teacher
22   missed for--Ms. Fequiere was disciplined as a result
23   of being absent on December--absent from the common
24   planning time meeting on December 23rd of 2015?
25        A.  No, she was not disciplined.
```

**249**

```
1                DORCELY - CROSS - MASSENA
2         Q.  She was not disciplined.
3                THE HEARING OFFICER:  And just for the
4    record, forgive me for interrupting, Fequiere is
5    spelled F-E-Q-U-I-E-R-E.
6                MR. MASSENA:  Thank you.
7         Q.  Okay.  What are the requirements regarding
8    the common planning time meeting?
9         A.  It's a circle of six assignment.  It's
10   their professional duties and responsibilities of the
11   teacher.
12        Q.  Okay.  And you run this assignment,
13   correct?
14        A.  No, I'm sometimes there, not all the time.
15        Q.  Okay.  And is it fair to say by December
16   23rd of 2015, the relationship between you and Mr.--
17   and Dr. Severin had taken a turn for the worse?
18               MR. FRANCIS:  Objection as to form.
19               THE HEARING OFFICER:  Yeah, why you
20   don't rephrase it?  It's a bit colloquial.  I
21   want to make sure the witness understands we're
22   all on the same page.  Why don't you rephrase?
23               MR. MASSENA:  Sure.
24        Q.  Is it fair to say that by December 23rd,
25   2015, you were aware that Dr. Severin had filed
```

**250**

```
1    allegations against you?
2         A.  Yes.
3         Q.  Okay.  And is it fair to say that after
4    December 23rd of 2015, you had already been
5    investigated, or the investigation had begun against
6    you by SCI?
7         A.  It's still pending, yes.
8         Q.  And in December 23rd, 2015, you were the
9    individual running the common planning time meeting,
10   right?
11        A.  For that particular one, I was present,
12   yes.
13        Q.  You were present, okay.  How big is the
14   room?
15        A.  It's a class room.
16        Q.  Okay.  Is it smaller than the current room
17   that we sit in?
18        A.  Larger.
19        Q.  Larger, okay.  And how were the teachers
20   situated during this planning time, common planning
21   time meeting?
22        A.  Well, they'd be in groups.
23        Q.  Okay, in groups.  Are you at the head of
24   the group?  How were you situated in the group?
```

**251**

```
1         DORCELY - CROSS - MASSENA
2         A.  I just, I sit and facilitate and watch
3    teachers have conversations.
4         Q.  Okay.  And it's fair to say that this
5    common planning time meeting is supposed to be an
6    intimate meeting of the teachers, meaning that it's a
7    small group.
8         A.  It's planning.  It's all the teachers
9    together for one on one together.
10        Q.  Okay, but the teachers are no less,
11   including you, and the teachers are no less than a
12   few feet away from each other as you discuss these
13   topics.  Is that correct?
14        A.  Yeah, you could say yes.
15        Q.  The teachers are seated around a table.
16        A.  Desk.
17        Q.  Desk, okay.
18               MR. MASSENA:  Just one moment, Your
19   Honor.
20               THE HEARING OFFICER:  Sure.
21               MR. MASSENA:  Okay.  I will need maybe
22   about--maybe can we go off the record?
23               THE HEARING OFFICER:  Sure, let's go
24   off the record.
25               [OFF THE RECORD 1:55:58]
```

252

```
1              DORCELY - CROSS - MASSENA
2              [ON THE RECORD 1:55:58]
3              THE HEARING OFFICER:  Go back on the
4    record.
5         Q.   Okay, Principal Dorcely, I'd like to draw
6    your attention to Specification five.  Specification
7    five reads during the 2015-2016 school year,
8    Respondent, as of December 15, 2015, had failed to
9    attend at least 29 out of 37 mandated professional C-
10   6 assignments, common planning time meeting, on or
11   about the following dates, correct?
12        A.   That is correct.
13        Q.   Okay.  Now, your--the way in which you came
14   about this determination is by--is primarily through
15   the use the sign in sheet.  Is that correct?
16        A.   That's one way.
17        Q.   Okay.
18             THE HEARING OFFICER:  I'm sorry,
19   what's your answer?
20             MR. DORCELY:  Yes, that's one way.
21        Q.   Now, I am going to show you what has been
22   marked into--moved into evidence as Department
23   Number--
24             [Background conversation]
25        Q.   --I'll give you that in a second,
```

253

```
1              DORCELY - CROSS - MASSENA
2    Department Number--Department Number 15.
3              [Background conversation]
4         Q.   Eighteen, 18 in evidence, okay, Department
5    Number 18 in evidence.
6              MR. MASSENA:  If the Department could
7    hand that to--
8              MR. FRANCIS:  [Interposing] Let the
9    record reflect that I have handed the witness
10   Department 18 in evidence.
11             MR. MASSENA:  Okay.
12        Q.   Now, looking at Department 18, I believe on
13   the third page you will see, or fourth page--
14             [Background conversation]
15        Q.   --okay on the seventh page, you'll see what
16   is the beginning of a list of attendance sheets.  Is
17   that correct?
18        A.   That is correct.
19        Q.   Okay.  Now, October 15th of 2015, you
20   marked Mr.--initially, there's, in the line that's
21   indicated Dr. Severin, initially there is a note, in
22   Room 128 class room.  Is that correct?  And then it's
23   crossed out.
24        A.   That is correct.
25        Q.   Okay.
```

254

```
1              DORCELY - CROSS - MASSENA
2              THE HEARING OFFICER:  I'm lost.
3              MR. FRANCIS:  I'm lost, too.
4              THE HEARING OFFICER:  So, tell me just
5    so I can follow the testimony.
6              [Crosstalk]
7              THE HEARING OFFICER:  I have
8    Department 18.
9              MR. MASSENA:  October 15th, 2015--
10             THE HEARING OFFICER:  [Interposing]
11   Okay.
12             MR. MASSENA:  --where Dr. Severin's
13   name is, in the narrative portion--
14             THE HEARING OFFICER:  [Interposing]
15   Oh, the narrative, okay.
16             MR. MASSENA:  --there is initially a
17   note in Room 128 class room.
18        Q.   Is that correct?
19        A.   That is correct.
20        Q.   Okay.  And to your knowledge, do you know
21   who that note was written by?
22        A.   Yes, Assistant Principal Barnett.
23        Q.   Okay.  And then that's crossed out,
24   correct?
25             THE HEARING OFFICER:  I'm not on the
```

255

```
1              DORCELY - CROSS - MASSENA
2    same page I don't think.  Oh, I'm looking at Dr.
3    Severin, the last line.  There are apparently
4    two entries for Dr. Severin, and that's my
5    confusion.  Now, I'm with you, thank you,
6    continue.
7              MR. MASSENA:  So for the record, to
8    clarify the record, we're looking at the
9    October--Department's Number 18 in evidence, the
10   October 15th common planning time sign in sheet.
11        Q.   Is that correct?
12        A.   That is correct.
13        Q.   Principal Dorcely?  And we're currently
14   looking at the entry for Dr. Severin, the first entry
15   for Dr. Severin.  Is that correct?
16        A.   That is correct.
17        Q.   And on this sign in sheet, there are two
18   entries for Dr. Severin.  Is that also correct?
19        A.   Yeah, duplicates, yes.
20        Q.   Okay.  Would you mind educating the Court
21   as to why his name is listed twice?
22        A.   His name and Ms. Fagan [phonetic] as well
23   is listed twice.  I created the template.  I did the
24   Excel twice, so it did the first two twice, yeah.
25             THE HEARING OFFICER:  I think I
```

256

```
1        DORCELY - CROSS - MASSENA
2        interrupted a question you had asked the witness
3    with regard to the cross out.  And I just don't-
4    -
5        [Crosstalk]
6        MR. MASSENA:  [Interposing] Yes, I am
7    going to get to that.
8        THE HEARING OFFICER:  And only because
9    I was confused.  I was looking at the last entry
10   for Dr. Severin, so why don't you continue,
11   counsel?
12       MR. MASSENA:  Okay.
13       Q.  So, there's an entry in the narrative
14   portion that's written in Room 128 class room.  Do
15   you know who wrote that entry?
16       A.  Yeah, that was Assistant Principal Barnett.
17       Q.  And then it's crossed out, correct?
18       A.  It is crossed out on this sheet.  That is
19   correct.
20       Q.  Okay.  And do you happen to know why it's
21   crossed out?
22       A.  Yes.  I would assume it's crossed out
23   because he is not present.
24       Q.  Okay, meaning not present meaning not
25   present in the school?
```

257

```
1        DORCELY - CROSS - MASSENA
2        A.  In that Room 101.
3        Q.  Okay.
4        THE HEARING OFFICER:  I have to stop
5    you.  When you say I would assume, it does
6    nothing for the Hearing Officer, because you're
7    only supposed to testify as to things you know.
8    Don't, please don't assume, because there is
9    nothing I can do with testimony where a witness
10   says I assume.
11       MR. DORCELY:  I don't know.
12       A.  But I just wanted to clarify that you asked
13   me.  It's a duplicate.  The Excel spreadsheet made
14   his name twice, so Ms. Fagan is there twice as well.
15   You see the duplication, so two teachers.  It was
16   supposed to stop right there.  Excel repeated itself.
17       Q.  Okay.
18       A.  All right.
19       Q.  So, this documentation doesn't indicate
20   whether or not Dr. Severin was present in the school
21   on October 15th of 2015.  Is that correct?
22       A.  Rephrase that please.
23       Q.  On October 15th of 2015, do you know
24   whether or not Dr. Severin was present in school that
25   day?
```

258

```
1        DORCELY - CROSS - MASSENA
2        A.  From this document, no.
3        Q.  Okay.  Okay, I'd like to take you to common
4    planning time meeting October 19th of 2015.  Now, in
5    this particular common planning time meeting, Dr.
6    Severin is present, correct?
7        A.  Yes.
8        Q.  Okay.  And you could describe to the Court
9    what the MOSL is?  I know you did before, but if you
10   could refresh our memory.
11       A.  It's the Measure of Student Learning.
12       Q.  Okay.  And why is it indicated here?
13       A.  Because that's the task that the teachers
14   are engaging in.
15       Q.  Okay.  So, the teachers are currently
16   engaging in taking the tests, or in grading the
17   tests?
18       A.  Norming, it says norming.
19       Q.  What does that mean?
20       A.  That means they're coming together to norm
21   how to capture student responses, what is the
22   appropriate way to make sure, so everyone is on the
23   same page during that process.
24       Q.  And that's October 15th, 2015.
25       A.  That is correct.
```

259

```
1        DORCELY - CROSS - MASSENA
2        Q.  Okay.  Now, October 20th of 2015, which is
3    indicated in Specification five, we note that there
4    is a line through Dr. Severin's name, correct?
5        A.  That is correct.
6        Q.  Okay.  So, that's not necessarily an
7    indication that he's absent, correct?
8        A.  For which one, please?
9        [Crosstalk]
10       Q.  Oh, I'm sorry, referring to October 20th of
11   2015, the attendance sheet for October 20th, 2015,
12   which is Department 18 in evidence.
13       A.  Your question, please?
14       Q.  We see a line through Dr. Severin's name.
15   That doesn't indicate that he's not present, correct?
16       A.  That's an indication he is not present.
17       Q.  That's an indication he's not present.
18       A.  That is correct.
19       Q.  Okay, but again, during this particular
20   time period, I see a narrative that there is a MOSL--
21   the MOSL again is taking place.  Is that correct?
22       A.  It's a continuation, correct.
23       Q.  All right.  So, the fact that the teachers
24   are working on the MOSL, it's not necessarily common
25   planning time, correct?
```

260

DORCELY - CROSS - MASSENA

A.  It's a common planning time.  They all meet
at the same time, so it's called common planning
time.
Q.  Okay.  They can also do the MOSL
separately, correct?
A.  You can't norm it, no.
Q.  Well, this particular page doesn't indicate
anything about norming on this particular page, and
we're referring to October 20th of 2015.
A.  The norming was done on the nineteenth.
Q.  Correct.  So, on the twentieth--
A.  [Interposing] There's no more norming.
Q.  So, they do not need to be together for
common planning time on October 20th of 2015.
A.  There's going to be common planning time
every day period six.
Q.  Once again, you described the MOSL as a
test, correct?
A.  No, it's a Measure of Student Learning,
correct.
Q.  Okay.  What is that--what does that process
indicate?
A.  The MOSL--
[Crosstalk]

261

DORCELY - CROSS - MASSENA

MR. FRANCIS:  [Interposing] Objection
asked and answered.
THE HEARING OFFICER:  That's okay.
The witness can answer.
A.  The first step in the MOSL is you go
through the norming.  That was done on the
nineteenth.  After you norm the exam, where every
single teacher knows exactly how to score it, the
next stage is once you norm, you still continue to do
MOSL.  So, you do the norming so that every single
teacher gets it.  So, the next day, when you finish
the norming, you go to the next process of the MOSL.
You're still looking at student responses.
Q.  And it's your testimony that this
particular activity that a teacher is doing, has to
be done in a common planning time, during the common
planning time.
A.  That's what was being done, correct.
THE HEARING OFFICER:  That's not the
question though.  Listen to the question,
Principal, and to the best of your ability
provide an answer.  Counsel, why don't you
state--
[Crosstalk]

262

DORCELY - CROSS - MASSENA

Q.  [Interposing] Is it your testimony that
this MOSL procedure is a procedure that must be done
by teachers in your school during the common planning
time?
A.  No.
Q.  I'd like to move to October 21st--October
21st, the common planning time.  Now, you earlier
stated that the MOSL is not a procedure that has to
be done by the teachers during the common planning
time, correct?
A.  No.
Q.  I believe that was your testimony earlier.
A.  I responded.  I said no.
THE HEARING OFFICER:  I'm sorry?
MR. DORCELY:  I said no.  He said the
MOSL has to be done during the common planning
time.
Q.  It does not.
A.  No, I said no.
Q.  Okay.  It can be done separately by the
teacher, correct?
A.  No, that's incorrect.
Q.  If a teacher were to do the common--to do--
to work on his MOSL, his or her MOSL, separately

263

DORCELY - CROSS - MASSENA

without other teachers, they are able to do that,
correct?
A.  Then that would become an after school,
yes.
Q.  But it's not necessarily something where it
requires the input of other teachers, correct?
A.  That's why it's called common planning
time, correct.  They have to do it together.
Q.  Let me ask you the question once again,
Principal Dorcely.  Working on the MOSL, is that
grading?  Is a teacher grading the test?
A.  The first, yes, it's norming the grading,
correct.
Q.  And is the grading a collaborative effort?
A.  To norming, yes.
Q.  I am not asking you to norm it, Principal
Dorcely.  I'm asking you to grade it.
A.  So, repeat the question.
Q.  Is grading the MOSL a collaborative effort?
A.  No.
Q.  Okay.  So, if a teacher is, not if, when a
teacher is grading the MOSL, there is no need for the
teacher to work collaboratively with other teachers.
Is that correct?

264

```
1          DORCELY - CROSS - MASSENA
2      A.   That is correct.
3      Q.   Okay.  So, you, or actually this is
4  Assistant Principal Barnett, Assistant Principal
5  Barnett, it appeared in Department 18, October 21st
6  common planning time attendance sheet, stated that
7  Mr.--Dr. Severin was in Room 28 class room.  Is that
8  correct?
9      A.   That is correct.
10     Q.   Okay.  And to your knowledge, did Principal
11 Barnett inquire as to whether or not Dr. Severin was
12 working on his MOSL?  He was grading his MOSL at that
13 time?
14          MR. FRANCIS:  Objection, it calls for
15 speculation.
16          THE HEARING OFFICER:  No, it doesn't.
17 This is a very direct question.  Did the
18 Assistant Principal communicate such information
19 to you?
20          MR. DORCELY:  The Assistant Principal
21 communicated to me that they are still doing
22 MOSL in Room 101.
23          MR. MASSENA:  Okay.
24     Q.   Let me follow up with the Arbitrator's
25 question.  I believe the Arbitrator's question was
```

265

```
1          DORCELY - CROSS - MASSENA
2  very specific.  Did--do you know whether or not
3  Assistant Principal Barnett inquired as to whether or
4  not Dr. Severin was working on his MOSL in Room 128,
5  grading his MOSL in Room 128?
6          MR. FRANCIS:  Objection as to the form
7     of the question.  It's a compound question.
8          [Crosstalk]
9          THE HEARING OFFICER:  [Interposing]
10    All right, so let's break it down, and let's try
11    to get--let's just try to get an answer from the
12    witness.
13          MR. MASSENA:  Sure.
14          THE HEARING OFFICER:  Sustained.
15          [Crosstalk]
16     Q.   I'll go back a little bit.  The MOSL can be
17 graded--the MOSL, it is not necessary that the MOSL
18 be graded collaboratively, correct?
19     A.   No, correct.
20     Q.   And the common planning time is a time for
21 the teachers to work collaboratively, correct?
22     A.   Common planning time, correct.
23     Q.   And during October 20th, October 21st,
24 October 22nd, October 23rd, October 26th, October
25 27th, October 28th, the teachers were grading their
```

266

```
1          DORCELY - CROSS - MASSENA
2  MOSLs.  Is that correct?
3      A.   That is correct.
4      Q.   And as you stated, the grading of the MOSL
5  is not a collaborative effort.
6      A.   It's common planning time, though.
7          THE HEARING OFFICER:  He said no five
8  times.
9          MR. MASSENA:  Okay.
10         THE HEARING OFFICER:  It's in the
11 record.
12         MR. MASSENA:  Okay.
13     Q.   So, my question to you is, does Assistant
14 Principal--did Assistant Principal Barnett inquire,
15 during these dates, as to whether or not, during the
16 common planning time, Dr. Severin was grading the
17 MOSL?
18     A.   I'm not aware of that.
19     Q.   Okay, moving on.  October 28th, October
20 28th, okay, this particular attendance, and referring
21 to Department 8, common planning time attendance
22 sheet, this particular attendance sheet indicates
23 that Dr. Severin is not present.  Is that correct?
24     A.   That is correct.
25     Q.   Okay.  Do you know where Dr. Severin was on
```

267

```
1          DORCELY - CROSS - MASSENA
2  October 28th of 2015?
3      A.   No.
4      Q.   Okay.  Was he with you during the common
5  planning time meeting?
6          MR. FRANCIS:  Objection asked and
7     answered.
8          THE HEARING OFFICER:  Yeah, he said he
9  doesn't know.
10         MR. MASSENA:  No, no, I am asking
11 October 28th, was Dr. Severin with him on
12 October 28th of 2015?
13         THE HEARING OFFICER:  I thought the
14    witness had testified, perhaps I am mistaken,
15    that he didn't know, but go on.  I'll allow the
16    question.  You can answer.
17         MR. MASSENA:  Thank you, Your Honor.
18     A.   I don't recall.
19     Q.   You don't recall, okay.
20         MR. MASSENA:  I'd like this document
21 marked for identification as Respondent's 1.
22         THE HEARING OFFICER:  Two.
23         MR. MASSENA:  Two, Respondent's 2.
24         THE HEARING OFFICER:  Yeah, the Demand
25 for a Bill of Particulars is Respondent's 1.
```

268

```
 1           DORCELY - CROSS - MASSENA
 2                [Background conversation]
 3                MR. MASSENA:  Respondent's 2, thank
 4    you.
 5           THE HEARING OFFICER:  All right, do
 6    you have copies for me and for counsel?
 7           MR. MASSENA:  Of course not.  That
 8    would be too easy.  I apologize.
 9                [Background conversation]
10           MR. MASSENA:  Sorry.  So, you know
11    what?  I'm actually going to give you a bunch.
12           THE HEARING OFFICER:  All right, let's
13    go off the record while we deal with the
14    assembly of the documents.
15                [OFF THE RECORD 2:12:06]
16                [ON THE RECORD 2:12:06]
17           THE HEARING OFFICER:  Okay.  So, let's
18    go back on the record.  Mr. Massena?
19           MR. MASSENA:  Yes.  At this time, I'd
20    ask that this document be marked for
21    identification as Respondent's Exhibit Number 2.
22    I am handing a copy to the Arbitrator and the
23    Department.
24           THE HEARING OFFICER:  All right, so
25    I'm marking this as Respondent's 2 for
```

270

```
 1           DORCELY - CROSS - MASSENA
 2           Q.  Okay.
 3                MR. MASSENA:  I'd ask that this
 4    document be moved into evidence as Respondent's
 5    Number 2.
 6                THE HEARING OFFICER:  Any objection?
 7           MR. FRANCIS:  No objection, Your
 8    Honor.
 9                THE HEARING OFFICER:  Okay,
10    Respondent's 2 is in evidence.
11                [Whereupon Respondent's Exhibit 2 is
12    admitted into evidence]
13           MR. MASSENA:  Okay.
14           Q.  So, on October 28th of 2015, you summoned
15    Mr.--you summoned Mr. Severin to your--to your
16    office, correct?
17           A.  Yes.
18           Q.  Okay.  And that's not a request.  Is that
19    fair to say?
20           A.  Rephrase the question, please.
21           Q.  That's not a request.  That's a demand.
22    That's a directive, correct?
23           A.  It's a summons, yes.
24           Q.  Okay.  And at the same time, and this was
25    for 12:20, correct?
```

269

```
 1           DORCELY - CROSS - MASSENA
 2    identification.
 3                MR. MASSENA:  Okay.  And I'd ask that
 4    the Department--okay, after Respondent has an
 5    opportunity to review it I'd ask that the--after
 6    the Department has had an opportunity to review
 7    the document, I'd ask that they show it to the
 8    witness with the Court's permission--
 9                [Crosstalk]
10           MR. MASSENA:  --permission.
11           Q.  Okay.  Principal Dorcely, do you recognize
12    what's been marked for Respondent's Number 2 for
13    identification?
14           A.  Yes.
15           Q.  What do you recognize it to be?
16           A.  That is a summons letter to a disciplinary
17    meeting to Dr. Severin on 12/20.
18           Q.  Okay.  And who--on 12/20?
19           A.  The time at 12:20, yeah--
20                [Crosstalk]
21           Q.  And how was this document generated?
22           A.  It's generated by my secretary.
23           Q.  Okay.  And is it a fair and accurate copy
24    of the summons that was provided to Dr. Severin?
25           A.  That is, yes.
```

271

```
 1           DORCELY - CROSS - MASSENA
 2           A.  That is correct.
 3           Q.  And the common planning time meeting
 4    happens at...?
 5           A.  Twelve fifteen to twelve fifty four.
 6           Q.  Okay.  And you marked him absent,
 7    withdrawn, withdrawn.  And on the October 28th, 2015,
 8    common planning time meeting attendance sheet, which
 9    is Department's 18 in evidence, Dr. Severin was
10    marked not present, correct?
11           A.  That is correct.
12           Q.  Okay.  Was there any indication by
13    Assistant Principal Barnett that Dr. Severin was
14    actually with you at the time of the common planning
15    time meeting?
16           A.  No, those meetings are five minutes.
17           Q.  Well, if you would answer the question--
18                [Crosstalk]
19           A.  [Interposing] No.
20           Q.  --Principal Dorcely.  No indication, right?
21           A.  No indication.
22           Q.  By Principal Barnett that--
23           A.  [Interposing] AP.
24           Q.  AP, sorry, AP Barnett, AP Barnett that you
25    were at this--that Dr. Severin was meeting with you
```

272

```
 1          DORCELY - CROSS - MASSENA
 2   at the time of the common planning time meeting.  Is
 3   that correct?
 4        A.   Just rephrase that one.
 5        Q.   Sure.  Dr. Severin was marked not present
 6   by AP Barnett, correct?
 7        A.   That is correct.
 8        Q.   And on October 28th of 2015.  Is that
 9   correct, at the common planning time meeting?
10        A.   That's incorrect.  You said 15, October
11   28th you mean.
12        Q.   Oh, okay.  On October 28th of 2015, Dr.
13   Severin was marked not present at the common planning
14   time meeting.  Is that correct?
15        A.   That is correct.
16        Q.   And October 28th of 2015, Dr. Severin was
17   summoned to meet with you at 12:20, correct?
18        A.   That is correct.
19        Q.   And is that during the sixth period?
20        A.   That is correct.
21        Q.   And the common planning time occurs during
22   the sixth period.  Is that correct?
23        A.   That is correct.
24        Q.   And to your knowledge, Dr. Severin did
25   appear at this--did appear at the disciplinary
```

274

```
 1        DORCELY - CROSS - MASSENA
 2        A.   Yes.
 3        Q.   So, now we're referring to the November
 4   9th, 2015, common planning time attendance sheet.
 5   There is no--so Mr. Severin is present at this
 6   particular meeting.  Is that correct?
 7        A.   Yes.
 8        Q.   Okay.  And during this particular meeting,
 9   they are reviewing the mid-term.  Is that correct?
10        A.   That is correct.
11        Q.   Okay, one moment.  I'd also like to draw
12   your attention to November 10th of 2000--November
13   10th of 2015, the common planning time meeting, okay,
14   the attendance sheet.  You indicated that Dr. Severin
15   is not--AP Barnett indicates that Dr. Severin is not
16   present.  Is that correct?
17        A.   I apologize.  I did not hear the date.
18        Q.   Oh, sure, November 10th, 2015.
19             THE HEARING OFFICER:  I don't know if
20   I have that, November 10th?
21             MR. MASSENA:  Yes, November 10th.
22             [Background conversation]
23             [Crosstalk]
24             THE HEARING OFFICER:  [Interposing]
25   Oh, I do, forgive me, right here.  I just
```

273

```
 1          DORCELY - CROSS - MASSENA
 2   conference that you summoned him to, correct?
 3        A.   That is correct.
 4        Q.   Okay, one moment.  Okay, I'd like to direct
 5   your attention to common planning--Department 18,
 6   common planning time attendance sheet--
 7             [Background conversation]
 8        Q.   Okay, withdrawn, okay.
 9             MR. MASSENA:  I'd like to go off the
10   record just for one moment.
11             THE HEARING OFFICER:  Sure, we'll go
12   off the record.
13             MR. MASSENA:  Okay.
14             [OFF THE RECORD 2:16:53]
15             [ON THE RECORD 2:16:53]
16             THE HEARING OFFICER:  Let's go back on
17   the record.
18             MR. MASSENA:  Okay.
19        Q.   I would like to direct your attention to
20   November 9th, 2015, the Department Number--Department
21   18, common planning time attendance sheet.
22        A.   Which date, please?
23        Q.   December, I'm sorry, November 9th.  In this
24   particular--and do you have that before you,
25   Principal Dorcely?
```

275

```
 1        DORCELY - CROSS - MASSENA
 2   skipped it.
 3        Q.   Okay, November 10th, that particular
 4   document says that Mr.--Dr. Severin is not present.
 5   Is that correct?
 6        A.   That is correct.
 7        Q.   And that's by AP Barnett.  Is that correct?
 8        A.   That is correct.
 9        Q.   Okay.
10             MR. MASSENA:  At this time, I'd like
11   this particular document marked as--marked as
12   Respondent's Number 3 for identification.  I am
13   handing a copy to the Arbitrator, and I'm also
14   handing a copy to Respondent--to the Department.
15             THE HEARING OFFICER:  All right, so I
16   have marked it as Respondent's 3 for
17   identification.
18             MR. MASSENA:  And once Respondent--
19   once the Department has had an opportunity to
20   review it, I'd ask that they show it to the
21   witness with the Court's--
22             THE HEARING OFFICER:  [Interposing]
23   Yes.
24             MR. MASSENA:  --permission.
25        Q.   Do you recognize this?
```

**276**

```
1          DORCELY - CROSS - MASSENA
2     A.   Yes.
3     Q.   What do you recognize it to be?
4     A.   It is a summons, a disciplinary letter,
5  it's November 10th and at 12:20 p.m. is the date, is
6  the time for the hearing.
7     Q.   Okay.  And so again, that's during the
8  sixth period.  Is that correct?
9     A.   That is correct.
10    Q.   And the common planning time is during the
11 sixth period.  Is that correct?
12    A.   That is correct.
13    Q.   And nowhere did you indicate, on the sign
14 in sheet, that Dr. Severin had a meeting with you on
15 the sign in sheet.  Is that correct?
16    A.   Can you please rephrase that question?
17    Q.   Sure.  On the November 10th attendance
18 sheet, for the common planning time meeting, is that
19 meeting attended by you or by Assistant Principal
20 Barnett?
21    A.   Assistant Principal Barnett.
22    Q.   And anywhere in this document, referring to
23 Department's 18, November 21st, 2015, common planning
24 time sheet, attendance, does Assistant Principal
25 Barnett indicate that Dr. Severin has a--has a
```

**278**

```
1          DORCELY - CROSS - MASSENA
2  November 13th of 2015, Department 18, Department's 18
3  in evidence, the November 13th common planning time
4  attendance sheet.  Okay, have you had a chance to
5  review that?
6     A.   Yes.
7     Q.   Okay.
8          MR. MASSENA:  At this time, I am
9  handing to the Arbitrator--
10         [Crosstalk]
11         MR. MASSENA:  At this time, I'd like
12 this document marked for Respondent's Number 4
13 in evidence--for identification.
14         THE HEARING OFFICER:  All right.  So,
15 I'll mark it as Respondent's 4 for
16 identification.
17         MR. MASSENA:  Am I am handing a copy
18 to the Department as well.  And once the
19 Department has had an opportunity to review, I'd
20 ask them to show it to the witness.
21    Q.   Okay.  Principal Dorcely, you have been
22 handed what is Respondent's Number 4 for
23 identification.  Do you recognize it?
24         MR. FRANCIS:  No objection by the
25 Department.
```

**277**

```
1          DORCELY - CROSS - MASSENA
2  disciplinary meeting scheduled with you for that
3  time?
4     A.   No.
5     Q.   Okay.  Do you know whether or not Assistant
6  Principal Barnett is aware that Dr. Severin has a
7  common--has a conference, disciplinary conference
8  with you scheduled for that date?
9     A.   Yes.
10    Q.   So, she's aware of this, and nowhere does
11 she indicate that on the documentation.
12    A.   No.
13    Q.   Okay.  Okay, I'd like to direct your
14 attention--
15         THE HEARING OFFICER:  [Interposing]
16 Are you offering Respondent's 3 into evidence?
17         MR. MASSENA:  Oh, thank you.  I'd like
18 to offer Respondent's 3 into evidence.
19         THE HEARING OFFICER:  Any objection?
20         MR. FRANCIS:  None by the Department.
21         THE HEARING OFFICER:  Okay.
22 Respondent's 3 is in evidence.
23         [Whereupon Respondent's Exhibit 3 is
24 admitted into evidence]
25    Q.   Now, I'd like to direct your attention to
```

**279**

```
1          DORCELY - CROSS - MASSENA
2          MR. MASSENA:  Oh, okay.  Let's move it
3  into evidence.
4          THE HEARING OFFICER:  Respondent's 4
5  is in evidence.
6          [Whereupon Respondent's Exhibit 4 is
7  admitted into evidence]
8     Q.   On November 13th of 2015, did you summon
9  Dr. Severin to a disciplinary conference?
10    A.   Yes.
11    Q.   And was that disciplinary conference
12 scheduled for--scheduled during the sixth period?
13    A.   Yes.
14    Q.   And is the common planning time meeting--
15 does the common planning time meeting take place
16 during the sixth period?
17    A.   Yes.
18    Q.   And Dr. Severin, although the November
19 13th, withdrawn.  The November 13th attendance sheet
20 does not indicate that Dr. Severin was absent from
21 that meeting.  Is that correct?
22    A.   No.
23    Q.   Okay.  And it doesn't appear to have his
24 signature either.  Is that correct?
25    A.   That is correct.
```

280

```
 1          DORCELY - CROSS - MASSENA
 2      Q.   Who attend--did you attend this meeting?
 3      A.   Yeah, I signed off on it.
 4      Q.   Okay.  And is it fair to notice that you
 5  did not mark him absent?
 6      A.   No, I did not.
 7      Q.   Okay.  And is it fair to say that you were
 8  aware that he was also scheduled to be at the
 9  disciplinary conference with you at 12:20?
10      A.   Yes.
11           THE HEARING OFFICER:  I'm sorry, could
12      you say that--
13           MR. DORCELY:  [Interposing] Yes.
14           THE HEARING OFFICER:  Thank you.
15           MR. DORCELY:  Mm hmm.
16      Q.   Okay.
17           MR. MASSENA:  One moment, Your Honor.
18      Q.   Okay.  I'd like to direct your attention to
19  November 17th, and Department Number 18, the common
20  planning time meeting attendance sheet for November
21  17th of 2015.  And have you had a chance to review
22  that document?
23      A.   Yes.
24      Q.   Yes, okay.
25           MR. MASSENA:  One moment, Your Honor.
```

281

```
 1          DORCELY - CROSS - MASSENA
 2      Okay, at this time, I'd ask that this document
 3  be marked for identification as Respondent's
 4  Number 5.  And I am handing a copy to the
 5  Arbitrator and also a copy to the Department for
 6  identification, unless there is no objection.
 7           THE HEARING OFFICER:  Any objection?
 8           MR. FRANCIS:  I haven't looked at it,
 9      yet, Your Honor.
10           THE HEARING OFFICER:  Okay, well take
11      your time.
12           [Background conversation]
13           [Crosstalk]
14           MR. FRANCIS:  No objection.
15           THE HEARING OFFICER:  So, Respondent's
16      5 is in evidence.
17           [Whereupon Respondent's Exhibit 5 is
18      admitted into evidence]
19      Q.   So, you've had an opportunity to review
20  Respondent's 5, correct?
21      A.   Yes.
22      Q.   And what is it?
23      A.   It's a summons letter to Dr. Severin,
24  November 17th, at 12:20 p.m.
25      Q.   Okay.  And to your knowledge, did he attend
```

282

```
 1          DORCELY - CROSS - MASSENA
 2  the 12:20, November 17th disciplinary conference that
 3  you summoned him to?
 4      A.   I don't recall that.
 5      Q.   Okay, but he was summoned, correct?
 6      A.   That's correct.
 7      Q.   Okay.  So, you expected him to be there.
 8  Is that fair to say?
 9      A.   That is correct.
10      Q.   And you've also had an opportunity to--
11  before you, you also have the Department's 18 in
12  evidence, the November 17th, 2015, common planning
13  time meeting, correct?
14      A.   That is correct.
15      Q.   Did you attend that meeting?
16      A.   No.  My Assistant Principal, Dr. Howell,
17  did.
18      Q.   Okay, Dr. Howard did.  To your knowledge,
19  was Dr. Howard aware that Dr. Severin had also been
20  summoned to meet with you during the sixth period?
21      A.   Yes.
22      Q.   He was aware.
23           THE HEARING OFFICER:  And just for the
24      record, it appears to be Dr. Howell, H-O-W-E-L-
25      L.  Is that correct, Principal?
```

283

```
 1          DORCELY - CROSS - MASSENA
 2           MR. DORCELY:  That is correct.
 3           THE HEARING OFFICER:  Thank you.
 4      Q.   Okay.  And nonetheless, despite him being
 5  aware that Dr. Severin was summoned to meet with you
 6  during the sixth period, he still marked him--he
 7  still marked that he did not attend.  Is that
 8  correct, yes or no?
 9      A.   That is correct.
10      Q.   Okay.  I'd like to direct your attention--
11  [Background conversation]
12      Q.   I'd like to direct your attention to
13  November 23rd of 2015, just one moment.
14      [Background conversation]
15      Q.   Department's Number 18, the common planning
16  time attendance sheet for December 23rd of 2015.
17           THE HEARING OFFICER:  December 23rd or
18  November 23rd?
19           MR. MASSENA:  November 23rd, November
20      23rd.  And at this time, I ask that this
21      document that I'm handing to Your Honorable
22      Arbitrator be marked for identification as
23      Respondent's Number 6.  I am handing a copy to
24      the Arbitrator.  I'm also handing a copy to the
25      Department.
```

**284**

```
 1        DORCELY - CROSS - MASSENA
 2                THE HEARING OFFICER:  All right.  So,
 3    I am marking this as Respondent's 6.
 4                MR. MASSENA:  I will proceed, unless
 5    there is no objection by the Department.
 6                THE HEARING OFFICER:  Let's give the
 7    Department an opportunity to review Respondent's
 8    6 for identification.
 9                MR. MASSENA:  Okay.
10                MR. FRANCIS:  No objection.
11                THE HEARING OFFICER:  Okay.
12    Respondent's 6 is in evidence.
13                [Whereupon Respondent's Exhibit 6 is
14    admitted into evidence]
15                MR. MASSENA:  Okay.
16         Q.   You have--you've had an opportunity to
17    review Respondent's 6 in evidence, Principal Dorcely?
18         A.   Yes, Respondent is summoned to a
19    disciplinary meeting on November 23rd at 12:25 p.m.
20         Q.   Okay.  And 12:25 p.m. occurs during what
21    period?
22         A.   Common planning time.
23         Q.   Okay.  And have you also had an opportunity
24    to review the common planning time attendance sheet
25    for November 23rd of 2015?
```

**285**

```
 1        DORCELY - CROSS - MASSENA
 2         A.   Yes.
 3         Q.   Okay, and one moment.  Okay.  And Mr.--Dr.
 4    Severin's attendance is not noted on that common
 5    planning time meeting.  Is that correct?
 6         A.   Rephrase that question.
 7         Q.   Is Dr. Severin indicated as present or not
 8    present on the November 23rd, 2015--November 23rd,
 9    2015, attendance, common planning time attendance
10    sheet?
11         A.   It's indicated not present.
12         Q.   Okay.  And who attended that meeting?
13         A.   AP Barnett.
14         Q.   Okay.  And was AP Barnett aware that Dr.
15    Severin had a disciplinary meeting scheduled with you
16    for November 23rd, 2015?
17         A.   Yes.
18         Q.   Okay.  And again, the common planning time
19    meeting occurs during the sixth period, correct?
20         A.   That is correct.
21         Q.   And the disciplinary meeting was scheduled
22    to occur also during the sixth period.  Is that
23    correct?
24         A.   That's correct.
25         Q.   Okay.
```

**286**

```
 1        DORCELY - CROSS - MASSENA
 2                MR. MASSENA:  Just one moment, Your
 3    Honor.
 4                THE HEARING OFFICER:  Mm hmm.
 5         Q.   If you know, Principal Dorcely, November
 6    11th of 2015, does that particular day have any
 7    significance for you?
 8         A.   No, I don't recall any of that.
 9         Q.   Do you know whether or not that date was a
10    holiday where the school may or may not have been
11    closed, November 11th of 2015, if you recall?
12         A.   No, I don't recall that.
13         Q.   Okay.  I'd like to draw your attention to
14    November 25th of 2015, the common planning time,
15    Department's Number 18, 2015--I'm sorry, Department
16    Number 18 in evidence, the November 25th, 2015,
17    common planning time attendance sheet.  Okay, do you
18    have that before you?
19         A.   Yes.
20         Q.   Okay.  And who is present at that meeting?
21    I mean who--did you supervise that meeting?
22         A.   No, my Assistant Principal Barnett.
23         Q.   Okay.  And Dr. Severin was present,
24    correct?
25         A.   That is correct.
```

**287**

```
 1        DORCELY - CROSS - MASSENA
 2         Q.   Okay.  I'd like to take--draw your
 3    attention to December 10th of 2015, Department's
 4    Number 18, December 10th, 2015, common planning time
 5    attendance sheet, in evidence.
 6                [Background conversation]
 7         Q.   Okay.  Have you had an opportunity to find
 8    that--to find that attendance sheet?
 9         A.   Yes.
10         Q.   Okay, and because I don't have it in front
11    of me.  Just give me one second.  Okay, thank you.
12                [Background conversation]
13                MR. MASSENA:  I am going to speed this
14    up.  Just one moment, Your Honor.
15                THE HEARING OFFICER:  All right.  So,
16    let's go off the record.
17                MR. MASSENA:  Thank you.
18                THE HEARING OFFICER:  Sure.
19                [OFF THE RECORD 2:33:22]
20                [ON THE RECORD 2:33:22]
21                THE HEARING OFFICER:  So, let's go
22    back on the record.
23         Q.   Okay.  So, December 10th of 2015, Dr.
24    Severin is--you've had an opportunity to review that,
25    correct?
```

**288**

```
1          DORCELY - CROSS - MASSENA
2       A.   Yes.
3       Q.   Okay.  And Dr. Severin is present at that
4  meeting, correct?
5       A.   Yes.
6       Q.   Okay, even though that meeting is listed as
7  a Specification.  Is that correct, which you've had a
8  chance to review as Department's Number 1 in
9  evidence.
10      A.   I'm sorry, the question.
11      Q.   Dr. Severin is listed as present.  Is that
12 correct?
13      A.   That's correct.
14      Q.   On the December 10th, 2015, common planning
15 time attendance sheet.  Is that correct?
16      A.   Correct.
17      Q.   Okay.  And you've also had a chance to
18 review the Specifications, correct?  The
19 Specifications that have been entered in this case as
20 Department's Number 1, correct?
21      A.   That is correct.
22      Q.   Okay.  And is it fair to say that you
23 provided the Department of Education with the
24 information necessary to draft these Specifications?
25 Is that correct?
```

**289**

```
1          DORCELY - CROSS - MASSENA
2       A.   That is correct.
3       Q.   And you provided them with December 10th.
4  Is that correct?
5       A.   That is correct.
6       Q.   Despite the fact that he was present on
7  that date, correct?
8       A.   Correct.
9       Q.   Okay, just one moment.
10 [Background conversation]
11      Q.   After the--I'd like you to take a look at
12 what's been identified as Department Number 18 in
13 evidence, common planning time meeting attendance
14 sheet.  After the December 10th, 2015, planning
15 sheet, there is another attendance sheet.  Is that
16 correct, immediately behind the December 10th,
17 immediately behind the December 10th planning sheet,
18 is that correct?
19      A.   There are several.
20      Q.   And there's several, right?
21      A.   Yeah.
22      Q.   And the one immediately behind the December
23 10th, 2015, planning sheet, Dr. Severin is present
24 for that one.  Is that correct?  Present at that
25 meeting is that correct?
```

**290**

```
1          DORCELY - CROSS - MASSENA
2       A.   That is correct.
3       Q.   Okay.  And the December 14th meeting is,
4  withdrawn.  I'd like to draw your attention to the
5  December 15th, 2000--December 15th, 2000, common
6  planning time attendance sheet.  Have you had an
7  opportunity to view that?
8       A.   Yes.
9       Q.   Okay.  And is Mr.--Dr. Severin is indicated
10 as present or not present for that particular
11 meeting?
12      A.   He did not sign, no.
13      Q.   Okay.
14           THE HEARING OFFICER:  I'm sorry, I
15 didn't get your answer.
16           MR. DORCELY:  He did not sign, no.
17           THE HEARING OFFICER:  What does that
18 mean, no?
19           MR. DORCELY:  I don't see a signature.
20           THE HEARING OFFICER:  Okay, but the
21 question was, I felt the question was he marked
22 absent or not absent, and I want to know the
23 answer.  I'm not sure I understand your answer.
24           MR. DORCELY:  He's marked as planning.
25      Q.   What does that mean?
```

**291**

```
1          DORCELY - CROSS - MASSENA
2           THE HEARING OFFICER:  He's marked as
3  planning, Principal?
4           MR. DORCELY:  He's marked as him and
5  two other colleagues are co-planning based on
6  the narrative.
7           THE HEARING OFFICER:  Oh, I see.
8           MR. DORCELY:  But he did not sign the
9  attendance sheet.
10      Q.   Okay.  So, and but you marked him as
11 absent.  Is that correct?
12      A.   It's not marked absent on this sheet.
13      Q.   Okay.  Well, you've had an opportunity to
14 view Department's 1 in evidence.  Is that correct?
15      A.   That is correct.
16      Q.   And Department's 1 in evidence, you've also
17 had an opportunity to, withdrawn.  You've had an
18 opportunity to view Department 1 in evidence.  Is
19 that correct?
20      A.   That is correct.
21      Q.   And you've had an opportunity to review
22 Specification five under Department's 1 in evidence,
23 correct?
24      A.   That is correct.
25      Q.   And have you also had an opportunity to
```

292

```
 1          DORCELY - CROSS - MASSENA
 2    review the twenty ninth entry in Department's 1,
 3    Specification five, in evidence, which indicates that
 4    Mr. Severin--Dr. Severin was absent or not present at
 5    the common planning time meeting on December 15th of
 6    2015.
 7          A.  That is correct, yes.
 8          Q.  But that's incorrect.
 9          A.  What is your question?
10          Q.  That's incorrect, correct, that on December
11    15th of 2015, that he was not present?  That's
12    incorrect.
13                MR. FRANCIS:  Objection as to form.
14                THE HEARING OFFICER:  No.  I think
15    that the witness understands.  If he doesn't
16    understand it, he's going to let counsel know.
17    Do you understand the question?
18                MR. DORCELY:  Yes.
19                THE HEARING OFFICER:  Okay.  So, is it
20    correct or incorrect, the entry for December
21    15th?
22                MR. DORCELY:  It is correct.
23                THE HEARING OFFICER:  That he was
24    absent on that day.
25                MR. DORCELY:  No, he was not present.
```

293

```
 1          DORCELY - CROSS - MASSENA
 2    He didn't sign.
 3                THE HEARING OFFICER:  Okay, hang on.
 4    It says the charge for Specification five is
 5    that the Respondent failed to attend a certain
 6    number of common planning time meetings.  And
 7    one of the dates listed in the Specification, as
 8    a date that he did not attend, is December 15th.
 9    So, the question I thought counsel was asking
10    you is, is that entry in Department Exhibit 1,
11    under Specification five, correct or incorrect?
12                MR. DORCELY:  That is incorrect.
13                THE HEARING OFFICER:  Okay, that's
14    all, that's fine.
15          Q.  And you provided this information,
16    withdrawn.  The information regarding Dr. Severin's
17    attendance, or lack of attendance, at the common
18    planning time meetings were provided to you--were you
19    provided them to the Department of Education.  Is
20    that correct?
21          A.  That is correct.
22          Q.  To bring these charges against Dr. Severin,
23    correct?
24          A.  That is correct.
25                MR. MASSENA:  Your Honor, I'll just
```

294

```
 1          DORCELY - CROSS - MASSENA
 2    need, well, can we go off the record?
 3                THE HEARING OFFICER:  Sure.  We'll go
 4    off the record and take a short break.
 5                [OFF THE RECORD 2:39:44]
 6                [ON THE RECORD 2:39:44]
 7                THE HEARING OFFICER:  Mr. Massena?
 8                MR. MASSENA:  Yes, thank you.
 9          Q.  Principal Dorcely, I'd like to direct your
10    attention to Specification number six, Department's
11    Number 1, Specification number six.  I believe you
12    have a copy in front of you.  The allegations are
13    that on or about November 12th of 2015, Respondent
14    left the school building during the school day,
15    without signing the teacher log in the school's main
16    office.  Are you familiar with that Specification?
17          A.  Yes.
18          Q.  Okay.  Now, during your testimony, you
19    stated that you observed Dr. Severin, and correct me
20    if I'm wrong please, you observed Dr. Severin leaving
21    the school.  Is that correct?
22          A.  No, I don't recall that.
23          Q.  Oh, okay.  Who observed Dr. Severin leaving
24    the school?
25          A.  I don't recall that one.
```

295

```
 1          DORCELY - CROSS - MASSENA
 2          Q.  No, no, the question is who observed Dr.
 3    Severin leaving the school?
 4          A.  It would be I don't know.
 5          Q.  Is there an eyewitness that observed Dr.
 6    Severin leaving the school?
 7          A.  I believe there is someone who observed
 8    him.  I'm not too sure.
 9          Q.  Please share with us.
10          A.  No, this--
11          Q.  [Interposing] If you can, share with us.
12          A.  It would be either the secretary--
13          Q.  [Interposing] Well, no, no, I'm not asking
14    you to guess.  I am asking you to share with us, who
15    is the person that observed him leaving the school?
16          A.  I don't recall.
17          Q.  Is there something that would refresh your
18    recollection?
19          A.  Yes.
20          Q.  And what would that be?
21          A.  The disciplinary letter.
22          Q.  The disciplinary letter, okay, one moment.
23    That actually is in evidence but just give me one
24    moment.  I am going to direct your attention to
25    Department 19.
```

296

```
1        DORCELY - CROSS - MASSENA
2     [Crosstalk]
3     Q.   Department 19--
4     [Background conversation]
5           THE HEARING OFFICER:  This is what I
6     have as Department 19.  It makes reference to
7     November 12th.
8           MR. MASSENA:  Thank you, I'm sorry.
9     Q.   I am going to direct your attention to what
10    is Department 19 in evidence.
11          MR. MASSENA:  I'm just going to ask
12    that the Respondent show that--that the
13    Department show that to the witness.
14          [Background conversation]
15          MR. MASSENA:  Sure.  My copy has notes
16    on it.
17          THE HEARING OFFICER:  Okay.
18          MR. FRANCIS:  And you're asking to
19    look at Department's 19?  Is that correct?
20          MR. MASSENA:  Yes.  It's a November
21    25th, 2015, disciplinary letter.
22          MR. FRANCIS:  That's what you're
23    referring to, correct?
24          MR. FRANCIS:  Yes.  Wait, no sorry, I
25    said that too quickly.
```

298

```
1        DORCELY - CROSS - MASSENA
2           THE HEARING OFFICER:  Okay.
3     Q.   You observed him.
4     A.   That is correct.
5     Q.   Describe to us how you observed him on that
6     day, despite the fact that just a few moments ago you
7     did not.
8           MR. FRANCIS:  Objection, the same
9     objection.
10          THE HEARING OFFICER:  Well--
11          [Crosstalk]
12          THE HEARING OFFICER:  [Interposing]
13    Hang on, hang on, hang on, hang on.  You asked--
14    the witness began by saying I don't know.  Then
15    the witness said I don't remember.  You asked
16    the witness if there was any document that he
17    could look at to refresh his recollection.  He
18    said yes.  It was the letter--the letter to
19    file.  You've now shown the witness the letter
20    to file, and apparently it has refreshed his
21    recollection, and he is now testifying that it
22    was himself who saw the Respondent leave.  So, I
23    mean that's, you know, that's the testimony you
24    have elicited.  Now, if you want to pursue this,
25    you're welcome to, but his testimony, after now
```

297

```
1        DORCELY - CROSS - MASSENA
2     [Background conversation]
3           MR. MASSENA:  Yeah, okay.
4     Q.   I'd like you to take a look at Department
5     19 in evidence.
6     A.   Okay.
7     Q.   Okay.  And once you've had an opportunity
8     to review it, I'd ask you to return it to the
9     Department, just the first page, Department 19 in
10    evidence, to refresh your recollection.  And once
11    you've had an opportunity to review it, I'd ask you
12    to return it to the Department.
13    Q.   Okay.  You've had an opportunity to review
14    Department 19 in evidence?
15    A.   Yes.
16    Q.   Who observed Dr. Severin leaving the
17    school?
18    A.   I observed that day.  It was me.
19    Q.   You observed that day.
20    A.   Yes.
21    Q.   But less than a few minutes ago, for some
22    reason that escaped your knowledge.  Is that correct?
23          MR. FRANCIS:  Objection,
24    argumentative.
25          MR. MASSENA:  Withdrawn, Your Honor.
```

299

```
1        DORCELY - CROSS - MASSENA
2     having his memory refreshed, is that it was
3     himself.
4           MR. MASSENA:  Okay.
5           THE HEARING OFFICER:  So, but
6     continue.  I'm not trying to short circuit or
7     preclude you from asking other questions, but
8     that's where we're at.
9     Q.   What did you--what did you observe that
10    day?
11    A.   Observed leaving--
12    [Background noise papers shuffling]
13    Q.   I'm sorry, could you repeat that?
14    A.   Observed Dr. Severin leaving and not
15    signing the late log.
16    Q.   Where did he go?
17    A.   Out of the building.
18    Q.   You saw him leave the building?
19    A.   Leave the main office.
20    Q.   And what do you mean by the main office?
21    A.   One oh three is the main office.  I
22    observed.  That's why I wrote the letter, the
23    discipline letter.
24    Q.   Okay.  So, if you can, if you can help us
25    understand the sequence of events, where is the exit
```

**300**

```
1            DORCELY - CROSS - MASSENA
2   to your building located?
3       A.  There's 17 exits.
4       Q.  Okay.  Which exit did you see Dr. Severin
5   exit from?
6       A.  Dr. Severin left the main office.
7       Q.  And where is the main office located?
8       A.  Right by my office, the Principal's office.
9       Q.  And--
10      A.  [Interposing] Where the sign in sheet is
11  kept.
12      Q.  Okay.  Well, you stated he left the
13  building, not that he left your office.
14      A.  So, he has a teaching assignment.  So if he
15  left, he never returned to receive the assignment.
16      Q.  So, your testimony is that he left the
17  building.  Is that correct?
18      A.  That is correct.
19      Q.  Okay.  And you observed him leave the
20  building.
21      A.  I observed him leaving.  That is correct.
22              THE HEARING OFFICER:  That's not the
23          question.  Let's just make sure that we--listen
24          to the question and answer the question.  I want
25          to develop the record properly.  Ask the
```

**301**

```
1            DORCELY - CROSS - MASSENA
2          question again and let's get an answer from the
3          Principal, please.
4       Q.  Did you see him leave the building?  Yes or
5   no.
6       A.  No.
7       Q.  Okay.  Did you see him, withdrawn.  Just
8   one second, withdrawn.  The Specification, and you've
9   had an opportunity to review Specification number
10  six, correct?
11      A.  That is correct.
12      Q.  And the allegation that you made.  Is that
13  correct, Specification number six is an allegation
14  that you made?  Is that correct, against Dr. Severin?
15      A.  Not signing the teacher's log?
16      Q.  And leaving the building, left the school
17  building.
18      A.  Can I refer to the Specification?  It says
19  the school's main office.  Specification number six
20  you are referring to, it says left the school
21  building during a school day without signing the
22  teacher's log in the school's main office.  It's by
23  my office.
24      Q.  Principal Dorcely--
25      A.  [Interposing] Yes.
```

**302**

```
1            DORCELY - CROSS - MASSENA
2       Q.  --you stated that you observed Dr.--you
3   stated that you did not observe Dr.--
4       A.  [Interposing] Severin.
5       Q.  --leave the building.  Is that correct?
6       A.  Signing the late log.
7       Q.  The question is did you observe Dr. Severin
8   leaving the building?
9       A.  No, I did not.
10      Q.  Okay.
11              MR. MASSENA:  One moment, Your Honor.
12      Q.  Who maintains this log, this sign in--this
13  sign in or sign out sheet log?
14      A.  It's in the main office, my secretary, Ms.
15  Townes.
16      Q.  Okay, Ms. Townes, and where does Ms.
17  Townes--where is this sign in sheet located in
18  relationship to the exit?
19      A.  Of the building?
20      Q.  Yes.
21      A.  I would tell you it's a U.  You leave the
22  main office, and then you make another U, and then
23  you go out the main.
24      Q.  And the sign in sheet is located where in
25  relationship to that exit?
```

**303**

```
1            DORCELY - CROSS - MASSENA
2       A.  In the main office by my office.
3       Q.  And Ms. Townes maintains this sign in
4   sheet, right?
5          [Crosstalk]
6       Q.  Log out sheet.
7       A.  Log, the teacher log.
8       Q.  The teacher log.
9       A.  Correct.
10      Q.  And where is the log maintained--where is
11  the log kept in relationship to Ms. Townes' desk?
12      A.  Ms. Townes is sitting here.
13              MR. MASSENA:  Let the record
14          reflect that Principal Dorcely is pointing
15          towards his lap.
16      A.  So, there's a desk here, and that's where
17  the log is maintained.  My office is right here.
18      Q.  Okay.  And when you say right here, you're
19  indicating a distance of...?
20      A.  I'm sorry, I just want to show you.  So,
21  you come into the main office.  The sign in sheet is
22  here.  Right here is my office, and it will be to my
23  left.
24      Q.  Okay.
25              MR. MASSENA:  Let the record reflect
```

304

DORCELY - CROSS - MASSENA

1       DORCELY - CROSS - MASSENA
2            that Principal Dorcely is indicating that the
3       sign in sheet is to his left, to the left of his
4       office, or his desk, specifically to the left of
5       his office, and a space no longer--no more than
6       four to five feet.
7                    MR. DORCELY:  That's incorrect.
8                    MR. MASSENA:  Okay.  Please clarify
9       the record.
10                   MR. DORCELY:  So, Ms. Townes, the
11      secretary, the sign in sheet is right on top of
12      her desk.  It's a big, I forget the name of it,
13      it's right, and then to the left is my office,
14      the conference room and then my office.  It's so
15      I see the log every time I go in the main
16      office.
17      Q.   Are you constantly staring at the log?
18      A.   I always look at the log.
19                   MR. FRANCIS:  Objection,
20      argumentative.
21                   THE HEARING OFFICER:  No, I'll permit
22      it.  It's fine.
23                   MR. MASSENA:  Okay.  And, my
24      apologies, may we go off the record?
25                   THE HEARING OFFICER:  Sure, let's go

305

1       DORCELY - CROSS - MASSENA
2            off the record.
3                    [OFF THE RECORD 2:50:14]
4                    [ON THE RECORD 2:50:14]
5                    THE HEARING OFFICER:  Okay.  So, let's
6       go back on the record.
7       Q.   Do you recall what time of day that was?
8       A.   Yes, that would be around perhaps period
9       four.
10      Q.   Period four.  Is there any significance
11      regarding that date and time?
12      A.   Yes.  Period four is usually when Dr.
13      Severin takes his lunch and he leaves the building.
14      So, I usually see him leaving the building by my
15      office.
16      Q.   And when you say, once again, when you say
17      leaving the building--
18      A.   [Interposing] He signs out.
19      Q.   --he signs out, but he didn't sign out on
20      that day.  That's your testimony.
21      A.   That is correct.
22      Q.   And on that day, you did not see him leave
23      the building.
24      A.   That day he did leave the building.
25      Q.   That's not the question I asked you,

306

1       DORCELY - CROSS - MASSENA
2       Principal Dorcely.  Did you--you did not see him
3       leave the building on November 12th of 2015.  It's a
4       yes or no question.
5       A.   The answer is yes.
6       Q.   Your testimony today is--your testimony
7       today is that you saw Principal Dorcely leave the
8       building?  I'm sorry, you saw the Respondent leave
9       the building?
10      A.   That is correct.
11      Q.   How long was he away from the building?
12      A.   He did not return.
13      Q.   Are you certain?  I'm asking you, are you
14      certain?
15      A.   May I look at the--
16      Q.   [Interposing] No, are you certain?
17      A.   I'm not certain.
18      Q.   Okay.  So, again I'd ask you to, well, I'd
19      ask you to the best of your ability, answer the
20      questions with the knowledge that you contain.  Okay,
21      so I'll give you another opportunity.  It's your
22      testimony that he--you saw him exit the building.
23      A.   It's my testimony Dr. Severin left and did
24      not sign the late log--the teacher log.  That is
25      correct.

307

1       DORCELY - CROSS - MASSENA
2       Q.   That he did not sign the teacher log.
3       A.   That is correct.
4       Q.   But it's not what--not your testimony that
5       he left the building.
6                    MR. FRANCIS:  Your Honor, I am going
7       to object again to this.  This question has been
8       posed and answered--
9                    [Crosstalk]
10                   THE HEARING OFFICER:  [Interposing]
11      Well, you know, it's--
12                   MR. FRANCIS:  --several times.
13                   THE HEARING OFFICER:  I have heard the
14      question asked of this witness, and I have heard
15      the witness repeatedly say that he did not the
16      Respondent leave the building.  And for some
17      reason, Respondent's counsel keeps asking the
18      question, and now we have a slightly different
19      answer, or certainly a more muddled answer.  And
20      the answer I am hearing is that, now, is that
21      the Principal did see the Respondent leave the
22      building.  I don't know which it is, but now
23      that we have this new testimony.  I am going to
24      allow counsel to explore this further but, you
25      know, counsel opened the door by asking him for

308

```
1         DORCELY - CROSS - MASSENA
2     a fourth time.  Counsel, if you'd like you may
3     pursue this.  We seem to have a different answer
4     now.
5         MR. MASSENA:  No actually, Your Honor,
6     I'll move on.
7         THE HEARING OFFICER:  Okay, as you
8     like.
9         MR. MASSENA:  Yeah, I'll move on.
10    Q.   I'd like to draw your attention to, just
11    one moment to--
12    [Crosstalk]
13        MR. MASSENA:  Can we go off the
14    record, please?
15        THE HEARING OFFICER:  Yeah, of course,
16    yes.  Let's go off the record.
17        [OFF THE RECORD 2:53:34]
18        [ON THE RECORD 2:53:34]
19        THE HEARING OFFICER:  Let's go back on
20    the record.  All right, there was a brief off
21    the record conversation.  And I just want to
22    make very clear on the record that when I used
23    the term, opened the door, I should not have.
24    And certainly I didn't mean to suggest that the
25    Department's counsel opened the door.  I think
```

309

```
1         DORCELY - CROSS - MASSENA
2     what I was simply getting at is that by asking a
3     question repeatedly of this witness, it turned
4     out that we ended up hearing what may have been
5     differing answers.  And the record will reflect
6     precisely what it is the witness said.
7         MR. MASSENA:  Okay.
8     Q.   Principal Dorcely, I'd like to draw your
9     attention to Specification eight, Department Exhibit
10    Number 1 in evidence.  Specification eight reads, on
11    or about November 4th, 2015, Respondent permitted a
12    student to enter the school building through exits
13    one and two, instead of entering through the main
14    entrance, where the student would have been subjected
15    to scanning.  Okay, what, at what period did this
16    fire drill take place if you recall?
17    A.   I don't recall.
18    Q.   Okay.  Is there a specific time that your
19    fire drills take place, any particular period in the
20    day?
21    A.   No, it's random.
22    Q.   Okay.  I believe during direct testimony
23    you said that generally you have eight--eight fire
24    drills within the school year--
25    A.   [Interposing] Per year.
```

310

```
1         DORCELY - CROSS - MASSENA
2     Q.   --academic--per year?  Excuse me, was there
3     any particular parameters about this fire drill, or
4     was this fire drill in the course with all other fire
5     drills?
6     A.   This one, students were subject to being
7     scanned.
8     Q.   Okay.
9     A.   So, a full blown fire drill.
10    Q.   Okay.  So, explain to us the difference
11    between this fire drill and other fire drills.
12    A.   Students would be returning.  So, this fire
13    drill would not be immediate dismissal.  So, if it
14    was during the end of the day, students would go
15    home.  If it's a fire drill, students are subject
16    back to get scanning.
17    Q.   Okay.  And the teachers are aware of this
18    procedure?
19    A.   All of them.
20    Q.   Now, your school is composed of how many--
21    your building has how many schools in your building?
22    A.   There's three schools, one program.
23    Q.   Okay.  What are the three schools and what
24    is the one program?
25    A.   Urban Action Academy.  I'm on the first
```

311

```
1         DORCELY - CROSS - MASSENA
2     floor.  The second floor is IM, including a program
3     called STEP, for students with disability.  And then
4     the third floor is Medical Professions.
5     Q.   Okay.  And this was a building wide fire
6     drill, or was this a fire drill that was solely for
7     your school?
8     A.   Oh, it was building wide, building wide.
9     Q.   Okay.
10    [Background conversation]
11    Q.   Okay.  So, it was a building wide fire
12    drill.  So, this means that other schools were also
13    participating in the fire drill.
14    A.   That is correct.
15    Q.   How would you describe the relationship
16    between the various administrators and teachers and
17    staff in between--amongst the three different schools
18    and professions?
19        MR. FRANCIS:  Objection as to
20    relevance.
21        THE HEARING OFFICER:  I just, also,
22    I'm just, I am going to sustain the objection
23    also as to form.  I'm not sure what you mean
24    between each individual teacher from the
25    different schools?
```

312

```
 1        DORCELY - CROSS - MASSENA
 2              MR. MASSENA:  Yes.
 3              THE HEARING OFFICER:  It's hard to
 4    answer that question, counsel.
 5              MR. MASSENA:  Yes, sir.
 6              [Crosstalk]
 7              THE HEARING OFFICER:  [Interposing]
 8    So, if you want to rephrase it.
 9              MR. MASSENA:  Yeah.
10        Q.   Do the staff, administrators, and teachers
11    of the various schools interact?
12              MR. FRANCIS:  Objection, relevance.
13              [Crosstalk]
14              THE HEARING OFFICER:  [Interposing]
15    No, no, that's fine.  I'll permit the question.
16        A.   I don't know about the staff, but we meet
17    in building council, all the Principals, every Monday
18    at 7:30.
19        Q.   Okay.  And is it fair to say that the
20    Principals of all three schools hold some
21    responsibility for all of the students in the
22    building?  Is that fair to say?
23        A.   Yes.
24        Q.   Okay, for example, well withdrawn.  So,
25    have you had an opportunity to view the video in
```

313

```
 1        DORCELY - CROSS - MASSENA
 2    relation to this fire drill?
 3        A.   No.
 4        Q.   You have not seen the video.  And at this
 5    particular time where it's alleged that Dr. Severin
 6    allowed a student to come into the school without
 7    being scanned, you were not present at that location
 8    at that time.  Is that correct?
 9        A.   That is correct.
10        Q.   Where were you?
11        A.   I was participating in the fire drill.
12        Q.   What were you doing, where, how?
13        A.   I have to--we all have responsibilities.  I
14    exit through five and six.
15        Q.   Okay.
16        A.   This occurred in exit one and two.
17        Q.   Okay.  And it was your testimony that
18    Principal, I'm going to get the name wrong.
19        A.   Adaleza Michelena.
20        Q.   Malaza [phonetic] Michelena--
21              MR. FRANCIS:  [Interposing] That's A-
22    D-E-L-Z-A--
23              MR. MASSENA:  [Interposing] Thank you.
24              MR. FRANCIS:  --capital M-I-C-H-E-L-L-
25    E-N-A.
```

314

```
 1        DORCELY - CROSS - MASSENA
 2              MR. MASSENA:  Thank you.
 3              THE HEARING OFFICER:  Thank you,
 4    counsel.
 5              MR. MASSENA:  Thank you.
 6        Q.   Was present during this--during this
 7    particular instance.  Is that correct?
 8        A.   Our school exit one and two, correct.
 9        Q.   Okay.  And do you know what her
10    responsibilities were, what her responsibilities were
11    during this fire drill?
12        A.   Making sure her students are out during the
13    fire drill.
14        Q.   Okay  And based on your experience, working
15    along with these three--these two other schools and
16    programs in your school, do the Principals and
17    teachers speak to the other students?
18        A.   Yes.
19        Q.   And it was your testimony that this
20    Principal observed Dr. Severin allowing this woman
21    into the--allowing your student into the school.
22        A.   The student, Student "A", correct.
23        Q.   Okay.  And did the--did that Principal
24    indicate to you whether or not she had spoken to the
25    student as well?
```

315

```
 1        DORCELY - CROSS - MASSENA
 2        A.   No, she did not.
 3        Q.   But it wouldn't be unusual for her to speak
 4    to the student, correct?
 5        A.   No.  She would inform me of what happened.
 6        Q.   That wasn't the question, Principal
 7    Dorcely.  Would it be unusual for this Principal from
 8    another school to speak to your student?
 9        A.   Sometimes unusual.
10        Q.   Sometimes unusual.  Okay, so I'll ask the
11    question just one more time.  Would it be unusual?
12        A.   Not unusual.
13        Q.   Thank you.  And she did, withdrawn.  You
14    don't know whether or not she spoke to the student in
15    this particular instance during the fire drill, if
16    she said any words to the student during this fire
17    drill.  Is that correct?
18        A.   That is correct.
19        Q.   And you proceeded to speak to her and
20    discipline Dr. Severin, correct?
21        A.   She informed me, yes.
22        Q.   Okay, and you took action to discipline Dr.
23    Severin based on your conversation with her.
24        A.   From my investigation, correct.
25        Q.   Okay.  And your investigation entailed...?
```

**316**

```
1       DORCELY - CROSS - MASSENA
2       A.   Student statement, and then the Principal
3  informed me what occurred during the fire drill.
4       Q.   Did you watch the video?
5       A.   No, I did not.
6       Q.   Why not?
7       A.   She informed me as my Principal colleague,
8  and a student testified to what had occurred, that
9  Dr. Severin allowed her to come in, Student "A".
10      Q.   But you knew there was a video, correct?
11      A.   You could obtain video, correct.
12      Q.   And you chose not to view the video.  Is
13 that correct?
14      A.   That is correct.
15      Q.   I'd like to discuss with you--actually
16 before I move on to another Specification, you--I am
17 going to--I am going to ask you to take a look at
18 what has been marked in evidence as Department
19 Number, one second here--
20      [Background conversation]
21      Q.   --as Department Number--the November 13th,
22 2015, disciplinary meeting.
23          THE HEARING OFFICER:  It could be
24      perhaps Department 21.
25          [Crosstalk]
```

**317**

```
1       DORCELY - CROSS - MASSENA
2          MR. MASSENA:  --21 or 22, 21,
3      Department 21.
4       Q.   Okay.  I'd like you to--when you've had an
5  opportunity to review Department 21.
6          THE HEARING OFFICER:  Department 21,
7      I'm not certain that references the same
8      Specification.  Are you moving--I mean my
9      Department's 21 is dated November 13th, 2015--
10     aw, forgive me.  No, no, no, I see it now.
11     Thank you.  Sorry for the confusion.
12         MR. MASSENA:  Okay.  Had I said the
13     Department show the witness Department 21.
14     Thank you.
15         MR. FRANCIS:  Let the record reflect
16     that the witness has been handed Department's 21
17     in evidence.
18         MR. MASSENA:  Thank you.
19      Q.   Okay.  Now, you indicated that--have you
20 had an opportunity to review it?
21      A.   Yes, I have.
22      Q.   Okay.  Now, without looking to it, do you
23 recall stating, during this--without reading the
24 disciplinary letter, do you recall stating that Dr.
25 Severin was observed during the fire drill both on
```

**318**

```
1       DORCELY - CROSS - MASSENA
2  camera and by Principal Adaleza Michelena from High
3  School of Innovation, Advertising, and Media?
4       A.   Yeah, that is correct.
5       Q.   Okay.  Who observed them on camera?
6       A.   My Assistant Principal Barnett.
7       Q.   Okay.
8          MR. FRANCIS:  Forgive me, I did not
9      hear that last question and answer.
10         THE HEARING OFFICER:  Okay.  So, would
11     you, as a courtesy, just repeat--
12         MR. MASSENA:  [Interposing] Sure.
13         THE HEARING OFFICER:  --the question?
14         MR. MASSENA:  Sure, Your Honor.
15      Q.   You have had an opportunity to review
16 Department Number 21 in evidence.  Is that correct?
17      A.   Yes.
18      Q.   Okay.  And do you--do you recall stating in
19 that--in that disciplinary letter that Dr. Severin
20 was observed during the fire drill both on camera and
21 by Principal Adaleza Michelena?
22      A.   And that is correct.
23      Q.   Okay.  And it's your statement to the
24 Court--the statement to Your Honorable Arbitrator
25 that it was Principal Barnett who--Principal,
```

**319**

```
1       DORCELY - CROSS - MASSENA
2  Assistant Principal Barnett who observed Dr. Severin.
3       A.   Correct, you observe correct.
4       Q.   Okay.  So, you're relying on her--on her,
5  and I'm assuming you had a conversation with her?
6       A.   Yes.
7       Q.   Okay.
8          THE HEARING OFFICER:  She observed the
9      Respondent, according to your testimony, on the
10     video tape.
11         MR. DORCELY:  That is correct.
12         THE HEARING OFFICER:  Okay.
13         MR. MASSENA:  Okay.
14      Q.   You did not--and you chose not to state
15 that anywhere on the--on the disciplinary letter.  Is
16 that correct?
17      A.   I wrote you were observed.  That is
18 correct.
19      Q.   Okay.  Did you have the Assistant Principal
20 sign off on this letter?
21      A.   She was present during the meeting, the
22 disciplinary meeting.
23      Q.   Oh.  Did you have her sign off on the
24 letter?
25      A.   No, I signed the letter.
```

320

```
1           DORCELY - CROSS - MASSENA
2        Q.   Okay.
3   [Background conversation]
4        Q.   Is there a log book, or a record of some
5   sort, as to what time the particular fire drills are
6   held during the school year?
7        A.   Yes.  The AP of Security would have that.
8        Q.   Oh, the AP of Security?
9        A.   Yes.
10       Q.   Okay.  And it's your belief that the fire
11  drill held on November 9th, I'm sorry, held on
12  November 4th was not at the end of the day?
13       A.   I don't recall.
14       Q.   And again, your testimony was that
15  fire drills that are held at the end of the day do
16  not require scanning.  Is that correct?
17       A.   Typically, correct.
18       Q.   Okay.
19  [Background conversation]
20            MR. MASSENA:  One moment, Your Honor.
21            THE HEARING OFFICER:  Sure.
22            [Background conversation]
23            MR. MASSENA:  May we go off the record
24  for a moment?
25            THE HEARING OFFICER:  Sure.  Let's go
```

321

```
1           DORCELY - CROSS - MASSENA
2   off the record.
3                 [OFF THE RECORD 3:07:34]
4                 [ON THE RECORD 3:07:34]
5            THE HEARING OFFICER:  So, let's go
6   back on.
7        Q.   Okay.  I'd like to direct your attention to
8   Specification nine, okay, Department's Number 1 in
9   evidence, Specification nine, which reads on or about
10  October 23rd, 2015, Respondent failed to contact the
11  main office and or immediate supervisor to inform
12  them of his absence.  Now, you--what is the policy
13  regarding absences?
14       A.   You have to contact your direct supervisor,
15  and also call SubCentral.
16       Q.   Okay.  Now, you send out what's called a
17  daily docket, correct?
18       A.   My secretary, that is correct.
19       Q.   Okay.  And it's a document that you have
20  reviewed.  Is that correct?
21       A.   It's vetted, correct.
22       Q.   And in that document, it also indicates
23  that the teachers should reach out to SubCentral.  Is
24  that correct?
25       A.   That is correct.
```

322

```
1           DORCELY - CROSS - MASSENA
2        Q.   Okay.  And it also says that that's also
3   listed in the handbook as well.  Is that correct?
4        A.   That is correct.
5        Q.   That the teachers should reach out to
6   SubCentral if they are going to be out.  Is that
7   correct?  Absent.
8        A.   That is correct.
9        Q.   And once again, by October 23rd of 2015,
10  you were already on notice that Dr. Severin had filed
11  allegations against you, correct?
12       A.   Repeat that question, please.
13       Q.   By October 23rd of 2015, you were already
14  on notice that Dr. Severin had filed against you--
15  [Crosstalk]
16       Q.   So, did you check whether or not Dr.
17  Severin had contacted SubCentral?
18       A.   He didn't contact the immediate supervisor.
19       Q.   My question to you is did you check whether
20  or not Dr. Severin had contacted SubCentral regarding
21  October--the alleged October 23rd, 2015, absence?
22       A.   No, I did not check.
23       Q.   Did anyone check?
24       A.   It would be my secretary.
25       Q.   Okay.  Did your secretary check?
```

323

```
1           DORCELY - CROSS - MASSENA
2        A.   I'm unaware of that.
3        Q.   Okay.  Why is it important to contact
4   SubCentral?
5        A.   Because you got to get a sub.
6        Q.   Okay.  And that's the primary purpose of
7   the teacher reaching out to SubCentral, correct?
8        A.   Rephrase that, please.
9        Q.   That's the primary purpose of the teacher
10  reaching out to SubCentral, once they know that
11  they're going to be absent, correct, is to get a sub?
12       A.   I'm sorry, just repeat that one more time.
13       Q.   Sure, no problem.  The primary purpose of
14  the teacher reaching out to SubCentral is notifying
15  SubCentral of his absence, so that a substitute
16  teacher can be obtained.
17       A.   That is correct.
18       Q.   Also regarding Specification ten, on or
19  about October 26 of 2000--you allege that the
20  Respondent failed to contact the main office or an
21  immediate supervisor to inform them of his absence.
22  Did you check whether or not the--whether or not Dr.
23  Severin had contacted SubCentral?
24       A.   No, I did not check.
25       Q.   Okay.  And you do not know whether or not
```

324

```
1              DORCELY - CROSS - MASSENA
2    your secretary checked.
3         A.   That is correct.
4         Q.   Okay.  Do you know whether or not the
5    classes were covered that day?
6         A.   Yes.
7         Q.   They were covered.
8         A.   They were covered.
9         Q.   So, there was a substitute there.
10        A.   Not necessarily with a sub.  It could be in
11   house, so I am not sure.
12        Q.   But they were classes.  Is that correct?
13        A.   The classes were covered, correct.
14        Q.   And you don't know whether it was a
15   substitute or whether it was in house.
16        A.   That is correct.
17        Q.   So, it could have been a substitute.
18        A.   Correct.
19        Q.   Okay.
20             MR. MASSENA:  Can we have just--may we
21   go off the record?
22             THE HEARING OFFICER:  Sure.  Let's go
23   off the record.
24             [OFF THE RECORD 3:11:23]
25             [ON THE RECORD 3:11:23]
```

326

```
1              DORCELY - CROSS - MASSENA
2              THE HEARING OFFICER:  Thank you.
3              [Background conversation]
4              THE HEARING OFFICER:  And you said A
5    one?
6              MR. DORCELY:  A one is referring to
7    see teacher attendance and lateness and absences
8    and--
9              [Crosstalk]
10             THE HEARING OFFICER:  [Interposing]
11   Oh, I'm on the wrong--I'm looking at Department
12   9--
13             [Crosstalk]
14             MR. DORCELY:  [Interposing] Okay, the
15   2015-2016.
16             THE HEARING OFFICER:  Twenty fifteen,
17   twenty sixteen.  My A one says absentee lesson
18   plans on page 32.
19             MR. DORCELY:  Correct, but if you
20   notice at the bottom, it said see teacher
21   attendance and lateness and absences.  I'm just
22   going to refer to that.
23             THE HEARING OFFICER:  Okay, that's not
24   a problem.
25             MR. DORCELY:  I'm sorry.
```

325

```
1              DORCELY - CROSS - MASSENA
2              THE HEARING OFFICER:  On the record.
3              MR. MASSENA:  We're back on?
4              THE HEARING OFFICER:  Yep.
5              MR. MASSENA:  Okay.
6         Q.   Principal Dorcely, I'd like to, with the
7    Court's permission, and the assistance of the
8    Department, for you to show us where in Department's
9    Number 9 it states that the Principal--the teachers
10   are to report to their direct supervisor.
11             THE HEARING OFFICER:  You said report,
12   counsel.  The charge isn't report.  It's
13   contact--
14             [Crosstalk]
15             MR. MASSENA:  [Interposing] Contact,
16   contact.
17             THE HEARING OFFICER:  --so it's...
18   This is an exercise you do by yourself.
19             MR. DORCELY:  Oh, I'm sorry.
20             THE HEARING OFFICER:  That's okay.
21             MR. DORCELY:  Yeah, I'm looking at A
22   one, absentee.
23             THE HEARING OFFICER:  And what page
24   are you on?
25             MR. DORCELY:  I'm on page 32.
```

327

```
1              DORCELY - CROSS - MASSENA
2              THE HEARING OFFICER:  No, it's okay.
3    You said you're looking for teacher attendance,
4    lateness, and absence?
5              MR. DORCELY:  Yeah.
6              THE HEARING OFFICER:  Take a look at
7    page 64, Principal Dorcely, and tell me if
8    that's what you're looking for.
9              MR. DORCELY:  Yes.
10             THE HEARING OFFICER:  Okay.
11        A.   Yep, if you are going to be absent, please
12   call your direct supervisor at the school.  That's
13   page 64, under T one, teacher attendance, lateness,
14   and absences.
15        Q.   Okay.  And who was Principal Dorcely's
16   direct supervisor--
17             THE HEARING OFFICER:  [Interposing]
18   Respondent's, that's okay, it's late in the day.
19             [Laughter]
20             THE HEARING OFFICER:  That's fine.
21        Q.   Who was Dr. Severin's direct supervisor on
22   October 23rd of 2015 and October 26th of 2015?
23        A.   That would be me, Principal Dorcely.
24        Q.   Okay, just one moment.
25             MR. MASSENA:  May we go off the
```

328

```
 1        DORCELY - CROSS - MASSENA
 2        record?
 3                THE HEARING OFFICER:  Sure.
 4                MR. MASSENA:  All right.
 5        [OFF THE RECORD 3:15:16]
 6        [ON THE RECORD 3:15:16]
 7                THE HEARING OFFICER:  Okay.  So, after
 8        some off the record discussions, we have all
 9        agreed that we're coming back on July 12th at
10        10:00 to continue the cross examination of the
11        Principal.  And we also have scheduled for this
12        matter July 14th.  Is there anything further
13        that needs to be added, Mr. Francis?
14                MR. FRANCIS:  Not from the Department.
15                THE HEARING OFFICER:  Okay, Mr.
16        Massena?
17                MR. MASSENA:  Not from the Respondent.
18                THE HEARING OFFICER:  Okay.  Thank you
19        all.  Have a wonderful July 4th holiday.
20                MR. MASSENA:  Thank you.
21                THE HEARING OFFICER:  Let's go off the
22        record.
23                (The hearing adjourned at 5:00 p.m.)
```

Student Index

330

```
Javenska Bernadine [phonetic], Student "A"
Anesha Job [phonetic], Student "B"
Sidney Bowrey [phonetic], Student "C"
```

CERTIFICATE OF ACCURACY            329

I, Debbie L. Manning, do hereby certify that the foregoing typewritten transcript of proceedings in the matter of New York City Department of Education v. Jean Richard Severin, File No. 29,298, was prepared using the required transcription equipment and is a true and accurate record of the proceedings to the best of my ability.  I further certify that I am not connected by blood, marriage or employment with any of the parties herein nor interested directly or indirectly in the matter transcribed.
Signature:
Date:  July 4, 2016

## THE STATE EDUCATION DEPARTMENT
## THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
JEAN RICHARD SEVERIN
Section 3020-a Education Law Proceeding (File #29,298)


DATE:              July 12, 2016

TIME:              10:00 a.m. to 4:00 p.m.

LOCATION:          NYC Department of Education
                   Office of Legal Services
                   100 Gold Street, 3rd Floor
                   New York, NY 10038

BEFORE:            JAMES BROWN, ESQ.
                   HEARING OFFICER

APPEARANCES:    FOR THE COMPLAINANT:
                   MICHAEL FRANCIS, ESQ., of Counsel
                   NYC Department of Education
                   Office of Legal Services
                   49-51 Chambers Street
                   New York, NY 10007
                   Telephone:  (212) 374-6741
                   mfrancis11@schools.nyc.gov

                FOR THE RESPONDENT:
                   ALAIN MASSENA, ESQ.
                   Massena Law P.C.
                   305 Broadway, Suite 1001
                   New York, NY 10007
                   Telephone:  (212) 766-1700
                   avm@massenalaw.com

Sheet 2

## Table of Contents

O P E N I N G   S T A T E M E N T

| NAME: | PAGE: |
|-------|-------|
| A. Massena | 369 |

W I T N E S S   E X A M I N A T I O N

| NAME: | PAGE: |
|-------|-------|

S. Dorcely:
| Cross (cont.) by Massena | 335 |
| Redirect by Francis | 359 |

M. Prayor:
| Sworn | 372 |
| Direct by Massena | 375 |
| Voir Dire by Francis | 379 |
| Direct (cont.) by Massena | 381 |
| Voir Dire by Francis | 383 |
| Direct (cont.) by Massena | 384 |
| Cross by Francis | 398 |
| Redirect by Massena | 403 |
| Re-cross by Francis | 419 |
| Voir Dire by Francis | 423 |
| Re-cross by Francis (cont.) | 426 |
| Redirect by Massena | 427 |

J. Severin:
| Sworn | 437 |
| Direct by Massena | 438 |

C L O S I N G   S T A T E M E N T

| NAME: | PAGE: |
|-------|-------|
| [None] | |

E X H I B I T S

| RESPONDENT | DESCRIPTION | I.D. | IN EV. |
|------------|-------------|------|--------|

## Table of Contents

| 7 | Email, Respondent to Superintendent Prayor regarding SCI case | 378 | 380 |
| 8 | Email, Respondent to Superintendent Prayor | 382 | 384 |
| 9 | Email, Respondent to Michael Romano | 385 | 386 |
| DEPARTMENT OF EDUCATION | DESCRIPTION | I.D. | IN EV. |
| 30 | OSI investigation findings | 415 | 418 |
| 31 | Exhibit not admitted | 419 | |

334

JEAN RICHARD SEVERIN - 07/12/16

1
2      (The hearing commenced at 10:00 a.m.)
3      THE HEARING OFFICER:  Good morning.
4  My name is James A. Brown.  I am the Hearing
5  Officer duly appointed pursuant to New York
6  State Education Law Section 3020-a, its rules
7  and regulations, as well as the contractual
8  provisions by and between the United Federation
9  of Teachers and the New York City Department of
10 Education.  We are here today in the matter of
11 Jean Richard Severin, SED File Number 29,298.
12 This is a continuing matter.  I note that the
13 Respondent is in the waiting area.  I have also
14 been told there are problems with security lines
15 downstairs.  I have been sitting here, and so I
16 have opened the record.  I am now going to go
17 off the record while we await the arrival of
18 counsel.  Thank you.
19      [OFF THE RECORD, Waiting for attorneys
20 10:06 a.m.]
21      [ON THE RECORD, Waiting for attorneys
22 11:00 a.m.]
23      THE HEARING OFFICER:  On the record.
24 We're on the record.  Okay, so we're back on the
25 record.  I have been joined by counsel,

335

JEAN RICHARD SEVERIN - 07/12/16

1
2  Respondent, and the Department's witness.  Let's
3  note our appearances beginning on my left.
4      MR. MICHAEL FRANCIS:  For the
5  Department of Education, Michael A. Francis.
6      [Background conversation]
7      MR. ALAIN MASSENA:  Alain Massena for
8  the Respondent.
9      THE HEARING OFFICER:  And I'll note
10 for the record that the Respondent is here
11 present with us, and I'll note that the
12 Principal has returned for his continued cross
13 examination.  Mr. Massena, are you ready to
14 cross examine?
15      MR. MASSENA:  I am ready.
16      THE HEARING OFFICER:  All right, I
17 just want to remind you, Principal, that you are
18 still under oath.
19      MR. STEVE DORCELY:  Okay.
20      THE HEARING OFFICER:  Mr. Massena?
21      MR. MASSENA:  Sure.
22 CROSS EXAMINATION (CONT.)
23 BY MR. MASSENA
24      Q.  Good after--well good morning, Principal,
25 how are you?

336

```
1          DORCELY - CROSS - MASSENA
2      A.   Good.
3      Q.   Excellent.  I just have a few questions for
4  you regarding direct.  Your goal at Urban Academy is
5  to--your goal is--what are some of your goals at
6  Urban Academy?
7      A.   To ensure that students are safe, to ensure
8  that the teachers perform to the best of their
9  abilities, and that the students are successful, and
10 to meet my CE goals, which is my comprehensive
11 educational goals, every year.
12     Q.   What does that mean?
13     A.   That means I have five goals throughout the
14 year that I set with my Superintendent.  One of the
15 goals was around teacher development.  The second
16 goal was graduation.  The third goal was parent
17 engagement.  The fourth goal was the Danielson.  And
18 the final goal was around attendance.
19     Q.   And as part of those goals, it also
20 includes increasing test scores, correct?
21     A.   Graduation, yes.
22     Q.   And graduation is often times determined by
23 test scores.  Is that correct?
24     A.   Regents, correct.
25     Q.   Okay.  You are aware that Dr. Severin had
```

337

```
1          DORCELY - CROSS - MASSENA
2  filed charges against you, or allegations against
3  you, regarding cheating, correct?
4      A.   Yes.
5      Q.   Okay.  And it's not the last time that
6  allegations were filed against you regarding
7  cheating.  Is that correct?
8          MR. FRANCIS:  Objection, basis?
9          THE HEARING OFFICER:  Hang on.  Yes,
10     tell me what the relevance of this question is
11     to this proceeding--
12         [Crosstalk]
13         MR. MASSENA:  [Interposing] Sure.  I
14     would ask the witness to step out.
15         THE HEARING OFFICER:  All right.
16     We're going to have to ask you to step out,
17     Principal.  Thank you.  I understand your
18     initial question to be whether or not the
19     Principal understood that the Respondent had
20     filed charges or allegations against him, to
21     which he answered in the affirmative.  Tell me
22     the relevance of your latest question.
23         MR. MASSENA:  Okay.  The relevance,
24     Your Honor, is that it's come to my knowledge
25     recently that additional allegations have been
```

338

```
1          DORCELY - CROSS - MASSENA
2  made against the Principal regarding cheating
3  and regarding his involvement in helping
4  students to cheat, or allowing students to cheat
5  at Urban Action Academy.  Obviously, is the
6  Court, that is the Honorable Court is garnered
7  by cross examination, you know, that part of our
8  case is that Mr.--Dr. Severin is, in fact, the
9  whistle blower and, you know, these--the
10 treatment and these allegations, these charges
11 against him, have basically been brought against
12 him because of him coming forward with these
13 allegations.  In light of the fact that new
14 allegations of cheating have been brought
15 against the Principal, that actually occur after
16 Dr. Severin was reassigned from the school, I
17 think it's fair--it's a fair opportunity for
18 cross examination to ask the Principal if he is
19 aware of these allegations, especially when the
20 Principal stated on direct examination that Dr.
21 Severin's allegations were completely unfounded
22 and did not occur.
23         THE HEARING OFFICER:  Mr. Francis,
24     would you like to be heard?
25         MR. FRANCIS:  The initial question
```

339

```
1          DORCELY - CROSS - MASSENA
2  that was posed to him regarding allegations of
3  cheating was investigated by SCI and found to be
4  unsubstantiated, so that closes that particular
5  door.
6          THE HEARING OFFICER:  It may or may
7      not close the door, Mr. Francis.
8          MR. FRANCIS:  And second, reference to
9      any present and or ongoing new investigation,
10     I'm not aware of it.  And if you have any
11     information to support that, I would appreciate
12     it--
13         [Crosstalk]
14         MR. FRANCIS:  --if, in fact, there is
15     an SCI investigation that's open and currently
16     open, the witness, and as you know, the witness
17     nor yourself or anyone else can discuss an
18     ongoing investigation.
19         MR. MASSENA:  Okay, I am unaware--
20         [Crosstalk]
21         THE HEARING OFFICER:  [Interposing]
22     Hang on, hang on, okay.  I am a little bit
23     troubled, quite frankly Mr. Massena, by you
24     asking this witness about investigations into
25     matters that involve him that were not
```

340

DORCELY - CROSS - MASSENA

1 precipitated by charges or allegations made by
2 Respondent himself.
3 MR. MASSENA: Well--
4 THE HEARING OFFICER: [Interposing]
5 There also seems, based on your representation
6 Mr. Massena, that these investigation or
7 investigations into the Principal were made
8 post-date the charges brought against the
9 Respondent. Moreover, I believe you said that
10 they post-date his exit from the school.
11 MR. MASSENA: Some of them do, Your
12 Honor.
13 THE HEARING OFFICER: I, you know, I
14 understand, I believe, the Respondent's theory
15 that there may be some retaliatory animus at
16 work here; but I cannot, unless you can explain
17 better to me, I cannot forge a link between
18 whatever retaliatory animus may exist from this
19 Principal towards the Respondent, and
20 allegations or charges made by others. Do you
21 want to take another stab at explaining why you
22 believe this is relevant?
23 MR. MASSENA: Again, Your Honor, I
24 believe it goes towards the Principal's motive

341

DORCELY - CROSS - MASSENA

1 to lie, his credibility in terms of his reason
2 for bringing forward these charges. I think it
3 all goes towards his credibility in essence,
4 Your Honor.
5 THE HEARING OFFICER: All right. I am
6 going to sustain the objection as to charges and
7 allegations made by others in this proceeding.
8 Let's bring the Principal back in, and you note
9 your objection as you like. Let's bring the
10 Principal back in. Mr. Massena, your witness.
11 MR. MASSENA: Yes, Your Honor. And as
12 the Court noted, I'd just like my objection
13 noted for the record.
14 Q. Okay. Now, I'd like to draw your attention
15 to Specification number seven, actually withdrawn.
16 That's Specification number 12. You've had an
17 opportunity to review Specification number 12,
18 correct?
19 A. Yes.
20 Q. Okay. And when you say a lesson plan
21 readily available upon request of an administrator,
22 how was that lesson plan supposed to be given to an
23 administrator?
24 A. Well, the system we created at Urban Action

342

DORCELY - CROSS - MASSENA

1 Academy is the teachers keep their lesson plan almost
2 like in a pocket. So, when you come into the class
3 room, there is no disruption at all. When you come
4 in, you take a lesson plan, and there's not even a
5 conversation with the teacher. So, that's what we
6 mean by a physical copy of their lesson plan.
7 Q. Okay. And as to September 11th of 2015, is
8 it your testimony that you directly went to the class
9 room and did not--and observe that there was not a
10 readily available lesson plan?
11 A. It was me and two of my Assistant
12 Principals.
13 Q. Who were those two Assistant Principals?
14 A. Dr. Howell and AP Barnett.
15 Q. Okay. And you were--it's your testimony
16 that you were present on September 11th.
17 A. It was a walk through.
18 Q. Okay.
19 THE HEARING OFFICER: I'm sorry?
20 MR. DORCELY: A walk through.
21 THE HEARING OFFICER: Thank you.
22 MR. MASSENA: Okay.
23 Q. And do you do this for every teacher in the
24 school?

343

DORCELY - CROSS - MASSENA

1 A. Yeah, a walk through is the entire
2 building.
3 Q. Okay. And every teacher had a lesson plan
4 readily available on September 11th, 2015?
5 A. For the class rooms that I went through,
6 particularly this one, there was no lesson plans
7 available.
8 Q. Well that, if you could answer the
9 question. Is it your testimony that everyone, every
10 class had a lesson plan readily available on
11 September 11th of 2015?
12 A. No.
13 Q. Okay. That's not your--okay, so you do.
14 That is your testimony, okay. Now, on September 11th
15 of 2015, you walked into the class room. Is that
16 correct?
17 A. Which class room are you referring to?
18 Q. Dr. Severin's class room.
19 A. Me and my colleagues, yes.
20 Q. And you observed some part of the lesson
21 that day. Is that correct?
22 A. That is correct.
23 Q. Okay. And you noticed that teacher Fagan
24 [phonetic] was teaching that day, correct? She was

344

DORCELY - CROSS - MASSENA

1    DORCELY - CROSS - MASSENA
2  conducting the class that day.  Is that correct, that
3  lesson?
4       A.  No, that's incorrect.
5       Q.  Did you also provide teacher Fagan with a
6  disciplinary letter as well?
7       A.  Yes.
8       Q.  Okay.  Do you have a copy of that
9  disciplinary letter available?
10      A.  Yeah, it's in the file.
11      Q.  Okay.
12          MR. MASSENA:  And I would ask the DOE
13  to present a copy of that letter--
14          [Crosstalk]
15          MR. FRANCIS:  [Interposing] Objection
16  as to the relevance of disparate treatment.
17          THE HEARING OFFICER:  All right.  It's
18  not my preference to get involved in discovery
19  disputes.
20          MR. FRANCIS:  Okay.
21          THE HEARING OFFICER:  I will
22  ultimately make a ruling if necessary.  At this
23  juncture, it's my understanding the Respondent
24  is demanding a letter to this particular
25  teacher's file.  The teacher's name is Fagan?

345

1    DORCELY - CROSS - MASSENA
2          [Crosstalk]
3          MR. FRANCIS:  Fagan, yeah.
4          THE HEARING OFFICER:  And is--the
5  Department has formulated its position that this
6  is not relevant?
7          MR. FRANCIS:  That's correct.
8          THE HEARING OFFICER:  Well, I have
9  limited powers as a Hearing Officer.  There are
10 other means available to Respondent to secure,
11 you know, documents in discovery.  If what I
12 heard Respondent say is the basis for the
13 request, namely a claim of disparate treatment,
14 I find that to be a compelling reason; but we
15 have other considerations to balance, namely,
16 the privacy interests that generally attach to
17 this other teacher, and his or her personnel
18 file.  Let's go off the record for a moment to
19 further discuss this.
20          [OFF THE RECORD, Discuss case 11:10
21 a.m.]
22          [ON THE RECORD, Discuss case 11:11
23 a.m.]
24          THE HEARING OFFICER:  You can go back
25 on the record.  I am very, very cautious as a

346

1    DORCELY - CROSS - MASSENA
2  Hearing Officer about invading other employees'
3  personnel files.  If the--and this is the
4  record.
5          [OFF THE RECORD]
6          [ON THE RECORD]
7          THE HEARING OFFICER:  So, let's go
8  back on the record.  Okay, so we're back on the
9  record in this matter.  There were some
10 discussions, further discussions, regarding the
11 balance between the Respondent's need, as well
12 as teacher Fagan's general personnel--general
13 privacy interests in her--his or her personnel
14 file.  In terms of reaching a decision and the
15 balance, the balance I just draw, was to deny
16 the Respondent's request for this particular
17 letter to file from this teacher's file.
18 Teacher Fagan is not a party to this proceeding.
19 I just want the record to reflect.  Having said
20 that, if Respondent feels as though this
21 particular document is in any way essential to
22 his defense there are other means available to
23 him to attempt to secure said document.  Let's
24 move on.
25          MR. MASSENA:  Okay.

347

1    DORCELY - CROSS - MASSENA
2       Q.  And when you entered into the class room,
3  what did you observe?
4       A.  Severin was at the front.  Ms. Pagan was
5  somewhere around the side of the class room next to
6  the window.
7       Q.  And on the board?
8       A.  There was nothing on the board, no name, no
9  instructional objective, none of the essential
10 elements that I expect teachers to have on the board
11 daily.  So immediately after that, we went in.  All
12 three of us went in.  We move around the room a
13 little bit.  I check my regular.  And then my
14 Assistant Principal Barnett asked Dr. Severin, may I
15 please have a copy of your lesson plans because we
16 did not see it at the regular place.  He didn't have
17 one, so we left the room.
18      Q.  And one was provided to you, however, isn't
19 that correct?
20      A.  No.  The lesson plan was never provided to
21 me.
22      Q.  Okay.  Moving on, I'd like to draw your
23 attention to Specification number 13.  Could you
24 explain the process of the electronic grades
25 gathering?

348

```
DORCELY - CROSS - MASSENA
1
2        A.   So, the EGG file, in advance of the due
3   dates for each of the marking periods, in this case
4   here this is marking period three and four, four is
5   the last marking period.  So, we have to get these
6   EGG files so we can start making decisions for
7   graduation, end of year stuff.  So, in this
8   particular case, we do the daily docket which is a
9   system we created, where we inform the teachers,
10  please be advised the EGG files are due, the marking
11  period grades are due.  I also make morning
12  announcements, so I do that every morning, where I
13  remind teachers be advised, you know, grades are due
14  on such and such a date.  And that's followed by an
15  email that is sent to every single teacher by the
16  STARS system indicating there here is your EGG file
17  with the date and instructions.
18       Q.   How many teachers failed to submit their--
19  is it fair to say that Mr. Severin--Dr. Severin was
20  not the only teacher who failed to submit their EGG
21  file by June 15th of 2015?
22            MR. FRANCIS:  Objection relevance.
23            THE HEARING OFFICER:  No, overruled.
24       A.   I'm unaware of that.
25
```

349

```
DORCELY - CROSS - MASSENA
1
2        Q.   Okay.  And but you are aware that Dr.
3   Severin is the only teacher to receive a disciplinary
4   letter as a result of this.
5        A.   That's not true.
6        Q.   So, you did provide other disciplinary
7   letters to other teachers when they failed to submit
8   their grades?
9        A.   Absolutely.
10       Q.   Okay.  Do you know the names of those
11  teachers?
12            MR. FRANCIS:  Objection relevance.
13            THE HEARING OFFICER:  No, the
14       relevance has already been stated, Mr. Francis.
15       Mr. Massena made clear what his--part of his
16       defense is earlier today.  He used the term
17       disparate treatment, which is not uncommon in
18       this forum.  I will allow Mr. Massena to further
19       explore this.
20       Q.   What are the names of the other teachers?
21       A.   That received for the marking period three
22  and four?
23       Q.   Yes.
24       A.   None.
25       Q.   However, you stated earlier, in your
```

350

```
DORCELY - CROSS - MASSENA
1
2   direct, that other teachers were late.
3        A.   No, they did get letters.  You asked me if
4   teachers get letters to file for not submitting the
5   marking period.  The answer is yes.
6        Q.   Okay.  And but Mr.--Dr. Severin was the
7   only teacher that you provided with a disciplinary
8   letter.  Is that correct?
9        A.   For marking three and four, yes, in this
10  case.
11       Q.   And this was after you were made aware that
12  he had filed allegations against you regarding the
13  cheating allegations.  Is that correct?
14       A.   No, that's not at that time.  I was made
15  aware of the cheating in a disciplinary meeting with
16  Dr. Severin, I believe, on the twenty--I think it was
17  June twenty something when he indicated to me, the
18  only reason you're having this meeting is because I
19  reported you to the SCI for cheating.  May I find
20  that for you?
21       Q.   No.  And, however, the email was the--just
22  one moment.
23            MR. MASSENA:  Just one moment.
24            THE HEARING OFFICER:  Sure.
25       Q.   Okay.  When were you informed--when were
```

351

```
DORCELY - CROSS - MASSENA
1
2   you informed Dr.--I'm sorry, Principal Dorcely, that
3   the--when were you informed you said regarding the--
4   regarding the investigation?
5        A.   I recall the disciplinary meeting with the
6   District representative.  His name is Charlie Turner.
7   We held three disciplinary meetings with Dr. Severin.
8   In one of those meetings, I think it's stated, where
9   I think Dr. Severin referenced, the reason why we're
10  having this is because of I reported you.  Somewhere
11  around June I recall that.
12       Q.   Well, now you report--you said you received
13  the email on, withdrawn.  You stated that you were
14  made aware of the allegations on June 20th.  Is that
15  correct?
16       A.   I did not say that.
17       Q.   When were you made aware of the
18  allegations?
19       A.   I recall that at a meeting, a disciplinary
20  meeting with Dr. Severin, where he informed me, and
21  because I wrote his statement down, when he indicated
22  the reason why we're having this meeting is because I
23  reported you to SCI.  I wrote verbatim what he said
24  at one of the disciplinary meetings.
25       Q.   Okay.  And it's your statement that that
```

352

```
1         DORCELY - CROSS - MASSENA
2    was the first time that you were made aware of this.
3         A.   By Dr. Severin in a disciplinary meeting.
4         Q.   Okay, one moment.  On April 20--I'd like to
5    draw your attention to Specification number 15.
6         A.   Yes.
7         Q.   Okay.  In Specification number 16 you and
8    the Department of Education allege that Dr. Severin
9    failed to contact the main office or an immediate
10   supervisor to inform them of his absence.  And how
11   were you made aware of this?
12        A.   I'm sorry, you said Specification 16 but I
13   read 15.
14        Q.   I'm sorry, 15.  I thought I said 15.
15        A.   All right.
16        Q.   How were you made aware of this?
17        A.   Oh, the system we have for teachers who are
18   absent for coverages, my secretary does the coverages
19   in the morning.  If we don't hear from someone, then
20   we--
21        [Background noise coughing]
22        A.   --that person is not present.  And since
23   I'm Dr. Severin's direct supervisor, he would notify
24   me that he is not coming.
25        Q.   Okay.  Now, did you contact--did you--do
```

353

```
1         DORCELY - CROSS - MASSENA
2    you recall receiving information from SubCentral,
3    that he had reached out to SubCentral?
4         A.   You don't get information from SubCentral.
5         Q.   Okay.
6         A.   You just enter it.
7         Q.   Okay.  And do you know whether or not Dr.
8    Severin reached out to SubCentral?
9         A.   I recall in his disciplinary response, I
10   recall him stating something regarding SubCentral.
11        Q.   Okay.  I'd like to draw your attention to
12   Specification number 16.  On or about February 12th,
13   2015, Respondent failed to have on file three
14   emergency lesson plans.  Do you recall...
15        MR. MASSENA:  Just one moment, Your
16   Honor.
17        THE HEARING OFFICER:  Mm hmm.
18        [Background conversation]
19        MR. MASSENA:  Just one moment, Your
20   Honor.  Just--
21        THE HEARING OFFICER:  [Interposing]
22   Would you like to go off the record?
23        MR. MASSENA:  Yeah, just off the
24   record.
25        THE HEARING OFFICER:  Let's go off the
```

354

```
1         DORCELY - CROSS - MASSENA
2    record for a minute.
3         [OFF THE RECORD, Review document 11:20
4    a.m.]
5         [ON THE RECORD, Review document 11:26
6    a.m.]
7         THE HEARING OFFICER:  Let's go back on
8    the record.  Mr. Massena?
9         MR. MASSENA:  Sure, thank you.
10        Q.   You had stated earlier that at a June 15th,
11   2015, meeting, disciplinary meeting with Dr. Severin,
12   who was present at that particular meeting?
13        A.   I don't recall if it was the June, but the
14   District rep, Charlie Turner.
15        Q.   Okay.  And at what other meetings was he
16   present with you and Dr. Severin?
17        A.   Three of the meetings, one involving what
18   you just asked me about in reference the emergency
19   lesson plan.
20        Q.   Okay.
21        A.   I recall that one very specifically because
22   the District rep said to Dr. Severin, you were wrong
23   for not submitting your emergency lesson plan.  And I
24   quoted, because I wrote his quote down.  And I also
25   recall during Charlie Turner's presence, the other
```

355

```
1         DORCELY - CROSS - MASSENA
2    one involved him not scheduling the support sessions
3    with the secretary, Ms. Townes [phonetic].  So, he
4    received a letter for that.  And I recall there is
5    one more involving the District rep, where also he
6    talked to Dr. Severin that his behavior was wrong.
7         THE HEARING OFFICER:  When you make
8    reference to the term District rep, is that a
9    union title?
10        MR. DORCELY:  Yes.
11        THE HEARING OFFICER:  Thank you.
12        MR. DORCELY:  That's for the District.
13        THE HEARING OFFICER:  Thank you.
14        Q.   Okay.  Regarding Specification--okay, I'd
15   like to draw your attention to Specification number
16   18.  You state that the Respondent failed to follow
17   directives given by administration to schedule four
18   instructional support sessions.  Those four
19   instructional support sessions did occur.  Is that
20   correct?
21        A.   That is correct after.
22        Q.   Okay.  And regarding the January 5th, 2000-
23   -drawing your attention to Specification number 17,
24   on January 5th, 2015, Respondent failed to follow a
25   directive given by administration to supply weekly
```

356

```
1        DORCELY - CROSS - MASSENA
2   lesson plans to administration.  Those lesson plans
3   also were supplied.  Isn't that correct?
4        A.   That is incorrect.  That's why there was a
5   discipline meeting.  That's the third one with the
6   District rep, Charlie Turner.
7        Q.   Okay.
8        A.   And from that meeting, Mr. Turner--Dr.
9   Severin was present and he acknowledged that he was
10  wrong for not submitting the lesson plan, the three
11  emergency lesson plans, and then not scheduling the
12  sessions for me.
13       Q.   Okay.
14       A.   That was a result of his ineffective rating
15  in his observation.
16       Q.   Now, I'd like to draw--I'd like to--now,
17  are these, regarding the Specifications that you drew
18  up in, withdrawn.  Regarding some of the charges,
19  regarding January 5th of 2015, February 12th of 2015,
20  April 23rd of 2015, some of these particular
21  allegations did not have disciplinary letters.  Is
22  that correct?
23            MR. FRANCIS:  Objection compound
24  question.
25            THE HEARING OFFICER:  I think I
```

357

```
1        DORCELY - CROSS - MASSENA
2   understood the question.  Did you understand the
3   question?
4            MR. DORCELY:  No.
5            THE HEARING OFFICER:  All right, so
6   let's rephrase it.
7        Q.   The January 5th, 2015, allegations, and
8   right now I am having you look at Specification,
9   yeah, Specifications number 14 through 18, so
10  actually withdrawn, looking at 15 through 18.
11       A.   Okay.
12       Q.   Fifteen through 18, I'm looking at
13  Specifications 15 through 18.  How many of these
14  Specifications were the result of, well withdrawn,
15  also have disciplinary letters attached to them?
16            MR. FRANCIS:  Asked and answered,
17  objection, asked and answered.
18            THE HEARING OFFICER:  Overruled.
19            MR. FRANCIS:  Several times.
20            THE HEARING OFFICER:  Well, I'm not
21  sure I have the answer, Mr. Francis, so I am
22  going to permit the question.
23       A.   Each of the Specifications, 15, 16, 17, and
24  18, they all have disciplinary letters.
25       Q.   And--
```

358

```
1        DORCELY - CROSS - MASSENA
2   [Crosstalk]
3        Q.   And all of those discipline--those
4   disciplinary letters were not all drafted on the same
5   dates.  Is that correct?
6        A.   Not, with the exception one.  We have met
7   with Charlie Turner, and we gave Dr. Severin--we
8   held--Turner came in one day.  We had three meetings,
9   and gave Dr. Severin three disciplinary meetings--
10  letters as a result of that one meeting with the
11  District rep.
12       Q.   Okay.
13            MR. FRANCIS:  I believe I am almost
14  finished.  I just need a few moments.
15            THE HEARING OFFICER:  Okay.  So, we'll
16  go off--
17            [Crosstalk]
18            THE HEARING OFFICER:  We'll go off the
19  record.
20            [OFF THE RECORD, Break 11:30 a.m.]
21            [ON THE RECORD, Break 11:35 a.m.]
22            THE HEARING OFFICER:  So, let's go
23  back on the record.  Mr. Massena?
24            MR. MASSENA:  Yes.  We are done with
25  this witness.  We do -- [00:01] the opportunity
```

359

```
1        DORCELY - CROSS - MASSENA
2   to call him as a witness.
3            THE HEARING OFFICER:  Okay.  Mr.
4   Francis, does the Department have any redirect?
5            MR. FRANCIS:  Yes.
6   REDIRECT EXAMINATION
7   BY MR. FRANCIS
8        Q.   On cross examination, you indicated that
9   you started out as a school aide.  Is that correct?
10       A.   Yes.
11       Q.   What were your duties and responsibilities
12  as a school aide?
13       A.   As a school aide, I was responsible for
14  computers, cafeteria, anything that the school deemed
15  appropriate for me to do, including working with kids
16  on a daily basis.
17       Q.   Now, you indicated the Hiring Committee
18  hired the Respondent as a Social Studies teacher,
19  correct?
20       A.   That is correct.
21       Q.   And you said that was based upon his
22  resume.  Is that right?
23       A.   That is correct.
24       Q.   And with respect to the resume submitted by
25  Respondent Severin, did you have an opportunity to
```

360

```
 1        DORCELY - REDIRECT - FRANCIS
 2   vet that resume since his hiring?
 3        A.   Yes.  I actually had an opportunity to vet
 4   that resume.  I went back and I discovered that Dr.
 5   Severin has been to ten different Districts.  Dr.
 6   Severin was a substitute teacher from 1997 to 2006,
 7   where he has been to three different schools.  He was
 8   discontinued on his license as a middle school Social
 9   Studies teacher.  In addition, he received two
10   unsatisfactory ratings.
11             MR. MASSENA:  Objection, Your Honor.
12             THE HEARING OFFICER:  And on what
13        grounds?
14             MR. MASSENA:  This is not relevant
15        towards the hearing, Your Honor.
16             THE HEARING OFFICER:  Mr. Francis?
17             MR. FRANCIS:  This is very relevant to
18        the hearing, as the resume was submitted, and I
19        am asking him a question as to why he was hired,
20        and if it was based on this resume.  And the
21        question is if he had an opportunity to vet the
22        resume and what did he find out.
23             THE HEARING OFFICER:  I'm sustaining
24        the objection on the grounds of relevance.
25        Q.   Now, you mentioned that teachers, both on
```

361

```
 1        DORCELY - REDIRECT - FRANCIS
 2   direct examination, both teachers in the class were
 3   disciplined with letters to file, with respect to
 4   teacher--
 5        A.   [Interposing] Burlingame.
 6        Q.   --Burlingame, and both teachers were
 7   disciplined, correct?
 8        A.   That is correct.
 9        Q.   And you indicated that the--as the Dean of
10   the department, you issued receipts for the
11   confiscated phones.  Is that correct?
12        A.   That is correct.
13        Q.   And the phones were returned to the
14   students at the end of the day.  Is that right?
15        A.   That is correct.
16        Q.   And you indicated that you observed
17   Respondent Severin during the sixth period.  Is that
18   right?
19        A.   That is correct.
20        Q.   And what did you observe?
21        A.   I observed that the Respondent missed
22   common planning time and he would go into his class
23   room and not attend common planning time.  He would
24   be in his class room, lights off, his foot is up.  I
25   also observed--
```

362

```
 1        DORCELY - REDIRECT - FRANCIS
 2        Q.   [Interposing] When you say his foot is up,
 3   what do you mean by that?
 4        A.   He is sitting at his desk and the lights
 5   are off.  His two feet is actually up on the desk,
 6   and he's back like this, and the lights are off, and
 7   his eyes is actually closed.
 8        Q.   Okay.  Now, there was discussion regarding
 9   the common plan--common planning time, and there was
10   discussion regarding his absence from those common
11   planning times.  Is that correct?
12        A.   That is correct.
13        Q.   Now, on cross examination, it was discussed
14   that you had disciplinary conferences with the
15   Respondent during the time that he was having this--
16   he was absent from the common planning time.  Is that
17   correct?
18        A.   That is correct.
19        Q.   How long does it take for you to do a
20   disciplinary conference with the Respondent?
21        A.   No more than ten minutes.
22        Q.   And after the ten minutes of the
23   disciplinary conference, it is expected that he goes
24   back to his--go back to the common planning time,
25   correct?
```

363

```
 1        DORCELY - REDIRECT - FRANCIS
 2             MR. MASSENA:  I am objecting.  This is
 3        leading.
 4             THE HEARING OFFICER:  Sustained.
 5        Q.   After you have a disciplinary conference
 6   with the Respondent, what is expected of the
 7   Respondent to do?
 8        A.   So, after reviewing both the attendance
 9   sheet that was brought to my attention during direct,
10   on cross I noticed that the UFT Chapter Leader
11   returned to his common planning time, but Dr. Severin
12   did not return to his common planning time after each
13   of the hearings.  And they usually last no more than
14   sometimes it's just a question.  Did you do this?
15   The response is yes or no and it's over.  That's it.
16        Q.   And then what is expected of the Respondent
17   after the disciplinary conference?
18        A.   To return back to his common planning time,
19   Room 101, with his team.
20        Q.   And did he do that?
21        A.   He did not.
22        Q.   Now, you indicated that you know of a
23   teacher, Fequiere, am I pronouncing that correctly?
24        A.   Fequiere.
25        Q.   Fequiere, and you were asked whether or not
```

364

```
 1        DORCELY - REDIRECT - FRANCIS
 2   Fequiere was disciplined on that particular day,
 3   correct?
 4        A.   That is correct.
 5        Q.   And you indicated no, correct?
 6        A.   No.
 7        Q.   And was that teacher absent that day?
 8        A.   That is correct, she was absent.
 9        Q.   And that's why she wasn't disciplined,
10   correct?
11        A.   That is correct.
12        Q.   And what is M-O-S-L?
13        A.   That's the MOSL, Measure of Student
14   Learning.
15        Q.   And that's for the common assessment of
16   student grading.  Is that correct?
17        A.   Yeah, that's the baseline assessment that
18   we administer throughout the New York City Department
19   of Education.
20        Q.   Now with respect to Specification number
21   six, which indicates that on or about November 12th,
22   2015, Respondent left the school building during a
23   school day without signing the teacher log in the
24   school's main office, is that correct?
25        A.   That is correct.
```

365

```
 1        DORCELY - REDIRECT - FRANCIS
 2        Q.   And what is the procedure that he was
 3   supposed to follow on that date?
 4        A.   Well--
 5        [Crosstalk]
 6        MR. MASSENA:  [Interposing] Objection
 7   asked and answered, Your Honor.
 8        THE HEARING OFFICER:  Well, I don't
 9   have the transcript in front of me.  I'm
10   curious, Mr. Francis, as to what your response
11   is.  Is this a matter that you went over with on
12   your direct examination of this witness?
13        MR. MASSENA:  It was brought up on
14   cross examination.  The question was posed as to
15   whether or not he left the building, an at
16   length discussion in cross examination,
17   regarding whether he left the building.  I'm
18   just trying to clarify--
19        [Crosstalk]
20        THE HEARING OFFICER:  [Interposing]
21   You know, I am going to overrule the objection
22   and permit the question; but, Mr. Francis, it is
23   certainly the better practice to ask this
24   witness what the procedure was on your direct
25   examination.  Under the circumstances, where it
```

366

```
 1        DORCELY - REDIRECT - FRANCIS
 2   was explored in some detail on cross I am going
 3   to overrule the objection and permit the
 4   question.
 5        Q.   Okay.  So, the question is what was the
 6   procedure with respect to a--the Respondent leaving
 7   the main office without signing the log?
 8        A.   The procedure is any teacher who is
 9   leaving, whether it's during a prep or any time
10   during work hours, must sign the main log so we are
11   aware at all times where that teacher, in this case,
12   is stepping out of the building.  In this particular
13   case, Dr. Severin did not sign the log to which I use
14   to then have a disciplinary meeting as a result of
15   that.
16        Q.   Now, with respect to when the Respondent
17   failed to report to the school, was his class covered
18   immediately?
19        A.   When that happens, yes, we go through
20   emergency mode.  We try to--it's a dance, because we
21   have to call any teacher who is available.  If
22   they're not available, we try to do what's called in
23   house.  And if a teacher is covering in house, we
24   have to pay them, so it's a challenge, but we are
25   able to make it happen whenever a teacher is not
```

367

```
 1        DORCELY - REDIRECT - FRANCIS
 2   present and does not notify the school.  We have to
 3   go scrambling.
 4        Q.   And on or about June 15th, 2015, for
 5   marking period three and four, were there any other
 6   teachers that failed to provide their E-G-G?
 7        A.   For that one, that's a very important,
 8   because that's the last marking period, because we
 9   have to make graduation decisions.  In that
10   particular instance, there were no teachers late.  In
11   this particular case, because I remember that very
12   clearly, it was about four hours before I heard from
13   Dr. Severin in submitting his grades.  And we didn't
14   get those grades until the next day, where then he
15   sent an email and said he was going to be absent that
16   Monday and Tuesday.  So, it really caused us severe
17   pain that he did not submit his grades on time.
18        MR. FRANCIS:  I have nothing further.
19        THE HEARING OFFICER:  Any additional
20   questions from Respondent?
21        MR. MASSENA:  No re-cross, Your--well,
22   actually just one moment, Your Honor.
23        THE HEARING OFFICER:  Mm hmm.
24        MR. MASSENA:  Okay, no, no--
25        THE HEARING OFFICER:  [Interposing].
```

Sheet 11

368

DORCELY - REDIRECT - FRANCIS

1  All right, I have no questions of you,
2  Principal. That means you're excused. Thank
3  you very much for your participation. Let us
4  now go off the record before we proceed with the
5  Superintendent.
6          MR. FRANCIS: Okay.
7          [OFF THE RECORD, Dismiss witness 11:45
8  a.m.]
9          [ON THE RECORD, Dismiss witness 11:49
10  a.m.]
11         THE HEARING OFFICER: Mr. Francis,
12  does the Department have any additional
13  witnesses?
14         MR. FRANCIS: No. The Department
15  rests at this time.
16         THE HEARING OFFICER: Thank you. And
17  is the Respondent ready to proceed with his
18  case?
19         MR. MASSENA: Yes.
20         THE HEARING OFFICER: Okay. And is
21  the Respondent intending to make an opening
22  statement?
23         MR. MASSENA: Briefly.
24         THE HEARING OFFICER: Would you like

369

JEAN RICHARD SEVERIN - 07/12/16

1  to do that now, or would you like to take a
2  short break?
3          MR. MASSENA: We'll need a short
4  break, yeah.
5          THE HEARING OFFICER: All right, so
6  let's take a short break. We'll come back for a
7  brief opening and the Respondent's first
8  witness.
9          MR. MASSENA: Okay.
10         THE HEARING OFFICER: Thank you.
11         [OFF THE RECORD, Break 11:50 a.m.]
12         [ON THE RECORD, Break 1:00 p.m.]
13         THE HEARING OFFICER: Okay. Okay, so
14  we're back on the record. At this point, is the
15  Respondent ready to proceed with an opening
16  statement?
17         MR. MASSENA: Yes, Your Honor. On
18  behalf of Dr. Severin, we would like to present
19  to Your Honor that this entire case, brought by
20  the Department of Education, should be seen
21  through the prism of a motivated Principal who
22  had one singular goal, and that goal is to get
23  Dr. Severin out of the school to protect his
24  reputation, meaning protecting the reputation of

370

JEAN RICHARD SEVERIN - 07/12/16

1  the Principal. I believe all the evidence, once
2  the Arbitrator has had an opportunity to view
3  all of the evidence, the evidence provided not
4  only by the DOE but the evidence provided--the
5  testimony that the Arbitrator will hear from
6  Superintendent Michael Prayor, union rep Mark
7  Satchel [phonetic], and finally Dr. Severin,
8  that a history of retaliation developed after--
9  after Principal Dorcely attempted to have Dr.
10  Severin corroborate, or have Dr. Severin
11  participate in a cheating incident involving
12  Student "A". Dr. Severin recoiled from that
13  proposal and thus began the retaliation and the
14  singling out of Dr. Severin. And the singling
15  out of Dr. Severin only intensified after Dr.
16  Severin made these allegations of cheating, or
17  attempted cheating, by Dr. Severin known to
18  investigatory agencies of the city. The
19  evidence will support that. All of the
20  Specifications should be viewed through that
21  prism. And once those Specification--once these
22  Specifications are viewed through this prism of
23  retaliatory actions by the Principal, this Court
24  or tribunal will come back with a decision

371

JEAN RICHARD SEVERIN - 07/12/16

1  dismissing all of the Specifications, because
2  the--because of the motivated nature of the
3  Specifications and the allegations being brought
4  by the Principal.
5          THE HEARING OFFICER: All right, thank
6  you. Is the Respondent ready to proceed with
7  his first witness?
8          MR. MASSENA: Yes.
9          THE HEARING OFFICER: All right, let's
10  go off the record and let's bring him in.
11         [OFF THE RECORD, Bring in witness 1:04
12  p.m.]
13         [ON THE RECORD, Bring in witness 1:05
14  p.m.]
15         THE HEARING OFFICER: All right, Mr.
16  Massena, I see that Respondent has his first
17  witness, if you could kindly introduce him to
18  us.
19         MR. MASSENA: Yes. The Respondent
20  calls Superintendent Michael Prayor.
21         THE HEARING OFFICER: Can you spell
22  your last name for us, sir?
23         MR. MICHAEL PRAYOR: P as in Peter, R-
24  A-Y-O-R.

**372**

JEAN RICHARD SEVERIN - 07/12/16

1
2      THE HEARING OFFICER:  All right.  I am
3  the Hearing Officer.  I am going to swear you
4  in, if you'll kindly raise your right hand.  Do
5  you swear to tell the truth, the whole truth,
6  and nothing but the truth?
7      MR. PRAYOR:  Yes, I do.
8      MR. FRANCIS:  At this time, the
9  Department wishes to--an offer of proof as to
10  the Superintendent's testimony.
11      THE HEARING OFFICER:  Mr. Massena, do
12  you want to make a brief proffer?
13      MR. MASSENA:  Sure.  Do you want to do
14  it in front of him or--
15      [Crosstalk]
16      THE HEARING OFFICER:  [Interposing]
17  Superintendent, why don't you just wait outside
18  if you would?  Don't go far, just right outside
19  the door.
20      MR. PRAYOR:  Okay.
21      THE HEARING OFFICER:  Thank you so
22  much.
23      MR. MASSENA:  As we--are we okay?
24  Okay.  As was said during direct and also was
25  noted throughout the proceedings, our defense,

**373**

JEAN RICHARD SEVERIN - 07/12/16

1
2  or part of our defense, is that the actions, or
3  the Specifications and the allegations by the
4  Principal were motivated by Dr. Severin
5  reporting the Principal attempted--attempt at
6  cheating.  The Superintendent was made aware of
7  this.  He can speak to notice that Dr. Severin
8  put him on notice.  He can also speak to--so, he
9  can corroborate part of our case in terms of
10  the--Dr. Severin's state of mind and, well,
11  withdrawn, Dr. Severin's--he can corroborate, in
12  essence, that these actions were retaliatory and
13  more so, he was present during the cooling off
14  period as well.  He was at that meeting as well.
15      THE HEARING OFFICER:  Mr. Francis,
16  would you like to be heard?
17      MR. FRANCIS:  Yes.  The Superintendent
18  may or may not be aware of the fact that this--
19  the allegations made by the Respondent were
20  unsubstantiated by not one, but two separate
21  bodies.  There is a OLR Number 160340, which is
22  also involved the UFT, okay, and both the UFT,
23  as well as OLR, found and made a decision that--
24      MR. MASSENA:  [Interposing] I would
25  object to the findings being put on the record,

**374**

JEAN RICHARD SEVERIN - 07/12/16

1
2  especially since the direct that, at least that
3  I plan to elicit, do not plan to elicit the
4  results of the findings.
5      THE HEARING OFFICER:  Yeah, I don't
6  even need to hear the finding.
7      MR. MASSENA:  Yeah.
8      THE HEARING OFFICER:  If that's the
9  basis for the objection to this witness
10  testifying, I am going to overrule the
11  objection.  I'd like to hear this witness'
12  testimony.  If at any time, in response to any
13  question, the Board decides to make another
14  objection, I certainly will hear it at that
15  time.  So, let's bring in the witness.
16      MR. FRANCIS:  And note my objection.
17      THE HEARING OFFICER:  So noted.
18  Welcome back, Superintendent.
19      MR. PRAYOR:  Thank you.
20      THE HEARING OFFICER:  Did you want to
21  be heard further, Mr. Francis?
22      MR. FRANCIS:  Yes, with respect to the
23  special complaint.  I still believe that it is
24  relevant and the decision that was made is
25  relevant to these proceedings, because the

**375**

JEAN RICHARD SEVERIN - 07/12/16

1
2  allegations by the Respondent have been
3  investigated and found to be--
4      [Crosstalk]
5      MR. MASSENA:  [Interposing] Objection,
6  Your Honor--
7      [Crosstalk]
8      THE HEARING OFFICER:  [Interposing]
9  Understood.  I understand the nature of the
10  objection, and I understand the nature of the
11  argument.  Let's proceed--
12      MR. FRANCIS:  [Interposing] Okay.
13      THE HEARING OFFICER:  --with the
14  testimony.  I have sworn in the witness.  Thank
15  you.
16      MR. MASSENA:  Thank you.
17  DIRECT EXAMINATION
18  BY MR. MASSENA
19      Q.  Mr. Prayor, Mr. Prayor, I would just ask
20  you to keep your voice up so that you can--everything
21  you say can be captured on the recording device which
22  is right here.
23      A.  Okay.
24      Q.  Okay, thank you.  Mr. Prayor, could you
25  tell the Arbitrator what your position is?

376

PRAYOR - DIRECT - MASSENA

1        PRAYOR - DIRECT - MASSENA
2     A.  I'm a High School Superintendent for School
3 Districts 15, 17, 18, 20, 21, and 22.
4     Q.  Okay.
5        THE HEARING OFFICER:  Could you do
6 that one time?  Fifteen, seventeen--
7        MR. PRAYOR:  [Interposing] Eighteen,
8 twenty, twenty one, and twenty two.
9        THE HEARING OFFICER:  Thank you.
10       MR. MASSENA:  Okay.
11    Q.  And what do your responsibilities entail as
12 a Superintendent for these various Districts?
13    A.  Supervisory and support of Principals and
14 school communities.
15    Q.  Okay.  And does your--does your role as a
16 Superintendent for these Districts also include being
17 a Superintendent as it relates to Urban Action
18 Academy?
19    A.  Yes, it does.
20    Q.  Okay.  Are you familiar with Principal
21 Dorcely?
22    A.  Yes, I am.
23    Q.  Okay.  How are you familiar with Principal
24 Dorcely?
25    A.  He's one of my Principals within District

377

1        PRAYOR - DIRECT - MASSENA
2 18.
3    Q.  Okay.  Are you familiar with an individual
4 by the name of Assistant Principal Barnett?
5    A.  Yes.
6    Q.  Okay.  And how are you familiar with
7 Assistant Principal Barnett?
8    A.  She is the Assistant Principal for
9 Principal Dorcely.
10    Q.  Okay.  And do you know an individual by the
11 name of Dr. Severin?
12    A.  Yes.
13    Q.  Okay.  And how do you know Dr. Severin?
14    A.  He is a teacher within Urban Action Academy
15 supervised by Principal Dorcely.
16    Q.  Okay.  And is it fair to say that you've
17 had communications with all of these parties within
18 the last two years?
19    A.  Yes.
20    Q.  Okay.  And you could describe the nature of
21 these conversations?
22    A.  The nature of the conversation is, I guess,
23 one to be informed of certain issues that took place
24 at the school between Principal Dorcely and teacher
25 Dr. Severin, and also to bring all parties together

378

1        PRAYOR - DIRECT - MASSENA
2 to try to get to a mutual understanding of
3 professionalism that can ultimately be given to all
4 parties to have a reprieve of their professional
5 responsibilities and some conflicts between them.
6    Q.  How long have you been a Superintendent,
7 Mr. Prayor?
8    A.  Three years.
9    Q.  And I'd like to direct your attention...
10       MR. MASSENA:  Well, actually I'd like
11 this document marked for identification as
12 Respondent's 1.
13       THE HEARING OFFICER:  We already have
14 a Respondent's 1--
15       [Crosstalk]
16       THE HEARING OFFICER:  I believe we're
17 up to Respondent's 7.
18       MR. MASSENA:  Oh, sorry about that,
19 Respondent's 7.
20       THE HEARING OFFICER:  Okay.  So, we'll
21 mark this for identification as Respondent's
22 Exhibit 7.
23       MR. MASSENA:  Okay.
24    Q.  Okay.  I am going to show you what has been
25 marked as Respondent's 7 for identification.  Do you

379

1        PRAYOR - DIRECT - MASSENA
2 recognize it?
3    A.  Yes.
4    Q.  Okay.  And what do you recognize it to be?
5    A.  An email from Dr. Severin to me, informing
6 me of a case that he submitted to the Special
7 Commission of Investigations.
8    Q.  Okay.  And is that email a fair and
9 accurate representation of the email that you
10 received from Dr. Severin?
11    A.  Yes.
12    Q.  Okay.
13       MR. MASSENA:  I'd like to move it into
14 evidence as Respondent's Number 8.
15       THE HEARING OFFICER:  Seven.
16       MR. FRANCIS:  Objection.
17       MR. MASSENA:  Seven, seven, I
18 apologize, seven.
19       MR. FRANCIS:  Objection Voir Dire.
20       THE HEARING OFFICER:  Okay, please.
21 VOIR DIRE
22 BY MR. MICHAEL FRANCIS
23    Q.  Were you made aware of the--were you made
24 aware that the allegation by the Respondent in this
25 case were unsubstantiated?

**380**

```
1        PRAYOR - VOIR DIRE - FRANCIS
2              MR. MASSENA:  Objection, improper--
3        [Crosstalk]
4              THE HEARING OFFICER:  [Interposing]
5        Sustained, sustained.  We're just going--we're
6        really just addressing issues as to the
7        authenticity of the document for purposes of
8        admissibility.
9        Q.   Looking at Respondent's 7 for
10       identification, was this an email that you received
11       over your computer?
12       A.   Yes.
13             THE HEARING OFFICER:  I'm sorry, you
14       have to speak louder.
15       Q.   Was this an email that you received over
16       your computer?
17       A.   Yes.
18             MR. FRANCIS:  I have nothing further.
19             MR. MASSENA:  And I'd like this moved
20       into evidence as Respondent's Number 7.
21             THE HEARING OFFICER:  Any objection?
22             MR. FRANCIS:  Note my objection, yes.
23             THE HEARING OFFICER:  Okay.
24       Respondent's--overruled.  Respondent's 7 is in
25       evidence.
```

**381**

```
1        PRAYOR - VOIR DIRE - FRANCIS
2              [Whereupon Respondent's Exhibit 7 is
3        admitted into evidence]
4              MR. MASSENA:  Okay.
5        DIRECT EXAMINATION (CONT.)
6        BY MR. MASSENA
7        Q.   Upon receiving what is has been marked into
8        evidence as--what has been moved into evidence as
9        Respondent's Number 7, what, if any, action did you
10       take?
11       A.   None.
12       Q.   Okay.  Was this the first time that you
13       were made aware of the allegations that Dr. Severin
14       had filed against the Principal?
15       A.   I can't recall.
16       Q.   Okay.  And you said you took no action,
17       correct?
18       A.   Correct.
19       Q.   Okay.  Were you aware of any issues between
20       Principal Dorcely and Dr. Severin prior to May of
21       2015?
22       A.   I believe so.
23       Q.   Okay.  And...
24       A.   Yes.
25       Q.   Okay, okay.  Now, I'd like to draw your
```

**382**

```
1        PRAYOR - DIRECT - MASSENA
2        attention to...
3              MR. MASSENA:  Or actually, I'd like
4        this document marked for identification as
5        Respondent's 8.
6              THE HEARING OFFICER:  Okay.  So, I'll
7        mark this as Respondent's 8 for identification.
8              [Background conversation]
9        Q.   I'd like to show you what has been marked
10       for Respondent's 8 as identification.  Do you
11       recognize it?  When you have an opportunity, if you
12       could just let the Court know if you recognize it.
13       A.   Yes, I do.
14       Q.   Okay.  And what do you recognize it to be?
15       A.   An email, again, from Dr. Severin to
16       myself.
17       Q.   Okay.  And this email was addressed to you,
18       correct?
19       A.   Yes.
20       Q.   Okay.  And is it a fair and accurate copy
21       of the email that was sent to you by Dr. Severin?
22       A.   Yes.
23       Q.   Okay.
24             MR. MASSENA:  At this time, I'd like
25       this document moved into evidence as
```

**383**

```
1        PRAYOR - DIRECT - MASSENA
2        Respondent's 8.
3              MR. FRANCIS:  Objection.  May I have
4        Voir Dire?
5              THE HEARING OFFICER:  Sure.
6        VOIR DIRE
7        BY MR. MICHAEL FRANCIS
8        Q.   Now, this letter that you indicated you
9        received from the Respondent.  Is that correct?
10       A.   Yes.
11       Q.   Now, you also note that you--that the
12       letter contains some accusations.  Is that correct?
13       A.   Yes.
14       Q.   And are you aware that these accusations
15       were not founded.  Is that correct?
16       A.   Correct.
17             MR. MASSENA:  Objection.
18             THE HEARING OFFICER:  The same ruling,
19       sustained.  Any other objections to the
20       authenticity of the document or otherwise, Mr.
21       Francis?
22             MR. FRANCIS:  No, but I do object to
23       it being moved in.
24             THE HEARING OFFICER:  All right.  I am
25       going to overrule the objection and admit
```

384

```
 1        PRAYOR - VOIR DIRE - FRANCIS
 2    Respondent's 8 into evidence.
 3              [Whereupon Respondent's Exhibit 8 is
 4    admitted into evidence]
 5         MR. MASSENA:  Okay.
 6    DIRECT EXAMINATION (CONT.)
 7    BY MR. MASSENA
 8    Q.   And so you recall receiving Respondent's 8,
 9    correct?
10    A.   Yes.
11    Q.   Okay.  Did you take any action upon
12    receiving Respondent's 8 in evidence?
13    A.   No.
14    Q.   Okay.  Is it fair to--
15    A.   [Interposing] No.
16    Q.   Okay.  Is it fair to describe Respondent's
17    8 as a call for help by Dr. Severin?
18         MR. FRANCIS:  Note my objection.
19         THE HEARING OFFICER:  I'll sustain the
20    objection.
21    Q.   Okay moving on and I'd like to show you
22    what...
23         MR. MASSENA:  I'd like this document
24    marked for identification as Respondent's 9.
25    I'm handing a copy to the Arbitrator and also a
```

385

```
 1        PRAYOR - DIRECT - MASSENA
 2    copy to DOE, which they have a copy of it.
 3         THE HEARING OFFICER:  So, I am marking
 4    this as Respondent's 9 for identification.
 5         MR. MASSENA:  Okay.
 6    Q.   Do you recognize this document that's been
 7    handed to you for identification as Respondent's 9?
 8    A.   Yes.
 9    Q.   Okay.  What do you recognize it to be?
10    A.   An email, again, from Dr. Severin, and that
11    email was sent to a Michael Romano [phonetic], but I
12    was cc'd on the email.
13    Q.   Okay.  And is this a fair and accurate copy
14    of the email that was cc'd to you by Dr. Severin?
15    A.   Yes.
16    Q.   Okay.
17         MR. MASSENA:  At this time, I'd like
18    what has been marked for identification as
19    Respondent's 9 moved into evidence as
20    Respondent's 9.
21         MR. FRANCIS:  Objection.  This witness
22    can't authenticate an email sent to a Michael
23    Romano.
24         MR. MASSENA:  He can authenticate
25    whether or not he received the email.
```

386

```
 1        PRAYOR - DIRECT - MASSENA
 2    Q.   Did you receive this email?
 3    A.   Yes.
 4    Q.   Okay.  And was the email--is it fair and
 5    accurate copy of the email that you received?
 6    A.   Yes.
 7    Q.   Okay.
 8         MR. MASSENA:  I ask that this be moved
 9    into evidence as Respondent's 9.
10         THE HEARING OFFICER:  I note that the
11    Superintendent is copied on this email.  I am
12    going to admit Respondent's 9 into evidence over
13    the--
14         MR. FRANCIS:  [Interposing] Over my
15    objection.
16         THE HEARING OFFICER:  --over the
17    Department's objection.
18              [Whereupon Respondent's Exhibit 9 is
19    admitted into evidence]
20    Q.   Over the course of the academic years of
21    2014 to 2015 and 2015 to 2016, you received several
22    emails from Dr. Severin.  Is that correct?
23    A.   Yes.
24    Q.   Okay.  How would you best classify, or
25    describe those emails as a whole?
```

387

```
 1        PRAYOR - DIRECT - MASSENA
 2         MR. FRANCIS:  Note my objection.
 3         THE HEARING OFFICER:  I'm not sure I
 4    understand the question, counsel.
 5         MR. MASSENA:  I am asking him, Your
 6    Honor, to describe to the Court how would he
 7    describe the--as a whole, how would he describe
 8    the emails?  I am not putting any words into his
 9    mouth.  I'm--
10         THE HEARING OFFICER:  [Interposing] Do
11    you understand the question?
12         MR. PRAYOR:  Maybe.  I'm assuming--
13         THE HEARING OFFICER:  [Interposing]
14    Well, I don't want you to guess.
15         MR. PRAYOR:  Oh, okay.
16         THE HEARING OFFICER:  So, the question
17    is do you understand the question posed by
18    counsel?
19         MR. PRAYOR:  I would say yes then.
20         THE HEARING OFFICER:  All right.
21    Well, why don't you then offer an answer?
22         MR. FRANCIS:  He said yes and then he
23    said I'm assuming.
24              [Crosstalk]
25         THE HEARING OFFICER:  Yeah, no, I need
```

388

```
1          PRAYOR - DIRECT - MASSENA
2     a yes or no, because if you don't, I am going
3     to--
4               MR. PRAYOR:  [Interposing] Sure, sure.
5          [Crosstalk]
6               THE HEARING OFFICER:  Only one of us
7     can talk at a time.  If you don't understand the
8     question, I am simply going to ask counsel to
9     rephrase the question subject to the
10    Department's--any additional objections raised
11    by the Department.
12              MR. PRAYOR:  All right.  So, I would
13    say no.
14              MR. MASSENA:  Okay.
15              THE HEARING OFFICER:  Okay.  So, why
16    don't you rephrase?
17              MR. MASSENA:  Sure.
18         Q.   During the course of 2014 and 2015, you
19    received several emails--and the academic year of
20    2015 and 2016, you received several emails from Dr.
21    Severin.  Is that correct?
22         A.   Yes.
23         Q.   Okay.  And how would you best describe the
24    nature of those emails as a whole?
25              MR. FRANCIS:  Objection.
```

389

```
1          PRAYOR - DIRECT - MASSENA
2               THE HEARING OFFICER:  And what's the
3     nature of the objection?
4               MR. FRANCIS:  The objection is that
5     the witness indicated that he did not understand
6     the question, and that he is assuming--he's
7     making an assumption as to what his answer is.
8     He's not--
9          [Crosstalk]
10              THE HEARING OFFICER:  [Interposing]
11    All right, but counsel has just rephrased the
12    question, and so let's see if the witness
13    understands it now.  If not, we'll go back to
14    the well and we'll formulate another question.
15         [Crosstalk]
16              THE HEARING OFFICER:  Yeah.  So,
17    Principal--Superintendent, do you have an
18    answer?
19              MR. PRAYOR:  Yes, I understand the
20    question.
21         Q.   How would you describe them?
22         A.   I would describe the emails from Dr.
23    Severin to me to either inform me or to ask for
24    assistance.
25         Q.   Okay.  And did there come a time that you
```

390

```
1          PRAYOR - DIRECT - MASSENA
2     did provide assistance?
3               MR. FRANCIS:  Note my objection that
4     the witness is reading from Respondent's 9 prior
5     to--
6          [Crosstalk]
7               MR. MASSENA:  [Interposing] With the
8     Court's permission, I'll take Respondent's 9
9     away from the witness.
10              THE HEARING OFFICER:  Okay.
11              MR. MASSENA:  Okay.
12         [Background conversation]
13              THE HEARING OFFICER:  No, I have
14    Respondent's 9.  So, you can now answer.
15         Q.   I can repeat the question with the Court's
16    permission.  Did there come a time that you did
17    provide assistance?
18         A.   Yes.
19         Q.   Okay.  Can you describe the nature of your
20    assistance?
21         A.   With the support of the UFT District rep,
22    James Duncan, we brought both teacher and Principal
23    together to have a cool down period of interaction
24    between those two, because there was a lot of
25    tension.  And the cool off period was to give both
```

391

```
1          PRAYOR - DIRECT - MASSENA
2     parties an opportunity to collect themselves and act
3     professionally, so that in the interim of that cool
4     down period, that Dr. Severin would find employment
5     elsewhere if that was possible.
6          Q.   Okay.  Now, who ordered the cool down
7     period?
8          A.   Myself and UFT District Chapter Leader--
9     District Leader James Duncan.
10         Q.   Okay.
11              MR. FRANCIS:  And note my objection as
12    to the characterization of a cool off period.
13    There's no use in Department of Education
14    language, a cool off period.
15              THE HEARING OFFICER:  Well, you can
16    cross examine that.  I think I have a general
17    understanding of the term, but again, you can
18    feel free to cross on that.
19         Q.   And could you describe the terms of this
20    cool off period?
21         A.   That during this time, no interaction
22    basically would be between the Principal and Dr.
23    Severin, the teacher.
24         Q.   Okay.  And did there come a time that this
25    cooling off period ended?  And did this cooling off
```

**392**

```
 1        PRAYOR - DIRECT - MASSENA
 2   period come to an end at some time?
 3        A.   Yes.
 4        Q.   Okay.  And how did--how did it come to an
 5   end?
 6        A.   How did it come to an end?
 7        Q.   Yeah, or withdrawn.  Did Principal Dorcely
 8   terminate the cool down period?
 9        A.   Yes.
10        Q.   Okay.  And was that cool down period
11   terminated earlier than what you had prescribed?
12        MR. FRANCIS:  And note my objection to
13   these leading questions.
14        THE HEARING OFFICER:  Yeah, it's not
15   clear in the record that the witness prescribed
16   any termination date for the cool down period.
17   So, I'm sustaining the objection.
18        MR. MASSENA:  Okay.
19        Q.   Was there a termination date for the cool
20   down period?
21        A.   I know if there was a date, but there was a
22   timeframe in terms of the months.
23        Q.   Oh, what was that timeframe?
24        A.   I believe the end of the first semester,
25   which would have been January 31st or January 30th.
```

**393**

```
 1        PRAYOR - DIRECT - MASSENA
 2   That would have been the end of the first semester.
 3        THE HEARING OFFICER:  Of what year,
 4   please?
 5        MR. PRAYOR:  Two thousand and fifteen,
 6   sixteen, I'm sorry--
 7        THE HEARING OFFICER:  [Interposing]
 8   Take your time.
 9        MR. PRAYOR:  It would have been 2015.
10        THE HEARING OFFICER:  Thank you.
11        Q.   Are you certain it was 2000, actually
12   withdrawn.  I'd like to draw your attention, once
13   again, to Respondent's 9 in evidence.  And I'd just
14   like you to take a brief look at that.
15        MR. FRANCIS:  Your Honor, that's
16   improper.
17        THE HEARING OFFICER:  Well, there's an
18   objection.
19        MR. FRANCIS:  Yes, objection.  It's
20   improper.  The witness is now reading from
21   Respondent's 9 in order to facilitate an answer
22   to his prior question.
23        THE HEARING OFFICER:  I think you're
24   entirely correct, Mr. Francis.  However, I do,
25   for the record, want to get the precise date.  I
```

**394**

```
 1        PRAYOR - DIRECT - MASSENA
 2   think it can only benefit the process and
 3   properly develop the record, but you are--
 4        [Crosstalk]
 5        MR. FRANCIS:  [Interposing] It's in
 6   evidence.
 7        THE HEARING OFFICER:  But you are
 8   technically correct.  You know, the witness has
 9   not expressed any lack of memory or uncertainty.
10   He testified January 30th, 2015.  If for any
11   reason, counsel, you have reason to believe it's
12   some other date, I will allow you to ask this
13   witness.
14        MR. MASSENA:  Okay.
15        Q.   Do you--
16        THE HEARING OFFICER:  [Interposing]
17   Pursue this.
18        MR. MASSENA:  Yes, thank you, Your
19   Honor.
20        Q.   Do you--do you believe it could have been
21   any other date, other than January 30th of 2015?
22        A.   Yes.
23        Q.   And what might that date have been?
24        A.   January 30th, 2016.
25        Q.   Okay.  So, the cooling off period, to your
```

**395**

```
 1        PRAYOR - DIRECT - MASSENA
 2   knowledge, was terminated prior to January 30th,
 3   2016.  Is that correct?
 4        A.   Yes.
 5        Q.   And it was terminated, withdrawn.  And who
 6   was it terminated by?  Or who terminated the cooling
 7   off period?
 8        A.   Principal Dorcely.
 9        Q.   Okay.  You stated that you have been a
10   Principal for over, withdrawn.  You have been a
11   Superintendent for three years, correct?
12        A.   Yes, yes.
13        Q.   And you've had an opportunity--during those
14   three years, you've had an opportunity to observe the
15   relationship between various Principals and various
16   teachers.  Is that correct?
17        A.   Yes.
18        MR. FRANCIS:  Note my objection to
19   relevancy.
20        THE HEARING OFFICER:  We don't have a
21   question yet, but I'll reserve your objection.
22   Let's get the question first and then you can
23   make your objection.
24        Q.   And in this particular case, you had an
25   opportunity to receive multiple emails from Principal
```

396

```
1           PRAYOR - DIRECT - MASSENA
2    Dorcely and also from Dr. Severin.  Is that correct?
3           A.   Yes.
4           Q.   Well, based on your three years of
5    experience as a Superintendent, did you find the
6    amount of communication to be unusual?
7               MR. FRANCIS:  Note my objection.
8               THE HEARING OFFICER:  And the
9    communication from whom to whom?
10              MR. MASSENA:  From--the communication
11   between the two parties.
12              THE HEARING OFFICER:  I still don't
13   understand, forgive me, between, are you saying
14   between the Respondent and the Principal, or
15   between the Respondent and the Superintendent?
16   I'm not clear.
17              MR. MASSENA:  Between the, withdrawn.
18   I'll withdraw that question.
19              THE HEARING OFFICER:  Sure.
20              Q.   Based on your experience as a
21   Superintendent for the last three years, did you find
22   anything unusual about the relationship between
23   Principal Dorcely and Dr. Severin?
24              A.   Can I ask a question?
25              THE HEARING OFFICER:  I'm sorry?
```

397

```
1           PRAYOR - DIRECT - MASSENA
2               MR. PRAYOR:  I mean I just want to get
3    more clarity.
4               MR. MASSENA:  Sure, withdrawn.
5               Q.   Was this the first, withdrawn, was this the
6    first time that you had to order a cooling off period
7    between a Principal and a teacher?
8               MR. FRANCIS:  Note my objection--
9    [Crosstalk]
10              THE HEARING OFFICER:  [Interposing]
11   Overruled.
12              A.   Yes.
13              Q.   Okay.
14              MR. MASSENA:  No further questions,
15   Your Honor.
16              THE HEARING OFFICER:  All right.
17   There were some previous discussions in terms of
18   timing and scheduling.  We are going to take our
19   break now.  During this break, we're going to
20   allow the Department its allotted time to
21   prepare for cross examination.  Let's now go off
22   the record.
23              [OFF THE RECORD, Break and prepare for
24   cross 1:30 p.m.]
25              [END 549900Master1.MP3]
```

398

```
1           PRAYOR - DIRECT - MASSENA
2               [START 549900Master2.MP3]
3               [ON THE RECORD, Break and prepare for
4    cross 2:29 p.m.]
5               THE HEARING OFFICER:  We're all set.
6    Let's go back on the record.  Mr. Francis, are
7    you ready to proceed with cross examination?
8               MR. FRANCIS:  The Department is.
9    CROSS EXAMINATION
10   BY MR. FRANCIS
11              Q.   Good afternoon, Superintendent.  My name is
12   Michael Francis and I represent the Department of
13   Education in this 3020-a proceeding against
14   Respondent, Jean Severin.  And you indicated that you
15   were familiar with Respondent's 7 in evidence, which
16   was an email to you.  Is that correct?
17              A.   Yes.
18              Q.   And that email contains a--further contains
19   a correspondence between Gerard Ralph [phonetic] and
20   to Richard Severin, correct?
21              A.   Yes.
22              Q.   And that's Respondent's 7, correct?
23              A.   Yes.
24              Q.   And that's informing Severin that the
25   information you reported has been reviewed by the
```

399

```
1           PRAYOR - CROSS - FRANCIS
2    Office of the Special Commissioner, SCI, and then the
3    decision has been made to refer the matter to the
4    Chancellor's Office of Special Investigations, OSI,
5    for appropriate action.  Are you aware of that?
6               A.   Yes.
7               Q.   And you're also asked to--you can contact
8    OSI at 718-935-3800, or OSI inquiries at schools dot
9    New York City dot gov for further information,
10   correct?
11              A.   Yes.
12              Q.   And did you contact OSI?
13              A.   No.
14              Q.   Okay.  Now, are you aware, further, that
15   the allegations that were reported to OSI were
16   unsubstantiated?
17              MR. MASSENA:  Objection.
18              THE HEARING OFFICER:  Overruled.
19              MR. MASSENA:  If I may be heard?
20              THE HEARING OFFICER:  Sure.
21              MR. MASSENA:  Your Honor, I believe
22   we've kind of went over bridge, in terms of the
23   actual findings of OSI not being relevant
24   towards this--
25              [Crosstalk]
```

400

```
 1        PRAYOR - CROSS - FRANCIS
 2          THE HEARING OFFICER: [Interposing]
 3   No, it's not a question of relevance. It's a
 4   question as to the admissibility of certain
 5   testimony earlier. I ruled that the findings
 6   did not bear on the admissibility of the
 7   testimony. Now, if the Department wants to make
 8   any kind of argument with regard to the
 9   complaint and the findings being
10   unsubstantiated, if in fact they were
11   unsubstantiated, I am going to permit the
12   Department to make that argument.
13          MR. MASSENA: Okay.
14          THE HEARING OFFICER: Overruled.
15          MR. FRANCIS: Thank you.
16     Q.  And you are aware of the allegations by the
17   Respondent, because it's documented in Respondent's
18   7, 8, and 9, correct?
19     A.  Yes.
20     Q.  Now, you indicated that there was a, quote
21   unquote, period of time where the Principal,
22   Principal Dorcely, was not to be--was not to be the
23   direct supervisor of the Respondent, correct?
24     A.  Yes.
25     Q.  And who was designated to supervise the
```

401

```
 1        PRAYOR - CROSS - FRANCIS
 2   Respondent during this period of time?
 3     A.  Can you repeat the question?
 4     Q.  Who was designated to be the Respondent's
 5   supervisor, direct supervisor, during this period of
 6   time where you indicated that there should be no
 7   interaction between Principal Dorcely and Respondent
 8   Severin?
 9     A.  His Assistant Principal, AP Barnett.
10          THE HEARING OFFICER: Just keep your
11   voice up, please.
12          MR. PRAYOR: His Assistant Principal,
13   AP Barnett.
14     Q.  That's Jordan Barnett, correct?
15     A.  Yes.
16     Q.  Okay. And you are--you are the Principal's
17   direct supervisor, correct?
18     A.  Yes.
19     Q.  Now, if there were allegations made against
20   the Principal, you would be aware of that, right?
21     A.  Yes.
22     Q.  Now, have you ever received any
23   notification from any external organization that
24   there are--that there were pending investigations
25   against the Principal?
```

402

```
 1        PRAYOR - CROSS - FRANCIS
 2     A.  Wait, I'm sorry, can you--
 3     Q.  [Interposing] Have you ever received
 4   notification from any external organization that
 5   there were charges pending, or being investigated,
 6   against the Principal?
 7     A.  No.
 8     Q.  Okay. Have you been--ever received any
 9   notification or any--from any internal division that
10   there is an investigation or pending charges against
11   the Principal?
12     A.  Not that I recall.
13     Q.  Well, it's either whether--it's either
14   there were--
15          MR. MASSENA: [Interposing] Objection,
16   Your Honor.
17     Q.  --or there wasn't.
18          THE HEARING OFFICER: I think he said
19   no in the negative.
20          MR. MASSENA: Well, his answer was he
21   doesn't recall and it's--
22          [Crosstalk]
23          THE HEARING OFFICER: [Interposing]
24   No, I think his answer wasn't that he didn't
25   recall. He said no. Well, I'll let the
```

403

```
 1        PRAYOR - CROSS - FRANCIS
 2   Principal--
 3          [Laughter]
 4     A.  I will say no. The answer is no.
 5          THE HEARING OFFICER: Yeah, that's
 6   what I heard.
 7     Q.  Now, have you ever had to discipline
 8   Principal Dorcely in regard to any allegations made
 9   by the Respondent?
10     A.  No.
11          MR. FRANCIS: I have nothing further.
12          MR. MASSENA: Okay.
13   REDIRECT EXAMINATION
14   BY MR. MASSENA
15     Q.  Wouldn't you consider...
16          MR. MASSENA: Oh, may I proceed--
17          THE HEARING OFFICER: [Interposing]
18   Please.
19          MR. MASSENA: --with cross, thank you.
20          THE HEARING OFFICER: Please.
21     Q.  Wouldn't you--or redirect. Wouldn't you
22   consider a cooling off period a type of discipline?
23          MR. FRANCIS: Note my objection.
24          THE HEARING OFFICER: Are you
25   objecting?
```

404

```
1          PRAYOR - REDIRECT - MASSENA
2               MR. FRANCIS:  Yes.
3               [Laughter]
4               THE HEARING OFFICER:  And the nature
5     of the objection?
6               MR. FRANCIS:  It's a leading question.
7               THE HEARING OFFICER:  I am going to
8     sustain the objection and ask you to rephrase.
9               MR. MASSENA:  Sure.
10    Q.   Do you normally discipline--do you normally
11    institute cooling off periods for your Principals?
12              MR. FRANCIS:  Objection, irrelevant.
13    He talked about disciplining and then he used do
14    you normally.  That--
15              THE HEARING OFFICER:  [Interposing]
16    Okay.
17              MR. FRANCIS:  --it's vague.
18              MR. MASSENA:  Okay.
19              THE HEARING OFFICER:  Well, why don't
20    we rephrase the question again?  I'm sustaining
21    the objection.
22              MR. MASSENA:  Actually, I'll move on
23    to another area.
24    Q.   You had stated that Principal Dorcely is--
25    you're the direct supervisor of Principal Dorcely.
```

405

```
1          PRAYOR - REDIRECT - MASSENA
2     Is that correct?
3     A.   Yes.
4     Q.   And during cross, counsel indicated to you
5     if you were aware of any allegations pending against
6     the Principal.  Is that correct?
7     A.   Yes.
8     Q.   Okay and what was your answer again?
9     A.   I said no.
10    Q.   No.  Were you--are you aware of any
11    allegations made by teachers pending against the
12    Principal?
13              MR. FRANCIS:  Objection, beyond the
14    scope of--
15              THE HEARING OFFICER:  [Interposing]
16    Overruled.
17    Q.   Are you aware?
18    A.   Can you repeat the question?
19    Q.   Are you aware of any allegations made a
20    Principal--by teachers regarding the Principal?
21              MR. FRANCIS:  Again, note my
22    objection.
23              THE HEARING OFFICER:  So noted,
24    overruled.
25    A.   Yes.
```

406

```
1          PRAYOR - REDIRECT - MASSENA
2     Q.   Can you describe some of those allegations?
3               MR. FRANCIS:  Objection.
4               THE HEARING OFFICER:  Okay, and what's
5     the basis for the objection?
6               MR. FRANCIS:  Relevance to this
7     proceeding.
8               THE HEARING OFFICER:  Okay, counsel.
9               MR. MASSENA:  I believe counsel opened
10    the door.
11              THE HEARING OFFICER:  Let's have the
12    witness step outside.  Superintendent, don't go
13    far while we resolve this.  Thank you.
14              MR. MASSENA:  I believe counsel opened
15    the door as to whether or not the Superintendent
16    was aware of any allegations.  I believe counsel
17    is trying to intimate that the Principal has
18    clean hands via the SCI complaint and--
19              [Crosstalk]
20              THE HEARING OFFICER:  [Interposing]
21    All right.  So, the Superintendent has just now
22    testified that he is aware of complaints made by
23    teachers.  So, where are we going with this?
24              MR. MASSENA:  I want to hear what
25    these complaints are, since--
```

407

```
1          PRAYOR - REDIRECT - MASSENA
2               [Crosstalk]
3               THE HEARING OFFICER:  [Interposing]
4     And how are other complaints against the
5     Principal relevant to this particular
6     proceeding?
7               MR. MASSENA:  Well, what I believe the
8     Superintendent is going to answer is that he is
9     aware of allegations of the Principal being part
10    and parcel, or assisting in teaching, and there
11    are other teachers that made this complaint.
12    And again, that is the crux of where the
13    retaliation has begun against my client, so I
14    think it corroborates, or not corroborates, it
15    lends credibility to my client's position.
16              THE HEARING OFFICER:  Mr. Francis,
17    what sayeth the Department?
18              MR. FRANCIS:  The Department, again,
19    reiterates that the--any other reporting or
20    reports about the Principal is irrelevant to
21    this 3020-a proceeding.
22              MR. MASSENA:  And again, my position
23    is that the Department opened the door when they
24    started to talk about other allegations.
25              MR. FRANCIS:  No, no, no.  The
```

---

**408**

PRAYOR - REDIRECT - MASSENA

1
2  allegations--the Department specifically asked
3  questions about the reporting by the Respondent
4  against the Principal, was he aware of any of
5  those allegations.
6          MR. MASSENA: No, that's not--that's
7  not what my--
8          [Crosstalk]
9          THE HEARING OFFICER: [Interposing]
10  Well, here's my concern as the Hearing Officer.
11  I really don't want to see this hearing
12  derailed, or sidetracked by collateral matters.
13  With that having been said, I will allow
14  Respondent to ask this witness, in light of the
15  recent testimony, as to whether or not--not
16  simply whether or not there were complaints made
17  by teachers. We understand that there were, but
18  generally, what the nature of those complaints
19  were. Let's bring in the Superintendent.
20          MR. FRANCIS: And again, over the
21  Department's objection.
22          THE HEARING OFFICER: So noted. Thank
23  you, Superintendent.
24          MR. PRAYOR: Yes.
25          MR. MASSENA: Okay.

---

**409**

PRAYOR - REDIRECT - MASSENA

1
2          THE HEARING OFFICER: Mr. Massena?
3          MR. MASSENA: Thank you, Your Honor.
4      Q.  I believe, Superintendent, the question I
5  was just asking was generally, what are the nature of
6  the complaints from other teachers that you've heard?
7      A.  I can't recall.
8      Q.  Okay. Earlier, during your redirect
9  testimony, you said that you were aware of
10  allegations that teachers have made--
11          MR. FRANCIS: [Interposing] Objection
12  asked and answered.
13          THE HEARING OFFICER: He hasn't asked
14  the question yet.
15          MR. MASSENA: Yeah.
16          THE HEARING OFFICER: And so let's
17  give him a moment and then you can make your
18  objection.
19      Q.  You were aware of allegations that teachers
20  have made regarding Principal Dorcely. What were the
21  nature of those allegations?
22          MR. FRANCIS: Objection asked and
23  answered.
24          THE HEARING OFFICER: I do believe
25  that was asked and answered. I believe that was

---

**410**

PRAYOR - REDIRECT - MASSENA

1
2  asked and answered. Did you not just ask the
3  witness that same question or did I
4  misunderstand?
5          MR. MASSENA: Well, I'm asking him
6  earlier does he recall stating that he is aware
7  of allegations--
8          THE HEARING OFFICER: [Interposing]
9  Yes.
10          MR. MASSENA: --that teachers have
11  made against the Principal.
12          THE HEARING OFFICER: And his answer
13  is, yes, he did testify to that, and I thought
14  you had just asked that very same questions
15  moments ago. I mean I'll let you do--I'll give
16  you some latitude to further explore this, but
17  it seems as though you just asked that exact
18  same question.
19      Q.  Now having answered that you were aware of
20  allegations, my question to you is--my question to
21  you is what the nature of those allegations--
22          MR. FRANCIS: [Interposing] Objection.
23      Q.  --that you recall?
24          MR. FRANCIS: Objection, he indicated
25  he did not recall.

---

**411**

PRAYOR - REDIRECT - MASSENA

1
2          THE HEARING OFFICER: Well, you know
3  what, I'm--look, the witness just testified that
4  he is aware that teachers made allegations
5  against the Principal. That's his testimony,
6  and I am going to allow this question. And,
7  Superintendent, what's your answer?
8          MR. PRAYOR: Sorry, but can I ask a
9  question?
10          THE HEARING OFFICER: No.
11          MR. PRAYOR: I can't--
12          [Crosstalk]
13          THE HEARING OFFICER: --not here.
14      A.  Can you repeat the question, sorry?
15      Q.  Sure. I guess--
16  [Background conversation]
17      Q.  Okay. Are you aware of the nature of the
18  allegations that you said teachers have made
19  regarding Principal Dorcely?
20          MR. FRANCIS: Objection, that wasn't
21  the question.
22          THE HEARING OFFICER: I think in
23  essence it was, overruled.
24      A.  I would say yes.
25      Q.  Could you describe that to the Arbitrator?

---

412

PRAYOR - REDIRECT - MASSENA

1
2       MR. FRANCIS: [Interposing] Objection-
3   -
4       [Crosstalk]
5       THE HEARING OFFICER: [Interposing]
6   Overruled, overruled, I have already ruled on
7   this.
8       A.  So, they could be allegations that relate
9   specific to--
10      MR. MASSENA: [Interposing] May I
11  just--if the Court could remind--the Arbitrator
12  could just remind the Superintendent, which I am
13  sure he is aware of, that he is under oath.
14      THE HEARING OFFICER: Well, I think he
15  knows he's under oath. Please tell us your
16  answer.
17      A.  I'm trying to gather. It's just there's a
18  lot going on, but there are allegations of--there are
19  allegations of grade changes. I have allegations of
20  harassment. That's what I recall right now.
21      Q.  And these allegations are being made by
22  teachers other than Dr. Severin. Is that correct?
23      A.  Yes.
24      Q.  Okay.
25      MR. MASSENA: And just one moment,

413

PRAYOR - REDIRECT - MASSENA

1
2   Your Honor.
3       THE HEARING OFFICER: Mm hmm.
4       Q.  You had also spoken during cross
5   examination about that you were--that you were aware
6   regarding the finding of the investigation. Is that
7   correct? I believe during direct examination--the
8   finding of the OSI investigation.
9       A.  The findings?
10      Q.  Yeah, the findings.
11      A.  Say that--repeat.
12      Q.  It's my recollection that during cross
13  examination you stated that you were aware of the
14  findings of the OSI investigation. Is that correct?
15      A.  I don't know if I said that.
16      Q.  Okay. So, you are not aware, correct?
17      A.  The findings?
18      Q.  Yes, the findings.
19      [Crosstalk]
20      Q.  What the ruling was or the determination.
21      A.  No, I don't think I said that.
22      Q.  Okay. So, you are not aware. And you were
23  not privy to that investigation. Is that fair to
24  say?
25      A.  Which...?

414

PRAYOR - REDIRECT - MASSENA

1
2       Q.  I'll withdraw that question. Were you
3   interviewed as a result of that investigation?
4       MR. FRANCIS: Note my objection. This
5   is beyond the scope of cross.
6       THE HEARING OFFICER: Well, there were
7   questions about the investigation. I will
8   acknowledge that they were not followed up on by
9   the Department, but it was raised by the
10  Department, and so I am going to permit these
11  questions.
12      MR. MASSENA: Oh, okay.
13      Q.  You were not investigated as--and you
14  didn't participate in that investigation.
15      A.  No.
16      Q.  Okay.
17      MR. MASSENA: No further questions.
18      THE HEARING OFFICER: Any additional
19  questions from the Department?
20      MR. FRANCIS: Yes, in so much as the
21  Respondent opened the door to--as to the results
22  of findings and investigations, the Department
23  would like to have this marked as Department--
24      THE HEARING OFFICER: [Interposing] I
25  believe we're up to--

415

PRAYOR - REDIRECT - MASSENA

1
2       MR. FRANCIS: --19.
3       THE HEARING OFFICER: No, no, I think
4   we're up to 30. I've got--
5       MR. FRANCIS: [Interposing] Yes,
6   Department's 30 for identification.
7       THE HEARING OFFICER: Mm hmm.
8       MR. FRANCIS: I have a copy for the
9   Arbitrator.
10      THE HEARING OFFICER: So, I'll mark
11  this for identification as Department Exhibit
12  30.
13      MR. FRANCIS: I have a copy for the
14  Respondent.
15      MR. MASSENA: Should I--
16      MR. FRANCIS: [Interposing] And as
17  such, I ask that the Arbitrator take judicial
18  notice of the decision and admit Department's 30
19  into evidence.
20      MR. MASSENA: Your Honor, there has
21  been no foundation for this. I do not believe
22  that the door was opened in any shape, way, or
23  form. The Department asked on their direct
24  whether or not the Superintendent was aware of
25  the findings, and that the findings were, I

416

PRAYOR - REDIRECT - MASSENA

1
2   believe, the Department actually said what the
3   findings were during their direct.  I simply
4   asked was he aware, or was he privy, and did he
5   investigate.
6          THE HEARING OFFICER:  All right,
7   here's the thing.  The Department seems, I
8   recall, to ask the Superintendent a question
9   about the outcome of this investigation, the
10  report for which is marked as Department 30 for
11  identification.  I never heard an answer.  I
12  think we just moved on from there; but I will
13  say, as the Hearing Officer, that enough has now
14  been said and spoken and questioned, with regard
15  to this investigation, that I am going to admit
16  it into the record.  I am not certain that I am
17  going to attach much, if any, weight to it given
18  the fact that it's dated June 27th, 2016, and
19  for other reasons that have been discussed on
20  the record generally with a defense of
21  retaliatory animus, but I am going to allow the
22  Department to make its argument with regard to
23  the outcome of this investigation.  I already
24  signaled that, so I am now revisiting this issue
25  as to the admissibility of Department 30.  And

417

PRAYOR - REDIRECT - MASSENA

1
2   in light of the record and what has transpired
3   over the last couple of hearing days, I am now
4   at this juncture where I am going to admit this
5   Department 30 into evidence.
6          MR. MASSENA:  I would ask the Court to
7   just please note my objection.  Please note my
8   objection.  I don't see anywhere in the
9   testimony where what the Court had ruled
10  previously doesn't apply.  Although there has
11  been a lot of testimony about the complaint, the
12  sole purpose of the testimony, at least from the
13  Respondent's position, is to demonstrate that a
14  complaint was filed and the animus that
15  proceeded from that complaint.
16          THE HEARING OFFICER:  And I have made
17  clear, both on the record and off the record,
18  that I generally agreed with that position, that
19  the relevant aspect of any retaliation claim is
20  that a complaint was made, not the outcome of
21  that complaint.  Having said that, the
22  Department has apparently made very clear,
23  especially today, that part of its argument is,
24  is that the complaint was found to be meritless
25  without--and that it was ultimately

418

PRAYOR - REDIRECT - MASSENA

1
2   unsubstantiated.  I am not going to preclude the
3   Department from further developing that
4   argument.  And on that basis, and generally on
5   the grounds of relevance, I am admitting
6   Department 30 into evidence.
7          [Whereupon Department of Education's
8   Exhibit 30 is admitted into evidence]
9          MR. FRANCIS:  Okay.  I do have to make
10  copies of Department--an item that I will ask to
11  be marked Department's 31 for identification.
12          THE HEARING OFFICER:  Okay.  So, let's
13  go off the record while we make copies.
14          [OFF THE RECORD, Make copies 2:49
15  p.m.]
16          [ON THE RECORD, Make copies 2:54 p.m.]
17          THE HEARING OFFICER:  Okay, so let's
18  go back on the record.  Mr. Francis, do you have
19  any additional questions for this witness?
20          MR. FRANCIS:  Yes, I do.  I have a
21  document in my hand, a two page document, a
22  three page, I apologize, document in my hand
23  that I asked be marked Department's 31 for
24  identification.  I have a copy for the
25  Arbitrator, and a copy for the Respondent.

419

PRAYOR - REDIRECT - MASSENA

1
2          THE HEARING OFFICER:  All right.  So,
3   I have marked it as Department 31 for
4   identification.
5          MR. FRANCIS:  Okay.
6   RE-CROSS EXAMINATION
7   BY MR. FRANCIS
8      Q.   Did you receive an email from OSI regarding
9   the--regarding the allegations made by the Respondent
10  against Principal Dorcely?
11     A.   I don't recall.
12     Q.   Were you ever made aware of a decision in
13  regard to the allegations made by the Respondent
14  against the Principal?
15     A.   I don't recall.
16     Q.   I ask for you to take a look at
17  Department's 30 for identification and ask if that
18  refreshes your recollection.
19          THE HEARING OFFICER:  Department 31?
20          MR. FRANCIS:  Thirty one, I apologize.
21          THE HEARING OFFICER:  And this is a
22  double sided document--
23          MR. FRANCIS:  [Interposing] Yes.
24          THE HEARING OFFICER:  --right,
25  counsel?  Okay.

420

```
1        PRAYOR - RE-CROSS - FRANCIS
2        Q.   Does that refresh your recollection?
3        A.   Yes.
4              MR. FRANCIS:  I'd ask that
5   Department's 31--
6              [Crosstalk]
7              MR. MASSENA:  [Interposing] Refresh
8   his recollection as to what?
9              MR. FRANCIS:  Whether or not there was
10  a result in the--or a decision regarding the
11  allegations made by the Respondent against the
12  Principal.
13             MR. MASSENA:  Objection.  Could the
14  witness step out--
15             [Crosstalk]
16             THE HEARING OFFICER:  [Interposing]
17  Yes, certainly, Superintendent, if you could
18  step out.  Thank you so much.
19             MR. MASSENA:  I believe the--when
20  asked by the Department does that--does the
21  individual recall, or recall, you know, a
22  decision, that he said, no, he does not recall.
23  Showing him the decision, I don't know if that
24  necessarily lays the ground for the--
25             [Crosstalk]
```

421

```
1        PRAYOR - RE-CROSS - FRANCIS
2              THE HEARING OFFICER:  [Interposing] It
3   doesn't, no, no, it doesn't.  So, it's not a
4   foundational question.  I thought the question
5   being put to the witness was intended to try to
6   refresh his recollection.
7              MR. FRANCIS:  That's correct.
8              THE HEARING OFFICER:  I am not at all
9   clear, counsel, I'm directing this to the
10  Department's counsel, what Department 31 is.  I
11  have no clue.  I thought maybe it was linked to
12  Department 30, but I don't know.
13             [Crosstalk]
14             THE HEARING OFFICER:  Hang on.  The
15  Hearing Officer should never put in a position
16  where he has to guess an connect these kinds of
17  dots that are very far apart.  I would ask,
18  counsel, that you lay a more proper foundation
19  for this document.  You can ask him if he can
20  identify the document, if you intend to put it
21  in as a starter, but that's how we're going to
22  approach this.  If you put it in now, counsel,
23  it does the Department no good, because I don't
24  know what it is.  I don't know if this witness
25  can lay a proper foundation to identify it, but
```

422

```
1        PRAYOR - RE-CROSS - FRANCIS
2   someone has to.  So, I'm sustaining the
3   objection if the objection was to the
4   admissibility of Department 31.
5              MR. MASSENA:  Yes, sir.
6              THE HEARING OFFICER:  And let's bring
7   the Superintendent back in.  And if you wish,
8   counsel, as you like, you can attempt to lay a
9   foundation for its admission into evidence.
10             MR. FRANCIS:  Okay.
11        Q.   Superintendent, I ask that you look at
12  Department's 31 for identification again, and let me
13  know if you recognize it, and what you recognize it
14  to be.
15        A.   So, yeah, I recognize it, and I recognize
16  it to be a--this is traditional when an investigator
17  concludes a case, whether they substantiate or
18  unsubstantiate a case, and this one, based on what I
19  am reading, was unsubstantiated.
20             MR. FRANCIS:  And at this time, I ask
21  that Department's 31 for identification be moved
22  into evidence.
23             MR. MASSENA:  Brief Voir Dire, Your
24  Honor.
25             THE HEARING OFFICER:  Sure.
```

423

```
1        PRAYOR - VOIR DIRE - MASSENA
2        VOIR DIRE
3   BY MR. ALAIN MASSENA
4        Q.   Prior to today, had you seen this document?
5        A.   I believe so.
6        Q.   And when did you see this document?
7        A.   We are, I don't know if this could be a
8   response, but this is--we are always cc'd on any
9   conclusions of substantiated or unsubstantiated
10  cases.
11        Q.   But as you stand here today, you're not
12  certain whether or not you--
13             [Crosstalk]
14             MR. FRANCIS:  [Interposing] Objection,
15  he's impeaching his own witness.
16             THE HEARING OFFICER:  Well, no, no,
17  that's--
18             MR. MASSENA:  This is Voir Dire.
19             THE HEARING OFFICER:  Yeah, but you
20  can Voir Dire as to the authenticity of the
21  document.  That may go to whether or not, as
22  counsel has already asked if he has previously
23  seen this document.  I believe it's the witness'
24  testimony that he believes he has seen this
25  document before.  Is there another question for
```

424

```
 1         PRAYOR - VOIR DIRE - MASSENA
 2      this witness?
 3      Q.   When did you see the document?
 4      A.   I can't recall.
 5      Q.   Did you generate the document?
 6      A.   No.
 7      Q.   Is your signature anywhere on the document?
 8      A.   No.
 9      Q.   And...
10           MR. MASSENA:  One second, Your Honor.
11      Q.   And you don't recall when or if you saw
12   this document, correct?
13           MR. FRANCIS:  Objection, that wasn't
14   his testimony.
15           THE HEARING OFFICER:  No, he said he
16   saw the document.
17      Q.   You don't recall when you saw the document,
18   okay.  And there is no way, withdrawn.  And you don't
19   know if the document that you believe you may or may
20   not have seen is a fair and accurate representation
21   of the document that is seen--that you have before
22   you today.
23           MR. FRANCIS:  Objection.
24           THE HEARING OFFICER:  Look, I am going
25   to cut to--I am going to cut to the quick.  I am
```

425

```
 1          JEAN RICHARD SEVERIN - 07/12/16
 2      not going to admit this document.  It is not
 3      signed.  I don't know if it's a draft.  I don't
 4      know if it's a final.  I don't know what it is,
 5      and I don't think this witness, quite frankly,
 6      is confident to address those questions.  I
 7      don't--cannot attach the sufficient reliability
 8      to this document--
 9           [Background noise coughing]
10           THE HEARING OFFICER:  --the kind of
11      comfort that would allow this Hearing Officer to
12      rely on said document in any consideration of
13      this case.  So, Department 31 is not in
14      evidence.  Any additional questions for this
15      witness?
16           [Crosstalk]
17           THE HEARING OFFICER:  Forgive me, any
18      additional questions from the Department in its
19      cross of this witness?
20           MR. FRANCIS:  Yes, I do, but I'm going
21      to need a moment.
22           THE HEARING OFFICER:  Okay.
23           MR. FRANCIS:  Okay.
24           THE HEARING OFFICER:  Let's take a
25      short break.
```

426

```
 1          JEAN RICHARD SEVERIN - 07/12/16
 2           MR. FRANCIS:  Thank you.
 3           [OFF THE RECORD, Break 3:03 p.m.]
 4           [ON THE RECORD, Break 3:07 p.m.]
 5           THE HEARING OFFICER:  Okay, let's go
 6      back on the record.  Any additional questions,
 7      Mr. Francis?
 8           MR. FRANCIS:  Yes.
 9      RE-CROSS EXAMINATION (CONT.)
10      BY MR. FRANCIS
11      Q.   You indicated on redirect that other
12   teachers made allegations against the Principal.  Is
13   that correct?
14      A.   Yes.
15      Q.   Now, were you--did you hold a disciplinary
16   conference with the Principal in regard to these,
17   quote unquote, allegations?
18      A.   No.
19           MR. FRANCIS:  Nothing further.
20           THE HEARING OFFICER:  Anything
21      additional from Respondent?
22           MR. MASSENA:  Just briefly.
23           THE HEARING OFFICER:  Mm hmm.
24           MR. MASSENA:  This is re-redirect.
25      REDIRECT EXAMINATION
```

427

```
 1          PRAYOR - REDIRECT - MASSENA
 2      BY MR. MASSENA
 3      Q.   Superintendent Prayor, on re-cross you
 4   just--on cross you just stated that you were aware of
 5   allegations by other teachers, correct?
 6      A.   Yes.
 7      Q.   Okay.  Could you just give us a timeframe
 8   for some of these allegations?
 9           MR. FRANCIS:  Note my objection.  It's
10      beyond the scope.
11           THE HEARING OFFICER:  So noted,
12      overruled, you can answer.
13      A.   What do you mean?
14      Q.   The timeframe, like when did--when were
15   these allegations made, excluding the allegations
16   made by Dr. Severin?
17      A.   I would say within the last four months.
18      Q.   Okay.  Were any of--
19      [Crosstalk]
20           THE HEARING OFFICER:  [Interposing]
21      Hang on, hang on, there's an objection.  Yes,
22      there's no question you recognize, okay.
23           MR. FRANCIS:  However, the answer is
24      within the last four months.  That post dates--
25           [Crosstalk]
```

428

```
1          PRAYOR - REDIRECT - MASSENA
2              THE HEARING OFFICER: [Interposing]
3   You can argue that.  That's his answer.
4              MR. FRANCIS: --Specifications.
5              THE HEARING OFFICER: That's his
6   answer under oath.  You may argue that, next
7   question.
8              MR. MASSENA: Okay.
9          Q.  Were any of these allegations publicized in
10  the media?
11             MR. FRANCIS: What could be the
12  relevance of that question, Mr. Massena?  It
13  seems if they were, in fact, in the last four
14  months, they would post date the filing of the
15  charges in this case.  So, tell me what the
16  relevance is.
17             MR. MASSENA: I'm just asking whether-
18  -I was asking whether they were publicized.
19         Q.  How were these allegations--how did these
20  allegations come to light, or how did you learn of
21  these allegations?
22             THE HEARING OFFICER: Okay, so it's a
23  different question now.  How did you--he's
24  asking the witness how he learned of the
25  allegations.
```

429

```
1          PRAYOR - REDIRECT - MASSENA
2              MR. FRANCIS: We went over this.  He
3   indicated he didn't recall.
4              THE HEARING OFFICER: Well, I don't
5   know.  No, no, I don't--I don't recall that, but
6   I am a bit concerned that we're asking this
7   question at this juncture.  Mr. Massena, you
8   want to know how he came to learn of the
9   allegations?
10             MR. MASSENA: Yes.
11             THE HEARING OFFICER: Made by other
12  teachers against the Principal?
13             MR. MASSENA: Correct.
14             MR. FRANCIS: Again, note my
15  objection--
16             THE HEARING OFFICER: [Interposing] I
17  do.
18             MR. FRANCIS: --as to relevance, and
19  it's highly prejudicial more than probative.
20             THE HEARING OFFICER: All right.  I
21  note your objective, your objection, and I am
22  going to permit the question.  You can answer,
23  Superintendent.
24         A.  Sure.  So, the question is how did I--
25         Q.  [Interposing] Learn.
```

430

```
1          PRAYOR - REDIRECT - MASSENA
2          A.  --of the allegations.
3          Q.  Yes.
4          A.  I would say through Principal Dorcely.
5          Q.  Did you learn through any other means?
6   [Crosstalk]
7              THE HEARING OFFICER: --so I did not
8   hear it, and you can make your objection if you
9   like.
10         Q.  Did you learn through any other means?
11             THE HEARING OFFICER: No, I am going
12  to permit the question.  It's the same question.
13  It's just expanding upon it.  Go ahead, your
14  answer?
15         A.  Yes.
16         Q.  What were those means?
17         A.  Media.
18         Q.  Okay.  And what did you learn from the
19  media?
20             MR. FRANCIS: Objection, beyond the
21  scope completely.
22             THE HEARING OFFICER: Yeah, Mr.
23  Massena, I'm not sure I understand the relevance
24  of this question.  So, let's presuppose that the
25  allegations were--
```

431

```
1          PRAYOR - REDIRECT - MASSENA
2   [Crosstalk]
3              THE HEARING OFFICER: --no, no, hang
4   on--were made in the media, or that this
5   witness, who just testified that he heard about
6   the allegations in the media, how does that help
7   develop this record?
8              MR. MASSENA: In essence, Your Honor,
9   and again I don't know if this is something that
10  the Superintendent should be privy to--
11             THE HEARING OFFICER: [Interposing]
12  All right, well let's have the Superintendent
13  step outside.  You're almost done,
14  Superintendent.
15             [Crosstalk]
16             MR. MASSENA: Thank you.
17             THE HEARING OFFICER: Well, let's have
18  him step outside.  We're doing this exercise.
19  Okay, go ahead.
20             MR. MASSENA: In essence, Your Honor,
21  my client has made allegations regarding the
22  Principal taking part, or attempting to cheat,
23  and that--
24             THE HEARING OFFICER: [Interposing] I
25  got it.
```

432

```
1        PRAYOR - REDIRECT - MASSENA
2            MR. MASSENA:  --we got all of that,
3    right.  Now, within the last four months, and I
4    would say that he was reassigned on May 26th,
5    May 6th, so we're still talking about a
6    timeframe that is prior to his reassignment.
7            THE HEARING OFFICER:  When were the
8    charges filed?  Do you know, counsel?
9            MR. MASSENA:  I believe April 23rd.
10           THE HEARING OFFICER:  Of what year?
11           MR. MASSENA:  Of this year 2000--which
12   charges are you referring to?
13           THE HEARING OFFICER:  I'm talking
14   about the--when were the disciplinary charges,
15   that are the subject of this 3020-a proceeding,
16   when were they filed?
17           MR. MASSENA:  I believe it was April
18   23rd.
19           THE HEARING OFFICER:  Of 2016.
20           MR. MASSENA:  Correct, correct, so
21   four months we're still talking about a
22   timeframe that's within--within the charging
23   period.  Other teachers came forward indicating
24   that Principal Dorcely was taking part in
25   cheating.  Again, this lends credibility to my
```

433

```
1        PRAYOR - REDIRECT - MASSENA
2    client's defense--
3            [Crosstalk]
4            THE HEARING OFFICER:  Mr. Francis?
5            MR. FRANCIS:  Again, these are, quote
6    unquote, if they exist, allegations.  We've
7    already heard testimony that no allegations have
8    been substantiated.  And, therefore, to permit
9    that answer on the record would be highly
10   prejudicial and definitely not probative.
11           THE HEARING OFFICER:  Well, I can
12   certainly distinguish, Mr. Francis, between
13   allegations and, you know, findings of guilt.
14   They are not one in the same, and I certainly
15   appreciate that.
16           MR. FRANCIS:  And further, I ask that
17   any testimony in this regard be stricken from
18   the record.
19           THE HEARING OFFICER:  Mr. Massena, if
20   you want to ask the witness about any
21   allegations that he heard, and we've already
22   established that he is aware of other
23   allegations from teachers, but in terms of the
24   timeframe that you're now injecting into this
25   questioning, anything that predates the filing
```

434

```
1        PRAYOR - REDIRECT - MASSENA
2    of the charges against the Respondent, I will
3    hear that.  In other words, if you're trying to
4    pinpoint a timeframe, the timeframe--
5            [Background noise coughing]
6            THE HEARING OFFICER:  --for the
7    purpose of this 3020-a proceeding is only
8    relevant as it relates to the period before,
9    before these instant charges--the instant
10   charges were filed against the Respondent so...
11           MR. MASSENA:  I understand the Court's
12   ruling; however again, specifically what the
13   defense is attempting to do through this
14   witness, which I believe is probative to the
15   Arbitrator's ability to make a fair ruling on
16   all the evidence, is that my client put forward
17   that, you know, what my client has put forth.
18   Now, lo and behold, other teachers have come
19   forward with the exact same allegations.
20           THE HEARING OFFICER:  But they're just
21   allegations, sir.  They're just allegations.
22   There is really very little that I can do with
23   that as a Hearing Officer.  They're allegations.
24   Allegations are not the same as findings of
25   guilt.  You know, I will allow you to try to
```

435

```
1        PRAYOR - REDIRECT - MASSENA
2    identify the period in which these allegations
3    against the Principal were made by other
4    teachers.  And to the extent that it predates
5    the filing of the disciplinary charges against
6    the Respondent, I am going to deem them
7    relevant, but that's the extent of it, all
8    right?  They're just allegations.  Let's bring
9    the witness back in.  Thank you, Superintendent.
10           MR. PRAYOR:  Yep.
11       Q.  Okay.  You stated on cross--you stated on
12   that cross that you were aware of allegations made by
13   teachers, right.  And I believe you--if you could
14   just refresh our recollection as to when you said
15   you--if you give us a period of time as to when these
16   allegations by other teachers were made.
17       A.  Yeah, I think I said within the last four
18   months.
19       Q.  Okay.  And when you say the last four
20   months, would that be--we're in July--that would be
21   April or March?
22           MR. FRANCIS:  Note my objection as to-
23   -
24           [Crosstalk]
25           THE HEARING OFFICER:  [Interposing] So
```

436

```
1         PRAYOR - REDIRECT - MASSENA
2    noted, overruled.  Let's get an answer.
3    A.   Yes.
4    Q.   Okay.  So, that would be towards the end of
5    March up to today?
6         MR. FRANCIS:  Note my objection,
7    leading.
8         THE HEARING OFFICER:  So noted, that's
9    fine, overruled.
10   A.   Yes.
11   Q.   Okay.  And the--and I believe you stated
12   earlier as well that the nature of these allegations
13   was Principal Dorcely participating in cheating?
14        MR. FRANCIS:  Objection.
15        THE HEARING OFFICER:  Overruled.
16   A.   Yes.  I think yes, yeah.
17   Q.   And these were made by teachers other than
18   Dr. Severin.  Is that correct?
19        MR. FRANCIS:  Objection asked and
20   answered.
21        THE HEARING OFFICER:  Asked and
22   answered, sustained.
23        MR. MASSENA:  Okay.
24   Q.   And then just lastly, you--actually
25   that's...
```

437

```
1         PRAYOR - REDIRECT - MASSENA
2         MR. MASSENA:  No further questions.
3         THE HEARING OFFICER:  Okay, anything
4    further from the Department?
5         MR. FRANCIS:  Nothing further from the
6    Department.
7         THE HEARING OFFICER:  That means
8    you're excused, Superintendent.  Thank you very
9    much for your participation.  Let us now go off
10   the record.
11        [OFF THE RECORD, Dismiss witness 3:18
12   p.m.]
13        [ON THE RECORD, Dismiss witness 3:30
14   p.m.]
15        THE HEARING OFFICER:  Let us go back
16   on the record.  Does the Respondent have another
17   witness that he wishes to call?
18        MR. MASSENA:  Yes.  The Respondent
19   right now calls Dr. Severin to the stand.
20        THE HEARING OFFICER:  Okay, Dr.
21   Severin, if you would kindly raise your right
22   hand.  Do you swear to tell the truth, the whole
23   truth, and nothing but the truth?
24        MR. JEAN RICHARD SEVERIN:  I affirm.
25        MR. MASSENA:  Your witness.
```

438

```
1         PRAYOR - REDIRECT - MASSENA
2         MR. MASSENA:  Thank you.
3    DIRECT EXAMINATION
4    BY MR. MASSENA
5    Q.   Dr. Severin, could you please--
6    [Background conversation]
7    Q.   Dr. Severin, what do you do for a living?
8    A.   I am an educator.
9         THE HEARING OFFICER:  Keep your voice
10   up, please.
11   A.   I am an educator with the New York City
12   Department of Education.
13   Q.   Okay.  And would you kindly tell--give the
14   Arbitrator a little information about your
15   background?
16   A.   I was born and raised in Haiti.  I came
17   here when I was 14 years old.
18   Q.   And you came here alone, or you came here
19   with family?
20   A.   I came here with my family, my mother and
21   my sisters.
22   Q.   Just one second.  Okay, and is English your
23   first language?
24   A.   No.
25   Q.   Okay.  So, how did your education proceed?
```

439

```
1         SEVERIN - DIRECT - MASSENA
2    A.   I attended junior high school at 109, high
3    school at Andrew Jackson High School.
4    Q.   That's a public--a New York City public
5    school?
6    A.   Yes.  I graduated the top five per cent in
7    my class.  Following that, I attended City College of
8    New York.
9    Q.   And what did you study at City College of
10   New York?
11   A.   At City College, I major in black studies.
12   I received my Bachelor's Degree.  And following my
13   Bachelor's Degree, I received a Master's Degree in
14   History.
15   Q.   When did you receive the Master's Degree?
16   A.   In 2007.
17   Q.   Okay.
18   A.   From the same city institution, City
19   College.  And--
20   Q.   [Interposing] And I'm sorry, the Master's
21   Degree was in what again?
22   A.   History.  And in 2008, I started my
23   doctoral program in interdisciplinary studies.
24   Q.   What does that mean?
25   A.   Interdisciplinary studies, my focus was on
```

440

```
 1          SEVERIN - DIRECT - MASSENA
 2   public policy and social change, social issues.  In
 3   2014 I defended and successfully obtained my
 4   Doctorate Degree.
 5        Q.   Could you share with the--so you're a
 6   product of the New York City school system.
 7        A.   Yes.
 8        Q.   Okay.  Could you share with the Arbitrator
 9   your professional background?  Actually withdrawn,
10   before that, are you married?
11        A.   Yes.
12        Q.   What is your marital status?
13        A.   I am married.  I'm a father of five boys.
14        Q.   Okay.  And how long have you been married?
15        A.   Three years.
16        Q.   Okay.  And, okay, and you're a New York
17   City resident?
18        A.   Yes.
19        Q.   Okay.  Could you share with the Arbitrator
20   your professional background?
21        A.   In 1996, I joined the New York City
22   Department of Education as a substitute teacher.
23   Within that same school year, I obtained my PPT,
24   professional teaching license.
25        Q.   And what goes into obtaining your PPT?
```

441

```
 1          SEVERIN - DIRECT - MASSENA
 2        A.   It consists of having a Bachelor's Degree,
 3   having my transcript assessed by the New York City
 4   Department of Education.  And there, they grant the
 5   PPT license for me to fully--to be fully employed
 6   teaching class on my own, not as a substitute.
 7        Q.   And that was when?
 8        A.   From the school year 1996 to 1997.  And I
 9   had the PPT license from that time until I became
10   certified with the new requirement.
11        Q.   What school--what was the first school that
12   you worked in?
13        A.   I taught at P.S. 22 in elementary school.
14   There I taught fourth and fifth grade.
15        Q.   Okay.  How long did you work at P.S. 22?
16        A.   I work at P.S. 22 for five years from 1996
17   to 2001.
18        Q.   Okay and your reason for leaving that
19   school?
20        A.   At the time, the provisional license was
21   discontinued, and I did not have the new certificates
22   that was required.
23        Q.   Okay.  And where did you go after that
24   school?
25        A.   After that, I move to Queens, where I sub
```

442

```
 1          SEVERIN - DIRECT - MASSENA
 2   for a short period of time.  Then I receive
 3   provisional license and gained the certification.
 4        Q.   Okay.  And what school was that?
 5        A.   I sub at various schools.
 6        Q.   Okay.
 7        A.   In 2004, I joined the middle school 8, I.S.
 8   8 in Queens, where I worked as a Social Studies
 9   teacher.  There, I was able to implement various
10   program, a young male mentorship program, -- [00:01]
11   program.  Following middle school 8, I move on to
12   Catherine and Count Basie Middle School 72, and I
13   taught Social Studies there till 2007.
14             MR. FRANCIS:  I apologize.  I didn't
15        hear the name of the latter school.
16             THE HEARING OFFICER:  Catherine and
17        Count Basie.
18             MR. FRANCIS:  Thank you.
19        A.   And following Catherine and Count Basie, I
20   joined P.S. 40 in Queens as well, and I taught
21   elementary school again, while I was pursuing my
22   doctorate degree.  And in 2010, I left P.S. 40 and I
23   move on to high school, where I taught at Queens High
24   School for Information, Research, and Technology,
25   QIRT.  There, I was a teacher under the Principalship
```

443

```
 1          SEVERIN - DIRECT - MASSENA
 2   of Ms. Michelle Williams.  I spent two years there.
 3   Following that, I was excessed.
 4        Q.   Now when you say excessed, what does that
 5   mean?
 6        A.   I receive an unsatisfactory rating, and
 7   from that I still had an 89 per cent passing rate,
 8   which was a whole different issue.  So following the
 9   excess, I became an ATR, and that school year, 2012-
10   2013, I joined BCAE, the School of Business for
11   Computer Application and Entrepreneurship, my old
12   high school campus, Andrew Jackson.  And I spent a
13   year and a half there.
14        Q.   Okay, so you were able to teach at your old
15   high school.
16        A.   Yes.
17        Q.   Okay.  So, what was that experience like?
18        A.   It was very, very enriching.  I was able to
19   help the students make significant progress.
20   Following that year, BCAE was closed, one of the
21   school that was phased out, and I had to seek
22   additional new employment.  And I submitted a copy of
23   my resume via fax to Urban Action Academy.  When I
24   submitted my resume to Urban Action Academy, that
25   very same afternoon, I received a call from the
```

444

```
1          SEVERIN - DIRECT - MASSENA
2   secretary of the school at that time, Ms. Paris
3   [phonetic], who called me asking me to make an
4   appointment.
5       Q.   Do you remember when that was?
6       A.   The exact date, no; however, I do remember
7   it was that very same day that I submitted a fax that
8   Ms. Paris called me, informing me that Mr. Dorcely
9   want to see me, want me to schedule a demonstration,
10  a demonstrative lesson, a demo lesson.
11      Q.   Was this in June of 2014?
12      A.   Yes.
13      Q.   Okay.  So, please share with us what
14  happened next.
15      A.   June 2014 the appointment was made.  I
16  attended the demo lesson.  It was conducted in the
17  presence of two teachers.
18      Q.   Do you recall who those two other teachers?
19      A.   Ms. Apperson [phonetic] and Ms. Castillo
20  [phonetic].
21      Q.   Okay.  And could you just explain to us
22  what a demo a lesson is.
23      A.   A demo lesson is when a teacher is given an
24  opportunity to come and demonstrate their ability to
25  teach, to manage, to basically motivate, move,
```

445

```
1          SEVERIN - DIRECT - MASSENA
2   inspire students.  And at that lesson, Ms. Apperson
3   and Ms. Castillo were very impressed with my ability
4   to manage the students that were given to me, even
5   though one of the students were asked to be a
6   challenge somewhat, to try to see how I would respond
7   to a student who was troubling in the class, who's
8   not behaving, who's not cooperative--cooperating with
9   me.  And as a result of that, the report was sent to
10  Mr. Dorcely that I was fine; but more than anything,
11  the reason, I learned later on, with why I was called
12  immediately, was that Michelle Williams, who had been
13  reassigned as a Principal, she was the Assistant
14  Principal for Mr. Dorcely at Urban Action Academy.
15      Q.   And what was your relationship with Ms.
16  Williams?
17      A.   Ms. Williams was my former Principal, as
18  mentioned, and under her leadership, I had a 94 per
19  cent passing rate.  So, when Mr. Dorcely, which later
20  I find out, learned or saw the school that I was
21  coming from, and the numbers that I had listed on my
22  resume, he verified with Michelle Williams whether or
23  not this was accurate.  And she informed him that as
24  solid as a rock.  And Mr. Dorcely even stated to me
25  that you were going to be here.  It was just a
```

446

```
1          SEVERIN - DIRECT - MASSENA
2   formality.  It was a done deal.  Once Michelle
3   Williams vouched for you, that's all that was matter.
4       Q.   Okay.  So, what happened next?
5       A.   What happened next, the end of the school
6   year, summer school started in July, usually the
7   first day after July 4th.  Mr. Davis [phonetic], who
8   was supposed to be teaching, was unable to be there.
9   Mr. Dorcely asked me to cover, and I covered the
10  class for the two days.  At the time, again, Mr.
11  Dorcely was informed by Ms. Paris how great I was
12  able to manage the class, I was able to have the
13  students writing, have the students focus and
14  working, and Mr. Dorcely was very impressed.  And as
15  a result of him being impressed with what I was
16  doing, we engage in a variety of thought provoking
17  ideas for the school year, upcoming school year,
18  where he asked what are some of the concerns that I
19  have.  And I informed him that the number one problem
20  we have in the school system today is many of the
21  children are unable to write.  And one of the number
22  one target you should have is to help each and every
23  one of the students develop their writing, so they
24  can be able to express themselves both in ELA and
25  Social Studies, and he will see that the school will
```

447

```
1          SEVERIN - DIRECT - MASSENA
2   rise.  So, on saying that, we had different ideas,
3   other ideas that I have.  He said--he asked me
4   regarding the -- [00:01] that I had in the other
5   schools.  I told him one of the thing I can do, I can
6   do a -- [00:01] for school.  At the time, I can also
7   do a boys' club, where we have soccer, where we have
8   a soccer club where the young men could be encouraged
9   to come to school early, play some soccer, and go to
10  class right after, and all of--
11      [Crosstalk]
12      Q.   [Interposing] These conversations that you
13  had with Mr. Dorcely, when did these conversations
14  take place?
15      A.   These took place in July.  In July when I
16  came to sub, we had some ideas, and later on when Mr.
17  Dorcely would ask me to come and work with teachers
18  in preparation for the upcoming school year.
19      Q.   So, how would you describe this early stage
20  of your relationship with Mr. Dorcely?
21      A.   It was a perfect match, in the sense that
22  he wanted to see what I could bring to the school,
23  and I was too happy to make my contribution to move
24  the students and help them improve.
25      Q.   Okay.  So, what happened next?
```

448

```
1            SEVERIN - DIRECT - MASSENA
2       A.  Well what happened next, one day I was
3  preparing with some of my colleagues, and Mr. Dorcely
4  came into the room and asked me to come with him.
5  And when he asked me to come with him--
6       Q.  [Interposing] Now do you--when you say one
7  day, do you remember the specific day?
8       A.  No, I do not remember the exact same day--
9  the exact date; however, I do remember that Mr.
10 Dorcely came and said--he spoke Creole to me at that
11 time.
12      Q.  Now when you say he spoke Creole to you at
13 that time, what do you mean?
14      A.  Well, I don't know if the Arbitrator will,
15 but I'll translate.  He said to me, I'll translate
16 what's said, he says hey my man, come and look at
17 this for me.
18      Q.  Okay.  And when you say Creole, are you
19 referring to a particular type of Creole?
20      A.  Haitian Creole.
21      Q.  Okay.  And as you stated, you're of Haitian
22 dissent?
23      A.  Yes.
24      Q.  Is Mr. Dorcely of Haitian dissent as well?
25      A.  Yes.
```

449

```
1            SEVERIN - DIRECT - MASSENA
2       Q.  Okay.  So, what happened next?
3       A.  And when he said look at this for me, he
4  had an exam in his hand and said, see that this young
5  lady receives all of her scores, all her grades.
6       Q.  Now when he said young lady, was there a
7  particular lady he was referring to?
8       A.  Yes.  He was referring to Student "A".
9       Q.  And was she present during this
10 conversation?
11      A.  No.  At that time, we were walking in the
12 hall--
13      Q.  [Interposing] And I am going to ask you
14 just, Dr. Severin, if you could just speak up and
15 then slow down just a little bit so that everything
16 can be captured.
17          THE HEARING OFFICER:  You said you
18 didn't know when this happened?  Leaving aside--
19          [Crosstalk]
20          THE HEARING OFFICER:  [Interposing]
21 Leaving aside the precise date, can you give us
22 a month--
23          MR. SEVERIN:  [Interposing] Oh, yes.
24          THE HEARING OFFICER:  --year--
25          MR. SEVERIN:  [Interposing] August, it
```

450

```
1            SEVERIN - DIRECT - MASSENA
2  was August 2014.
3          THE HEARING OFFICER:  Thank you.
4       A.  So, as we're walking down the hallway
5  towards the main office, Room 105, he showed me the
6  test score, and I look at it, and I check to see if
7  all the scores were bubbled.
8       Q.  And this was a test score for what?
9       A.  For Global Studies, Regents exam for
10 Student "A", and I looked at it.  Afterwards, I
11 informed Mr. Dorcely that she didn't receive--
12      [Background noise papers shuffling]
13      A.  --and there was, you know, there was no
14 error in term of grading that was given to her.
15      Q.  Now, Student "A" was not one of your
16 students, correct?
17      A.  I had not even been--I did not begin
18 teaching at the school yet--
19      Q.  [Interposing] Okay.
20      A.  --so I didn't know any of the students.
21 So, there was no way of me to know who is Student
22 "A", except just the paper--
23      Q.  [Interposing] Okay.
24      A.  --but while I was in the room--
25      [Crosstalk]
```

451

```
1            SEVERIN - DIRECT - MASSENA
2       Q.  [Interposing] Well, let me--just one
3  moment, Dr. Severin.  If you know, what is the--what
4  is the procedure in terms of grading Regents?
5       A.  The Regents are graded at different
6  location.  At one time, they used to be graded in
7  house, but at that particular time it was graded at a
8  different school, but it was brought back.  All
9  Regents are sent to their school after grading.
10      Q.  And what happens when the Regents is sent
11 to their school?
12      A.  When the Regents is sent to the school, the
13 Principals are responsible to store, to keep them,
14 and whatever it is that they have to do to safeguard
15 just in case a score is challenged, a grade needs to
16 be reviewed for example.
17      Q.  And was this such an example of a review or
18 a challenge?
19      A.  Personally, I don't know what preceded him
20 coming to ask me.  The only thing that I know is I
21 don't know Student "A", but just out of nowhere, Mr.
22 Dorcely came and asked me to look.  And when I looked
23 at the exam, I give him my assessment, following
24 telling him that she had received all her credits.
25 He asked me what do you think?  Where do you think
```

452

```
 1          SEVERIN - DIRECT - MASSENA
 2   she could have done better?  I looked at her essay
 3   exam, and looking at the essay exam, I mention that
 4   she had not written enough.  Second, I look at the
 5   DBQ, which are short answers, where students receive
 6   individual points for each answer, and I mention to
 7   him that she could have answered X question a little
 8   bit, and that could have given her one or two more
 9   points, and that would have made the difference.
10        Q.   When you say made the difference, what do
11   you mean by that?
12        A.   What I mean by is Student "A" may have
13   scored 63 or 64.
14        Q.   And what is the significance of a 63 or a
15   64?
16        A.   A 65 is passing, and her graduation was
17   pending on her passing the Global Studies.  So, when
18   her mother, Student "A's" mother came to the school
19   to find out if she had passed the Global, that's when
20   Mr. Dorcely, I learned, came to try to pull her--
21   pulled her exam out of all the other exams to look
22   and -- [00:01] what was in it.
23        Q.   So, what happened next?
24        A.   What happened next, Student "A" was brought
25   into the room.
```

453

```
 1          SEVERIN - DIRECT - MASSENA
 2        Q.   What room is this?
 3        A.   That's a room adjacent to the main office,
 4   which is Room 105.  At that time, when Student "A"
 5   came in, Mr. Dorcely proceeded to pull out a pencil.
 6        Q.   Who else was present in the room at this
 7   time?
 8        A.   It was just myself, Mr. Dorcely, and
 9   Student "A" at the time.
10        Q.   Okay.
11        A.   When he pulled out the pencil and give it
12   to Student "A", and she actually begin to write.  I,
13   my body gesture cringed a little bit across my--
14        [Crosstalk]
15             MR. MASSENA:  [Interposing] Let the
16        record reflect that the Respondent is currently
17        pushing his chair in his chair as if to demonstrate a
18        recoiling motion, and that his hands are--and
19        that his arms are folded across his chest.
20        A.   So, when I did that, Mr. Dorcely noticed my
21   reaction.  He said to Student "A", you know what,
22   Student "A", please, disregard that.  You'll come
23   back and you'll take the exam in January.  We'll
24   prepare you by then and you should be fine.  He says
25   I'll speak to mom, and I'll her mom--and I'll let
```

454

```
 1          SEVERIN - DIRECT - MASSENA
 2   mom we're going to work with you.
 3        Q.   Now, how would you describe when you made
 4   that motion that you demonstrated earlier for us, the
 5   recoiling motion, how would you describe Principal
 6   Dorcely's reaction to your recoiling motion?
 7        A.   When he saw me make that recoil motion,
 8   that's when he decide, you know nonchalantly, you
 9   know what Student "A", don't worry about that.  We're
10   going to prepare you and bring you--and in January
11   you'll take the exam again, and we'll make sure to
12   prepare you and you'll pass.  It will be fine.  Let
13   me speak to mom and let her know.  So, Mr. Dorcely
14   went to Ms.--Student "A's" mother.
15        Q.   And how do you know this?
16        A.   Because I was not far from the main office.
17   And he said, mom, we're going to prepare her for the
18   exam in January, but in the meantime, you know, she
19   can just come in and do some preparation and--
20        [Crosstalk]
21        Q.   [Interposing] Let me just stop you for one
22   moment.  So, this entire sequence took place in
23   August of 2014?
24        A.   Yes, sir.
25        Q.   Okay.  And you said you now have been in
```

455

```
 1          SEVERIN - DIRECT - MASSENA
 2   the--you have been teaching and you have been in the
 3   teaching system for 20 years.  Is that correct?
 4        A.   Now 2016, yes.
 5        Q.   Okay, for 20 years.  What is the
 6   significance of Regents scores as it relates to a
 7   Principal?
 8        A.   Well, every Principal have goals.  And
 9   these goals determine whether or not a Principal is
10   kept as a Principal.  It's a reflection on the
11   school, whether or not the Principal is effective or
12   ineffective.  There's a great deal of implication
13   regarding those Regents scores.
14        Q.   Okay.
15             THE HEARING OFFICER:  When you
16        testified, you said each Principal has goals.
17        So, you're talking about to your knowledge.
18             MR. SEVERIN:  To my knowledge.
19             THE HEARING OFFICER:  Goals that the
20        Principal creates, or are goals created by
21        others for the Principal?  I just didn't
22        understand your testimony.
23             MR. SEVERIN:  These are goals created
24        by others for the Principal.
25             THE HEARING OFFICER:  Thank you.
```

456

```
 1              SEVERIN - DIRECT - MASSENA
 2              MR. MASSENA:  Okay, could you just--
 3    just one moment.  May we go off record?
 4              THE HEARING OFFICER:  Sure.
 5              MR. MASSENA:  For one moment?
 6              THE HEARING OFFICER:  We'll go off the
 7    record.
 8              [OFF THE RECORD, Discussion 3:52 p.m.]
 9              [ON THE RECORD, Discussion 3:52 p.m.]
10              THE HEARING OFFICER:  Let's go back on
11    the record.  Okay, given the time of the day, it
12    makes sense that we're going to conclude at this
13    time.  I thank you all for your participation.
14    We will reconvene this Thursday at 10:00 a.m.
15    Thank you all.  Let's go off the record.
16              MR. MASSENA:  Thank you.
17              (The hearing adjourned at 4:00 p.m.)
```

Student Index

458

Ashley Weber [phonetic], Student "A"

CERTIFICATE OF ACCURACY          457

I, Debbie L. Manning, do hereby certify that the foregoing typewritten transcript of proceedings in the matter of New York City Department of Education v. Jean Richard Severin, File No. 29,298, was prepared using the required transcription equipment and is a true and accurate record of the proceedings to the best of my ability.  I further certify that I am not connected by blood, marriage or employment with any of the parties herein nor interested directly or indirectly in the matter transcribed.
Signature:
Date:  July 15, 2016

## THE STATE EDUCATION DEPARTMENT
## THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
JEAN RICHARD SEVERIN
Section 3020-a Education Law Proceeding (File #29,298)


DATE:              July 14, 2016

TIME:              10:00 a.m. to 5:15 p.m.

LOCATION:          NYC Department of Education
                   Office of Legal Services
                   100 Gold Street, 3rd Floor
                   New York, NY 10038

BEFORE:            JAMES A. BROWN, ESQ.
                   HEARING OFFICER

APPEARANCES:       FOR THE COMPLAINANT:
                   DANA KIM, ESQ., of Counsel
                   NYC Department of Education
                   Office of Legal Services
                   49-51 Chambers Street
                   New York, NY  10007
                   Telephone:  (212) 374-6741
                   dkim14@schools.nyc.gov

                   FOR THE RESPONDENT:
                   ALAIN MASSENA, ESQ., of Counsel
                    305 Broadway, Suite 1001
                   New York, New York 10007
                   Telephone: (212) 766-1700
                   avm@massenalaw.com

Table of Contents
OPENING STATEMENT                                    1
NAME:              PAGE:                              2
WITNESS EXAMINATION                                  3
NAME:              PAGE:                              4
M. Satchell                                          5
    Sworn           464                              6
    Direct by Massena    465                         7
    Cross by Kim     478                             8
    Re-direct by Massena    494                      9
    Re-cross by Kim    497                          10
J. Severin                                          11
    Direct by Massena    499                        12
    Voir dire by Kim    566                         13
    Direct (resume) by Massena    567               14
    Voir dire by Kim    571                         15
    Direct (resume) by Massena    575               16
    Voir dire by Kim    577                         17
    Direct (resume) by Massena    578               18
    Cross by Kim    581                             19
CLOSING STATEMENT                                   20
NAME:              PAGE:                            21
EXHIBITS                                            22
RESPONDENT        DESCRIPTION      I.D.   IN EV.    23
10    E-mail from Ms. Fagan to Dr.    535           24
          Severin dated 3/22/15                     25
11    E-mail            478    484
12    Phone log, 4/23/15        485    488
13    E-mail, 9/18/15        570    576
14    Dr. Severin's resume    577    578
DEPARTMENT OF EDUCATION  DESCRIPTION    I.D.  IN EV.

461

1    DR. JEAN RICHARD SEVERIN - 07/14/16
2        (The hearing commenced at 10:00 a.m.)
3        THE HEARING OFFICER:  Good morning, my
4    name is James A. Brown. I'm the hearing officer
5    duly appointed pursuant to New York State
6    Education Law, Section 3020-a, its rules and
7    regulations, as well as the contractual
8    provisions by and between the New York City
9    Department of Education and the United
10   Federation of Teachers.  We are here today in
11   the matter of Jean Richard Severin, SED File No.
12   29,298. This is a continuing matter. While I
13   await the arrival of counsel, let us now go off
14   the record. Thank you.
15       [OFF THE RECORD, Awaiting arrival of
16   counsel]
17       [ON THE RECORD, Awaiting arrival of
18   counsel]
19       THE HEARING OFFICER:  So let us go on
20   the record. Okay, so we are back on the record
21   in this matter and I am joined by counsel for
22   both sides, as well as the respondent.  Good
23   morning to you, Dr. Severin.
24       DR. RICHARD SEVERIN:  Good morning.
25       THE HEARING OFFICER:  If you would

462

DR. JEAN RICHARD SEVERIN - 07/14/16
kindly note your appearances, beginning on my
left.
        MS. DANA KIM:  Yes, Dana Kim for the
Department.  Good morning.
        THE HEARING OFFICER:  Good morning.
        DR. SEVERIN: Good morning.
        MR. ALAIN MASSENA:  Alain Massena for
the respondent.  Good morning.
        THE HEARING OFFICER: Good morning to
you.  Now when we last left off we were in the
middle of the respondent's direct examination.
It's my understanding, by way of an agreement,
that respondent is going to call out of order a
different witness to begin this morning.
However, I'm also told by respondent's counsel
that he wishes to be heard further with regard
to Department Exhibit 30, which was admitted
into evidence at the last hearing.  Mr. Messena?
        MR. MASSENA:  Yes, Your Honor.
Briefly and respectfully I would just like to
renew my objection to Department 30 being moved
into evidence as Your Honorable Arbitrator rule
prior to allowing this document into evidence
that this evidence--that you're familiar with

463

1    DR. JEAN RICHARD SEVERIN - 07/14/16
2    this evidence, that this document is a document
3    that is investigated by DOE, that it was entered
4    into evidence, and I also just renew my
5    objection that it was entered into evidence
6    above the respondent's objection.  With this
7    particular document and what the District--the
8    DOE seeks to achieve is to have another employee
9    of the Department of Education in essence
10   testify in this court and that's what, in
11   essence, is taking place there in this finding
12   which is highly prejudicial to my client and
13   where my client has not had an opportunity to
14   cross examine the individual regarding this
15   document. I don't believe the document--there
16   was any evidence or even a foundation that was
17   properly laid for this document to come in, and
18   obviously it's up to this fact find to determine
19   the credibility of the respondent and of the
20   witnesses and not necessarily to rely on the--or
21   be persuaded by any other fact finding
22   procedures, especially one that is in essence an
23   arm of the Department of Education.
24       THE HEARING OFFICER:  All right. I've
25   heard this objection raised before.  My ruling

464

1  DR. JEAN RICHARD SEVERIN - 07/14/16
2  remains the same.  Department 30 is in evidence.
3  I think respondent is correct; I am the ultimate
4  fact finder in this proceeding and I honor and
5  respect that role.  With that having been said,
6  let us now off the record so that we can bring
7  in the respondent's first witness.
8       [OFF THE RECORD, Call witness]
9       [ON THE RECORD, Call witness]
10       THE HEARING OFFICER:  All right, let
11  us go on the record.  All right, I see that the
12  respondent has his first witness this morning.
13  Can you kindly introduce him to us, Mr. Messana?
14       MR. MASSENA:  Yes.  The respondent
15  calls Mr. Mark Satchell.  Mr. Satchell, would
16  you kindly spell your last name for us?
17       MR. MARK SATCHELL:  Yes.  S-A-T-C-H-E-
18  L-L.
19       THE HEARING OFFICER:  If you would
20  raise your right hand.  Do you solemnly swear or
21  affirm to tell the truth in this proceeding?
22       MR. SATCHELL:  I do.
23       THE HEARING OFFICER:  Mr. Messana,
24  your witness.
25  DIRECT EXAMINATION

465

1       SATCHELL - DIRECT - MESSANA
2  BY MR. ALAIN MESSANA:
3       Q.  Good afternoon--good morning, Mr. Satchell.
4  How are you?
5       A.  I'm fine.
6       Q.  What do you do for a living?
7       A.  I'm a teacher at--
8       THE HEARING OFFICER:  Could you just
9  keep your voice up please?
10       A.  I'm a teacher at Urban Action Academy and
11  I'm also the UFT Chapter leader at the school.
12       Q.  Okay, how long have you been a teacher?
13       A.  I've been a teacher for five years.
14       Q.  And your employer is the Department of
15  Education?
16       A.  Yes.
17       Q.  How long have you been--you said for five
18  years, is that correct?
19       A.  Mm-hmm.
20       Q.  Okay.
21       THE HEARING OFFICER:  You have to say
22  yes or no.
23       A.  Yes, sorry.
24
25       Q.  And how long--you said you--how long have

466

1       SATCHELL - DIRECT - MESSANA
2  you been assigned to Urban Action Academy?
3       A.  About three years.
4       Q.  Besides being a teacher, do you serve any
5  other roles?  I know you stated chapter leader--
6       A.  Yes.
7       Q.  Do you serve any other roles?
8       A.  No, not currently, just the chapter leader.
9       Q.  And are you familiar with disciplinary
10  conferences?
11       A.  Yes.
12       Q.  What are they?
13       A.  They are conferences held by an
14  administrator where they're addressing a concern that
15  they're having.  You know, they're usually given when
16  administration finds a teacher or somebody else on
17  the staff doing something that they're not supposed
18  to or maybe not doing something that they were told
19  to do or asked to do.
20       Q.  Do you know an individual by the name of
21  Jordan--withdrawn.  As a UFT rep, do you have any
22  duties or responsibilities during the disciplinary
23  conference?
24       A.  I'm there as a representative of the union
25  for the member and to make sure that their contract

467

1       SATCHELL - DIRECT - MESSANA
2  is not being violated and that their rights can help.
3       THE HEARING OFFICER:  Just keep your
4  voice up.
5       A.  Sorry.
6       Q.  Do you know an individual by the name of
7  Jordan Barnett?
8       A.  I do.
9       Q.  Who is she?
10       A.  She is the assistant principal at Urban
11  Action.
12       Q.  And do you know an individual by the name
13  of Steve Dorcely?
14       A.  I do.
15       Q.  How do you--
16       A.  [Interposing] Principal of Urban Action
17  Academy.
18       Q.  And do you also know--do you know an
19  individual by the name of Dr. Severin?
20       A.  I do.
21       Q.  And how do you know him?
22       A.  He was a teacher at Urban Action Academy.
23  He's temporarily reassigned I believe.
24       Q.  Okay.  Do you know why you are here today?
25       A.  Yes, I'm a witness for Dr. Severin.

468

SATCHELL - DIRECT - MESSANA

Q. Okay. And then do you know that
disciplinary charges have been brought against Dr.
Severin?
    A. I do.
    Q. Did you attend any disciplinary conferences
with Dr. Severin?
    A. Yes.
    Q. And do you recall how many disciplinary
conferences you--
    A. [Interposing] I actually tried to look back
to count them before coming and some of the pads that
I write my notes on during a meeting are at the
school building--
    Q. Okay.
    A. --locked up, so I wasn't able to actually
get a good count but there was a lot.
    Q. When you say a lot, more than five?
    A. Yes.
    Q. More than ten?
    A. Yes.
    Q. And how would you describe these
disciplinary meetings, roughly?
    A. To be honest, there was more than ten. I
would say the number was in the upwards of twenty

470

SATCHELL - DIRECT - MESSANA

wasn't the best thing to do in the eyes of the
principal or Ms. Barnett, the other assistant
principal.
    Q. And during these meetings, how did you
participate in these meetings?
    A. Well, I was there, as I said earlier, as a
representative for the union to make sure that the
members rights weren't being violated and to make
sure that it was, I guess, kind of kept to what the
charges were at the time and nothing else.
    Q. Do you know what the genesis of the
hostility was?
    A. I have an idea.
    Q. Could you share that with us?
    A. Yes. So this--not this school year but the
end of last school year, which would have been
2014/2015, Dr. Severin, I believe, was asked by the
administration to--and I can't recall if it was to
change a grade or if it was to allow a student extra
time on an exam, something along those lines, and Dr.
Severin had reported this incident to, I believe, SCI
and it seemed like a lot of the hostility throughout
this school year carried over from that incident.
    Q. Okay, and you were able to garner this

469

SATCHELL - DIRECT - MESSANA

plus.
    THE HEARING OFFICER: Just tell me the
time frame, if you would, roughly.
    A. During the school year, since--from
September to March.
    THE HEARING OFFICER: So it's the
2015/2016 school year?
    A. Yes. Correct.
    THE HEARING OFFICER: Thank you. I'm
sorry, your witness.
    Q. And in attending these disciplinary
meetings with Dr. Severin, how would you describe the
mood of these meetings?
    A. It was overall hostility; it definitely was
the overall mood.
    Q. Okay, and could you describe that
hostility?
    A. Well I would say the hostility, it
depended, because it could have been coming from
either side, it felt hostile being in the room.
They--the two sides were not working together in any
shape or form. It was not what I've seen to be
productive in any way. It was just pointing out
something that Dr. Severin might have done that

471

SATCHELL - DIRECT - MESSANA

through your meetings, through the disciplinary
conferences you attended?
    A. Yes.
    Q. In any of the disciplinary conference
meetings that you attended, did you ever observe or
overhear a threat from Principal Dorcely to Dr.
Severin?
    A. I did not, not that I can recall. But as I,
you know, as I was saying, there was definitely
hostility. There might have been but I don't
remember the exact wording. The principal did not
seem happy in any meetings overall.
    MS. KIM: Objection.
    THE HEARING OFFICER: Sustained.
    A. This is just my opinion.
    Q. Just one moment, Your Honor. Just one
moment. Do you recall being present during a staff
meeting in September, September 8th of 2015?
    A. Yes, I do. I remember it because it was my
birthday.
    Q. Okay, and what do you recall about that
meeting?
    A. I remember very clearly a statement that
was made by the principal where he had said you had

472

SATCHELL - DIRECT - MESSANA

1 SATCHELL - DIRECT - MESSANA
2 tried to take me down.  He did not name who he was
3 talking about.  But then something along the lines of
4 "I'm back and I'm stronger than ever and I'm going to
5 ride you."
6 Q.  And this was--
7 A.  [Interposing] And that was in September,
8 yes.
9 Q.  2015, right?
10 A.  Correct.
11 Q.  And this was--what type of meeting was this
12 that you were present in?
13 A.  This was our pre-year faculty meeting where
14 the staff was just coming together for the first time
15 of the school year.  There was a whole bunch of new
16 staff there that has never been a part of the
17 community for the school, and where we were really
18 getting our assignments and our staff handbook and
19 getting a little bit of a brief of what's coming for
20 the year ahead.
21 Q.  And if you could just repeat the statement
22 that you overhead Principal Dorcely say.
23 MS. KIM:  Objection.
24 THE HEARING OFFICER:  I think he
25 already stated it for the record, counsel.

473

1 SATCHELL - DIRECT - MESSANA
2 Sustained.
3 Q.  And do you know who that--do you have an
4 idea of who that statement was directed to?
5 A.  I assumed in my mind it was to Dr. Severin
6 but, again, he didn't name anybody's name, so.
7 Q.  Why did you make that assumption?
8 A.  Because I had known about Dr. Severin
9 reporting the incident in regards to cheating.
10 Q.  And how did you find out about Dr. Severin
11 reporting this incident?
12 A.  From Dr. Severin.
13 Q.  Okay.  And have you learned--have any other
14 teachers reported cheating by Principal Dorcely?
15 A.  Yeah, this school year.
16 Q.  And how did you learn about that?
17 MS. KIM:  Objection as to relevance.
18 THE HEARING OFFICER:  What's the
19 relevance, Mr. Massena, as to other teachers'
20 complaints?
21 MR. MASSENA:  The relevance goes,
22 again, to--withdrawn.  Just one moment, Your
23 Honor?
24 THE HEARING OFFICER:  Sure.
25 Q.  I'd like to talk to you about the common

474

1 SATCHELL - DIRECT - MESSANA
2 planning time meetings, all right?  What are those
3 meetings?
4 A.  They are, or they were, our Circular 6
5 assignments which every teacher is supposed to have,
6 and they were actually, I guess, not correctly
7 assigned to us.
8 Q.  What do you mean by that?
9 A.  Teachers were not given a preference sheet
10 the prior year, the 2014/2015 school year, they were
11 not given the preference sheet where a teacher is
12 supposed to select three preferences off a menu of
13 options for their Circular 6 assignment.  So when
14 that was brought to the principal's attention,
15 instead of reverting back to the contract as he was
16 asked to do, pretty much we were all told that we had
17 to go to common planning time where we were split
18 into three separate groups and every day while the
19 students were at lunch during their 6th period, the
20 teachers were in common planning time and we're given
21 options of things we can do during this coming
22 planning time.
23 Q.  What were some of those options?
24 A.  Lesson tuning, unit planning, co planning
25 if you have a co-teacher, which didn't always work

475

1 SATCHELL - DIRECT - MESSANA
2 out too well because some of the co-teachers were in
3 different groups so we didn't really get to work
4 together as much as we would like to.  I mean, those
5 are the only real good examples I could think of at
6 the moment.
7 Q.  Was there frustration regarding the common
8 planning time among the teachers?
9 A.  There was.  There was, especially at first,
10 because a lot of teachers, as I mentioned, weren't
11 able to work with those that they might have wanted
12 to, they weren't able to plan for lessons during that
13 time because they were kind of busy with other things
14 to do.  So there was a little bit of hostility.
15 Eventually it kind of seemed to break a little bit,
16 but for the most part, teachers were not happy with
17 the assignments that were given to them.
18 Q.  Were these common planning time meetings
19 well attended?
20 A.  As far as I know, yeah.  Yeah, they were.
21 Q.  Okay.  And now let me ask you this
22 question.  The--these common planning meetings, what
23 period did they occur?
24 A.  They occurred during 6th period, the same
25 period all the students were in lunch.

476

SATCHELL - DIRECT - MESSANA

Q. And you stated that you attended at least twenty disciplinary meetings, maybe more, with Dr. Severin, correct?

A. Correct.

Q. At what time did those disciplinary meetings take place?

A. During the common planning time, during that 6th period.

Q. And, generally, how long would these disciplinary meetings take--how long would they last?

A. They ranged from a brief five minutes to the entire period, which was a thirty-eight minute period.

Q. And were there times--withdrawn. You said that you attended well over twenty disciplinary conference meetings during the school year, is that correct?

A. Yeah, well over. I know--I counted at one point from, I believe it was December 10th up until about the middle of May. The District rep for the union, James Duncan, did a survey of his schools, he's a Brooklyn High School rep, and--

MS. KIM: Objection. This is going beyond the scope of this question.

477

SATCHELL - DIRECT - MESSANA

THE HEARING OFFICER: Well, I believe the question was how many disciplinary meetings were there?

MR. MASSENA: Yeah.

THE HEARING OFFICER: So I'm sustaining the objection and you can, as you like, answer, but specifically answer that question.

A. Okay, well I was getting to the number was about forty-three that I had counted just between the timeframe of December to May.

Q. Okay. As a--in your rule as UFT rep, did you find the amount of the disciplinary meetings unusual?

A. Yes.

Q. And what did you believe was the purpose of these disciplinary meetings?

A. I believe they were just a way for the principal to have something to say I gotcha with. That was just my overall feeling. I thought that they were just too many.

Q. One moment, Your Honor.

THE HEARING OFFICER: Let's go off the record.

478

SATCHELL - DIRECT - MESSANA

[OFF THE RECORD, Discussion]

[ON THE RECORD, Discussion]

THE HEARING OFFICER: Let's go on the record. Mr. Massena, any additional questions?

MR. MASSENA: No additional questions for Mr. Satchell.

THE HEARING OFFICER: Cross examination?

MS. KIM: Arbitrator Brown, if I could just have twenty minutes?

THE HEARING OFFICER: By all means. Let's go off the record once again.

MS. KIM: Thank you.

[OFF THE RECORD, Witness review]

[ON THE RECORD, Witness review]

THE HEARING OFFICER: Let's go back on the record. Ms. Kim, are you ready to proceed with cross examination?

MS. KIM: Yes.

THE HEARING OFFICER: Please do.

CROSS EXAMINATION

BY MS. DANA KIM

Q. Okay, thank you. Good morning, Mr. Satchell. If there is a question that you don't

479

SATCHELL - CROSS - KIM

understand, just let me know and I'll rephrase it, okay?

A. Yeah.

Q. And just to let you know, I am the attorney for the Department.

A. Okay.

MS. KIM: So, Arbitrator Brown, is this witness still under oath?

THE HEARING OFFICER: Yes.

MS. KIM: Okay.

THE HEARING OFFICER: You are reminded that you are still under oath.

Q. Thank you. And Mr. Satchell, you've spoken to Mr. Severin at length about this case, correct?

A. Correct.

Q. And you mentioned before that you are aware of what the charges are in this case?

A. Correct.

Q. Okay. To your knowledge, what are they?

A. I believe it was educational negligence.

Q. Is that what Mr. Severin told you?

A. That's--yeah, if I recall.

Q. And what, if anything else, did he tell you about the--

480

SATCHELL - CROSS - KIM

1 SATCHELL - CROSS - KIM
2         MR. MASSENA:  Objection, Your Honor.
3 As the UFT rep there's confidentiality
4 privileges between the representative and the--
5 and Dr. Severin.
6         THE HEARING OFFICER:  Would you like
7 to be heard on that, Ms. Kim?
8         MS. KIM:  Yes.  Calling him as a
9 witness and as a character witness, I think,
10 forgoes that confidentiality.  Mr. Satchell has
11 already testified about the fact that he is
12 aware of the disciplinary charges in this case.
13 He testified about that on direct so the
14 Department has a right to ask of him what he
15 knows and what it is that he was told.
16         MR. MASSENA:  He wasn't called as a
17 character witness, Your Honor, he was called as
18 a fact witness.
19         THE HEARING OFFICER:  Okay, when you
20 say that the witness should be--the Department
21 should be entitled to hear the witness'
22 testimony as to what he was told, you're
23 speaking specifically about what the respondent
24 told the witness?
25         MS. KIM:  Because that's what the

481

1 SATCHELL - CROSS - KIM
2 genesis of his knowledge is.  He had just
3 testified that Mr. Severin is the one who told
4 him what the charges are in this case so I'd
5 like to know what it is he was told.
6         THE HEARING OFFICER:  And do you wish
7 to address the issue raised by the respondent
8 concerning a privilege that may or may not
9 attach to the communications by and between the
10 respondent and his union representative?
11         MS. KIM:  Again, on direct examination
12 this witness was asked by counsel about was he
13 aware of the charges and he said yes, so I am
14 asking on cross examination for leeway to
15 determine what it is, his knowledge is.  He's
16 already said that Mr. Severin told him so
17 because the basis of his knowledge is what the
18 respondent told him, then that privilege is
19 waived.
20         THE HEARING OFFICER:  All right, we're
21 hearing an argument, Mr. Messena, from the
22 Department that any privilege that may or may
23 not exist has been waived through both the
24 direct testimony and the testimony just now on
25 cross examination from this witness.  Do you

482

1 SATCHELL - CROSS - KIM
2 wish to address the argument being made by the
3 Department that any such privilege to the extent
4 it exists has now been waived by respondent
5 calling the UFT representative as his witness to
6 testify in this matter?
7         MR. MASSENA:  No, we obviously object
8 to any further questioning regarding this--
9 regarding the Department's line of questioning.
10 He was asked generally was he aware of the--was
11 he aware of the charges.  He said generally he
12 was; he didn't go into specifics about the
13 charges.  We allowed--we did not object when the
14 Department of Education asked how did he find
15 out about the charges; however, any further
16 inquiry is improper.
17         THE HEARING OFFICER:  All right, let's
18 go off the record for a moment.
19         [OFF THE RECORD, Discussion]
20         [ON THE RECORD, Discussion]
21         THE HEARING OFFICER:  All right, so
22 let's go back on the record.  Ms. Kim, do you
23 have any additional questions?
24      Q.  Yes, just going back to your knowledge of
25 the charges in this case, what, if anything else, are

483

1 SATCHELL - CROSS - KIM
2 you aware of the charges being in this case?
3      A.  I don't remember the exact wording that
4 they might be but it was something along the lines of
5 Severin not doing what he was supposed to or--yeah,
6 that's--I don't remember--I remember before I said
7 the educational negligence and that's as far as I
8 know, it's something along those lines.
9      Q.  Now you testified previously that you
10 believe that the meetings that you attended, there
11 seemed to be hostility on both sides, correct?
12      A.  Correct.
13      Q.  And you were asked whether--what your
14 opinion was as to the genesis of the hostility,
15 correct?
16      A.  Correct.
17      Q.  And do you recall testifying that you said
18 it had something to do with Mr. Severin reporting to
19 SCI that the principal had either asked him to change
20 a grade or to allow a student more time to take a
21 test?
22      A.  Correct.
23      Q.  Okay.  Were you aware that there was an
24 investigation that was undertaken?
25         MR. MASSENA:  Objection, Your Honor.

484

SATCHELL - CROSS - KIM

1 SATCHELL - CROSS - KIM
2        THE HEARING OFFICER: Overruled.
3    A.  There was an investigation that was done
4 this school year.
5    Q.  So you're aware there was an investigation.
6    A.  There was.
7    Q.  Do you know what the outcome of that
8 investigation was?
9        MR. MASSENA: Objection, Your Honor.
10       THE HEARING OFFICER: Overruled.
11 We've been through this before. I'm going to
12 hear the testimony.
13   Q.  You're not aware.
14   A.  No, I'm not aware of the outcome.
15   Q.  Were you aware that OSI unsubstantiated Mr.
16 Severin's complaint against the principal?
17       MR. MASSENA: Objection, Your Honor.
18       THE HEARING OFFICER: Hang on.
19 There's an objection. I believe the witness
20 just testified that he did not know the outcome
21 so I'm going to sustain the objection.
22   Q.  Now in terms of, you said, the hostility,
23 the genesis of the hostility was a report that Mr.
24 Severin made against the principal, right?  And you
25 seemed that the hostility, you believed, came from

485

1 SATCHELL - CROSS - KIM
2 his reporting of principal, correct?
3    A.  Correct.
4    Q.  But you're just guessing that to be the
5 case?
6        MR. MASSENA: Objection, Your Honor.
7        THE HEARING OFFICER: No, overruled.
8 That's a proper question. Your answer?
9    A.  I'm assuming, again, and it's based off the
10 statement the principal made during--
11   Q.  So it's yes or a no. You're guessing that
12 to be the case, correct?
13   A.  Yes.
14   Q.  Okay. You never spoke with the principal.
15 The principal never came up to you and said this is
16 why there's hostility between me and Mr. Severin,
17 correct?
18   A.  Correct.
19   Q.  Okay. Now at the pre year faculty meeting
20 you testified that the principal made a statement,
21 correct?
22   A.  Correct.
23   Q.  But when he made that statement he never
24 named anyone, correct?
25   A.  Correct.

486

1 SATCHELL - CROSS - KIM
2    Q.  And you're testifying to the fact that
3 you're guessing that he was talking about Mr.
4 Severin, that's all that is, you're just guessing,
5 correct?
6        MR. MASSENA: Objection as to
7 characterization, Your Honor, of the witness'
8 testimony.
9        THE HEARING OFFICER: Well I'm going
10 to sustain the objection as to form and allow
11 you to rephrase, counsel.
12   Q.  Okay, so just going back, at that meeting,
13 with the statement that he made he never said or
14 alluded to who he was referring to, correct.
15   A.  Correct.
16   Q.  And you were just guessing that the
17 principal was talking about Mr. Severin, correct?
18   A.  His wording--
19   Q.  [Interposing] It's yes or no.
20       MR. MASSENA: Objection, Your Honor.
21 He's trying to answer the question. .
22       MS. KIM: It's a yes or no question. .
23       THE HEARING OFFICER: I think it is a
24 yes or no question. Overruled. You can answer.
25 I'm sorry, I had interrupted. I just want to

487

1 SATCHELL - CROSS - KIM
2 make sure the answer was recorded. If you could
3 restate your answer. .
4    A.  My answer was yes.
5        THE HEARING OFFICER: Thank you.
6    Q.  And you mentioned that there was a time
7 period this school year where you attended a number
8 of disciplinary conferences on behalf of Mr. Severin,
9 correct?
10   A.  Correct.
11   Q.  And you said that that time frame was what
12 time frame?
13   A.  Well they started, I believe, late
14 September or early October, and then through the time
15 Dr. Severin was removed from the school.
16   Q.  And when was he removed?
17   A.  I believe it was the middle of March.
18   Q.  And what was that number that you said that
19 you attended? The number of meetings?
20   A.  Well the number I said was between December
21 and May overall was about forty-three for the school.
22   Q.  Okay. How did you come up with that
23 number, forty-three?
24   A.  I counted off of my notes.
25   Q.  Okay, the notes that you said are locked up

488

SATCHELL - CROSS - KIM

1       at the school?
2           A.  No, the notes that are locked up in the
3       school go back from prior to December--
4           Q.  Okay, so--
5           A.  --and the notes that I have at home are
6       from December 10th to current.
7           Q.  Okay, but you didn't bring those notes with
8       you today, correct?
9           A.  No.
10              MS. KIM:  Arbitrator Brown, I'd ask
11      that this witness produce those notes. .
12              THE HEARING OFFICER: That request has
13      to be directed to counsel for respondent.
14      You're asking for discovery demand.  I would ask
15      that you direct that to respondent. .
16              MS. KIM:  Yes, I'm asking you,
17      Arbitrator Brown, that you direct Mr. Massena to
18      have his witness, Mr. Satchell, turn over notes
19      that he has testified about with respect to
20      disciplinary meetings. .
21              THE HEARING OFFICER:  Tell me the
22      respondent's position. .
23              MR. MASSENA:  I don't have the notes;
24      I haven't seen the notes.  I'm hearing about the

490

SATCHELL - CROSS - KIM

1           Q.  Now as a UFT chapter chair you're aware
2       that when an administrator gives a directive to a
3       staff member they have to follow it, correct?
4           A.  Correct.
5           Q.  And even if it violates the contract, the
6       staff member has to follow it and then file a
7       grievance at a later point, correct?
8           A.  Correct.
9           Q.  And with respect to filing a grievance,
10      that is a fundamental right that all teachers have,
11      correct?
12          A.  Correct.
13          Q.  And with respect to filing a grievance, in
14      this case, did you ever file a grievance on behalf of
15      Mr. Severin?
16          A.  No.
17          Q.  Okay.  And did you, on your own accord,
18      file a grievance for anything that you may have
19      witnessed in the forty-three or so disciplinary
20      meetings that you attended on his behalf?
21          A.  Not the ones on behalf of Dr. Severin.
22          Q.  Okay, so the answer is no.
23          A.  No.
24          Q.  Now Mr. Satchell, as a UFT chapter chair,

489

SATCHELL - CROSS - KIM

1       notes actually for the first time so I will get
2       those notes.  I will attempt to get those notes
3       and provide them forthwith. .
4               THE HEARING OFFICER:  Very good. .
5               MS. KIM:  Thank you. .
6           Q.  Now, Mr. Satchell, how long have you been
7       the UFT chapter chair?
8           A.  A little over a year.
9           Q.  Prior to that did you hold any other
10      position with the UFT?
11          A.  No.
12          Q.  So you--prior to that you were not just a
13      union representative, you just became a chapter
14      chair?
15          A.  Correct.  I was -- [00:01].
16          Q.  Okay, and have you been a UFT leader or rep
17      at any other school?
18          A.  No.
19          Q.  Now as a UFT chapter chair, it's your job
20      to protect the union members, correct?
21          A.  Correct.
22          Q.  And it is your job to look out for their
23      best interests, correct?
24          A.  Correct.

491

SATCHELL - CROSS - KIM

1       are you aware that staff members can file special
2       complaints against administrators?
3           A.  Correct.
4           Q.  And those special complaints, they are
5       investigated by a joint team of DOE and union
6       members, correct?
7           A.  Yes.
8           Q.  And with these special complaints, any
9       outcomes, in terms of what the investigation
10      uncovers, any outcome has to be agreed upon by both
11      of the UFT and the DOE, correct?
12          A.  Correct.
13          Q.  Okay.
14              MR. MASSENA:  Objection, Your Honor.
15      Relevance. .
16              THE HEARING OFFICER:  Overruled. .
17          Q.  Now with respect to Mr. Severin, were you
18      aware that he filed a special complaint against the
19      principal back on June 16th, 2016?
20          A.  No, I'm not aware of that.
21          Q.  Okay.  Did Mr. Severin not tell you that
22      he--?
23              MR. MASSENA:  [Interposing] Objection,
24      Your Honor. .

492

SATCHELL - CROSS - KIM

1      MS. KIM: But I--.
2      THE HEARING OFFICER: Hang on one
3  second. There is an objection. I--you're
4  raising on the grounds of privilege?
5      MR. MASSENA: Yes.
6      THE HEARING OFFICER: Yeah, I'm going
7  to overrule the objection for this limited
8  question as to whether or not the respondent
9  communicated to this witness as to whether or
10  not he filed a special complaint.
11      A.  I was unaware of it.
12      Q.  Okay.  And because you were not aware of a
13  special complaint that Mr. Severin filed against the
14  principal, it would be fair to say that you were also
15  not aware of what the outcome of that special
16  complaint was, correct?
17      MR. MASSENA: Objection.
18      THE HEARING OFFICER: Overruled.
19      A.  Correct.
20      Q.  Mr. Satchell, for the approximately forty-
21  three or so disciplinary meetings that you attended
22  on behalf of Mr. Severin, did you know what the
23  outcome was for all forty-three of those meetings?
24      A.  No.

493

SATCHELL - CROSS - KIM

1      Q.  Okay.  Of those forty-three meetings, do
2  you remember who conducted those meetings?
3      A.  Yeah, it was either the principal, the
4  principal and the AP, Ms. Barnett, or, I believe, on
5  occasion, Ms. Barnett could have held some alone.  I
6  know that she's done that before.  I don't remember if
7  they were for Dr. Severin or a different member.
8      Q.  For any of the forty-three meetings for
9  which you were the UFT representative, do you recall
10  if the superintendent was present for any of them?
11      A.  He was not present for any disciplinary
12  meetings.  We did meet with him once though.
13      Q.  But it was not for a disciplinary meeting?
14      A.  It was not for a disciplinary meeting.
15      Q.  So just to be clear, for the forty-three or
16  so you attended, it's your recollection that the
17  superintendent was not present for any of those?
18      A.  He was not present for any of them.
19      Q.  What is the superintendent's name?
20      A.  Michael Prayor.
21      Q.  Prayor?
22      A.  Yeah, P-R-A-Y-O-R.
23      MS. KIM: I just need a couple of more
24  minutes.

494

SATCHELL - CROSS - KIM

1      THE HEARING OFFICER: Sure.  Let's go
2  off the record.
3      [OFF THE RECORD, Discussion]
4      [ON THE RECORD, Discussion]
5      THE HEARING OFFICER: Any additional
6  questions?
7      MS. KIM: No.
8      THE HEARING OFFICER: All right, any
9  re-direct?
10      MR. MASSENA: Brief re-direct, Your
11  Honor.
12  RE-DIRECT EXAMINATION
13  BY MR. ALAIN MASSENA:
14      Q.  You stated on cross, Mr. Satchell, that the
15  superintendent was not present for any of the
16  disciplinary meetings.
17      A.  Correct.
18      Q.  However, you also stated that he was
19  present at a meeting that you attended.
20      A.  Correct.
21      Q.  And who else was present at that meeting?
22      A.  Myself, Dr. Severin, James Duncan, who is
23  the District rep for the union, Michael Prayor, the
24  principal, Mr. Dorcely, and also one person who works

495

SATCHELL - RE-DIRECT - MASSENA

1  for Mr. Prayor, his name is Mr. Moses.
2      Q.  And what was that meeting about?
3      A.  That meeting was about setting up what the
4  union was calling a cooling-off period where both
5  sides had agreed to, I guess, kind of stay away from
6  each other while they found a new school to transfer
7  Dr. Severin so that they wouldn't be this clashing
8  anymore inside the school building.
9      Q.  And why was this cooling off period
10  necessary?
11      A.  It was necessary because both sides seem to
12  be, again, hostile and it just wasn't a good fit at
13  the very least and they felt that it was in the best
14  interest to separate them and have them in different
15  places and it would be better that way.
16      Q.  You also stated that, during your direct,
17  that you were guessing that the statement that
18  Principal Dorcely made was directed toward--I'm
19  sorry, yeah, that Principal Dorcely made was directed
20  toward Dr. Severin.  Is that what you said?
21      A.  I said that I was--
22      MS. KIM: [Interposing] Objection. .
23      THE HEARING OFFICER: Hang on, hang
24  on.  There's an objection.  Yes?

496

SATCHELL - RE-DIRECT - MASSENA

1      SATCHELL - RE-DIRECT - MASSENA
2      MS. KIM: It's a yes or no question. .
3      THE HEARING OFFICER: And the question
4 you're asking him is did he say it?
5      MR. MASSENA: Yeah.
6      THE HEARING OFFICER: Well, I think
7 the testimony reflects that that's what he said.
8      Q. How would you describe that guess?
9      MS. KIM: Objection. Asked and
10 answered.
11      MR. MASSENA: I'm asking him to
12 describe the guess. I don't think that was
13 asked or answered.
14      MS. KIM: He's already testified at
15 length about why it is he guessed.
16      MR. MASSENA: And -- [00:01] on
17 redirect.
18      THE HEARING OFFICER: Yeah. I'm
19 overruling the objection and allowing counsel to
20 inquire.
21      A. As mentioned, Principal Dorcely said you
22 had tried to bring me down and to my knowledge, the
23 only person who had even filed anything against
24 Principal Dorcely was Dr. Severin so the way he was
25 addressing it definitely made it seem that he was

497

SATCHELL - RE-DIRECT - MASSENA

1      SATCHELL - RE-DIRECT - MASSENA
2 addressing to Dr. Severin but, no, he did not mention
3 his name.
4      MR. MASSENA: No further questions.
5      THE HEARING OFFICER: Any additional
6 questions from the Department?
7      MS. KIM: Just a couple.
8      RE-CROSS EXAMINATION
9      BY MS. DANA KIM
10      Q. Just going back to that meeting you talked
11 about where the superintendent was present, you
12 mentioned that it was a meeting set up for both sides
13 to talk about some kind of cooling off period,
14 correct?
15      A. Correct.
16      Q. Just to be clear, you said Superintendent
17 Prayor was present?
18      A. Yes.
19      Q. The principal?
20      A. Yes.
21      Q. Mr. Severin?
22      A. Yes.
23      Q. And then James Duncan?
24      A. Yes.
25      Q. I'm sorry, who is Mr. Duncan?

498

SATCHELL - RE-CROSS - KIM

1      SATCHELL - RE-CROSS - KIM
2      A. Mr. Duncan is the Brooklyn UFT District
3 representative.
4      Q. You were present as well?
5      A. Yes.
6      Q. Was there anyone else, other than the
7 individuals--?
8      A. [Interposing] Yes.
9      Q. Who?
10      A. Mr. Moses.
11      Q. Who was Mr. Moses?
12      A. I believe he's a deputy for the
13 superintendent. I don't know his exact title.
14      Q. Now at this meeting isn't it true that
15 Superintendent Prayor reprimanded Mr. Severin for
16 being overly hostile and inappropriate?
17      A. I don't remember that.
18      MS. KIM: Okay. I have nothing
19 further.
20      THE HEARING OFFICER: Anything
21 additional from the respondent?
22      MR. MASSENA: No, nothing further.
23      THE HEARING OFFICER: All right, that
24 means you're excused as a witness. I thank you
25 very much for your participation. Let us go off

499

SATCHELL - RE-CROSS - KIM

1      SATCHELL - RE-CROSS - KIM
2 the record.
3      MR. MASSENA: I'll walk Mr. Satchell
4 out.
5      THE HEARING OFFICER: Sure. Why don't
6 you walk the witness out?
7      [OFF THE RECORD, Walk witness out]
8      [ON THE RECORD, Walk witness out]
9      THE HEARING OFFICER: All right, so
10 let's go on the record. All right, at this time
11 it's my understanding that the respondent is
12 going to continue his direct examination. Is
13 that correct, Mr. Massena?
14      MR. MASSENA: Yes.
15      THE HEARING OFFICER: All right. Dr.
16 Severin, I just want to remind you that you are
17 still under oath.
18      DR. SEVERIN: Yes sir.
19      THE HEARING OFFICER: Mr. Massena,
20 your witness.
21      DIRECT EXAMINATION
22      BY MR. ALAIN MASSENA
23      Q. Dr. Severin, I believe where we left off
24 was your testimony, you had just finished describing
25 an incident between you and Principal Dorcely in

500

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2  August of 2014, is that correct?
3      A.  Yes sir.
4      Q.  Okay, was it August of 2014?
5      A.  Yes sir.
6      Q.  Okay, and very briefly, could you just
7  describe that incident?
8      A.  Basically I was in a meeting with some
9  colleagues in preparation for this upcoming school
10  year.  Principal Dorcely came to the room, asked me
11  to come with him.  As I step out of the room we
12  started walking.  He produced a paper and asked me to
13  look at this student's Regents score and see if the
14  child had received all her credits.  And we walked
15  into the main office, the office adjacent to the main
16  office, and I looked at the paper and I saw that the
17  students had received full credit. I informed
18  Principal Dorcely that she received full credit,
19  nothing was missing, and he proceeded to ask me where
20  did the student go wrong.  I look at the essay, I see
21  her essay, she did not write enough, her grade is
22  fair.
23      Q.  Just one moment.  You can briefly, but you
24  can slow down a little bit as well.
25          THE HEARING OFFICER:  That would be

501

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2  helpful.
3      A.  Sorry.
4          THE HEARING OFFICER:  Let's just go
5  off the record for a quick moment.
6          [OFF THE RECORD, Break]
7          [ON THE RECORD, Break]
8          THE HEARING OFFICER:  On the record.
9          MS. KIM:  Actually--
10          THE HEARING OFFICER:  Do you want to
11  go off the record?
12          MS. KIM:  No, no, no.  That's fine.
13  Are we back on?
14          THE HEARING OFFICER:  We're on.
15          MS. KIM:  Okay.  I did want to raise
16  an objection though.  If my understanding is
17  correct, Mr. Severin is testifying about the
18  complaint that he made to SCI regarding
19  Principal Dorcely allegedly asking him to change
20  a grade or something of that nature, but I think
21  there's already been testimony elicited that
22  that case was unsubstantiated so I don't see how
23  this is relevant and how it would be helpful to
24  you as a finder of fact to determine whether or
25  not the charges here are either proven or

502

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2  disproven.
3          THE HEARING OFFICER:  We went over this
4  in some detail when a similar objection was
5  raised by the Department's attorney, Mr.
6  Frances, at the last hearing, and I'll just, in
7  a nutshell, try to encapsulate my ruling on
8  this.  I do consider the testimony to be
9  relevant.  I think what's relevant, given the
10  respondent's defense, in part of retaliatory
11  animus is the complaint that the respondent
12  made; not necessarily the outcome of that
13  complaint.  And on that basis, I overruled the
14  Department's earlier objection, which was very
15  similar to the one you raise now, Ms. Kim, and
16  my ruling stands.  Mr. Massena, you can
17  continue.  Did you want to be heard further, Ms.
18  Kim?
19          MS. KIM:  No, I apologize for being
20  redundant.
21          THE HEARING OFFICER:  That's okay.
22          MR. MASSENA:  And I'm about to be
23  redundant as well, Your Honor, that this
24  actually, again, goes to the crux of our
25  objection as to--and, again, not to upset the

503

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2  court, but goes to the crux of our objection as
3  to why Department 30 should not be in evidence
4  because, again, it's clear that the Department
5  wants this to stand for the principle that these
6  allegations did not occur when which really is
7  the crux--which is not the crux of this case in
8  terms of what took place.
9          THE HEARING OFFICER:  I thought I had
10  also addressed this issue raised by respondent
11  at the last hearing.  While I think, with regard
12  to a claim of retaliation, what is most relevant
13  is whether or not a complaint was made by the
14  respondent, and we've heard some testimony about
15  that already.  I do think it is within the right
16  of the Department; I'm certainly not going to
17  preclude the Department from arguing that the
18  complaint made with the respondent was, for
19  example, frivolous.  I don't know how much
20  weight I will attach to that argument if the
21  Department chooses to make that argument, but
22  the Department is certainly well within its
23  right to make that argument in response to the
24  respondent's defense and on that basis I
25  ultimately did allow the decision to be entered

504

SEVERIN - DIRECT - MASSENA

1 into the record as Department Exhibit 30.
2 Q. Thank you, Your Honor. If you could
3 continue, Dr. Severin.
4 A. Yes, so having looked, reviewed the paper,
5 I informed Principal Dorcely that the essay was fair,
6 the student, Student A, received a fair grade for
7 that and the only area where she needed to have
8 provided more information was on the DVQ. And in it,
9 two or three of the questions, she did not receive
10 any credit because she failed to write them out. And
11 at that time Student A was in the room, Principal
12 Dorcely pulled out a pen from--a pencil, I'm sorry,
13 from his jacket pocket, gave it to the student, and
14 the student began to write. As she began to write I
15 recall with a gesture, a physical gesture, and
16 Principal Dorcely decided to change his mind, letting
17 the student know, "Hey, don't worry about it, that's
18 where we will prepare you and you will come back in
19 January and take the exam again."
20 Q. Okay, so what happened next?
21 A. What happened next? Well Principal Dorcely
22 went and spoke with mom, with Student A's mother, and
23 informed her that she is going to be coming in and
24 take the exam in January. At that time mom said,

505

SEVERIN - DIRECT - MASSENA

1 "Well, what is she going to do during the time?" and
2 Principal Dorcely said we can give her--we can have
3 her work at the school, and she ended up becoming one
4 of the students who worked at the school. I don't
5 know her capacity, as far as work, whether it was
6 volunteer or paid or what have you, but she was part
7 of the students that work at the school at the time.
8 Now following this the school year began. There were
9 several promises that were made.
10 Q. What were those promises?
11 A. For example, I was supposed to help other
12 teachers, prepare other teachers to teach their
13 students how to write.
14 Q. And who made these promises?
15 A. In conversation with Mr. Dorcely earlier
16 when I came in the school, I subbed during the July
17 time period, substitute. We had several plans,
18 including having a mentorship, young male
19 empowerment, mentorship program, having a soccer
20 program, etc. And these suddenly never materialized.
21 But I never really put much weight into that; I
22 believed that--I believed Mr. Dorcely said that the
23 money was not available for the procession for me to
24 do these things so I took him at his word. However,

506

SEVERIN - DIRECT - MASSENA

1 one thing that I noticed, suddenly my rating
2 regarding my observation, Mr. Dorcely constantly
3 talked about how I did not know my content. I was
4 ineffective in my content. At first I didn't say
5 anything to him, I didn't really put much weight into
6 it. I believed that in due time everything would be
7 corrected. Then on December 22nd--
8 Q. [Interposing] And when you say December
9 22nd, you're referring to December 22nd of?
10 A. 2014. On December 22nd, 2014 I had
11 assigned a student a term paper in social studies, my
12 9th grade and my 10th grade, and that term paper was
13 also submitted to Principal Dorcely and Ms. Barnett,
14 AP Barnett, informing them that this is the term
15 paper for the first semester of the school year, and
16 I would be conducting a workshop, a writing workshop
17 with my students, teaching them how to put together
18 the five to seven pages. And at that time I
19 conducted the writing workshop in the morning for my
20 earlier period and around 7th or 8th period, the last
21 period of the day Principal Dorcely and Ms. Barnett
22 walked in. When they walked in they observed the
23 lesson, the students were taking notes, they were
24 following my instruction, directives, etc., and

507

SEVERIN - DIRECT - MASSENA

1 lesson concluded. On January 5th when we returned, I
2 had a first period. I taught the first period and
3 second period was my prep. I was called into
4 Principal Dorcely's office, I attended that meeting
5 2nd period. Principal Dorcely decided to inform me
6 that the lesson was very ineffective and he gave me
7 ineffective all throughout. And I shared with him
8 that--I gave him the term paper in advance, I
9 informed him I would be conducting the workshop, and
10 this is precisely what I did. Principal Dorcely
11 determined that no, this wasn't effective, it did not
12 have any objective, but nonetheless, I didn't say
13 anything except to show Principal Dorcely that about
14 twelve to thirteen of the students had turned in that
15 paper already that he said was ineffective. And I
16 think, if I'm not mistaken, the exact date on January
17 10th, I sent Principal Dorcely an email expressing my
18 grief how debilitating that ineffective was to me
19 since I knew what I was doing was in the best
20 interest of the student.
21 Q. How so?
22 A. Many of the children were unable to write
23 which was one of the main concerns that I expressed
24 to Principal Dorcely. I informed him that many of

508

SEVERIN - DIRECT - MASSENA

1
2  the children all throughout the different school,
3  they're unable to express themselves in writing and
4  this is one of the items that I was able to get the
5  students to correct and therefore be able to do well.
6  And I stared seeing evidence of that with the first
7  ten to twelve, thirteen students who turned in their
8  paper. So I complained to Principal Dorcely, let him
9  know how it was demoralizing. I penned an email and
10  I sent it to him and Principal Dorcely never
11  commented. It was not until February 12th when I was
12  called in for a disciplinary meeting and Charlie
13  Turner was there at that disciplinary meeting to
14  represent me. At that disciplinary meeting Principal
15  Dorcely proceeded to accuse me of an enormous amount
16  of allegation that totally was surprising.
17  Surprising was the least thing I could say, but it
18  was--basically he was short of calling me the worst
19  of the worst. He even accused me of having gang
20  affiliation, for what reason, I don't know. He
21  accused me of--
22      Q.  [Interposing] Do you have any gang
23  affiliation?
24      A.  No sir.
25      Q.  Okay. Where were these allegations coming

509

SEVERIN - DIRECT - MASSENA

1
2  from?
3      A.  I have absolutely no ideas. Principal
4  Dorcely went on to call me a liar, a deceitful
5  person, a thief regarding some passing, some--
6      Q.  [Interposing] And what happened next during
7  the meeting?
8      A.  At that meeting Principal Dorcely tried to
9  insinuate there was some OSI investigation that he
10  was conducting against me but nothing was purposed
11  from that. He informed Charlie Turner that I stole a
12  pass--parking permit, sorry, I was a liar for that
13  purpose, whereas he withheld one of the passes and I
14  confronted him on that pass because at that time I was also the chapter leader
15  because at that time I was also the chapter leader
16  for the school prior to Mr. Satchell becoming chapter
17  leader. And as chapter leader I was responsible to
18  distribute those passes and Principal Dorcely wanted
19  to keep one of those passes for Ms. Barnett. In
20  discussion with him he informed me that was for Ms.
21  Barnett, but nonetheless, at that time he alleged
22  that I was deceitful, my colleagues did not trust me,
23  I was not a fit at the school.
24      Q.  So how did this meeting come to an end?
25      A.  At the end of the meeting I was extremely

510

SEVERIN - DIRECT - MASSENA

1
2  depressed when I heard all of these allegations about
3  me that I never knew about. At that time, it was a
4  day--it was on a Thursday, I remember correctly,
5  clearly, because on the next day was Friday the 13th
6  and that was the day before we went on winter recess.
7  I didn't go in to school that day; I was extremely
8  depressed. That whole week we had off from school I
9  was in a deep depression where basically I didn't
10  even leave my house, then I went back to school the
11  following.
12      Q.  So when you got back to school what
13  happened next?
14      A.  When I got back to school--
15      Q.  [Interposing] And this is in February of
16  2015, correct?
17      A.  Yes. February of 2015 Principal Dorcely
18  had--I had a scheduled meeting with Principal Dorcely
19  regarding support session. I attended the support
20  session, I improved my lesson planning as Principal
21  Dorcely wanted me to. And somewhere toward May or
22  April these post-observations of myself was
23  completely effective and highly effective. Those
24  highly effective lesson plans one day just turned
25  ineffective again. So when I contacted one of my

511

SEVERIN - DIRECT - MASSENA

1
2  friends trying to find out what's going on, my friend
3  said to me, "What could you have done to this man?
4  This is clearly personal." I said, "I don't know
5  what I did except two things. He wanted to keep a
6  parking permit, I said no, he doesn't have the right
7  to. And when he tried to ask me to change this
8  student's grade, that's the only thing that I know I
9  kind of said no to him about." And he said, "What do
10  you mean?" I said, well--I explained the earlier
11  situation with Student A and he said, "Did you report
12  it?" I said, "No, I didn't think he changed--I mean,
13  the grade was not changed, I didn't think I had to."
14  He said, "Well this is something you still have to
15  report." And I said, "Okay."
16      Q.  Did you know at the time you were to report
17  that?
18      A.  Well, no, I didn't think of it because
19  there was nothing changed. So once Mr. Mann, Gene
20  Mann, who was the person that I was talking to,
21  informed me that I'm supposed to be reported, right
22  away I hung up the phone, I called OSI initially.
23  OSI heard my issue and they said that this is
24  something that ought to be addressed to Special
25  Commission of Investigation. And I called SCI in May

512

SEVERIN - DIRECT - MASSENA

1  and filed my complaint.  As a matter of fact, my
2  complaint was not even a complaint; it was pretty
3  much asking SCI if there is an issue there.  And then
4  SCI took the complaint and later on SCI, I'm
5  assuming, sent it to OSI, which was there was an
6  email sent to me informing me that there was sent to
7  OSI for their investigation.  So while I was offsite
8  grading, I received an email, some message, I don't
9  remember what nature or what method was used, to
10  inform me that I had to report to my home school,
11  Urban Action Academy, regarding an OSI investigation.
12  And at that time, after I was done with my session--
13  no, I think I left earlier and went back to my
14  school, met with the OSI investigators, and was
15  interviewed.  I was informed Principal Dorcely would
16  be interviewed as well, as well as Student A.
17      Q.  Do you remember what date that was?
18      A.  The exact date, no, but I--
19      Q.  [Interposing] What month and year?
20      A.  I know it was June 2015 because I was
21  grading Regents at that time.  I was assigned to
22  grade Regents exam and it must have been somewhere
23  around June--between June 16th and June 23rd,
24  somewhere around that time.
25

513

SEVERIN - DIRECT - MASSENA

1      THE HEARING OFFICER:  Was it SCI or
2  OSI?
3      A.  Both.
4      THE HEARING OFFICER:  Thank you.
5      A.  Yes.
6      Q.  So after you were interviewed, what
7  happened next?
8      A.  I presume--
9      Q.  [Interposing] Well don't presume.  After
10  you were interviewed, what happened next?
11      A.  What happened?  As I said, I was informed
12  OSI said there would be an interview with Principal
13  Dorcely and Student A, and after that I received
14  notification that I would be disciplined by Principal
15  Dorcely regarding failing to submit grades, but yet
16  the grades were submitted on time.  For example, on
17  June 17th I submitted my grade to Assistant Principal
18  Barnett and those grades were never reviewed by
19  Principal Barnett.  And on June 23rd, I'm assuming
20  when she first saw those grades--
21      MS. KIM:  [Interposing] Objection.
22      THE HEARING OFFICER:  Sustained.
23      A.  On June 23rd when she saw the email I sent
24  her--
25

514

SEVERIN - DIRECT - MASSENA

1      MS. KIM:  Objection.
2      THE HEARING OFFICER:  Were you present
3  with the Assistant Principal when she reviewed
4  your email?  It's a yes or--
5      DR. SEVERIN:  No, no.
6      THE HEARING OFFICER:  Okay, so I think
7  the nature of the objection is don't speculate,
8  don't assume.
9      DR. SEVERIN:  Yes sir.  Yes.
10      THE HEARING OFFICER:  Mr. Massena, do
11  you want to continue?
12      Q.  Yes.  So you stated that--you stated that
13  on June 23rd you--on June 23rd you were notified of
14  something on June 23rd?
15      A.  Yes.  On June 23rd--
16      Q.  [Interposing] What were you notified of?
17      A.  On June 23rd Ms. Barnett sent me an email
18  requesting the grades from me and I sent her an email
19  in regards saying I submitted the grade on June 17th.
20  And at that time she informed me that the email that
21  I sent to her was without an attachment or the wrong
22  attachment, one of the two.  And immediately I looked
23  and I submitted the information to her again.
24  Perhaps it was a human error, perhaps whatever the
25

515

SEVERIN - DIRECT - MASSENA

1  situation was, the right file was not sent to Ms.
2  Barnett, but yet I received a disciplinary letter.
3  But all their -- [00:01] that was requested of me was
4  submitted to Ms. Barnett on time.  Following that,
5  the school year came to an end, I received effective
6  as my overall rating by the time we come back in
7  September.
8      Q.  So I'd like to take you to September of
9  2015.  What takes place in September 2015?
10      A.  September 2015, on September 8th, to be
11  precise, teachers were asked to report to work and
12  report to Room 111, which is the room where all the
13  teachers gather.  And at that meeting Principal
14  Dorcely began to talk about expectation, etc., etc.,
15  and at that time he also made the comment that, "You
16  had me investigated.  I'm stronger than ever.  I'm
17  going to go into beast mode and I'm going to ride
18  you," while he's directly looking at me.  He did not
19  mention me by name but he was clearly looking at me
20  while he was making that comment.  I didn't respond
21  to that; I simply took it to mean that I have to do
22  my work.  So September 9th, the first day of school,
23  Principal Dorcely visited my class--
24      THE HEARING OFFICER:  [Interposing]
25

516

SEVERIN - DIRECT - MASSENA

1  SEVERIN - DIRECT - MASSENA
2  Before we get to September 9th, you said
3  something mode.
4         DR. SEVERIN:  Beast mode.
5         THE HEARING OFFICER:  Beast?
6         DR. SEVERIN:  Yes.
7         THE HEARING OFFICER:  Thank you.
8      Q.  September 9th?
9      A.  September 9th he visited my classroom,
10  walked through, no nothing, no problem.
11     Q.  [Interposing] And I'm going to ask you just
12  to keep your voice up.
13     A.  September 10th he visited my class again.
14  On September 11th Principal Dorcely visited my class.
15  At that time my co-teacher had--Ms. Fagan, who I co-
16  taught with--
17     Q.  [Interposing] Are you referring to
18  September 10th or September 11th, I'm sorry?
19     A.  September 11th.
20     Q.  Okay.
21     A.  Ms. Fagan came to me informing me that she
22  and the other social study teachers were planning on
23  doing something to commemorate the event of September
24  11th.  I informed Ms. Fagan that this is the first
25  topic in the social studies scope and sequence was

517

SEVERIN - DIRECT - MASSENA

1  SEVERIN - DIRECT - MASSENA
2  the scientific revolution.  But being that Mr.
3  Dorcely had informed me that I should not monopolize
4  the class, I should cooperate, I said, "Okay."
5      Q.  [Interposing] What do you mean by that, Dr.
6  Severin?
7      A.  In the previous school year Principal
8  Dorcely did mention how it's important that we
9  collaborate.
10     Q.  When you say we, what are you referring to?
11     A.  Myself, my co-teachers.  This is a
12  togetherness type of environment where it's not one
13  teacher leading while the other one is just observing
14  or being an unofficial substitute, so to speak, or
15  aid, and I've got time.  When Ms. Fagan made the
16  request I said sure, no problem.  But I had my lesson
17  plan regarding the scientific revolution.
18     Q.  Now let me ask you a question about this.
19  Was this directive something that was directed
20  towards you or all of the teachers in terms of how to
21  work with the co-teachers?
22     A.  It was all of us, the collaborative team
23  teaching, it's a model that in an ICT setting,
24  everyone is able to make recommendation to make
25  suggestions.  So when Ms. Fagan made the

518

SEVERIN - DIRECT - MASSENA

1  SEVERIN - DIRECT - MASSENA
2  recommendation, and I agreed, I basically took my
3  principal's directives and I followed it.  So when
4  Principal Dorcely walked in, in addition with Ms.
5  Barnett and Dr. Howell, Principal Dorcely--
6      Q.  [Interposing] Could you spell Dr. Owl?
7      A.  Howell--
8      Q.  Oh, Howell.
9      A.  Yeah, H-O-W-E-L-L.  When they walked in I
10  was standing in front of the room by the projector,
11  SMART Board, and Ms. Fagan was standing to the--
12  toward the window and there was a short video clip
13  showing.  Principal Dorcely came in, he asked me for
14  the lesson plan--no, he asked me to step outside.
15  When he asked me to step outside he asked me for the
16  lesson plan.  I walked back inside the room, I took
17  the lesson plan that I had on the scientific
18  revolution and I explained to him, I said, "Mr.
19  Dorcely, this is the lesson that I have.  According
20  to the scope and sequence this is the first item
21  covered in Global 3; however, Ms. Fagan asked me to
22  do this September 11th to commemorate September 11th.
23  And per your mandate, I'm basically following the
24  collaborative team teaching approach that you want."
25  He said "This is unacceptable."  I said, "Sir, this

519

SEVERIN - DIRECT - MASSENA

1  SEVERIN - DIRECT - MASSENA
2  is my lesson plan right here.  Ms. Fagan is basically
3  the one conducting this lesson."  He decided, I don't
4  want to hear it.  He walked away.  Ms. Barnett, Dr.
5  Howell, they left and Mr. Dorcely, they left the
6  class.  I was called in for disciplinary meeting; not
7  necessarily a post-observation, disciplinary meeting,
8  and I was informed that I had no agenda on the board,
9  I had no lesson plan.  And I informed Principal
10  Dorcely, I said, "Mr. Dorcely, here's my lesson plan
11  for that particular day.  Ms. Fagan was conducting
12  the September 11th lesson and it was at the very last
13  minute when she came in, she brought this idea to me,
14  but I was already prepared to conduct my own
15  instruction following the curriculum guideline.  In
16  addition, there was an agenda on the board.  We have
17  two sets of board; there's one board in front where
18  the projector was, and there's one in the back.  The
19  one in the back, that's where the agenda was written.
20  The agenda is written with the do now, how long it's
21  supposed to take, the mini-lesson, how long it's
22  supposed to take, the independent practice, the
23  shared, the homework, etc.  Everything is clearly
24  delineated on that board; however, Principal Dorcely
25  felt that he didn't see it on the board up front and

520

1       SEVERIN - DIRECT - MASSENA
2   he decided that he would write this letter, in that
3   letter, letting me know that I didn't have my lesson
4   plan and I didn't have an agenda on the board, which
5   was totally inaccurate.
6       Q.  Okay, Dr. Severin, I'd like to just go off
7   the record for a moment.
8           THE HEARING OFFICER:  Sure, let's go
9       off the record.
10          [OFF THE RECORD, Discussion]
11          [ON THE RECORD, Discussion]
12          THE HEARING OFFICER:  So let's go back
13      on the record.  Mr. Massena, are you ready to
14      continue your direct examination?
15          MR. MASSENA:  Yes.
16          THE HEARING OFFICER:  Please.
17      Q.  Dr. Severin, I believe we left off with
18  your describing an interaction between you and
19  Principal Dorcely in September 2015, correct?
20      A.  Yes.
21      Q.  And that was in regard to a lesson plan
22  that he had observed on September 11th?
23      A.  Yes.
24          THE HEARING OFFICER:  Can we just go
25      off the record for a quick moment?

521

1       SEVERIN - DIRECT - MASSENA
2           [OFF THE RECORD, Sidebar]
3           OFFICER:  Thanks so much.  Let's go
4       back on.  Mr. Massena.
5       Q.  Okay, Dr. Severin, you've had an
6   opportunity to review the specifications in this
7   case, is that correct?
8       A.  Yes.
9       Q.  Okay, and regarding Specification 12, which
10  states--which is in the record which states, "On or
11  about September 11th of 2015 respondent failed to
12  follow a directive plan given by administration to
13  have the following plan readily available upon
14  request of an administration and an instructional
15  objective, followed by a timestamp agenda, listing
16  the skill standards the lessons would be addressing
17  on the board, SMART Board."  Did you have a plan that
18  was readily upon request of an administrator?
19      A.  Yes.
20      Q.  Okay, and did you provide that plan to an
21  administrator?
22      A.  Yes.
23      Q.  How did you provide that plan to an
24  administrator?
25      A.  I showed it to--sorry.  I showed the lesson

522

1       SEVERIN - DIRECT - MASSENA
2   plan that I had on the scientific revolution to Mr.
3   Dorcely and explained to him that Ms. Fagan had asked
4   that we try something--I mean we do a different
5   lesson to commemorate the events of September 11th.
6       Q.  And so you submitted that lesson plan to
7   whom?
8       A.  I showed it to Mr. Dorcely but he did not
9   accept it, claiming that it was not what was being
10  shown on the SMART Board.
11      Q.  Okay, and why was it not what was being
12  shown on the SMART Board?
13      A.  Because Ms. Fagan came in and she asked
14  that we--her and her colleagues were preparing for a
15  lesson regarding September 11th and she wanted to do
16  that as well in our class.
17      Q.  Okay.  So--and then did you have an
18  instructional objective with a timestamp agenda
19  listing the skills and standards the lesson would be
20  addressing on the SMART Board?
21      A.  No, not on the SMART Board; it was on my
22  lesson plan regarding the scientific revolution and
23  the agenda was in the second blackboard in the back
24  of the room.
25      Q.  And is that blackboard visible to an

523

1       SEVERIN - DIRECT - MASSENA
2   individual who enters into the classroom?
3       A.  Yes.
4       Q.  Readily visible to an individual who enters
5   into the classroom?
6       A.  Yes.
7       Q.  Okay.  I'd like to--so after September 11th
8   of 2015, how would you describe your relationship
9   between you and Principal Dorcely?
10      A.  The relationship was extremely hostile.
11      Q.  How so?
12      A.  Principal Dorcely clearly demonstrated his
13  hostility on numerous occasions.  Case in point, on
14  September 17th when he called me in for my post-
15  observation, which I thought was going to be a post-
16  observation regarding the September 11th lesson,
17  after that meeting which turned out to be a
18  disciplinary meeting, Principal Dorcely walked,
19  followed behind  me from Room 105 all the way to my
20  room, down the hall which is about a good six to
21  seven classrooms, talking, harassing, taunting me,
22  telling me how this year I'm done and I'm gone, to
23  the point where we got in front of Room 128 he
24  threatened me, telling me he's going to, excuse the
25  arbitrator and members here, that he was going to

524

SEVERIN - DIRECT - MASSENA

1  fuck me up and this year that I'm done and I'm gone.
2  And I said--
3     Q.  [Interposing] When did this occurrence take
4  place?
5     A.  On September 17th.
6     Q.  Okay, and where did it take place?
7     A.  In the hallway in front of Room 128. But
8  prior to him making that statement he walked behind
9  me from Room 105 to my classroom 128, talking how
10  "This year I'm going to be on your back. Believe you
11  me you are gone, you are gone." So when I asked
12  Principal Dorcely, I said, "Are you threatening me?"
13  he informed me, "Yes, it's a threat." I said, "Are
14  you saying you're threatening me?" he said, "Yes,"
15  and then he walked away. What I did, I spoke with
16  one of my relative, my brother--
17     Q.  [Interposing] We'll get to that. Let me--
18  so this was in September of 2015?
19     A.  Yes.
20     Q.  So describe some of the other actions that
21  took place during the fall semester of 2015.
22     A.  Principal Dorcely was in my room literally
23  every day. Every day he came in, he observed me, but
24  he never gave me any feedback. The only time

525

SEVERIN - DIRECT - MASSENA

1  Principal Dorcely was not in my room was when I fell
2  ill and I was out for about seven days, and
3  immediately upon returning to work, Principal Dorcely
4  was in my room again. In addition to his constant
5  attendance in my room, I was constantly being called
6  in for disciplinary reasons. Sometime I would have
7  three or four disciplinary meetings in one day. Some
8  of--
9     Q.  [Interposing] This was all during the fall
10  semester of 2015?
11     A.  Yes.
12     Q.  I'd like to draw your attention to what's
13  been entered into evidence as Respondent's 9. Do you
14  recognize it?
15     THE HEARING OFFICER:  Just give us a
16  moment to get that exhibit. Ms. Kim, do you
17  have copies?
18     MS. KIM:  I think I'd like to back up
19  my--
20     THE HEARING OFFICER:  [Interposing]
21  Let's go off the record.
22     MS. KIM:  I apologize
23     [OFF THE RECORD, Review exhibit]
24     [ON THE RECORD, Review exhibit]

526

SEVERIN - DIRECT - MASSENA

1     THE HEARING OFFICER:  Okay, let's go
2  back on the record.  Mr. Massena, we have before
3  us now Respondent's Exhibit 9.
4     Q.  9, yes.  Do you recognize it?
5     A.  Yes.
6     Q.  Okay.  What is it?
7     A.  This is an email that--well, this is a
8  response that Michael Romano sent to me regarding an
9  email that I sent him documenting how Principal
10  Dorcely had intensified his retaliation towards me.
11     Q.  Why did you feel the need to send this
12  email?
13     A.  I was looking for someone to do something
14  to help, to remediate--to do something and help me
15  get some kind of reprieve.
16     Q.  Did that help finally come?
17     A.  No.
18     Q.  I'm going to show you what's been moved
19  into evidence as Respondent's 8.  Do you recognize
20  this document?
21     A.  Yes.
22     Q.  Okay.  And what is that document?
23     A.  This is an email that I sent to Michael
24  Prayor, the superintendent, asking him to somehow

527

SEVERIN - DIRECT - MASSENA

1  intervene on my behalf with regard to Mr. Dorcely's
2  aggression towards me.
3     Q.  And I'd like to show you also what's been
4  marked into evidence as Respondent's 7.  Do you
5  recognize that?
6     THE HEARING OFFICER:  Before we move
7  on to Respondent's 7, Respondent's 8 is already
8  in evidence.  I just want to make sure that I'm
9  reading the document correctly.  Dr. Severin,
10  when did you send this email?
11     DR. SEVERIN:  It says May 27th, 2015.
12     THE HEARING OFFICER:  Thank you.  Mr.
13  Massena, please continue.
14     Q.  Thank you.  And Respondent's 7, do you
15  recognize it?
16     A.  Yes.
17     Q.  And what is it?
18     A.  This is, prior to sending the second--
19  first email--I'm sorry.  I sent--this is my email to
20  Principal Prayor informing him that I filed a
21  complaint with the Special Commission of
22  Investigation.
23     THE HEARING OFFICER:  That's
24  Superintendent Prayor, correct?  You said--.

528

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2         DR. SEVERIN: Yes. .
3         THE HEARING OFFICER: --I believe you
4    said Principal Prayor. .
5         DR. SEVERIN: My apologies. Yes,
6    Superintendent Prayor. .
7         Q.  And what was the purpose of that email?
8         A.  To let him know that Principal Dorcely has
9    been very hostile towards me and I believe that
10   perhaps it is because--not perhaps, that has
11   something to do with my filing that complaint.
12        Q.  Did there come a time--withdrawn.  Was
13   there ever a cooling period instituted between you
14   and Dr.--you and Principal Dorcely?
15        A.  Yes.
16        Q.  Okay, when did that cooling period take
17   place?
18        A.  The exact date and time I do not fully
19   remember.  I believe it was around December 10th.
20        Q.  Of?
21        A.  December 2015.
22        Q.  Okay, could you describe to the arbitrator
23   what proceeded that cool--the cooling period being
24   instituted?
25        A.  After several attempts to reach out to the

529

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2    superintendent to see if I could get some relief from
3    the aggression of Mr. Dorcely, the District rep, Mr.
4    James Duncan, decided to intercede on my behalf and
5    spoke with the superintendent and asked him to find a
6    way to kind of allow for some kind of reprieve for
7    myself where I would be able to leave the school and
8    go somewhere else so we could be at peace.
9         Q.  And who was present at this cooling off
10   meeting?
11        A.  At that meeting, myself, Mr. Prayor, Mr.
12   James Duncan, Mark Satchell, the UFT rep., Mr. Moses
13   and Principal Dorcely.
14        Q.  Describe what took place at that meeting.
15        A.  At that meeting we were in one of the rooms
16   in the school wing, I think it was 142, and Mr.
17   Dorcely, I mean Mr. James Duncan decided to start the
18   meeting and inform everyone why we're there and how
19   he has recognized that there is conflict between
20   Principal Dorcely and I, and that in the interest of
21   both individuals, that we would try to find some kind
22   of answer, some kind of remedy where it would not be
23   confrontational.
24        Q.  And what, if anything, came out of this
25   meeting?

530

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2         A.  At the end of the meeting both the
3    principal--I mean the District rep and the
4    superintendent agreed that they would have this
5    cooling off where Principal Dorcely will cease his
6    aggression towards me and that we would maintain a
7    professional relationship and that I would be given
8    an opportunity to transfer to a different school.  At
9    that time, I went, I searched on the open--
10        Q.  [Interposing] So let me--before you get to
11   that, Dr. Severin.  So during this--what was the--was
12   there a time frame for this cooling period?
13        A.  Yes, from--again, I don't remember the
14   exact date but I have some about date which was
15   December 10th, 2015 to the end of the semester which
16   is normally January 30th or 31st, 2016.
17        Q.  And was that supposed to be the prescribed
18   period or the prescribed time period for the cooling
19   off period?
20        A.  Yes.
21        Q.  Did the cooling off period last for that
22   length of time?
23        A.  No, it did not.
24        Q.  What happened?
25        A.  On or about January 14th, 2016, please

531

SEVERIN - DIRECT - MASSENA

1    SEVERIN - DIRECT - MASSENA
2    pardon me if the date is slightly off, there was a
3    disciplinary meeting where Mr. James Duncan
4    represented me where Ms. Barnett, AP Barnett and
5    Principal Dorcely gave me several documents to sign.
6    After I signed those documents, as we agreed on
7    during the cooling off period meeting, at that
8    cooling off period meeting also Principal Dorcely was
9    to cease his attempt toward a 3020 as well. Following
10   me signing those letters that were given to me, at
11   the end Principal Dorcely said, "Cooling off period
12   is over, I'm still proceeding with the 3020-a" and
13   the observation and the aggression continues.
14        Q.  And when was--when did that conversation
15   take place?
16        A.  At the end of that meeting with myself and
17   Mr. Duncan.
18        Q.  And do you remember approximately what date
19   or time that took place?
20        A.  Again, I don't remember the exact date but
21   I believe vaguely that it was around January 14th.
22        Q.  Okay, and how did you react to that?
23        A.  My reaction was pretty much in disbelief;
24   however, Mr. Duncan felt that this was a man who did
25   not negotiate in good faith and decided that he would

532

SEVERIN - DIRECT - MASSENA

file a harassment Article 23 against Principal
Dorcely.  And that was--

Q.  [Interposing] Well let me just--before you
go into that, now after this meeting between you,
Principal Dorcely, and Assistant Principal Barnett,
what took place next?

A.  What took place, once Mr. Dorcely said that
a cease--the cooling off period ended and he
would continue his aggression, Mr. Duncan decided
that he would file an Article 23 on my behalf.

Q.  In terms of--let me specific, in terms of
your relationship and your interaction with Mr.--with
Principal Dorcely, what took place next?

A.  Oh, it was--it became extremely hostile.

Q.  How so?

A.  Practically breathing the air that's
natural to us was a disciplinary reason.  Constantly
I was walking on eggshells.  I was made to feel that I
was in an uncomfortable environment.  Principal
Dorcely has even gone as far as trying to coerce my
students into not following my class.  He allowed
children not to take my exam, informing the children
that they weren't learning anything in my class.
Children became very hostile towards me, trying to

533

SEVERIN - DIRECT - MASSENA

disrupt my class, which never happened before.  A
slew of actions took place that demonstrated that
administration somehow was targeting me.

Q.  So there came a point in time where you
were no longer at the school, correct?

A.  Yes.

Q.  How did that come about?

A.  On May 6th--on May 6th I walked into school
ready to move my card as I normally do every day.
Principal Dorcely met me in the hallway and escorted
me to the main office and informed me that here's a
letter, I've been reassigned, 3020 charges will be
coming forth, and I was asked to come to 100 Gold
Street and receive my reassignment.

Q.  As we said before, you've had an
opportunity to review the specifications, is that
correct?

A.  Yes.

Q.  In this particular case?

A.  Yes.

Q.  All right, I'd like to draw your attention
to Specification 1.  On or about April 4th of 2016
respondent signed out and left the school building
without approval at 12:20 p.m. and did not return to

534

SEVERIN - DIRECT - MASSENA

his post assignments, Period 7 prep and Period 8.
What is your response to that specification?

A.  On that particular day I fell ill.  I
approached Ms. Towns, whom I was instructed to speak
to without having to go through administration.  The
hostility from both Principal Dorcely and Ms. Barnett
was that if I had anything to say to them, I had to
inform the secretary or make an appointment with the
secretary and then she would relay the information to
them.

Q.  So by this period you were no longer
speaking directly to Assistant Principal Barnett and
Principal Dorcely?

A.  Correct.

Q.  Okay.  And your instructions were to do
what?

A.  To address Ms. Towns and she would inform
them, if needed.

Q.  And did you do so in this case?

A.  Yes.

Q.  Okay.  I'd like to draw your attention to
Specification 2 and--withdrawn, one moment.  And do
you know the reason why you were informed to address
Ms. Towns and not Principal Dorcely and Assistant

535

SEVERIN - DIRECT - MASSENA

Principal Barnett?

A.  Yes.  Principal Dorcely and Ms. Barnett one
time saw me in the hallway--

MS. KIM:  Objection.

THE HEARING OFFICER:  Well as to what
you saw, you were in the hallway with the two
individuals?

DR. SEVERIN:  Yes, I was in the
hallway--

THE HEARING OFFICER:  Fine, so
continue.

A.  I was in the hallway and Principal Dorcely
and Ms. Barnett accused me of saying inappropriate--
something that was rude or inappropriate.  I don't
know to what was it that was said but somehow they
never wrote me up or gave me a disciplinary letter
for that.  And I think as a result of that day they
determined that if I were to say anything to them I
had to speak to the secretary.

Q.  Now on or about--okay, now moving to
Specification 2, on or about February 5th of 2016, do
you recall that day?

A.  Yes.  When I look at the specs I--
specifications that were brought against me it says

536

SEVERIN - DIRECT - MASSENA

1  something--
2  Q. [Interposing] Well, I'm just asking if you
3  recall that day.
4  A. Yes, yes.
5  Q. And do you--withdrawn. In Specification 2,
6  which is in evidence, it states that "On or about
7  February 5th of 2016 the respondent failed to adhere
8  to the school cell phone policy when he allowed
9  students to use their cell phones during his Period 3
10 class." What is your response to this specification?
11 A. That is totally inaccurate. I was not--
12 Q. [Interposing] Could you please describe to
13 the arbitrator what took place on that day?
14 A. I was not even in the room. I was
15 conferencing with one of the students in my class, in
16 that particular class, outside of the office while my
17 co-teacher, Ms. Burlingame, was in the room. As I
18 was outside, Principal Dorcely was walking by. He
19 passed by me from the first window and then when he
20 got to the second window he looked into the
21 classroom. When he looked into the classroom he
22 entered the class and then he walked back outside
23 while I was still outside conferencing with the
24 student, and informed me that "Did you know that

537

SEVERIN - DIRECT - MASSENA

1  students had their cell phone out in my class?" I
2  informed him, I said, "Principal Dorcely, I'm not in
3  the room. There's no way of me to know that." And
4  he decided--and I said, "Ms. Burlingame is right
5  there." She should be the one addressing--he should
6  be addressing that to him, I mean to her. And he
7  decided to walk away and I received a letter later on
8  saying that I had to be disciplined and he gave me a
9  disciplinary letter for that.
10 Q. I'm directing your attention to
11 Specification 3, which is in evidence. On or about
12 December 25th, during Period 6, it states that you
13 failed, the respondent failed to attend and
14 participate in common planning meeting with the
15 social studies department. Before responding to
16 Specification 3, how would you describe the common
17 planning meetings at Urban Action Academy?
18 A. Common planning is a time where teachers
19 are supposed to be planning with one another,
20 especially if they have co-teachers. However, common
21 planning never really existed. Every time I attended
22 common planning I was always planning by myself.
23 Either my co-teachers were illegally doing IEP's at
24 that time, or doing something else, absent, on trips.

538

SEVERIN - DIRECT - MASSENA

1  I was constantly by myself during this common
2  planning.
3  Q. Just one moment.
4  THE HEARING OFFICER: Let's go off the
5  record. .
6  [OFF THE RECORD, Review]
7  [ON THE RECORD, Review]
8  THE HEARING OFFICER: Okay, so let's
9  go back on the record. Mr. Massena?
10 MR. MASSENA: Yes. At this time, I
11 would like this document marked for
12 identification as Respondent's 10.
13 THE HEARING OFFICER: Yes, that's
14 correct. I'll mark this for--
15 MR. MASSENA: [Interposing] I'm
16 handing a copy to Department.
17 THE HEARING OFFICER: I'll mark this
18 as Respondent's Exhibit 10 for identification.
19 Q. Mr.--Dr. Severin, I'm handing you what has
20 been marked for identification as Respondent's 10.
21 Do you recognize it?
22 A. Yes.
23 Q. Okay, and what do you recognize it to be?
24 A. This is an email from Ms. Fagan to myself.

539

SEVERIN - DIRECT - MASSENA

1  Q. Okay. And when is it dated?
2  A. It's dated March 22nd, 2015.
3  Q. Okay. And is it a fair and accurate copy
4  of the email that you sent to Ms. Fagan?
5  A. Yes. No, Ms. Fagan sent to me.
6  Q. Ms. Fagan sent to you. At this time, I'd
7  ask that this document be moved into evidence.
8  THE HEARING OFFICER: Any objection?
9  MS. KIM: Could I just note which
10 specification is this in reference to?
11 MR. MASSENA: This is in reference to
12 Specification 3. And also generally
13 Specification #5.
14 MS. KIM: I have no objection.
15 THE HEARING OFFICER: Respondent's 10
16 is in evidence.
17 Q. Okay, you described to the--withdrawn. You
18 sent an email to Ms. Fagan, is that correct?
19 A. Yes.
20 Q. And when did you send that email?
21 A. I sent that email on March 2015.
22 Q. Okay, and what was the purpose of sending
23 that email?
24 A. Basically asking them, we need to plan

540

SEVERIN - DIRECT - MASSENA

together.  It's not been happening.  We are given the
time, but somehow it's not being used.  It's very
frustrating.

Q.  Okay.  And what was Ms. Fagan's response?

A.  She replied that, you know, we were given
the time, as we agreed, but some of the
recommendations were not being addressed.

Q.  And when you spoke about--earlier in your
testimony you spoke about--you were describing the
common planning time.  Does this and your mood--
withdrawn.  And you were describing the common
planning time- does this email capsulate some of what
you were testifying to earlier?

A.  Yes.

Q.  How so?

A.  Basically, common planning was given to us,
that period, for us to come together, figure out some
of the best strategies, but somehow the other
teachers always had something else to do.  Ms. Fagan
in particular, she was always doing IEP.  She was
always meeting and doing other things, but she was
never really there.

Q.  Now, and when you say "never really there",
what do you mean by that?

541

SEVERIN - DIRECT - MASSENA

A.  She was never there to common plan.  She
was always doing something other than common
planning.

Q.  So, she--would she be in the room?

A.  She would be in the room, in the school,
but not planning with me.

Q.  And just to clarify- she would be in the
room during common planning time and during the
common planning time--withdrawn.  She would be in the
room during the time prescribed for common planning,
correct?

A.  Yes.

Q.  However, she was not common planning- is
that your testimony?

A.  Yes.

Q.  And is that consistent with many of the
teachers?

A.  Yes.

Q.  Okay, and are you also guilty of that on
occasion as well?

A.  Yes.

Q.  You've had an opportunity to also see what
is in evidence as Specification 5, correct?

A.  Yes.

542

SEVERIN - DIRECT - MASSENA

Q.  And in Specification 5, several dates are
listed, dates that you missed common planning time.

A.  Yes.

Q.  Okay.  Do many of those--withdrawn.  How
would you describe this listing of these dates that
you suppose that she supposedly missed during common
planning time?

A.  I never missed those common planning.

Q.  Why do you say that?

A.  Either I was being disciplined with Mr.
Dorcely or Ms. Barnett or when I would walk into
those meetings, I didn't sign in.  But I was always
there.

Q.  Now, in terms of the common--in terms--
withdrawn.  Principal Dorcely was at times present at
these common planning meetings.  Is that correct?

A.  Yes.

Q.  And so was Assistant Principal Barnett,
correct?

A.  It's either or.

Q.  Oh.

A.  Yes.

Q.  And by October of 2015, how would you
describe your relationship with them by this period

543

SEVERIN - DIRECT - MASSENA

in time?

A.  Oh, it was extremely toxic.

Q.  What do you mean by that?

A.  By October 20th 2015, Principal Dorcely had
already threatened to fuck me up.  He had already
informed me that this year I'm done and I'm gone.
And he had visited my class over 20 times and he had
never given me any feedback whatsoever.

Q.  When you say he visited your class over 20
times, during what particular period or timeframe are
referring to this 20 times?

A.  During second period, during my teaching,
especially period 1, 2, and 3.  He never gave me any
feedback except for the September 11th that he came
in, Ms. Fagan was conducting the lesson and that he
decided that he would write me up saying that I was
not prepared which was inaccurate.

Q.  And the room that the common planning
meetings are held, what type of a room is it?

A.  Prior to October 20th, common planning was
taking place in teachers' rooms.  In particular, in
my room I was given that time to plan on my own.  It
was not until October 20th, when the MOSL grading
needed to be completed, that Principal Dorcely asked

544

SEVERIN - DIRECT - MASSENA

teachers to go and grade the MOSL instead of
planning, instead of doing common planning, that is
became an issue.

Q. So--

A. [Interposing] Common planning became an
issue.

Q. So, the MOSL--when was the MOSL grading
period?

A. The MOSL grading began, if I'm not
mistaken, around the third week of October and we had
to be trained in the train--we had to be trained in
the grading.

Q. Where did the training take place?

A. In Room 104, if I'm not mistaken.

Q. Is that the same room where the common
planning time--

A. [Interposing] No.

Q. --needed to be taken? Okay.

A. No. At that time, there was no common
planning as described in the specification #5.

Q. Okay. And when did the common planning
time meeting as described in Specification 5 begin?

A. When Principal Dorcely wanted us, wanted
the teachers, to grade the MOSL- that's when he

545

SEVERIN - DIRECT - MASSENA

requested that all teachers attend Room 104 for the
common--for the purpose of grading the MOSL exam.

THE HEARING OFFICER:  Just for the
record, MOSL is M-O-S-L.

A. Measure of Student Learning, yes.

Q. Was the MOSL grading taking place at the
same time as the common planning time?

A. Yes, that--I guess you would call it--this
is what Principal Dorcely tried to call common
planning.

Q. So, what you're saying is that during
common planning time, common planning was not taking
place?

A. Correct.

Q. But what--

A. [Interposing] It was--it was the grading of
the Measure of Student Learning.

Q. Okay. And that took place for how long?

A. That took place during 6th period. And it
took a good two weeks, if I'm not mistaken. Their
attendance record should show that we worked on MOSLs
as opposed to actually planning for our students as
directed--as the whole common planning is described
as.

546

SEVERIN - DIRECT - MASSENA

Q. Okay, to grade MOSLs at that day, could you
describe to us whether or not that is a collaborative
effort?

A. No.

Q. Okay. I'd like to draw your attention to
Wednesday, November 11th of 2015. Does that date
stand out to you for any particular reason?

A. Yes.

Q. Why?

A. This is Veteran's Day.

Q. Okay, do you know whether you were marked
absent from the grading plan on--from the common--the
alleged common planning time meeting on that date?

A. Yes, I was marked absent but there was no
school on that day.

Q. Okay. I'd also like to draw your
attention, if you recall, the date of November 25th
2015.  Does that particular date have any relevance
to you?

A. Yes.

Q. Okay, how so?

A. That was Wednesday, the day before
Thanksgiving. At that time, we had Thanksgiving
gathering at the school. There were various

547

SEVERIN - DIRECT - MASSENA

festivities as far as the school having some
gathering to honor teacher. I received some award at
that meeting. And while I was at that meeting, I was
approached by Ms. Barnett, Principal Dorcely, and Ms.
Towns, giving me several documents to sign at that
meeting in, I mean, the most humiliating way. And
everybody who was in attendance who was there, they
could see that the way I was accosted, it was
awkward.

MS. KIM:  Objection.

THE HEARING OFFICER:  Alright,
sustained as to the latter part, as to what the
others may have -- [00:01].

A. At that time, I was accosted by the three
individuals asking me to sign this document and I
informed them, "Please allow me to read the
document." Principal Dorcely ended the gathering,
the party that was taking place, and sent all the
students back to their classrooms which was 8th
period. And at that time, I was further harassed and
followed to my class and forced to--and tried to
force to sign those documents. And I simply asked
them, "Please allow me to look at the document and
see what it is that I'm signing." At that time, when

548

SEVERIN - DIRECT - MASSENA

1  SEVERIN - DIRECT - MASSENA
2  I got to the room, they wanted me to sign and I said,
3  "I have students that I have to teach.  Am I going to
4  be relieved of that?"  So, Principal Dorcely sent all
5  the children home, dismissing their class before
6  time, and demanding that I sign the paper right
7  there.  I said, "Principal Dorcely, I never had a
8  problem signing.  I just want to be able to read the
9  content of these letters that I'm signing."  As--
10  Q.  [Interposing] Do you--go ahead.
11  A.  As I started looking at the letters to
12  sign, the fire drill--there was a fire drill which
13  was a rapid dismissal--the fire drill came in and
14  tried to force me to stay during the fire drill and
15  sign the paper.  And I informed them.  I said, "It's
16  a fire drill.  By law, I'm supposed to leave the
17  building and come back."  When I came back in, I'm
18  ready to sign and then the bell rang, dismissal.  I
19  asked them to allow me to look at the paper and
20  resubmit.  And everybody went home.  I took the
21  papers.  I read them, and on November 30th, I signed
22  them and turned them to Ms. -- [00:01].
23  Q.  Okay, so back to November 25th- was that an
24  early dismissal?
25  A.  Yes.

549

1  SEVERIN - DIRECT - MASSENA
2  Q.  How early was it?
3  A.  It was a rapid dismissal that the school
4  had.
5  Q.  What does that mean- rapid dismissal?
6  A.  In other words, from time to time when they
7  have fire drills, depending on the day, they could--
8  excuse me--they could have the fire drill at a time
9  when there's not much time left in the school day, so
10  students can just leave right after that, the
11  dismissal--I mean, the fire drill.
12  Q.  Okay.  And is that what took place on
13  November 4th--is that what took place on November
14  25th?
15  A.  Yes.
16  Q.  Okay.  The school-wide party, what time did
17  the school-wide party take place?
18  A.  It took place from 6th period through 8th
19  period, to the end of the day.
20  Q.  Okay, and 6th period is the time that the
21  common planning time takes place?
22  A.  Yes.
23  Q.  Correct?
24  A.  Yes.
25  Q.  Okay.  I'd like to draw your attention to

550

1  SEVERIN - DIRECT - MASSENA
2  Specification 4 which states that on or about
3  November 25th of 2015, you failed to adhere to school
4  policy or a written directive from school
5  administrators to keep one set of lights on in the
6  classroom during the viewing of a video or a movie.
7  What is your response to that specification?
8  A.  The light was off, but there was no
9  directive.  The principal came in and informed me
10  that- were you aware that your lights were off?  I
11  had explained to her--Principal Dorcely that my room,
12  as located, is to the south where the sun is directly
13  beaming on the room and when that happens, it's hard
14  for the students to see the smart board with the
15  video.  And as such, the best way to do it is to not
16  only bring down the shades, but to also turn off the
17  lights.  When Principal Dorcely came in taunting me
18  with this, with his colleagues where he was pointing
19  fingers, laughing at me through the window.
20  Afterwards, he decides to send me the email informing
21  me of the light.  And I was given that email as a
22  disciplinary conference, as a letter.
23  Q.  Okay.  I'd like to draw your attention to
24  Specification #6.  On or about November 12th 2015,
25  respondent left the school building during the school

551

1  SEVERIN - DIRECT - MASSENA
2  day without signing the teacher log in the school's
3  main office.  On November 12th of 2015, did you leave
4  the school building?
5  A.  No sir.
6  Q.  Okay.  Why would Principal Dorcely indicate
7  that you left the school building?
8  A.  I am unable to determine how but I know--
9  the only thing I can fathom is that because I'm
10  accustomed to leave during my lunch, he may have
11  guessed or assumed that because I didn't sign that
12  day, I left without signing, but there was no need
13  for me to leave without signing.  I understand
14  clearly.
15  Q.  When you say you understand clearly, what
16  do you mean?
17  A.  That that was something I've been doing.
18  That was -- [00:01] of us to sign out.  I've done it.
19  Q.  So you did not leave the building?
20  A.  No.
21  Q.  Okay.  Why didn't you sign the log-in
22  sheet?
23  A.  You only get to sign if you're leaving the
24  building.
25  Q.  So the reason why you didn't sign the log-

552

SEVERIN - DIRECT - MASSENA

1  SEVERIN - DIRECT - MASSENA
2  in book is--
3      A.  I didn't leave.
4      Q.  Okay.  Off the record please?
5          THE HEARING OFFICER:  Sure.  Let's go
6  off the record.
7          [OFF THE RECORD, break, 18:14]
8          [ON THE RECORD]
9          THE HEARING OFFICER:  Okay, let's go
10  back on the record.  Mr. Massena?
11      Q.  Okay, Dr. Severin, I'd like to draw your
12  attention to Specification #7.  On or about November
13  9th of 2015, respondent failed to follow a directive
14  given by administration to submit his mid-term exam
15  for feedback and review to administration.  Do you
16  have a response to that particular specification?
17      A.  The MOSL is not a teacher-administered.
18  It's a state exam.  But yet, Principal Dorcely felt
19  that I should've submitted the MOSL to him.  I'm not
20  responsible for the MOSL.
21      Q.  So, where does the MOSL get submitted?  Or
22  how is the MOSL administered?
23      A.  What I know is that the MOSL, Measure of
24  Student Learning, is an exam that is given to
25  students in the early part of the year and toward the

553

1  SEVERIN - DIRECT - MASSENA
2  end to determine whether or not students have
3  improved or not.  This particular exam, Principal
4  Dorcely wrote me up, failing to submit my midterm
5  exam, claiming that the MOSL is the midterm that I
6  should be given.
7      Q.  Is the MOSL a midterm exam?
8      A.  No, absolutely not.
9      Q.  Okay.  At this time, I'd like to point you
10  to--your attention to Specification 8.  On or about
11  November 4th of 2015, respondent permitted a student
12  to reenter the school building through exits 1 and 2
13  instead of entering through the main entrance where
14  the student would've been subjected to -- [00:01].
15  Now prior to your response, I'd just like to draw to
16  the attention to--Mr. Brown, to the arbitrator, that
17  the case of Andre versus Cadet -- [00:01] to self-
18  incriminate, Mr.--Dr. Severin, I'm just going to ask
19  you about the invest--the disciplinary meeting in
20  reference to Specification 8 and not the underlying
21  allegations regarding it.  Do you recall being drawn
22  into a disciplinary meeting regarding an incident
23  that allegedly took place on November 4th of 2015?
24      A.  Yes.
25      Q.  Okay, and who was present at that

554

1  SEVERIN - DIRECT - MASSENA
2  disciplinary meeting?
3      A.  Myself, Mr. Satchel, UFT representative,
4  Mr. Dorcely, and Ms. Barnett.
5      Q.  Okay, and those were the only individuals
6  present at that conference, correct?
7      A.  Yes.
8      Q.  Okay.  Were you shown a video of any sort?
9      A.  No.
10      Q.  Were there any other principals from any
11  other school at that particular meeting?
12      A.  No.
13      Q.  So the only individuals that you spoke to
14  or had an opportunity to confront with on these
15  allegations were Principal Dorcely and Assistant
16  Principal Barnett.  Is that correct?
17      A.  That is correct.  With Ms. Barnett, I don't
18  even remember if she was, but normally when we have
19  those meetings, she would be the one there.
20      Q.  Okay.  And again, not referring to the
21  underlying incident but primarily referring to the
22  disciplinary conference, at the disciplinary
23  conference, did Principal Dorcely state whether or
24  not he was present during the alleged incident on
25  November 4th of 2015?

555

1  SEVERIN - DIRECT - MASSENA
2      A.  Yes.
3      Q.  He state he was?
4      A.  Yes.
5      Q.  Okay.  And what about Principal--and what
6  about Assistant Principal Barnett?
7      A.  I--as I mentioned, most of our disciplinary
8  meetings were taken place with Ms. Barnett and
9  Principal Dorcely, but I don't remember Ms. Barnett
10  being there and saying anything.  But I wouldn't be
11  surprised if she was.
12      Q.  Okay.  Alright, I'd like to draw your
13  attention to Specification #9.  On or about October
14  23rd of 2015, respondent failed to contact the main
15  office and/or an immediate supervisor to inform them
16  of his absence.  What is your response to that?
17      A.  That is totally inaccurate.  On October
18  19th at 4 p.m., I called Subcentral and I requested
19  coverage for October 23rd and October 26th.
20      Q.  Okay.  And for a moment, I'd like to show
21  you what is the first page--and I'll show it to the
22  arbitrator and to DOE--the entire email, what is the
23  first page of a document which I'm seeking to put
24  into evidence.  However, I'm showing the entire
25  email, but I'm only seeking to put in the first page

556

SEVERIN - DIRECT - MASSENA

1  SEVERIN - DIRECT - MASSENA
2  of the document. I'd like it marked for
3  identification as Respondent #11.
4      THE HEARING OFFICER:  Okay, so
5  Respondent's 11. I just want to make sure I
6  understand what you're handing up.
7      MR. MASSENA:  Yes.
8      THE HEARING OFFICER:  You want the
9  entire document to be marked for identification,
10  but you're only offering the first page?
11     MR. MASSENA:  I'm only offering the
12  first--actually, I only want the first page
13  marked for identification. However, if there's
14  an objection, that's why I have the entire.
15     THE HEARING OFFICER:  Okay, so I'm
16  going to hand you back the balance. I have
17  before me a one-page document I'm going to mark
18  for identification as Respondent's Exhibit 11
19  for identification only.
20     Q.  And Dr. Severin, I am handing you what has
21  been marked for identification as Respondent's
22  Exhibit #11 and if you'll give me one moment, I'll --
23  [00:02]. You've been handed what has been marked for
24  identification as Respondent's #11. Do you recognize
25  it?

557

1  SEVERIN - DIRECT - MASSENA
2      A.  Yes.
3      Q.  What do you recognize it to be?
4      A.  An email, the daily docket which directs
5  teachers to contact Subcentral of any impending
6  absences.
7      Q.  Okay, and you received this particular
8  docket?
9      A.  Yes.
10     Q.  Okay, and--okay, you received this
11  particular docket. And when did you receive this
12  docket?
13     A.  It's a daily docket but the message is
14  constant regarding the contacting Subcentral.
15     Q.  Okay.
16     A.  Basically, this is how we're instructed to
17  inform admin.
18     Q.  Okay, very good.
19     MR. MASSENA:  I'd ask at this time
20  that this document be marked for identification-
21  -moved into evidence as Respondent's Exhibit 11.
22     THE HEARING OFFICER:  Any objection?
23     MS. KIM:  I do have an objection,
24  Arbitrator Brown. With respect to this
25  document, because it is just the first page of

558

1  SEVERIN - DIRECT - MASSENA
2  what looks like several pages of the email, I
3  would object on that grounds based on I'd like a
4  complete and accurate record of this particular
5  email. #2, it's based on relevance. The
6  charges for Specifications 9 and 10 deal with
7  his failure to contact the main office and/or an
8  immediate supervisor to inform them of his
9  absences. This only goes to directed by the
10  school telling teachers to contact Subcentral.
11  That has nothing to do with the teacher's
12  responsibility to also inform the school of any
13  absences. So, I would argue that this is not
14  relevant for the purposes of Specification 9 and
15  10.
16     THE HEARING OFFICER:  Alright, I would
17  have the Department argue that in its closing at
18  the appropriate time. I don't know that that
19  goes necessarily to the relevance of the
20  document. However, I can't help but notice--and
21  tell me if I'm wrong, Mr. Massena--that this
22  document is dated July 14, 2016 which post-dates
23  the two days in question reflected in
24  Specifications 9 and 10. Can you tell me why
25  this document dated July 14th 2016 is relevant?

559

1  SEVERIN - DIRECT - MASSENA
2      MR. MASSENA:  Actually, the--it is
3  dated October 26th 2015. It was email to me on,
4  I believe, July 14th 2016 after I had asked the
5  -I had asked the respondent to send it to me
6  several days before his testimony.
7      THE HEARING OFFICER:  I see, I see.
8      MR. MASSENA:  So, he finally--are we
9  off the record?
10     THE HEARING OFFICER:  No, we're on the
11  record.
12     MR. MASSENA:  Okay.
13     THE HEARING OFFICER:  That's fine. I
14  understand. From two, the two I myself,
15  Severin, is you, Mr. Massena? Are you
16  indicating that this is an--I just want to make
17  sure I understand what your representation is.
18     MR. MASSENA:  Oh. No, I'm sorry.
19  This is actually--yes, the representation is
20  that this is a document that I had asked the
21  respondent for quite some time ago.
22     THE HEARING OFFICER:  Okay.
23     MR. MASSENA:  The respondent hand
24  delivered the document to me this morning
25  without any further discussion and it appears

560

SEVERIN - DIRECT - MASSENA

1   
2   it's a document that he's--an email to himself
3   and then provided to me.
4   THE HEARING OFFICER:  Okay.  So, I see
5   now, and I've been directed to a different date
6   line which reads "October 26th 2015" which I
7   think addresses the relevance question with
8   regard to the timing of the email.  And I am
9   prepared to admit it into evidence.  There is,
10  however, another objection raised by the
11  Department that it's an incomplete document.  I
12  have reason to believe, Mr. Massena, that you
13  have the balance of the document.
14  MR. MASSENA:  Yes, I do.  And I will
15  just say for the record that the court is
16  familiar to the testimony that the DOE
17  representative has not been able to hear, is
18  familiar with this document which has already--
19  this type of document has already been put into
20  evidence which is called a daily docket.  And
21  the court is familiar with that as well.
22  THE HEARING OFFICER:  Do you just want
23  to share it with--
24  MR. MASSENA:  [Interposing] Sure, the
25  balance.  Absolutely.

561

SEVERIN - DIRECT - MASSENA

1   
2   THE HEARING OFFICER:  --with Ms. Kim?
3   MR. MASSENA:  Absolutely.  Ms. Kim,
4   thank you.
5   MS. KIM:  Arbitrator Brown, just in
6   the interest of completeness, I would like the
7   entire document to go into evidence.
8   THE HEARING OFFICER:  What's the
9   respondent's position on this?
10  MR. MASSENA:  The particular document
11  is simply put--being put into evidence, page 1,
12  is the relevant document as to this particular
13  testimony which goes towards counter -- [00:01]
14  directives by the principal--by Principal
15  Dorcely.
16  THE HEARING OFFICER:  So, respondent
17  is not inclined to offer the other pages of this
18  document.  Is that correct?
19  MR. MASSENA:  That's correct.
20  THE HEARING OFFICER:  Okay.  So, tell
21  me why, Ms. Kim, this first page is incomplete
22  without the balance of the document?
23  MS. KIM:  Just in terms of--as we
24  concede, this is a--based on what's printed,
25  it's approximately five pages of an email that

562

SEVERIN - DIRECT - MASSENA

1   
2   it looks like the school secretary emailed to
3   the administration and staff members and again,
4   my concern is just for the interest of making a
5   complete record.  I would like all five pages to
6   be entered into evidence instead of having just
7   a snippet of an email entered.
8   THE HEARING OFFICER:  Alright, I do
9   want to wind this up, but what I'm hearing from
10  respondent is that the reason Respondent's 11 is
11  being offered into evidence is because of the
12  notice it provided to the respondent with regard
13  to certain action or actions he should take that
14  are reflected on page 1.  And again, he was not
15  the only recipient of this email, one of among
16  many.  And my only question to the Department
17  again is- why is this particular page incomplete
18  without the other pages?  I'm really not
19  interested in cluttering up the record with
20  extraneous pages.
21  MS. KIM:  I have nothing else to add.
22  THE HEARING OFFICER:  Okay, that's
23  fine.  So, I'm going to admit Respondent's 11
24  into evidence as a one-page document.
25  (Whereupon Respondent's Exhibit 11 is

563

SEVERIN - DIRECT - MASSENA

1   
2   admitted into evidence)
3   Mr. Massena, -- [00:01] your witness.
4   MR. MASSENA:  Thank you.
5   Q.  So, did you receive this particular email?
6   A.  Yes.
7   Q.  And when you received that particular
8   email, what did you believe it to mean or how did you
9   interpret that email?
10  A.  This is instruction given to us.  If we
11  should be absent, what to do.
12  Q.  Okay.  I am--off the record for a moment,
13  please?
14  THE HEARING OFFICER:  Sure.  Let's go
15  off the record.
16  [OFF THE RECORD, break, 1:46 p.m.]
17  [ON THE RECORD, ?]
18  THE HEARING OFFICER:  Okay, Mr.
19  Massena?
20  MR. MASSENA:  Thank you.
21  Q.  Okay, I'd like to draw your attention, Dr.
22  Severin, to Specification #15.  On or about April
23  23rd of 2015, respondent failed to contact the main
24  office and/or an immediate supervisor to inform them
25  of his absence.

564

SEVERIN - DIRECT - MASSENA

1      MR. MASSENA:  At this time, I'd like
2 that this document be marked for identification
3 as Respondent's Exhibit #12.  I'm handing a copy
4 to the arbitrator and also to the Department.
5      THE HEARING OFFICER:  Okay, I'm going
6 to mark this as Respondent's Exhibit 12 for
7 identification.
8   Q.  Dr. Severin, I'm handing you what has been
9 marked for identification-- -- [00:01].  I'm going to
10 hand you what has been marked for identification as
11 Respondent's Exhibit #12.  Do you recognize it?
12   A.  Yes.
13   Q.  What do you recognize it to be?
14   A.  It's a phone log of myself calling
15 Subcentral on April 23rd.
16   Q.  Okay.  And what is the number for
17 Subcentral.
18   A.  It is 718--
19   Q.  [Interposing]  Actually withdrawn.  And is
20 this document a fair and accurate--withdrawn.  What
21 did you state this was again?
22   A.  This is a phone log.
23   Q.  Okay, and how did you acquire the phone
24 log?

565

SEVERIN - DIRECT - MASSENA

1   A.  It is my cellphone record of myself calling
2 Subcentral to request a sub, substitute teacher for
3 April 23rd.
4   Q.  And is it a fair and accurate copy of your
5 phone log?
6   A.  Yes.
7      MR. MASSENA:  Okay.  At this time, I'd
8 ask that this document be moved into evidence as
9 Respondent's Exhibit #12.
10      THE HEARING OFFICER:  Any objection?
11      MS. KIM:  Just a couple questions--
12      THE HEARING OFFICER:  [Interposing]
13 Sure.
14      MS. KIM:  --Arbitrator Brown.
15 VOIR DIRE
16 BY MS. DANA KIM:
17   Q.  Now, Mr. Severin, with respect to this
18 phone log, how did you create this phone log?
19   A.  I went to my cellphone account and
20 basically found the exact date in one of the--what do
21 you call that again?  The--not phone log, but the
22 account something, whatever they give you every
23 month.  I'm drawing a blank right now.
24   Q.  Your phone bill?

566

SEVERIN - VOIR DIRE - KIM

1   A.  Yes, thank you.
2   Q.  It's okay.
3   A.  Bill, yes.  Phone bill for that particular
4 month.
5   Q.  Okay.  And the entries that are contained
6 in here- they're all phone calls that you made from
7 your phone?
8   A.  Yes.
9   Q.  Your cellphone?
10   A.  Yes.
11   Q.  Okay, and in terms of this particular phone
12 log, how exactly did you create it so that you were
13 able to attach it to an email?
14   A.  Oh, I did a screenshot--I think that's what
15 it's called--and then I just emailed it to myself and
16 printed it because I was having some difficulties
17 with my printer.
18   Q.  Okay
19      MS. KIM:  I have no objection.
20      THE HEARING OFFICER:  Respondent's 12
21 is in evidence.
22      (Whereupon Respondent's Exhibit 12 is
23 admitted into evidence)
24 DIRECT EXAMINATION (RESUME)

567

SEVERIN - DIRECT - MASSENA

1 BY MR. ALAIN MASSENA
2   Q.  So, on April 23rd of 2016--2015, what did
3 you do that day?
4   A.  I called Subcentral and I requested a
5 substitute teacher for my absent that day.
6   Q.  Okay, and I--looking at Respondent's #12 in
7 evidence, what is the number for Subcentral?
8   A.  It is 718-935-6740.
9   Q.  And it appears that in Respondent's #12 you
10 called Subcentral four separate times.  Why did you
11 call four separate times?
12   A.  I had an emergency situation and ask the
13 situation progressed, I didn't know if I was going to
14 make it or if I was not.  And by the time I made
15 several--the first two or three attempts, I realized
16 that I was not going to be able to go to work that
17 day and that's when I made the last call to request a
18 sub.
19   Q.  And the actions that you took on April 23rd
20 of 2015 to report that you were not going to show up
21 to--that you were going to be absent from work, had
22 you taken to this practice on other dates?
23   A.  Yes.
24   Q.  And when do you take that, when do you do

568

SEVERIN - DIRECT - MASSENA

1
2  that?
3      A.  If a situation presents itself where you're
4  unable to go to work, you call in a sub and you give
5  the information to DOE and they email the school
6  informing them that--of your absent.
7      Q.  Okay.  Just one moment, Your Honor.  May we
8  go off the record for a second?
9      THE HEARING OFFICER:  Okay, let's go
10  off the record.
11      [OFF THE RECORD, break, 2:06 p.m.]
12      [ON THE RECORD, ?]
13      THE HEARING OFFICER:  Okay, let's go
14  back on the record.
15      Q.  Dr. Severin, I'm going to put before you
16  what has been moved into evidence as Department's
17  Exhibit #1.  Do you recognize it?
18      A.  Yes.
19      Q.  Okay, and I'd like to ask you to take a
20  look at Specification #13, 14, 16, 17, and 18.  How
21  would you best summarize the fact that these
22  specifications, these allegations were made against
23  you?  And you can take your time to review them in
24  whole, total.  But how would you best describe the
25  fact that these particular types of allegations or

569

SEVERIN - DIRECT - MASSENA

1
2  specifications were made against you?  How would you
3  characterize them?  Do you need me to repeat the
4  specifications I mentioned?
5      A.  Yes, please.
6      Q.  Okay.  And with the court's permission, I'm
7  going to just hand Mr.--Dr. Severin them as well.
8      THE HEARING OFFICER:  Okay.
9      Q.  Okay, 13, 15--withdrawn.  13, 14, 16, 17,
10  and 18.  As a whole, how would you best characterize
11  the fact that these particular specifications were
12  drawn against you?
13      A.  It's just pure aggression.
14      Q.  What do you mean by that?
15      A.  As I mentioned regarding the December 22nd
16  observation, we came back on January 5th which was
17  the first day of--after the winter break--second
18  period when Principal Dorcely brought me in and
19  informed me how ineffective my lesson was, despite
20  several of the students having turned in their
21  papers.  More than anything, I never--I didn't even
22  know about Specification 17, 18, or even 16 until
23  February 12th when I had the meeting with Mr. Duncan.
24  By that time, there was nothing that I could do that
25  was right in the school.  Students were doing well; I

570

SEVERIN - DIRECT - MASSENA

1
2  was still being written up, being rated ineffective.
3  I still didn't know the source of it and by the time
4  June came and the investigators came to the school
5  and Principal Dorcely -- [00:01] was interviewed by -
6  - [00:01].  Even something as simple as attaching a
7  file and the file not going through, I got written
8  up.  Meanwhile, every effort was made to adhere to
9  whatever mandate was given to me, but nonetheless, as
10  long as there was one glitch it was a disciplinary
11  meeting.
12      Q.  Did Principal Dorcely ever discuss a
13  counseling memo with you?
14      A.  No.
15      Q.  In the same -- [00:01] as the specification
16  11, how would you characterize that particular
17  specification being brought against you?
18      A.  Purely -- [00:02]
19      Q.  Dr. Severin I would like to at this time
20  ask the arbitrator that this particular document be
21  marked for identification as Respondent's 13.
22      THE HEARING OFFICER:  I will mark as
23  Respondent's 13 for identification.
24      Q.  You have been handed what is Respondent's
25  13, do you recognize it?

571

SEVERIN - DIRECT - MASSENA

1
2      A.  Yes.
3      Q.  What do you recognize it to be?
4      A.  This an e-mail that I sent to
5  Superintendent Prayor as well as a cc, carbon copy to
6  district representative James Duncan and it is
7  entitled grave concern regarding working environment.
8      Q.  When did you send this e-mail?
9      A.  On September 18, 2015.
10      Q.  Is this copy an accurate representation of
11  what was sent to Superintendent Prayor Michael?
12      MR. MASSENA:  At this time, I ask that
13  this document be moved into evidence.
14      THE HEARING OFFICER:  Any objection.
15      MS. KIM:  Just one second Arbitrator
16  Brown, I'm sorry.  Just a few voir dire
17  questions?
18      THE HEARING OFFICER:  Sure.
19      VOIR DIRE
20  BY MS. DANA KIM
21      Q.  Mr. Severin, so this is an e-mail, it looks
22  like you had sent or it's a -- [00:01] of something
23  that you had sent to SCI investigator -- [00:01]?
24      A.  Yes.
25      Q.  Then the paragraph on top of that is a

572

SEVERIN - VOIR DIRE - KIM

1   SEVERIN - VOIR DIRE - KIM
2   communication that you sent to the Superintendent Mr.
3   Prayor, correct?
4       A.  Yes.
5       Q.  Now looking at this one page document, this
6   is not the entire e-mail is that correct?
7       A.  Toward the bottom it appears that there is
8   more yes.
9       Q.  How many pages is it supposed to be?
10      A.  Depends on the page.
11      Q.  But there is at least one additional,
12  possibly more pages to this document?
13      A.  Yes, it appears so, yes.
14          MS. KIM:  I would object on that
15  ground [00:01] that it's not a complete e-mail
16  and my second ground is that the witness has
17  already testified at length about what Principal
18  Dorcely allegedly told him and I believe that
19  this e-mail is just merely cumulative of what he
20  has already testified about.  So I would object
21  on that ground that it's, again, Principal
22  Dorcely not the one on trial here.  This is
23  merely cumulative and all it could is clutter up
24  the record.
25          THE HEARING OFFICER:  Okay, so there

573

1   SEVERIN - VOIR DIRE - KIM
2   is a couple of issues one of them being that
3   it's an incomplete-e-mail.  Was it the
4   Respondent's intentions Mr. Massena to offer
5   both the e-mail to Dr. Prayor and the one below
6   to Mr. Ramono if I'm reading this correctly?
7           MR. MASSENA:  That is correct, however
8   we can -- [00:01] if necessary and it was my
9   understanding that this was pretty much the
10  entire e-mail.  It appears as if there is a
11  signing off please feel free to contact me
12  towards the end and it does say page one of one.
13  I just believe it's the manner in which it is
14  being printing.  It doesn't contain the whole e-
15  mail.
16          THE HEARING OFFICER:  I am as the
17  hearing officer, uncomfortable receiving the e-
18  mail to Mr. Ramono in its present form.  It does
19  not seem to be a complete e-mail and there may
20  be much that is relevant to the outcome of this
21  matter contained in that part which is cut off.
22  I am on the other hand prepared to accept the
23  top quarter or one-third of the page which
24  appears to be a complete e-mail from the
25  Respondent to the superintendent.  Tell me what

574

1   SEVERIN - VOIR DIRE - KIM
2   your preference is Mr. Massena if you wish to
3   offer as well the part below.  That is your
4   right, but we are going to need a complete
5   version of that e-mail.
6           MR. MASSENA:  I do not have a complete
7   version of that e-mail.  This is the only
8   version that I have.  So I will, at this time,
9   offer the first part of the e-mail.
10          THE HEARING OFFICER:  So what I'm
11  going to do is redact that part which appears
12  beginning RESCI case number 2015, 3600, I'm just
13  going to put an X through that part of the page.
14  I don't know Ms. Kim if you want to be heard
15  further with regard to any further objection,
16  but I am prepared to admit the top third of the
17  page as Respondent's Exhibit 13.  Anything
18  further Ms. Kim?
19          MS. KIM:  So just to be clear, Mr.
20  Massena you do not have, if you look at the
21  right hand side it looks like there is a scroll
22  button so there was additional words.  So you do
23  not have the full e-mail?
24          MR. MASSENA:  I do not.  If there is a
25  request by the Department, I can attempt to --

575

1   SEVERIN - VOIR DIRE - KIM
2   [00:01] it, but I do not have, this is what I
3   have.
4           MS. KIM:  I would like the full copy,
5   but I am mindful of your ruling regarding the
6   first third of this e-mail.
7           THE HEARING OFFICER:  There are a
8   couple of issues again.  I'm going to admit
9   Respondent's 13 into evident, only the top one
10  third of the page and regards to the balance of
11  the page, an email, apparently it's Mr. Ramono.
12  It's my understanding that a discovery demand
13  has been made by the Department on the
14  Respondent's to produce the full e-mail.
15          MR. MASSENA:  I will comply with the
16  demand.
17          THE HEARING OFFICER:  So Respondent's
18  13 as previously described is in evidence.
19          [Whereupon Respondent's Exhibit 13 is
20  admitted into evidence]
21  DIRECT EXAMINATION (RESUME)
22  BY MR. ALAIN MASSENA
23      Q.  Why did you send this e-mail Dr. Severin?
24      A.  Basically, that was to inform
25  Superintendent Prayor that Principal Dorcely had just

576

SEVERIN - DIRECT - MASSENA

1   SEVERIN - DIRECT - MASSENA
2   threatened me telling me that he was going to F me up
3   and this year I was done and I was gone.  I felt
4   threatened.  I felt that anything at any time any
5   moment a situation like that could escalate further.
6   Also as a result of this, filed a police report
7   informing the authorities that Principal Dorcely had
8   threatened me.  Later on the harassment charges was
9   filed against Principal Dorcely.  It was investigated
10  by a joint team consisting of the DOE and the UFT.
11      Q.  Well before we get to that, I just have a
12  few more questions for you regarding and at this time
13  I would like to have this Respondent's 14 in
14  evidence.  I'm handing a copy to the Arbitrator and
15  also to the Department.
16      THE HEARING OFFICER:  Alright, so I'm
17  marking this as Respondent's 14 for
18  identification.
19      Q.  Do you recognize this?
20      A.  Yes.
21      Q.  What do you recognize it to be?
22      THE HEARING OFFICER:  Are you looking
23  to offer this into evidence?
24      MS. MASSENA:  Yes.
25      THE HEARING OFFICER:  Is there any

577

SEVERIN - DIRECT - MASSENA

1   SEVERIN - DIRECT - MASSENA
2   objection to the Respondent's CV being admitted
3   into evidence?
4       MS. KIM:  I don't believe so.
5       THE HEARING OFFICER:  Do you want to
6   take an additional moment or two to consider it?
7   There's no rush.
8       MS. KIM:  If I could just ask like a
9   couple of voir dire.  It shouldn't be a problem.
10      THE HEARING OFFICER:  Certainly.
11  VOIR DIRE
12  BY MS. DANA KIM
13      Q.  Mr. Severin this is a copy of your resume?
14      A.  My curriculum -- [00:01], yes.
15      Q.  When did you create this document?
16      A.  This is a document that has been created a
17  while, but constantly gets updated.
18      Q.  When is the last time you updated this
19  document?
20      A.  This, if you don't mind, looking, this
21  documented April 2016, as one of the last conferences
22  that I attended and presented document on.  So I'm
23  assuming it's after that date because I normally
24  whenever I do any conferences I usually add to it and
25  update it.

578

SEVERIN - VOIR DIRE - KIM

1   SEVERIN - VOIR DIRE - KIM
2       Q.  The conference that you are mentioning, I'm
3   sorry, is it the first one on the second page?
4       A.  Yes.
5       Q.  Okay, got it.
6       MS. KIM:  I have no objection.
7       THE HEARING OFFICER:  Respondent's 14
8   is in evidence.
9       [Whereupon Respondent's Exhibit 14 is
10  admitted into evidence]
11  DIRECT EXAMINATION (RESUME)
12  BY MR. ALAIN MASSENA
13      Q.  Dr. Severin just describe before we
14  conclude, describe for the arbitrator what the last
15  two years at the Urban Action Academy, what has it
16  been like for you?
17      A.  In a single word, I could say hell.  I have
18  never experienced such hostile working environment,
19  so much harassment.  Working condition was --
20  [00:01].  It was not a pleasant year and a half, two
21  years for me at all.
22      Q.  What do think was the genesis of created
23  this living hell for you?
24      A.  I believe that the fact Principal Dorcely
25  asked me to look to see where this young lady could

579

SEVERIN - DIRECT - MASSENA

1   SEVERIN - DIRECT - MASSENA
2   get grade from after I pointed to him where he give
3   her the pencil to write and recoiled.  I believe
4   somehow that may have been interpreted as a rejection
5   of his cheating and as such I believe in my
6   estimation that Principal Dorcely must have felt
7   embarrassed that I recognized that he was dishonest
8   and that he could not continue seeing me in his
9   building and as such he tried to push me out and when
10  I reported him he decided to retaliate.
11      Q.  Have you learned of any other allegations
12  by teachers at Urban Action Academy regarding
13  cheating or alleged cheating by Principal Dorcely?
14      MS. KIM:  Objection?
15      THE HEARING OFFICER:  Mr. Massena what
16  could the relevance possibly be?
17      MR. MASSENA:  Dr. Severin has
18  testified as to a particular incidence and the
19  question is to find out whether or not he has
20  learned of any other allegations of cheating.
21      THE HEARING OFFICER:  I'm sustaining
22  the objection.
23      Q.  What would you like the arbitrator to do in
24  this particular hearing?
25      MS. KIM:  Objection.

580

SEVERIN - DIRECT - MASSENA

THE HEARING OFFICER: It's an unusual question Mr. Massena. I'm not fully understanding the context of a 30-20A proceeding.

Q. What would you like to have happen at the end of this proceeding?

MS. KIM: Objection.

THE HEARING OFFICER: I'm going to allow you to ask the question. I believe I'm going to allow you to ask the question, but I do need you to rephrase it.

Q. After this proceeding is over what do you want to do with the rest of your professional career?

A. At the conclusion of this, it is my hope that I will be able to go and continue to teach, making a difference in young children's life. I enjoy my profession. I look forward to work with children, making them better academically, socially, personally. I have committed about 20 years into this profession. I have been very successful at it. I understand this is not a competency case, however, I am highly competent in my profession and I will look forward to be back in the classroom.

THE HEARING OFFICER: Mr. Massena?

581

SEVERIN - DIRECT - MASSENA

MR. MASSENA: No further questions.

THE HEARING OFFICER: Cross examination?

MS. KIM: Yes.

CROSS EXAMINATION
BY MS. DANA KIM

Q. Good afternoon Dr. Severin.

A. Good afternoon.

Q. If there is a question that you don't understand, please let me know and I will try to rephrase, okay?

A. Yes.

Q. You had been a teacher at Urban Action Academy for how long?

A. Two years. Two academic school years.

Q. Prior to that, where were you?

A. I was at BCAE, Business, Computer, Application and Entrepreneurship which is in Cambria Heights.

Q. Your area of specialty is social studies?

A. Yes.

Q. While you were at Urban Action Academy which grades did you teach?

A. Nine through twelve.

582

SEVERIN - CROSS - KIM

Q. You mentioned that you were the, for that school, for Urban Action you were the UFT -- [00:01] correct?

A. Initially, yes.

Q. For what time period were you the chapter chair?

A. From September to October.

Q. September to October of which year?

A. 2014.

Q. So September 2014 to October 2014?

A. Yes.

Q. So you were the chapter chair for approximately two months?

A. Yes.

Q. The chapter chair immediately following was Mr. Satchell?

A. Yes.

Q. I believe Mr. Satchell testified that he was elected to that position, correct?

A. Yes.

Q. Is that accurate, he was elected?

A. Yes.

Q. How did you become the -- [00:01] chapter chair at Urban Academy?

583

SEVERIN - CROSS - KIM

A. I was elected.

Q. By elected, it would be the other union members or teachers at your school, correct?

A. Yes.

Q. Why is it that you were the UFT chapter chair for only two months?

MR. MASSENA: Objection your honor.

THE HEARING OFFICER: Ms. Kim what's the relevance?

MS. KIM: This is going, I'm going to -- [00:01] into an issue that he raised on direct examination regarding Principal Dorcely and parking passes which this witness testified about.

THE HEARING OFFICER: I'm going to permit the question, overruled.

A. Please repeat?

Q. Why is it that you were the UFT chapter chair for only two months at Urban Academy?

A. After the second month I realized that there was some friction between myself and Principal Dorcely and in the capacity as chapter leader, we would consistently be interacting and I didn't see that interaction to be productive. It was already

584

SEVERIN - CROSS - KIM

2  becoming hostile.  So therefore I resigned my
3  position and held election and Mr. Satchell was
4  elected.
5      Q.  So the allegation that you reported SCI
6  regarding Principal Dorcely allegedly asking you to
7  cheat, when did you report that?
8      A.  That was reported in the spring of 2015.
9      Q.  Approximately when?
10     A.  Approximately April.
11         THE HEARING OFFICER:  Spring of what
12  year sir?
13     A.  2015.
14     Q.  You testified that in terms of reporting
15  it, you did not report that allegation immediately,
16  correct?
17     A.  Correct.
18     Q.  As a matter of fact you waiting until
19  someone else advised you that you should report it,
20  correct?
21     A.  Correct.
22     Q.  When did the actual incident that you
23  alleging happened between Principal Dorcely and the
24  student take place?
25     A.  August 2014.

585

SEVERIN - CROSS - KIM

2      Q.  It was after this incident on August 2014,
3  the next school year 2014/2015 is when you became the
4  chapter chair, correct?
5      A.  No.  The incident happened August 2014 when
6  we came to school in September 2014, that's when I
7  was elected.
8      Q.  That what I meant, the next school year
9  2014/2015 you became the chapter chair?
10     A.  Oh yes, yes okay.
11     Q.  Now when you were the UFT chapter chair,
12  you had several responsibilities including parking
13  passes right?
14     A.  Yes.
15     Q.  It was your responsibility to disseminate
16  parking passes to the members, correct?
17     A.  Yes.
18     Q.  With respect to these parking passes, they,
19  back when you were the chapter chair there was
20  parking passes were distributed via a lottery,
21  correct?
22     A.  Yes.
23     Q.  You were in charge of that lottery process,
24  correct?
25     A.  Yes.

586

SEVERIN - CROSS - KIM

2      Q.  Can you describe for us what that lottery
3  process entailed?
4      A.  Basically, all the members they submit,
5  they write their name into a lottery and those names
6  are pulled out and whomever is pulled will receive a
7  parking permit.
8      Q.  That's the process that took place when you
9  were the chapter chair, correct?
10     A.  Yes.
11     Q.  With respect to that lottery process, did
12  you not make an allegation saying that Principal
13  Dorcely withheld one, that he kept one for himself?
14     A.  Yes.
15     Q.  Isn't it true that with respect to the
16  lottery process there was some teachers who
17  complained about how the process unfolded?
18     A.  No.
19     Q.  Do you recall there was a teacher who
20  actually won a parking pass through the lottery
21  system, but because she didn't have a car she wanted
22  to give it to another teacher Mr. -- [00:01]?
23         MR. MASSENA:  Objection your honor.
24         THE HEARING OFFICER:  I'm going to
25  allow some -- [00:01] it's overruled.

587

SEVERIN - CROSS - KIM

2      A.  That is a clear lie by Mr. Dorcely.
3      Q.  Okay, sir, so it's not your recollection
4  that, that is what happened?
5      A.  That did not happen.
6      Q.  But there is a Mr. -- [00:01] who teaches
7  at the school?
8      A.  Yes.
9      Q.  Isn't true that instead of the principal
10  being the one withholding a parking pass, you're the
11  one who withheld it correct?
12     A.  That is not true.
13     Q.  So that's not true correct?  That was the
14  question.
15     A.  May I answer the question?
16     Q.  No, it's a yes or no question sir.
17     A.  That is not true.  Principal Dorcely held
18  the parking permit.
19     Q.  Okay, so didn't you and Mr. -- [00:01] have
20  a conflict because you refused to give that parking
21  pass to him?
22     A.  No.
23     Q.  Okay, so that never happened?
24     A.  No.
25     Q.  Isn't true that because of the lottery

588

SEVERIN - CROSS - KIM

process and there were teachers who were upset with
how it unfolded, that is why you stepped down as
chapter chair?

A. No.

Q. For the 2014/2015 school year, again, you
reported to SCI on the advise of, was it Mr. Mann?

A. Yes.

Q. You reported that allegation against
Principal Dr. Dorcely around the spring time or April
2015 correct?

A. Yes.

Q. Isn't true for the 2014/2015 school year
for that school year the principal, Principal Dorcely
gave you an effective rating?

A. Did you say effective or ineffective?

Q. Effective, correct.

A. Effective, yes. He didn't give me, I
earned an effective.

THE HEARING OFFICER:  Your job here is
to answer the questions asked by the
Department's counsel.

Q. So your answer is Principal Dorcely did
give you an effective rating for 2014/2015?

A. Yes.

589

SEVERIN - CROSS - KIM

Q. Now with respect to, just one moment
please. You mentioned that at some point because the
relationship between you and the principal got so
hostile, he and AP Barnett no longer wanted to
interact with you and that you were instead directed
to speak with Ms. Towns, the payroll secretary?

A. Yes.

Q. Who told you that you were supposed to
interact with her and not with your direct
supervisors?

A. Mr. Dorcely.

Q. When did he tell you?

A. Verbally. He didn't put it in writing. He
basically informed me--

Q. My question to you was when did he tell
you?

A. I don't have an exact date.

Q. Was it during the 2014/2015 school year?

A. It was in the 2015/2016.

Q. Okay, so you don't recall when he said this
to you?

A. The exact date, no, but it was early in the
year around September.

Q. You said he said it to you verbally?

590

SEVERIN - CROSS - KIM

A. Yes.

Q. Where were you when he said it?

A. I was in the main office asking him for my
computer and he informed me speak to Ms. Towns, the
secretary and ask her what I need and she will relay
it to him.

Q. So this is in the main office where the
principal was there, you were there, Ms. Towns was
there?

A. Yes.

Q. Who else was in the office at that time if
there was anyone else?

A. I don't remember.

Q. Other than what you just said the principal
said to you at that time?

A. Yes.

Q. Did he say anything else at that time?

A. It was regarding the computer that I needed
and he say okay we are going to look for your
computer which I never received.

Q. But other than that, he did not say
anything else?

A. No, not that I remember. It was mainly
about that.

591

SEVERIN - CROSS - KIM

Q. At that time, what you were seeking to
address with him was your computer?

A. Yes.

Q. While a teacher at Urban Action Academy for
both school years, you have attended the
faculty/staff meetings that happened right before the
school year starts, correct?

A. Yes.

Q. You were here when the principal and the
assistant principal testified and I believe through
one of those witnesses the staff handbooks for the
2014/2015, 2015/2016 school years were entered into
evidence, correct?

A. Yes.

Q. You received copies of both handbooks,
correct?

A. Yes.

Q. When you received it, you signed a sheet
saying I acknowledge received, correct?

A. Yes.

Q. You knew back then when you received those
handbooks that it was your responsibility to read
what is the handbooks correct?

A. Yes.

592

SEVERIN - CROSS - KIM

Q. As the UFT chapter chair and as a long time UNT member you are aware that any directives that are given by any administrator must be followed, correct?

A. Yes.

Q. Even if they violate the contract you have to follow it and then leave later?

A. Yes.

Q. With respect to this case there were many disciplinary meetings that either the principal or assistant principal held with you and a union rep, correct?

A. Yes.

Q. As a result of those meetings, letters to file were placed in your file, correct?

A. Yes.

Q. Of the letters to file that were discussed at this hearing and were entered into evidence, you never submitted a rebuttal for any of them, correct?

A. Correct.

Q. You as a former UFT chapter chair and a long time union member, you know that you have the right to submit rebuttals to any letters to file, correct?

A. Yes.

593

SEVERIN - CROSS - KIM

Q. Now with respect to teachers, staff members of the school, isn't it true that the protocol is that a staff member or an administrator sets foot off the campus, you have to sign out?

A. Yes.

Q. Again, that applies not only to teachers, but to Principal Dorcely, AP Barnett, correct?

A. I don't know that.

Q. But for teachers you definitely are aware of that correct?

A. Yes.

Q. With respect to chancellor's regulations as a long time member you are aware of their various different type of chancellor's regulations, correct?

A. Yes.

Q. And you know it's your responsibility to read up on them and be aware of what the regulations are?

MR. MASSENA: Objection your honor.

THE HEARING OFFICER: What's the basis of your objection?

MR. MASSENA: I think the question is over broad in terms of the chancellors. Is she referring to a specific chancellor's regulation

594

SEVERIN - CROSS - KIM

or the -- [00:01]

THE HEARING OFFICER: Overruled.

A. Yes.

Q. With respect to at Urban Action Academy there is a document that the school disseminated to all staff members regarding students cellphone usage, correct?

A. Yes.

Q. Is it your understanding that when it comes to cellphones, students are allowed to bring their cellphones, but they are not supposed to use it during class time, correct?

A. Correct.

Q. For the 2014/2015 school year, did you have a co-teacher then?

A. Yes.

Q. Who was the co-teacher?

A. I had Ms. Fagan, Mr. Zaike, that's it, those two.

Q. For Ms. Fagan, which part of that 2014/2015 school year was she your co-teacher?

A. Both.

Q. Then Mr. Zaike, how do you spell his name?

A. Z, as in zebra A-I-K-E.

595

SEVERIN - CROSS - KIM

Q. For Mr. Zaike, for what part of the 2014/2015 school year?

A. Both.

Q. So you had two co-teachers?

A. For different classes. Ms. Fagan, Can I elaborate?

Q. Please.

A. Ms. Fagan, for my global classes with students with special needs and Mr. Zaike for the ELL students.

Q. What is ELL?

A. English language learners.

MR. MASSENA: I would just ask for a spelling of Zaike.

THE HEARING OFFICER: I think we did it for the record.

MR. MASSENA: We did it, okay.

THE HEARING OFFICER: Do you need it for your notes? Go ahead.

A. Z-A-I-K-E.

Q. Dr. Severin, you testified at length about common planning meetings, correct?

A. Yes.

Q. Those are actually contractually mandated,

596

SEVERIN - CROSS - KIM

1  correct?
2     A. Correct.
3     Q. Attendance is mandatory?
4     A. Correct.
5     Q. Now you mentioned previously, you talked
6  about there was an allegation regarding you not
7  having submitted your midterm examinations, correct?
8     A. Correct.
9     Q. That was back in the last school year that
10 we finished 2015/2016, correct?
11    A. Correct.
12    Q. So it's your testimony and correct me if
13 I'm wrong, you said that the midterm exam was the
14 state mandated Mosul, correct?
15    A. Principal Dorcely wrote me up--
16    Q. [Interposing] My question to you, midterm
17 exam was that, it was the state Mosul exam, correct.
18    A. Principal Dorcely, yes.
19    Q. Now with respect to the Mosul exam, isn't
20 it true that all teachers have to administer the
21 Mosul exam?
22    A. Yes.
23    Q. So you as a social studies teacher had to
24 administer the Mosul to your students, correct?

597

SEVERIN - CROSS - KIM

1     A. Yes.
2     Q. Just going back to 2015/2016, for this
3  previous school year, who were your co-teachers?
4     A. Ms. Fagan and Ms. Burlingame.
5     Q. Was it the same sort of the arrangement
6  where both teachers, you had them for the entire
7  school year just for different periods?
8     A. Classes, yes.
9     Q. Now for this Mosul that you say that was
10 administered, it was roughly around November of last
11 year, correct?  2015?
12    A. Yes.
13    Q. With respect to the Mosul, again, you
14 administered the Mosul for your students correct?
15    A. Correct.
16    Q. For the last school year, 2015/2016, which
17 grades did you teach?
18    A. Tenth grade global as well as
19 constitutional law and criminology.
20    Q. When you administered the Mosul, it was for
21 those subjects and for your tenth grade students?
22    A. No, it was just for the global.
23    Q. When you are administering the Mosul exam,
24 tell us what you have to do when you are

598

SEVERIN - CROSS - KIM

1  administering that particular exam?
2     A. Basically, administration has different
3  personnel deliver the exam in stock and I'm supposed
4  to sort them out according to who is in the classroom
5  and it is presorted where if there are twelfth
6  graders in the class, there are twelfth graders exam
7  and I have to make sure that I disseminate, I assign
8  the right grade to each student.
9     Q. So when you were administering the Mosul
10 exam, isn't it also true that you were proctoring the
11 students?
12    A. Yes.
13    Q. Meaning you are the individual responsible
14 for making sure the students aren't cheating on the
15 exam, they are not talking to each other and making
16 sure that the exam that is administered properly,
17 correct?
18    A. Yes.
19    Q. For that Mosul, in November 2015, it was
20 your responsibility to make sure that it was
21 administered properly, correct?
22    A. Yes.
23    Q. In terms of that Mosul exam, what was the
24 format of the exam?  Was it multiple choice, was it

599

SEVERIN - CROSS - KIM

1  something else?
2     A. I think it's a combination of both.  Are
3  you, may I ask--
4        THE HEARING OFFICER:  If you are not
5     clear about the question just say you are not
6     clear.
7     A. Okay, I'm not clear.  Are you asking me
8  content of the exam?
9     Q. Not the content, but the format?  Is it
10 multiple choice where you bubble in or is it
11 something else?
12    A. Combination of both often times.
13    Q. There is also a writing portion?
14    A. Yes.
15    Q. For this particular Mosul exam in November
16 of 2015, do you remember what the format was?
17    A. A combination of writing and multiple
18 choice.
19    Q. When you administered that Mosul exam, how
20 long did it take?
21       MR. MASSENA:  Objection your honor --
22    [00:01].
23       THE HEARING OFFICER:  Ms. Kim there is
24 an objection on the grounds of relevance.  There



600

1 SEVERIN - CROSS - KIM
2 is the specific charge specifically
3 specification seven speaks to the Respondent's
4 failure to follow directive to submit his
5 midterm exam for feedback and review. Tell me
6 how the administration of the exam is relevant?
7           MS. KIM: I will withdraw that
8 question and I will speed it along.
9     Q. Now once the students were finished with
10 that Mosul exam, didn't they turn in the multiple
11 choice and the writing portion to you, correct?
12     A. Yes. I think it's a single booklet. It's
13 not two different.
14     Q. So whatever they were working on for the
15 exam, they handed that to you, correct?
16     A. Correct.
17     Q. You as the proctor and the administrator of
18 that Mosul exam for this class, wasn't it your
19 responsibility to submit it to the administration?
20     A. Administration sent personnel again to come
21 and collect them.
22     Q. Okay, but it was your responsibility to
23 make sure that the exam was submitted, correct?
24           MR. MASSENA: Objection, asked and
25 answered.

601

1 SEVERIN - CROSS - KIM
2           THE HEARING OFFICER: I will permit
3 the question.
4     A. Repeat please?
5     Q. It was your responsibility to make sure
6 that the exams were submitted, correct?
7     A. To administration?
8     Q. Yes.
9     A. It was collected and it was collected by
10 the person that was responsible to do that, yes.
11     Q. Who was that person?
12     A. I don't remember who exactly it was, but
13 the protocol is the same person who delivered the
14 exam to be given to the students, would go around
15 collecting them.
16     Q. So it's your testimony that once the
17 students finish their exam, you gave it to this
18 person, correct?
19     A. Correct.
20     Q. Do you know if this person actually gave it
21 to the administration?
22     A. You are asking me to determine--
23     Q. [Interposing] Do you know, to your
24 knowledge do you know if in fact the students midterm
25 exams were submitted to the administration.

602

1 SEVERIN - CROSS - KIM
2     A. I trust that it was, yes.
3     Q. But you don't know.
4     A. I don't know what other people do mam.
5           THE HEARING OFFICER: Can we go off
6 the record for a moment?
7           [OFF THE RECORD, 2:45:10]
8           [ON THE RECORD]
9           THE HEARING OFFICER: Alright, so we
10 are back on the record having cleared up a
11 matter that I believe required some additional
12 clarity. Ms. Kim are you ready to continue?
13           MS. KIM: Yes. Arbitrator Brown is
14 Dr. Severin still under oath?
15           THE HEARING OFFICER: Yes.
16     Q. Thank you. Dr. Severin as a teacher at
17 Urban assembly, each teacher is responsible for
18 administrating a midterm exam and a final exam for
19 each semester, correct?
20     A. Yes.
21     Q. For the previous school year 2015/2016
22 isn't it true that the teachers had to administer a
23 midterm exam in about November of 2015?
24     A. Yes.
25     Q. In terms of midterm exams, each teacher,

603

1 SEVERIN - CROSS - KIM
2 isn't it true that each teacher when they formulate a
3 midterm exam before they administer it to their
4 students, each teacher has to submit the exam to an
5 administrator for review and feedback, correct?
6     A. Correct.
7     Q. For the November 2015 midterm exam, you did
8 not do so, correct? You did not submit a midterm
9 exam for review and feedback to an administrator,
10 correct?
11     A. No.
12     Q. So your answer is no?
13     A. May I be allowed to answer?
14           THE HEARING OFFICER: I think it's a
15 yes or no question Dr. Severin. You can have
16 counsel to ask you additional questions at the
17 end of the cross examination.
18     A. Yes sir.
19           THE HEARING OFFICER: Do you have an
20 answer on the record to your question, the yes
21 or no answer?
22     Q. I just want to clarify. So the answer is
23 no you did not submit a midterm exam for review and
24 feedback to an administrator correct?
25     A. It was submitted.

604

SEVERIN - CROSS - KIM

1
2    Q. But you just testified no that you didn't.
3    A. I'm sorry. The question you are asking is
4  a yes or no, right, but remember I have co-teacher.
5  It was submitted to the principal.
6    Q. I'm talking about the midterm exam. So
7  it's your testimony that you submitted the midterm
8  exam to the principal for review and feedback prior
9  to your administering that exam to your students? Is
10  that your testimony?
11    A. It was submitted to the principal.
12    Q. Who submitted it?
13    A. Ms. Fagan my co-teacher.
14    Q. When?
15    A. Ms. Kim, I don't have the exact date in
16  time, but a midterm exam was administered to the
17  student for that time.
18    Q. Okay, but I'm not talking about the actual
19  administration of the midterm exam. So your
20  testimony is you yourself did not submit a midterm
21  exam to an administrator, correct?
22    A. Correct.
23    Q. Now Dr. Severin as a long time teacher I'm
24  sure you are aware that all teachers have to have
25  lesson plans prepared, correct?

605

SEVERIN - CROSS - KIM

1
2    A. Correct.
3    Q. And that actually isn't just an option,
4  it's something that's contractually mandated,
5  correct?
6    A. Correct.
7    Q. Would you agree with me that the purpose of
8  having a lesson plan always ready is for, so each
9  teacher can be prepared when they are teaching daily
10  lessons, correct?
11    A. Correct.
12    Q. In the event that an administrator doesn't
13  walk through an observation at any given time an
14  administrator can come to your classroom and if you
15  have a lesson plan ready then the administrator is
16  aware of what's going on in the class, correct?
17    A. Correct.
18    Q. A part of a teachers pedagogy is having the
19  lesson plan always available, correct?
20    A. Correct, with some latitude.
21    Q. I didn't ask about latitude, but thank you.
22  Now back on April 4, 2016, I'm looking at
23  specification one Arbitrator Brown. So it's your
24  testimony that on that day, you left school early
25  around 12:20 p.m.?

606

SEVERIN - CROSS - KIM

1
2    A. Yes.
3    Q. What were your hours for that day?
4    A. I don't remember the exact day, if it was,
5  allow me to say on Monday and Tuesday. Monday we
6  have one hour. Tuesday we have another hour.
7  Wednesday through Friday we have a different one. So
8  I don't know which one it is exactly, but so if I was
9  to say from 8:10 to at least 2:30.
10    Q. Okay, so 12:20 p.m., that was not during
11  that time period. So back in the last school year
12  2015/2016, you never ended your school day at 2:20
13  p.m., correct?
14        THE HEARING OFFICER: 2:20 or 12:20?
15        MS. KIM: 12:20 p.m. thank you.
16    A. No.
17    Q. If I can have the witness look at
18  specification one Mr. Massena. Please look at
19  specification one and let me know when you are
20  finished Dr. Severin.
21    A. Yes.
22    Q. Okay, so on that day, when you left you
23  still had period seven for prep and period eight,
24  your constitutional law still pending, correct?
25    A. Yes.

607

SEVERIN - CROSS - KIM

1
2    Q. When you left that day, you did not tell
3  the principal or any of the AP's that you were
4  leaving early that day, correct?
5    A. The principal was informed.
6    Q. That wasn't my question. You did not tell
7  the principal or any of the AP's that you were
8  leaving early that day, correct?
9    A. No.
10        THE HEARING OFFICER: No, it's not
11  correct or no you didn't. I don't understand
12  your answer.
13    A. No, I did not tell them.
14    Q. Now looking at specification two Dr.
15  Severin. Please take a look at that specification
16  and let me know when you are ready.
17    A. Yes. Specification two?
18    Q. Yes.
19    A. Yes.
20    Q. You have had a chance to look at that?
21    A. Yes.
22    Q. Now on that date, your testimony was that
23  you were out in the hallway conferencing with a
24  student, correct?
25    A. Correct?

608

SEVERIN - CROSS - KIM

1
2    Q.  Who was that student?
3    A.  I do not remember the student name.
4    Q.  What were you conferencing with the
5 student?
6    A.  I do not remember the content of that
7 conference.
8    Q.  How long were you out in the hallway with
9 the student conferencing?
10   A.  I did not time, but no more than two or
11 three minutes.
12   Q.  Now with respect to, so your testimony is
13 on that day, whatever was going on in the classroom
14 was not your responsibility--
15        MR. MASSENA:  Objection, that's not
16   his testimony your honor.
17        THE HEARING OFFICER:  I'm going to
18   sustain as to the form of the question.  I don't
19   think that was his testimony.
20   Q.  Now you were outside in the hallway and I
21 believe you said was it Ms. Burlingame who was in the
22 classroom?
23   A.  Yes.
24   Q.  If you are not in your classroom does that
25 mean you are not responsible for happens in your

609

SEVERIN - CROSS - KIM

1
2 classroom?
3    A.  I don't understand the question.
4    Q.  I will withdraw that.  Now you testified
5 that while you were talking to the student, the
6 principal came by, correct?
7    A.  He was passing in the hallway.
8    Q.  Other than Principal Dorcely was there
9 anyone else who was passing by in the hallway at the
10 time you were conferencing with the student?
11   A.  The other person that approached me was
12 Principal Dorcely.
13   Q.  What did Principal Dorcely, he spoke to you
14 about the cellphone usage in the class by the
15 students at that time?
16   A.  He ask me was I aware that students were
17 using their phones in the room and I informed him Ms.
18 Burlingame is in there.  I'm not aware of that. I was
19 already outside as mentioned earlier.
20   Q.  So your testimony is you had no idea that
21 students were using their cellphones in class?
22        MR. MASSENA:  Objection your honor.
23        THE HEARING OFFICER:  Overruled.
24   A.  I was outside with the student and as I was
25 conferencing with the student, Ms. Burlingame was in

610

SEVERIN - CROSS - KIM

1
2 charge of the class.  I couldn't see what was going
3 on.
4    Q.  So it's your testimony you were not aware?
5    A.  No, I was not aware.
6        THE HEARING OFFICER:  One at a time
7   please when you are answering questions and
8   asking questions.
9    Q.  Now there was a student named Student B in
10 your class, correct?
11   A.  Yes.
12   Q.  There was also Student C?
13   A.  Yes.
14   Q.  And both students were in class at that
15 time when the allegation of the students using their
16 cellphones took place, correct?
17   A.  I don't know.
18   Q.  With Student B and Student C you had no
19 issues with those students?
20        MR. MASSENA:  Objection your honor,
21   relevance.
22        THE HEARING OFFICER:  Ms. Kim what is
23   the relevance?
24        MS. KIM:  The students, there is in
25   evidence, two statements written by each of the

611

SEVERIN - CROSS - KIM

1
2 students.
3        MR. MASSENA:  Actually your honor I
4   know Ms. Kim was not present for the testimony.
5   Certain statements by the students were marked
6   and they are not in evidence and I will request
7   permission, I will just draw Ms. Kim's attention
8   to Student B from--
9        THE HEARING OFFICER:  [Interposing]
10  Which exhibits?
11       MR. MASSENA:  To Student B from--
12       THE HEARING OFFICER:  [Interposing]
13  Which exhibits, counselor?
14       MR. MASSENA:  This is exhibit--
15       MS. KIM:  [Interposing] I think
16  Department's 12.
17       MR. MASSENA:  Department's 12?  I have
18  it as 13.  You have it as 12?
19       MS. KIM:  Yeah I have it as 12 and
20  then 13 I have--
21       MR. MASSENA:  [Interposing] Yeah, 12,
22  yeah I'm sorry.  It's 12.  So Department's 12,
23  Student B and again, obviously the arbitrator
24  can correct if I'm, incorrect, correct me if I'm
25  incorrect.  From law, everything from law was

612

SEVERIN - CROSS - KIM

1  crossed out and is not in evidence.
2      MS. KIM:  Okay.
3      THE HEARING OFFICER:  That's correct.
4  That's fine.  My exhibit reflects for the first
5  page of Department 12.
6      MS. KIM:  And in the exhibits I also
7  see a brief statement by Student C.  Was that
8  entered into evidence?
9      THE HEARING OFFICER:  That's in
10  evidence and not redacted.
11      MS. KIM:  Okay.
12      MR. MASSENA:  One second.
13      THE HEARING OFFICER:  Ms. Kim, would
14  you like to go off the record?
15      MS. KIM:  Oh no.  I was just waiting
16  for--
17      THE HEARING OFFICER:  [Interposing] No
18  I think we're on the record.
19      MS. KIM:  Okay, okay--
20      MR. MASSENA:  [Interposing] I think
21  she's waiting for a ruling.
22      THE HEARING OFFICER:  I'm sorry.  I
23  did not know that there was an issue before me
24  for a ruling.  Forgive me.  The issue is your

613

SEVERIN - CROSS - KIM

1  objecting to the testimony on the grounds of
2  relevance?
3      MR. MASSENA:  On the ground that I
4  believe Ms. Kim was about to question Dr.
5  Severin as to statements that are not in the
6  record and have been stricken.
7      THE HEARING OFFICER:  There were
8  issues between the Respondent and two particular
9  students.  I thought that perhaps this had
10  cleared up the issue, forgive me for the delay.
11      MS. KIM:  That's all right.
12      THE HEARING OFFICER:  So your proffer
13  as to relevance is what precisely, Ms. Kim?
14      MS. KIM:  I--
15      THE HEARING OFFICER:  [Interposing]
16  You said that there were two statements in
17  direct.
18      MS. KIM:  Sure.
19      THE HEARING OFFICER:  Concerning each
20  of these, there were two statements concerning
21  these two students.
22      MS. KIM:  Sure.  My purpose in asking
23  questions about whether or not Dr. Severin had
24  any issue with these students goes to

614

SEVERIN - CROSS - KIM

1  credibilities of these students.  We have in
2  evidence these two statements that were taken
3  and I believe it's relevant to this matter
4  and I believe it's relevant to show in terms of
5  credibility if there was any sort of issue or --
6  [00:01] between Dr. Severin and the students.
7      THE HEARING OFFICER:  All right.  Let
8  me just take a moment to review Department's 12.
9      I'm going to sustain the objection.  I
10  had commented earlier when Department 12 was
11  admitted into evidence that hearsay is generally
12  admissible but is not going to be deposited when
13  it comes to sustaining any particular
14  specification in this matter.  And, but I did
15  permit the document into evidence subject to
16  some kind of connection in the future.  But for
17  that reason generally speaking, I'm going to
18  sustain the objection on the grounds of
19  relevance.
20      MS. KIM:  Okay.
21      Q.  Now, Dr. Severin, the students' statements
22  that are in evidence, you've had an opportunity to
23  look at them, correct?
24      A.  I don't remember.
25      Q.  Specifically if I could, Mr. Massena could

615

SEVERIN - CROSS - KIM

1  you show him Student B's statement?
2      MR. MASSENA:  Okay.
3
4      Q.  Now Dr. Severin, isn't it true that--
5      A.  [Interposing] Ma'am I'm sorry.
6      Q.  Sorry, go ahead.
7      A.  Let me look through it.
8      MR. MASSENA:  And I'll just remind the
9  Respondent that, I'll just remind the Respondent
10  that after law everything else is stressing.
11      MR. SEVERIN:  Yes.
12      A.  Okay.
13      Q.  You finished.
14      A.  I'm sorry, what was the question?
15      Q.  Okay just, looking at Student B's statement
16  do you see where he has written, second sentence,
17  "Dr. Severin was", I don't know what that word
18  is,"'Disgrading' the principal.  He said that he was
19  not allowed to take our cell phone.  It's against the
20  law."
21      Isn't it true that that's what you said to
22  Principal Dorcely at that time?
23      MR. MASSENA:  Objection, I don't know
24  it can even be read that way.  I'm not how that

616

SEVERIN - CROSS - KIM
1. can be read.
2. THE HEARING OFFICER:  Well what
3. specifically are you asking the witness with
4. regard to if in fact he said that to the
5. principal?  Why don't you just identify that
6. part--
7. MS. KIM:  [Interposing] Okay.
8. THE HEARING OFFICER:  Of the
9. statement.
10. MS. KIM:  It should be, it's actually,
11. it starts at the third line after the word
12. "phone" and then "Dr. Severin" and then all the
13. way to, "against the law" and then everything
14. else is redacted after that.  So that's the
15. particular sentence that I'm looking at.
16. MR. SEVERIN:  Am I still responding?
17. THE HEARING OFFICER: I'm not sure
18. because I'm not sure, I apologize, I don't mean
19. to belabor this point but I'm just not certain I
20. understand the question.  Are you asking the
21. Respondent if he said something in particular to
22. the principal?  Or whether he said it to
23. students about the principal?  I don't really
24. follow the question.

617

SEVERIN - CROSS - KIM
1. MS. KIM:  I will rephrase it.
2. THE HEARING OFFICER:  Okay.
3. Q.  Now, that day when you say that you were
4. out in the hallway conferencing with the student. and
5. the principal walked by, he spoke to you.  Didn't he
6. speak to you about there being cell phone usage in
7. the classroom?
8. Q.  Okay.  And isn't it true that you
9. responded, you said to the principal that Principal
10. Dorcely was not allowed to take the student's cell
11. phones, that it was against the law?
12. A.  No.
13. Q.  You never said that?
14. A.  No.
15. Q.  Okay.  But as you can see here, Student B
16. has it written in her statement, correct?
17. A.  I was not in the room.
18. Q.  I'm not asking you whether you were in the
19. room--
20. A.  [Interposing] I don't understand the
21. question, I'm sorry.
22. Q.  But it's written in her statement, right?
23. A.  Yes.
24. Q.  He was not allowed to take our cell phone.

618

SEVERIN - CROSS - KIM
1. It's against the law, correct?
2. MR. MASSENA:  I'm actually going to
3. object, Your Honor, simply because I feel as to
4. form this is a hearsay statement offered by an
5. individual who did not testify here.  In
6. essence, the Department is asking the, Dr.
7. Severin to interpret the witnesses statement.  I
8. actually read this completely different.  I read
9. it as Doctor, that Student B is stating Dr.
10. Severin was disregarding the principal and the
11. principal said that it's against the law.  I
12. don't know how to, how does the composition of
13. this, I don't think it's a fair question to ask
14. the Respondent.
15. THE HEARING OFFICER:  I recognize that
16. it's hearsay evidence.  I do believe the
17. Department has the right to ask the witness, the
18. Respondent, whether or not he made a certain
19. statement to the principal.  He has answered in
20. the negative.  I don't think there's anything
21. further that we can purse with regard to this.
22. MS. KIM:  I'll move on.
23. Q.  Now, okay.  Now Dr. Severin, with respect
24. to the common planning meetings you said that for

619

SEVERIN - CROSS - KIM
1. specification three and five the dates for which you
2. are alleged to have failed to attend the common
3. planning meetings.  It was your testimony that you
4. did attend those meetings, correct?
5. A.  I'm sorry.  Repeat that.
6. Q.  For specification three and five, if I
7. could have the witness look at it.
8. MR. MASSENA:  Sure.
9. Q.  The specifications, thank you Mr. Massena.
10. Specification three.
11. A.  Yes.
12. Q.  And specification five.
13. A.  Yes.
14. Q.  Please look at those, okay?  So correct me
15. if I'm wrong, Dr. Severin, but when Mr. Massena was
16. asking you questions I believe you testified that did
17. attend those meeting, correct?
18. A.  Correct.
19. Q.  So you never missed a single one of them?
20. A.  I have missed some, a couple
21. Q.  How many?
22. A.  I don't remember.
23. Q.  Okay and when you say a couple you say you
24. missed two only?

620

SEVERIN - CROSS - KIM
1
2     A.  If you interpret couple to mean two--
3          THE HEARING OFFICER:  [Interposing]
4     What do you mean by that?
5     A.  I don't have an exact number.  Okay?  I
6     don't have an exact number.
7     Q.  Can you approximate how man you didn't--
8     A.  [Interposing] I'm unable to do that.
9     Q.  Okay.  But you would agree with me when
10    someone says couple, the common plain, meaning of the
11    word is two, correct?
12         MR. MASSENA:  Objection.
13    Argumentative, Your Honor.
14         THE HEARING OFFICER:  I think it is
15    counsel.  I mean, he's stated that he doesn't
16    know exactly how many.
17         MS. KIM:  Okay.
18         THE HEARING OFFICER:  I did hear him
19    initially use the word couple and then he had
20    some further testimony.
21    Q.  Was it you missed less than five meetings?
22    A.  I'm sorry?
23    Q.  Did you not attend less than five--
24    A.  [Interposing] I do not have a number in my
25    head as to how many.

622

SEVERIN - CROSS - KIM
1
2     was scheduled for, excuse me let me see, December
3     23rd, 2015 correct?
4     A.  Correct.
5     Q.  And that's evidenced by the hand written
6     date on the upper left hand corner?
7     A.  Correct.
8     Q.  And you see your name is typed in the first
9     column on the left-hand side?
10    A.  Yes.
11    Q.  And do you see how in narrative it says
12    "abs" and that stands for "absent", correct?
13    A.  Correct.
14    Q.  Slash did not attend.
15    A.  Correct.
16    Q.  So wouldn't it be fair to say that you did
17    not show up for that meeting?
18    A.  No it's not fair.
19    Q.  Oh you did show up for that meeting.
20    A.  Yes.
21    Q.  Oh you did, okay.
22    A.  There was no meeting at that time.
23    Q.  There was no meeting at all?
24    A.  No one attended.  I spent five minutes in
25    that room by myself and then when I left this I

621

SEVERIN - CROSS - KIM
1
2     Q.  Okay.  Now for each of the common planning
3     meetings, every time one was convened there were sign
4     in sheets, correct?
5     A.  Correct.
6     Q.  And if you attended a common planning
7     meeting you would sign your name saying I attended,
8     correct?
9     A.  Correct, but several--
10    Q.  [Interposing] Okay so that's a yes or no,
11    yes.
12    A.  Oh, oh, correct, yes.
13    Q.  Okay.
14    A.  I'm sorry.
15    Q.  And you were here when I didn't note if it
16    was Principal Dorcely or the AP, there were several
17    numerous sign in sheets for the common planning
18    meetings that were entered into evidence.  Do you
19    recall that?
20    A.  Yes.
21    Q.  Okay.  And just as an example I want to
22    show the witness Department Exhibit number 14.
23         MR. MASSENA:  Okay.
24    Q.  Now with respect to that meeting, Dr.
25    Severin, that was for a common planned meeting that

623

SEVERIN - CROSS - KIM
1
2     strongly believe that it was fabricated.  The date
3     may have been inappropriately upgraded.
4     Q.  Who fabricated it?
5     A.  I'm not aware.  I'm not at liberty to
6     explain who or know who.  But I know I was in room
7     101 12/23 which was the day before we went on the
8     break.  And when I finished, I walk away.  I went by
9     and then we had a party that day at school.
10    Q.  Okay.
11    A.  Yes.
12    Q.  Okay.  So it's your testimony that this
13    document here which says that you, someone wrote
14    "absent/did not attend".  This was fabricated?
15    A.  I'm assuming it was, yes.
16    Q.  Okay.  But you don't know who did it?
17    A.  I'm not at liberty to know who.
18    Q.  You've seen this document before, correct?
19    A.  It was shown to me here, yes.
20    Q.  Okay.  And you saw the other documents in
21    evidence that were entered in, entered by either the
22    principal or AP Barnett regarding the numerous other
23    common planning meetings where you are alleged to
24    have been absent from, correct?
25    A.  Correct.

624

SEVERIN - CROSS - KIM

2   Q.  Okay.  And so that would be Department
3   Exhibit number 18.
4         THE HEARING OFFICER:  Do you want to
5   take a look at that one, or -- [00:01].
6   Q.  So I would have the witness look at, I
7   think it's starting from October 15, 2015.
8   A.  I am aware--
9   Q.  [Interposing] Okay, just--
10        THE HEARING OFFICER:  [Interposing]
11   Wait for a question.
12        MR. SEVERIN:  Oh, I'm sorry.
13        THE HEARING OFFICER:  -- [00:01].
14   Q.  So the documents that have been entered
15   into evidence, this batch of document, you've seen
16   them before testifying today, right?
17   A.  Correct.
18   Q.  And you would agree with me that a number
19   of these documents, the sign in sheets have you
20   listed as absent, correct?
21   A.  Correct.
22   Q.  So why does it have you listed as absent if
23   you attended the vast majority of these meetings
24   except for perhaps, maybe a couple or so that you say
25   you did not attend?

625

SEVERIN - CROSS - KIM

2   A.  Because I was being disciplined by
3   Principal Dorcely or Ms. Barnett.
4   Q.  For, so in this batch of documents, if you
5   were marked absent it's because you were being
6   disciplined by the principal or the AP?
7   A.  Most likely.
8   Q.  Most likely?  Are you guessing?
9   A.  Yes.
10        MR. MASSENA:  Objection, Your Honor.
11   A.  I mean am I guessing, the answer is I was
12   being disciplined by the principal or the assistant
13   principal.
14   Q.  For every single one of the dates
15   represented here where you are marked absent, is that
16   your testimony?
17   A.  No.
18   Q.  Okay.  So which dates were being
19   disciplined and which dates were you not?
20   A.  May I have the document to refresh my
21   memory?  If I'm not mistaken, there were several item
22   that were entered into evidence regarding
23   disciplinary meeting and their dates.  Those dates
24   could be cross referenced.
25   Q.  While that's being done, these common plan

626

SEVERIN - CROSS - KIM

2   meetings, what period were they held?
3   A.  Sixth period.
4   Q.  Okay.  And what period did you have the
5   disciplinary meetings--
6   A.  [Interposing] Sixth period.
7   Q.  Okay.  So for the entire sixth period for
8   any of these entries, sign in sheets, you were at a
9   disciplinary with the principal or the AP.  That's
10   why you couldn't attend the common planning meeting.
11   That's your testimony?
12   A.  Yes.
13   Q.  Okay.  So for these stack of sign in
14   sheets, the absences, you're saying, they were not,
15   the word absence wasn't written there.  They were
16   fabricated by anyone?
17   A.  No but December 23rd I know I was at that
18   common planning meeting December 23rd but there was
19   no one there.
20        MR. MASSENA:  Okay.  May we go off
21   the record for a moment?
22        THE HEARING OFFICER:  Sure, let's go
23   off the record.
24        [OFF THE RECORD, conference, 03:11:17]
25        [ON THE RECORD, conference, 03:11:17]

627

SEVERIN - CROSS - KIM

2         THE HEARING OFFICER:  All right, we're
3   back on the record.  Ms. Kim?
4   Q.  Yes, just one moment please.  Now Dr.
5   Severin, going back to, it was specification one
6   where you were accused of signing out and leaving the
7   school building without approval at approximately
8   12:20 p.m.
9   Now, you attended a disciplinary meeting with
10   Principal Dorcely and Mark Satchell, correct?
11   A.  Yes.
12   Q.  And at that time you were given an
13   opportunity to respond to the allegation?
14   A.  Yes.
15   Q.  And at that time, you did not bring up at
16   the meeting that you had told Ms. Towns, correct?
17   A.  I'm sorry?
18   Q.  At the meeting with Principal Dorcely and
19   the UFT rep, Mr. Satchell, you did not bring up at
20   that meeting what you were alleging that you told Ms.
21   Towns that you were leaving early that day, correct?
22   A.  Yes, I did.
23   Q.  You did bring it up?
24   A.  Yes.
25   Q.  Okay.  But you see this letter, Department

628

SEVERIN - CROSS - KIM

1   SEVERIN - CROSS - KIM
2   number four.  You've seen this before, correct?
3       A.  Yes.
4       Q.  And we've already established that even
5   though you claim that's what you said, you never
6   submitted a rebuttal, correct?
7       A.  Correct.
8       Q.  Okay.  Now, you mentioned that for the
9   common planning meetings the purpose of that was for
10  teachers who teach the same subject matter to get
11  together to collaborate, right?
12      A.  Yes.
13      Q.  And for, obviously for pedagogical reasons,
14  correct?
15      A.  Yes.
16      Q.  Okay.  And you testified that there were
17  teachers there who were, I think you used the word
18  "illegally" working on other things other than what
19  you would work on at a common planning meeting,
20  correct?
21      A.  I do not remember if I said "illegally" but
22  yes, there were teachers there doing other things
23  other than common planning.
24      Q.  So other things, they were doing other
25  things at the common planning meeting that they

629

SEVERIN - CROSS - KIM

1   SEVERIN - CROSS - KIM
2   weren't supposed to be doing, correct?
3       A.  According to the circle of six, yes
4   correct.
5       Q.  According to the contract?
6       A.  Yes.
7       Q.  Okay.  Did you report any of them?
8       A.  It's not my role to do that, no.
9       Q.  It's not your role to--
10          MR. MASSENA:  [Interposing] Objection,
11  Your Honor.
12          MS. KIM:  Report other teachers for
13  misconduct?
14          MR. MASSENA:  Relevant.
15          THE HEARING OFFICER:  There's an
16  objection.  Ms. Kim it seems a little bit of a
17  stretch to be asking the witness with regard to
18  these particular charges and specifications
19  whether or not he has an obligation to report
20  other teachers.  Do you want to be heard on
21  this?
22          MS. KIM:  I'll withdraw.
23          THE HEARING OFFICER:  Okay.
24          MS. KIM:  It's not a problem.
25      Q.  Now with respect to, for this particular

630

SEVERIN - CROSS - KIM

1   SEVERIN - CROSS - KIM
2   past school year, 15/16, each class period is
3   approximately how many minutes long?
4       A.  Forty-five to 47 minutes with the first,
5   oh--
6          THE HEARING OFFICER:  [Interposing]
7   Just keep your voice up please.
8       A.  Forty-five to 47 minutes with the first
9   period being, I think, 53 minutes, 6 minutes for
10  announcements.
11      Q.  Okay.  And for the last school year is it
12  fair to say that each school day, Monday through
13  Friday, was approximately eight periods or so?
14      A.  Yes.
15      Q.  Okay.  And so would you agree with me as a
16  longtime educator, it's important for teachers to use
17  every single minute of each period for instruction?
18      A.  Definitely.
19      Q.  Okay.  I'm sorry.  Just bear with me, I
20  apologize.  Okay.  Now Mr. Massena asked you about
21  another allegation with specification six where it's
22  alleged that on November 12, 2015 the allegation is
23  that you left the school building during the school
24  day without signing the teacher log in the main
25  office.  And your testimony was that, the reason why

631

SEVERIN - CROSS - KIM

1   SEVERIN - CROSS - KIM
2   you didn't sign the teacher log is because you did
3   not leave that day.
4       A.  Correct.
5       Q.  So it's your testimony that from the start
6   of that school day until the end of that school day,
7   until the last period finished, you never left the
8   school?
9       A.  Correct.
10      Q.  Okay.  Now another allegation that Mr.
11  Massena spoke to you about, I think you had mentioned
12  that on a particular, withdrawn.  There was an
13  allegation where you are alleged to have allowed a
14  student to re-enter the building.  Instead of using
15  the main entrance where security is you allegedly
16  allowed the student to re-enter through exit one and
17  two.  Are you familiar with that allegation?
18      A.  -- [00:01], yes.
19      Q.  You're aware, correct?  Okay.  And, okay,
20  so at the main entrance there is security posted
21  there, correct?
22      A.  Correct.
23          MR. MASSENA:  Objection, beyond the
24  scope.
25          THE HEARING OFFICER:  I think that

632

SEVERIN - CROSS - KIM

1
2    this is charged misconduct and I do believe that
3    the Department has a right to cross examine on
4    it. And I'm going to permit the question.
5         MR. MASSENA: If I could just expound
6    on my objection.
7         THE HEARING OFFICER: Yes, please.
8         MR. MASSENA: During direct testimony
9    there was, actually during direct testimony
10   there was no direct evidence regarding this
11   particular specification. The principal
12   testified that he spoke to, he spoke to
13   Principal Minchalina [phonetic] and he also
14   testified that he spoke to Assistant Principal
15   Barnett. But he testified that he did not
16   observe the actual incident and he also
17   testified that he did not see the video.
18        And as Your Honorable Arbitrator said
19   the arbitrator will not make a, will not
20   substantiate a specification based totally on
21   hearsay. Therefore, for those reasons, I
22   believe and especially considering the very
23   limited direct that I presented for this
24   particular specification. I believe any cross
25   into the underlying facts or the underlying

633

SEVERIN - CROSS - KIM

1
2    allegations are inappropriate for cross.
3         THE HEARING OFFICER: I disagree.
4    Once a Respondent chooses to testify in this
5    forum he is opening himself up to cross
6    examination. The Respondent had a choice to
7    make at the outset whether to testify or not to
8    testify. That is his choice.
9         Having made the decision to testify,
10   I, the Department at this point may cross
11   examine in regards to the charges in
12   specifications. Ms. Kim?
13   Q.   Yes, thank you. Now again, repeating, at
14   the main entrance there is security posted, correct?
15   A.   Correct.
16   Q.   And for this past school year, specifically
17   in November of 2015, how many officers or school
18   safety agents were posted at the main entrance?
19   A.   I do not know.
20   Q.   Okay. Was there at least one?
21   A.   I do not know.
22   Q.   There was security at the main entrance,
23   correct?
24   A.   I do not know I was not at the main
25   entrance.

634

SEVERIN - CROSS - KIM

1
2    Q.   So, okay. Going, the two years that you
3    were assigned to Urban Action Academy, how did you
4    get into the school?
5    A.   Walked in the main entrance.
6    Q.   Okay so you are familiar with where the
7    main entrance is, correct?
8    A.   Correct.
9    Q.   Okay. So let me ask you again. So for the
10   two years or so that you've been assigned to Urban
11   Academy--
12   A.   [Interposing] Okay.
13   Q.   You walk through the main entrance every
14   day, correct?
15   A.   Correct, yeah.
16   Q.   And it's fair to say that when you leave
17   the school day you also walk out of the main
18   entrance, correct?
19   A.   Correct.
20   Q.   So, how many security or school safety
21   agents were posted at the main entrance?
22   A.   Oh, at least, one.
23   Q.   Okay.
24   A.   Yes.
25   Q.   And isn't it true that the reason why

635

SEVERIN - CROSS - KIM

1
2    there's a security officer or a school safety agent
3    posted there is to make sure that no one is
4    trespassing, correct?
5    A.   Correct.
6    Q.   And that also with security being an issue,
7    the security officer is also there to make sure that
8    students or other staff members or anyone entering
9    the building is not bringing any contraband with
10   them, correct?
11   A.   Correct.
12   Q.   Okay. And during the two years that you
13   have been assigned to Urban Academy, everyone, staff
14   memebers, administrators, students, any guests who
15   came to the school, they all have to go through the
16   main entrance, correct?
17   A.   Correct.
18   Q.   Okay. Dr. Severin, you're familiar with a
19   student named Student D?
20   A.   Yes.
21   Q.   Okay. Was this student in your class?
22   A.   Yes.
23   Q.   Okay. Student D is a boy?
24   A.   Girl.
25   Q.   A girl, okay. Now it's your testimony, so

636

SEVERIN - CROSS - KIM

2 on November 4, 2015 you did not allow Student D to,
3 instead of going through the main entrance you did
4 not allow her to use exit one and two?
5    A.  Correct.
6    Q.  And you did not tell Student D that she can
7 go with you so that she can get her phone at the end
8 of the fire drill?
9    A.  Correct.
10    Q.  Okay, you did not say that?
11    A.  I did not say that.
12    Q.  But on that date there was, was there a
13 fire drill?
14    A.  Yes.
15    Q.  Okay. Now Dr. Severin, you've testified
16 that for the allegations where you were accused of
17 failing to contact the main office or an immediate
18 supervisor to inform them of your being absent you
19 said, I believe I'm just paraphrasing your testimony,
20 that you did fulfill your responsibility by
21 contacting sub-central?
22    A.  Yes.
23    Q.  Okay.  And how long have you been with the
24 DOE?
25       MR. MASSENA:  Objection, asked and

637

SEVERIN - CROSS - KIM

2    answered, Your Honor.
3       THE HEARING OFFICER:  Oh that's okay.
4    A.  Since 1996.
5    Q.  Okay.  So you've been with the DOE for
6 approximately 20 years?
7    A.  Yes.
8    Q.  Okay.  And prior to coming to Urban
9 Academy, or you're saying while at Urban Academy you
10 were not told that if you're going to be absent from
11 school that you are to reach out to the main office
12 or to an immediate supervisor?
13    A.  Please explain--
14    Q.  [Interposing] Okay. If it's confusing let
15 me rephrase.
16    A.  Yeah.
17    Q.  So the two years that you've been at Urban
18 Academy no one told you, principal, APs, no one said
19 to you or put you on notice that if you are going to
20 be absent from work that you are to notify them or
21 someone in the main office?
22    A.  I was instructed to contact sub-central,
23 yes, by the principal.
24    Q.  That was not my question. My question to
25 you was during the two years that you've been at

638

SEVERIN - CROSS - KIM

2 Urban Academy, so the principal and none of the APs
3 informed you or other staff members that if you're
4 going to be absent from work that you have to reach
5 out to the main office or to a supervisor?
6       MR. MASSENA:  Objection as to form.
7       THE HEARING OFFICER:  Well do you
8    understand the question?
9       MR. SEVERIN:  No.
10       THE HEARING OFFICER:  All right, well
11    that's the answer. If you don't understand the
12    question, we'll have to rephrase it.
13    Q.  So principal Dorcely never told you or the
14 other teachers if you're going to be absent from
15 work, you have to notify the main office or a
16 supervisor?
17       MR. MESSINA:  Objection as to other
18    teachers. How does he know if the principal
19    said that?
20       THE HEARING OFFICER:  I thought we had
21    an answer, I thought we had a clear question.
22    Only because there was some overlapping
23    dialogue, I'm afraid Ms. Kim, I'm going to ask
24    you to repeat the question and let's get an
25    answer on the record.  I'd like to know the

639

SEVERIN - CROSS - KIM

2    answer.
3       MS. DANA KIM:  Okay.
4    Q.  I hope I get this right on the fourth try.
5 So, in the two years that you've been at Urban
6 Academy, no administrator told you that if you're
7 going to be absent from work, that you have to notify
8 the main office or an immediate supervisor?
9    A.  No.
10    Q.  Okay, so you were never told that?
11    A.  I was informed to contact sub central.
12    Q.  That's not my question, so again, your
13 question is no, no administrator told you not to go
14 to the main office or--
15    A.  [Interposing] Oh, no, no, no, no.  Until I
16 was given those disciplinary conferences with --
17 [00:01].
18    Q.  So when you were given the letters to file,
19 that's when you--
20    A.  [Interposing] No, when I saw the specs,
21 etc., then I was informed that I had to.
22    Q.  So when you were given the specifications,
23 you were then aware that you have to notify the main
24 office or a supervisor if you're going to be absent
25 from work?

640

SEVERIN - CROSS - KIM

2  A. May I refresh my memory regarding the
3  specs?
4  Q. Yes, please.
5  A. Because one of them said the specs, which
6  one was it? I'm sorry.
7  Q. I'm talking about specifications nine, ten-
8  -
9  A. Yes, for example nine it says failure to
10  contact immediate supervisor, but all throughout the
11  two years, I was constantly reminded to call sub
12  central. Yes.
13  Q. Okay. All right so moving on to later you
14  touched briefly on lesson plans, so for specification
15  11 where the allegation is that approximately on
16  November 22nd, 2015 you failed to follow a directive
17  given by your administrators to supply period two
18  lesson plans for three weeks to the administration
19  and with respect to that allegation, Mr. Messina can
20  you show him a copy of this one page?
21  MR. MESSINA: Sure.
22  MS. KIM: Thank you.
23  Q. You can look at specification 11 and let me
24  know when you're finished.
25  A. Yes. I'm done.

641

SEVERIN - CROSS - KIM

2  Q. Okay. Now with respect to that
3  specification, is it not true that you did not supply
4  period two lesson plans for three weeks?
5  A. I don't recall any directives per se.
6  Please rephrase the question. Repeat the question in
7  this specification.
8  Q. Isn't it true as it is laid out in that
9  specification that you did not submit to
10  administration period two lesson plans for three
11  weeks?
12  A. That's not true.
13  Q. Just one second.
14  A. Uh-huh.
15  Q. Okay, so I am looking at Department's
16  Exhibit number 5, so Dr. Severin, it's here, you said
17  that the allegation is not true, so it says
18  Specification 11, that allegation is not true.
19  A. Eleven, that, yes.
20  Q. Okay, so are you saying that you did supply
21  to the administration the period two lesson plans?
22  A. This is unclear. I don't quite understand
23  the specification itself.
24  Q. Okay.
25  A. It's reading.

642

SEVERIN - CROSS - KIM

2  Q. Okay.
3  A. In other words, go ahead.
4  Q. Okay, now Department's Exhibit number 5, if
5  we can direct the witness to, it should be about
6  after the letter to file, there is an APPR, annual
7  professional performance review evaluation form
8  attached and it's on the third page if we can have
9  the witness look at that.
10  MR. MESSINA: Okay, on the third
11  page?
12  Q. And at the bottom where it's number three.
13  Do you see that Dr. Severin?
14  A. Yes.
15  MR. MESSINA: Is that 3B?
16  MS. KIM: It's just number three.
17  Q. It should be the third page of the APPR. I
18  think you went too far.
19  A. May I see what you're looking at?
20  THE HEARING OFFICER: Did you say 3B?
21  MS. KIM: No, no, no, three, down
22  here. This one right here.
23  A. Thank you.
24  Q. Take a look at that and please let me know
25  when you're finished.

643

SEVERIN - CROSS - KIM

2  A. Um, it says schedule.
3  Q. Okay, and you're finished looking at it?
4  There's not a question before you.
5  A. One second, yeah. I'm sorry. I'm
6  finished, yes.
7  Q. Okay. And the APPR, actually that was
8  generated by, excuse me, AP Barnett, correct?
9  A. Correct.
10  Q. And that was as a result of an observation
11  that took place?
12  A. Correct.
13  Q. And I believe it was an informal
14  observation, correct?
15  A. Correct.
16  Q. Okay. And based on that informal
17  observation of this APPR, AP Barnett, in her
18  evaluator notes it basically laid out certain things
19  that you could perhaps either improve upon or certain
20  expectations that she wanted you to meet, correct?
21  A. I cannot assume what Ms. Barnett want, no
22  I'm sorry.
23  Q. Okay, but in the APPR there are additional
24  evaluator notes from AP Barnett, correct?
25  A. Yes.

644

SEVERIN - CROSS - KIM

Q.  And you looked at number three which states, please schedule to meet with me for the next three weeks starting the week of November 22nd and submit your period two lesson plans for my review and feedback by Thursday, November 18, 2015.  You are aware of that, correct?

A.  The date just went backwards from the 22nd to November 18th.  That's unclear to me.

Q.  Okay.  Number three says, correct me if I'm wrong, AP Barnett, let me break it down.  She wanted to meet with you for the next three weeks starting November 22nd, correct?

THE HEARING OFFICER:  Let's have the witness have the document before him so that he can answer your questions.  It's department five.  By my count it's four pages.  It's the third page of the APPR.

A.  Okay.

THE HEARING OFFICER:  You have questions for the witness, Ms. Kim now that he has it in front of him.

Q,  Yes, so for number three, would you agree with me that what it says is AP Barnett wanted to start meeting with you for the next three weeks

645

SEVERIN - CROSS - KIM

starting the week of November 22nd, correct?

A.  Yes.

Q.  And she also wanted you to submit your period two lesson plans for her review and feedback by Thursday, November 18th, 2015, correct?

A.  Oh, okay, correct.

Q.  Okay and if you look at, if you could turn, keep on turning the page Dr. Severin, do you see what appears to be an e-mail, correct?

A.  Uh-huh.

Q.  And it's looking at the first e-mail, so this is reverse chronological order.  It's an e-mail that Ms. Barnett sent to you and she cc'd Dr. Howell and Principal Dorcely, correct?

A.  Correct.

Q.  Okay.  Now if you look at the third paragraph in her e-mail, she's asking you to submit your period two lesson plans immediately, correct?

A.  Um, you said third paragraph?  It says as discussed briefly--

Q.  [Interposing] No, no, no, no, not there.  Let me just--

A.  [Interposing] Oh, the highlighted?

Q.  Yes.

646

SEVERIN - CROSS - KIM

A.  I'm sorry, yeah, yes, correct, yes.

Q.  And isn't it true that AP Barnett, the reason why she wrote that is because you hadn't submitted your period two lesson plans for her review.

A.  Correct.

Q.  Okay.  Did you ever submit them to her after that point?

A.  I don't recall.

THE HEARING OFFICER:  Is your question up--

[Crosstalk]

MS. KIM:  After that point.

Q.  So after the date of her writing that e-mail to Dr. Severin, did you after that point submit the period two lesson plan?

A.  The date of the e-mail was December 2nd and we had the cooling off.

THE HEARING OFFICER:  Just the answer.

A.  No, no, no.

THE HEARING OFFICER:  Okay.

A.  Yes, no.

Q.  But you previously testified that you did submit the lesson plans.

647

SEVERIN - CROSS - KIM

A.  That was, I was confused by your question, yes.

Q.  Okay.  Are you still confused?

A.  Oh, no, no, I got cleared, yes, yes.

Q.  Okay, so, just to clarify, you did not submit the period two lesson plans as directed in the APPR by AP Barnett?

A.  Correct.

Q.  Okay.  Now going to specification 12, specification 12 is the allegation that takes place on September 11 of 2015.

MR. MESSINA:  With the Arbitrator's permission - - [00:01].

THE HEARING OFFICER:  Thank you.

A.  Yes.

Q.  And I believe it was your testimony that Ms. Fagan, your co-teacher, had expressed to you and I'm paraphrasing here, that she and other teachers wanted to commemorate September 11, correct?

A.  Correct.

Q.  So just refresh my recollection please as to, and if I get this wrong, she, when did she approach you about commemorating September 11th?

A.  At the very beginning.

648

SEVERIN - CROSS - KIM

Q. On September 11th?

A. Yes.

Q. Okay and you said that it was she and other teachers who wanted to commemorate?

A. Other social studies teachers, yes.

Q. Okay. Did she say who those other teachers were?

A. There's about five. I mean, Amas [phonetic], Omain [phonetic], Davis, -- , Casta [phonetic].

Q. Did she name those teachers?

A. Oh, no, no, no. no. I'm saying, she said her and the other social studies teachers, so I know them, that's why I just gave you those names.

Q. Okay and what is it specifically that Ms. Fagan said to you about how they wanted to commemorate the day?

A. To paraphrase, she said myself and the other social study teachers, we plan to commemorate the evening of September 11th and we're going to do activities around that, around the events for the day and I would like to do it, Minnie Fagan, I, "I would like to do that for this class," to which I responded sure, no problems.

649

SEVERIN - CROSS - KIM

Q. Well in terms of, okay, so do some activities around that, so what, did she express to you what it is that she wanted you to do or how she wanted you to assist?

A. What she did was, um, of course I assisted, but what she did was she wanted to show them a short video clip reminding children at that time who were one or two years old to see what really happened and asked that they have discussion and followed by write ups. My way of helping at that time was to equally solicit information from the children after viewing the video and also again get the children to write, which we did.

Q. So that was the, it would be fair to say that was the lesson plan for that day? Was it for the whole day or a specific period?

A. That was from Ms. Fagan's period with me.

Q. Which period was that?

A. First period.

Q. And so I believe your testimony was that on that date the principal, I don't know if you mentioned any other individuals, came to your classroom?

A. Yes. The principal and the two AP's.

650

SEVERIN - CROSS - KIM

Q. So that would be?

A. Ms. Barnett and Dr. Howell.

Q. And at that time they, correct me if I'm wrong, one of them asked you for lesson plans?

A. Principal Dorcely.

Q. Okay. And it was your testimony that you did provide a lesson plan?

A. Correct.

Q. Okay. IN what form was that lesson plan?

A. It was in hard copy that I showed Principal Dorcely my lesson on the scientific revolution. However, it says it is totally in contradiction to what was being shown and I said, I informed him that Ms. Fagan gave me and et cetera and asked that we up end that particular lesson that I had and do something regarding September 11th.

Q. The lesson plan you showed him you said it was a hard copy on the scientific revolution, correct?

A. Correct.

Q. When you showed it to Principal Dorcely, where were you?

A. He had pulled me out of the classroom into the hallway and informed me how it was unacceptable

651

SEVERIN - CROSS - KIM

that I had something on being shown and the lesson plan did not match that.

Q. Okay, but it's your testimony that you did provide a lesson plan?

A. Correct.

Q. Okay and with respect to--

MR. MESSINA: [Interposing] Objection, Your Honor.

THE HEARING OFFICER: Yes?

MR. MESSINA: It's my recollection that in terms of the characterization of the witness's testimony, my recollection is that he said he attempted to provide it and Dr. Dorcely refused to accept it.

THE HEARING OFFICER: Well let me put the question to the witness. Is that your testimony?

A. Correct.

THE HEARING OFFICER: That you attempted to provide it?

A. Correct.

THE HEARING OFFICER: Okay. So with that correction.

Q. When you say that you attempted to provide

652

SEVERIN - CROSS - KIM

1  it to him, how did you attempt to provide it to him?
2      A.   After he called me out into the hallway,
3  informed me that where was my lesson plan, I told him
4  that it was on the scientific revolution, I walked
5  back inside, came back with, to the hallway while he
6  was still waiting and I showed him, this is what I
7  had planned for today prior to Ms. Fagan coming in
8  and asking to do something regarding September 11.
9      Q.   Where were Dr. Howell and Ms. Barnett?
10     A.   They were inside the classroom.
11     Q.   Was Ms. Fagan also in the classroom?
12     A.   Correct.
13     Q.   Okay.  And you also testified about,
14  withdrawn.  When it comes to daily lesson plans, in
15  conjunction with the lesson plan, the teachers are
16  supposed to put their instructional objectives on the
17  smart board or a board in the classroom, correct?
18     A.   Correct.
19     Q.   And with respect to the instructional
20  objective, is that a mirror of what your lesson plan
21  would be for the day?
22     A.   Correct.
23     Q.   Okay.  So would it be fair to say that the
24  instructional objective that's on the board is just

653

SEVERIN - CROSS - KIM

1  sort of like a, is it like an outline of what the
2  lesson plan is?
3      A.   It's not an outline, it's a statement.
4      Q.   Okay.  But it's something that, it's not
5  the entire lesson plan, but it takes basically the
6  gist of what the lesson plan is for the day?
7      A.   I don't know if I can explain it to you,
8  but.
9      Q.   Tell me what the instructional objective
10  is.
11     A.   Instructional objective is the goal,
12  meaning it can be a statement.  For example, students
13  would learn what is the capital for New York?
14     Q.   And that instructional objective must be on
15  the board or smart board for every day, every school
16  day, every period?
17     A.   I don't know if you would allow me to say
18  this.  The instructional objective is part of the
19  lesson plan, right?  In my case, for example, all my
20  lesson plans are always displayed on the smart board
21  for anyone to walk in to see.  From the first day
22  that I walk into Urban Action Academy, to the last
23  day I was there, my computers can document each and
24  every single lesson that I've taught at the school

654

SEVERIN - CROSS - KIM

1  and you can see objection, I'm so sorry, not
2  objection, instructional objective, I mean the title
3  of the lesson, the instructional objective, the do
4  now, the mini lesson and all the different component
5  that are to be in a lesson plan.  That particular day
6  the lesson that I showed Principal Dorcely consisted
7  of all these elements; however, it was not about
8  September 11 which was the activity showing in the
9  class, but what I had planned to deliver prior to Ms.
10  Fagan.
11     Q.   Okay.  And in terms of the September 11, if
12  that was what was shown on the smart board, that was
13  the instructional objective that was shown.
14     A.   No.  On the board at that time there was a
15  video showing, yes.
16     Q.   Was there anything at the time that
17  principal and the two AP's visited you that day, was
18  there anything on the smart board?
19     A.   The video.
20     Q.   The video.
21     A.   Yes.
22     Q.   Okay.  But not, it wasn't, that's separate
23  from the instructional objective, correct?
24     A.   I'm sorry.  The smart board is like a

655

SEVERIN - CROSS - KIM

1  projector.  It's either you're showing the video or
2  you're showing the actual objective or whatever the
3  writing is that the student is supposed to be
4  following, so if the video is showing and there is no
5  way you would be seeing an instructional objective.
6      Q.   So at the time that the principal and the
7  AP visited your classroom, it was the video that was
8  showing on the smart board?
9      A.   Correct.  Correct.
10     Q.   And in terms of your, the lesson plan for
11  that day, it's your belief that the principal, again,
12  this is just paraphrasing.  Correct me if I'm wrong.
13  You believe that the principal had an issue with your
14  lesson plan because it didn't match up with what was,
15  what you say was Ms. Fagan's agenda for that day.
16     A.   Correct.  Okay.
17     Q.   Okay and in terms of the plan for
18  commemorating 9/11 that day, that's something that
19  was determined between you and Ms. Fagan.
20     A.   No.
21     Q.   Okay.
22     A.   It was Ms. Fagan and the other social
23  studies teacher; however, I had my lesson following
24  the curriculum guideline on the scientific



656

SEVERIN - CROSS - KIM

1
2  resolution.
3       Q. And so again, so just to be clear, the 9/11
4  commemoration was something that you and Ms. Fagan
5  did jointly along with the other teachers who had
6  spoken with her about what their desires were for
7  commemorating that day, correct?
8       A. I did not speak with the other teachers.
9       Q. I understand that, but--
10      A. [Interposing] Oh, yes.
11      Q. But it's your understanding, correct?
12      A. Yes.
13      Q. Okay. Now if we can move on to
14  specification 13. Now please read that you specification
15  to yourself, Dr. Severin and let me know when you are
16  finished.
17      A. Correct.
18      Q. Actually if you could also look at
19  specification 14.
20      A. Uh-huh. Correct.
21      Q. Finished?
22      A. Yes.
23      Q. Okay so you had an opportunity to look at
24  both 13 and 14, correct?
25      A. Correct.

657

SEVERIN - CROSS - KIM

1
2       Q. Now as a classroom teacher, one of your
3  duties and responsibilities is to submit grades in a
4  timely manner?
5       A. Correct.
6       Q. And would you agree with me that the reason
7  why that they have to be submitted in a timely manner
8  is because if you don't do that, then student
9  commotions could be sort of held up and it could also
10  compromise the student's ability to graduate.
11      A. That's - - .
12      Q. Okay, so you're aware of how important it
13  is for all teachers to submit grades in a very timely
14  manner.
15      A. Yes.
16      Q. Okay. Now with respect to the two
17  specification, 13 and 14, now you are aware that you
18  are being charged with failing to follow the
19  directive given by the administrators to supply
20  electronic grades for at least for specifically 13,
21  marking the periods three and four, correct?
22      A. So alleged.
23          THE HEARING OFFICER: I'm sorry? I
24  didn't hear you.
25      A. So alleged.

658

SEVERIN - CROSS - KIM

1
2          THE HEARING OFFICER: So alleged,
3  okay.
4       Q. Okay. So did you in fact submit the
5  electronic grades.
6       A. Yes.
7       Q. When?
8       A. I don't have the information right in front
9  of me right now as to the exact date and time.
10  However, I do remember that there was a chain of e-
11  mail that was sent between myself and AP Barnett
12  regarding those grades. If I'm not mistaken, the
13  June, the specific dates in 13, that particular e-
14  mail was sent on the 14th, if I'm not mistaken. And
15  regarding the May 29th, again Your Honor, please if I
16  don't remember the exact date, I don't have a
17  refresher, it was submitted in a timely manner.
18      Q. So it's your testimony that for the two
19  specifications where you were alleged to have not
20  submitted electronic grades, you were saying that you
21  did in fact submit those grades.
22      A. Correct.
23      Q. Okay. Okay, now, I'm sorry. What did you
24  say for specification 13 for marking periods three
25  and four? When did you say that you submitted your

659

SEVERIN - CROSS - KIM

1
2  grades?
3       A. As I mentioned I my response, I do not
4  remember the exact date and time, but I believe it
5  was submitted prior to June 15th.
6       Q. Okay. Now, isn't it true, so when you
7  submitted the grades, in what form? How did you
8  submit the grades?
9       A. E-mail.
10      Q. To whom?
11      A. It was e-mailed to assistant principal
12  Barnett.
13      Q. And isn't it true that when you sent her
14  the first e-mail you did not actually attach
15  anything?
16      A. I was under the impression I did, but it
17  turned out that it was not attached.
18      Q. And did you, and isn't it true that you
19  then attempted to send the grades again?
20      A. Right away.
21      Q. By e-mail to Ms. Barnett?
22      A. Correct.
23      Q. And then isn't it true that on your second
24  attempt, you actually e-mailed the wrong file?
25      A. Yes, that's what, yes exactly.

660

SEVERIN - CROSS - KIM

1
2  Q.  Okay.  And the deadline for the submission
3  of the grades was June 15th, 2015?
4  A.  Correct.
5  Q.  Okay and it's your testimony that you sent
6  the first e-mail to AP Barnett before the deadline?
7  A.  Yes.
8  Q.  Okay.  Well isn't it true that at the
9  disciplinary conference you told principal Dorcely
10  that you submitted them on June 17, two days after
11  the deadline?
12  A.  I do not remember that meeting.  I
13  understand that there is a write up that documented
14  that.  The best recollection would be the chain of e-
15  mail that was sent and the directives that were given
16  regarding the date and time would definitely clarify
17  the record.
18  Q.  The second e-mail that you sent where it
19  was the wrong file, when did you send that?
20  A.  I do not know the exact date, but if there
21  was an e-mail, it would have shown the date and time.
22  Q.  But you don't have those e-mails?
23  A.  I was not anticipating producing that.  I
24  didn't know you were going to ask that question?
25  Q.  Do you still have those e-mails?

662

SEVERIN - CROSS - KIM

1
2      THE HEARING OFFICER:  Okay.  Not
3  hearing anything further that needs to be
4  addressed, let's now go off the record.  Thank
5  you.
6      MS. KIM:  Thank you.
7      MR. MESSINA:  Thank you.
8      (The hearing adjourned at 5:15 p.m.)

661

SEVERIN - CROSS - KIM

1
2  A.  I could look into my e-mail and sent box
3  and see.
4      MS. KIM:  Mr. Messenia if I could have
5  the witness produce these e-mails?
6      MR. MESSINA:  Sure.  Can we go off the
7  record for a second?
8      THE HEARING OFFICER:  Sure, let's go
9  off the record.
10     [OFF THE RECORD]
11     [ON THE RECORD}
12     THE HEARING OFFICER:  I think we're
13  talking about the e-mail.
14     [Laughter]
15     THE HEARING OFFICER:  All right, so
16  given the time of day, we're going to conclude
17  today's hearing.  In off the record discussion
18  it was agreed that we are going to reconvened on
19  Monday, July 25 at 1:00 p.m. and if need be, the
20  case will continue until Tuesday, July 26th.  Is
21  there anything further that needs to be
22  addressed?  I first turn to the department.
23     MS. KIM:  No.
24     THE HEARING OFFICER:  Respondent?
25     MR. MESSENIA:  No.

663

CERTIFICATE OF ACCURACY
I, Trisha Ruckart, do hereby certify that the foregoing
typewritten transcript of proceedings in the matter of New
York City Department of Education v. Dr. Jean Richard
Severin, File No. 29298 was prepared using the required
transcription equipment and is a true and accurate record
of the proceedings to the best of my ability. I further
certify that I am not connected by blood, marriage or
employment with any of the parties herein nor interested
directly or indirectly in the matter transcribed.
Signature:
Date:_____July 19, 2016_____

Student Index

664

Ashley Webber, Student A
Anisha John [phonetic], Student B
Sidney Bowery, Student C
Javinska Bernadine [phonetic], Student D

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
JEAN RICHARD SEVERIN
Section 3020-a Education Law Proceeding (File #29,298)


DATE:           July 25, 2016

TIME:           1:00 p.m. to 5:10 p.m.

LOCATION:       NYC Department of Education
                Office of Legal Services
                100 Gold Street, 3rd Floor
                New York, NY 10038

BEFORE:         JAMES BROWN, ESQ.
                HEARING OFFICER

APPEARANCES:    FOR THE COMPLAINANT:
                DANA KIM, ESQ., of Counsel
                NYC Department of Education
                Office of Legal Services
                49-51 Chambers Street
                New York, NY  10007
                Telephone:  (212) 374-6741
                dkim14@schools.nyc.gov

                FOR THE RESPONDENT:
                ALAIN MASSENA, ESQ.
                Massena Law P.C.
                305 Broadway, Suite 1001
                New York, NY 10007
                Telephone:  (212) 766-1700
                avm@massenalaw.com

Sheet 2

Table of Contents

OPENING STATEMENT

| NAME: | PAGE: |
| --- | --- |
| [None] | |

WITNESS EXAMINATION

| NAME: | PAGE: |
| --- | --- |
| J. Severin: | |
| Cross (cont.) by Kim | 670 |
| Redirect by Massena | 755 |
| Voir Dire by Kim | 758 |
| Redirect (cont.) by Massena | 760 |
| J. Duncan: | |
| Sworn | 738 |
| Direct by Massena | 738 |
| Cross by Kim | 748 |

CLOSING STATEMENT

| NAME: | PAGE: |
| --- | --- |
| [None] | |

EXHIBITS

| RESPONDENT | DESCRIPTION | I.D. | IN EV. |
| --- | --- | --- | --- |
| 13 | Email, substitute for original exhibit 760 | 760 | |

| DEPARTMENT OF EDUCATION | DESCRIPTION | I.D. | IN EV. |
| --- | --- | --- | --- |
| 32 | Letter to file regarding showing video 724 | 725 | |
| | in class room with lights off | | |

667

1    JEAN RICHARD SEVERIN - 07/25/16
2         (The hearing commenced at 1:00 p.m.)
3         THE HEARING OFFICER:  Good afternoon.
4    My name is James A. Brown.  I am the Hearing
5    Officer duly appointed pursuant to New York
6    State Education Law, Section 3020-a, its rules
7    and regulations, as well as the contractual
8    provisions by and between the United Federation
9    of Teachers and the New York City Department of
10   Education.  We are here today in the matter of
11   Jean Richard Severin, SED File Number 29,298.
12   This is a continuing matter.  I was just advised
13   by the Department's counsel that private counsel
14   for the Respondent is running a little bit late.
15   We're going to go off the record while we await
16   his arrival.  Thank you.
17         [OFF THE RECORD, Waiting for
18   Respondent counsel 1:01 p.m.]
19         [ON THE RECORD, Waiting for Respondent
20   counsel 2:14 p.m.]
21         THE HEARING OFFICER:  On the record.
22   All right, so we're back on the record after
23   some earlier unavoidable delay.  We're ready to
24   start.  Let's just note appearances, beginning
25   on my left.

668

JEAN RICHARD SEVERIN - 07/25/16
         MS. DANA KIM:  Yes, Dana Kim, for the
Department.  Good afternoon.
         THE HEARING OFFICER:  Good afternoon.
         MR. ALAIN MASSENA:  Alain Massena, for
the Respondent.  Good afternoon.
         THE HEARING OFFICER:  Good afternoon
to you.  And I'll note for the record that the
Respondent is also present here with us.  When
we left off last, we were in the middle of the
cross examination of the Respondent.  Ms. Kim,
are you ready now to continue?
         MS. KIM:  Yes.
         [Crosstalk]
         MR. MASSENA:  [Interposing] And, Your
Honor, I would like to--
         THE HEARING OFFICER:  [Interposing]
I'd just like to remind Dr. Severin that he is
still under oath.  Mr. Massena, you'd like to be
heard?
         MR. MASSENA:  Yes, just prior to
continuing redirect, I did turn over--continuing
cross--I did turn over to the Department, I
turned over the completed email that was
discussed.  I believe it was Respondent's Number

669

JEAN RICHARD SEVERIN - 07/25/16
13.  I turned that over to the Department of
Education.  Also, the Department made a
discovery request regarding the notes of Mr.
Satchell.  As to the notes, I was able to
acquire some notes; however, I am going to
object to those notes being turned over, as the
privacy, the confidentiality between the union
in terms of the union.
         THE HEARING OFFICER:  Let's go off the
record for a moment.
         [OFF THE RECORD, Conference 0:02:04]
         [ON THE RECORD, Conference 0:02:04]
         THE HEARING OFFICER:  So, in a brief
off the record conversation by and between the
parties and myself, it appears that we have
resolved this outstanding issue regarding the
disclosure of certain notes taken by the UFT
representative.  We're going to revisit this
matter later in the afternoon, and it's my
understanding that after Respondent's counsel
reviews said notes, a certain disclosure will be
made to the Department.  Ms. Kim, are you ready
to continue now with the cross examination?
         MS. KIM:  Yes.

670

1    JEAN RICHARD SEVERIN - 07/25/16
2        THE HEARING OFFICER:  Please do.
3        MS. KIM:  Thank you, Arbitrator Brown.
4    CROSS EXAMINATION (CONT.)
5    BY MS. KIM
6    Q.  Good afternoon, Dr. Severin.
7    A.  Good afternoon.
8    Q.  Now, just going back to one of the
9    allegations, Specification three talks about how you
10   failed to attend a common planning meeting on
11   December 23rd, 2015.  Do you remember that?
12   A.  Yes.
13   Q.  Okay.  And I believe your--
14       COURT REPORTER:  [Interposing] Speak
15   up.
16   Q.  I believe your testimony was that you
17   attended that meeting, but that someone had
18   fabricated that you were absent, correct, or had
19   written on the sign in sheet that you were absent.
20   A.  I did not say that it was fabricated.  I
21   said perhaps it may have been fabricated, but I know
22   I attended.  There was no one at the meeting.
23   Q.  So, it's your belief that someone may have
24   fabricated, on that sign in sheet, that you were
25   absent?

671

1        SEVERIN - CROSS - KIM
2    A.  No.
3    Q.  Okay.  What are you--what is it then that
4    you were trying to say?
5    A.  Well, what I am saying, is that when I
6    attended, after I got there and there was no one,
7    after about five, seven minutes I went back to my
8    room.  And supposedly, this sign in sheet shows up,
9    but there was no one there.
10   Q.  Okay.  So, you saw that sign in sheet,
11   correct?  It--
12   A.  [Interposing] Oh, no, no, no, no.  There
13   was no sign in sheet in the room.  I was--
14   Q.  [Interposing] No.
15   A.  --there by myself.
16   Q.  I am not talking about that day, but
17   subsequently for this case, you saw the sign in
18   sheet, correct?
19   A.  Yes.
20   Q.  Okay.  And on there, do you recall it had
21   the letters, ABS, for absent, correct?
22   A.  Yes.
23   Q.  And so that is not something that you
24   wrote, correct?
25   A.  No.

672

1        SEVERIN - CROSS - KIM
2    Q.  Okay.  So, if you didn't write it, then
3    someone else possibly could have written that--
4    [Crosstalk]
5        MR. MASSENA:  [Interposing] Objection,
6    it's speculation, Your Honor.
7        THE HEARING OFFICER:  I'll sustain.
8    Q.  So, it's your belief that possibly someone
9    had fabricated that?
10       MR. MASSENA:  Objection, Your Honor.
11       THE HEARING OFFICER:  No, I think
12   that, no, overruled.  I'll allow that question.
13   A.  The term fabricated, as mentioned earlier,
14   was just something that was said and for lack of
15   better word, but I'm not insinuating.  I am not
16   saying that somebody fabricate it.  What I'm--my
17   answer is that I went to the room 12:15.  By 12:22 I
18   walked back to my room.  And when I was called in for
19   a disciplinary meeting, there was this paper that was
20   signed with several people on it, but there was no
21   one there.
22   Q.  Did you ever report it to anyone that the
23   entry on that sign in sheet was not accurate?
24   A.  Did I ever--I didn't see it until just now.
25   Q.  At this hearing.

673

1        SEVERIN - CROSS - KIM
2    A.  Until the hearing, until the specs, until
3    the Specification that, yes.
4    Q.  So, when you finally were aware that there
5    was this inaccurate entry on that sign in sheet, did
6    you report it to anyone?
7    A.  There was then--
8    Q.  [Interposing] It's a yes or no question.
9    A.  Oh, no.
10   Q.  Okay.
11   A.  No.
12   Q.  Now, going into Specification five, that
13   Specification, if you remember, deals with a number
14   of common planning meetings that you failed to
15   attend, correct?
16   A.  Yes.
17   Q.  That was what the allegation was.  And your
18   testimony, on the last date, was that you attended
19   all of the meetings; but if you did not, it was
20   because you were at disciplinary meetings with either
21   the Principal or the AP, correct?
22   A.  Yes.
23   Q.  Okay.  And I believe you also testified
24   that when you were at the common planning meetings,
25   that you did not sign in sheets, correct?

674

SEVERIN - CROSS - KIM
1
2     A.  Correct.
3     Q.  Okay.  So, would you agree with me that the
4  procedure for these meetings was if you show up, then
5  you sign on the sign in sheets to document that you
6  have attended the meeting, correct?
7     A.  Correct.
8     Q.  So, why is it that, even though you say
9  that you attended these meetings, you never signed
10  the sign in sheet?
11     A.  Is that a yes or no question?
12     Q.  No.  I am asking you, if your testimony is
13  that you attended these common planning meetings, why
14  isn't it that you signed the sign in sheets to
15  document your attendance?
16     A.  I have signed many of the sign in sheets.
17     Q.  Okay, but you just said you didn't sign in
18  the sign in sheets, and that was your testimony on
19  the last date as well.
20     A.  I'm in agreement with you.  I said I have
21  signed many of them.  There are some that I didn't
22  sign.
23     Q.  Your testimony, on the last date and just
24  now, was that you did not sign the sign in sheets.
25     A.  I agree.

675

SEVERIN - CROSS - KIM
1
2     Q.  Okay, but now you are saying you that you did
3  sign the sign in sheets?
4     A.  I have signed many of them.  I don't
5  understand the question.
6     Q.  Okay.  Let me move on from that.  So,
7  you're saying you did sign many of the sign in
8  sheets.  That's--
9     A.  [Interposing] Yes.
10     Q.  --your testimony right now.
11     A.  Yes.
12     Q.  Okay.  Now, the documents that are in
13  evidence for Specification five, for the rest of the
14  allegations where you are alleged to have not
15  attended the common planning meetings, if the sign in
16  sheet says you were absent, so for those sign in
17  sheets--
18     A.  [Interposing] Oh, for those sign in sheets,
19  no, I did not.
20     Q.  Okay.  You did not what?
21     A.  Sign.
22     Q.  Okay.
23     A.  Yes.
24     Q.  But it's your testimony that you were
25  there.

676

SEVERIN - CROSS - KIM
1
2     A.  Yes, for many of them, yes.
3     Q.  Okay.  So, then why didn't you sign the
4  sign in sheet if you were there?
5     A.  I don't know that.
6     Q.  You didn't think it was important for you
7  to--
8     A.  [Interposing] I don't know.
9     Q.  Let me finish my question.
10     A.  Oh.
11     Q.  You did not think it was important for you
12  to document your own attendance at a common planning
13  meeting?
14     A.  I don't know, ma'am.
15     Q.  Okay.  You don't have a reason.
16         MR. MASSENA:  Objection.
17         THE HEARING OFFICER:  No, no,
18  overruled.
19     A.  I don't know, ma'am.
20     Q.  Why don't you know?
21     A.  I don't know.
22     Q.  Is it because you didn't feel like signing
23  it?
24     A.  I don't know, ma'am.
25         MR. MASSENA:  Objection.

677

SEVERIN - CROSS - KIM
1
2         THE HEARING OFFICER:  All right, let's
3  move on.
4         MS. KIM:  Okay.
5     Q.  Now, the disciplinary meetings that you
6  were summoned to, by either the Principal or the
7  Assistant Principal, you did not attend all of them,
8  correct?
9     A.  Excuse me?
10     Q.  The disciplinary meetings that you were
11  summoned to by either the Principal or the AP, isn't
12  it true that you did not attend every single one of
13  them?
14     A.  I don't recall.  Which, I mean, which spec
15  is that--
16         [Crosstalk]
17     Q.  [Interposing] Okay, that's not a
18  Specification.  You're not charged with not attending
19  a disciplinary meeting, but I'm asking you, do you
20  remember that for the disciplinary meetings that you
21  were summoned to by the Principal or the AP, isn't it
22  true that you did not attend all of those meetings?
23     A.  What's the--okay, you're asking me if I
24  attended all of the disciplinary meetings?
25     Q.  Did you?

SEVERIN - CROSS - KIM
1
2     A. That's the question.
3     Q. Did you?
4     A. Yes, I mean--
5     [Crosstalk]
6     Q. [Interposing] Every single one of them?
7     A. No.
8     Q. Okay. Isn't it true that for some of the
9  disciplinary meetings you chose not to attend,
10 correct?
11    A. Yes.
12    Q. Okay. And that instead of your going to
13 the meeting, your UFT representative went--
14    A. [Interposing] Oh, okay.
15    Q. --in place of you, correct?
16    A. Yes, yes.
17    Q. Okay.
18    A. Now I understand where you were going, I'm
19 sorry.
20    Q. Okay. And isn't it true that the reason
21 why you did not attend some of the disciplinary
22 meetings is because you refused to attend?
23    A. You don't know my reason.
24    Q. I am asking you--
25       THE HEARING OFFICER:  [Interposing]

SEVERIN - CROSS - KIM
1
2     It's a question to you, Dr. Severin.  Your job,
3  as the witness, is to answer the questions.
4        MR. SEVERIN:  Oh, she's asking my
5     thought.
6     A. Then no.
7        THE HEARING OFFICER:  There's a
8     question put to you, your answer?
9     A. Yes. Can you repeat the question, please?
10    Q. Isn't it true that for some of the
11 disciplinary meetings that you did not attend, the
12 reason why is because you refused to attend, correct?
13    A. Refuse is a strong word.
14    Q. Okay. So, what word would you use?
15    A. The environment created by the Principal
16 was so hostile that it was extremely toxic towards
17 me. Afterwards, I would feel sick. I was feeling
18 tired. I--
19    [Crosstalk]
20    Q. [Interposing] Okay. So--
21    A. --I would have headaches, so for my
22 preservation, some of these meeting were so toxic, it
23 was best for me to just let him just write his
24 letters. Regardless of what I say, I will still be
25 written up. So, that's why I didn't attend, and I

SEVERIN - CROSS - KIM
1
2  requested my UFT to attend for me.
3     Q. Okay. Thank you for that answer.  Now,
4  going back to I'm now referring to Specification
5  seven, now we already went over your testimony
6  regarding the allegation where you failed to submit a
7  mid-term exam for review and feedback. Do you
8  remember that?
9     A. Mid-term exam, yes.
10    Q. Yes. And with respect to the mid-term
11 exam, would you agree with me that one of the reasons
12 why teachers are asked to submit their mid-term exams
13 for review and feedback is so that the administration
14 can know that the content is appropriate for testing?
15    A. Please repeat the question.
16    Q. Sure. Would you agree with me that one of
17 the reasons why administrators have teachers submit
18 mid-term exams for review and feedback, prior to the
19 administration of the exam, is because the
20 administration wants to make sure that the content
21 that you're testing for is appropriate, correct?
22    A. Yes.
23    Q. And that the subjects or the content on the
24 mid-term exam covers topics that are in sync with the
25 subject that you are teaching and the class

SEVERIN - CROSS - KIM
1
2  curriculum, correct?
3     A. Yes.
4     Q. Okay. Now, you are also charged with a few
5  allegations, where you were absent from work, but you
6  failed to notify the school or administration that
7  you were absent, correct?
8     A. Correct.
9     Q. Okay. And I believe your testimony was
10 that you did follow school policy by reaching out to
11 SubCentral, correct?
12    A. Correct.
13    Q. And you also testified that prior to your
14 receiving the Specifications in this case, you were
15 not aware that you were supposed to reach out to the
16 school or to a direct supervisor, correct?
17    A. No.
18    Q. That wasn't your testimony on the last
19 date?
20    A. Please repeat that again.
21    Q. Okay. Now, isn't it true also that you
22 testified before that you were not aware that you had
23 to notify the school or a direct supervisor that you
24 were going to be absent from work. You were not
25 aware of this prior to being served with the charges

682

SEVERIN - CROSS - KIM

1    SEVERIN - CROSS - KIM
2    in this case.
3        A.  I do not remember, if you can refresh my
4    memory with the answer, where I say that.  I don't
5    recall if I had said that.
6        Q.  You don't remember if you said that.
7        A.  No.
8        Q.  You were not, okay.
9        MS. KIM:  Can we have a moment off the
10   record?
11       THE HEARING OFFICER:  Sure, let's go
12   off the record.
13       MS. KIM:  Okay.
14       [OFF THE RECORD, Conference 2:35 p.m.]
15       [ON THE RECORD, Conference 2:37 p.m.]
16       THE HEARING OFFICER:  Back on the
17   record.
18       MS. KIM:  Now, I am looking at the
19   transcript from our last hearing date, July 14.
20   And I am on page 638 of the transcript.  And if
21   I could have--I am going to show Mr. Massena
22   first.  And then if you could hand that--give it
23   to your client, please.
24       [Background conversation]
25       MR. MASSENA:  Six twenty eight, or

683

1    SEVERIN - CROSS - KIM
2    thirty eight, correct?
3        MS. KIM:  Yes.
4        MR. MASSENA:  Okay.
5        A.  Yes.
6        Q.  You read the transcript that was put in
7    front of you, correct, Dr. Severin?
8        A.  Yes.
9        Q.  And in looking at that, does that refresh
10   your recollection as to what your testimony was on
11   the last date?
12       A.  Yes.
13       Q.  Right, and on the last date, did you not
14   testify that you did not know, or you were not
15   informed, that you had to reach out to the school or
16   a direct supervisor as to an absence, correct?
17       A.  We were repeatedly to contact SubCentral.
18       Q.  That was not my question to you.
19       A.  Yes.  I'm saying to you.
20       Q.  That was not question to you.
21       [Crosstalk]
22       MR. MASSENA:  Objection, Your Honor,
23   argumentative, Your Honor.
24       THE HEARING OFFICER:  All right.
25   Let's present the question again.  Ms. Kim,

684

1    SEVERIN - CROSS - KIM
2    you're referencing a question you have already
3    asked this witness on cross examination?
4        MS. KIM:  Yes, so--
5        THE HEARING OFFICER:  [Interposing]
6    You're asking for--
7        MS. KIM:  --I asked him prior.  He
8    didn't remember what his testimony was.  So, I
9    was refreshing his recollection.
10       THE HEARING OFFICER:  Presumably, this
11   is a spring board to some avenue of questioning
12   you wish to put to--
13       MS. KIM:  [Interposing] Yes, that is
14   correct.
15       THE HEARING:  --the witness, but you
16   have already asked him the question.
17       MS. KIM:  Yes, yes.
18       THE HEARING OFFICER:  Okay, please
19   proceed, let's go.
20       MS. KIM:  Yes.
21       Q.  So again, my question to you, Dr. Severin,
22   on the last date when you testified, isn't it true
23   that you said that you did not know that you were
24   supposed to reach out to the school or to a direct
25   supervisor with respect to being absent?  You did not

685

1    SEVERIN - CROSS - KIM
2    know about until you saw the specs in this case,
3    correct?
4        A.  No.
5        Q.  That wasn't your testimony.
6        A.  Allow me to finish my answer, please.
7        Q.  It's a yes or a no, so it's no, correct?
8        A.  No.
9    [Background noise coughing]
10       Q.  You said that the school told you that you
11   had to reach out to SubCentral.
12       A.  All right.
13       Q.  And that's the only directive that the
14   school gave to you with respect to reporting an
15   absence.
16       A.  Repeatedly.
17       COURT REPORTER:  Speak up.
18       MR. SEVERIN:  Okay.
19       COURT REPORTER:  What was your answer?
20       MR. SEVERIN:  Repeatedly, yes.
21       COURT REPORTER:  Thank you.
22       Q.  And they gave you no other directive to
23   reach out to the school or to a direct supervisor as
24   to an absence.
25       A.  We are reminded--

686

**SEVERIN - CROSS - KIM**

1
2  [Crosstalk]
3  Q. [Interposing] It's a yes or no.
4  [Crosstalk]
5  MR. MASSENA: [Interposing] He's
6  answering the question, Your Honor.
7  MS. KIM: It's a yes or no question,
8  and it's not that difficult.
9  MR. MASSENA: Objection, Your Honor,
10  argumentative--
11  [Crosstalk]
12  THE HEARING OFFICER: [Interposing]
13  Hang on, let's--if you want a yes or no, Ms.
14  Kim, let's frame the question in the form that
15  requires a yes or no answer, and we'll go from
16  there. So, why don't you repeat your question,
17  please.
18  MS. KIM: Okay.
19  Q. So, what you were saying is that the school
20  never informed you that you had to reach out to the
21  school or a direct supervisor to tell them that you
22  were going to be out of work. The school never told
23  you that you had to do that.
24  MR. MASSENA: I believe this was asked
25  and answered, Your Honor.

687

**SEVERIN - CROSS - KIM**

1
2  THE HEARING OFFICER: I thought, I
3  believe we have an answer to the question, Ms.
4  Kim. It's my understanding that the
5  Respondent's testimony is that he was never
6  informed of that. You know, I'm allowing you
7  some latitude to follow up on that, but I think
8  the record is pretty clear in terms of this
9  witness' testimony and response.
10  MS. KIM: Okay.
11  Q. Now, the two years that you were at Urban
12  Academy, if you were absent, the protocol that you
13  would follow is that you would always call
14  SubCentral.
15  A. Yes.
16  Q. Okay. And during the two years that you
17  were at the school, you never reached out to a
18  supervisor to let them know that you were going to be
19  absent?
20  A. Please rephrase the question. I don't
21  understand it.
22  Q. During the two years that you were at Urban
23  Academy, did you ever reach out to a supervisor or to
24  the school that you would be absent?
25  A. Yes.

688

**SEVERIN - CROSS - KIM**

1
2  Q. Okay. If that wasn't what you were told to
3  do, then why did you reach out to a supervisor or to
4  the school?
5  A. Is that an if question, a yes or no?
6  Q. Why did you do that?
7  A. That's a yes or no question?
8  THE HEARING OFFICER: It's not a yes
9  or no question--
10  [Crosstalk]
11  THE HEARING OFFICER: [Interposing]
12  No, no, no, no, that's okay, it's okay. Let's
13  just try to get through the afternoon as
14  efficiently as we can.
15  MR. SEVERIN: Oh, okay.
16  THE HEARING OFFICER: That, in my
17  estimation, was clearly not a yes or a no
18  question. It was more open ended and your
19  answer is...?
20  A. Please repeat the question.
21  Q. If the protocol that you followed was to
22  SubCentral because that's what the school told you to
23  do, then why did you reach out to the school or to a
24  supervisor to let them know that you were going to be
25  absent from work?

689

**SEVERIN - CROSS - KIM**

1
2  A. Okay. My apologies for not understanding
3  the question. As a courtesy, the school would say as
4  a courtesy, inform your colleagues that you're not
5  going to be there, especially if you co-teach. At
6  the same time, you are informed, but the most
7  important thing that, on the first meeting in
8  September, was contact SubCentral if you know you're
9  not going to be available for that day. Contact
10  SubCentral. I have contacted Principal Dorcely, Ms.
11  Barnett, my co-teachers, Fagin, Zaike, Burlingame, on
12  several occasions.
13  Q. So, according to you, contacting an
14  administrator or someone at the school was just a
15  courtesy--
16  [Crosstalk]
17  A. [Interposing] That is correct. That is
18  what Principal Dorcely emphasized.
19  Q. Okay.
20  A. It's courtesy to inform the person that
21  you're not going to be there, and that they would be
22  able to do what's necessary to cover their classes.
23  Q. So, according to your testimony, it wasn't
24  a requirement to reach out to the members of the
25  school, but just a mere courtesy.

SEVERIN - CROSS - KIM

1
2    A. It, courtesy was emphasized, yes.
3    Q. Okay. Now, I am going to show you what's
4 already in evidence as Department Exhibit Number 26.
5 And it's a letter to file from June 12th, 2015. Dr.
6 Severin, you have seen that letter, correct?
7    A. Yes.
8    Q. Okay. And in that letter, it talks about
9 your not calling the school ahead of an absence,
10 correct?
11    A. Correct.
12    Q. Okay. And in this letter, it documents
13 what your response was, correct--
14    A. [Interposing] Yes.
15    Q. --at the meeting?
16    A. Yes.
17    Q. Okay. And at that meeting, when you were
18 asked about why you did not reach out to the school,
19 call them regarding your absence, you had responded
20 saying since 1996 I have been teaching, even in the
21 school community. I never had any issue about being
22 absent or not calling, correct? That's what you said
23 in part, correct?
24    A. Yes.
25    Q. Correct, okay. And do you see how, in this

691

SEVERIN - CROSS - KIM

1
2 letter, the conclusion that the Principal reaches is
3 that your failure to adhere to school policy, in
4 notifying the school in advance of your absence,
5 constitutes neglect of duty, correct? Do you see
6 that there?
7    A. Yes.
8    Q. Okay.
9    A. Okay.
10    Q. And this letter is dated June 12th, 2015,
11 correct?
12    A. Yes, that's immediately after he learn--
13 [Crosstalk]
14    Q. [Interposing] Okay, your answer was yes,
15 correct?
16    A. Correct.
17    Q. Okay. And this was issued prior to your
18 absences, the charges for the following school year,
19 2015-2016, where you were absent from school,
20 correct?
21    A. I'm sorry, say that again?
22    Q. Okay. This letter predates the absences
23 for which you were charged in this case, correct,
24 October 23rd, 26th, 2015, correct? And also for
25 those two dates, correct?

SEVERIN - CROSS - KIM

1
2    A. Yes.
3    Q. Okay. So, you were on notice, with respect
4 to at least Principal Dorcely wanting you to teach
5 out to the school to let them know that you were
6 going to be absent from work, correct?
7    A. Correct.
8    Q. Okay. Now, Dr. Severin, with respect to
9 the September 11th, 2015, Specifications, where you
10 testified that your co-teacher, and some of other
11 Social Studies teachers, wanted to do a special
12 presentation to memorialize or commemorate September
13 11th, and you said that you attempted to show a
14 lesson plan to Principal Dorcely, correct?
15    A. I did. I did show Principal Dorcely a
16 lesson plan.
17    Q. Okay.
18    A. Yes.
19    Q. Now, you testified, on the last date, that
20 I believe Principal Dorcely, how is it that he asked
21 you for the lesson plan?
22    A. When he came in, he saw the video showing.
23 And then he saw that it was something different. So,
24 he called me outside, and then he asked me what is
25 this, what's this, et cetera, where is the lesson

693

SEVERIN - CROSS - KIM

1
2 plan. And I informed him, I said, Principal Dorcely,
3 I have my lesson plan on the scientific revolution.
4 I left him standing there. I walked back inside. On
5 my desk, I took my lesson plan, and walked back. I
6 said, this is my lesson plan on the scientific
7 revolution. Ms. Fagan came in and mentioned--Ms.
8 Fagan is my co-teacher--she came in and mentioned
9 that they want to commemorate something regarding
10 September 11.
11    Q. Okay, but I, I am not asking you about Ms.
12 Fagan. I am asking you right now about your--
13 [Crosstalk]
14    A. [Interposing] I am answering your question.
15    Q. --Principal Dorcely.
16    A. Yes, he asked me. I went to my desk. I
17 took the lesson plan, and I walked back out. I said
18 this is the lesson plan on scientific revolution.
19    Q. So, you showed it to him then?
20    A. Yes.
21    Q. Did he look at it?
22    A. He was not interested in that.
23    Q. Okay.
24    A. It was, he was combative from day one. He
25 already told me that--

694

SEVERIN - CROSS - KIM

1
2  [Crosstalk]
3  A. --he was going to write me. You asked me--
4  Q. [Interposing] Okay.
5  A. --a question. Let me answer.
6  Q. I am not interested in what he said to you
7  from day one.
8  A. No--
9  [Crosstalk]
10  THE HEARING OFFICER: [Interposing]
11  Hang on, hang on, hang on. Let's do this in an
12  orderly way.
13  MR. SEVERIN: Okay.
14  THE HEARING OFFICER: It's Ms. Kim's
15  job to ask questions. Let's now move on to the
16  next question.
17  Q. So, your testimony was that when Principal
18  Dorcely asked you for it, you went back into the
19  class room, and you got the lesson plan.
20  A. Yes.
21  Q. Where was the lesson plan?
22  A. On my desk.
23  Q. Okay. It was sitting on your desk?
24  A. Yes, it was a hard copy.
25  Q. It was in plain sight.

695

SEVERIN - CROSS - KIM

1
2  A. What does that mean?
3  Q. It was sitting right on your desk. So, if
4  anyone were looking at your desk at that time, they
5  would have seen this document on your desk?
6  A. Ms. Kim, I had so many different things on
7  my desk, but I know where my lesson plan was. I just
8  went in and got it.
9  Q. Okay, but when Principal Dorcely, and the
10  two APs went into the class room, where were you in
11  the class room?
12  A. I was in front by the projector, I mean by
13  the, yeah, projector, whatever they are showing the
14  video.
15  Q. Okay. Now, on the last date, you gave
16  testimony about the grades that you had to submit,
17  the E-G-G files, correct?
18  A. Yes.
19  Q. Okay. And you mentioned that you had
20  submitted it on time, but the first email that you
21  sent did not have an attachment, correct?
22  A. I was informed, at this point, I had said
23  that, yes.
24  Q. Okay. I am not, well, you--isn't that the
25  case you attached, or you did not attach a file to

696

SEVERIN - CROSS - KIM

1
2  that first email, correct?
3  A. I thought I did.
4  Q. Okay, but you did not, correct?
5  A. I thought I did.
6  Q. But you did not, correct?
7  A. I thought I did.
8  THE HEARING OFFICER: Okay. Now,
9  we're moving on to a different question. The
10  question is now did you, in fact, to your
11  knowledge, Dr. Severin--
12  DR. SEVERIN: [Interposing] Yes.
13  THE HEARING OFFICER: --attach?
14  DR. SEVERIN: Yes.
15  THE HEARING OFFICER: Okay.
16  Q. Okay, but it turned out that you did not,
17  correct?
18  A. Correct.
19  Q. And then when you were told that you did
20  not, you then emailed it again, correct?
21  A. Right away, yes.
22  Q. And then the second time you emailed it, it
23  was, in fact, the wrong file, correct?
24  A. Yes.
25  Q. Okay. And when you say you emailed it

697

SEVERIN - CROSS - KIM

1
2  right away, what do you mean by right away?
3  A. As soon as I learned of the error, I
4  rectified it, but I guess under the pressure to send
5  it, that's probably why I ended up sending the wrong
6  file.
7  Q. Okay. So--
8  [Crosstalk]
9  A. [Interposing] Because there's multiple
10  files that share the same link, so the wrong one was
11  attached.
12  Q. And the deadline for submitting those
13  grades were June 15, 2015, correct?
14  A. Correct.
15  Q. Okay. And your testimony was that the
16  first email, at least you did submit it either on or
17  before the deadline?
18  A. Yes.
19  Q. Okay. Dr. Severin, in preparation for this
20  case, you've seen the documents that the Department
21  turned over, correct?
22  A. Yes.
23  Q. As a part of its discovery request?
24  A. Yes.
25  Q. And with respect to the E-G-G files, you

698

SEVERIN - CROSS - KIM

1 SEVERIN - CROSS - KIM
2 have seen the email exchange between you and Ms.
3 Barnett, correct?
4     A. Correct.
5     Q. Okay. And so let me--
6         MS. KIM: I'd like to have the witness
7 look at Department Exhibit Number 24,
8 specifically five--
9         [Crosstalk]
10        THE HEARING OFFICER: [Interposing]
11 Let's take a break for a moment. We're going to
12 take a two minute break, off the record, okay?
13        [OFF THE RECORD, Break 2:52 p.m.]
14        [ON THE RECORD, Break 2:56 p.m.]
15        [Background conversation]
16        THE HEARING OFFICER: Ms. Kim?
17        MS. KIM: Yes. Mr. Massena, I would
18 like to have the witness shown Department
19 Exhibit Number 24, and you can to go to the
20 fourth page in this exhibit.
21        [Background conversation]
22        MR. MASSENA: You said Department's
23 Number 24?
24        MS. KIM: Twenty four, yes.
25        MR. MASSENA: Okay. Which spec was

699

1 SEVERIN - CROSS - KIM
2 that?
3        MS. KIM: That is 13.
4        MR. MASSENA: Thirteen, okay.
5        MS. KIM: Yes.
6        MR. MASSENA: Okay, Respondent Number
7 13?
8        MS. KIM: Yes.
9        MR. MASSENA: Okay, I'm sorry--
10        [Crosstalk]
11        MS. KIM: --Specification 13.
12        MR. MASSENA: Okay. Yes, I am showing
13 it to him.
14     Q. Dr. Severin, you can skip to the fourth
15 page of this document.
16        MS. KIM: If I could have him look at
17 the document starting from that page on.
18     Q. So, Dr. Severin, these documents in front
19 of you, you have seen them, correct, you have seen
20 this before?
21     A. Just one second. Okay, yes.
22     Q. Now, based on this email exchange, are
23 they--they are, in fact, emails between you and Ms.
24 Barnett, correct?
25     A. Yes.

700

1 SEVERIN - CROSS - KIM
2     Q. Okay. And in looking at the email
3 exchanges, isn't it true that the first date that you
4 tried to submit the E-G-G files were actually the
5 date was June 17 and not either before June 15 like
6 you said?
7     A. Yes.
8     Q. Okay. And in looking at this email, isn't
9 it also true that if you look at the last two pages
10 of this document, now isn't it true here, in looking
11 at these emails, that, and especially the last page,
12 that as of June 23rd, 2015, as of that date, you
13 still had not sent to Ms. Barnett your marked period
14 three or four grades, correct?
15     A. That's inaccurate.
16     Q. These, what's represented in these emails
17 is inaccurate.
18     A. Yes.
19     Q. Okay. So, what is inaccurate about it?
20     A. What's inaccurate is if the deadline was
21 the 15th, Ms. Barnett send it to me on the 15th.
22 Something is inaccurate in this here. It says sent
23 from Ms. Barnett on Monday, 15th, at 7:10 p.m., and
24 here is my response. On the seventeenth I responded,
25 Ms. Barnett, here is the grade for the last marking

701

1 SEVERIN - CROSS - KIM
2 period. And then it says I don't see anything. Ms.
3 Barnett is saying, I'm assuming she is saying she did
4 not see anything. And then that came on the
5 eighteenth. So, at the end, the inaccuracy is it
6 could not have been the deadline on the fifteenth for
7 me to have, you know, receive it on the same day and
8 submit it on the same day.
9     Q. But correct if I'm wrong, even as, based on
10 this email, as of June 23rd, 2015, you had not
11 submitted the grades, correct?
12     A. Like I say, this is inaccurate.
13     Q. I am asking you. I am not talking about
14 whatever inaccuracy you just talked about, but based
15 on the last document in this packet, if you could
16 please turn to that page--
17     A. [Interposing] Yes, go ahead.
18     Q. --as you can see, as of June 23rd, 2015,
19 you still had not sent to Ms. Barnett your grades for
20 the marking period three or four, correct?
21     A. This is definitely inaccurate. That's
22 incorrect.
23     Q. So, this email is wrong, too.
24     A. I am assuming, yes, it is, because--
25     Q. [Interposing] Okay--

702

SEVERIN - CROSS - KIM
2     A.  --there is no way that Ms. Barnett
3  documented when she received the file from me.
4     Q.  Okay--
5     A.  [Interposing] So, I don't know.  This is
6  incomplete.
7     Q.  Your testimony is that this email is wrong.
8         THE HEARING OFFICER:  Which, hang on,
9  which email are you referring to?
10        MS. KIM:  The last page--
11        THE HEARING OFFICER:  [Interposing]
12 Thank you.
13        MS. KIM:  --of this packet.
14        THE HEARING OFFICER:  I just want the
15 record to reflect--
16        MS. KIM:  [Interposing] Sure.
17        THE HEARING OFFICER:  -what you're
18 referring to.
19        MS. KIM:  Sure.
20        MR. SEVERIN:  Yes.
21     Q.  The very last page, where it has in the
22 middle in red, immediate action.  So, you were saying
23 that what is represented here in this email--
24        [Crosstalk]
25     Q.  --by Ms. Barnett to you, saying that she

703

SEVERIN - CROSS - KIM
2  still has not received your grades for the marking
3  period three and four periods, this is inaccurate as
4  well.
5     A.  Yes.
6     Q.  Okay.  So, did you ever--when did you
7  submit the grades to her?
8     A.  Ma'am, I don't know.
9     Q.  You don't know.
10    A.  I don't have that in front of me.  I wasn't
11 preparing for that.
12    Q.  Okay.  So, just to clarify, this email is
13 also inaccurate.
14    A.  Yes.  I will say that, because I submitted
15 the grades, and it is of interest to the Court to
16 find out a complete email, when did she receive the
17 grade from me.
18    Q.  Well, it says in her email, on the last
19 page, that as of 2:11 p.m., I have not received your
20 grades for marking period three or marking period
21 four.
22    A.  This is totally inaccurate.
23    Q.  So, you're saying--
24        [Crosstalk]
25    A.  [Interposing] I would like to see--

704

SEVERIN - CROSS - KIM
2     Q.  [Interposing] Dr. Severin--
3     A.  --when she received it.
4     Q.  You are saying that this email is
5  inaccurate.
6     A.  Yes.
7     Q.  That what Ms. Barnett has represented in
8  this email--
9     A.  [Interposing] Is inaccurate.
10    Q.  --is wrong.
11    A.  Yes.
12    Q.  It's incorrect.
13    A.  Yes.
14    Q.  Because you did submit your grades.
15    A.  Yes.
16    Q.  You submitted the correct E-G-G files for
17 marking period three and four.
18    A.  Correct.
19    Q.  Okay.  Do you have the emails for that?
20    A.  I didn't know I was going to be asked for
21 that right now.
22    Q.  Okay, but you do have emails showing that
23 you did submit it to her.
24    A.  Normally, yes.
25    Q.  Within the deadline that is represented in

705

SEVERIN - CROSS - KIM
2  this email?
3     A.  Stating the deadline--
4         [Crosstalk]
5     Q.  [Interposing] My question to you is you
6  were saying--
7         MR. MASSENA:  [Interposing] Objection.
8     Q.  --that you do have emails--
9         THE HEARING OFFICER:  [Interposing]
10 Wait, there's an objection, hang on.  There's an
11 objection.  Listen to the question, and to the
12 best of your ability provide a response.
13        MR. SEVERIN:  Okay.
14        THE HEARING OFFICER:  I think the
15 question is a bit different than the answering
16 you're offering.
17        MR. SEVERIN:  Okay.
18        THE HEARING OFFICER:  Thank you.
19    Q.  So, what you are saying is you--that the
20 grades that you submitted, you submitted them within
21 the deadline period?
22    A.  Yes.
23    Q.  Is that what you're saying?
24    A.  Yes.
25    Q.  And you're saying that you do have these

706

SEVERIN - CROSS - KIM

1
2 emails showing that you submitted these grades within
3 the deadline period.
4      A.  I don't have them with me, but I'm sure I
5 can produce that.
6      Q.  Okay.
7      A.  Ms. Barnett has a record of when I
8 submitted the grades.
9      Q.  Oh, and what's in front of you right now is
10 not it.
11      A.  No, it's not.
12      Q.  Okay.
13      A.  It does show when I sent it, when I
14 submitted the grades.
15      Q.  Okay.  So, whatever Ms. Barnett has
16 represented in her emails is totally false and
17 inaccurate?
18      A.  I would not say totally false.
19      Q.  But it's inaccurate--
20      A.  [Interposing] It's inaccurate.
21      Q.  --in your opinion.
22      A.  Yes.
23      Q.  Okay.  Now, for Specification 14, Dr.
24 Severin, that's the allegation where you failed to
25 supply marking period two E-G-G files on or about May

707

SEVERIN - CROSS - KIM

1
2 29th, 2015.  Now, for that Specification, okay.  So,
3 this is Department Exhibit Number 25, Specification
4 14.
5          MS. KIM:  Mr. Massena, if you can show
6      the witness a copy, I would appreciate it.
7          MR. MASSENA:  Department what again,
8      sorry?
9          MS. KIM:  It should be Department
10      Number 25.  It's Specification 14.
11      Q.  So, Dr. Severin, you have seen this letter
12 before, correct?
13      A.  Yes.
14      Q.  And this is something that you received and
15 signed for, correct?
16      A.  Yes.
17      Q.  And with respect to Specification 14, it's
18 of a similar allegation as to the one--as to the one
19 we just discussed, where you're alleged to have
20 failed to submit your marking period two E-G-G files,
21 correct?
22      A.  Yes.
23      Q.  And for that particular date, May 29, 2015,
24 it's true--isn't it true that you did not submit the
25 grades?

708

SEVERIN - CROSS - KIM

1
2      A.  No, it's not true.
3      Q.  So, you did submit them.
4      A.  Yes.
5      Q.  Okay.  Now, if you look at the letter,
6 paragraph two, you will see.  Read that paragraph to
7 yourself, please.
8      A.  Go ahead.
9      Q.  Ready?
10      A.  Yes.
11      Q.  Okay.  So, when you were asked by the
12 Principal why you didn't submit your E-G-G file for
13 that particular date, do you recall your response
14 being I tried to submit my grades but it didn't go
15 through?
16      A.  Yes.
17      Q.  Okay.  And when the Principal asked you why
18 did you not inform me of this issue, do you recall
19 saying to him, when I submitted the file and it
20 didn't go through, I realized once you sent me the
21 email?  Do you remember that?
22      A.  Yes.
23      Q.  Okay.  So, here you're saying that you did
24 submit the grades via email?
25      A.  Yes.

709

SEVERIN - CROSS - KIM

1
2      Q.  But the grades did not go through.
3      A.  Yes.
4      Q.  Okay.  Is it similar--
5      A.  [Interposing] I was informed it didn't go
6 through.
7      Q.  Okay.  And so because you didn't submit it,
8 the email properly, you missed the deadline, correct?
9          MR. MASSENA:  Objection, Your Honor.
10          THE HEARING OFFICER:  Yes.  I am going
11      to sustain the objection just as to form.
12          MS. KIM:  Okay, no problem.
13      Q.  Now, the deadline that you were given was
14 May 29, correct?
15      A.  Yes.
16      Q.  Okay.  And because you--the grades didn't
17 go through, you missed that deadline, correct?
18      A.  Yes.
19      Q.  Okay.  And if you look at the last page of
20 this document, if you look at the last page, please.
21      A.  Go ahead.
22      Q.  If you could turn to the last page.  Do you
23 see that document, correct?
24      A.  Yes.
25      Q.  And it's an email exchange between you and

710

SEVERIN - CROSS - KIM

1        SEVERIN - CROSS - KIM
2    Principal Dorcely, correct?
3        A.  Yes.
4        Q.  Okay.  And do you see how--I am going to
5    point where it says on May 29, 2015, at 9:19:03 Steve
6    Dorcely, he sent you an email below that, correct?
7        A.  Yes.
8        Q.  And it says there that as of 7:03 p.m., I
9    have not received your E-G-G files, correct?
10       A.  Yes.
11       Q.  Okay.  And do you see, above that, is your
12   response to Principal Dorcely's email, correct?
13       A.  Yes.
14       Q.  Okay.  And in there, you don't talk about
15   E-G-G files.  You're just, you were telling him that
16   you can't report to work on that following Monday or
17   Tuesday, correct?
18       A.  That is the distortion of this, of
19   Principal Dorcely because--
20       [Crosstalk]
21           THE HEARING OFFICER:  [Interposing]
22   Hang on, hang on, hang on, hang on.  Ms. Kim, if
23   you believe that the witness is not being
24   responsive to your question, please ask for my
25   intervention and ask me to direct the witness to

711

1        SEVERIN - CROSS - KIM
2    respond to your question.
3           MS. KIM:  Yes.
4           THE HEARING OFFICER:  I really would
5    like to keep the tone as civil as possible for
6    the balance of this hearing.
7           MS. KIM:  Yes.
8           THE HEARING OFFICER:  So, why don't
9    you--
10          [Crosstalk]
11          THE HEARING OFFICER:  [Interposing]
12   No, that's fine.  So, why don't you ask the
13   question again and see if we can get an answer.
14   If you feel again it's not responsive, please
15   seek my intervention.
16          MS. KIM:  Yes, I will.
17       Q.  So, Dr. Severin, again, above Principal
18   Dorcely's email to you is your response to him,
19   correct?
20       A.  Correct.  No, that's inaccurate.
21       Q.  That is not your response--
22       [Crosstalk]
23       A.  [Interposing] That is not my response to
24   him.
25       Q.  Okay, but that is your email, correct?

712

SEVERIN - CROSS - KIM

1        SEVERIN - CROSS - KIM
2        A.  Yes.
3        Q.  Okay.  And that email, as you can see, is
4    right above the one that he wrote to you, correct?
5        A.  Correct.
6        Q.  And in your email, there is no mention
7    about E-G-G files, correct?
8        A.  That's correct.
9        Q.  And in your email, there is no attachment,
10   correct?
11       A.  That is correct--
12       Q.  [Interposing] Okay, thank you.  Thank you.
13       A.  Okay.
14       Q.  Thank you.
15          MR. MASSENA:  Off the record for a
16   moment, please.
17          THE HEARING OFFICER:  Sure, let's go
18   off the record.
19          [OFF THE RECORD, Break 3:05 p.m.]
20          [ON THE RECORD, Break 3:11 p.m.]
21          [Background conversation]
22          THE HEARING OFFICER:  Ms. Kim?
23          MS. KIM:  Yes, thank you.
24       Q.  Now, Dr. Severin, with respect to emergency
25   lesson plans, you're familiar with what they are,

713

1        SEVERIN - CROSS - KIM
2    correct?
3        A.  Yes.
4        Q.  And you would agree with me that emergency
5    lesson plans are important because if, for example, a
6    teacher is out sick, then they can be utilized for
7    someone to step in to teach the lesson, correct?
8        A.  Yes, you mean in my opinion?  I don't
9    understand the question.
10       Q.  Okay, you don't understand the question.
11   Now, so tell me what an emergency lesson plan is.
12          MR. MASSENA:  One moment, Your Honor.
13   May we go off the record for a moment?
14          THE HEARING OFFICER:  Okay, let's go
15   off.
16          [OFF THE RECORD, Conference 3:12 p.m.]
17          [ON THE RECORD, Conference 3:13 p.m.]
18       A.  The emergency lesson plan, basically
19   teachers are supposed to go by them in case of
20   emergency.
21       Q.  Okay.  And isn't it true that for each
22   semester or term of the school year, it's a teacher's
23   responsibility to have at least three of them on
24   hand, correct?
25       A.  Yes.

714

1      SEVERIN - CROSS - KIM
2      Q.  Okay.  And once those three are used, then
3  a teacher has to replenish them, correct?
4      A.  Yes.
5      Q.  Now, for--I'm sorry, that was Specification
6  16.  So, back in between January and February of
7  2015, you were absent prior--from work prior to that
8  time period, correct?
9      A.  Yes.
10     Q.  And because you were absent, the school had
11 to utilize your emergency lesson plans, correct?
12     A.  Yes.
13     Q.  Okay.  And with respect to your emergency
14 lesson plans, I am going to show the witness what's
15 in evidence as Department Exhibit Number 27, the
16 second page.  Now, Dr. Severin, look at that document
17 and let me know when you're finished.
18     A.  Yes.
19     Q.  Okay.  Now, that is an email that Ms.
20 Townes [phonetic], the school secretary, sent to you,
21 correct?
22     A.  Correct.
23     Q.  Okay.  And in there, she is asking you,
24 because you used up--or not that you have used it,
25 but the school has used up your three emergency

715

1      SEVERIN - CROSS - KIM
2  lesson plans.  She asks you to replenish that supply,
3  correct?
4      A.  Correct.
5      Q.  Okay, you can hand that back.  And in the
6  email, it references two specific dates that you were
7  absent, correct?
8      A.  Correct.
9      Q.  January 6th and 7th, 2015?
10     A.  Yes.
11     Q.  And then her email is dated January 7th,
12 2015, correct?
13     A.  Yes.
14     Q.  Okay.  And the documents, the first page of
15 this is the letter to file that you received?
16     A.  Yes.
17     Q.  Okay.  And your signature is at the bottom?
18     A.  Yes.
19     Q.  Okay.  And in there, it was regarding, that
20 letter is regarding a meeting that the Principal with
21 you regarding the three emergency lesson plans,
22 correct?
23     A.  Yes.
24     Q.  Okay.  And the date of that disciplinary
25 meeting was February 12th, 2015?

716

1      SEVERIN - CROSS - KIM
2      A.  Yes.
3      Q.  Okay.  And as of the date of that meeting,
4  you, in fact, had not supplied the school with three
5  emergency lesson plans, correct?
6      A.  That's incorrect.
7      Q.  That's incorrect?
8      A.  Yes.
9      Q.  Okay.  Your--
10     A.  [Interposing] Bear in mind--
11 [Crosstalk]
12     Q.  [Interposing] No, no, no, no.
13     A.  --twenty seventh.
14 [Crosstalk]
15         THE HEARING OFFICER:  [Interposing]
16 There is no question before you.
17         MS. KIM:  Yes, yes.
18         MR. SEVERIN:  Oh, okay.
19     Q.  So, the second paragraph where it starts
20 during a meeting I asked, in there it documents what
21 your response was at the meeting, correct?
22     A.  Mm hmm, yes.
23     Q.  Okay.  And do you recall--
24     A.  [Interposing] Wait, I'm sorry, do you ask--
25 you said--say that question again, I'm sorry.

717

1      SEVERIN - CROSS - KIM
2      Q.  That your response was documented in the
3  second paragraph of this letter, starting it starts,
4  the paragraph starts during our meeting I asked you.
5      A.  Yes.
6      Q.  Okay.
7      A.  But that's not my full response.
8      Q.  Sir, okay.  And at that meeting, the UFT
9  District rep, Charlie Turner [phonetic], was present?
10     A.  Yes.
11     Q.  Okay.  And at the meeting, he spoke on your
12 behalf, correct?
13     A.  Yes.
14     Q.  Okay.  And you spoke on your own behalf and
15 he also spoke on your behalf?
16     A.  I wouldn't say he spoke on my behalf.  I
17 don't remember the exact, you know.  I remember I was
18 really slandered at that meeting--
19 [Crosstalk]
20     Q.  [Interposing] Okay.  So--
21     A.  [Interposing] But I don't remember.
22     Q.  --did Mr. Turner, he spoke at the meeting,
23 correct?
24     A.  Yes.
25     Q.  Okay.

718

SEVERIN - CROSS - KIM

1
2    MS. KIM:  I am showing the witness
3  what's in evidence as Department Exhibit Number
4  28.
5    Q.  Now, Dr. Severin, you have seen that letter
6  to file, correct?
7    A.  Yes.
8    Q.  And then if you would turn to the next
9  page, the remaining documents include an observation
10  report, an observation of you back on December 22nd,
11  2014, correct?
12    A.  Correct.
13    Q.  Okay.  And if I can just have the document
14  back, please.
15    A.  Just one second.
16    Q.  Now, based on that December 2014
17  observation, there were a few things that Principal
18  Dorcely wanted you to do based on the observation,
19  correct?
20    A.  Correct.
21    Q.  Okay.  And one of the things that he wanted
22  you to do was to supply to the administration weekly
23  lesson plans, correct?
24    A.  Correct.
25    Q.  Okay.  And another directive that the

719

SEVERIN - CROSS - KIM

1
2  Principal gave to you was to schedule four
3  instructional support sessions, correct?
4    A.  Correct.
5    Q.  Okay.  And with respect to the weekly
6  lesson plans, isn't it true that you did not submit
7  them to administration as directed by the Principal
8  in his observation report?
9    A.  Correct.
10    Q.  Okay.  And with respect to the four
11  instructional support sessions, isn't it also true
12  that you did not schedule those four instructional
13  support sessions with Principal Dorcely?
14    A.  That's incorrect.
15    Q.  That is incorrect.
16    A.  Yes.
17    Q.  Okay.  Now, you were aware, at that time,
18  that you were supposed to schedule them, correct?
19    A.  They were scheduled, yes, correct.
20    Q.  Okay.  And Ms. Townes actually reached out
21  to you, actually no.  Ms. Townes reached out to the
22  Principal and cc'd you to let you know which dates
23  were to be scheduled for the support sessions,
24  correct?
25    A.  Were scheduled, yes.

720

SEVERIN - CROSS - KIM

1
2    Q.  Okay.  Now, so it's your testimony that you
3  did schedule those sessions with the Principal.
4    A.  Yes.
5    Q.  Okay.  Now, you proactively scheduled them
6  with the Principal.
7    A.  What does proactive mean?
8    Q.  That you took the initiative, and you are
9  the one who scheduled those sessions with the
10  Principal.
11    A.  Yes.  He informed me--
12  [Crosstalk]
13    Q.  [Interposing] So, it's a yes.
14    A.  No, he informed me to--
15  [Crosstalk]
16    THE HEARING OFFICER:  [Interposing]
17  Okay, just turn to me, Ms. Kim, and I will
18  direct the witness, as I have been, just to
19  listen to the question--
20    MS. KIM:  [Interposing] Yes.
21    THE HEARING OFFICER:  --and answer.
22  The way this works, as you probably know by now,
23  Dr. Severin, is you have very able counsel.  He
24  gets an opportunity to redirect--
25    [Crosstalk]

721

SEVERIN - CROSS - KIM

1
2    MR. SEVERIN:  [Interposing] Okay.
3    THE HEARING OFFICER:  --and then he
4  can ask for clarifications, and I'm certain
5  will--
6    MR. SEVERIN:  [Interposing] Okay.
7    THE HEARING OFFICER:  --with regard to
8  certain of the questions.
9    MR. SEVERIN:  Yes, sir.
10    Q.  So, your testimony is that you did schedule
11  the four support sessions with the Principal,
12  correct?
13    A.  Yes.
14    Q.  When did you schedule them?
15    A.  I don't remember the exact date.
16    Q.  Okay.  Did you schedule them by the
17  deadline, which was the week of January 5, 2015?
18    A.  I don't remember.
19    Q.  The sessions that you say that you
20  scheduled, it was just four sessions, correct?
21    A.  Yes.
22    Q.  And they were the only four for that school
23  year, correct, starting from, no, the latter half of
24  the school year.  So, starting January 2015 until the
25  end of that school year, it was just those four?

722

SEVERIN - CROSS - KIM

1
2     A.  That's what was requested.
3     Q.  Okay.  Now, Dr. Severin, you've already
4  testified about there was one date.  I believe it was
5  around November 25th, 2015, when you were showing a
6  video, or a movie in your class room, correct?
7     A.  Correct.
8     Q.  And on or about that date, the allegation
9  is that the lights were completely off in your class
10  room, correct?
11     A.  Correct.
12     Q.  Okay.  And on the last date that you
13  testified, just one moment please.  When Mr. Massena
14  was asking you questions, your testimony was that you
15  had turned off the lights and lowered the shades,
16  because it was hard to see, correct?
17     A.  Yes.
18     Q.  Because there was like a glare or something
19  in the room?
20     A.  Yes.
21     Q.  Okay.  And while you were showing the
22  video, how long was that video for?
23     A.  Three to five minutes at most.  These are
24  video clips.
25        THE HEARING OFFICER:  I'm sorry, I

723

SEVERIN - CROSS - KIM

1
2  didn't hear you.
3        MR. SEVERIN:  These are video clips.
4     Q.  Okay.  And while you were playing the video
5  clips, isn't it true that some of the students had
6  their heads down?
7     A.  I cannot recall that now.
8     Q.  Now, based on that allegation, you met with
9  the Principal and the AP, along with Mr. Satchell and
10  Mr. Duncan, to discuss what allegedly happened in the
11  class that day?
12     A.  I don't remember.
13     Q.  But you received a letter to file, correct?
14     A.  Yes, yes.
15     Q.  Okay.
16  [Background conversation]
17        THE HEARING OFFICER:  Is this a new
18  exhibit or are you referring--
19        MS. KIM:  [Interposing] Yes.  Actually
20  I'd like to have it marked for identification as
21  Department Exhibit Number 32 I believe.
22        THE HEARING OFFICER:  Yes, that's
23  correct.  As a general practice, I mark my own
24  exhibits--
25        MS. KIM:  [Interposing] Oh, I

724

SEVERIN - CROSS - KIM

1
2  apologize.
3        THE HEARING OFFICER:  --but thank you
4  for the courtesy.
5        MS. KIM:  Sure.
6        THE HEARING OFFICER:  We'll mark this
7  for identification as DOE 32.
8     Q.  Now, Dr. Severin, do you recognize this
9  document?
10     A.  Yes.
11     Q.  Okay.  And this is the letter to file that
12  was issued to you after you met with Ms. Barnett, Mr.
13  Dorcely, and your two union representatives,
14  concerning the allegation of showing you a video in
15  your class room with the lights off, correct?
16     A.  Correct.
17     Q.  And you received a copy of this document,
18  correct?
19     A.  Yes.
20     Q.  And on the second page, it is your
21  signature at the bottom of the page?
22     A.  Yes.
23     Q.  And this is a fair and accurate copy
24  of the letter to file that you received with respect
25  to the allegation, correct?

725

SEVERIN - CROSS - KIM

1
2     A.  Yes.
3     Q.  Okay.
4        MS. KIM:  Arbitrator Brown, I'd like
5  to have this entered into evidence as DOE
6  Exhibit Number 32.
7        THE HEARING OFFICER:  Any objection?
8        MR. MASSENA:  Just one moment, Your
9  Honor.
10        THE HEARING OFFICER:  Sure.
11        MR. MASSENA:  No objection.
12        THE HEARING OFFICER:  DOE 32 is in
13  evidence.
14        [Whereupon Department of Education's
15  Exhibit 32 is admitted into evidence]
16     Q.  Now, Dr. Severin, you testified before
17  about an allegation that you reported to SCI against
18  Principal Dorcely, correct?
19     A.  Correct.
20     Q.  Okay.  And I believe your testimony was
21  that you spoke with an investigator about the
22  allegation that you made?
23     A.  Yes.
24     Q.  And it was an investigator from OSI,
25  correct?

726

SEVERIN - CROSS - KIM

A. Do I get to explain?

Q. Do you know? Do you remember if it was OSI?

A. It was OSI. Then I was asked to contact SCI.

Q. Okay. And so when you first reported that allegation against Principal Dorcely, so just to clarify, was it OSI that you reached out to or was it SCI?

A. I called OSI, and OSI heard, and then they asked me to contact SCI.

Q. When you initially reported the allegation to OSI, correct?

A. It was not reported to OSI. It was reported to SCI. They told me to report it to SCI.

Q. When you reported it to SCI--

A. [Interposing] Yes.

Q. --what was the allegation that you reported to SCI about Principal Dorcely?

A. What I said to SCI was I don't know. I didn't know if I had to report this, but I was informed that I should report the Principal asking me to--what I implied was changing of a grade. The language may have been different. I said change of

727

SEVERIN - CROSS - KIM

grade, of right, because I understood that's what he wanted me to do, but I have been told that he didn't have right ask me to change the grade. Therefore, I cannot say that he asked me, but he gave the young lady the pencil to start writing. She started writing, and when I recoiled from that, that's when he changed the issue.

Q. So, that is the allegation that you reported to SCI, correct?

A. Correct.

Q. Okay. And when you say that, correct me if I'm wrong, that Principal Dorcely asked you to change a grade, is that right?

A. Yes.

Q. Okay. What kind of grade?

A. It was a Global Regents for Student "A".

Q. Okay. So, you told SCI that Principal Dorcely asked you to change the Global Regents grade for that student.

A. Yes, but he asked me to look at it, see what's wrong with it, where it can be improved. Once I pointed out to him the way it should be improved, he gave the young lady a pencil, and she started writing.

728

SEVERIN - CROSS - KIM

Q. Okay.

A. When he noticed that I recoiled from that, he said you know what, Student "A", forget it, disregard. You come back and take the exam in January.

Q. So, the Global Regents exam, isn't that-- the Regents are given right before the end of the school year, correct?

A. Regents are given three times a year.

Q. And it's within the school year. So, during September to end of June--

[Crosstalk]

A. [Interposing] No, it's all year. It goes from you have a Regents in January, a Regents in June, a Regents in August. And that particular Regents was a summer Regents.

Q. So again, just for clarification, he asked you regarding a Global Regents grade--

[Crosstalk]

MR. MASSENA: [Interposing] Objection asked and answered, Your Honor.

THE HEARING OFFICER: Yeah, thank you. That's already been established for the record.

MS. KIM: Okay.

729

SEVERIN - CROSS - KIM

Q. And, Dr. Severin, the allegations that you made against Principal Dorcely, you filed a special complaint against him, correct?

A. Yes.

Q. Okay. And with respect to that special complaint the--excuse me for one second--you were represented by the UFT with respect to that complaint, correct?

A. Correct.

Q. Okay. And you filed a formal document, the special complaint, outlining or listing all of the allegations against Principal Dorcely, correct?

A. Correct.

Q. And to your knowledge, there was a disposition that was reached jointly by the DOE and UFT, correct?

A. Yes, but DOE--

Q. [Interposing] Yes, the question--

THE HEARING OFFICER: [Interposing] Yes. Was there a disposition?

MR. SEVERIN: Yes.

THE HEARING OFFICER: Okay.

Q. Okay. And what's in evidence as Department Exhibit Number 30, Dr. Severin, you have seen this

730

SEVERIN - CROSS - KIM

1  document before, correct?
2  THE HEARING OFFICER:  A simple
3  question.
4  A.  Yes.
5  Q.  Okay.  You received a copy of it after the
6  joint investigation by the DOE and the UFT was
7  completed.
8  A.  This is not the joint investigation.  This
9  is the--this is the Chancellor's evaluation, but the
10  joint investigation is different from that.  This is
11  the Chancellor's determination.
12  Q.  Actually, if you look at the last page, it
13  refers to on March 23, 2016, the JIC, JIC stands for
14  Joint Investigation Committee, correct?
15  A.  Correct.
16  Q.  Okay.
17  A.  But this was written by the Chancellor's
18  representative.
19  Q.  But this document is the only document that
20  came from this joint investigation, correct?
21  A.  The joint investigation--
22  Q.  [Interposing] Is that a yes or a no?
23  MR. MASSENA:  He is answering the
24  question fully, Your Honor.

731

SEVERIN - CROSS - KIM

1  THE HEARING OFFICER:  Okay, well let's
2  hear the answer.  Go ahead.
3  A.  The joint investigation was, I mean, found
4  merit for step two, but the joint investigation
5  report is not here.  This isn't complete.
6  Q.  Where is it?
7  A.  Well, you ought to have access to it.
8  Principal Dorcely had it and produced this.
9  Q.  So, you're saying this is not the--
10  A.  [Interposing] This is not the joint
11  investigation.
12  Q.  This is not the joint investigation--
13  A.  [Interposing] No.
14  Q.  --even though it says it.
15  [Crosstalk]
16  A.  This is written by the Chancellor's
17  representative.
18  THE HEARING OFFICER:  All right, let's
19  go off the record.
20  [OFF THE RECORD, Conference 3:34 p.m.]
21  [ON THE RECORD, Conference 3:37 p.m.]
22  THE HEARING OFFICER:  All right, we're
23  back on the record.  Ms. Kim?
24  MS. KIM:  Yes.

732

SEVERIN - CROSS - KIM

1  Q.  So, based on this document, Dr. Severin,
2  the allegations that you have listed against the
3  Principal, now isn't it true that the Joint
4  Investigation Committee found your allegations to be
5  unfounded?
6  A.  That's not accurate.
7  Q.  Okay.  You have read this document before,
8  correct?  You've seen it before?
9  A.  This was presented here; however, the
10  document I have--
11  [Crosstalk]
12  Q.  [Interposing] I am asking you--
13  [Crosstalk]
14  Q.  --if you could answer the question about
15  this particular document.
16  THE HEARING OFFICER:  Yeah, the
17  question is very specific about this particular
18  Chancellor's finding.
19  A.  Yes, I read that here.  I find it first on
20  my -- [00:01].
21  Q.  Here meaning...?
22  A.  During the hearing.
23  Q.  Once this hearing started, this is when you
24  first saw this document.

733

SEVERIN - CROSS - KIM

1  A.  Yes.
2  Q.  Okay.
3  MS. KIM:  Arbitrator Brown, if I could
4  just have a moment.  We don't have to go off the
5  record.  I just need a minute.
6  THE HEARING OFFICER:  Sure.
7  MS. KIM:  Thank you.
8  Q.  Dr. Severin, with respect to Department
9  Exhibit Number 30, so prior to this hearing, your
10  union representatives did not give you a copy of
11  this?
12  A.  Prior this hearing?
13  Q.  Yes.
14  A.  No.
15  Q.  Okay.  And prior--when was the first time
16  you found out about the results contained in that
17  document?
18  A.  When was it we were here, Department
19  counsel who presented this, is when.
20  Q.  So, prior to that, you did not know what
21  the outcome of--
22  A.  [Interposing] No, ma'am.
23  Q.  Okay.  So, your union representatives, the
24  ones, any of the union representatives listed on the

734

SEVERIN - CROSS - KIM

1    SEVERIN - CROSS - KIM
2    first page of this document, none of those people
3    reached out to you and let you know that there was a
4    report?
5        A.  They mailed it to me.  I received this, I
6    think, Saturday.  That's when I first received this.
7        Q.  Which Saturday are you talking about?
8        A.  This current, this past Saturday.
9        Q.  This past Saturday?
10       A.  Yeah.
11       Q.  So, you received it in the mail on--
12       A.  [Interposing] Two days ago.
13       Q.  Two days ago.  And then but prior to that--
14       A.  [Interposing] No.
15       Q.  --the union members had not forwarded it to
16   you.
17       A.  No.
18       Q.  Okay.
19           MS. KIM:  Arbitrator Brown, I have no
20   further questions, but I do want to put
21   something on the record.  I would like to make a
22   discovery request to Mr. Massena of during the
23   Respondent's testimony with respect to, I
24   believe it was Department Exhibit Number 13--
25           MR. MASSENA:  [Interposing]

735

1    SEVERIN - CROSS - KIM
2    Department's 13 or--
3            MS. KIM:  [Interposing] Oh, I'm sorry,
4    Specification number 13--
5            MR. MASSENA:  [Interposing] Oh, okay.
6            MS. KIM:  --regarding the E-G-G files.
7    And I believe his testimony was that he had
8    emails showing that he did supply those files to
9    the AP.  And I believe he testified that he did
10   not prepare or maybe anticipate that he would
11   need them.  So, I am asking that they be
12   produced.  And also if the Respondent has
13   anything showing that he submitted them for
14   Specification number 14, I'd like those emails
15   as well, including any attachments that were
16   included in those emails.
17           MR. MASSENA:  Okay.  So, you're
18   looking for E-G-G--any emails regarding E-G-G
19   files, specifically in Specifications 13 and 14,
20   correct?
21           MS. KIM:  And 14, yes.
22           THE HEARING OFFICER:  Mr. Massena?
23           MR. MASSENA:  I'll do my best to get
24   them.
25           THE HEARING OFFICER:  Okay.  So, no

736

SEVERIN - CROSS - KIM

1    SEVERIN - CROSS - KIM
2    further questions for cross examination?
3            MS. KIM:  That is correct, yes.
4            THE HEARING OFFICER:  Okay, any
5    redirect?
6            MR. MASSENA:  Yes, Your Honor, there
7    is redirect; however, I was going to ask to make
8    a request.
9            THE HEARING OFFICER:  Okay.
10           MR. MASSENA:  I am going to request
11   that we be allowed to call Mr. Duncan, the UFT
12   Director.  He's been outside--
13           [Crosstalk]
14           THE HEARING OFFICER:  [Interposing]
15   Okay.  We'll let you call him out of order.  Is
16   there any objection?
17           MS. KIM:  No.  I would just like--
18           [Background conversation]
19           MS. KIM:  --but it shouldn't be a
20   problem.
21           THE HEARING OFFICER:  Okay.
22           MR. MASSENA:  He was present during
23   some of the disciplinary meetings that came up
24   during direct and cross examination.
25           THE HEARING OFFICER:  Okay.

737

1    SEVERIN - CROSS - KIM
2            MR. MASSENA:  And some Mr. Satchell
3    wasn't present.
4            THE HEARING OFFICER:  Okay.  So, he's
5    being offered as a fact witness relevant to some
6    of the Specifications.  Okay hearing no
7    objection, let's take a moment off the record.
8    Let's produce this next witness out of order.  I
9    just want Dr. Severin to know that during this
10   process, that he still cannot talk about his
11   particular testimony with counsel, because he is
12   still on the witness--
13           [OFF THE RECORD, Getting witness 3:43
14   p.m.]
15           [ON THE RECORD, Getting witness 3:53
16   p.m.]
17           THE HEARING OFFICER:  Mr. Massena, I
18   see that the Respondent has another witness, if
19   you kindly introduce him to us.
20           MR. MASSENA:  Yes, the Respondent
21   calls Mr. James Duncan.
22           THE HEARING OFFICER:  All right, Mr.
23   Duncan, if you would kindly raise your right
24   hand.  Do you swear to tell the truth, the whole
25   truth, and nothing but the truth?

738

1    SEVERIN - CROSS - KIM
2        MR. JAMES DUNCAN:  Yes, I do.
3        THE HEARING OFFICER:  Mr. Massena,
4    your witness.
5        MR. MASSENA:  Sure.
6    DIRECT EXAMINATION
7    BY MR. MASSENA
8        Q.  Mr. Duncan, I am just going to ask you a
9    few questions.  If you don't understand anything I'm
10   saying, just ask me to repeat or rephrase.  I'll be
11   more than happy to do so.  Mr. Duncan, what do you do
12   for a living?
13       A.  I am a teacher.
14       Q.  Okay.  And how long--
15       A.  [Interposing] And a union representative.
16       Q.  Okay.
17          COURT REPORTER:  Speak up, speak up.
18       Q.  How long have you been a teacher?
19       A.  Eighteen years.
20       Q.  Okay.  And how long have you been a union
21   rep?
22       A.  I have been a part time union rep for three
23   years.  I have been a District rep for Brooklyn high
24   schools for the past year.
25       Q.  Okay.  And which District do you serve as

739

1        DUNCAN - DIRECT - MASSENA
2    a--
3        A.  [Interposing] Brooklyn high schools.
4        Q.  All the Brooklyn high schools.
5        A.  I am responsible for 40 of the Brooklyn
6    high schools directly.
7        Q.  And what does some of your responsibilities
8    entail in that role?
9        A.  My responsibilities are to make sure the
10   members of those schools are treated contractually
11   fairly, that they have adequate tools to do their
12   jobs, and I take care of things like grievances,
13   complaints, and other issues.
14       Q.  Do you know an individual by the name of
15   Principal Barnett--Assistant Principal Barnett?
16       A.  Yes, I do.
17       Q.  How do you know that individual?
18       A.  She's the Assistant Principal at one of my
19   schools.
20       Q.  Okay.  Would that school happen to be Urban
21   Action Academy?
22       A.  Yes, it is.
23       Q.  Okay.  And do you also know an individual
24   by the name of Dorcely, Mr. Dorcely?
25       A.  Yes, Principal Dorcely is the Principal at

740

1        DUNCAN - DIRECT - MASSENA
2    that school.
3        Q.  And lastly, do you also know an individual
4    by the name of Jean Richard Severin?
5        A.  Yes, I do.
6        Q.  And how do you know him?
7        A.  He is one of the teachers at that school.
8        Q.  Okay.  And have you had an occasion to meet
9    with these individuals within the last two years?
10       A.  Yes, I have.
11       Q.  Okay.  Could you describe that to the
12   Arbitrator, please?
13       A.  Okay.  I have--I met with Dr. Severin,
14   along with the Chapter Leader and other members of
15   the school, throughout the year.  There was--it was
16   one of the schools I had more activity in.
17       Q.  What do you mean by that?
18       A.  More complaints from staff.  There seems to
19   be a problem with the way discipline is handled at
20   the school.
21       Q.  And when you say the way discipline is
22   handled in the school, what do you mean by that?
23       A.  For instance, the number of discipline
24   letters given out by the Principal is well far and
25   above any other school.  Out of 40 schools, I did a

741

1        DUNCAN - DIRECT - MASSENA
2    survey at the end of last year.  I had 85
3    disciplinary letters for the 40 schools from
4    December.  From December in Urban Action, I had--I'm
5    sorry, I had 85--85 total letters since December.
6    Fifty of them were from Urban Action, from one
7    school.
8        Q.  And so you said you had an opportunity to
9    meet with these individuals, correct?
10       A.  Right, because of the number of times I was
11   in there, there was--there seemed to be a situation
12   that was coming to a head between Dr. Severin and
13   Principal Dorcely.  I had seen that.  Michael Prayor,
14   the Superintendent, had come to me when he had
15   noticed it.  We talked about it.  So, we tried to
16   come up with a plan to alleviate that anxiety that
17   seemed to be building between the two individuals.
18       Q.  And what was that plan?
19       A.  The plan was to develop a one month period
20   of what we call the cooling off period, where both
21   members would have limited interaction.  They would
22   both continue to do their jobs in the most
23   professional manner, but they would limit their
24   interaction with each other over a period of a month.
25   And then through their cooling off period, Dr.

742

DUNCAN - DIRECT - MASSENA
1
2    Severin would look for another place for employment,
3    and Principal Dorcely would stop what I considered
4    harassing him with the disciplinary letters.
5        Q.  So, what happened next?
6        A.  We set up a meeting.  Everyone was in
7    agreement at that meeting.  It was Superintendent
8    Prayor, his community liaison, I believe his name was
9    Mr. Henry, myself, Dr. Severin, Mark Satchell, a
10   Chapter Leader, Principal Dorcely.  The meeting took
11   about 45 minutes.  We all agreed that they would
12   limit their interaction.  Dr. Severin could be
13   observed during that period of time.  They would not
14   use Danielson in the observations.  I believe he said
15   that the Principal--Assistant Principal Barnett would
16   do any observations.  And it was agreed that Dr.
17   Severin would stop--would not go forward with an
18   Article 23, which he had submitted to me, and I was
19   bringing to the committee in Brooklyn.  And Principal
20   Dorcely wouldn't go forward with any further
21   disciplinary actions as an Article 3020 or anything
22   like that.  To be able, at the end of that meeting,
23   Principal Dorcely informed us that there was still
24   some outstanding disciplinary letters that had not
25   been signed by Dr. Severin.  So, I agreed, as a

743

DUNCAN - DIRECT - MASSENA
1
2    gentleman and to expedite matters in this, to come in
3    and act as his representative for those disciplinary
4    letters.  There were two, and it turned out, an
5    observation report.  The reason I did that is Mark
6    Satchell, who is a young teacher, had been doing so
7    many of these hearings it was taking away from his
8    work as an educator.  So, to expedite the matter, I
9    went in to meet with the Principal and Dr. Severin to
10   get it to stop.  When I went into the meeting, he
11   produced the first letter.  I honestly don't remember
12   what this--what was the specifics of the letter, but
13   he demanded an explanation.
14       Q.  When you say demanded, how did he present
15   the letter?
16       A.  He said, well, this is what it says, and I
17   want to know what you say in response to it.
18       Q.  How would you describe Principal Dorcely's
19   tone during that meeting?
20       A.  His tone was aggravated and harassing,
21   belittling.  So, I repeated what we had said at the
22   meeting that--and what I advised Dr. Severin to do.
23   He had no comment and that he would sign it.
24       Q.  And what did you do?  What happened next in
25   the meeting?

744

DUNCAN - DIRECT - MASSENA
1
2        A.  Well, he said--he told Barnett to say to
3    write down Duncan says no comment, and my response
4    was write down that no comment to expedite the
5    matter, is what I asked them write down for the
6    record.  The same was repeated with the next letter,
7    exactly the same.  He asked for an explanation.  I
8    said no comment.  Sign the letter.  He signed the
9    letter.  Then he wanted the observation report
10   signed.  Dr. Severin said he thought he had done that
11   already.  He said this was a different observation
12   than the one he had signed earlier.  So, I asked him
13   to sign it and to look at it later, which is our
14   policy anyway.  As UFT reps, we tell our members to
15   sign and then grieve if there's an issue--
16       [Crosstalk]
17       Q.  [Interposing] So, did you--did you have an
18   opportunity to review how many observations had been
19   made of Dr. Severin?
20       A.  I had--I can't tell you off hand, but there
21   had been a disproportionate amount of observations
22   compared to what the average teacher gets.  I have
23   three and a half thousand members.  When people have
24   issues with observations, I have a greater problem
25   with people not getting observed enough.  It's very--

745

DUNCAN - DIRECT - MASSENA
1
2    [Background noise papers shuffling]
3        A.  --a lot.  I think he had over 25
4    disciplinary letters by this point, which is more
5    than most schools have.  And I never heard anything
6    in the way of remedy, just--and I had spoken to
7    Principal Dorcely about this a number of times.
8        THE HEARING OFFICER:  What do you mean
9    remedy?
10       MR. DUNCAN:  Well, if a teacher is
11   getting disciplinary letters, there should be a
12   reason for them, and there should be a cause.
13   So--
14       [Crosstalk]
15       THE HEARING OFFICER:  [Interposing]
16   So, but you used the word remedy--
17       [Crosstalk]
18       MR. DUNCAN:  --so if there's a cause,
19   a good administrator will find out, you know,
20   see what the cause is, and try to do something
21   to correct that, whatever is leading to those
22   letters, unless it's a one-time thing.
23       THE HEARING OFFICER:  Thank you.
24       MR. DUNCAN:  So, if it's pedagogy,
25   what do you do to support the person to be a

746

DUNCAN - DIRECT - MASSENA

1
2    better teacher?
3            THE HEARING OFFICER:  Thank you.
4    [Crosstalk]
5        A.  At the end of that--at the end of that
6    meeting, we stood up, and that was supposed to be,
7    now mind you, I had worked to get this done.  The
8    Superintendent had done work.  We've all put a lot in
9    to stay to this, to try to correct this, because we
10   saw it as a, you know, as something that wasn't
11   helping anybody.  I got up to leave.  I said thank
12   you.  And when we were leaving, Principal Dorcely,
13   now I go forward with the 3020-a hearings.  I asked
14   him I said, well, what are you talking about?  I
15   thought this was an agreement for a cooling off
16   period.  Everyone had said so.  He said, that doesn't
17   mean I won't go forward with this.  I am going
18   forward with this, because I want him out of here, or
19   something along that line.  I can't say verbatim.
20       Q.  How did you take that?
21       A.  I said, well, this is a--I was upset.  I
22   said, this is--this is ridiculous, because we all
23   agreed that this was a period where we could--cool
24   heads should prevail and things could possibly --
25   [00:01].  He said he would go forward.  I said, and

747

DUNCAN - DIRECT - MASSENA

1
2    that is not what the meeting was about.  I said there
3    were six people at that table.  We all agreed to
4    this.  If you are not going to abide by it, then I
5    guess my member won't abide by his side of the
6    agreement either, and that was it.  That was the end
7    of the meeting.
8        Q.  Have you heard anything Principal Dorcely
9    since then regarding Dr. Severin or anything
10   regarding Principal Dorcely since then?
11       A.  Well, it's been a constant--there's been
12   constant back and forth with more letters.  I mean
13   Mark Satchell keeps me informed, because that's the
14   relationship I have with all my Chapter Leaders,
15   keeping me informed to what we could do to make the
16   school better.
17       Q.  Okay.
18           MR. MASSENA:  No further questions,
19   Your Honor.
20           THE HEARING OFFICER:  Cross
21   examination?
22           MS. KIM:  Yes.  Thank you, Arbitrator
23   Brown.
24   CROSS EXAMINATION
25   BY MS. KIM

748

DUNCAN - CROSS - KIM

1
2        Q.  Good afternoon, Mr. Duncan.  I'm the
3    attorney for the Department.  And if there is a
4    question that you don't understand, just let me know
5    and I'll rephrase.
6        A.  What is your name?
7        Q.  Dana.
8        A.  Okay, Dana.
9        Q.  Yes, yes.  So, okay, you testified that you
10   have been a Chapter, let's see, a District rep for
11   the past year, focusing on Brooklyn high schools,
12   correct?
13       A.  Correct.
14       Q.  And you were also a union rep for three
15   years.
16       A.  Yes.
17       Q.  So, is that, the union rep position, is
18   that something that you do full time continuously as
19   a District rep?
20       A.  No.  I was Chapter Leader for three years
21   and worked part time in the Brooklyn office.  Now, I
22   am strictly a District rep--
23           [Background conversation]
24       Q.  Okay.  And--
25       A.  [Interposing] I'm sorry to be--it did for

749

DUNCAN - CROSS - KIM

1
2    about a month or two--
3            [Background conversation]
4        Q.  And so when you were the UFT Chapter
5    Leader, which school were you assigned to?
6        A.  Edward R. Murrow.
7        Q.  Edward R. Murrow.  And with respect to Dr.
8    Severin, now you have spoken with Dr. Severin about
9    his 3020-a matter?
10       A.  That it was not specifically about the
11   details of it, but that the Principal was going
12   forward with that.
13       Q.  Okay.  And with respect to this 3020-a
14   matter, you have not spoken with Principal Dorcely
15   about the details of it, correct?
16       A.  The details, well I spoke to Dorcely
17   numerous times about what his take was on Severin,
18   what he thought, when I was trying--when I was trying
19   to figure a way to resolve this.
20       Q.  In that conversation you had with
21   Principal Dorcely that was before the meeting where
22   it was decided there would be a cooling off period?
23       A.  Yes.
24       Q.  Okay.  And that cooling off period meeting,
25   correct me if I'm wrong, but it take place around

DUNCAN - CROSS - KIM

1      DUNCAN - CROSS - KIM
2  December of 2015?
3      A.  Right.
4      Q.  Okay.  You were in attendance along with
5  Principal Dorcely, Mr. Satchell, Mr. Moses--
6      A.  [Interposing] I forgot Mr. Moses.
7      Q.  --Dr. Severin, and the Superintendent
8  Prayor, correct?
9      A.  Yes.
10      Q.  Okay, anyone else other than the
11  individuals I mentioned?
12      A.  I don't think so.
13      Q.  Okay.  And so with respect to this cooling
14  off period, the purpose of that meeting was to get
15  both sides to come together to have some sort of at
16  least temporary resolution to sort of take the heat
17  off each other, correct?
18      A.  Yes.
19      Q.  Okay.  And--
20      A.  [Interposing] That's cooling off.
21      Q.  Yes, hence a cooling off period, yes.  And
22  you just testified that in terms of what's going on
23  with Dr. Severin, would it be fair to say that Dr.
24  Severin, along with Mr. Satchell, are the ones who
25  have been filling you in as to what's been going on?

751

1      DUNCAN - CROSS - KIM
2      A.  Mostly, but others as well.
3      Q.  Okay.  The meetings that you were present
4  for on behalf of Mr. Severin, I believe you testified
5  that it was so that Mr. Satchell can, correct me if I
6  am wrong, tend to other matters that he had pending
7  at the school?
8      A.  That one meeting, where about--that was,
9  yes, it was a courtesy to get--to expedite the matter
10  and get--
11      [Background conversation]
12      Q.  So just to be clear, was it one meeting or
13  two meetings where you accompanied Mr. Severin--
14      A.  [Interposing] One.
15      Q.  Just one.  So, it was actually, okay, the
16  meeting for the cooling off period?
17      A.  Cooling off period.
18      Q.  And then the one meeting where it was a
19  disciplinary--
20      [Crosstalk]
21      Q.  --conference.
22      A.  Yes.
23      Q.  Okay.  And with respect to that
24  disciplinary conference, or did Mr. Satchell tell you
25  about the other disciplinary conferences that he had

1      DUNCAN - CROSS - KIM
2  attended for or on behalf of Mr. Severin?
3      A.  Well, how do you mean did he tell me?
4      Q.  Did he ever tell you about those meetings?
5      A.  Yes, he--there were numerous.
6      Q.  Okay.  And with respect to the numerous
7  meetings that he told you about, and the ones that
8  you attended with Dr. Severin, are you aware of the
9  outcomes of all of those meetings combined?
10      A.  No, I am not aware as to the outcome of all
11  of them.
12      Q.  Okay.  Did you speak with--
13      A.  [Interposing] I am aware of the amount of
14  them.
15      Q.  Okay, but not the outcomes.
16      A.  No.
17      Q.  Okay.  And I know you have established that
18  you have spoken with Principal Dorcely.  Did you ever
19  speak with Assistant Principal Jordan Barnett about
20  this case or about Dr. Severin?
21      A.  Not specifically, no.
22      Q.  Okay, all right.  And, you know, would it
23  be fair to say that you, as a union member, whether
24  as a Chapter Leader or as a District rep, it's your
25  job to advocate for your union members, correct?

753

1      DUNCAN - CROSS - KIM
2      A.  Yes.
3      Q.  And to make sure that they're--
4      THE HEARING OFFICER:  [Interposing]
5  Voices up, please.
6      MS. KIM:  Sure.
7      MR. DUNCAN:  Oh.
8      A.  Yes.  It's my job to advocate for my
9  members to make sure that they're contractually
10  treated fairly.
11      Q.  Yes.  And so you, as the union member or as
12  a leader or a District rep, are looking out for your
13  members' best interests, correct?
14      A.  Correct.
15      Q.  Okay.
16      MS. KIM:  I just need one moment,
17  Arbitrator Brown.
18      THE HEARING OFFICER:  Sure.
19      MS. KIM:  I don't believe--
20      [Background conversation]
21      MS. KIM:  I have nothing further.
22      THE HEARING OFFICER:  Any redirect?
23      MR. MASSENA:  No redirect.
24      THE HEARING OFFICER:  All right.  I
25  just have a question for you.  You stated that

754

1      DUNCAN - CROSS - KIM
2      there were a couple of meetings you attended,
3      one in which the cooling off period was
4      discussed. And that, I believe, was in December
5      of 2015, correct? Is that correct?
6            MR. DUNCAN: Yeah, correct.
7            THE HEARING OFFICER: Okay. And that
8      you also attended a disciplinary conference.
9            MR. DUNCAN: Correct.
10           THE HEARING OFFICER: What was the
11     date, if you recall, of the disciplinary
12     conference?
13           MR. DUNCAN: I am not sure. It was
14     within a week after. It was within a few days
15     to a week. If I--one of the reasons I didn't,
16     that was if we had a way for him to schedule
17     Mark Satchell, he would have to lose time, or
18     that it would be easier to schedule with him.
19           THE HEARING OFFICER: It may be
20     reflected in one of the documents. I am being
21     shown Department's Exhibit 32, which is dated
22     December 18th, 2015. Any additional questions
23     based on the question I put to the witness? Mr.
24     Massena?
25           MR. MASSENA: No.

755

1      DUNCAN - CROSS - KIM
2            THE HEARING OFFICER: Ms. Kim?
3            MS. KIM: No.
4            THE HEARING OFFICER: That means
5      you're excused as a witness. Thank you very
6      much.
7            MR. DUNCAN: Thank you.
8            THE HEARING OFFICER: And let's go off
9      the record.
10           [OFF THE RECORD, Walk witness out
11     1:30:31]
12           [ON THE RECORD, Walk witness out
13     1:30:31]
14           THE HEARING OFFICER: Okay. Are we
15     ready to begin the redirect of the Respondent?
16           MR. MASSENA: Yes.
17           THE HEARING OFFICER: Dr. Severin,
18     again, it's my job to remind you that you are
19     still under oath.
20           MR. SEVERIN: Yes, sir.
21     REDIRECT EXAMINATION
22     BY MR. MASSENA
23     Q. Dr. Severin, you were asked, during cross
24     examination, about an email dated Monday, June 1st of
25     2015, which is currently Department's 25 in evidence.

756

1      SEVERIN - REDIRECT - MASSENA
2      I am going to show it to you.
3      A. Okay, yes.
4      Q. Okay. And would you mind giving an
5      explanation regarding that email, please?
6      A. This particular email does not address when
7      the document was sent to Principal Dorcely. It only
8      shows something that was totally irrelevant, that I
9      just used the same email he sent me, and I just
10     replied to him and informed him I was not coming to
11     school. Now, what's important is the time and date
12     that I submitted the grade, would be very helpful in
13     clarifying this record.
14     Q. Now, did you have trouble with sending the
15     email?
16     A. When I sent the email, I believe I may have
17     used my DOE email. The DOE email tend to have
18     issues. So, when I sent it, I received a email from
19     Principal Dorcely, informing me that he did not
20     receive it. I use a different email account, and
21     that is why the grade is not reflected in this
22     particular email. And I will submit that as
23     requested.
24     Q. Okay.
25           MR. MASSENA: Now, at this time, I'd

757

1      SEVERIN - REDIRECT - MASSENA
2      like to have what was partially entered into
3      evidence as Respondent's Number 13, which is an
4      email correspondence between doctor, not doctor,
5      between Mr. Prayor, the Superintendent, and Dr.
6      Severin. The Department's main objection was
7      that the objection to this coming this, was that
8      the email was an incomplete email. I provided
9      the Department with the full email, and I will
10     note that basically two lines were left out.
11     And I am submitting a copy of that to the
12     Arbitrator, Your Honorable Arbitrator, and I'd
13     ask that the document be moved in--be entered
14     into evidence fully, and remain as Respondent's
15     Number 13.
16           THE HEARING OFFICER: Okay. So, just
17     so I understand, are you asking that this
18     document substitute for Respondent's 13 as a
19     complete copy of Respondent's 13, or are you
20     asking that this be marked with a different
21     number and added to the record?
22           MR. MASSENA: Thank you for the
23     Court's--for the Arbitrator's guidance. I would
24     say substitute it--
25           THE HEARING OFFICER: [Interposing]

758

1    SEVERIN - REDIRECT - MASSENA
2    Okay.
3         MR. MASSENA:  --Respondent's 13.
4         THE HEARING OFFICER:  I am going to
5    give Ms. Kim an opportunity to review both
6    documents, and we'll wait to hear from her.
7         MS. KIM:  Thank you.  I don't believe
8    I have an objection, but if I could just ask
9    a couple of questions--
10        [Background conversation]
11        THE HEARING OFFICER:  Sure, please.
12        MS. KIM:  Okay.
13        THE HEARING OFFICER:  We're on the
14   record still?
15        COURT REPORTER:  Mm hmm.
16   VOIR DIRE
17   BY MS. DANA KIM
18   Q.  Dr. Severin, these two documents, so this
19   is the initial email that you discussed during your
20   last testimony, correct?
21        THE HEARING OFFICER:  You're showing
22   the witness Respondent's Exhibit 13?
23        MS. KIM:  Yes, that's correct.
24   A.  Yes.
25   Q.  Okay.  And then this document that is not

759

1    SEVERIN - VOIR DIRE - KIM
2    marked, this is supposed to be the full email of
3    Respondent Exhibit Number 13?
4    A.  Yes.
5    Q.  Can I ask you why it is that--do you notice
6    how the format of this email differs from the one in
7    front of you that's in your hand?  Why is it that
8    it's different?
9    A.  I do not know why.  It's different fonts I
10   guess.
11   Q.  Okay.  The one you, this document here, who
12   printed this document?
13   A.  This was printed by my attorney.
14   Q.  Okay.
15        MS. KIM:  And, Mr. Massena, you
16   printed this?  Oh, you printed this one.
17        MR. SEVERIN:  Yeah.
18   Q.  So with this document, how is it that Mr.
19   Massena, your attorney, was able to print this
20   document?
21   A.  I don't know.  What's the difference?
22   Q.  Did you send him the email?
23   A.  Yeah, I forwarded him the email.
24   Q.  Okay.  And this email exchange, did you
25   have it--where did you have it saved?

760

1    SEVERIN - VOIR DIRE - KIM
2    A.  Whatever the sent document, that's what it
3    is.
4    Q.  Did you--was this from your Outlook,
5    Microsoft Outlook, or some other program?
6    A.  I don't--whatever is the iPhone use.  I
7    just forwarded it.
8         MS. KIM:  It's fine, I have no
9    objection.
10        THE HEARING OFFICER:  All right.  So
11   what we're going to do then is, I am going to
12   discard what was in the record as Respondent's
13   13, and I am going to replace it with this new
14   document.  And I am going to mark it as
15   Respondent's 13.  So, in that sense, it's the
16   new Respondent's 13 now in evidence.
17        [Whereupon Respondent's Exhibit 13 is
18   admitted into evidence]
19        THE HEARING OFFICER:  Mr. Massena, any
20   additional questions or matters you wish to
21   raise?
22        MR. MASSENA:  Sure.
23   REDIRECT EXAMINATION (CONT.)
24   BY MR. MASSENA
25   Q.  So, Dr. Severin, I'd like you to take what

761

1    SEVERIN - REDIRECT - MASSENA
2    has now been--what has now been entered into evidence
3    as Respondent's 13.  Do you recognize--and taking a
4    look at the second half of the email, the letter to
5    Mr. Romano [phonetic], without going into detail,
6    could you describe--could you describe what is being
7    said in that email?
8         MS. KIM:  Objection.
9         THE HEARING OFFICER:  The document
10   speaks for itself, Mr. Massena.  I don't think
11   we need the witness to describe it.
12        MR. MASSENA:  Okay.
13   Q.  Is it--is it fair to characterize that
14   letter as a cry for help?
15        MS. KIM:  Objection.
16        THE HEARING OFFICER:  Sustained.
17        MR. MASSENA:  Okay.
18   Q.  What were you attempting to do by sending
19   that email?
20   A.  Basically, I was asking for help from Mr.
21   Romano, from Superintendent Prayor, from anyone who
22   would be able to help him with the situation that I
23   was in at Urban Action.  It was extremely hostile,
24   extremely aggravating.  The working environment was
25   so toxic.  Days I would leave work, headaches, I

762

SEVERIN - REDIRECT - MASSENA

1  SEVERIN - REDIRECT - MASSENA
2  mean--
3  Q. [Interposing] Do you feel that help ever
4  came?
5  A. No.
6  Q. Okay. During cross examination, withdrawn.
7  During cross examination, you were asked about the
8  incident where Principal Dorcely stated that the
9  lights were off in your room. Do you recall that?
10  A. Yes.
11  Q. Okay. And you were shown what is in--what
12  is now in evidence as Respondent--Department's 40--
13  MS. KIM: [Interposing] Thirty two.
14  Q. --32, okay, and one moment.
15  [Background conversation]
16  Q. What is Department's 32, and you've had an
17  opportunity to view that, correct?
18  A. Yes.
19  Q. Okay. Now, you, within that there is--
20  within that paragraph two, there is a line where you
21  say you mean you have--you mean how you taunted me
22  with other Principals. What do you mean by that?
23  A. What happened was Principal Dorcely brought
24  in his colleagues to look at me, jeering me,
25  laughing, and pointing fingers at me. And

763

SEVERIN - REDIRECT - MASSENA

1  SEVERIN - REDIRECT - MASSENA
2  afterwards, he went and sent me an email. This
3  document here was not a letter to file. He sent me
4  an email to inform me, please don't do--do not keep
5  your light off; but later on, this was manifested
6  into a letter, which as James Duncan was witness, as
7  one of the letters that I was given as a disciplinary
8  letter.
9  Q. And is it--could you, withdrawn. What did
10  you feel about--what did you feel at the time that
11  you were given a disciplinary letter for the December
12  15th, 2015, observation of your class, where--I'm
13  sorry, the November 25th, 2015, where your class room
14  lights were off? What did you--how did you feel when
15  you received the disciplinary letter for that?
16  A. It was a continuation of all the different
17  harassment that was going on throughout the school
18  year. He had informed me not to turn--to keep one
19  set of lights on, and to which I responded to him,
20  yes sir, no problem; but this particular letter was
21  not necessary, in that he made that concern known to
22  me. I addressed it, but being that Principal Dorcely
23  was really out to get me, to ride me as he stated in
24  September, everything had to be a disciplinary
25  letter. Everything had to be discipline, discipline,

764

SEVERIN - REDIRECT - MASSENA

1  SEVERIN - REDIRECT - MASSENA
2  constant. I mean constant barrage of harassment.
3  Q. You had attempted to set up four support
4  sessions, correct?
5  A. I did, yes.
6  Q. Okay. And what happened with those support
7  sessions?
8  A. Those support sessions were scheduled. I
9  attended them. Principal Dorcely and I worked on
10  those support sessions; however, on that February
11  12th meeting with Charlie Turner, Principal Dorcely
12  just brought in so many different allegations,
13  including this, as some disciplinary matter, but it
14  was not. It was a meeting that was scheduled. I
15  think it was the day--if it was the twelfth, the
16  discipline--they must have been scheduled twelfth in
17  the afternoon, or on the thirteenth.
18  Q. Who were the support sessions supposed to
19  be with?
20  A. With Principal Dorcely.
21  Q. So, you--you were supposed to sit in a room
22  with Principal Dorcely?
23  A. Yes. That was--
24  [Crosstalk]
25  Q. [Interposing] How long would these meetings

765

SEVERIN - REDIRECT - MASSENA

1  SEVERIN - REDIRECT - MASSENA
2  be?
3  A. That was during the sixth period, common
4  planning.
5  Q. Okay. And it's your understanding that it
6  was--it would just be you and him at these meetings?
7  A. Yes.
8  Q. Alone.
9  A. Yes.
10  Q. How did that make you feel?
11  A. I mean it was humiliating, because at the
12  beginning of the day, the lesson, the December 22nd,
13  December 23rd observation that Principal Dorcely
14  wrote me ineffective about, was a specific lesson
15  that managed to get the children to be--to do some
16  phenomenal work as far as writing their five to seven
17  page essays. And I even sent Principal Dorcely an
18  email, letting him know how debilitating his
19  ineffective observation of my work, pleading with
20  him, letting him know, Principal Dorcely, I take
21  pride in this work. This is something that I
22  informed you before I did it, but yet he deemed that
23  it was ineffective. I sent him the email.
24  Afterwards I even sent Superintendent Prayor the same
25  email to inform him how this was not a professional

766

SEVERIN - REDIRECT - MASSENA

1    SEVERIN - REDIRECT - MASSENA
2    assessment, but it seemed personal.  So, by the time
3    that whole observation, that whole session, was set
4    up, I didn't really say anything, because he's my
5    Principal.  He's my supervisor, so I set them up.  I
6    sat down.  I attended, and I took notes, and I
7    implemented everything he recommended.  That is why I
8    end up having effective, highly effective, in all the
9    lessons as he said.  But then immediately after the
10   highly effective, effective observation report, I
11   followed the same plan, only to find out in
12   September, all of my lesson plans were ineffective.
13   I understand this is not about competency--
14       Q.  [Interposing] Dr. Severin, let me stop you
15   for just one moment.  When you speak of this highly
16   effective plan, well, withdrawn.  So, you said more
17   specifically, sitting in the support session with
18   Principal Dorcely, more specifically in terms of your
19   relationship with Principal Dorcely at that time, how
20   did that make you feel?
21       A.  It was very condescending.  He was the
22   authority, as if he was scolding a child, as he was
23   scolding a subordinate.  It was more humiliating and
24   degrading than professional.
25       Q.  Okay.

767

SEVERIN - REDIRECT - MASSENA

1    SEVERIN - REDIRECT - MASSENA
2        MR. MASSENA:  Just one moment, Your
3    Honor.
4        THE HEARING OFFICER:  Mm hmm.
5        Q.  You stated that cross that you did not
6    attend some of the meetings, the UFT meetings--the
7    disciplinary conference meetings.
8        A.  Yes.
9        Q.  Why not?
10       A.  Basically, it was always combative.  There
11   was never a true reflection of my responses.  At
12   those meetings, Principal Dorcely would just write
13   whatever he want from my response.  And there was no
14   objectivity doing those write ups.  It was constantly
15   how do you--you have been charged with this, as if
16   this was a criminal procedure.  You have been, you
17   know, these charges have been brought against you.
18   It was always condescending, constantly berating,
19   constantly belittling.  It was intimidation,
20   confrontational.
21       MR. MASSENA:  Just one moment, Your
22   Honor.
23       THE HEARING OFFICER:  Mm hmm.
24       MR. MASSENA:  Okay, nothing further.
25       THE HEARING OFFICER:  Any additional

768

SEVERIN - REDIRECT - MASSENA

1    SEVERIN - REDIRECT - MASSENA
2    questions from the Department?
3        MS. KIM:  No.
4        THE HEARING OFFICER:  Okay.  That
5    means you're excused as a witness, Dr. Severin.
6    Does the Respondent have any additional
7    witnesses he wishes to?
8        MR. MASSENA:  No additional witnesses.
9
10       THE HEARING OFFICER:  The Respondent
11   rests.
12       MR. MASSENA:  Just one moment, Your
13   Honor--
14       [Crosstalk]
15       THE HEARING OFFICER:  [Interposing]
16   Sure take your time.
17       MR. MASSENA:  --talk to my client.
18       THE HEARING OFFICER:  Let's go off the
19   record.
20       MR. MASSENA:  Thank you.
21       THE HEARING OFFICER:  Mm hmm.
22       [OFF THE RECORD 4:28 p.m.]
23       [ON THE RECORD 4:39 p.m.]
24       THE HEARING OFFICER:  All right.  As I
25   understand from discussing the matter with both

769

JEAN RICHARD SEVERIN - 07/25/16

1    JEAN RICHARD SEVERIN - 07/25/16
2    parties, the union has, forgive me, the
3    Respondent has rested.  The Department is not
4    intending to call any rebuttal witnesses.  We're
5    at a juncture now where we're just ready for
6    closing statements.  Given the time of the day,
7    it does not make sense to begin those closing
8    statements this afternoon.  Rather, what we're
9    going to do by agreement, is reconvene here on
10   August 9th at 10:00 a.m. for closing statements
11   only.  Do I have that right, Ms. Kim?
12       MS. KIM:  Yes.
13       THE HEARING OFFICER:  Mr. Massena?
14       MR. MASSENA:  Yes.
15       THE HEARING OFFICER:  All right.  Not
16   hearing anything additional or further to
17   discuss, let us go off the record and have a
18   great evening, everyone.
19       MR. MASSENA:  Thank you.
20       THE HEARING OFFICER:  Thank you.
21       MS. KIM:  Thank you.
22       (The hearing adjourned at 5:10 p.m.)

CERTIFICATE OF ACCURACY          770

I, Debbie L. Manning, do hereby certify that the foregoing
typewritten transcript of proceedings in the matter of New
York City Department of Education v. Jean Richard Severin,
File No. 29,298, was prepared using the required
transcription equipment and is a true and accurate record
of the proceedings to the best of my ability.  I further
certify that I am not connected by blood, marriage or
employment with any of the parties herein nor interested
directly or indirectly in the matter transcribed.

Signature:

Date:  July 27, 2016

Student Index

771

Ashley Weber [phonetic] Student "A"

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK


In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
JEAN RICHARD SEVERIN
Section 3020-a Education Law Proceeding (File #29,298)


DATE:            August 9, 2016

TIME:            10:00 a.m. to 12:47 p.m.

LOCATION:        NYC Department of Education
                 100 Gold Street
                 New York, NY  10038


BEFORE:          JAMES A. BROWN, ESQ.
                 HEARING OFFICER


APPEARANCES:    FOR THE COMPLAINANT:
                    DANA KIM, ESQ., of Counsel
                    NYC Department of Education
                    Office of Legal Services
                    49-51 Chambers Street
                    New York, NY  10007
                    Telephone:  (212) 374-6741
                    dkim14@schools.nyc.gov


                FOR THE RESPONDENT:
                    ALAIN MASSENA, ESQ., of Counsel
                    Massena Law, P.C.
                    305 Broadway, Suite 1001
                    New York, New York 10007
                    Telephone: (212) 766-1700
                    avm@massenalaw.com

## Table of Contents

O P E N I N G   S T A T E M E N T
NAME:            PAGE:
A. Massena        776
D. Kim              828
W I T N E S S   E X A M I N A T I O N
NAME:            PAGE:
C L O S I N G   S T A T E M E N T
NAME:            PAGE:
E X H I B I T S
RESPONDENT      DESCRIPTION      I.D.  IN EV.
NONE
DEPARTMENT OF EDUCATION  DESCRIPTION      I.D.  IN EV.
NONE

**775**

JEAN RICHARD SEVERIN - 08/09/16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

THE HEARING OFFICER:  All right.
Let's go on the record.  All right.  So we're
back on the record in this matter, and we've
been joined by Respondent and his counsel.  Mr.
Massena, if you would kindly note your
appearance.

MR. ALAIN MASSENA:  Sure.  Alain
Massena for the Respondent.  Good morning.

THE HEARING OFFICER:  And again, I've
already mentioned on the record that Dr. Severin
is also present with us.  It's my understanding
based on a brief off-the-record conversation
that the Department would like to make a brief
representation before we proceed with the
closing arguments in this matter.  Ms. Kim.

MS. KIM:  Yes, that's correct.  On the
last date I discovered a--after the finish of
the last hearing date I discovered a stack of
letters that Mr. Francis [phonetic] had in his
possession, Mr. Francis the prior union
attorney.  I reached out to Mr. Massena because
they appeared to be letters that he and Dr.
Severin wanted for the Department to mail out to
parents, and I did get confirmation from Mr.

**774**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JEAN RICHARD SEVERIN - 08/09/16

(The hearing commenced at 10:00 a.m.)

THE HEARING OFFICER:  All right.  So
let's go on the record.  Good morning.  My name
is James A. Brown.  I am the hearing officer
duly appointed pursuant to New York State
Education Law Section 3020-a, its Rules and
Regulations, as well as the contractual
provisions by and between the New York City
Department of Education and the United
Federation of Teachers.  We are here today in
the Matter of Jean Severin, SED File Number
29,298.  This is a continuing matter.  If we
could kindly note our appearances beginning of
my left.

MS. DANA KIM:  Yes.  Dana Kim for the
Department.  Good morning.

THE HEARING OFFICER:  All right.  Good
morning to you, Ms. Kim.  While we await the
Respondent and his counsel let's go off the
record.  Thank you.

[OFF THE RECORD Waiting for Respondent
10:02 a.m.]

[ON THE RECORD Waiting for Respondent
10:22 a.m.]

**776**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JEAN RICHARD SEVERIN - 08/09/16

Massena that he spoke with Dr. Severin and they
both decided that it was not necessary for the
Department to mail out those letters on their
behalf.

THE HEARING OFFICER:  Okay.  Is that
an accurate representation, Mr. Massena?

MS. MASSENA:  Yes, it is.

THE HEARING OFFICER:  All right.  With
that having been said, are the parties now ready
to proceed with closings?

MS. KIM:  Yes.

MS. MASSENA:  Yes.

THE HEARING OFFICER:  Mr. Massena,
please.

MS. MASSENA:  Okay.

THE HEARING OFFICER:  On behalf of
Respondent.

MS. MASSENA:  Yes, if it pleases The
Court.  Your Honor, I'd like to begin by framing
this closing statement by referring to what is
Respondent's 13 in evidence and reading it in
brief for The Court.  This is a letter that Dr.
Severin submitted to the superintendent and
attachment that he submitted to the

JEAN RICHARD SEVERIN - 08/09/16

1
2 superintendent and was also followed with an
3 attachment from Mr. Romano [phonetic].  And in
4 part it states, "The email attachment is to
5 document that working conditions at Urban Action
6 Academy has deteriorated further.  Mr. Dorcely
7 has undertaken a new approach of direct
8 intimidation tactic.  For instance, on Tuesday,
9 September 8th, 2015, during the morning meeting
10 Mr. Dorcely looked straight at me in our staff
11 meeting to inform that despite recent staff
12 reporting him to authorities he is still
13 standing and growing strong.  He is not going
14 anywhere and that this year he is going into
15 beast mode.  Later on during another staff
16 meeting I proceed to write and highlight some
17 notes reminder on a paper that I had in my hand.
18 He informed me that I can write whatever I want
19 and report it to whomever I want and my
20 reporting only makes him stronger.  And on
21 Friday, September 11th at another staff meeting
22 Mr. Dorcely looking again directly at me
23 informed me this year I am going to ride you."
24      I point this out and highlight this
25 letter that Dr. Severin submitted in early--in

JEAN RICHARD SEVERIN - 08/09/16

1
2 the early school year of the 2015-2016 academic
3 year to highlight the environment under which
4 this case was brought, the genesis of this case.
5 I also note that the statements that were made
6 by Principal Dorcely to Dr. Severin were also
7 corroborated by the testimony of Mr. Satchell
8 [phonetic] and I also believe in part by the
9 testimony of Mr. Satchell.
10      Your Honor, I submit that this case
11 should be dismissed.  First, the Department did
12 not meet its burden.  It did not prove by a
13 preponderance of the evidence that Dr. Severin
14 committed these specifications.  The
15 Department's case is full of second and third
16 degree levels of hearsay and any direct evidence
17 of any wrongdoing by Dr. Severin is missing.
18 Second, I submit to you that the letters, the
19 meetings that gave rise to the allegation in
20 these specifications were conducted by an
21 administration with a vendetta against this
22 teacher that started with the principal and then
23 fell to the assistant principal who admitted on
24 direct testimony that she seeks to carry out the
25 goals of the principal.  Every meeting and the

JEAN RICHARD SEVERIN - 08/09/16

1
2 letters were to prove Principal Dorcely's power
3 over the career of Dr. Severin.  Every word said
4 about Dr. Severin during this hearing by the
5 Department of Education's witnesses were tinged
6 with disdain that he--disdain because he would
7 not take part in the cheating that Principal
8 Dorcely had taken under and that he would say no
9 to the principal.
10      Let's look at the Department's
11 witnesses.  Assistant Principal Barnett, she is
12 a third year assistant principal.  During the
13 time of the specs she was in only her second
14 year as an assistant principal.  The record is
15 devoid of any training, assistance that she got
16 to conduct investigations or disciplinary
17 meetings, but we do know that if we look to page
18 52 of her testimony she steps in to follow the
19 goals of the principal and wants to get
20 accomplished--and what he wants to get
21 accomplished in this school.
22      When discussing her observations
23 between Principal Dorcely and Dr. Severin she
24 admits that the relationship is toxic.  Those
25 are her words, not the Respondent's words.

JEAN RICHARD SEVERIN - 08/09/16

1
2 Those are her words that the relationship is
3 toxic but not beyond professional.  I submit to
4 you, Your Honor, that that is an oxymoron.  You
5 cannot have a toxic relationship and a
6 professional relationship at the same time.  The
7 two just do not work together.  An educator is a
8 role model for the students and the people that
9 teach them and she's okay with a professional
10 relationship that's toxic.  It doesn't make
11 sense.  I submit that that is problematic, and I
12 submit to you that when you look through her
13 testimony with that prism you will see that her
14 perspective is fatally skewed and that this is
15 not an acceptable working relationship.
16      In that vein when you look at her
17 testimony regarding the cooling off period,
18 pages 67 to 68, I submit that Assistant
19 Principal Barnett was so preoccupied with making
20 the principal look blameless that she simply
21 sounds ridiculous.  She cannot admit the
22 obvious.  That the cooling off period was a
23 period of high emotion and that the
24 superintendent had her step in to supervise Dr.
25 Severin and to be that other lens because

781

JEAN RICHARD SEVERIN - 08/09/16
1
2     Principal Dorcely had it out for Dr. Severin.
3     Yet even still she categorizes it as a
4     professional situation.  Our very own witness
5     Mr. Satchell and Mr. Dunkin [phonetic] testified
6     that it was a heated relationship.  They were
7     credible in their testimony.  I submit to you,
8     Your Honor, that Assistant Principal Barnett was
9     not credible, and we can see this by the way in
10    which she framed the relationship claiming it
11    was toxic yet professional at the same time.
12    Barnett admits that the SCI investigator
13    allegations about changing grades.  She admitted
14    that she was interviewed, and you'll see this at
15    page 54 of her testimony.
16         Therefore, Your Honor, I submit that
17    all of the specifications for which Assistant
18    Principal Barnett was brought into this hearing
19    to prove should be dismissed because Assistant
20    Principal Barnett is simply not an incredible
21    witness.
22         And just to step aside for one moment,
23    when you look at all of the specifications that
24    were brought by the Department of Education we
25    must simply ask ourselves why are we here today.

782

JEAN RICHARD SEVERIN - 08/09/16
1
2     These specifications do not rise to the level of
3     a 3020-a hearing in total, in part or even on an
4     individual basis.  You heard testimony from Mr.
5     Satchell.  You heard testimony from Mr. Dunkin
6     that these sorts of hearings, these sorts of
7     issues that the principal may have had, may or
8     may not have with Dr. Severin could have best
9     been handled in maybe a recommendation or maybe
10    simply a discussion with Dr. Severin, but that's
11    not what Principal Dorcely chose to do.  Once
12    Dr. Severin failed to get on board, failed to
13    change the grade of this student, the regent's
14    grade of this student Principal Dorcely knew
15    that he needed to get him out.  Principal
16    Dorcely knew that he was coming up for tenure as
17    a principal and he knew--or up for review as a
18    principal and he knew that Dr. Severin could get
19    in the way of that and especially once Dr.
20    Severin reported these allegations to the proper
21    authorities.
22         When we look at Principal Dorcely's
23    testimony we see a person who has a 24-year
24    history with the Department of Education as an
25    employee.  He spent half his time with the

783

JEAN RICHARD SEVERIN - 08/09/16
1
2     Department of Education as a school aide.  He
3     describes his responsibilities as meeting the
4     chancellor's framework for great schools but to
5     ensure that my kids graduate on time.  Those
6     were his words.  We submit that there has been
7     enough evidence to support that Principal
8     Dorcely holds a lot of animosity--and that's
9     being polite--towards Dr. Severin.  Someone
10    should have told him that this is not an
11    incompetence hearing because at every single
12    opportunity he attempted to make it into an
13    incompetence hearing but he failed to do the
14    proper work that would have been necessary to
15    make it an incompetence hearing because there
16    simply is no evidence to that.  At every point
17    in time he tried to make it into that but that's
18    not what this is, and I would just simply remind
19    The Court of that as well.  He failed to follow
20    the guidelines in the contract, and he didn't do
21    it.  If he wanted to make this an incompetence
22    hearing, then the former substitute teacher
23    turned principal should have stopped taking
24    shortcuts and done the necessary work to do that
25    which is also indicative of the shortcut that he

784

JEAN RICHARD SEVERIN - 08/09/16
1
2     was taking in terms of changing the regent's
3     grade or attempting to change the regent's
4     grade.
5          I want to talk about the incident
6     where Principal Dorcely asked Dr. Severin or
7     intimated to Dr. Severin to change the grade of
8     Student A, and I think the best way for The
9     Court to examine this particular incident is to
10    look at it from a logical perspective.
11    Principal Dorcely denies that this ever took
12    place, but why would Dr. Severin have any
13    contact with Student A at all if not for
14    Principal Dorcely?  He was new to the school.
15    Student A was not one of his students.  So the
16    only manner in which Dr. Severin would have any
17    contact with Principal Dorcely--with Student A
18    or her mother is if Principal Dorcely or an
19    agent of Principal Dorcely brought Student A
20    before Dr. Severin.
21         And I think that's the key viewpoint
22    into how to examine whether or not this actually
23    took place and whether or not whose version of
24    the facts that you can believe in terms of the
25    incident with Student A.  Once again, Dr.

785

1    JEAN RICHARD SEVERIN - 08/09/16
2    Severin was new to the school.  Student A was
3    not his student.  He had no contact with Student
4    A.  The only way for him to know of the
5    existence of Student A whom was a graduating
6    student would be for Principal Dorcely to bring
7    Student A to Dr. Severin's attention and that's
8    how we know that we can credit the testimony of
9    Dr. Severin how these series of events took
10   place in terms of Principal Dorcely attempting
11   to get Dr. Severin on board with changing the
12   regent's grade of Student A.
13         I submit because Principal Dorcely
14   wanted Dr. Severin to do something whether he
15   wanted him to say oh shucks or find shortcuts,
16   he's the one who described himself as concerned
17   with this student's grade.  He's the one who
18   wanted a teacher, Dr. Severin, with an 87%
19   passage rate on regents to take a look at the
20   exam and find some extra points so the kid could
21   pass.  It sounds like to me that Principal
22   Dorcely was trying to take another shortcut so
23   that this student could pass the regents in turn
24   make himself look good by boosting the school's
25   passage rates.  As Dr. Severin testified at page

786

1    JEAN RICHARD SEVERIN - 08/09/16
2    455, the regents' scores are a reflection of the
3    school and whether or not the principal is
4    effective or ineffective.  There's a great deal
5    of implication regarding those regents' scores.
6         One moment.  Specification Number 1--
7    let's look at the specifications.  Specification
8    Number 1, Assistant Principal Barnett testified
9    about this specification on page 63.  She said
10   that the secretary who's responsible for the
11   book let her know that Dr. Severin signed
12   himself out.  She never saw--Assistant Principal
13   Barnett never saw him sign in or out but only
14   saw his signature on page 64, and they had to
15   pull other teachers in to cover his eighth
16   period class.  But when a teacher has to leave
17   the building unless there is an issue--and I
18   submit that there was an issue in this case.  He
19   had a toxic relationship with his direct
20   supervisor.  There is nothing in the testimony
21   or evidence that the students were left alone or
22   put in harm's way.  Or whether she spoke to
23   supervisors--
24         [Phone Buzz]
25         MS. MASSENA:  Sorry about that.  I

787

1    JEAN RICHARD SEVERIN - 08/09/16
2    forgot to turn this off.  Okay.  Or whether she
3    spoke to any supervisors about Dr. Severin
4    signing out.  I submit the assistant principal
5    did not do a full investigation into whether Dr.
6    Severin and that they did not provide--to
7    whether Dr. Severin signed out, and they did not
8    provide proof that the investigation was fair
9    and objective.  This specification should be
10   dismissed and certainly cannot provide the basis
11   for a finding of insubordination or misconduct.
12         Specification Number 2, the cellphone
13   policy.  Assistant Principal Dorcely testified
14   that he walked into the classroom and that he
15   saw four cellphones and confiscated them.  I
16   submit that when you look at Department 12 which
17   is the students' statements these students had
18   their cellphones confiscated.  The principal
19   took statements to investigate Dr. Severin when
20   those students were engaged in the infraction.
21   The hearsay students' statement is being offered
22   directly for the truth of the allegations in
23   this matter and should not be considered.  What
24   we know is that the principal was in control of
25   those students' telephones.  They were asked to

788

1    JEAN RICHARD SEVERIN - 08/09/16
2    make statements because the Respondent wasn't
3    able to question these students it violates--and
4    because the Respondent wasn't able to question
5    these students it violates his right to confront
6    his accusers and to ask very basic questions
7    about the circumstances that these letters were
8    created.
9         The students' letters should not be
10   allowed to substantiate the disciplinary
11   charges.  This is particularly important since
12   the Department of Education's own witness
13   describes the relationship once again between
14   principal and Dr. Severin as toxic and that
15   they--as we all know that they needed a cooling
16   off period.  I submit that this investigation
17   was not full and fair, that this investigation
18   lacked objectivity.  This specification should
19   be dismissed.  Dr. Severin on page 536 of the
20   transcript testified that he wasn't even in the
21   classroom when Principal Dorcely came by.  He
22   was outside of the classroom conferencing a case
23   with a student and another teacher was inside--
24   his co-teacher was inside with the students.
25         As to Specification Number 3, the

789

JEAN RICHARD SEVERIN - 08/09/16
1
2    common planning meeting, Principal Dorcely
3    testified about the C-6 common planning time.
4    The principal testified about the common
5    planning session, and he also testified that he
6    attended most of the department planning
7    meetings.  Dorcely took over the assignment to
8    supervise the social studies department.  And
9    Principal Dorcely also testified that he was
10    present for most of the C-6 meetings, but he
11    also testified that if he wasn't able to attend
12    all of the C-6 meetings if I'm not there I don't
13    have my signature.
14            In regards to the common planning
15    meetings if you look to Mr. Satchell's
16    testimony, the administration didn't even make
17    the common planning sessions a priority because
18    they did not follow the contractual guidelines
19    to assign teachers to their groups.  If Your
20    Honor would look at page 474 to 476 of Principal
21    Dorcely's--Mr. Satchell's testimony, the
22    teachers were not given their preference sheets.
23    The teachers were given their options about what
24    to do during their common planning sessions
25    which in essence indicates that it's not a

790

JEAN RICHARD SEVERIN - 08/09/16
1
2    common planning session.  He testified that
3    Principal Dorcely's lack of organization was
4    frustration and caused hostility.  Additionally,
5    he also testified that a number of the
6    disciplinary conferences that he attended with
7    Dr. Severin usually occurred during the common
8    planning sessions.  They would last a range of
9    five minutes to sometimes the entire period
10    which was a 38-minute period.  There may have
11    been as many as 43 disciplinary meetings.
12            Further, Dr. Severin responded in his
13    email--Respondent's 10, in his email where he
14    reaches out to his co-teachers to coordinate the
15    common planning session.  In that--in
16    Respondent's 10 we see where Dr. Severin himself
17    is reaching out to fellow teachers to get it
18    together.  Let's pull it together.  Let's make
19    these common planning session meetings work.
20    Let's make them meaningful and clearly that's
21    not what is taking place.  So we see a level of
22    frustration in Dr. Severin as to what the common
23    planning meetings are being used for, if we can
24    even call them or classify them as common
25    planning meetings.

791

JEAN RICHARD SEVERIN - 08/09/16
1
2            And again, I think at this point it's
3    again important to draw The Court's attention,
4    to draw the attention to Your Honor that this is
5    basically a self-fulfilling case.  I would say a
6    self-fulfilling prophesy but it's really a self-
7    fulfilling case where you have someone who is
8    out to get Dr. Severin, and basically he creates
9    a pattern of letters, a pattern of emails, a
10    pattern of meetings that in essence will cause
11    anyone to fail.  If I have complete power over
12    someone, if I'm able to dictate their movements,
13    dictate what they're supposed to give to me and
14    what I'm supposed to receive from them, then I
15    also have the power to generate or to use the
16    colloquial term gen up [phonetic] charges that
17    really when you get to the bottom of them and
18    you remove the layer they're nothing but fluff.
19    So in essence, Principal Dorcely is abusing his
20    authority as a principal to go after a teacher
21    who made claims of cheating which the
22    superintendent Dr. Prayor admitted on the record
23    that there were other allegations of cheating by
24    other teachers made at Urban--or by Urban Action
25    Academy and he was aware of that.  That other

792

JEAN RICHARD SEVERIN - 08/09/16
1
2    teachers had made allegations of cheating other
3    than Dr. Severin.
4            So this is a clear case of
5    retaliation, and it's the worst type of
6    retaliation because it's not simply making the
7    environment hostile where maybe Dr. Severin
8    would just throw up his hands and quit.  It's
9    actually creating documents, creating evidence,
10    and in using the same evidence that you created-
11    -for example, saying that a common planning
12    session--that Dr. Severin is missing a common
13    planning session meeting when in fact, number
14    one, the meetings are not actually common
15    planning session meetings, and number two, for
16    many of those common planning meetings Dr.
17    Severin is actually in a meeting with the
18    principal.  So in essence wanting Dr. Severin to
19    be in two places at once and when he's unable to
20    split himself in two charging him with a
21    specification or charging him with violating
22    some sort of rule or insubordination or
23    misconduct.
24            This is the worst sort of retaliation.
25    This is the worst sort of hostile work

793

1       JEAN RICHARD SEVERIN - 08/09/16
2       environment that an individual can be under.
3       And for that reason, Your Arbitrator should view
4       all of the specifications under that prism, find
5       them and find the Department of Education's
6       witnesses to not be credible under that prism
7       and under that viewpoint.
8               Moving on to Specification Number 4
9       regarding keeping the one set of the lights off.
10      Principal Dorcely testified about this matter.
11      Again, whether or not this happened the question
12      to Your Arbitrator is should this really be a
13      subject matter for a disciplinary proceeding?
14      This is certainly not the type of issue that
15      would merit Dr. Severin losing his job.  There
16      are no allegations that the students were hurt
17      or in any harm or the light being off could give
18      rise to a dangerous situation.  Further, Dr.
19      Severin testified that he did not receive any
20      earlier directives about keeping the lights on.
21      And this is where it's important that we not
22      forget when we look at these specifications that
23      we not leave common sense outside of our
24      deliberations when we look at the specification.
25      We live in the real word.  We've all sat in

794

1       JEAN RICHARD SEVERIN - 08/09/16
2       rooms where I submit the lighting in the room
3       makes it difficult to view a screen, especially
4       a projection screen.  And I would submit that
5       The Court is free to use its own knowledge of
6       that type of experience.
7               And I also submit that Dr. Severin
8       testified about the manner in which his room was
9       facing.  I believe he stated--and The Court can
10      refer to the transcript.  I believe he stated it
11      was facing southwest and obviously that type of
12      position in relationship to the screen would
13      make it difficult for the students to see the
14      video.  So our question becomes as educators is
15      it more important to follow a directive that was
16      never given and keep all the lights on or is it
17      actually more important for the students to
18      actually be able to see the screen and to be
19      able to see the screen that has vital
20      information that would be a part of their lesson
21      that particular day?  But again, when someone
22      has it out for you and someone has the ability
23      and the power to generate documents, to create
24      disciplinary letters and put those disciplinary
25      letters in your file then what are you to do as

795

1       JEAN RICHARD SEVERIN - 08/09/16
2       a teacher?  You're defenseless.  Despite
3       reaching out to the superintendent for help,
4       you're literally at the mercy of Principal
5       Dorcely.
6               We go to Specification Number 5 and we
7       touched on this as well regarding the common
8       planning meeting, 29 of the 37 mandated planning
9       meetings.  The principal testified that of the
10      29 days he saw Dr. Severin at a location other
11      than the common planning room.  Dr. Severin and
12      Mr. Satchell testified that numerous times
13      Principal Dorcely called Dr. Severin in for
14      disciplinary meetings.  And at page 545 and 546
15      Dr. Severin testified that the teachers were
16      trained to and required to grade MOSLs during
17      the common planning periods.  One of the charged
18      days was actually Veteran's Day and another--
19      which was--one of the charged days was actually
20      Veteran's Day and The Court can see that on page
21      546, and another day was November 25th, 2015,
22      which was the day of the Thanksgiving party and
23      sixth period was canceled, again on page 546.  I
24      submit that these allegations should be
25      dismissed.

796

1       JEAN RICHARD SEVERIN - 08/09/16
2               And I just want to focus on
3       Specification Number 5 just for one moment
4       because again I believe it highlights--I believe
5       it's an illustration of the environment that Dr.
6       Severin was serving in as a teacher of this
7       school.  We have a teacher--we have a principal
8       who goes through the great extent or great
9       trouble of attempting to document numerous
10      missed--allegedly missed common planning time
11      meetings.  However, The Court heard extensive
12      testimony about what were these so-called MOSL
13      meetings.  Many of these initial meetings in
14      October and November were actually put aside for
15      MOSL planning, MOSL grading, MOSL norming.  A
16      great deal of time was spent on this to the
17      point where I believe it's fair to say that
18      anything but common planning was taking place
19      during the common planning sessions.  And the
20      fact that dates such as November 11th and dates
21      where Dr. Severin were in a disciplinary
22      conference meeting, the fact that those dates
23      are listed in these--in Specification Number 5
24      speaks to the animosity, speaks to the malaise
25      that Principal Dorcely wanted to go, intended to

JEAN RICHARD SEVERIN - 08/09/16

1
2  go to get Dr. Severin out of the school because
3  Dr. Severin was the first teacher, not the last
4  but was the first teacher to report the
5  allegations of the cheating, of alleged cheating
6  by Principal Dorcely.
7      Specification Number 6, this is--there
8  was no firsthand evidence that Dr. Severin left
9  the building without signing out. No video, no
10  eyewitness. Dr. Severin testified that he did
11  not leave the building so there was no need for
12  him to sign out. I submit that this allegation
13  should be dismissed for lack of evidence. And I
14  also want to point out to The Court that in this
15  courtroom Principal Dorcely first testified that
16  he did not see Dr. Severin leave the building
17  but after realizing that--after realizing during
18  cross examination that based on his testimony
19  this specification would have to be dismissed he
20  changed his testimony and then said he did. And
21  again I think that--and he changed his testimony
22  in court during this hearing because again
23  there's a vendetta, there's an agenda by
24  Principal Dorcely to have Dr. Severin removed
25  from the school, and I believe that The Court

JEAN RICHARD SEVERIN - 08/09/16

1
2  had an opportunity to see that, The Court had an
3  opportunity to see Principal Dorcely change his
4  answer, and I believe that The Court can assess
5  that that was not credible what Principal
6  Dorcely did during the hearing.
7      Regarding the midterms which was in
8  Specification Number 7, Principal Dorcely
9  testified about this specification and all of
10  the teachers were asked to submit terms for
11  grading. Dr. Severin testified that on page 552
12  and page 553 that at that time of the year it
13  was the MOSL and the MOSL was the test that was
14  being administrated and Dr. Severin bore no
15  responsibility for creating the exam or the
16  contents thereof.
17      And now we come back again to the
18  MOSLs which a great deal of time was spent. As
19  Your Honor, The Court reviews the record, great
20  deal of time was spent regarding discussing the
21  MOSLs, whether the MOSLs were midterms or
22  whether they were not midterms. At the end of
23  the day what's important here is to note that if
24  the principal wants to generate emails and wants
25  to generate documents that may or may not show

JEAN RICHARD SEVERIN - 08/09/16

1
2  whether or not Dr. Severin followed a directive,
3  then where is the document where they actually
4  did receive the MOSL or where is the document
5  indicating the time that it was received or the
6  document indicating the time where the midterm
7  was received. That should be part of the
8  evidence and it's not part of the evidence
9  because I would submit they do not want The
10  Court to have that information. So regarding
11  the MOSLs, Dr. Severin bore no responsibility
12  for that exam and creating that exam and the
13  contents thereof.
14      Specification Number 8, permitted a
15  student to enter the building. This particular
16  specification again should be dismissed at
17  whole. There was absolutely no direct evidence
18  by anyone regarding Dr. Severin allowing a
19  student into the building. Principal Dorcely
20  testified about this allegation. As a matter of
21  fact, Assistant Principal Barnett who may have
22  been able to provide a greater source of
23  information she didn't discuss this
24  specification as well. Principal Dorcely
25  testified about the allegations in this matter.

JEAN RICHARD SEVERIN - 08/09/16

1
2  The Department did not call a single student
3  witness to this allegation. The Department did
4  not produce any video footage about this
5  incident when they said initially they would and
6  they chose not to. The Court may make its own
7  determination as to why the video was not
8  brought forward if The Court so desires.
9      Furthermore, there was another
10  administrator that was part of the investigation
11  of these allegations. Even though Assistant
12  Principal Barnett was here and testified on an
13  earlier day, she did not testify about her role
14  in the investigation. I know we do not follow
15  strict rules of evidence here, Your Honor. I
16  submit that the Department did not meet its
17  burden of proof but that the allegations cannot
18  be substantiated on the hearsay statements two
19  or three people removed from the statement.
20  There's no evidence about this allegation at
21  all. The student was not called to testify.
22  The principal from the other school who is
23  certainly under the control of the Department of
24  Education was not called to testify.
25      And at this particular point I'll just

801

1        JEAN RICHARD SEVERIN - 08/09/16
2   briefly say that The Court may want to consider
3   175 of the jury instructions for a missing
4   witness charge, and as The Court may be aware,
5   pursuant to New York's -- [00:01] jury
6   instructions a party's failure to call a
7   particular witness could lead to a jury charge
8   allowing an adverse inference to be drawn.  If
9   the jury finds the party's explanations for not
10  calling the witness to be reasonable, the jury
11  is instructed not to consider the failure of the
12  party to call the witness in evaluating the
13  evidence.  If, however, the explanation is not
14  reasonable--and I don't see what reasonable
15  explanation the Department of Education would
16  have for not calling a DOE employee who was
17  present during this particular specification.
18  So if, however, the explanation is not
19  reasonable or the party did not give an
20  explanation, you know, Your Honorable
21  Arbitrator, the fact finder, you're not required
22  to conclude that the testimony would not--of the
23  witness would not have supported the
24  Respondent's position on the question on this
25  particular specification and that the--and that

802

1        JEAN RICHARD SEVERIN - 08/09/16
2   that particular DOE employee would not have
3   contradicted evidence offered by the Department
4   of Education on the issue of allowing the
5   student into the building during a fire drill.
6   So The Court may consider that particular line
7   of reasoning as it deliberates Specification
8   Number 8 and hold the Department of Education to
9   that standard.
10         As to Specification Number 9, that Dr.
11  Severin failed to inform an immediate supervisor
12  about his absence on October 23rd, 2015, looking
13  at Respondent's 11 in evidence, an email from
14  the principal and Dr. Severin's testimony about
15  what was expected from him when he should not--
16  excuse me--when he's present from the school.
17  On page 563 which simply says--
18         THE HEARING OFFICER:  [Interposing]
19  I'm sorry.  Which page?
20         MS. MASSENA:  563 which simply says
21  the contract Sub Central.  I should get some
22  water.
23         THE HEARING OFFICER:  Sure.  Let's go
24  off the record for a moment.
25         [OFF THE RECORD Break 10:58 a.m.]

803

1        JEAN RICHARD SEVERIN - 08/09/16
2         [ON THE RECORD Break 11:02 a.m.]
3         THE HEARING OFFICER:  Let us go back
4   on record.  Mr. Massena.
5         MS. MASSENA:  Thank you.
6   Specification 9, here the allegations are that
7   Dr. Severin failed to inform an immediate
8   supervisor about his absence.  Looking at
9   Respondent's 11, an email from the principal and
10  Dr. Severin's testimony and what was expected
11  from him we can look to page 563 of the
12  transcript which simply says to contract is Sub
13  Central.  Dr. Severin did call Sub Central.  I
14  submit that this specification should be
15  dismissed because these allegations occurred
16  during a time where there was a very heated
17  relationship between the principal and Dr.
18  Severin and in light of the fact that the
19  superintendent identified that the parties
20  needed a cooling off period.  I submit that
21  these allegations were created with the
22  intention to harass and intimidate instead of
23  providing guidance and correcting Dr. Severin.
24         THE HEARING OFFICER:  You said I
25  believe contract Sub Central.  You meant to say

804

1        JEAN RICHARD SEVERIN - 08/09/16
2   contact--
3         MS. MASSENA:  [Interposing] Contact.
4         THE HEARING OFFICER:  --Sub Central.
5         MS. MASSENA:  Correct.
6         THE HEARING OFFICER:  Thank you.
7         MS. MASSENA:  Contact.  As to
8   Specification Number 11 regarding supplying a
9   period two lesson plan, once again these
10  allegations, these specifications as well as the
11  specifications as a whole should all be viewed
12  through the prism of a toxic relationship where
13  Principal Dorcely has the power to dictate and
14  the power to fabricate these specifications.  So
15  do we--how do we know that Dr. Severin did not
16  submit a lesson two plan--a period two lesson
17  plan other than the testimony of Principal
18  Dorcely or Assistant Principal Barnett?
19         Specification Number 12 where it was
20  alleged that he failed to have a lesson plan on
21  September 11th of 2015.  The evidence during
22  this particular--regarding this particular
23  specification it made sense and it's not the
24  type of specification that should rise to a
25  3020-a hearing.  It's not the type of

805

1    JEAN RICHARD SEVERIN - 08/09/16
2    specification--it's not the type of charge that
3    should be included in a specification. It
4    simply isn't. Dr. Severin has a co-teacher who
5    is doing a September 11th--we all know what
6    September 11th is--a September 11th plan with
7    other teachers in the building. He gives her
8    the floor. He says fine. I agree with you.
9    You know, this is a worthy topic of discussion.
10   This is a worthy lesson plan. My lesson plan
11   which was the scientific revolution that can
12   hold off. We can hold off on that. I support
13   you in--I support you co-teacher in doing this
14   lesson plan. But that wasn't good enough for
15   Principal Dorcely. No. Principal Dorcely had
16   an agenda. He was going to ride Dr. Severin and
17   here was another opportunity to pick, you know,
18   at--to pick at Dr. Severin. He didn't care that
19   it was September 11th. He doesn't know whether
20   Dr. Severin had suffered a loss. He doesn't
21   know whether the co-teacher Ms. Fagan had
22   suffered a loss on September 11th. His goal was
23   to ride Dr. Severin and he was going to ride him
24   because Dr. Severin had seceded the floor to his
25   co-teacher, allowed her to proudly present a

806

1    JEAN RICHARD SEVERIN - 08/09/16
2    lesson plan that she had worked on, and he took
3    this as an opportunity to again file another
4    disciplinary charge against--disciplinary letter
5    against Dr. Severin.
6         It just doesn't make sense as all of
7    these charges do in total. When you look at
8    them in total they just don't make sense. So
9    that's what we have to say to Specification 12.
10   Dr. Severin had a lesson plan. He had a lesson
11   plan on the scientific revolution. It was
12   prepared. It was ready to go. However, his co-
13   teacher had another idea and he agreed with her
14   that this was an appropriate time to do a lesson
15   plan on September 11th. But Principal Dorcely
16   had an overriding agenda and that was to get Dr.
17   Severin regardless of the day, regardless of the
18   time, regardless of anything else.
19        Specification Number 13 regarding the
20   fourth marking period, the--sorry--the EGG and
21   also Specification Number 14. Again, when we
22   look at these particular specifications
23   regarding lesson plans, regarding EEGs, we have
24   to ask ourselves are these specifications that
25   rise to the level of a 3020-a hearing? Are

807

1    JEAN RICHARD SEVERIN - 08/09/16
2    these charges that are trumped up by Principal
3    Dorcely simply to try to get Dr. Severin out of
4    the school? Dr. Severin testified that he did
5    send the EGG files and that in sum he became
6    aware regarding the assistant principal or the
7    principal when they notified him that they were
8    not received. This was a simple technical issue
9    and certainly should not be the subject of any
10   disciplinary action. And they did receive the
11   EGG files.
12        Specification Number 15, failed to
13   notify of absence which was on page 176 of
14   Principal Dorcely's testimony. He states--
15   Principal Dorcely states that his--that Dr.
16   Severin's failure to notify the supervisors
17   about his absence was that the administrators
18   were looking for substitute teachers. There was
19   no testimony that the students were left alone
20   or did not have coverage. The Respondent in his
21   testimony points to the daily docket as
22   described by Principal Dorcely that was sent
23   every day and provided instructions on how to
24   deal with certain matters and that Principal
25   Dorcely required teachers to notify Sub Central.

808

1    JEAN RICHARD SEVERIN - 08/09/16
2    Here Dr. Severin testified that he called Sub
3    Central and even noted on Department Number 26
4    Dr. Severin explained in the disciplinary
5    conference and sum that whenever he has called
6    out sick he just called Sub Central. Notably
7    this is not a time and attendance case. So it's
8    not an incompetence case. It's not a time and
9    attendance case. Why are we here? We're here
10   because Principal Dorcely wants to get Dr.
11   Severin out of the school. The allegation is
12   that he did not call the proper person to notify
13   them of his absence.
14        Again looking at 16, 17, and 18,
15   failed to have three lesson plans, 17 supply
16   weekly lesson plan, and Specification Number 18
17   failed to schedule support. Hearing Officer,
18   when you view Specifications 9, 10, 11, 12, 16,
19   17, and 18, all together these are allegations
20   that are ministerial. There has been no
21   evidence that the school or the student body
22   were impacted by the alleged conduct. There has
23   been no correlation that the alleged conduct has
24   a correlation to Dr. Severin's ability to
25   perform his duties as a teacher. I submit that

809

JEAN RICHARD SEVERIN - 08/09/16

1       JEAN RICHARD SEVERIN - 08/09/16
2 despite this toxic environment Dr. Severin still
3 tried to comply with the principal's mandates to
4 attend meetings where the two of them were alone
5 in a room. He submitted lesson plans in his
6 testimony on page 765 and 766.
7       He described that he felt "I mean it
8 was humiliating because at the beginning of the
9 day the lesson, the December 22nd and December
10 23rd observation that Principal Dorcely wrote me
11 ineffective about was a specific lesson that
12 managed to get the children to do some
13 phenomenal work," these are Dr. Severin's words,
14 "as far as writing their five to seven page
15 essays. I even sent Principal Dorcely an
16 email," Dr. Severin testifies, "letting him know
17 how debilitating his ineffective observation of
18 my work, pleading with him, letting him know
19 Principal Dorcely I take pride in this work.
20 This is something that I informed you before I
21 did it, but he deemed that it was ineffective.
22 I sent him an email. Afterwards he even sent
23 Superintendent Prayor the same email to inform
24 him how this was not a professional assessment
25 but it seemed personal." So by the whole time--

810

1       JEAN RICHARD SEVERIN - 08/09/16
2 "So by the time that whole observation, the
3 whole session was set up I didn't really say
4 anything because he's my principal. He's my
5 supervisor. So I set them up. I sat down and I
6 attended, I took notes, and I implemented
7 everything he recommended." This is Dr.
8 Severin's words.
9       I submit that these charges should be
10 dismissed. The Department has failed to meet
11 its burden. This conduct in the specifications
12 and that were testified to by the Respondent and
13 the superintendent and UFT was in retaliation
14 for filing the SCI report that Principal Dorcely
15 engaged or attempted to engage in testing
16 irregularities. Dr. Severin as a New York City
17 employee was obligated to report what he
18 observed. He reported the allegations to SCI, a
19 branch of DOE. I submit that Dr. Severin was to
20 be protected by the Department of Education from
21 the behavior of his supervisor and the
22 Department of Education failed him.
23       Further, looking at the Department's
24 documentary evidence specifically pointing to
25 the Special Complaint 28 Determination that is

811

1       JEAN RICHARD SEVERIN - 08/09/16
2 in evidence over the Respondent's strenuous
3 objections I submit that it should not even be a
4 part of the record in this case. We ask that
5 when you are considering that document that you
6 not give it any weight at all. We submit to do
7 so would be to undermine your role as a
8 factfinder and the person who evaluates the
9 credibility and weight of all the witnesses and
10 the evidence presented here. Additionally, that
11 proceeding was presided over someone who works
12 for the Department, the chancellor's designee,
13 and we submit that the findings are inherently
14 prejudicial to my client Dr. Severin because
15 those findings that decision was rendered to
16 further the interest of the Department of
17 Education.
18       Now looking at the Respondent's
19 witnesses, I submit that they were credible and
20 testified truthfully. These witnesses are not
21 neighbors or friends but supervisors employed at
22 the DOE or seasoned representatives of the union
23 and they came to testify. First, Superintendent
24 Prayor who testified that his job was to support
25 the principals. He testified--this is page 376.

812

1       JEAN RICHARD SEVERIN - 08/09/16
2 He testified and characterized his conversations
3 between the principal, the assistant principal,
4 and Dr. Severin. The nature of the conversation
5 is I guess one to be informed of certain issues
6 that took place at the school between Principal
7 Dorcely and Dr. Severin and also to bring all
8 parties together to try to get to a mutual
9 understanding, professionalism that can
10 ultimately be given to all four parties, and to
11 have a reprieve of their professional
12 responsibilities and some conflicts between
13 them.
14       The superintendent acknowledged that
15 he received a number of emails from Dr. Severin,
16 that he described those emails as either to
17 inform the superintendent or to ask for his
18 help. But if you look back at the
19 superintendent's testimony at page 384 when
20 discussing Exhibit Number 8, an Email from Dr.
21 Severin, the superintendent did not offer any
22 assistance until he received the email that is
23 in Exhibit Number 9 and then he intervened by
24 seeking the support of the UFT District Rep
25 James Dunkin bringing both teacher and principal

813

JEAN RICHARD SEVERIN - 08/09/16

1
2 together to have a cooldown period of
3 interaction because there was a lot of tension
4 and the cool-off periods was to give both
5 parties an opportunity to collect themselves and
6 act professionally so that in the interim of the
7 cooldown period Dr. Severin would find
8 employment elsewhere that was possible.
9 I submit that perhaps if the
10 superintendent had intervened earlier that he
11 may have been able to diffuse some of the
12 tension.  This is mind-blowing that the
13 principal, a person who is in charge of
14 children, our city's children has to have a
15 cooling off period from one of the people he is
16 in charge of supervising.  The situation was so
17 desperate that Dr. Severin was to look for
18 another job.  The cooling off period was to last
19 until January 30th, 2016, according to
20 Superintendent Prayor, but Principal Dorcely
21 terminated the cooling off period early.
22 Principal Dorcely was so out of control that he
23 violated his supervisor's orders, basically an
24 act of insubordination by Principal Dorcely.
25 That is why we are here at this

814

JEAN RICHARD SEVERIN - 08/09/16

1
2 hearing Dr. Severin did not leave the school.
3 The principal was still hot and wanted to get
4 Dr. Severin out.  Sadly, based on the
5 superintendent's testimony at page 412 Dr.
6 Severin isn't the only one who has made reports
7 of harassment and grade changing.  And if you
8 recall--and this is at page 412.  And if you
9 recall, the superintendent was reluctant to
10 admit that but he did which I submit supports
11 his credibility that he wasn't a witness siding
12 with the Respondent.
13 Then the UFT Rep Mr. Satchell.  He
14 starts his testimony telling us that he attended
15 a lot of disciplinary meetings with Dr. Severin
16 and either the assistant principal or Principal
17 Dorcely, more than 20 during the 2015-2016
18 school year.  He described the meetings as
19 hostile and that it was just pointing out
20 something Dr. Severin might have done that
21 wasn't the best thing to do in the eyes of the
22 principal or Ms. Barnett.  At page 469 Satchell
23 noted that the hostility stemmed from Dr.
24 Severin being asked by the 19 administration to
25 either change--I'm sorry, withdrawn--being asked

815

JEAN RICHARD SEVERIN - 08/09/16

1
2 by the administration to either change a grade
3 or if it was to allow a student extra time on an
4 exam, something along those lines, and Dr.
5 Severin had reported this incident.  I believe
6 as Mr. Satchell says to SCI, "And it seemed like
7 a lot of hostility throughout the school year
8 carried over from that incident."
9 Mr. Satchell also testified that he
10 remembered very clearly that the principal made
11 an open threat and Satchell believed that it was
12 directed to an individual and that individual
13 was Dr. Severin.  Mr. Satchell testified that he
14 heard Principal Dorcely say you tried to take me
15 down.  He did not name who he was talking about
16 but he did say, Principal Dorcely, I'm back and
17 I'm stronger than ever and I'm going to ride
18 you.  I submit this goes to support a clear
19 retaliation by the principal against Dr.
20 Severin.  He said he was going to do it and now
21 we are here today in this room summing up on a
22 3020-a hearing.  And Dr. Severin was the only
23 person who had filed--at that time was the only
24 person who had filed an OSI case against
25 Principal Dorcely in the 2014-2015 school year.

816

JEAN RICHARD SEVERIN - 08/09/16

1
2 Then we heard from UFT Chapter Leader
3 Dunkin who testified that Urban Action Academy
4 is one of the more active schools because of the
5 day discipline is handled there.  At page 741
6 Mr. Dunkin noted that the schools he supervised
7 that there were 85 disciplinary letters since
8 December of 2015 and that of the 85, 50 of them
9 were from Urban Action Academy.  Mr. Dunkin
10 testified on page 741 and 742, "There seemed to
11 be a situation that was coming to a head between
12 Dr. Severin and Principal Dorcely.  I had seen
13 that Michael Prayor, the Superintendent, had
14 come to me when he noticed it.  We talked about
15 it." Meaning Mr. Dunkin and Mr. Prayor, the
16 Superintendent.  "So we tried to come up with a
17 plan to alleviate the anxiety."  And this plan
18 was the cooling off period where both members
19 had limited interaction and that they would have
20 limited interaction with each other over a
21 period of a month and then through their cooling
22 off period Dr. Severin would look for a place
23 for employment.
24 Mr. Dunkin spelled out the agreement
25 to expedite signing disciplinary letters.  He

JEAN RICHARD SEVERIN - 08/09/16

1  JEAN RICHARD SEVERIN - 08/09/16
2  explained that they agreed to just say there was
3  no comment and to sign the letter. Mr. Dunkin
4  described that even though there was an
5  agreement about how to handle the letters
6  Principal Dorcely's tone was aggravated,
7  harassing, belittling, and on page 744 despite
8  the Department's contentions, Dr. Severin agreed
9  to just sign the letter in accordance with the
10  agreement they came--they had come up with. But
11  that's not what Principal Dorcely wanted.
12  That's not what he wanted to do. I submit that
13  he showed his true colors and just simply how
14  underhanded he is.
15         When we refer to the transcript at
16  page 746 because at the end of all of this, at
17  the end of this meeting Principal Dorcely stood
18  up and--Mr. Dunkin had worked out this agreement
19  and they thought they had an agreement but
20  Principal Dorcely had stood up and--they put a
21  lot of time into this trying to work out this
22  agreement and Principal Dorcely said I'm still
23  going forward with my 3020-a hearing and Mr.
24  Dunkin asked him. What are you talking about?
25  I thought this was an agreement for a cooling

1  JEAN RICHARD SEVERIN - 08/09/16
2  off period. Everyone has said so. That doesn't
3  mean I won't go forward with this. I'm going
4  forward with this because I want him out of
5  here. Again, Mr. Dunkin's testimony goes to
6  show that Principal Dorcely wasn't acting in the
7  best interest of the students, wasn't even
8  acting in the best interest of Urban Action
9  Academy. He was acting in his own interest and
10  that was the interest of getting Dr. Severin
11  thrown out of the school to protect himself.
12  Principal Dorcely acted with complete disregard
13  for the -- [00:01] of Mr. Satchell and Dunkin
14  who had to attend all of these meetings and he
15  continued to harass Dr. Severin throughout the
16  school year.
17         And lastly we heard from the
18  Respondent. Your Honor has had an opportunity
19  to see Dr. Severin's demeanor during this entire
20  period, during this entire hearing. You heard
21  him testify. You saw that he was forthright.
22  He spoke candidly about things that were
23  difficult. He did his best to answer the
24  questions as he understood them and as the DOE
25  presented them to him. The Department may try

1  JEAN RICHARD SEVERIN - 08/09/16
2  to say that Dr. Severin is not credible based on
3  answers that he gave on some questions that were
4  compound questions on cross examination about
5  who he should notify when he was absent. That's
6  not why we are here and that isn't enough to try
7  to discredit Dr. Severin's entire testimony.
8  Dr. Severin faced a very rigorous cross
9  examination but recall his demeanor. I submit
10  that he was a gentleman but he stood up for
11  himself.
12         The Department could say all they want
13  about the reason why Dr. Severin made the SCI
14  report. He was having issues with his pedagogy
15  but this is not an incompetency case. He was
16  not having any issues with his pedagogy. But
17  what is clear is Dr. Severin, a new teacher in
18  the building, was asked to cover summer school,
19  was informed by the principal that a student and
20  her mother came to the principal's office to
21  inquire about the student's failing grade. I
22  submit the student and her mother when they came
23  to Principal Dorcely's office they didn't even
24  know Dr. Severin was there or who he was. The
25  principal brought their inquiry to Dr. Severin's

1  JEAN RICHARD SEVERIN - 08/09/16
2  attention.
3         One moment. Okay. In closing, if you
4  look at the timeline of the events, it further
5  corroborates Dr. Severin's allegations and
6  retaliation. The student, Student A, during the
7  summer Dr. Severin reports the allegations to
8  OSI, OSI interviews Dr. Severin in mid-June.
9  Dr. Severin is informed that the investigation
10  is slated to continue with other interviews.
11  Then there is summer break. The OSI report is
12  concluded either substantiated or
13  unsubstantiated. It doesn't matter. The
14  teachers return to school, Principal Dorcely
15  throws the gauntlet down with a threat you tried
16  to take me down. I'm stronger than ever. I'm
17  going to ride you. And following Dr. Severin's
18  testimony, Principal Dorcely was going into
19  beast mode and now this case begins.
20         Dr. Severin has suffered abuse at the
21  hands of the principal. Dr. Severin testified
22  that after the disciplinary conference on the
23  9/11 lesson plan Principal Dorcely walked
24  followed behind him from room 105 all the way to
25  his room down the hall which is about a good six

821

1        JEAN RICHARD SEVERIN - 08/09/16
2    to 20--about six to seven classrooms down the
3    hall talking, harassing, taunting him, telling
4    him how this year I'm done and I'm gone to the
5    point where we got in front of--Dr. Severin was
6    in front of room 128 and the principal
7    threatened him saying--telling him he's going
8    to--and excuse the language but he's going to
9    fuck him up this year.  That I'm done and I'm
10   gone.  Dr. Severin then testified at page 524,
11   he also said this year I'm going to be on your
12   back.  Believe you me you are gone, you are
13   gone.  So when I asked Principal Dorcely, Dr.
14   Severin says at page 524, are you threatening me
15   Principal Dorcely responded yes, it's a threat.
16   I said are you saying you're threatening me and
17   Principal Dorcely said yes.
18        He also suffered abuse by Principal
19   Dorcely with the multiple disciplinary
20   conferences.  As Mr. Dunkin described, there has
21   been a disproportionate amount of observations.
22   There were over 25 disciplinary letters and
23   without any sort of remedy.  So what exactly was
24   the point?  Was the point to move Dr. Severin
25   along?  Was the point to make Dr. Severin a

822

1        JEAN RICHARD SEVERIN - 08/09/16
2    better teacher?  Or was the point simply to
3    create a paper case where he would be able to
4    bring a 3020-a hearing, a paper trail where he
5    would be able to bring a 3020-a hearing?
6    Principal Dorcely would walk into his classroom
7    unannounced and observe him almost every day.  I
8    submit to The Court that this is unnerving to
9    have any interruption while a teacher is
10   teaching and to be observed by the principal on
11   such a repeated basis.  That's why the practice
12   of observing teachers and visiting classrooms
13   are covered under the CBA and clearly Principal
14   Dorcely was in violation of that.
15        Every interaction that Principal
16   Dorcely has with Dr. Severin, Dr. Severin
17   describes it as always condescending, constantly
18   berating, constantly belittling.  It was
19   intimidation and it was confrontational.  I
20   submit to Your Honor if there's a finding of
21   guilty--Dr. Severin--withdrawn.  Dr. Severin
22   reached out to the OSI investigator for help and
23   to the superintendent so he could get a reprieve
24   and it did not come.  And he also reached out to
25   the union for help.

823

1        JEAN RICHARD SEVERIN - 08/09/16
2        Lastly, Your Honor, if there's a
3    finding of guilty, the Hearing Officer must then
4    look to the penalty phase and make a
5    determination of what is the appropriate penalty
6    and the penalty must be proportionate to the
7    officers.  I submit that if you find that Dr.
8    Severin engaged in any misconduct there should
9    be no further penalty.  He already received
10   numerous letters to his file and that mark on
11   his career is proportionate to the lightweight
12   allegations against him and certainly he should
13   not be terminated for anyone or even the
14   collective body of allegations contained in the
15   specifications.  I submit that there is nothing
16   in the record, in the documents to conclude that
17   Dr. Severin should never teach again.
18        Furthermore, Dr. Severin was not an
19   insubordinate employee.  Numerous times during
20   his testimony he said that when Principal
21   Dorcely on September 8th, 2015, was talking
22   about going into beast mode Dr. Severin
23   testified that he better make sure he does his
24   work.  He later testified on page 570 he made
25   every effort to adhere to whatever mandate was

824

1        JEAN RICHARD SEVERIN - 08/09/16
2    given to him, and he described the principal's
3    actions had a severe impact on him personally.
4    He described his two years at Urban Action
5    Academy as hell and then described I've never
6    experienced such a hostile working environment,
7    so much harassment.  The working condition was
8    not pleasant and it was two years for me.
9        At page 578, the Superintendent Prayor
10   testified that his three years as superintendent
11   that he never had to give a principal and a
12   teacher a cooling off period before Principal
13   Dorcely.  I'll note that this was Principal
14   Dorcely's second year as a principal whereas Dr.
15   Severin has been a teacher for a very long time.
16   So within the second year of Principal Dorcely
17   being a principal he has to have a cooling off
18   period where Dr. Severin with his 20 years of
19   teaching who's never had to have a cooling off
20   period until he came under the supervision of
21   Principal Dorcely.  I submit that this work
22   environment was bitter and hostile hell that
23   Principal Dorcely created for Dr. Severin in
24   retaliation for filing the SCI report and is not
25   indicative of Dr. Severin's ability to retain

825

1      JEAN RICHARD SEVERIN - 08/09/16
2  his job as a teacher with the Department of
3  Education.
4        Additionally, it is a long-held
5  proposition that it is a graduated system of
6  employee discipline and this is Dr. Severin's
7  first disciplinary proceeding.  In citing
8  Mockler v Ambach the commissioner upheld a 30-
9  day unpaid suspension for a 23-year employee.
10  In DOE versus Elliot Factor, [phonetic] Decision
11  Number 13,068, the relevant inquiry is whether
12  the discipline imposed is proportionate to the
13  offense.  Informing this inquiry is the
14  principle that penalties are not to punish but
15  to impress upon a teacher the inappropriateness
16  of his conduct and to serve as warnings against
17  future improper conduct.  A teacher's record is
18  also relevant to the issue of penalty.  In this
19  case the Respondent has served the school
20  district for 23 years with incidents giving
21  rise to a 3020-a charge.  Under the
22  circumstance, a 30-day suspension without pay
23  seems appropriate and this is in the Appeal of
24  BOCES of Rockland County 29 Education Department
25  Rep. 406.  Under the circumstances, a 30-day

826

1      JEAN RICHARD SEVERIN - 08/09/16
2  suspension without pay seems appropriate to
3  impress upon the Respondent the seriousness of
4  the offense.
5        Okay.  In Dr. Severin's case, the
6  allegations of insubordination were primarily
7  ministerial issues.  There are no allegations or
8  testimony that any students were harmed or in
9  danger of harm or that the efficiency or
10  effectiveness of the school was impacted by his
11  alleged behavior.  Your Honor must also consider
12  whether Dr. Severin is able to continue with his
13  job as a teacher.  I submit that he can.  This
14  was not an incompetence case.  Dr. Severin has
15  an accomplished academic career throughout his
16  career and he's improved himself by earning a
17  PhD, completing it, publishing.  He lectures in
18  colleges in the exact subject that he is a
19  teacher.  Socially he is a role model to
20  students of color, students who are immigrants,
21  English language learners because that is his
22  story.  He can relate to these students and by
23  keeping his job as a teacher show them that they
24  can overcome the same struggles.  His passion to
25  remain a teacher and a teacher in New York City

827

1      JEAN RICHARD SEVERIN - 08/09/16
2  he wants to teach and he is committed to the New
3  York City Department of Education.  He is a
4  product of the New York City public schools, New
5  York City colleges.
6        And I will leave you with Dr.
7  Severin's words at page 580 of the transcript.
8  Dr. Severin says that--one moment--where Dr.
9  Severin talks about--at 580 of the transcript
10  Dr. Severin talks about his love of teaching.
11  He talks about the path that his career has
12  taken and Your Honor will have an opportunity to
13  see that.  "At the conclusion of this case it is
14  my hope that I will be able to go on to continue
15  to teach," which is what Dr. Severin says,
16  "making a difference in young children's lives.
17  I enjoy my profession.  I look forward to work
18  with children making them better academically,
19  socially, and personally."
20        For all of the reasons stated, all of
21  the reasons that were said, in light of the
22  evidence and the lack of evidence in this case,
23  I believe that the Arbitrator is left with one
24  decision and that's the decision to dismiss all
25  of the specifications brought by the Department

828

1      JEAN RICHARD SEVERIN - 08/09/16
2  of Education against Dr. Severin.  To do
3  anything but dismiss those charges would be to
4  allow Principal Dorcely and the Department of
5  Education to abuse--to continue to abuse Dr.
6  Severin after the two years of retaliation and
7  hostile work environment that he had to live
8  through.  Thank you.
9        THE HEARING OFFICER:  Thank you very
10  much.  Let's take a break at this time.
11        MS. MASSENA:  Okay.
12        [OFF THE RECORD Break 11:35 a.m.]
13        [ON THE RECORD Break 11:42 a.m.]
14        THE HEARING OFFICER:  Let's go on the
15  record.  Ms. Kim, are you ready to proceed with
16  the closing for the Department?
17        MS. KIM:  Yes.
18        THE HEARING OFFICER:  Okay.  Please
19  do.
20        MS. KIM:  Thank you very much.  And
21  good morning again to everyone.  Arbitrator
22  Brown, this case is nowhere near as complicated
23  as the Respondent would have you believe.  When
24  you separate the wheat from the chaff what you
25  are left with is a Respondent who engaged in a

829

1    JEAN RICHARD SEVERIN - 08/09/16
2    pattern of deliberate misconduct by failing to
3    follow school policies and administrator's
4    directives.  Instead of taking responsibility
5    for his actions the Respondent has stubbornly
6    and steadfastly clung to his belief that the
7    only reason why he is here today and is the
8    subject of this 3020-a proceeding is because the
9    administration started targeting him after he
10   reported Principal Dorcely to SCI for alleged
11   cheating.
12         As we all know that allegation along
13   with the other allegations that the Respondent
14   lodged against the principal was unsubstantiated
15   or unfounded.  The Respondent proffered nothing
16   to counter the Special Report in evidence as
17   Department's Exhibit Number 30 other than his
18   uncorroborated claim that this report was not
19   the final word on the matters.  Yes, the report
20   was written by a DOE representative Marshall
21   Kochanski [phonetic], but Mr. Kochanski wrote it
22   based on the findings of the Joint Investigation
23   Committee which consisted of the UFT and the
24   DOE.  The Respondent's own witness the UFT Rep
25   Mark Satchell if you recall testified that

830

1    JEAN RICHARD SEVERIN - 08/09/16
2    special complaints are investigated by a joint
3    team of DOE union members and that any outcomes
4    in terms of what the investigation uncovers have
5    to be agreed upon by both the UFT and DOE.  The
6    Respondent himself acknowledged during his
7    testimony that there was a disposition that was
8    reached jointly by the parties but then he also
9    claimed that the joint investigation found merit
10   for step two, that the joint investigation
11   report is not here, and that the report in
12   evidence as DOE 30 is not complete.
13         Arbitrator Brown, there is no other
14   joint investigation report.  The one in evidence
15   as DOE 30 that's it.  That's the actual finding.
16   There's no other report.  If there were, then
17   why didn't the Respondent himself enter it into
18   evidence or have someone testify about it?  Why?
19   Because it doesn't exist.  For the Respondent to
20   claim otherwise is a complete distortion of the
21   truth.
22         What the report DOE Number 30 did find
23   was that the Respondent's allegations were
24   meritless and that there was no evidence that he
25   had been subjected to any harassment by the

831

1    JEAN RICHARD SEVERIN - 08/09/16
2    administration, and by the administration I mean
3    Principal Dorcely.  In fact, the last paragraph
4    of the report specifically found that the
5    administration credibly denied engaging in any
6    harassing behavior and provided the Respondent
7    with extensive support to improve his
8    professional performance.  The report went on to
9    state that the Respondent's desperate accounts
10   as to what happened during the alleged August
11   2014 cheating incident which allegedly began the
12   administration's course of harassment severely
13   undermined the Respondent's credibility.  The
14   credible record of evidence before you is devoid
15   of any proof that the principal was ever
16   arrested, brought up on any type of charges
17   either criminal or civil, disciplined or that he
18   received a letter to file for the laundry list
19   of things that the Respondent accused him of
20   doing.  If anyone has been doing an harassing,
21   it's been the Respondent toward the principal
22   for his baseless and discredited allegations.
23         The Respondent's own witness the
24   Superintendent Michael Prayor told you that he
25   is Principal Dorcely's direct supervisor, and as

832

1    JEAN RICHARD SEVERIN - 08/09/16
2    such he would be aware if any allegations were
3    made against Principal Dorcely.  The
4    superintendent told you that he never received a
5    notification from any external or internal
6    organization that there were pending
7    investigations against the principal or that
8    there were charges pending or being investigated
9    against him.  The superintendent also told you
10   that he has never had to discipline the
11   principal in regard to any allegation that the
12   Respondent made against the principal.
13         Now what the Respondent's unfounded
14   allegations against the principal boiled down to
15   is truly much ado about nothing and a desperate
16   attempt by him to try to cover up and deflect
17   blame for his deliberate insubordination and
18   misconduct.  The administration at Urban
19   Assembly Academy, as it is the right of any
20   Department administration or supervisor, held
21   him accountable for his failures to follow
22   school policies and directives.  There was a
23   clear pattern of insubordination on his part and
24   yet throughout this entire proceeding the
25   Respondent refused to take any responsibility

833

JEAN RICHARD SEVERIN - 08/09/16

1  JEAN RICHARD SEVERIN - 08/09/16
2  and blamed everything on the principal. He even
3  described the charges and specifications against
4  him as being purely punitive when there is ample
5  evidence before you that the Respondent failed
6  to fulfill basic work responsibilities and that
7  he is in fact guilty.
8      Now the principal and the Respondent
9  didn't know each other prior to the Respondent
10  starting at the school in July 2014. He--the
11  Respondent had just gotten hired by the hiring
12  committee and started working at the school in
13  approximately July 2014. Respondent would have
14  you believe that Principal Dorcely, a long-time
15  DOE employee who started as a school aide and
16  worked his way up to being a principal earning
17  two masters' degrees and is currently in the
18  process of earning a doctorate degree would risk
19  throwing away his entire career, something he's
20  worked very hard for by asking a brand new staff
21  member to help him allegedly help a student
22  cheat on an exam. That the principal would ask
23  Dr. Severin, someone who had just started
24  working there, to do that merely a month later
25  makes absolutely no sense whatsoever.

834

1  JEAN RICHARD SEVERIN - 08/09/16
2      And going back to the Special Report
3  in evidence as DOE Number 30, it should be very
4  telling to you that the Respondent did not file
5  that complaint against the principal until June
6  16, 2016, several weeks after the Respondent had
7  already been served with the charges, the 3020-a
8  charges, and he had already been removed from
9  the school. I submit to you that the timing is
10  very suspect on his part. Respondent wants you
11  to believe that he sits here falsely accused and
12  that the school is out to get him but the
13  evidence clearly shows otherwise.
14      Now at this time I'd like to turn to
15  the specifications at hand starting with
16  Specification 1. Now with respect to this
17  specification it deals with the Respondent not
18  signing out and leaving the school building
19  without notifying or getting approval from an
20  administrator and not returning to his
21  assignments for period seven and period eight.
22  Now you heard testimony from AP Barnett and the
23  principal. They said that the protocol is that
24  in order for you to leave the building you have
25  to get approval from an administrator and once

835

1  JEAN RICHARD SEVERIN - 08/09/16
2  you get approval you have to sign out. Now the
3  Respondent acknowledged on cross exam that he
4  was well aware of the protocol that--for staff
5  members is that if you even set foot off campus
6  you have to sign out and during his testimony
7  the Respondent admitted that he did leave early
8  that day and that periods seven and eight were
9  pending.
10      Now he offered an interesting and
11  evolving explanation as to why he didn't inform
12  the principal or AP. Now at first on direct he
13  testified that the principal and AP Barnett had
14  accused him of saying something rude or
15  inappropriate and as a result they told him okay
16  speak with Ms. Towns [phonetic] only. Now on
17  cross examination when the Department asked him
18  well how did it come about that you were told to
19  speak with Ms. Towns only his response to that
20  was I asked the principal for my computer. The
21  principal told me to speak to Ms. Towns, ask her
22  what I need, and that she will relay it to the
23  principal. That conversation they had was
24  regarding a computer that the Respondent needed
25  and the principal had said to him okay we're

836

1  JEAN RICHARD SEVERIN - 08/09/16
2  going to look for your computer but that the
3  Respondent then said he never received it. That
4  the conversation was just mainly about that, the
5  fact that he didn't have his computer, and it
6  was very clear that at that time the issue that
7  the Respondent was seeking to address with the
8  principal was about his computer, nothing else.
9  That was it. There was absolutely nothing in
10  that conversation that would have led any
11  reasonable person to believe that the principal
12  and the AP told him that they would no longer
13  communicate with him and that he would have to
14  go through Ms. Towns. There is no other way to
15  characterize the Respondent's testimony about
16  this other than to say that he straight up lied.
17  He sat in that chair under oath and lied when he
18  said that the principal and the AP told him to
19  speak with Ms. Towns only.
20      Now moving on to Specification 2,
21  that's the allegation where the Respondent was
22  accused to adhere to the school cellphone policy
23  when he allowed students to use their cellphones
24  during his class. Now you heard credible
25  firsthand testimony from the principal who told

837

JEAN RICHARD SEVERIN - 08/09/16
1
2  you that he saw students using cellphones in the
3  Respondent's classroom and the principal's
4  testimony is corroborated by the students'
5  handwritten statements.  The principal also
6  testified that he saw both the Respondent and
7  the co-teacher Ms. Burlingame [phonetic] in the
8  classroom while this occurred, and he further
9  testified that it was absolutely not true that
10  the Respondent was outside of the classroom and
11  speaking with a student.  Principal Dorcely also
12  told you that he didn't just discipline the
13  Respondent.  He also disciplined Ms. Burlingame.
14  She also received a letter to file for that
15  incident.  It's clear in the record that there
16  is no evidence whatsoever that the students'
17  statements, the handwritten statements were
18  coerced or that they were bribed to write them.
19       And just touching briefly on the fact
20  that Mr. Massena brought up the fact that
21  because the Department did not call those
22  students to testify that it violated his
23  client's right to confront his accusers.
24  There's no stopping the Respondent or his
25  attorney from calling them as witnesses at this

838

1       JEAN RICHARD SEVERIN - 08/09/16
2  proceeding.  They could have and they chose not
3  to do so, so if anything, their failure to not
4  to call those witnesses is more so--their
5  failure to act upon a right that existed for Dr.
6  Severin.
7       And then Mr. Massena also briefly
8  mentioned about, you know, the Department not
9  conducting a full and fair investigation.
10  Arbitral precedent is very clear that
11  arbitrators are now backing away from a full and
12  fair investigation being an element of just
13  cause and as we all know this is a denobal
14  [phonetic] proceeding and the Department's case
15  will rise and fall on the evidence that is
16  presented at this hearing and the Department
17  cites to two cases in support of that
18  proposition: DOE versus LR and DOE versus WW
19  which with your permission, Arbitrator Brown,
20  the Department will submit electronically all
21  case law after the completion of this hearing
22  date.
23       THE HEARING OFFICER:  That's fine.
24       MS. KIM:  Thank you.  Now moving on to
25  Specification 3--

839

1       JEAN RICHARD SEVERIN - 08/09/16
2       THE HEARING OFFICER:  [Interposing]
3  Let me just make clear if I may with regard to
4  my direction.  If the Department can provide
5  that information to both Respondent's counsel
6  and to myself by close of business, is that
7  reasonable?
8       MS. KIM:  That is reasonable, yes.
9       THE HEARING OFFICER:  Thank you.
10       MS. KIM:  Yes.  Sure.  And moving on I
11  would like to talk about Specifications 3 and 5
12  in conjunction as they deal with the same
13  subject matter.  So as we know both
14  specifications deal with the Respondent's
15  failure to attend the common planning meetings.
16  And we all know and it's been established that
17  these common planning meetings are mandated
18  contractually.  Every teacher has to attend.
19  But focusing on specifically Specification 3,
20  December 23rd, 2015, Respondent failed to attend
21  or participate in the common planning meeting.
22  The principal's testimony in conjunction with
23  DOE Number 14 which is the sign-in sheet for
24  that date established that the responded was
25  absent from that particular meeting.

840

1       JEAN RICHARD SEVERIN - 08/09/16
2  Respondent's explanation for his--for that
3  particular incident was that he did attend the
4  meeting that day but that his belief was that
5  someone might have fabricated the sign-in sheet
6  by writing that he was absent.  When asked on
7  cross who it was he couldn't say who the person
8  was.  And then he actually took it one step
9  further and said that he was the only one who
10  attended that meeting and that he spent five
11  minutes alone in the room and then he left.  And
12  he kept on reiterating I strongly believe that
13  this was fabricated meaning whoever had written
14  absent on the sign-in sheet or that the date may
15  have been inappropriately upgraded.
16       Now if you look at that particular
17  sign-in sheet, you'll see that eight teachers
18  are listed.  Every single one of those teachers
19  except for the Respondent and Ms. Feckier
20  [phonetic] were absent that day and Principal
21  Dorcely gave an explanation as to why Ms.
22  Feckier was absent.  She wasn't just absent from
23  the meeting that day.  She was actually absent
24  from work.  She was absent the entire day.
25       Moving on to Specification 5, this

841

JEAN RICHARD SEVERIN - 08/09/16

deals with the numerous dates that the
Respondent missed the common planning meeting.
Now Principal Dorcely testified in detail about-
-and this is something that Mr. Massena touched
upon in his summation--about how time was spent
on MOSL and Principal Dorcely made it very clear
that using common planning time--or working on
MOSL is common planning time so it was
definitely within the confines of the contract
and the principal's authority to tell his staff
members to work on MOSL because it was part of
common planning time.

And with respect to again the dates
listed in Specification 5 we know that the
common planning meetings took place during sixth
period which was approximately between 12:15 and
12:54 p.m. Principal Dorcely told you in his
testimony in conjunction now with Department 18
that has the numerous letters to file and then
the sign-in sheets for all of the dates listed
in Specification 5, all of that taken together
established that the responded was absent from
the common planning meetings. Now Principal
Dorcely told you that yes there were dates that-

842

JEAN RICHARD SEVERIN - 08/09/16

-for the common planning meetings that coincided
with disciplinary conferences, but he told you
they took no more than ten minutes. It usually
was no more than sometimes just a question. Did
you do this? The response is yes or no and it's
over. The expectation of the Respondent was to
return to or to attend the common planning
meeting with his team, but Principal Dorcely
told you that the Respondent did not do that.
That instead of going to these meetings the
responded would go into his classroom, sit at
his desk, lights off, two feet up on his desk,
eyes closed.

When we get to what the Respondent's
explanation was for Specification 5 it was
another interesting one. So he says okay so I
attended the meetings but I didn't sign in, but
I was always there. I was either at a
disciplinary meeting or I was at the common
planning meetings, but I didn't sign in. So
when asked on cross examination so if you know
it's the protocol to sign in in order to
document your attention, why didn't you sign in?
What was his answer? I don't know. He himself

843

JEAN RICHARD SEVERIN - 08/09/16

didn't know why he didn't sign in and he wants
you to believe that he just had absolutely no
idea why he failed to sign those sheets.

Now the Department has an idea. He
didn't sign because he didn't attend those
meetings, plain and simple. The credible record
of evidence also shows that for a number of the
charged dates where disciplinary conferences
were held he didn't even bother to go. That he
instead sent Mr. Satchell to attend on his
behalf. So according to this Respondent he
didn't go to some of the disciplinary meetings
but as he put it he did always go to the common
planning meetings even though he didn't sign in
on the sign-in sheets, but then he doesn't know
why he didn't sign in. So and then for the
sign-in sheets where his name doesn't appear
someone may have written in the words--the
letters ABS for absent. Someone may have
fabricated those. But he never reported it to
anyone that someone--that he believed that
someone was fabricating these entries. His
ridiculous and utterly incredible testimony
really speaks for itself.

844

JEAN RICHARD SEVERIN - 08/09/16

Now moving on to Specification 4,
that's the charge where he failed to keep one
set of lights on in his classroom while he was
playing a movie. The principal told you
credibly what he observed when he was with his
principal colleagues. He told you that they
walked past the Respondent's classroom. It was
pitch dark, all lights were off, and a video was
playing on the screen. The principal also told
you how students' heads were down and that he
and his principal colleagues were by the door
for a minute or two as they observed this going
on. The Respondent created a classroom
environment where instead of having students
learning and actively participating he basically
hosted a nap session. That wasn't a good use of
a class period where every minute of instruction
is important. The Department doesn't need to
put a teacher on notice for something that is
common sense. People--keep one set of lights
on, keep your students engaged, and make sure
they're not sleeping. That's just common sense.

Respondent conceded on his testimony
that he had indeed turned off the lights but

JEAN RICHARD SEVERIN - 08/09/16

1
2  that he didn't notice if any students had their
3  heads down or were asleep. Well that's because
4  he wasn't paying attention. He tried to deflect
5  attention away from his poor classroom
6  management and pedagogy by telling you that the
7  principal came in and taunted him with his
8  principal colleagues where apparently Principal
9  Dorcely was pointing his fingers and laughing at
10  him through the window during…. The Department
11  has a very hard time believing that the
12  principal along with his principal colleagues
13  would engage in that type of childish behavior
14  and in front of a bunch of people, students, the
15  Respondent. The Respondent's testimony about
16  this is just so bizarre and doesn't make an iota
17  of sense that these principals would even engage
18  in that type of behavior.
19          Now moving on to Specification 6, the
20  Respondent is charged with leaving the school
21  building without signing the teacher log in the
22  school's main office. Now the Department
23  submits to you that Principal Dorcely, as he did
24  with all of the other specifications in this
25  case, testified credibly and to the best of his

846

JEAN RICHARD SEVERIN - 08/09/16

1
2  recollection. Principal Dorcely with respect to
3  this specification--the charge date is--the
4  incident date is November 12th, 2015. Principal
5  Dorcely didn't testify at this proceeding until
6  the end of June and mid-July so we're talking
7  about eight, seven, eight, nine months later
8  that he was called in to talk about an incident
9  that happened many months ago. And again as you
10  can see this case involves many charges and many
11  specifications. So it's normal I submit to you
12  for a witness to perhaps have a lapse in memory
13  and that's not tantamount to lying. That just
14  goes to show that the principal is human.
15          Now at the time that the principal met
16  with the Respondent at the disciplinary meeting
17  to discuss this particular specification he
18  subsequently issued the letter to file which was
19  close in time to when he met with him and when
20  the incident occurred. The incident was fresh
21  in his mind when he documented the letter and
22  what was documented in there was much closer in
23  time and represented an accurate memorialization
24  of what he observed on November 12, 2015, that
25  of the Respondent leaving the school building

JEAN RICHARD SEVERIN - 08/09/16

1
2  during the school day without signing the
3  teacher log. The Respondent claimed that he
4  didn't leave the school building that day, but
5  based on the numerous lies that he told
6  throughout his testimony the Respondent's
7  version should not be credited.
8          Now moving on to Specification 7, this
9  is the allegation where he failed to follow a
10  directive to submit his midterm exam for review
11  and feedback to an administrator. Now the
12  principal testified very credibly that he never
13  actually received a copy from the Respondent.
14  The staff members were all put on notice that
15  all unit tests and exams were due to a direct
16  supervisor three days before the administration
17  of the exam, and we know that at the time the
18  principal was the Respondent's direct
19  supervisor. So the Respondent on cross
20  examination again had an interesting
21  explanation. On cross examination he first said
22  that he did not submit it and then mere moments
23  later he said that oh yes it was submitted even
24  though he just testified that he hadn't
25  submitted it, and then he then went on to say it

848

JEAN RICHARD SEVERIN - 08/09/16

1
2  was submitted to the principal by my co-teacher
3  Ms. Fagan. And then finally when pressed again
4  he admitted that he didn't submit the midterm
5  exam for review and feedback prior to
6  administering the exam.
7          And he knew what the ramifications
8  were or what the repercussions could be for
9  failing to do so. He knew and he conceded on
10  his testimony that one of the reasons why
11  teachers have to give their midterm exams to an
12  administrator for review and feedback is so that
13  the administration can see that the content is
14  appropriate for testing and covers topics that
15  are in sync with the subject being taught and
16  with the class curriculum and that really speaks
17  to a larger impact that it would have in making
18  sure that the students are on track, learning
19  what they're supposed to learn, and being tested
20  on what is grade and subject appropriate.
21          Now moving on to Specification 8, this
22  is the specification where the Respondent is
23  alleged to have permitted a student to reenter
24  the building through a different exit and not
25  through the main entrance. The Department

849

JEAN RICHARD SEVERIN - 08/09/16

1
2    submits to you that there is credible hearsay
3    evidence in this case established by Principal
4    Dorcely that the Respondent was observed on
5    camera by the AP and in person by Principal
6    Micalona [phonetic] and also the student's
7    handwritten statement.  Taken together
8    collectively show that the Respondent did allow
9    the student to reenter the school building
10   through the exit as opposed to where the student
11   should have entered which is the main entrance
12   where security is posted and the student would
13   have been scanned for safety reasons.
14            I would just like to point out briefly
15   during the Respondent's testimony about this
16   specification when asked about a simple question
17   about wasn't there security posted at the main
18   entrance he couldn't even answer that simple
19   question.  The Department had to ask him
20   numerous questions just to get him to admit that
21   yes for the past two school years I went through
22   the main entrance in and out every day to get
23   into work and to leave work and only then would
24   he admit oh yeah there was security posted at
25   the main entrance.  Now that might seem like a

850

JEAN RICHARD SEVERIN - 08/09/16

1
2    minute detail to you, Arbitrator Brown, but it
3    should indicate to you that as a witness the
4    Respondent is not credible or forthcoming when
5    for even the smallest and simplest questions he
6    can't answer them in a straightforward manner.
7            Now moving on to Specification--I'll
8    talk about 9, 10, and 15 together as they cover
9    the same allegation that the Respondent failed
10   to contact the main office or a supervisor to
11   inform them of his absence.  Now the record and
12   evidence has very clearly established that the
13   Respondent was put on notice regarding his
14   obligations for if a staff member is going to be
15   absent you have to contact the main office or a
16   supervisor.  That directive was contained in the
17   2014-15, 2015-16 staff handbooks.  Respondent
18   admitted on cross that he read them.  That he
19   was familiar with the contents of that staff
20   handbook.  And we also have for one of the staff
21   handbooks an acknowledgement of receipt.  We
22   also know that at least in reference to
23   Specification 15 when he received a letter to
24   file for that failure to contact the school in
25   there the principal specifically asked him at

851

JEAN RICHARD SEVERIN - 08/09/16

1
2    the disciplinary meeting why didn't you reach
3    out to the school and the Respondent's response
4    was since 1996 I've been teaching.  Even in the
5    school community I never had any issue about
6    being absent or not calling.  So even as of
7    April 23rd, 2015, he received a letter to file
8    putting him on notice once again that it is your
9    responsibility to reach out to the school.
10            Now with respect to the Specifications
11   9, 10, and 15 in conjunction, the Respondent's
12   testimony was I didn't know I had to reach out
13   to the school and the principal only reminded us
14   that we should as a courtesy reach out to the
15   school but all of the credible record and
16   evidence shows otherwise.  Again, the staff
17   handbooks, the letter to file from April 23rd,
18   2015, all show that the expectation and the
19   directive of the school was that this Respondent
20   and all staff members at the school were
21   supposed to reach out to the main office or to
22   an immediate staff member.
23            Now the Respondent testified or
24   claimed that it wasn't until he saw the
25   specifications in this case that he knew that he

852

JEAN RICHARD SEVERIN - 08/09/16

1
2    had to notify the main office or an immediate
3    administrator about being absent, and he
4    continued to claim on cross examination that the
5    school never informed him of this obligation.
6    And it wasn't until the Respondent confronted
7    him with that letter which is Department's
8    Exhibit Number 26 which speaks to Specification
9    15, it wasn't until the Department confronted
10   him with that he finally admitted that oh yeah I
11   was aware.  I was put on notice about this.  Yet
12   throughout his testimony the Respondent
13   stubbornly continued to insist that hey I
14   fulfilled my responsibility.  I contacted Sub
15   Central.  I did what I had to do.  But yeah,
16   that was one part of the school's requirement as
17   seen in the emails that are in evidence, but the
18   other requirement was that he should have also
19   contacted his direct supervisor or the school
20   and he know this--he knew this very well.
21            And this specification, meaning 9, 10,
22   and 15, in conjunction with the others and the
23   subsequent specifications that I will be
24   discussing just really shows a pattern of
25   willful insubordination and a disregard for

853

JEAN RICHARD SEVERIN - 08/09/16

1   JEAN RICHARD SEVERIN - 08/09/16
2   directives, and if you look at DOE Number 22
3   which is the letter to file for I believe it's
4   Specification 10 or perhaps 9 as well in there
5   at the meeting when given an opportunity to
6   respond as to why he didn't reach out to the
7   school, this is what his response was,
8   "According to the daily docket teachers must
9   contact Sub Central or online. I informed Ms.
10  Towns I am finished here." Now again that
11  wasn't the requirement. Even back then he
12  didn't think it was wrong about how he conducted
13  himself or his failure to follow directives, and
14  even when he testified at this proceeding he
15  certainly didn't change his mind. He continued
16  to assert that he had done nothing wrong and
17  that he fulfilled his obligation by contacting
18  Sub Central. Again something as simple and
19  basic as reaching out to a supervisor he
20  couldn't even comply with that.
21          Now moving on to Specification 11 and
22  this is regarding his failure to supply with the
23  administration period two lesson plans for three
24  weeks. Now this directive was given by AP
25  Barnett and it's contained in DOE Number 5 in

854

1   JEAN RICHARD SEVERIN - 08/09/16
2   the APPR Section 3. As we all know, lesson
3   plans are contractually mandated and the purpose
4   is so that--a lesson plan is so that each
5   teacher can be prepared when they're teaching
6   and in the event an administrator walks through
7   an administrator can come into the class be
8   aware of what's going on, and it's part of the
9   teacher's pedagogy to have a lesson plan always
10  available.
11          And on direct examination the
12  Respondent characterized this specification as
13  being purely punitive and retaliatory; however,
14  on cross he admitted that yes I failed to supply
15  the period two lesson plans for three weeks. He
16  failed to do so as directed in AP Barnett's
17  APPR. Now he admitted to failing to submit
18  them, but he never offered an explanation
19  whatsoever as to why he didn't supply the lesson
20  plans. His failure to do so was again a
21  continuation of a pattern of willful
22  insubordination and a disregard of his
23  supervisor's directive.
24          Now moving on to Specification 12,
25  this has to do with his failure to follow a

855

1   JEAN RICHARD SEVERIN - 08/09/16
2   directive to have a lesson plan readily
3   available on the request of an administrator and
4   to have an instructional objection followed by a
5   timestamp agenda listing the skills and
6   standards on the board or SMART Board. Now
7   Principal Dorcely testified credibly and he
8   explained to you in terms of how the
9   specification is worded what readily available
10  means. He said that at his school teachers keep
11  their lesson plans almost like in a pocket so
12  when the principal or an administrator comes
13  into a class there's no disruption at all, the
14  principal comes in, you take the lesson plan and
15  there's not even a conversation with the
16  teacher. So that's what readily available
17  means, that a physical copy has to be readily
18  available.
19          Now Principal Dorcely told you that
20  the co-teacher Ms. Fagan was not conducting the
21  class that day and that based on her own
22  failures for that particular day she also
23  received a letter to file so the principal
24  wasn't just--he wasn't targeting the Respondent.
25  Ms. Fagan got in trouble as well. Now he told

856

1   JEAN RICHARD SEVERIN - 08/09/16
2   you that when he got to the classroom with the
3   other AP--I forget his name; Doctor I believe it
4   was Howell [phonetic]--and AP Barnett he told
5   you that the Respondent was at the front of the
6   classroom. Ms. Fagan was somewhere around the
7   side of the classroom next to the window. That
8   there was nothing on the board, no name, no
9   instructional objective, none of the essential
10  elements that an administrator expects teachers
11  to have on the board daily. He told you that
12  Ms. Barnett asked the Respondent may I please
13  have a copy of your lesson plans because we do
14  not see it at the regular place. Principal
15  Dorcely told you that the Respondent didn't have
16  one so the administrators left. He specifically
17  testified that the Respondent never provided the
18  lesson plan to him.
19          Now the Respondent's testimony was
20  that oh I did have a lesson plan. I tried to
21  show it to the principal but the principal
22  refused. He claimed that Ms. Fagan was showing
23  a video on the SMART Board and that his own
24  lesson plan was on the blackboard in the back of
25  the room. But then contrast that to his

857

1          JEAN RICHARD SEVERIN - 08/09/16
2     statement at the disciplinary meeting which is
3     memorialized in DOE Number 23 where he stated I
4     had a lesson plan.  My co-teacher had nothing on
5     the board.  This lesson I was not involved in
6     which is in complete contradiction to his
7     testimony here.  So at the disciplinary meeting
8     he never says I tried to show you the lesson
9     plan, Principal Dorcely.  At the disciplinary
10    meeting the Respondent never says hey my lesson
11    was on the blackboard in the back of the room.
12    The first time he says that is at this
13    proceeding here and again the evidence
14    established, you know, he as a former UFT leader
15    he knows his rights.  He knows that he can file
16    a rebuttal to any letter to file and that
17    someone else can do it on his behalf, but he
18    never did so for any letters to file, in this
19    instance never filed a grievance, and again he
20    didn't file that special complaint until he had
21    already been served with 3020-a charges for this
22    proceeding and removed from Urban Assembly.
23          Now with respect to the remaining
24    specifications--so it's 13, 14, 16, 17, and 18,
25    starting with 13 in conjunction with 14.  So

858

1          JEAN RICHARD SEVERIN - 08/09/16
2     those specifications deal with the Respondent's
3     failures to submit by the deadline the marking
4     period grades, the EGG files.  So we know that
5     the Respondent was aware of his responsibility
6     to do so.  All staff members were emailed that
7     there was a deadline and with respect to at
8     least Specification 13 we know that AP Barnett
9     herself emailed this Respondent several times
10    regarding the EGG files and how she followed up
11    with him.  Now Principal Dorcely testified that-
12    -so during this time period this is around June
13    '15, the month of June so we're talking about
14    we're nearing the end of the school year, grades
15    are being finalized, promotion and graduation
16    decisions are being made, so it's a very
17    important, very stressful time and meeting
18    deadlines is especially important because not
19    doing so can really hold up promotions and
20    graduations.
21          Principal Dorcely testified very
22    credibly that for both Specifications 13 and 15
23    the Respondent did not submit his grades in a
24    timely manner.  Now Specification 13, DOE Number
25    24, the emails from the AP asking the Respondent

859

1          JEAN RICHARD SEVERIN - 08/09/16
2     to submit his files, the emails really speak for
3     themselves.  I'm not going to linger on it too
4     much but just to point out that her--I believe
5     the AP's last email to the Respondent dated June
6     23, 2015, even as of that date which is well
7     beyond the deadline the Respondent still had not
8     submitted his EGG files.  And the principal
9     explained to you that it had gotten to the point
10    where after even several emails the AP had to
11    finally get the UFT chapter leader involved by
12    CC'ing him and requesting the files.
13          And just briefly turning to the
14    Respondent's testimony about this.  So he
15    basically said I did send her an email but I
16    didn't realize that I had not attached anything,
17    so when the AP followed up with him he attaches
18    something but it ends up being the wrong
19    attachment.  And then after that nothing.  He
20    didn't submit the grades.  And he really I think
21    tried to stress in his testimony that I did what
22    I could.  I made some mistakes.  It wasn't a big
23    deal.  But it was a big deal as I mentioned
24    before, and he had actually regarding these
25    specifications--again 13 through 18--he had

860

1          JEAN RICHARD SEVERIN - 08/09/16
2     characterized those specifications as follows.
3     They're just pure regression as to why these
4     charges were brought.  Even something as simple
5     as attaching a file and the file not going
6     through I got written up.  I mean of course he
7     would get written up.  He failed to follow
8     directives and not just that not sending grades
9     on time is not something simple.  Again such an
10    omission can lead to promotions and graduations
11    being held up.  That's no small thing that isn't
12    just significant for the student but for the
13    school as well, and for the Respondent to
14    characterize his omission as something simple
15    shows his complete and utter disregard for the
16    administration and for the students.
17          And one other thing I wanted to point
18    out about his testimony regarding the AP's
19    emails.  He kept on saying they were inaccurate.
20    He didn't know when he submitted the EGG files
21    to AP Barnett, but he kept on insisting that her
22    emails were totally inaccurate and that whatever
23    was represented in her email was inaccurate.
24    Now Arbitrator Brown, the Department would like
25    to remind you that it did make a discovery

861

JEAN RICHARD SEVERIN - 08/09/16

1
2 request for the Respondent to produce the emails
3 that show that he submitted the EGGs.  During
4 his testimony he said that he believed that he
5 still had them but the Department never received
6 them, and the Department submits to you that we
7 didn't receive them because they don't exist in
8 the first place.
9         Now with Specification 14 again
10 Respondent failed to submit his marking two EGG
11 files by the due date and time and that is
12 proven by the credible record and evidence from
13 the principal's testimony as well as the emails
14 that are in evidence and that is DOE Number 15.
15 And the Respondent's response at the
16 disciplinary conference for this specification
17 was the same old song and dance from the
18 previous specifications.  I submitted the file
19 but it didn't go through.  I didn't realize it
20 until you sent me the email.  And he admitted
21 during his testimony that he did in fact miss
22 the May 29, 2015, deadline.  And again with this
23 particular email exchange for this specification
24 between him and Principal Dorcely he
25 characterized the email exchange as inaccurate.

862

JEAN RICHARD SEVERIN - 08/09/16

1
2 And again the Department made a discovery
3 request for whatever emails he had and did not
4 receive them, and again I submit to you it's
5 because they don't exist or that they never
6 existed.
7         Now moving on to Specification 16
8 where he's accused of failing to have on file
9 three emergency lesson plans.  The directive to
10 him was clear.  It was something that all
11 teachers know that in case of emergency or if a
12 teacher is absent there have to be at least
13 three emergency lesson plans on file and that
14 directive is in the school handbook, and
15 Principal Dorcely's testimony in conjunction
16 with the handbook and DOE Number 27 which was
17 the Disciplinary Letter all support the
18 Department's position that the Respondent did in
19 fact fail to have on file three emergency lesson
20 plans.  Excuse me; sorry.
21         And at that meeting which was held on
22 February 12th, 2015, the principal asked him,
23 you know, he--Ms. Towns the school secretary had
24 emailed the Respondent back on January 7, 2015,
25 you're fresh out of lesson plans.  Please submit

863

JEAN RICHARD SEVERIN - 08/09/16

1
2 more.  But as of that meeting date on February
3 12 he still had no submitted any new emergency
4 lesson plans.  And what was his response at the
5 meeting?  I was under the impression that I had
6 emergency lesson plans.  I was under the
7 impression for having lesson plans by the 13th
8 so that is why I didn't go and look even though
9 he had been asked by the school please provide
10 them.
11         Now with respect to Specification 17,
12 this is regarding his failure to follow a
13 directive to supply weekly lesson plans to the
14 administration.  We all know that that directive
15 came from an observation that the principal
16 conducted and based on that observation the
17 principal gave the Respondent a specific
18 directive to submit lesson plans in order for
19 the principal to support him because the
20 Respondent was showing that he needed support
21 with his planning; however, Principal Dorcely
22 testified that the Respondent failed to provide
23 him with lesson plans.  And we have the Letter
24 to File in evidence as Department Exhibit Number
25 28 and we also have the Respondent who on cross

864

JEAN RICHARD SEVERIN - 08/09/16

1
2 examination admitted that he did not submit the
3 lesson plans as directed by Principal Dorcely
4 and again nor do we have any explanation from
5 him as to why he didn't submit the lesson plans.
6         Now lastly with Specification 18, this
7 was the Respondent's failure to follow a
8 directive to schedule four instructional support
9 sessions.  Now that directive was based on a
10 December 22, 2015, observation where the
11 Respondent was directed to schedule four support
12 sessions so that the principal can support him
13 in his professional practice and the principal
14 told you that the Respondent's failure to do so
15 was a pattern of just deliberate disregard to
16 directives.
17         Now on cross examination the
18 Respondent said that he did schedule four
19 support sessions, but he didn't recall if he
20 scheduled them within the deadline.  Well that's
21 because he didn't schedule them within the
22 deadline.  He knew that the schedule deadline
23 was that he was supposed to start the sessions
24 the week of January 5th, 2015.  Again that
25 language is included in the Observation, DOE

JEAN RICHARD SEVERIN - 08/09/16

1. JEAN RICHARD SEVERIN - 08/09/16
2. Number 28. In DOE Number 29, that's an email
3. that Ms. Towns sent to the principal and AP
4. Barnett and the Respondent which shows that the
5. Respondent didn't even bother to schedule the
6. four sessions until January 16, 2015, which is
7. well past the starting date of the week of
8. January 5th which was the deadline that AP
9. Barnett set. And again, the Respondent's
10. failure to do so in a timely manner and to
11. adhere to the deadline was again another example
12. of his deliberate disregard for an important
13. directive given by an administrator that--a
14. directive put into place to help him with his
15. pedagogy.
16.     Now with respect to--there was much
17. ado from the Respondent about this cooling off
18. period. Arbitrator Brown, I'd like to just have
19. you keep in mind that the Respondent's own
20. witnesses even said that whatever hostility
21. there was it wasn't one sided. It wasn't a one-
22. way street. It was actually something that both
23. parties--they were both hostile to each other.
24. So for this Respondent to claim that he's a
25. victim is just absolutely an inaccurate

866

1. JEAN RICHARD SEVERIN - 08/09/16
2. characterization of the situation between them.
3. The Respondent does not have clean hands. He
4. was hostile. He did things that caused
5. Principal Dorcely to act in a way that any
6. administrator or supervisor in his position
7. would have and that was to take the Respondent
8. to task for failing to follow reasonable
9. directives.
10.     Now the defense witnesses such as Mr.
11. Satchell, Mr. Dunkin, and to a certain extent
12. Superintendent Prayor added nothing to your
13. ultimate question of whether or not the
14. Department met its burden of proving its case by
15. a preponderance. And I would like to also point
16. out that of the three witnesses that the
17. Respondent called, two of them were UFT chapter
18. leaders whose number one concern, number one
19. goal is to protect their union members.
20.     And then touching briefly on the
21. alleged comment that the principal made at the
22. beginning of the year staff meeting where the
23. principal was there, Dr. Severin, Mr. Satchell,
24. all these other staff members and the comment
25. about, you know, going into beast mode and

867

1. whatever it was. So it's just really
2. interesting that of all the witnesses he could
3. have called, staff members, anyone who was there
4. who witnessed these alleged comments that again
5. were already unfounded by the joint
6. investigation and the report that arose from
7. that he calls the UFT chapter leader who is
8. clearly a biased witness. Again, his job is to
9. zealously advocate for Dr. Severin and other
10. union members. He's not the most impartial
11. person. His job is all about partiality and
12. protecting union members.
13.     And I think what was also very telling
14. was that when Mr. Satchell testified the
15. Department asked him about the special
16. complaint. He was not aware that a special
17. complaint had been filed even though a lot of
18. what the Respondent is alleging the principal
19. did to him, conduct that, you know, arose
20. during--alleged conduct that arose during
21. disciplinary meetings or whatever, these are all
22. things that Mr. Satchell would ostensibly be
23. aware of because he was present but I just find
24. it very interesting that he never bothered to

868

1. tell his own union leader that I filed a special
2. complaint. He didn't tell him that he filed
3. one. He also never told him what the outcome
4. was. And we all know what the outcome is. All
5. of the allegations, the laundry list of
6. allegations against Principal Dorcely were
7. unfounded. Now I just--again I find that very
8. suspicious, you know, that the one person who is
9. supposed to--
10.     MS. MASSENA: [Interposing] Objection.
11.     THE HEARING OFFICER: What's the
12. nature of the objection?
13.     MS. MASSENA: The suspicious--
14.     THE HEARING OFFICER: [Interposing]
15. I'm sorry. I didn't hear you.
16.     MS. MASSENA: The characterization of
17. Mr. Satchell's testimony.
18.     THE HEARING OFFICER: That's fine.
19. Overruled. This is a closing. Ms. Kim may
20. argue as she likes.
21.     MS. KIM: Yeah. I wasn't going to say
22. that Mr. Satchell is suspicious. I just said
23. the circumstances are suspicious that the union
24. leader, someone whom he's had advocate for him,

869

JEAN RICHARD SEVERIN - 08/09/16
1
2   someone who--in whom he's confided and trusted
3   this Respondent never even bothered to tell him
4   a huge--something as huge and as important as
5   filing a special complaint and having all of
6   those allegations unfounded.
7           And if you also again even though this
8   allegation about going into beast mode and this
9   and that was addressed by the Joint
10  Investigation Committee and unfounded, I just
11  wanted to point out to you that if you look very
12  carefully at what Mr. Satchell says was said at
13  the meeting or at the beginning of the year
14  staff meeting what the Respondent says is
15  different and that even based on that there
16  should be--it should cause you to question
17  witnesses' credibilities.
18          Now moving on to I'd like to discuss
19  applicable case law at this time.  Arbitrator
20  Brown, in looking at all of the evidence in this
21  case it should be apparent to you that the
22  Respondent engaged in a pattern of calculated
23  behavior against the administration.  He was
24  well aware that he was supposed to follow
25  directives that the administration issued to

870

JEAN RICHARD SEVERIN - 08/09/16
1
2   him.  In this case when you look at all of the
3   specifications and the directives issued none of
4   them was unreasonable or in violation of the
5   Collective Bargaining Agreement.  The school was
6   in the right when it held the Respondent
7   responsible for his misconduct.  The
8   Respondent's reasons for disregarding the
9   directives thereby disregarding and being
10  disrespectful to supervisors, all of those
11  reasons are unacceptable and should not be
12  considered mitigation for his conduct.
13          And in support of its position that
14  the Respondent should be terminated the
15  Department will cite several cases where
16  arbitrators terminated teachers for
17  insubordination.  Although the fact patterns for
18  the cases I'm about to cite are different from
19  the instant matter, the Department asks that you
20  take these decisions into consideration as each
21  of the cases articulate the same basic tenants
22  of why insubordination is a termination worthy
23  offense.
24          Now in DOE versus DV SED Number
25  19,440, in that case the fact pattern consisted

871

JEAN RICHARD SEVERIN - 08/09/16
1
2   of a Respondent who against his supervisor's
3   specific directive that he report to work and
4   that his vacation was not approved.  This
5   Respondent had purchased airline tickets before
6   receiving permission and once he was denied went
7   on his trip anyway.  In terminating--this was a
8   one-time incident and in terminating that
9   Respondent Arbitrator Robert Gray held that when
10  a teacher intentionally, willfully, and
11  unjustifiably fails to appear for scheduled
12  teaching days after being told by the principal
13  that his request for leave for those days is
14  denied the Department has a reasonable basis to
15  believe it cannot rely upon that teacher to
16  provide teaching services when and where needed.
17          Here in that case the Department
18  argued that this was the type of conduct which
19  was clearly so inappropriate that no warning was
20  necessary and the Department submits to you that
21  that applies in this case too.  This case as
22  well as a lot of the directives given here were
23  commonsense, were things that the Respondent as
24  a long-time DOE employee has done before,
25  submitting lesson plans, calling out when he's

872

JEAN RICHARD SEVERIN - 08/09/16
1
2   sick, you know, everything that's mentioned in
3   the specifications he either knew about it or
4   should have had the commonsense, and I'll submit
5   to you that he did but that he just failed to or
6   refused to follow directives because he didn't
7   like the principal.
8           Arbitrator Gray went on to say the
9   Respondent's proven misconduct in this case
10  demonstrates intention and willful bad faith
11  toward his employer.  Here the credible record
12  evidence shows that the Department has a
13  reasonable basis to believe that they cannot
14  rely on this Respondent to conduct himself in a
15  professional and ethical manner.  His misconduct
16  demonstrated intentional and willful bad faith
17  toward the Department.
18          Now in DOE versus JK, SED Number
19  19,626, this involved the case where the
20  Respondent was charged with verbal abuse, --
21  [00:01] violations, and also insubordination.
22  The arbitrator in that case terminated the
23  Respondent, Arbitrator Felice Busto [phonetic]
24  and held Respondent's misconduct toward her
25  superior over a three-year period was

JEAN RICHARD SEVERIN - 08/09/16

1
2   "insubordinate, confrontational, and disruptive
3   to the functioning of the school system.  She
4   appeared not to grasp the basic tenant that the
5   principal is her superior and she's required to
6   follow directives, instructions, and school
7   policies.  Whether it was as simple as providing
8   homework for an absent student or ensuring that
9   her students did not leave the classroom
10  unattended Respondent engaged in a pattern of
11  gross insubordination and neglect of duty.
12  Despite numerous letters to file on a variety of
13  issues Respondent was unable to make any changes
14  to correct her behavior.  To the contrary, the
15  evidence established that she became more
16  confrontational and defiant of school policies
17  and the principal's authority.  Thus the
18  Department's repeated efforts to use progressive
19  discipline to correct Respondent's behavior were
20  futile.  As the principal put it, Respondent had
21  become unmanageable as she refused to follow
22  directives and instructions from her superior or
23  act professionally."  The arbitrator then went
24  on to write, "Respondent's persistent
25  insubordination alone warrants termination."

JEAN RICHARD SEVERIN - 08/09/16

1
2   bases on which she terminated the Respondent was
3   the Respondent's lack of remorse.  That
4   Respondent appealed her termination and the
5   Appellate Division held that the Respondent's
6   termination did not shock the conscience
7   considering her lack of remorse and harm caused
8   by her actions.
9           And the Department would also like to
10  cite to a Court of Appeals case People v
11  Agostino [phonetic], and in that case the Court
12  of Appeals held that defendants are interested
13  witnesses in that they are interested in the
14  outcome of the case so they are interested
15  witnesses as a matter of law.  And I--the
16  Department realizes that this is clearly not a
17  criminal proceeding; however, it does submit to
18  you that should the theory of interested witness
19  should also apply in this proceeding as the
20  Respondent himself is clearly an interested
21  witness and his interest in the outcome of this
22  case is motivated--motivated him to lie and it
23  definitely affected the truthfulness of his
24  testimony.  And the Department submits to you
25  that his interest is that he wants to keep his

874
876

JEAN RICHARD SEVERIN - 08/09/16

1
2           And in DOE versus NW, SED Number
3   8,253, Arbitrator Arthur Regal [phonetic] held--
4   and this was also an insubordination case--he
5   held--in terminating this particular Respondent
6   Arbitrator Regal held, "This case involves a
7   teacher who refuses to abide by reasonable
8   rules.  She was insubordinate repeatedly and
9   expressed not the slightest bit to remorse."  He
10  stated that her conduct did not change after the
11  charges were served and actually continued
12  throughout her hearing.  He continued to write
13  in his decision "her insubordination led to the
14  charges and her defiance in the process, the
15  absence of remorse, and her conduct throughout
16  the hearing makes it clear that she would not
17  behave in a different manner if she were
18  permitted to return to her position."
19          And I would like to also cite DOE
20  versus DC, SED Number 8,131, and there's also an
21  Appellate Division determination upon appeal.
22  And I don't have the cite for that, but I will
23  provide case law to both parties.  In the
24  original 3020-a Arbitrator Mary Cringle
25  [phonetic] terminated the Respondent and one

JEAN RICHARD SEVERIN - 08/09/16

1
2   job, that his desire to keep his job gave him
3   the motive to lie and to bend the truth.
4           And just briefly just one more case I
5   wanted to cite and this is in response to Mr.
6   Massena regarding a missing witness charge.
7   There is a Court of Appeals case which talks
8   about timeliness when making a request for a
9   missing witness charge.  I will supply that case
10  law as well.  And in the Court of Appeals case,
11  it's People v Gonzalez, in there are certain
12  elements that the moving party has to meet in
13  order to request or be granted a missing witness
14  charge; however, there has been subsequent case
15  law that says that in terms of timeliness but
16  this is in The Court's discretion that whether a
17  request is timely is a question to be decided
18  taking into account both when the requesting
19  party knew or should have known that a basis for
20  a missing witness charge existed and any
21  prejudice that may have been suffered by the
22  other party as a result of the delay.
23          In People v Carr [phonetic] the court
24  actually denied the defendant's motion for a
25  missing witness charge because the defendant

877

JEAN RICHARD SEVERIN - 08/09/16

1
2   made the request more than a week after the
3   People provided their witness list and after the
4   People had rested their case in chief. The
5   court held that the request for a missing
6   witness charge had come too late and they--the
7   court denied the Respondent's motion.
8           Now with respect to going back to our
9   case, Arbitrator Brown, not once did this
10  Respondent demonstrate any remorse or take
11  responsibility for what he did. That should
12  indicate to you that he can't be rehabilitated
13  and that he's not fit to continue to teach or be
14  employed by the Department. We have no
15  guarantee that he's not going to continue to be
16  insubordinate. We have no guarantee that he's
17  going to follow reasonable directives given by
18  the Department. He continuously downplayed his
19  misconduct and his failure to comport with
20  directives. He even went so far to say that he
21  made every effort to adhere to whatever mandate
22  was given to him which as the evidence has shown
23  was clearly not the case.
24          Now there's a portion of the
25  Respondent's testimony that I thought was

878

JEAN RICHARD SEVERIN - 08/09/16

1
2   particularly telling about his mindset. This
3   was on page 766. So when Mr. Massena asked the
4   Respondent how it made him feel when he was
5   sitting in the support sessions with Principal
6   Dorcely this was the Respondent's answer. "It
7   was very condescending. He was the authority as
8   if he was scolding a child, as if he was
9   scolding a subordinate." But that's exactly
10  what the Respondent is. He is the principal
11  subordinate. Principal Dorcely is his
12  authority. That's the major of all supervisor-
13  subordinate relationships. One is held in a
14  higher position and perhaps esteem than the
15  other. Now the Respondent's testimony right
16  there should tell you everything you need to
17  know about Dr. Severin and his approach or his
18  defense on his case. The Department submits to
19  you that his tremendous ego couldn't handle
20  being told what to do, having it pointed out to
21  him that he was wrong or that his work
22  performance was not up to par.
23          Arbitrator Brown, teaching is not an
24  absolute or an unfettered right. This
25  Respondent through his actions, his failures has

879

JEAN RICHARD SEVERIN - 08/09/16

1
2   demonstrated through his misconduct, his
3   repeated and intentional misconduct that he has
4   given up his right to work for the Department
5   and the Department asks that you terminate this
6   Respondent. Thank you.
7           THE HEARING OFFICER: Thank you very
8   much. I'd like to go off the record for a quick
9   moment if we may.
10          [OFF THE RECORD Sidebar 12:44 p.m.]
11          [ON THE RECORD Sidebar 12:46 p.m.]
12          THE HEARING OFFICER: Let's go back on
13  the record. Okay. Well I've heard closing
14  arguments from both sides. I found them both to
15  be very helpful. Is there anything further that
16  needs to be addressed? I turn first to the
17  Department.
18          MS. KIM: No.
19          THE HEARING OFFICER: Now I turn to
20  the Respondent.
21          MS. MASSENA: No, Your Honor. No,
22  Your Honor.
23          THE HEARING OFFICER: All right. With
24  that having been said, I in my role as the
25  hearing officer in this matter will issue a

880

JEAN RICHARD SEVERIN - 08/09/16

1
2   timely decision marked from the time that I
3   receive today's transcript. I want to thank you
4   both very much. Let us now go off the record.
5           (The hearing adjourned at 12:47 p.m.)

CERTIFICATE OF ACCURACY          881

I, Michelle Eaves, do hereby certify that the foregoing
typewritten transcript of proceedings in the matter of New
York City Department of Education v. Jean Richard Severin,
File No. 29,298, was prepared using the required
transcription equipment and is a true and accurate record
of the proceedings to the best of my ability. I further
certify that I am not connected by blood, marriage or
employment with any of the parties herein nor interested
directly or indirectly in the matter transcribed.

Signature:

Date: _____August 12, 2016_____

Student Index

                                               882

Ashley Weber, Student A