

# EXHIBIT C

**UNIVERSITY OF THE STATE OF NEW YORK**
**STATE EDUCATION DEPARTMENT**
---------------------------------------------------------------X

**IN THE MATTER OF THE CHARGES PREFERRED**

**BY:**

**OPINION AND AWARD**

**Board of Education of**
**the City School District of New York**
**New York**

**Complaint - Employer**

**FILE Nos. 30678 & 30977**

**-and-**

**Jean Severin**

**Respondent**

**Pursuant to Education Law Section 2590 (j)(7) and Section 3020(a)**
---------------------------------------------------------------X

Before: Richard D. Williams, Esq., Hearing Officer

**APPEARANCES:**

**FOR THE DEPARTMENT**
Kareen Evans-McKay, Esq. of Counsel
New York City Department of Education

**FOR THE RESPONDENT**
Wendy Starr, Esq. of Counsel
Steven Friedman Esq. of Counsel
Office of Richard E. Casagrande, Esq.

## PROCEDURAL HISTORY

Pursuant to § 3020-a and § 2590 (j) (7) of the New York State Education Law, Disciplinary Charges were preferred by the Department of Education of the City School District of the City of New York ("Department") against Jean Severin ("Respondent"), a tenured teacher assigned to Urban Action Academy (UAA) within District 18; and later assigned to Middle School of Marketing and Legal Studies within District 18. The consolidated charges brought against Respondent were assigned State Education Department (SED) case numbers 30678 and 30977 respectively. The allegations covered in this matter involve conduct allegedly engaged in by Respondent during 2015-2016 and 2016 -2017 school years while assigned to UAA and later assigned to the "Middle School of Marketing and Legal Studies" (MLS) within District 18.

In its charges, the Department alleged that Respondent failed to perform his duties by engaging in conduct unbecoming his position, misconduct, verbal abuse, neglect of duty, and conduct that rendered him unfit to perform properly his obligations to the service, insubordination, conduct prejudicial to the good order, efficiency or discipline of the service, and violations of the By-Laws, rules and regulations of the Chancellor, school and/or District.[1] As a result of the above charges, the Department seeks, as a penalty, disciplinary action pursuant to Education Law § 3020-a and argues just cause for termination from employment exist.

A pre-hearing conference was held before Hearing Officer Richard D. Williams on March 7, 2017, and thereafter, hearings were convened on March 16, 22, 24; April 3, 5; May 18, 19, 22, 31; and June 1, 2017. Testimonial evidence was received from Confidential Investigator Vanessa Perdomo, Paraprofessionals Terrance Norris (Urban Action Academy- hereinafter "UAA") and Amber Jackson (Middle School for Marketing and Legal Studies- hereinafter "MLS"), UAA Assistant Principal Jordan Barnett, UAA Principal Steve A. Dorcely, , MLS Secretary Lorraine Purvis, MLS Principal Jameela Horton-Ball, MLS Teacher/Supervisor Linda Underdue, Student KF (aka student "J"), Student AP (aka student "A"), and Student KD (aka student "G"), and Respondent. 33 Department Exhibits and 2 Respondent Exhibits were entered into evidence.

[1] (T._) refers to pages from the transcripts of the proceedings. (D.Ex_) and (R.Ex_) refer to Department and Respondent exhibits respectively from the hearings.

30,678 + 30,977 4/3/19

Both parties had ample opportunity to present testimony and documents to argue in support of their respective positions. The parties chose to make oral closing arguments and after receipt of the final transcript, the record was declared closed.

## CHARGES AND SPECIFICATIONS

The Specifications against Respondent in SED case number 30678 and 30977 read as follows:

### SPECIFICATIONS[2]

### (SED Case # 30678)

**JEAN SEVERIN** (hereinafter referred to as "Respondent") is a tenured teacher under File # [redacted] assigned to Urban Action Academy within District # 18. During the 2015-2016 school year, the Respondent engaged in misconduct, insubordinations, verbal abuse, conduct unbecoming his position, and neglect of duty as follows:

**In Particular:**

**SPECIFICATION 1:** On or about May 5, 2016, during spirit week, Respondent stated to students in sum and substance:

a. This is not okay and/or This is not right (referencing boys dressing up as girls)
b. The school is promoting gays
c. The boys are dressed up like trannies
d. This is a disgrace

**SPECIFICATION 2:** On or about May 5, 2016, in the presence of students, Respondent stated in sum and substance:

a. This school is bullshit
b. Asshole
c. Piece of shit principal and/or principal is full of shit
d. This dumb principal
e. The principal is bullshit and/or bullshit principal
f. The principal is an asshole
g. This piece of shit lets students walk around dressing like girls
h. This bullshit principal let this happen

[2] At the March 16, 2017 hearing, the Specifications 1 & 2 were amended to change the date the alleged incidents occurred from May 5, 2016 to April 8, 2016; and Specifications 3 & 4 were amended to change the date the alleged incidents occurred from May 5, 2016 to April 18, 2016.

**SPECIFICATION 3:** On or about May 5, 2016, Respondent was observed during work hours and/or instructional time to be asleep and/or in a relaxed position.

**SPECIFICATION 4:** On or about May 5, 2016, Respondent failed to discharge his professional responsibilities when Responsible:

a. Failed to obtain permission from the Principal and/or Administration to allow students to watch an R-rated animation with adult themes and/or pervasive language and/or sexual references
b. Allowed his minor students to watch an R-rated animation, having no educational value, called the Boondocks
c. Allowed students to listen to a song called "Dick Riding" with lyrical content in sum and substance: "I wanna ride your nuts because I think you are the man", "It's ok to ride that dick", "Now we're dick riding Obama".

**SPECIFICATION 5**: During the 2015-2016 school year, Respondent engaged in misconduct and failed to discharge his professional responsibilities when Respondent:

a. Repeatedly misused his teaching time by frequently sleeping during class
b. Often used his cell phone during class time
c. Repeatedly failed to provide classroom instruction to the students under his supervision.

**The forgoing constitutes:**

- Just cause for disciplinary action pursuant to Education Law 3020-a;
- Verbal abuse;
- Conduct unbecoming Respondent's position, or conduct prejudicial to the good order, efficiency, or discipline of the service;
- Substantial cause rendering Respondent unfit to perform properly his obligations to the service;
- A violation of the By-laws, Rules and Regulations of the Chancellor, School and/or District;
- Misconduct;
- Insubordination;
- Neglect of duty; and
- Just cause for termination

**(SED Case # 30977)**

**SPECIFICATIONS**

**JEAN SEVERIN** (hereinafter referred to as "Respondent") is a tenured teacher under File # [redacted] assigned to Middle School of Marketing and Legal Studies within District #18. During

the 2016-2017 school year, the Respondent engaged in misconduct, insubordination, conduct unbecoming his position, and neglect of duty as follows:

In Particular:

**SPECIFICATION 1:** On or about December 1, 2016, while assigned to Middle School of Marketing and Legal Studies, Respondent failed to discharge his professional responsibilities when:

a. Respondent was observed during work hours and/or instructional time to be asleep and/or in a relaxed position in the presence of students.
b. Failing to follow school protocols and procedures by not reporting to an assigned location as directed to by Principal and/or Administration.
c. Failed to follow directives by Principal and/or Administration to retrieve and review *Hooked on Phonics* program for intervention and the Running records for student planning and intervention.
d. Failed to follow directive by Principal and/or Administration to execute scripted lesson plans to students.
e. Failed to follow directive by Principal and/or Administration to assist staff members with the supervision of students in outdoor recess, resulting in limited and or inadequate supervision of students.
f. Failed to follow school protocol and procedures by repeatedly arriving late for scheduled yard duty.

