# EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 17
----------------------------------------X
IN THE MATTER OF THE APPLICATION OF
JEAN RICHARD SEVERIN,

                              Petitioner,

                                        Index No.
            -against-                   655086/2017

THE DEPARTMENT OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF THE CITY OF NEW YORK,

                              Respondent.
----------------------------------------X
Transcript of Motion Proceedings
                         New York Supreme Court
                         60 Centre Street
                         New York, New York 10007
                         January 14, 2019


B E F O R E:

          HON. SHLOMO S. HAGLER, Justice of the Supreme Court


A P P E A R A N C E S:

BRYAN D. GLASS, ESQ.
Attorneys for the Petitioner
100 Church Street, 8th Floor
New York, New York 10007


NEW YORK CITY LAW DEPARTMENT
Attorneys for the Respondent
Office of the Corporation Counsel
100 Church Street
New York, New York 10007-2601
BY: J. CORBIN CARTER, ESQ.




                *   *   *   *   *   *   *   *   *   *   *   *
                         LAURA L. LUDOVICO
                        Senior Court Reporter
                     60 Centre Street - Room 420
                      New York, New York 10007

1                        Proceedings

2              THE COURT:  Good morning.  Welcome.  I'm Judge

3     Hagler.

4              Counsel, is everyone ready to proceed?

5              MR. GLASS:  Yes.

6              MR. CARTER:  Yes, Your Honor.

7              THE COURT:  This is an Article 75 proceeding

8     wherein the petitioner is seeking to vacate the termination

9     of the hearing officer, who found just cause for

10    termination of the petitioner's employment.

11             Counsel for Petitioner, are you ready to proceed?

12             MR. GLASS:  Yes.

13             THE COURT:  Please argue the petition.

14             MR. GLASS:  Okay. Your Honor, just to let you

15    know, I took over this case from another attorney just

16    recently, so she had --

17             THE COURT:  Welcome aboard.

18             MR. GLASS:  Would you like me to stand or sit?

19             THE COURT:  Sit.  You know my policy, we're

20    informal.

21             MR. GLASS:  Okay.

22             THE COURT:  I want the arguments as quickly as we

23    can, then we go one case to the other.

24             MR. GLASS:  Sure.

25             THE COURT:  And we try to do it quickly, but we

26    want to get the arguments out so that everyone has due

| | |
|---|---|
| 1 | Proceedings |
| 2 | process and has an opportunity to be heard.  Remember, this |
| 3 | is your only time in front of the Court. |
| 4 | MR. GLASS:  Okay.  Well, Mr. Severin is a 20-year |
| 5 | teacher with the Board of Ed. |
| 6 | THE COURT:  Is Mr. Severin seated next to you? |
| 7 | MR. GLASS:  Yes, he is. |
| 8 | THE COURT:  Welcome, Mr. Severin. |
| 9 | MR. GLASS:  In the 20 years with the Board of Ed, |
| 10 | he had a very good record with the Board of Ed until he got |
| 11 | to the school under Steven Dorcely, Principal Steven |
| 12 | Dorcely.  Things started fine at the school until the |
| 13 | Summer of 2014 when he reported Mr. Dorcely for encouraging |
| 14 | him to change Regents grades.  This happened in the Summer |
| 15 | of 2014. |
| 16 | He was encouraged by his union to report this to |
| 17 | the Special Commissioner of Investigation.  When |
| 18 | Mr. Dorcely found out about this report, his attitude |
| 19 | towards Mr. Severin changed dramatically, which led to a |
| 20 | relentless barrage of disciplinary letters and other |
| 21 | allegations of misconduct ever since Mr. Dorcely found out |
| 22 | about that in approximately September of 2015 -- '14. |
| 23 | As you can see in the record, there was a first |
| 24 | 3020-a commenced by Mr. Dorcely against Mr. Severin in |
| 25 | front of James Brown, the arbitrator.  That case involved a |
| 26 | series of allegations from '14 to '15, up to about April of |

2015, which resulted -- the arbitrator in that case

recognized the hostility and retaliatory nature of conduct

towards Mr. Severin and only issued him a $2,000 fine at

that point.