**SPECIFICATION 2:** During 2016-2017 school year, Respondent was excessively late approximately 11 times on the following dates:

| | |
|---|---|
| 1. October 17, 2016 | 1 minute |
| 2. October 24, 2016 | 10 minutes |
| 3. October 25, 2016 | 4 minutes |
| 4. October 26, 2016 | 10 minutes |
| 5. October 27, 2016 | 10 minutes |
| 6. November 1, 2016 | 14 minutes |
| 7. November 3, 2016 | 5 minutes |
| 8. November 16, 2016 | 5 minutes |
| 9. November 21, 2016 | 15 minutes |
| 10. November 22, 2016 | 3 minutes |
| 11. November 30, 2016 | 35 minutes |

**The foregoing constitutes:**

- Just cause for disciplinary action pursuant to Education Law 3020-a;
- Conduct unbecoming Respondent's position, or conduct prejudicial to the good order, efficiency, or discipline of the service;

- Substantial cause rendering Respondent unfit to perform properly his obligations to the service;
- A violation of the By-laws, Rules and Regulations of the Chancellor, School and/or District;
- Misconduct;
- Insubordination;
- Neglect of duty; and
- Just cause for termination

**RELEVANT DEPARTMENT RULES AND REGULATIONS**

... NYC Department of Education Regulation of the Chancellor ...Issued 10/30/14 ...Number A-421...Subject: Pupil Behavior and Discipline – Verbal Abuse...
**Summary of Changes ...**This Regulation updates and supersedes Chancellor's Regulation A-421 dated July 19, 2013. It defines and prohibits the verbal abuse of students and sets forth the reporting and investigative requirements for allegations of verbal abuse of students. (D. Exh. 2)

...I. **POLICY**

A. It is the policy of the Department of Education (DOE) to prohibit verbal abuse of students by DOE staff members...on school property...

B. Disruptive behavior by a student must never be punished by use of verbal abuse. Schools should address a student's disruptive behavior through offering guidance intervention, working with parents, and addressing behavior in accordance with Chancellor's regulation A-443 and the DOE's Discipline Code.

C. Any employee who violates this regulation will be subject to appropriate disciplinary action.

II. **DEFINITIONS**

A. Verbal abuse is defined as language (written or oral) about or directed toward students that:

1. Belittles, embarrasses or subjects students to ridicule; or
2. Has or would have the effect of unreasonably and substantially interfering with a student's educational performance or ability to participate in or benefit from an educational program, school sponsored activity or any other aspect of a student's education; or
3. Has or would have the effect of unreasonably and substantially interfering with a student's mental, emotional, or physical well-being; or
4. Reasonably causes or would reasonably be expected to cause a student to fear for his/her physical safety; or

5. Reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student.

B. Verbal statements by DOE staff members...directed to or about students that are discriminatory based on race, color, national origin, alienage/citizenship status, age, ethnicity, religion, creed, gender, disability, sexual orientation, or weight will be investigated under the procedures of Chancellor's Regulation A-830. Schools should refer any such complaints to the DOE's Office of Equal Opportunity and Diversity Management.

## III. NOTIFICATION TO STAFF

The principal must ensure that all members of the staff, including non-instructional staff, are informed of the DOE's policy and rules with respect to verbal abuse. At a minimum, the principal/designee must:

A. review the importance of this Regulation with all staff, distribute a copy of this Regulation to every staff member, and have every staff member sign an acknowledgement of its receipt at the beginning of each school year;

B. review the importance of this regulation with every staff member who comes to the school after the beginning of the school year, provide him/her with a copy of this Regulation, and have the staff member sign an acknowledgement of its receipt; and

C. redistribute and/or provide technical assistance regarding this regulation as needed during the school year. (D. Exh. 2)

## IV. REPORTING AN ALLEGATION OF VERBAL ABUSE

A. Staff Member Obligations

Any staff member who witnesses verbal abuse, who has knowledge or information about or who receives a report about a student who may have been the victim of verbal abuse, is required to orally report the allegation to the principal/designee within one school day. Within two school days of making the oral report, the staff member also must:

1. submit a written report to the principal/designee by completing a witness statement found in the DOE's Online Occurrence Reporting System ("OORS") or

2. file an online report directly with the Office of Special Investigation ("OSI") (see Section IV.B.2 below) ...

B. Principal/Designee Obligations

The principal or designee must immediately report all allegations of verbal abuse of students by DOE employees...to OSI within 24 hours of learning of the allegation by one of the following methods:

1. entering the information into the OORS; or

2. entering the information into OSI's reporting system at https://www.nycenet.edu/office/osi/CPR Form/form.aspx, or by calling OSI at 718-935-3800.

If the principal/designee enters a report of alleged corporal punishment into OORS, he/she will automatically be routed to OSI's online reporting system. There is no need for the principal/designee to also report the complaint separately to OSI....

## VI. INVESTIGATION

A. Allegations of verbal abuse will be investigated either by OSI or by the school at which the incident occurred. After OSI receives a report of verbal abuse, OSI will advise the principal whether OSI will conduct the investigation or whether the principal must conduct a School-Based Investigation ("SBI"). (D. Ex. 2)

*****

## URBAN ACTION ACADEMY FACULTY/STAFF HANDBOOK 2015-2016 (D5)

...School Policy Handbook ...This booklet and other policy/faculty notes, procedures, flyers, or bulletins should be retained for future reference and will be referred to as School Policy. New policies and changes will be promulgated for inclusion as needed. (D5 p.1)

### U.A.A. Culture & Expectations SY 2015-16

**Routine/Expectation – Teacher Standing at the Door**: Where should the teacher be as the students enter class?
**What does it look like?** – Teacher stands at door of classroom and greets (brief comment or acknowledgement) students as they enter.
**Why we do it?** – Individual communication with students sets a positive tone for the class. Additionally, teachers can check in with specific students as they enter and can get a feel for how the class/students are doing. (D5, p 14)

---

**Routine/Expectation – Student Conversation**: How will students speak to one another? How will students speak to adults?
**What does it look like?** – Students engage with teacher and each other in a respectful manner that is appropriate for a learning environment.
**Why we do it?** – Student communication should be consistent with our core values. How students communicate should be aligned to our core values and sets the tone for a productive classroom. (D5p.14)

---

**Routine/Expectation – Videos and Powerpoint Presentations in Class/Sacredness of Classtime:** When should videos be shown? How should PowerPoints be used?
**What does it look like?** – Class time is incredibly valuable. A movie or a powerpoint presentation should not be shown for an entire class period. It is not a good use of class time to "show the movie" of a book a class read during reading or writing class. (This may be an excellent after-school bonus activity). Students should note copy notes for an extensive period of time. Other activities should be incorporated into the lesson.
**Why we do it?** – Video and PowerPoint presentations can be very effective. When videos are used, they should be used as short (1-7 min) clips. It is ok if more than one clip is shown per class period.
**How will we know?** Students will not watch videos or PowerPoint presentations for an entire class period (unless they are in a film class). Students will not copy notes from a PowerPoint for an extensive period of time. (D5 pp.14-15)

---

**...C11. Computers & Cell Phones**

**...Cell phones are not to be used in the hallways or in the presence of students.** (D5 p.44)

## POSITIONS OF THE PARTIES

**Department**

- The evidence established that Respondent engaged in a litany of failures including but not limited to:
  - Engaging in misconduct at two very different schools, with two very different administrations, with two very different sets of staff members and two very different sets of students(T1533).
  - Failing to provide students with the same opportunities he was afforded – the ability to learn and earn a higher education. (T1534)

- Chancellor Regulations define verbal abuse to include conduct that directed towards students, in written or oral form that belittles, embarrasses or subjects to ridicule, or has or would have the effect of reasonably and substantially interfering with a student's mental, educational or physical well-being; or would reasonably be expected to cause a student to fear for his physical safety; and/or would reasonably cause or be expected to cause physical injury or emotional harm to a student. (T1536-1537)

- Respondent admitted he was aware of the Chancellors Regulation on Verbal Abuse. (T1537)

- The overwhelming credible evidence supports a finding that Respondent made the comments attributed to him in Specification 1. (T1538)

- Respondent's denial of making the comments attributed to him notwithstanding; Respondent did acknowledge that gender/bender day took place; and that Students "A" and "J" were two model students; and that Students "A" and "J" credibly testified to what they saw and heard. (T1539)