During the -- almost the -- just about when that

proceeding concluded, the Board decided to bring a second

set of charges against Mr. Severin and that's why we're

here today. Now, some of that raises some due process

concerns because some of those charges that could have been

part of the first proceedings were made part of a separate

second proceeding, and part of what the board was doing was

arguing, well, he has a prior now, we have this second set

of charges and now he's got a prior. There was no reason

why that first set of charges could not have been heard

together with the second set of charges.

THE COURT: I have to tell you, that's an ironic

argument because I usually hear it's the other way around.

I usually hear it's prejudicial to consolidate two

different specifications. That's the argument that I've

gotten from you and from petitioners throughout the last

five years. I've never heard anyone argue the converse,

that it's prejudicial to split it up.

Why would it be prejudicial?

MR. GLASS: Well, because in this case you have

an arbitrator who would have seen the whole context and

recognized the retaliation and the incident that really got

him fired in the second set of the allegations is from

April of 2015, which is the same time that charges from the

first proceeding were held.  So if he had one consolidated

proceeding, there would have been no prior and we believe

Mr. Brown would have just found this to be, you know,

continuing conduct of a principal who had retaliated

against Mr. Severin.

THE COURT:  Isn't that speculative?  Why wouldn't

the charges alone stand on the veracity of them?  Either

they are justified, sustained or not.  That's what wins or

loses the case, they stand or fall based upon the merits.

MR. GLASS:  But it wasn't one egregious -- you

know, this was a series of a lot of different allegations,

so it's easier for the board to argue, you know, that there

was a prior and that he had prior discipline.  I mean, this

isn't one horrific allegation of a teacher, this is a

series of death by a thousand cuts here.

So my argument would be that if this was heard

together by Mr. Brown, Mr. Brown would have considered this

in the context of the retaliatory nature of the

relationship after he reported the principal.  And you see

that in Arbitrator Brown's decision, I think it's part of

the record, the first decision, where he does acknowledge

there was even a calling off period that the superintendent

had ordered between the teacher and the principal in that
case because it had gotten so bad.

And this is basically what Mr. Williams, the
arbitrator, fired him in the second case, essentially, it
appears, because he lost his cool about the principal.  And
that's really the nature of the allegation that got him
terminated.  If you look at the other allegations when he
was an ATR after he was reassigned from the first case,
there are very, very minor misconduct and I think even
Mr. Williams acknowledged that this would not be worthy of
termination.

So I think you have to look at the whole
procedural context here and realize that Mr. Severin has
lost his job because he was a whistleblower and whether it
took two sets of 3020-a charges to do it or three or five
or one, I mean, this is all stemming -- this was a perfect
teacher who had no issues until, you know, he antagonized
the principal for reporting him for misconduct.  So I think
that's what I see here.

And I just wanted to cite -- I know the standard
has been very difficult for teachers after those cases,
we've discussed this, but there seems to be hope for
teachers.  I'm aware of two decisions from this Court that
have still recognized this shocking to the conscience
standard, and one is the Dikovski(ph), which has been cited

1                        Proceedings

2     in the previous papers.

3              And just recently in December Judge Tisch vacated

4     a termination on the basis of finding it shocking to the

5     conscience under the circumstances.  That's the matter of

6     Brown v. Board of Education, 2018 N.Y. Misc. LEXIS 5904

7     [December 3, 2018].  I don't know if you'd like a copy of

8     that decision.

9              THE COURT:  I could look at it, but we all know

10    what the standard is.  It didn't change.  As a matter of

11    fact, it's the opposite of what you just said.  In Bolt v.

12    New York City Department of Education, 30 NY3d 1065,

13    Justice Rivera, in a very thorough decision, delineated and

14    clarified the standard for shocking the conscience and

15    whether or not there is some wiggle room that you just

16    mentioned.  And Justice Rivera actually went back and cited

17    the case law saying that you don't second-guess the hearing

18    officer's determination.  As long as there's any possible

19    grounds, then it would stand scrutiny.

20             It went the other way at the Court of Appeals.

21    And I don't think that there's been a movement to undermine

22    the hearing officer's determination in that regard.  Quite

23    frankly, it went the other way, it went more stringent

24    pursuant to the Bolt decision.