- Student "J" testified that Respondent verbalized in front of his students that "...this is what the school condones...promoting boys being gays...but won't let me take you guys to the burial ground of Malcolm X...your bullshit Principal is stupid, irresponsible, a disgrace and an abomination. (T1539 citing T273-274)

- Student "J" immediately left the class and reported what she heard inside the second period class. (T1540 citing T269)

- Student "J" testified that there were persons in the class who were gay. (T1540)

- Student "A", a stellar student, testified that Respondent actually complimented the girls for playing their part, but became angry, frustrated and flustered at the boys dressing as girls; saying the bullshit Principal is allowing this; saying this is a shit school(T385); Respondent referred to the boys as trannies (T385); and calling the Principal a bullshit Principal, an asshole, and a shitty Principal in front of his students. (T1541-1542), citing T391). Student A also testified Respondent was disrespectful to the Principal in her presence before and that she did not feel the comments were appropriate. (T1542, citing T391)

- Student "A" testified that she went to the Dean's Office who gave her and others a paper to write statements. (T1543 citing T388)

- Student "A's" statement is in evidence. (T1543) Student "A" explained how Respondent was bashing homosexuals and that he threatened to fail students. (T1544)

- All the submitted statements entered into evidence should be given weight as corroborative evidence. (T1544)

- Hearsay evidence is good evidence. (T1546) The written statements of the other students credibly support the verbal testimony in the record and should be accorded substantial weight. (T1546-1549)

- The evidence suggest that Respondents conduct and statements caused students to feel embarrassed, belittled and subjected to ridicule. (T1550-1552)

- There was no collusion between the students in the preparation of their written statements. (T1552)

- Terrance Norris was a credible witness. (T1553-1555 citing T475) He corroborated what had occurred on Gender/Bender Day. (T1554-1558 citing T455, 475-477)

- Principal Barnett credibly testified to the sleeping she observed and the video that was playing in the fifth period class. (T1557-1560 citing T585, 587)

- Respondent testified in a self-serving manner and provided only self-interested statements (T1567)

- That Respondent played the "Dick Riding Obama" episode in the second period class was proven. (T1567-1569)

- The record contains credible evidence that Respondent sleeps in class. (T1569)

- Respondent's testimony concerning the reasons his eyes were closed was disingenuous (T1570)

- Respondents reply to cell phone usage goes to the fact he was not following instructions. (T 1573, D5)

- The overall impact on the total school environment must be considered on these facts. (T1576)

- Respondent's lateness's were proven as admitted to.

- Respondents dereliction of duties as alleged in the specifications at the Middle School of Marketing and Legal Studies was proven. (T1584-1593)

- Respondents failures to conform are simply willful. (T1593)

**Respondent**

- The OSI investigators final report is replete with inconsistencies and contradictions (T1520)
- With regard to the testimony – (a) three students who were interviewed denied that any derogatory comments were made about the gender/bender incident at all; (b) three students who were interviewed denied hearing any comments about Principal Dorcely; and (c) three denied seeing Respondent sleeping during instructional time. (T1520)
- The comments attributed to Respondent ranged from "…an asshole;" to "…this dumb Principal allowed this;" (T1520, D3 p.123); the students ages ranged from 15 to 19, and the statements were inconsistent.
- The OSI investigator reported that Respondent referred to unspecified students as "faggots" based on a report of Student A's father, yet not one of the seven students who were interviewed corroborated this allegation. Two denied the allegation and two could not recall. (T1521)
- Student KF testified that she received a failing grade around the time the incidents alleged occurred and right after she complained about receiving it. (T1522)
- Student AP testified she did not complain to administrators about her grades until after she received a failing grade from Respondent in the spring of 2016. (T1522)
- Student AP also testified that she first saw a Boondocks episode around the Christmas break yet the first time she complained about the Boondocks and the Snapchat pictures was when she told her father of the incidents. (T1523 citing T435-436)
- Student AP evidenced bias and retaliatory motive in the bringing of her complaints to Principal Dorcely who stated in part, "…and they were bringing concerns regarding Respondents classroom. And what was interesting about that is we had report cards maybe that week." (T1523 citing T764, 909)
- The testimony of Terrance Norris was devoid of probative values and only contained vague assertions that so lacked specificity it had no probative value. (T1524 citing T484)

- The testimony of Terrance Norris and the entirety of Specification 1 is like receiving a parking ticket for a parking violation that does not state the date, time and location of the violation making the Specification impossible to defend against. (T1254-1255)

- The testimony of AP Barnett and Principal Dorcely and the OSI investigator were of limited probative value due to their lack of direct knowledge of the alleged events. These witnesses were only the procurers, assemblers and interviewers for the information that culminated in the charges; and is therefore overwhelmingly hearsay. (T1526)

- The testimony of AP Barnett that she witnessed Respondent sleeping in a classroom on one occasion during the 2014/2015 school year was outside the time period in the charges. (T1526)

- Paraprofessional Amber Jackson only testified she witnessed Respondent sleeping on a few occasions that totaled three to four minutes on all the classes. (T1526)

- Principal Horton-Ball only actually observed Respondent fail to report to an assigned classroom (D22) Further, the only specific allegation concerned the failure to produce evidence definitively showing that Respondent failed to have picked up the hooked on phonics materials from the school office as directed. No documentary proof of a directive was proven. (T1527)

- Student DD testified he never saw the "dick riding" Boondocks episode. He also testified that he saw the "Freedom Rider" Boondocks episode. (T1528)

- The Respondent apologized for an error in judgement in showing the episode due to the profanity making it inappropriate. (T1528)

- The Respondent apologized for his lateness and he remedied the problem. (T1528)

- Respondent credibly testified that he neither made the "gender/bender" comments or inappropriate remarks about Principal Dorcely as attributed to him. (T1528)

- The Hearing Officer is respectfully directed to the plausible inference of "retaliatory motive" on the part of the students as the allegations arose after the students received failing grades. (T1529)

- The record contains no proof indicating Respondent was ever accused of the conduct he is accused of on this record. (T1529)

- Respondent testified he was not sleeping but rather, concentrating on listening and was in fact attempting to teach a concentrated listening technique to his students. Further, no evidence was produced that Respondent was sleeping for an extended period of time. (T1529)

- Respondent had never been told there were issues with sleeping in class and in this regard, he did not willfully disobey a directive. (T1529)

- No administrator ever demonstrated that they attempted to assist Respondent. (T1531)

- The entire first set of Specifications should be dismissed for vagueness and a lack of specificity, especially Specification 5. (T1531)

- It would be improper for the Arbitrator to consider the prior 3020-a proceeding for notice purposes due to the dates of that proceeding and the institution of the instant charges. (T1532)

## RELEVANT FINDINGS OF FACT

A 3020-a proceeding is a *denovo* proceeding that essentially serves as a search for the truth. In this regard, it is essential that fact be separated from fiction, feelings, opinion and outright falsehoods. To accomplish this many variables are taken into consideration including levels of a witness's self -interest, demeanor, the possible existence of bias or motive, the ability to perceive and recollect, the degree of consistency in the facts asserted by the various witnesses. In addition, where necessary appropriate inferences were drawn based on circumstantial proofs to determine facts consistent with the "ring of truth." In this regard, the Hearing Officer has sifted through the witness testimony and submitted evidence constituting the record in this matter; reconciled and harmonized recollections over events by scrutinizing material and immaterial differences; evaluated the same and make the following determinations concerning the relevant findings of fact

in this proceeding. Further, as Hearing Officer, not only do I find as a matter of credibility that Respondent tailored and scaled portions of his testimony and recollections to serve his own self-interest in having the specifications in this matter dismissed; I find he was outright dishonest about certain events. As a result, when having to weigh and assess conflicting testimony for the " ring of truth," this factor was also taken under consideration.