25             MR. GLASS:  Oh, no, I acknowledge that.  I'm just

26    saying that just recently, though, in December there are

                    Laura L. Ludovico, SCR

2     judges of this Court that are still vacating, even under

3     the Bolt standard and this decision cites Bolt and still

4     finds that there are circumstances.  I understand, it's

5     limited.

6               THE COURT:  Quite frankly, I did one also.

7               MR. GLASS:  Oh, did you?

8               THE COURT:  And the Appellate Division, I think,

9     reversed me recently on it.  The courts do justice.  If I

10    believe there was a situation where there was a

11    determination that shocks my conscience, I don't hesitate

12    to do so, and I did so under those circumstances.  I think

13    it was your case as well, that you argued.

14              MR. GLASS:  Since Bolt?

15              THE COURT:  It was since Bolt, yes.  And the

16    Appellate Division reversed saying that the termination of

17    the -- it was an individual that was like an assistant --

18              MR. GLASS:  Principal.

19              THE COURT:  -- administrator.

20              MR. GLASS:  Yes, the difference, though, that's a

21    slightly different standard because he was a probationary

22    assistant principal.  What I'm arguing here is this is a

23    tenured teacher, it's a different standard.

24              THE COURT:  It was a probationary employee,

25    correct, but nonetheless, there was still a termination,

26    and it's a little different, but nonetheless, I have done

| | |
|---|---|
| 1 | Proceedings |
| 2 | that under certain circumstances and my colleagues have |
| 3 | done that because we still have to do justice and we don't |
| 4 | ignore the law, we apply the law when it is appropriate to |
| 5 | use a standard that would do justice to the petitioner and, |
| 6 | quite frankly, for the public as well. It's not a good |
| 7 | policy to uniformly terminate individuals or employees |
| 8 | under shocking circumstances. |
| 9 | I'll allow you to conclude, I don't want to |
| 10 | interrupt your argument. |
| 11 | MR. GLASS: I acknowledge the reading of the law |
| 12 | the same way. I'm just saying that Brown is a case where |
| 13 | the tenured teacher, the Court recognized -- Judge Tisch |
| 14 | recognized that shocking to the conscience is still a |
| 15 | viable theory post Bolt and I think this case has some |
| 16 | elements of that that you may consider in this case. And I |
| 17 | think that given -- |
| 18 | THE COURT: Can I ask you one question? I know |
| 19 | you didn't write the papers. I was looking at the papers. |
| 20 | I don't remember there being an argument as strong as you |
| 21 | just made that the principal was out to get the petitioner. |
| 22 | MR. GLASS: I mean, it's clearly all throughout |
| 23 | the first -- |
| 24 | THE COURT: You're correct, but I'm saying in the |
| 25 | petition I don't see it mentioned at all. And I was |
| 26 | looking quickly through the memorandum. It does mention |

| | |
|---|---|
| 1 | Proceedings |

1    Proceedings

2    the prior 3020-a proceeding and cited that there was some

3    animus from the principal against the petitioner herein

4    that was cited, but I don't remember seeing any reference

5    to the second 3020-a charges that would --

6         MR. GLASS:  I know that due process argument was

7    made about --

8         THE COURT:  Due process argument about

9    consolidation was made, correct, but the argument that the

10   reason that the petitioner was terminated was because of

11   the animus of the principal, I don't remember it being a

12   strong argument in this verified petition or amended

13   verified petition.

14        You can look through the papers, we'll do

15   opposition and then reply.  You can just answer my

16   question.  I don't want to waste time.

17        MR. CARTER:  Your Honor, just to address that

18   first.  There were allegations about the principal himself

19   having animus.  They were not retaliation-based

20   allegations, as you just noted.  The basic allegation was

21   that the principal, who was involved in the first set of

22   3020-a allegations, harbored some sort of animus against

23   him -- against the petitioner.

24        I think the critical thing to point out here is

25   in the second set of allegations, those allegations were

26   brought by the assistant principal and by students, not by

the principal.  So that animus isn't necessarily the
driver, even if there was some sort of retaliation-based
argument.