1. Respondent has worked as a teacher with the NYCDOE for over approximately 20 years beginning employment in or about 1996. (T1302-1303)
2. During the 2015-2016 school year, Respondent was assigned to Urban Action Academy (UAA) located in Brooklyn, NY. On September 8, 2015, Respondent signed an acknowledgement of receipt for materials, including the school handbook, and a verification of attendance form at the opening faculty conference. (D5)
3. During the 2015-2016 school year, the Principal of UAA was Steve A. Dorcely. (T689)
4. At UAA, a Senior Planning Committee of students was permitted to propose activities for a Senior Spirit Week. During the 2015-2016 school year Spirit Week, proposed activities included gender/bender day, twin day, pajama day, and culture day. Juniors were also permitted to participate that year. (T267, 562-564, 728-729)
5. On April 8, 2016, gender/bender day took place at UAA. Gender/bender day was to be a fun day where girls dressed as boys and boys dressed as girls. (T267, 384-385, 563, 728-729)
6. On April 8, 2016, after the participating students passed Respondents second period classroom he complimented some female students that had participated on their gender/bender outfits. (T384-385, 1416-1417)
7. Respondent appeared to get upset/frustrated after he saw male students who dressed as girls come through the hallway and caused a commotion. (T267-268, 385) Most students left the

classroom to watch the procession. Thereafter, the second period class had reassembled in the classroom (T385) and Respondent made the following comments and voiced his own opinions to the class (T269) stating in sum and substance:

- "...this is what they condone in the school...they promote boys to be gay...but they won't let me take you guys to the burial ground of Malcolm X...and your bullshit Principal would not even give me an ok for it..." (T267-269, 274, 384-385, D14(a)(c))
- That Principal Dorcely was "an idiot", "stupid", "irresponsible", and "a bullshit Principal", "a piece of shit Principal", "a shitty Principal", an "asshole". (T273, 385, 391, 476, D7, D9, D14(a)(c))
- That the school permitted boys to dress like "trannies" and that it was "stupid" and a "disgrace." (T385-386, 429, 443-444, 475, 476)
- That the school was a "shit school." (T385)

8. At the end of the second period on April 8, 2016 Student KF left the classroom, went to see Dean Smith, was then escorted by the Dean to AP Barnett's office and wrote a statement of complaint in the AP's office under the supervision of the Dean. (T269-270, 564-565, D7)
9. After allowing the use of her office for the statement to be written, AP Barnett went into the hallway and saw Respondent speaking with a group of adults after the start time for the next period (third period) had passed. AP Barnett then went into Respondents classroom which had students in it with no teacher. Respondent then entered the room late to begin instruction. AP Barnett stayed in the third period class for the remainder of the period. (T565-568)
10. Once AP Barnett left that class, she received the complaints of four female students, AP, HA, BP, and KB about what had occurred in Respondent's second period class. AP Barnett

provided the location/room for the students to write their complaints, under the supervision of a Dean. (T389, 431-433, 565-578)

11. AP Barnett notified Principal Dorcely, who was out of the building on April 8, 2016, about what had occurred in Respondents second period class. (T577-578, 728-730, D14(a)(b)(c))

12. Principal Dorcely made the complaint about the April 8, 2016 incident to the SCI after student AP's father and he had a meeting concerning his daughter and her interactions with Respondent, including the instruction and treatment his daughter received from Respondent. (T734)

13. On April 18, 2016, a student approached AP Barnett while she was in her office and showed her a picture of Respondent sleeping in his current fifth period classroom on her cell phone. The picture was shot from outside the classroom. (T598)

14. AP Barnett left her office and immediately proceeded to Respondent's fifth period classroom. AP Barnett silently entered the classroom; saw Respondent sleeping in a chair with his head back, eyes closed and mouth open; saw students in the class watching an episode of the Boondocks that contained adult content including "The Dick Riding Song"; AP Barnett also opened the classroom door to let a late arriving student enter the classroom with no visual or verbal reaction from Respondent; AP Barnett stayed in the classroom for approximately five - seven minutes and watched Respondent awaken only after a student called his name twice. (T583-587, D12, D16)

15. AP Barnett informed Principal Dorcely of the incident on April 18, 2016 and prepared and sent an e-mail message to him at approximately 10:18 am on April 19, 2016. (D16)

16. Jameela Horton serves as the only Principal at MLS, which has approximately 160 students, 9 teachers and 2 long term substitute teachers. (T1041) At MLS, and among other duties,

Lorraine Jackson Purvis serves a role as Principal Horton's agent for conveying directives to staff. (T1043-1044, 1272)

17. In mid-October 2016, Respondent was assigned to MLS out of the Absent Teacher Reserve (ATR). (T1271, D21) Respondent acknowledged that while at MLS, at times, he at times received assignments from Ms. Purvis. (T1272-1273)
18. Respondent admits that Principal Horton gave him an assignment to work with students who were English Language Learners (ELL) using a "Hooked on Phonics" program and that he did not complete the assignment. (T1275-1282)
19. When Principal Horton gave Respondent the "Hooked on Phonics" assignment, she provided him with a list of students he was supposed to service by pulling them out of their regular classes to provide the services. (T1048-1050)
20. On November 20, 2016, Amber Jackson was working with Respondent during a "Restorative Circle" class she observed Respondent lean back in his chair with his eyes closed and head titled backwards sleeping. (T933-936, 1447-1451)
21. On November 28, 2016 Respondent and his UFT Representative met with ATR Principal Sharon Meade to discuss the OSI Report that concluded that Respondent engaged in verbal abuse, misused teaching time, and used his cell phone during instructional time. On January 5, 2017 Respondent signed an acknowledgement of receipt for a December 6, 2016 letter memorializing the meeting. (D23)
22. On December 7, 2016 Respondent and his UFT Representative met with ATR Principal Sharon Meade to discuss allegations of misconduct at MLS as alleged by Principal Horton on December 1, 2016. On January 5, 2017 Respondent signed an acknowledgement of receipt for a December 7, 2016 letter memorializing the meeting. (D24)

## FINDINGS OF FACT AND RULINGS FOR THE SPECIFIC ALLEGATIONS IN CHARGES AND SPECIFICATIONS

**(SED Case # 30678)**

The following is a discussion of the Specifications (as amended) as set forth in the charging document[3]

***SPECIFICATION 1:*** *On or about April 8, 2016, during spirit week, Respondent stated to students in sum and substance:*

a. *This is not okay and/or This is not right (referencing boys dressing up as girls)*
b. *The school is promoting gays*
c. *The boys are dressed up like trannies*
d. *This is a disgrace*

***Discussion***

The Department has charged Respondent with making specific statements in the presence of students, specified within an allowable margin of de minimis variation. Based on my review of the submitted evidence and considering what falls within that allowable margin of de minimis variation, and based upon my findings of fact, the following Specifications are Sustained: 1(a) [FF7], 1(b)[FF7], 1(c) [FF7], 1(d) [FF 7], 1(e)[FF7], 1(f)[FF7], 1(g)[FF7], 1(h)[FF7].

Respondent simply denied making any of the statements attributed to him while two student participants in this proceeding made contemporaneous complaints about the statements, both verbally and in writing. The two student participants also provided credible and consistent testimony about the specified events at this proceeding. Additionally, an adult paraprofessional, with no interest in the outcome of this proceeding, Terrance Norris, corroborated the students claims that during the second period class, Respondent appeared confused and thereafter engaged in a loud argument with the students, offering his opinions about his frustrations from the middle point to the end of second period. (T474-477) Therefore, Respondent failed to provide a fully accurate account of events. Further Respondents denials could not be reconciled with the other

[3] In the discussion portion of this section, "FF" refers to the numbered paragraph in the section entitled "Relevant Findings of Fact."

evidence and would require a wholesale rejection of the other credible testimony and evidence. I am not inclined to do so.

I therefore find that Specifications 1(a), 1(b), 1(c) and 1(d) are sustained.

***<u>SPECIFICATION 2:</u>*** *On or about April 8, 2016, in the presence of students, Respondent stated in sum and substance:*

*a. This school is bullshit*
*b. Asshole*
*c. Piece of shit principal and/or principal is full of shit*
*d. This dumb principal*
*e. The principal is bullshit and/or bullshit principal*
*f. The principal is an asshole*
*g. This piece of shit lets students walk around dressing like girls*
*h. This bullshit principal let this happen*

**<u>Discussion</u>**

The Respondents defense to Specification 2(a-h) as stated by him was essentially "…I would never say anything disparagingly in front of the students about the Principal." (T1403-1404). That defense was simply not supported by the credible record evidence.