Aside from that, I think that it is important to
note just on the due process allegations, you know, due
process itself is dictated here, as there was a full and
fair investigation before charges are even brought.  For
that reason -- you know, the first charges were brought in
May of 2016.  There was not adequate time for the
department to have some sort of, you know, investigative,
you know, process before they could allege misconduct from
April 2016.  You know, one month is not going to allow them
enough time to have that recitation and to bring those
charges.  The department was completely within its rights
to bring two different sets of charges.  That's provided by
the statute and by the Collective Bargaining Agreement.

I think more generally, Your Honor is right to
note that the shock to the conscience standard has been
reaffirmed as extremely strenuous by the Court of Appeals
recently.  And the termination here is not done willy-nilly
by the arbitrator.  There is a 37-page opinion by the
arbitrator setting forth, you know, a broad variety of
misconduct by the petitioner, all of which is then
coalesced in the actual penalty determination.

The arbitrator basically goes on to say that

there is no chance of remediation here. This is not

something that, you know, petitioner might do better if

given another chance. The arbitrator has made that

decision.

And this Court just last year proclaimed that an

arbitration award must be upheld if the arbitrator even

offers a barely colorable justification for the outcome

reached. We cited that in our papers, page seven of our

memorandum. And I think that Your Honor would probably

agree that there is more than just a barely colorable

justification here.

THE COURT: Okay. Counsel?

MR. GLASS: Well, just a couple of points. I

mean, I think there's some red herrings in some of the

arguments made by the City.

First, this idea that there was an adequate time

to do the April investigation. I mean, as you know, 3020-a

is a completely discretionary process. There's a

three-year statute of limitations. They weren't going to

lose any time if they had decided to wait to finish that

investigation before bringing this set of charges and this

is why there's an unfairness to this.

If you think about it, if the board needs to

bring a charge separately on every one of these things, I

mean, it might cost them a lot of money, but they could get

a lot of priors that way.  And so there was no reason at
all that -- what was such a horrible charge that needed
them to go forward for that first set -- second set of
charges -- first set of charges at that point?  It's
completely within their discretion to say that there was a
rush or they needed to get through more time for adequate
process.

The incident happened.  It was the same -- it was
two April instances.  There's an April 2016 incident for
the first case, there's an April 2016 incident for the
second case.  In 99 percent of the cases, the board will
charge these together because it's the same timeframe.
Here they're playing games, they're saying we couldn't get
them the first time, here's a principal who clearly doesn't
want this guy in his school, he had to take him back and
starts a second set.  So they wanted to make sure because
they couldn't get him the first time.  So that seems to
be -- you know, they have complete discretion when they
want to do these charges.

The second point about the assistant principal is
not involved in the second set of charges, again, is a red
herring.  Who controls the assistant principal?  The
principal.  Do you think this principal's handprints were
not on the second set of charges?  I mean, it's the same
school and it's the same principal.  To say that the AP

students initiated this apart from the principal, it's

ridiculous. I mean, there's no question the principal was

behind this. The principal orchestrates these

investigations, they decide whether to report to OSI and

SCI. So he's clearly behind the second set of charges.

They even brought a second set of charges and

then there was like a third set of charges. What you're

seeing is a consolidation. Why did they do the second and

third set of charges separately? Because what they did is

actually they brought a second set of charges, then later

they brought a third set of charges and then they

consolidated the second and third set of charges together

and leave the first one alone. So there's a lot of

gamesmanship here with the DOE here.

Obviously, Mr. Dorcely wanted Mr. Severin gone

under any purposes and they were going to do whatever it

took to get it. And they decided to consolidate and play

arbitrators to get the right combination of factors here to

get Mr. Severin fired. The fact is Mr. Severin would still

be teaching if he had not reported the principal for fraud.

The principal has since been removed. Honestly,

I'm not sure you're aware of that. So he has been removed,

but Mr. Severin has been the victim of reporting -- he's a

whistleblower and he's being terminated because he's a

whistleblower and the board knows how to play the games

with charges. I think he has -- I think there are 45 -- I think there are 45 separate allegations against Mr. Severin since he made that report, none before then.

So, you know, you can look at it -- I can't fight paper. You know, you can come up with charges against any teacher, you can pound them with 100 specifications, you're probably going to get them fired on the paper, but if you look at the cold reality of this case, Mr. Severin was a fine teacher who was loved by Mr. Dorcely until he reported him for fraud and he's being fired because he's a whistleblower. That's all this case is really about.