In this Specification, the Department has again charged Respondent with making specific statements in the presence of students, specified within an allowable margin of de minimis variation. Based on my review of the submitted evidence and considering what falls within that allowable margin of de minimis variation, and based upon my findings of fact, the following Specifications are Sustained: 1(a) [FF7], 1(b)[FF7], 1(c) [FF7], 1(d) [FF 7], 1(e)[FF7], 1(f)[FF7], 1(g)[FF7], 1(h)[FF7].

The allegations made herein were a continuation of the incident referenced in Specification 1. The different witnesses who pieced the puzzle together of this specification provided credible evidence that Respondent stated the following to his second period students about Principal Dorcely, the school and "gender bender day" on April 8, 2016: "your bullshit Principal wouldn't even give me an ok for it…" (T268, 273, 385, D9, D14(a)); "…this piece of shit Principal for a Principal can allow this but not my trips..." (D7); that Principal and/or "gender bender day" is "stupid," the Principal is "an idiot", "irresponsible" and the event and Principal were "a disgrace." (T273-274,

475-476); that the school was a "shit school" (T385); that the school was permitting boys to dress like "trannies" (T385, 429-431, 443-444, 475).

The Respondent's credibility on this Specification is seriously lacking for the same reasons articulated under Specification 1. Again, Respondent failed to provide a fully accurate account of events. Respondent's denials could not be reconciled with the other evidence and would require a wholesale rejection of the other credible testimony and evidence. I am not inclined to do so.

I therefore find that Specifications 1(a), 1(b), 1(c), 1(d), 1(e), 1(f), 1(g), 1(h) are sustained.

***SPECIFICATION 3:*** *On or about April 18, 2016, Respondent was observed during work hours and/or instructional time to be asleep and/or in a relaxed position.*

**Discussion**

AP Barnett credibly testified how she was in her office on April 18, 2016 during fifth period, when a student came into her office, showed her a picture taken by another student that showed Respondent sleeping with a classroom full of students. That student also told her the class was watching an episode of the "Boondocks" at that very moment. AP Barnett excused the student and went to the classroom to see for herself. She entered Respondents classroom without any acknowledgement; stood by the door and witnessed Respondent sitting in a chair with his head back, eyes closed and mouth open for five to seven minutes, during which time she opened the door and let a late arriving student into the class with no response/reaction from Respondent. While in the classroom, AP Barnett also witnessed the playing of a animated adult sitcom "Boondocks" episode on a video, where "The Dick Riding Song" was playing. AP Barnett also witnessed a student call Respondent's name twice where after Respondent woke up in a startled manner, grabbed papers and asked "…So what did we learn from this." (T583-587, D16)

Respondent denied that he was sleeping (T1264) and testified that on April 18, 2016 he was listening to the video with his eyes closed. (T1263) Respondent also testified while demonstrating, that leaning back in his chair, putting his head back and closing his eyes while a video was playing was a methodology he used and even taught his students when listening so they could get a picture, since a picture is worth a thousand words. (T1262-1264)

Respondents denial of sleeping is not credible. In addition to my credibility finding of Respondent's propensity to tailor and scale his testimony to his own self-interest, and even _assuming arguendo_ Respondent had a methodology for concentration purposes as he described, there was no need to resort to that method when a video segment contrasted to *an audio only segment*, was playing. In other words, the picture was being provided by the video; there was no need to make up a picture in your mind. I find Respondents explanation for closing his eyes to be contrived. Secondly, Respondent could not discredit or explain away the credible testimony of AP Barnett. When provided the opportunity to provide reasons that AP Barnett would fabricate or contrive testimony about what she witnessed on April 18, 2016, Respondent was unable to do so. (T1515-1516) Respondent admitted that he never had any conflict with AP Barnett and that his relationship and dealings with her were professional. (T1515)

AP Barnett also testified that there was no animosity between her and Respondent and that their relationship was purely professional. (T542) Further, on April 18, 2016, AP Barnett took contemporaneous handwritten notes (D11), then scheduled a meeting for April 19th with Respondent "…to discuss a matter of professional misconduct-sleeping in your classroom during your instructional teaching period, while students were left to watch the adult, animated sitcom, "The Boondocks," during your period 5 Mock Trial class." That contemporaneous writing to Respondent was recited in AP Barnett's 10:18 am e-mail message to Principal Dorcely on the subject "RE Professional Misconduct-Severin" which also detailed her witness to the video playing the "Dick Riding Song". (D16) I find that documentary evidence both probative, credible and supportive of her testimony in this proceeding.

I therefore find that Specification 3 is sustained.

***Specification 4:*** *On or about April 18, 2016, Respondent failed to discharge his professional responsibilities when Respondent:*

a. *Failed to obtain permission from the Principal and/or Administration to allow students to watch an R-rated animation with adult themes and/or pervasive language and/or sexual references*
b. *Allowed his minor students to watch an R-rated animation, having no educational value, called the Boondocks*
c. *Allowed students to listen to a song called "Dick Riding" with lyrical content in sum and substance: "I wanna ride your nuts because I think you are the man", "It's ok to ride that dick", "Now we're dick riding Obama".*

**Discussion:**

Respondent apologized on the record for showing the Boondocks (T1262); acknowledged that it was in poor taste to have shown the video (T1262); admitted it was wrong to use the Boondocks in the class (T1266-1267, 1460); admitted that his students brought the Boondocks to his attention (T1267, 1326, 1333, 1372-1373, ); admitted that he used the "Freedom Riders" episode of the Boondocks in his law class and only played it once on April 18, 2016 (T1267, 1300, 1307, 1310); stated that Terrance Norris was incorrect in stating he played the Boondocks more than once (T1308); articulated his belief that the content in the "Freedom Riders" episode had appeal for the students and he apologized for the language used in the episode (T1267, 1325, 1371, 1459); admitted that prior to showing the Boondocks he knew it contained vulgar language (T1325, 1331); admitted that showing the Boondocks was not included in his lesson plans (1458-1459); admitted that he did not ask either Principal Dorcely, AP Barnett or Ms. Razak nor anyone else for permission to show the Boondocks video (T1330-1331, 1367-1368, D28).

Based on the rationale stated under Specification 3, I fully credit the evidence from AP Barnett over the denials of Respondent, and find that on April 18, 2016, Respondent did play a Boondocks video that played the Dick Riding song that contained the lyrics cited. (D8, D16)

Based on the above, Respondent admitted that he did not get permission before allowing his students "...to watch an R-rated animation with adult themes and/or pervasive language and/or sexual references." [Specification 4(a)] Respondent admitted to allowing his minor students to watch an R-rated animation called the Boondocks. [Specification 4(b)] Further Respondent allowed his students to listen to a song called the "Dick Riding" song and its attendant lyrics. [Specification 4(c)]. The Department did not prove that the R-rated animation had no educational value. What was proven was that the R-rated animation was inappropriate for student consumption.

I therefore find that Specification 4(a) and 4(c) were sustained. Specification 4(b) was sustained in part and is not sustained in part.

***Specification 5:*** *During the 2015-2016 school year, Respondent engaged in misconduct and failed to discharge his professional responsibilities when Respondent:*

*a. Repeatedly misused his teaching time by frequently sleeping during class*
*b. Often used his cell phone during class time*

c. *Repeatedly failed to provide classroom instruction to the students under his supervision.*

Respondent submitted a Motion to Dismiss the instant Specification as: "*...overly vague in that the Specification spans an entire school year and contains no information to discern when the alleged misconduct occurred during that broad ten-month period of time. The specification additionally fails to provide any information as to when during the school-day said misconduct allegedly occurred, which class it allegedly occurred in or how often it is alleged to have occurred. Respondent is therefore left having to guess as to what he is actually charged with. This is exactly why Specification 5 is not sufficiently specific enough to satisfy the principles of due process, provide actual notice and/or allow the preparation of an adequate defense. Moreover, Specification 5(c) is additionally overbroad and vague in that the Respondent is left without knowing what class or students the Board of Education is referring to and within what time-period. The specification is further unclear as to what the board of education is alleging he actually failed to do and when...(citations omitted)...Due process protections required by the statute require the board of education to provide detailed charges such that a Respondent is on notice as to what he is charged with and can adequately prepare a defense. With respect to Specification 5, the board of education has failed to satisfy this minimum pleading requirement. For all of these reasons, specification 5 must be dismissed in its entirety.*" (Motion paragraph 12)

A final decision on the motion was deferred until the issuance of the Final Opinion and Award.