They could have brought a thousand charges or three charges, eventually they were going to get him and that's what they did, you know.

MR. CARTER: Your Honor, respectfully, may I respond?

THE COURT: Yes, quickly, please.

MR. CARTER: First, as I just noted, retaliation, those arguments are not in the petition, they shouldn't be considered here.

I think it's important to note that it was not the same school. The second set of charges involved two different schools, the Principal Dorcely led school and another school. So there was another set of administrators that also took issue with petitioner's conduct.

1

2          I think it's very important to note here that

3     there is serious misconduct.  I think petitioner's counsel

4     is trying to, you know, somehow put out there that this was

5     just like a piecemeal, you know, letter to file, letter to

6     file.  There was a very intense allegation that was

7     substantiated regarding verbal abuse of students,

8     homophobic voluntary vulgar effectives and it was

9     substantiated.

10          This is considered the primary charge in the

11    second set of charges.  Again, our papers, you know,

12    spell this out in detail, but this was a substantiated

13    charge where petitioner was said to have, you know, derided

14    abuse to students who were participating in a gender bender

15    day and, quote, called the school a shit school, and said

16    that it was a school that, quote, condoned promoting boys

17    being gays.  You know, again, this is not something that

18    is lightly taken.  There were students who reported this,

19    there were students who were said to have been abused by

20    this and who testified at a 3020-a proceeding, noting

21    that this had a negative impact on their educational

22    experience.

23          THE COURT:  Okay.  Thank you.

24          I just want to read some of the specifications

25    into the record so that the crux and the allegations are

26    clear what we are dealing with here today.  I'm going to

1        Proceedings

2   note that the hearing officer amended the specifications on

3   the date.  I will read it with the correct date.

4        "On or about April 8, 2016, during Spirit Week,

5   respondent stated to students in sum and substance:  A.

6   This is not okay and/or this is not right (referencing boys

7   dressing up as girls); b. The school is promoting gays; c.

8   The boys are dressed up like trannies; d. This is a

9   disgrace."

10        Specification No. 2:  On or about April 8, 2016,

11   in the presence of students, respondent stated in sum and

12   substance:  This school is -- and I will spell it rather

13   than saying it, B-U-L-L-S-H-I-T.  I will spell again,

14   A-S-S-H-O-L-E; C, piece of shit principal and/or principal

15   is full of shit; D, this dumb principal; E, the principal

16   is B-U-L-L-S-H-I-T or B-U-L-L-S-H-I-T principal, the

17   principal is an A-S-S-H-O-L-E; G, this piece of S-H-I-T

18   lets students walk around dressing like girls.  This

19   B-U-L-L-S-H-I-T principal let this happen.

20        The bulk of those charges were sustained by the

21   hearing officer as follows:  On page 35, this is what the

22   hearing officer states, the first full paragraph:

23        "On this record, respondent incredibly testified

24   the April 8th event he was charged with never happened and

25   that he was a victim of conspiracy between the

26   administration and certain students.  I find respondent's

Laura L. Ludovico, SCR

failure to even acknowledge the event and his role in it is

beyond troubling, it is inexcusable and uncorrectable.  The

first step in changing anything is acknowledgment of the

problem.  Respondent's failure to acknowledge what all the

other credible evidence established (i.e. three

eyewitnesses, contemporaneous reporting, contemporaneous

written complaints) demonstrates his inability to correct

his behavior.

Further, under closer examination, respondent's

outburst was brought on by his personal frustration

stemming from his personal animosity towards Principal

Dorcely.  The actions of the students were secondary to his

contempt and lack of respect for Principal Dorcely.  In

this regard, whatever corrective action respondent needs is

personal and not professional.  Deciding appropriate

penalties under 3020-a involves the question of whether

professional correction can be achieved, not personal

correction.  At the crux of respondent's misconduct is a

personal inability to let his resentment go and to a lesser

extent, his ability to confirm directives.

The proven conduct also evidenced respondent's

unprofessionalism, extreme poor judgment, lack of control,

lack of restraint, impulsiveness and unwillingness to

accept the demands of this position.  Simply put,

respondent could have mitigated the situation and avoided

the entire April 8th incident and many of the proven

specifications concerning a failure to follow directives by

accepting the reasonable expectations of the employer and

not allowing personal resentment to build to the point of

verbal explosion.  It has often been said that, quote, the

tongue is mightier than the sword, end quote, and on these

facts, respondent's tirade cut an incalculable swath of

damage on many levels.  Perhaps that is why respondent

maintains that the event never happened."