As a matter of pleading, the specific words used in Specification 5 were of conclusory nature and general variety. Specification 5(a) uses the word "Repeatedly" without specifying the repetitive dates the sleeping allegedly occurred; 5(b) uses the word "Often" without specifying the dates or numbers of times the cell phone was allegedly utilized; 5(c) uses the word "Repeatedly" without specifying the repetitive dates, class periods, or assignments when Respondent allegedly failed to provide classroom instruction.

Likewise, the record evidence does not contain sufficient material and probative evidence which establishes repetitive sleeping at UAA; nor sufficient material and probative evidence that establishes the frequency of cell phone use during class time; nor sufficient material and probative evidence that establishes repetitive failures to provide classroom instruction to students under Respondent's Supervision. Therefore, the attempt at clarification through witness testimony at the

hearings provided neither timely notice nor adequate specific notice to the Respondent of the specifics concerning the alleged malfeasance nor did the testimony overcome the basic just cause problems centered on fairness. Proof is different than presumption.

The way the Department's witnesses addressed these concerns lacked specificity, were not corroborated and were not documented. Even allowing for appropriate inferences to be made from the evidence presented to prove Specifications 1-4, those proofs do not establish that Respondent engaged in conduct at UAA of a repetitive or frequent nature as described in Specification 5. In sum, the proofs in the record did not cure the pleading deficiencies raised in the Motion to Dismiss.

In sum, this Specification is too imprecise. The identified period that it purports to cover is overbroad and expansive. The submitted proofs on the allegations as written are insubstantial and it does not appear that any substantial effort was made to conform the pleadings to the proofs by amending the general wording to more specific allegations. The flaws of an incomplete investigation remain to the "as worded" Specification 5. It is apparent that the department merely marshalled student's opinions and partially recollected classroom memories and recorded them under the guise of a Specification. To his credit, Principal Dorcely even recognized that more than "community chatter" (T802) was needed to establish a fact and assert a wrong.

Thus, a lack of fundamental fairness underlies the Specification itself since Respondent had no reasonable certainty of what specific allegations he needed to respond to.

I therefore find that Specifications 5(a), 5(b), and 5(c) are not sustained.

**(SED Case # 30977)**

***Specification 1:*** *On or about December 1, 2016, while assigned to Middle School of Marketing and Legal Studies, Respondent failed to discharge his professional responsibilities when:*

*a. Respondent was observed during work hours and/or instructional time to be asleep and/or in a relaxed position in the presence of students.*
*b. Failing to follow school protocols and procedures by not reporting to an assigned location as directed to by Principal and/or Administration.*
*c. Failed to follow directives by Principal and/or Administration to retrieve and review Hooked on Phonics program for intervention and the Running records for student planning and intervention.*

d. *Failed to follow directive by Principal and/or Administration to execute scripted lesson plans to students.*
e. *Failed to follow directive by Principal and/or Administration to assist staff members with the supervision of students in outdoor recess, resulting in limited and or inadequate supervision of students.*
f. *Failed to follow school protocol and procedures by repeatedly arriving late for scheduled yard duty.*

**Discussion**

(a) *Respondent was observed during work hours and/or instructional time to be asleep and/or in a relaxed position in the presence of students.*

MLS Paraprofessional Amber Jackson credibly testified that on November 20, 2016, while engaged in a Restorative Circle Class with Respondent she witnessed Respondent nodding off for a total of three to four minutes. To support her conclusion of sleeping, Ms. Jackson described how the Respondent leaned back in his chair with his head titled backwards, with his neck drifting back and forth and with Respondent demonstrating no reaction to the snickering of the students or her taking a photo of him in that state. (T933-937, 949-954, D18A, D18B)

Respondent maintained that he was not sleeping but rather was using a methodology he used and even taught his students when listening so they could get a picture, since a picture is worth a thousand words. (T1262-1264) Respondent also testified the only time his eyes are closed is when the class is listening (T1424); that he heard the students snickering or giggling and those actions not disturb the class (T1450); that he was always aware of what was going on in class and there was no disruption (T1450); that he apologized to Ms. Meade for closing his eyes and understands the problems with doing so, and assured her he will not close his eyes again. (T1451) Respondent also admitted that if his eyes were closed he would not be aware if the students were pointing at him but he does not agree that the students would not be doing their classwork because students can multitask. (T1423)

The testimony of Amber Jackson is more credible than the contrived explanations of the Respondent. The fact Respondent did not react to snickering/giggling students, was

unaware his photo was being snapped, was leaning back in his chair with eyes closed and bobbing head lead to the conclusion he was dozing off and in various degrees of sleep.

I therefore find that Specification 1(a) is sustained

*(b) Failing to follow school protocols and procedures by not reporting to an assigned location as directed to by Principal and/or Administration.*

Once assigned to MLS out of the ATR, MLS administration decided to utilize Respondent to fill staffing needs that arose during his assignment. This meant Respondent would not necessarily be doing the same thing every day and he therefore had no permanent classroom to serve as a base location. When initially assigned in October 2016, Respondent was working out of the teachers' lounge in the school after speaking to other staff. (T1273) On some unidentified date, Principal Horton tried to locate Respondent and was unsuccessful. Principal Horton and Respondent thereafter had a conversation where Respondent explained he did not hear the announcement for his attendance because he was on the first floor. Principal Horton then told Respondent that "…for future reference…" he was not to go downstairs, but was to use room 213 and wait in room 213 for his assignments. (T1063) Principal Horton admitted that upon his arrival to MLS, she did not have a conversation with Respondent about where he was to go. (T1063) After Principal Horton told Respondent to use room 213, she had to speak with him one or two more times about the issue after he was found using room 229.

(T1063-1064, D22) Thereafter, on November 28, 2016, ATR Supervisor Meade reiterated to Respondent that he had to use room 213. (T 1151, 1273,1284, D22) I do not find Respondents testimony that Principal Horton agreed that he could use room 229 as his base credible and I resolve that testimonial conflict consistent with my analysis of Respondents overall testimony. (T1283) I also credit Principal Meade's testimony that Respondent told her he did not see anything wrong with his utilization of room 229 because he was in the building and that room was more desirable for him as an indication that Respondent did what he thought was best for him rather than what he was instructed. (T1150-1152)

It is reasonable and a legitimate employer expectation for an employer to expect that employees be in the proper place at the proper time while at work. Respondent admittedly failed to conform to that reasonable expectation because he determined there was a more

desirable location that could serve as his base. His claim that Principal Horton authorized the use of room 229 as his base is just not credible. Based on the credibility determinations, the partial admissions of the Respondent and the chronology of events, I find that Respondent did fail to report to an assigned location as directed.

I therefore find that Specification 1(b) is sustained.

(c) *Failed to follow directives by Principal and/or Administration to retrieve and review Hooked on Phonics program for intervention and the Running records for student planning and intervention.*

Respondent acknowledges that he never used the "Hooked on Phonics" program with the ELL class. Respondent testified that the reason was twofold; (1) he never received a list of students (T1442) and (2) he was being assigned to other tasks that contributed to his inability to complete the assignment. (T1443-1444, 1101)

Principal Horton testified that she handed Respondent two student lists, one for ELL and one for Intervention (TT1092), and that Respondent was the only instructor/teacher that was supposed to use "Hooked on Phonics." (T1091) Principal Horton also testified that Ms. Jackson was the person who informed her that Respondent was not using the "Hooked on Phonics" materials with the students. (T1092) Further, while there was no sign in/sign out sheet for the "Hooked on Phonics" materials, MLS administrators contend that the box containing the materials appeared not to have ever been moved from where they were stored, under the desk of Ms. Purvis. The employer contends that the apparent lack of movement which caused the administrators at MLS to conclude Respondent was not following the directive.