With regard to the penalty, the hearing officer

stated:  "Respondent has a 20-year record of employment

with the Department.  Respondent would rather label his

students, coworkers and colleagues and supervisors

liars/dishonest and co-conspirators than accept

responsibility for his actions.  He has allowed personal

resentment to blind him to his professional

responsibilities and has continued to disobey the directive

of his supervisors.  On this record, I find that the

employer has demonstrated just cause to terminate the

employment of respondent.  I find that it is highly

unlikely respondent can or will correct his behavior.

Respondent's failure to acknowledge that his outburst of

April 8, 2016, demonstrates a continued denial of

wrongdoing and evidences respondent's lack of understanding

that what he did was wrong and must not be continued.

| | |
|---|---|
| 1 | Proceedings |
| 2 | Since respondent did not get the message, his employment is |
| 3 | terminated. |
| 4 | These are very strong words of the hearing |
| 5 | officer. The argument that these charges were sustained |
| 6 | as a result of the animus that the principal had to |
| 7 | petitioner really goes to the heart of the issue. The |
| 8 | hearing officer found at least three types of evidence that |
| 9 | demonstrably showed that the events of April 8, 2016 |
| 10 | occurred. The Petitioner denies having any involvement and |
| 11 | making such allegations. That is the crux and the heart of |
| 12 | dispute. |
| 13 | As counsel knows, and I'll clarify to petitioner |
| 14 | herein, this Court cannot substitute its judgment as to |
| 15 | credibility. With regard to credibility, the hearing |
| 16 | officer's determinations cannot be disturbed. In this case |
| 17 | the hearing officer made correct findings and found that |
| 18 | the April 8 comments were made by the petitioner. The |
| 19 | petitioner denies this. This Court must take those |
| 20 | allegations as true. |
| 21 | Under the circumstances, the allegations are |
| 22 | heinous, they are unbecoming of a teacher and have no place |
| 23 | in our society, let alone in a place of higher learning. A |
| 24 | teacher is supposed to be a model for students that they |
| 25 | learn and be able to accept the pearls of wisdom that |
| 26 | emanate from their mouths. We educate children and we |

| | |
|---|---|
| 1 | Proceedings |
| 2 | provide moral fabric and background for the children to |
| 3 | learn. |
| 4 | To undercut, to use expletives that this Court |
| 5 | cannot even state in a courtroom, in front of the children |
| 6 | and describing the policies of the school to have |
| 7 | inclusiveness and to show a merciful side to the students |
| 8 | that everyone is accepted in school and it's a place where |
| 9 | you're going to learn, cannot be tolerated in our society |
| 10 | and certainly cannot be tolerated in a school. |
| 11 | The standard is shocking the conscience. Quite |
| 12 | frankly, it's the right result. If the allegations are |
| 13 | true, this is no place for such a teacher in a school. It |
| 14 | does not shock my conscience. It would be shocking if we |
| 15 | allow a teacher like that to remain in the school under |
| 16 | those circumstances. This is even more exacerbated by the |
| 17 | first 3020-a. While there was minimal misconduct, it's the |
| 18 | second time, it's not the first. |
| 19 | The hearing officer correctly noted, there is no |
| 20 | ability to mitigate when the petitioner does not recognize |
| 21 | the wrong or harm that was done to not only the students, |
| 22 | but the entire system and the ability for the students to |
| 23 | learn under such a circumstance. Therefore, this Court |
| 24 | denies the petition and dismisses the proceeding. |
| 25 | Please order the record. |
| 26 | MR. CARTER: Thank you, Your Honor. |

1          Proceedings

2          THE COURT:  You're welcome.  Have a good day.

3                    *    *    *    *    *

4          I, Laura L. Ludovico, a senior court reporter for

5     the State of New York, do hereby certify that the foregoing

6     is a true and accurate transcription of my original

7     stenographic notes.

8          *Laura L. Ludovico*

9                    Laura L. Ludovico
                     Senior Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26