The allegation in this Specification maintains Respondent failed to retrieve the materials and to review the materials "...for student planning and intervention." The proofs are simply insufficient in that regard. What the record does establish is that the materials were never used by Respondent with the students.

Respondent testified in unrebutted testimony that Principal Horton gave him the "Hooked on Phonics" materials and that he was directed to familiarize himself with the materials, which he did on back to back days before leaving the materials in the main office. (T1275-1279)

I find that Principal Horton did provide a list of students as she testified to. However, I also find that the record proofs do not support this Specification as Respondent did retrieve and review the materials. Respondent admittedly never used the materials as directed, an act that is not alleged/specified herein. I also find the record has no support whatsoever for the allegations concerning "Running Records."

I therefore find that Specification 1(c) is not sustained.

(d) _Failed to follow directive by Principal and/or Administration to execute scripted lesson plans to students._

When students made Principal Horton aware that confusion existed as a result of Respondent not following the script that was included with the "Master Reader" intervention, she spoke with Paraprofessional Jackson who clarified what was going on in the class. (T1053-1054) Ms. Jackson the class paraprofessional testified that the Master Reader intervention program was computer based, started at level one and progressed up to higher levels. (T938) Ms. Jackson further explained that Respondent was not following the steps, was interjecting his own processes; was jumping around and/or totally eliminating steps that came with the program. When Principal Horton spoke with Respondent he informed her he deviated from the script because he believed certain things that were scripted were unnecessary and that he had added in some things of his own to teach the children. (T1054-1055) Further, as indicated in the discussion under Specification 1(c), Respondent admitted he did not use the "Hooked on Phonics" program with the ELL students I previously determined he was assigned by Principal Horton. Respondent also testified that the Master Reader intervention was not scripted to the extent that it locked his instruction into a particular format or order. Respondent offered that he saw and took the opportunities that were present to interject "speed reading" techniques into his lessons. (T1441, 1452-1453)

There is no evidence in the record that either prior to or after the revelations of nonconformance, Respondent was directed to follow the Master Reader intervention script without deviation. (T1052-1053) There is however proof that Respondent did not use the "Hooked on Phonics" scripted lessons as directed nor did he discuss his alleged inability to execute the same with administration. Instead Respondent irresponsibly permitted the ELL students to proceed through the school days without the instruction that may have benefitted their learning.

Based on the above I find Respondent did fail to follow the directive of Principal Horton to execute the scripted lessons contained in the "Hooked on Phonics" program with the ELL students that were listed by the Principal.

I therefore find that Specification 1(d) is sustained.

(e) *Failed to follow directive by Principal and/or Administration to assist staff members with the supervision of students in outdoor recess, resulting in limited and or inadequate supervision of students.*

Due to the short staffing levels at MLS, Linda Underdue serves as the Supervisor of the lunch room and student recess. (T1061) On an unspecified date, Ms. Underdue made a request of Respondent to come into the cafeteria and then assist with recess outside in the yard to help protect student safety. (T1009) Ms. Underdue testified that during that unspecified occasion, she asked Respondent to go get his coat and he never did. (T1111-1112) ( Principal Mendes' December 1, 2016 e-mail to Principal Horton suggests the date was December 1, 2016. D22) Ms. Underdue testified that Respondent would attempt to avoid yard supervision by saying he was working with a particular student in the cafeteria. (T1112) Ms. Underdue also admitted that as a Supervisor, she knew she had the authority to direct and order compliance but, (T1120) she chose to only make requests, and not to issue directives or orders for staff to perform assignments. (1120-1123)

Respondent testified that he was never asked to get his coat, that Ms. Underdue merely approached him and said word to the effect, "...oh, you don't have your coat...". (T1290-1292) Respondent also denied ever being late for yard duty. (T1290-1292)

The support for this specification is inconclusive and insubstantial. No corroborative evidence, in any form, was offered or entered to support this Specification. Further, Ms. Underdue was

clear that she made requests and did not direct or order staff to comply. She posited that it should be implied that her requests were directives. Respondent was new to the school and cannot be held to that level of knowledge or for distinguishing a request from an order/directive. Directives/Orders exist to avoid confusion and confusion over whether a request is discretionary.

I therefore find that Specification 1(e) is not sustained.

*(f)* *Failed to follow school protocol and procedures by repeatedly arriving late for scheduled yard duty.*

The only probative evidence in this record on lateness for yard duty was the testimony of Ms. Underdue who testified that Respondent was not in his place in the yard a couple of unspecified times (T1114) and that his compliance improved and corrected itself after she briefed Principal Horton concerning what was going on. (T1119)

Respondent simply denies that he was ever late for yard duty. (T1290-1292)

The support for this specification is inconclusive and insubstantial. No corroborative evidence, in any form was offered to support this Specification.

I therefore find that Specification 1(f) is not sustained.

***Specification 2:*** *During 2016-2017 school year, Respondent was excessively late approximately 11 times on the following dates:*

| | |
|---|---|
| *1. October 17, 2016* | *1 minute* |
| *2. October 24, 2016* | *10 minutes* |
| *3. October 25, 2016* | *4 minutes* |
| *4. October 26, 2016* | *10 minutes* |
| *5. October 27, 2016* | *10 minutes* |
| *6. November 1, 2016* | *14 minutes* |
| *7. November 3, 2016* | *5 minutes* |
| *8. November 16, 2016* | *5 minutes* |
| *9. November 21, 2016* | *15 minutes* |
| *10. November 22, 2016* | *3 minutes* |
| 11. November 30, 2016 | 35 minutes |

**Discussion**

Respondent admitted to being late as alleged in the Specification.

I therefore find Specification 2 sustained.

## CONCLUSIONS AND APPROPRIATE PENALTY

In summary, I find the following Specifications **have** been sustained:
**Case number 30678** – Specifications: 1(a)(b)(c)(d); 2(a)(b)(c)(d)(e)(f)(g)(h); 3; 4(a)(c), 4(b) in part

I find the following Specifications are **not** sustained:
**Case number 30678** – Specifications: 4(b) in part; 5

I find the following Specifications **have** been sustained:
**Case number 30977** – Specifications: 1(a)(b)(d); 2

I find the following Specifications are **not** sustained:
**Case number 30977** – Specifications 1(c)(e)(f)

I find that the Department has met its burden of proving Respondent guilty of the above listed specifications and that good and sufficient cause for discipline exists under §3020-a of the State Education Law. More specifically, I find that the proven specifications do constitute and establish just cause for disciplinary action under Education Law §3020-a; Conduct unbecoming Respondents position, or conduct prejudicial to the good order, efficiency, or discipline of the service; substantial cause rendering Respondent unfit to perform his obligations to the service; misconduct; neglect of duty; insubordination, a violation of the Rules and Regulations of the Chancellor, School and/or District; inappropriate comments; verbal abuse and just cause for termination.

As presented in this case, Respondent has approximately twenty years of service with one known prior formal discipline in his employment record. That prior discipline involved alleged misconduct during the 2014/2015 school year and the 2015/2016 school year. In that matter, the Hearing Officer sustained 10 of the 18 Specifications in whole or in part and made the following comment in his Opinion and Award dated September 9, 2016: "…Herein, the unmistakable thread running through Respondent's misconduct is his stubborn noncompliance with his administrators' directives." (D1(A) p.30) The proven events at MLS (D1[B]) all occurred after September 9, 2016, and two of those events involved failures to follow supervisory directives. Therefore, Respondent did not correct his failure to comply with directives issue after enduring a 3020-a proceeding, but rather, continued to engage in such behaviors. The record has also demonstrated that Respondent has an independent streak that makes it difficult for him to conform to the legitimate expectations



of his employer when he disagrees with or is somewhat constrained by the directive. (Failure to obtain permission before showing R-rated animation; failure to accept gender/bender day - a school sponsored activity; failure to utilize a classroom Principal Horton assigned him to use as his base; failure to follow through with the ELL students with the scripted lessons in Hooked on Phonics program; failure to arrive for work at MLS on time)

Respondent was also found guilty of sleeping at two different schools, UAA and MLS. Eye witness testimony and still photos were placed into the record for each occasion. (D12, D18(a)(b)) Rather than admit to the obvious, Respondent used the same unbelievable and contrived defense to each allegation - that he was using a concentration and listening technique he teaches his students. (T1262-1264) In other words, the AP who watched him for five to seven minutes; and the Paraprofessional that was in the room with him and observed him nod off for a total of three to four minutes are not to be believed, yet his account and explanation is. This illustrates that Respondent refuses to take responsibility for his actions and admit he was sleeping. In fact, the most Respondent admitted to was that he told ATR Principal Meade; that he will not close his eyes anymore and that he understands the problems when he does. (T1451) The problem with not keeping an eye on students is obvious; things can happen in the blink of an eye and the resting/ intentional closing of eyes on duty by those charged with student care and oversight cannot be tolerated.

Respondent was also found guilty of playing an episode of the adult sitcom "The Boondocks" for his students. On this record, the Respondent apologized for his poor judgment and admitted that it was inappropriate to have played the Boondocks for his students. (T1262) However, Respondent only admitted to playing the Boondocks episode entitled "Freedom Ride" and refused to accept responsibility for and admit to also playing the episode that contained "The Dick Riding Song" which AP Barnett saw and heard playing on April 18, 2016. (D16) Respondent also admitted that he never discussed playing the "Boondocks" with any administrator or parents which would have been the responsible thing to do. Respondent claimed there was no requirement get permission, so he did not.

Finally, the employer has proven that on April 8, 2016, during his second period class, Respondent violated Chancellors Regulation A-421 which provides in relevant part that:

"... I. **POLICY**

A. It is the policy of the Department of Education (DOE) to prohibit verbal abuse of students by DOE staff members...on school property...

B. Disruptive behavior by a student must never be punished by use of verbal abuse. Schools should address a student's disruptive behavior through offering guidance intervention, working with parents, and addressing behavior in accordance with Chancellor's regulation A-443 and the DOE's Discipline Code.

... II. **DEFINITIONS**

C. Verbal abuse is defined as language (written or oral) about or directed toward students that:

1. Belittles, embarrasses or subjects students to ridicule; or
2. Has or would have the effect of unreasonably and substantially interfering with a student's educational performance or ability to participate in or benefit from an educational program, school sponsored activity or any other aspect of a student's education; or
3. Has or would have the effect of unreasonably and substantially interfering with a student's mental, emotional, or physical well-being; or
4. Reasonably causes or would reasonably be expected to cause a student to fear for his/her physical safety; or
5. Reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student.

Based on the findings of fact in this matter, Respondent has clearly failed to conform to the legitimate expectations of his employer as expressed in Chancellors Regulation A-421. The Chancellors Regulation essentially codifies the employer's expectation that DOE staff members are expected to exercise utmost restraint in their verbal interactions with students; refrain from language that would belittle, embarrass or subject a student to ridicule; refrain from any language that would cause a student to fear for their physical safety; and refrain from any language that would cause or reasonably be expected to cause physical or emotional harm to a student. That Respondent was aware of and had knowledge of the Chancellors Regulation on verbal abuse was established and admitted to. (T1304-1305)

On April 8, 2016, Respondent verbalized what he had permitted to become lingering resentment towards Principal Dorcely, which he exposed in an avalanche of verbal scorn, disdain, derision

and antipathy. The vulgar invectives and obscenities he spewed had no place in a classroom discussion with impressionable students. This conduct modeled poor behavior and evidenced not only poor judgment but also a lack of control as Respondent went emotionally berserk. Respondents conduct violated so many rules and norms of behavior for a professional educator that it not only had a destructive impact on the students, their emotional health, self-esteem, and respect for educators; it also undermined and was a blow to the entire infrastructure of the education system. The conduct evidenced not only unprofessional and unethical behavior, it was also immoral. Those who witnessed the tirade testified about the impact Respondents words had on them and their classmates. That impact included but is not limited to purported bi-sexual and gay students leaving the classroom; the positive impact of "Spirit Week" in general and "gender/bender day" in particular being negatively impacted; the undermining of respect for Principal Dorcely and his position; the undermining of respect for approved student inspired school events; the undermining of respect for the school in general; the fueling of a rise in student disillusionment in education generally; and a stigma being attached to those who express sexuality differently. (FF7) The Respondents language was belittling; embarrassing; substantially interfered with multiple student's ability to benefit in the class and school's education program; interfered with multiple student's mental and emotional wellbeing; interfered with student's ability to participate in or benefit from a school sponsored activity. (D2)

On this record, Respondent incredibly testified the April 8th event he was charged with, never happened, and that he was a victim of a conspiracy between the administration and certain students. I find, Respondents failure to even acknowledge the event and his role in it, is beyond troubling, it is inexcusable and uncorrectable. (T1391-1392) The first step in changing anything is acknowledgement of the problem. Respondents failure to acknowledge what all the other credible evidence established (i.e.- three eyewitnesses, contemporaneous reporting, contemporaneous written complaints) demonstrates his inability to correct his behavior. Further, under closer examination, Respondent's outburst was bought on by his personal frustration stemming from his personal animosity towards Principal Dorcely. The actions of the students were secondary to his contempt and lack of respect for Principal Dorcely. In this regard, whatever corrective action Respondent needs is personal and not professional. Deciding appropriate penalties under 3020-a involves the question of whether professional correction can be achieved, not personal correction.

At the crux of Respondents misconduct is a personal inability to let his resentment go and to a lesser extent his ability to conform to directives.

The proven conduct also evidenced Respondents unprofessionalism, extremely poor judgment, lack of control, lack of restraint, impulsiveness, and unwillingness to accept the demands of his position. Simply put, Respondent could have mitigated the situation and avoided the entire April 8th incident and many of the proven specifications concerning a failure to follow directives by accepting the reasonable expectations of the employer and not allowing personal resentment to build to the point of verbal explosion. It has been oft said that "...the tongue is mightier than the sword...", and on these facts, Respondents tirade cut an incalculable swath of damage on many levels. Perhaps that is why Respondent maintains that the event never happened.

It is fundamental in a progressive discipline system that the purpose of discipline is not to punish employees but to correct their behavior. In most situations, discipline should be the minimum necessary to assure the employee understands what they did or are doing is wrong and must not be continued or repeated. It is only when the employee clearly has not, and obviously will not, get the message, that their termination should be upheld.

Respondent has a 20-year record of employment with the Department. Respondent would rather label his students, co-workers, colleagues, and supervisors liars/dishonest and co-conspirators than accept responsibility for his actions. He has allowed personal resentment to blind him to his professional responsibilities and has continued to disobey the directives of his supervisors. On this record, I find the employer has demonstrated "just cause" to terminate the employment of Respondent. I find that it is highly unlikely Respondent can or will correct his behavior. Respondents failure to acknowledge that his outburst of April 8, 2016, demonstrates a continued denial of wrongdoing and evidences Respondents lack of understanding that what he did was wrong and must not be continued. Since Respondent does not get the message, his employment is terminated.

**AWARD**

1. In Case number 30678 – Specifications: 1(a)(b)(c)(d); 2(a)(b)(c)(d)(e)(f)(g)(h); 3; 4(a)(c), are sustained and Specification 4(b) in sustained part; and

2. In Case number 30678 - Specification 5 is not sustained, and Specification 4(b) is not sustained in part

3. In Case number 30977 –Specifications 1(a)(b)(d) and 2 are sustained

4. In Case number 30977 – Specifications 1(c)(e)(f) are not sustained

5. As and for a penalty Respondent is terminated from employment.

Dated: July 17, 2017

**AFFIRMATION**

State of New York )
) ss.
County of Westchester )

I, Richard D. Williams, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Opinion and Award.

Richard D. Williams, Esq.

Dated: July 17, 2017