UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #:_____                    │
│ DATE FILED:__3/31/2023___                │
└─────────────────────────────────────────┘
```

JEAN RICHARD SEVERIN,

        Plaintiff,

        -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,
STEVEN DORCELY, former Principal of Urban Action
Academy High School, JORDAN BARNETT, former
Assistant Principal of Urban Action Academy High School,
and MICHAEL PRAYOR, former Superintendent over
Urban Action Academy High School,

        Defendants.

19-cv-775 (MKV)

OPINION & ORDER
GRANTING
MOTION FOR SUMMARY
JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Jean Richard Severin, a former New York City public school teacher, brings this action alleging that Defendants New York City Department of Education ("DOE"), Steven Dorcely, Jordan Barnett, and Michael Prayor retaliated against him in violation of the First Amendment. Defendants seek summary judgment. For the reasons discussed below, Defendants' motion is GRANTED.

## I.    **BACKGROUND**[1]

From September 2014 to May 2016, Plaintiff Jean Richard Severin worked as a social studies teacher at Urban Action Academy High School ("UAA"). *See* Def. 56.1 ¶ 1; Pl. Counter 56.1 ¶ 1. Defendant Steven Dorcely was the principal. *See* Def. 56.1 ¶ 2; Pl. Counter 56.1 ¶ 2.

---

[1] The facts are taken from the evidence cited in the parties' Local Civil Rule 56.1 statements [ECF Nos. 77 ("Def. 56.1"), 78 ("Def. Response to Pl. Counter 56.1"), 83 ("Pl. Counter 56.1")], the declarations submitted in connection with the parties' motions, and the exhibits attached thereto [ECF Nos. 74 ("Dorcely Decl."), 75 ("Prayor Decl."), 76, 76-1 ("First 3020-a Opinion"), 76-2 ("Second 3020-a Opinion"), 76-9 ("SCI Reporting Obligations"), 80, 84, 84-1 ("Severin Depo."); 84-1 ("Dorcely Depo."), 84-5 ("Barnett Depo."), 84-6 ("OSI Report"), 84-10 ("November 20, 2015 Email"), 84-11 ("September 18, 2015 Email"), 84-12 ("October 28, 2015 Email"), 84-13 ("December 10, 2015 Email")].

Defendant Jordan Barnett was an assistant principal.  Def. 56.1 ¶ 4; Pl. Counter 56.1 ¶ 4.  Defendant Michael Prayor was the superintendent.  Def. 56.1 ¶ 7; Pl. Counter 56.1 ¶ 7.

### A. The August 2014 Meeting

Severin worked as a proctor and grader at UAA during the summer of 2014, before he started as a full-time social studies teacher in September 2014.  *See* Pl. Counter 56.1 ¶ 3; Dorcely Depo. at 104:13–15.  In August 2014, Dorcely was meeting with a student, A.W., who had failed a Regents examination on Global History, and Dorcely went to get Severin.  *See* Def. 56.1 ¶¶ 9, 10; Pl. Counter 56.1 ¶¶ 9, 10; Severin Depo. at 21:5–24; Dorcely Depo. at 105:15–25, 108:17–24.  The parties agree that Severin was not one of A.W.'s teachers or graders.  Pl. Counter 56.1 ¶ 60; Def. Response to Pl. Counter 56.1 ¶ 60; Dorcely Depo. at 105:4–14.

The parties dispute what happened at the August 2014 meeting.  Defendants maintain that Dorcely simply asked Severin to review the examination with A.W. and "give her some pointers," Dorcely Depo. at 108:10–11, "to help [her] . . . improve the next time," Dorcely Decl. ¶ 11.  *See* Def. 56.1 ¶ 10.  Severin maintains, however, that Dorcely intended to change the exam in order to give the student a passing grade.  *See* Pl. Counter 56.1 ¶¶ 10–12, 61–64.  Specifically, Severin maintains that Dorcely had brought "the original test booklet," which was supposed to remain locked in a vault, and "pull[ed] out a pencil" and gave it to the student to change her answers. Severin Depo. at 23:3–11; 24:11–21; *see* Pl. Counter 56.1 ¶¶ 10, 61; Barnett Depo. at 79:21–80:11 (testifying that Dorcely got the exam from the vault, even though, "once they're locked away, they are not supposed to be touched").  According to Severin, he made a "gesture" that indicated his "disbelief" at what he perceived as Dorcely's intention to change the exam, and, when Dorcely "realize[d]" this, Dorcely "took the booklet" and "left" with A.W.  Severin Depo. at 23:12–18; *see*

Pl. Counter 56.1 ¶ 64.  There is no dispute that A.W.'s exam score was not actually changed.  Def. 56.1 ¶ 17; *see* Pl. Counter 56.1 ¶ 17.

### B.  Severin's April 2015 Report to SCI and Severin's Contemporaneous Misconduct

There is no dispute that, about eight months later, in April 2015, Severin spoke to his union representative about what he perceived as the "incident" at the August 2014 meeting.  Def. 56.1 ¶¶ 13, 14; Pl. Counter 56.1 ¶¶ 13, 24, 65; Def. Response to Pl. Counter 56.1 ¶ 65.  The union representative advised Severin to report the incident to the New York City Special Commissioner of Investigation ("SCI").  Def. 56.1 ¶ 14; Pl. Counter 56.1 ¶¶ 14, 66; Severin Depo. at 57:13–20 (testifying that the union representative said, "You have to report it.").  Severin called SCI the same day.  Severin Depo. at 57:15–16; *see* Def. 56.1 ¶ 15; Pl. Counter 56.1 ¶¶ 15, 66; Def. Response to Pl. Counter 56.1 ¶ 66.

There is no dispute that SCI is an independent New York City agency that investigates corruption and crime within the DOE [ECF Nos. 76-9 ("Reporting Obligations"), 79 ("Def. Mem.") at 10, 82 ("Opp.") at 5, 86 ("Def. Reply") at 3].  There is also no dispute that SCI referred Severin's complaint to the DOE's Office of Special Investigations ("OSI"), which is an internal investigative unit.  *See* Def. 56.1 ¶ 15; Pl. Counter 56.1 ¶ 15.  OSI conducted an investigation and, in July 2015, concluded that Severin's complaint about Dorcely and the August 2014 meeting could not be substantiated.  Def. 56.1 ¶ 16; Pl. Counter 56.1 ¶ 16; OSI Report.

The parties agree that Dorcely cited Severin for a number of instances of misconduct during a period from April 2015 (the same month Severin called SCI) and October 2015.  *See* Def. 56.1 ¶ 18; Pl. Counter 56.1 ¶ 18.  Dorcely cited Severin for lateness, failure to notify the school when he was absent, failure to submit student grades, and failure to submit lesson plans.  Def. 56.1 ¶ 18;

Pl. Counter 56.1 ¶ 18.  The parties also agree that as of June 2015 Dorcely was aware Severin had filed a complaint against him.  Pl. Counter 56.1 ¶ 67; Def. Response to Pl. Counter 56.1 ¶ 67.

Severin contends that this timeline shows "Dorcely started to target Severin with various issues after Severin reported him to SCI for test cheating" in April 2015, although there is no evidence that Dorcely knew about the report before June 2015.  Pl. Counter 56.1 ¶ 18.  But Severin's own testimony makes clear that his problems with Dorcely arose before April 2015.[2]  At his deposition, Severin testified that, prior to April 2015, he had "never bother[ed] to report" Dorcely for the August 2014 meeting with A.W. because he "didn't see it as anything" and "it was water under the bridge."  Severin Depo. at 56:16–19, 57:12–13.  However, according to Severin, "over a period of time" prior to April 2015, he "kept noticing Dorcely kept undermining [him]."  Severin Depo. at 56:19–20.  Severin then spoke to his union representative, in April 2015, and said, "I don't understand why this guy keep[s] doing that."  Severin Depo. at 57:3.  According to Severin, it was his union representative who suggested that "something must've happened," and, after some back and forth, "the only thing [Severin] could think of [was] this [A.W.] incident."  Severin Depo. at 57:4–11.

At that point, the union representative asked if Severin had reported the August 2014 incident, and Severin said, "No.  To me, I didn't see it as anything."  Severin Depo. at 57:12–13.  Then the union representative responded, "No.  You have to report it."  Severin Depo. at 57:13–14.  It was the union representative who advised Severin to call SCI, rather than pursue some other avenue of relief.  *See* Severin Depo. at 57:16–17.

---

[2] The Opinion on the First § 3020-a Hearing [ECF No. 76-1 ("First 3020-a Opinion")], discussed below, describes three specifications that were filed against Severin about incidents in January and February 2015, although the Hearing Officer dismissed two of the specifications.  First 3020-a Opinion at 5, 28–29.

### C.  Fall 2015 Incidents

At the beginning of the next school year, on September 8, 2015, Dorcely held a meeting with the staff of UAA.  *See* Pl. Counter 56.1 ¶ 68; Dorcely Depo. at 121:20–22; Def. Mem. at 4. The parties dispute what happened at the September 8, 2015 meeting.  Severin offers evidence that Dorcely told the staff that a teacher had filed a complaint against him but that he was "back and stronger than ever" and was "going to go in beast mode."  Pl. Counter 56.1 ¶ 68; *see* Severin Depo. at 73:17–20; Barnett Depo. at 112:10–20.  Dorcely denies saying it.  Def. Response to Pl. Counter 56.1 ¶ 68; Dorcely Depo. at 121:23–122:10.

Severin also offers evidence that, from September through November of 2015, Dorcely: (1) verbally threatened Severin, saying, "This year, you're done and gone, I'm going to [expletive] you up"; (2) shoved him at school; and (3) used his cellphone to take pictures of Severin without permission.  Pl. Counter 56.1 ¶¶ 71, 74, 76; *see* Severin Depo. at 75:18–20, 77:24–78:2, 79:7–20; September 18, 2015 Email; October 28, 2015 Email.  Dorcely denies engaging in this conduct. Def. Response to Pl. Counter 56.1 ¶¶ 71, 74, 76.

It is undisputed that, from September through November of 2015, Dorcely cited Severin for misconduct, placed disciplinary letters in his file, and sent an email accusing Severin of misconduct to Superintendent Prayor.  *See* Def. 56.1 ¶ 18; Pl. Counter 56.1 ¶ 18, 70; Def. Response to Pl. Counter 56.1 ¶ 70; November 20, 2015 Email; First 3020-a Opinion.

### D.  The Cooling-Off Period

In December 2015, Superintendent Prayor met with Severin, Dorcely, and Severin's union representative in an effort to reduce tensions.  Prayor Decl. ¶ 14; Def. 56.1 ¶ 24; Pl. Counter 56.1 ¶ 24.  The group agreed to a two-month "cooling off" period, during which Assistant Principal Barnett would act as Severin's direct supervisor, instead of Dorcely.  Def. 56.1 ¶ 25; *see* Pl. Counter

56.1 ¶ 25.  Dorcely agreed that he would "not interact" with Severin during this period.  December 10, 2015 Email.  They also agreed that Severin should transition to another school by February 1, 2016, which was supposed to obviate any need for Dorcely to pursue formal disciplinary charges against Severin.  *See* Def. 56.1 ¶ 26; Pl. Counter 56.1 ¶¶ 25, 26.

However, after the December 2015 meeting, Dorcely continued to cite Severin for various violations of school policy, including failure to attend mandatory meetings, failure to submit his mid-term exam for review, failure to inform the school when he was absent, and failure to follow certain directives.  Def. 56.1 ¶ 29; *see* Pl. Counter 56.1 ¶ 29.  In addition, there was, apparently, no understanding among those present at the December 2015 meeting about who was responsible for finding Severin a position at another school by February 1, 2016.  *See* Pl. Counter 56.1 ¶ 26; Prayor Decl. ¶ 15.  As such, Severin was still at UAA months later.

### E.  The First § 3020-a Hearing

In May 2016, Severin was served with eighteen formal disciplinary "Charges and Specifications" seeking Severin's termination pursuant to Section 3020-a of the New York State Education Law.  Def. 56.1 ¶ 30; Pl. Counter 56.1 ¶ 30; *see* First 3020-a Opinion at 5.  The charges were brought by the DOE's Office of Legal Services because of Dorcely's complaints.  Def. 56.1 ¶ 31; *see* First 3020-a Opinion at 2.  While the charges were pending, Severin was moved from UAA to a DOE Reassignment Center.  Def. 56.1 ¶ 32; Pl. Counter 56.1 ¶ 32.

Hearing Officer James Brown presided over the 3020-a proceedings.  *See* First 3020-a Opinion at 2.  He conducted six days of hearings at which Severin and the DOE, through counsel, submitted evidence and arguments in support of their positions.  *See* First 3020-a Opinion at 2. Severin urged Hearing Officer Brown to dismiss all of the specifications, arguing that Dorcely had

a "vendetta" against him because Severin had reported Dorcely's "scheme to change a Regents grade." First 3020-a Opinion at 11.

In an Opinion and Award dated September 9, 2016, Hearing Officer Brown found Severin guilty of ten of the specifications. *See* First 3020-a Opinion at 29, 31. He found that Severin had: failed to attend numerous mandatory meetings; failed to submit his mid-term examination for review; failed to notify the school of his absences from work; failed to submit lesson plans; and failed to submit student grades. *See* Def. 56.1 ¶ 34; Pl. Counter 56.1 ¶ 34; First 3020-a Opinion at 19, 20–22, 22–24, 24–25, 26–27, 28–29. In response to the argument that Dorcely had a vendetta against Severin, Hearing Officer Brown found that Severin was guilty of misconduct irrespective of Dorcely's "animus" towards him. First 3020-a Opinion at 30. Hearing Officer Brown found that a fine was the appropriate penalty. First 3020-a Opinion at 30.

## F. The Second 3020-a Hearing

In October 2016, about a month after the first 3020-a decision, Severin was assigned to a teaching position at the Middle School of Marketing and Legal Studies ("MLS"). Def. 56.1 ¶ 36; Pl. Counter 56.1 ¶ 36. Then, in March 2017, Severin was served with five additional Charges and Specifications based on prior conduct at UAA, as well as two Charges and Specifications based on Severin's conduct at MLS. Def. 56.1 ¶ 37; Pl. Counter 56.1 ¶ 37. Dorcely claims not to know why the DOE brought the UAA charges in two separate proceedings. Dorcely Decl. ¶ 31. Severin speculates that the second round of UAA charges represents either Dorcely "continu[ing] his campaign of retaliation against" Severin [ECF No. 1 ("Compl.") ¶ 44], or the DOE seeking "a tactical advantage" by "'shop[ping]' assigned hearing officers" to find one who "would find grounds for termination," Pl. Counter 56.1 ¶ 39.

Hearing Officer Richard Williams presided over ten days of hearings on the new charges. *See* Second 3020-a Opinion at 2.  Severin, who was again represented by counsel, testified that "he was a victim of a conspiracy."  Second 3020-a Opinion at 35.  Hearing Officer Williams repeatedly found that Severin's testimony denying instances of misconduct was not credible. Second 3020-a Opinion at 19–20, 21, 22, 23, 26, 35.

In an Opinion and Award dated July 17, 2017, Hearing Officer Williams found Severin guilty of four of the five new specifications of misconduct at UAA.  Def. 56.1 ¶ 40; Pl. Counter 56.1 ¶ 40.  First, commenting on boys dressing up as girls during a "spirit week" at UAA, Severin said to students: "This is not okay and/or This is not right"; "The school is promoting gays"; "The boys are dressed up like trannies"; and "This is a disgrace."  Second 3020-a Opinion at 19–20. Second, in connection with the same event, Severin made disparaging comments about UAA and Principal Dorcely to students, including: "This school is bullshit"; Dorcely is "dumb," "an asshole," and a "[p]iece of shit principal"; and "This piece of shit [Dorcely] lets students walk around dressing like girls."  Second 3020-a Opinion at 20–21.  Third, Severin slept during class while allowing his students to watch an inappropriate video, described below.  Second 3020-a Opinion at 21–22.  Fourth, without obtaining permission from the UAA administration, Severin allowed his minor students to watch *The Boondocks*, an R-rated animated sitcom with adult themes, vulgar language, and sexual references, and to listen to a song called "Dick Riding" with vulgar lyrics.  Second 3020-a Opinion at 22–23.

Hearing Officer Williams also found Severin guilty of sleeping during class, excessive lateness, and failing to follow supervisors' directives at MLS.  *See* Second 3020-a Opinion at 25– 27, 27–28, 29–30, 31.  Hearing Officer Williams found that Severin's "proven conduct" showed "unprofessionalism, extremely poor judgment, lack of control, lack of restraint, impulsiveness, and

unwillingness to accept the demands of his position."  Second 3020-a Opinion at 36.  He found

that Severin's "continued denial of wrongdoing" and "lack of understanding that what he did was

wrong" made it "highly unlikely" that Severin would "correct his behavior."   Second 3020-a

Opinion at 36.  As such, Hearing Officer Williams concluded that termination was appropriate.

Second 3020-a Opinion at 36.  That penalty was later upheld in an Article 75 proceeding in New

York State Supreme Court.  Def. 56.1 ¶ 45; Pl. Counter 56.1 ¶ 45.

### G.  Procedural History

Severin initiated this action by filing a complaint [ECF No. 1 ("Cmpl.")].  The complaint

asserts two causes of action against the New York City DOE, Dorcely, Assistant Principal Barnett,

and Superintendent Prayor.  First, Severin contends that each of the defendants, while acting under

color of State law, violated his First Amendment rights by retaliating against him for exercising

his freedom of speech as a citizen on a matter of public concern.  Cmpl. ¶ 49.  That is, Severin

contends that Defendants violated the First Amendment by firing him in retaliation for reporting

Dorcely's alleged August 2014 "testing impropriety" to SCI.  Cmpl. ¶¶ 23–24, 39, 47, 48–50.

Second, the complaint asserts that each of the defendants retaliated against him in violation of New

York State Civil Service Law § 75-b.  Cmpl. ¶ 52.

Defendants previously moved for judgment on the pleadings [ECF Nos. 33, 34 ("Def. 12(c)

Mem.")], which Severin opposed.  Defendants argued that the state law claim was barred by the

statute of limitations and that both claims were barred by the doctrines of collateral estoppel and

res judicata because Severin had already unsuccessfully argued that he was a victim of retaliation

in the 3020-a and Article 75 proceedings.  Defendants also argued that, "assuming" Severin's

"reporting of Defendant Dorcely to SCI/OSI" was protected speech, "the incontrovertible evidence

amply supports a finding that Defendants would have served Plaintiff with charges in any event

based on Plaintiff's egregious misconduct." Def. 12(c) Mem. at 17.  In other words, Defendants

argued that the Court should dismiss Severin's claims at the pleading stage because Defendants

would have taken the same adverse action against Severin regardless of his allegedly protected

speech. *See* Def. 12(c) Mem. at 16–18 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,

429 U.S. 274, 287 (1977)).  Defendants did not argue that the SCI report was not protected by the

First Amendment.

The Court granted in part and denied in part Defendants' motion for judgment on the

pleadings [ECF No. 42 ("Opinion & Order")].  The Court dismissed Severin's state law claim

because the statute of limitations had run.  Opinion & Order at 8.  However, the Court rejected

Defendants arguments for dismissing, at the pleading stage, Severin's First Amendment retaliation

claim.  As the Court explained, the Second Circuit has squarely rejected the argument that such

claims may be precluded by litigation in prior 3020-a and Article 75 proceedings, since the

tribunals in those proceedings lack the power to hear and decide First Amendment claims.  *See*

Opinion & Order at 9–13.  The Court also explained that a *Mount Healthy* defense—finding that

a defendant would have taken the same adverse action against the plaintiff in the absence of his

protected speech—is a question of fact that generally is not appropriate for resolution at the

pleading stage.  Opinion & Order at 14–15.

Since the Court's decision, the parties have completed discovery, and Defendants now

move for summary judgment [ECF No. 73].  Defendants the New York City DOE, Dorcely, and

Prayor jointly filed one brief [ECF No. 79 ("Def. Mem.")].  They first argue that Severin fails to

state a *prima facie* claim of First Amendment retaliation because he did not engage in protected

speech.  Def. Mem. at 2, 7–11.  Specifically, they argue that Severin was acting as an employee,

rather than a citizen speaking on a matter of public concern, when he reported Dorcely to SCI.

Def. Mem. at 2, 7–11.  Second, the DOE, Dorcely, and Prayor reargue the *Mount Healthy* defense "in the summary judgment context."  Def. Mem. at 13.  Third, they argue that Severin fails to show that Superintendent Prayor had personal involvement in the alleged retaliation and that Prayor is protected by qualified immunity.  Def. Mem. at 15–19.  Finally, they argue that the case against the DOE must be dismissed because there is no evidence of a policy or custom of First Amendment retaliation.  Def. Mem. at 19–20.

Defendant Barnett filed a separate brief [ECF No. 81 ("Barnett Mem.")].  She "adopts" the arguments that Severin fails to state a *prima facie* claim of First Amendment retaliation and that the *Mount Healthy* defense bars all liability.  Barnett Mem. at 1.  Barnett also argues that there is no connection between any protected speech by Severin and any adverse employment action by Barnett.  She stresses that: all of Severin's evidence of allegedly retaliatory actions were initiated by Dorcely, not Barnett; Severin "specifically testified that Barnett was not hostile" to him; and Barnett previously commenced her own action against Dorcely and the DOE for harassment and hostile work environment.  Barnett Mem. at 2, 6–7.  Barnett also argues that she is protected by qualified immunity.  Barnett Mem. at 9–10.

Severin opposes Defendants' motion for summary judgment [ECF No. 82 ("Opp.")].  He argues that he engaged in protected speech and that a jury should decide whether Defendants would have sought his termination in the absence of that speech.  Opp. at 4–7, 8–15.  Severin also argues that Prayor and Barnett were involved in the alleged retaliation against him and are not protected by qualified immunity.  Opp. at 15–20.  Finally, he argues that Superintendent Prayor is a final policymaker whose discretionary choices subject the DOE to liability.  Opp. at 20–22.

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To create a genuine dispute of fact, the party opposing summary judgment must provide "hard evidence." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).  The court must "draw all reasonable inferences" in favor of the non-moving party. *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).  "However, in determining what may reasonably be inferred" from evidence in the record, a court should not afford the party opposing summary judgment "the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Cty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990) (internal citation omitted).

## III.     DISCUSSION

There is evidence in the record to support an inference that Dorcely harbored ill will towards Severin. But Severin cannot prevail on a First Amendment retaliation claim. As a matter of law, Severin did not engage in protected speech. And a reasonable jury could not help but find that Severin would have been terminated, irrespective of any protected speech, because of his own, repeated misconduct.

### A.  Severin Did Not Engage in Protected Speech.

Defendants argue that, as a matter of law, Severin cannot establish his First Amendment retaliation claim because he did not engage in protected speech.  Specifically, they argue that Severin was acting as an employee, rather than a citizen speaking on a matter of public concern, when he reported Dorcely to the SCI.  Def. Mem. at 2, 7–11.  Defendants are correct.

"To establish First Amendment retaliation by a government actor, the plaintiff must demonstrate," first, that his "'speech or conduct was protected by the First Amendment.'" *Agosto v. New York City Department of Education*, 982 F.3d 86, 94 (2d Cir. 2020) (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018)). "Speech by a public employee is protected by the First Amendment only when the employee is speaking 'as a citizen on a matter of public concern.'" *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012) (quoting *Piscottano v. Murphy*, 511 F.3d 247, 269–70 (2d Cir. 2007)). "[W]hether a public employee spoke as a citizen on a matter of public concern is a question of law." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).

As the Second Circuit has observed, the Supreme Court's jurisprudence about the speech of public employees reflects that "government offices could not function if every employment decision became a constitutional matter." *Weintraub v. Board of Education of City School District of City of New York*, 593 F.3d 196, 201 (2d Cir. 2010) (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)). With respect to whether an employee spoke on a matter of public concern, "[t]he heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (quoting *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999)). Moreover, if the employee spoke "solely as an employee," there is no First Amendment protection, even if he did speak on a matter of public concern. *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015); *see Ross*, 693 F.3d at 305.

The law is clear that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "The objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" *Weintraub*, 593 F.3d at 202 (quoting

13

*Garcetti*, 547 U.S. at 424).  The Supreme Court and the Second Circuit have "cautioned courts against construing a government employee's official duties too narrowly."  *Weintraub*, 593 F.3d at 202.  Thus, while courts may consider the employee's job description, or other documented job requirements, speech that was not "expressly required may still be 'pursuant to official duties.'"  *Id.*  In determining whether an employee spoke pursuant to his official duties, a key question is whether the complaint "was part-and-parcel of his concerns about his ability to properly execute his duties."  *Ross*, 693 F.3d at 306 (quoting *Weintraub*, 593 F.3d at 203).

The Second Circuit has made clear that a public employee speaks as an employee, rather than a citizen, when he complains "pursuant to an existing dispute–resolution policy established by his employer," such as a "union grievance."  *Weintraub*, 593 F.3d at 204.  By contrast, he speaks as a citizen when he "voic[es] his grievance through channels available to citizens generally," such as "a letter to the editor" or a complaint to an "inspector general."  *Id*.  Courts may consider other factors, too.  *See Airday v. City of New York*, 131 F. Supp. 3d 174, 180 (S.D.N.Y. 2015) (listing factors).  A court is more likely to conclude that the plaintiff spoke as an employee if the speech resulted from knowledge gained through the plaintiff's employment and concerned the subject matter of the employee's job.  *Airday*, 131 F. Supp. 3d at 180.

In their motion for judgment on the pleadings, Defendants did not seek dismissal on the ground that Severin's speech was not protected by the First Amendment.  *See* Opinion & Order at 13.  Rather, Defendants "assum[ed]" that Severin's "reporting of Defendant Dorcely to SCI/OSI was activity protected by the First Amendment," arguing only that Severin would have been fired regardless.  Def. 12(c) Mem. at 17.  Now, however, Defendants argue that Severin cannot establish First Amendment retaliation, as a matter of law, because "Severin was speaking pursuant to his

14

official duties as an employee" when he reported Dorcely to the SCI for purportedly attempting to change a Regents exam.  Def. Mem. at 10.

Defendants argue that "reporting inappropriate conduct" in testing and grading students is "an obligation of a DOE employee."  Def. Mem. at 10.  They point to a description of "Reporting Obligations" on the SCI website, which states that every "employee" of the New York City public schools has an "affirmative obligation to report, directly and without undue delay, to the Special Commissioner of Education, any and all information concerning conduct which they know or should reasonably know *may involve* corrupt or other criminal activity or conflict of interest" by another employee concerning his employment.  SCI Reporting Obligations § (e) (emphasis added).  Defendants argue that "although the report was many months late, Severin was *required* to file that report, and so he was acting as an employee, rather than as a citizen."  Def. Mem. at 10.

The Court agrees with Defendants.  Regents Examinations are state-wide standardized tests that students must pass to graduate, and students' success or failure on such exams reflects on the principal of their school.  If a principal were to remove a student's exam booklet from a locked vault and prompt her to alter the exam in order to achieve a passing grade, that might be an act of corruption by the principal.  *See* SCI Reporting Obligations § (e); *see also* Pl. Counter 56.1 ¶¶ 10, 61–64; Barnett Depo. at 79:21–80:11 (testifying that "once [the exams are] locked away, they are not supposed to be touched").  As an "employee" of the New York City public schools, Severin had an "affirmative obligation to report" any conduct that might involve corruption to the SCI.  SCI Reporting Obligations § (e).  This suggests that Severin was speaking "pursuant to [his] official duties" when he reported what he perceived as an attempt by Dorcely to change a Regents exam and, therefore, Severin was "not speaking as [a] citizen[] for First Amendment purposes."  *Garcetti*, 547 U.S. at 421.

Severin responds that the cited SCI Reporting Obligations did not impose a duty on Severin to report Dorcely because "the conduct reported here did not involve corrupt/criminal activity nor conflict of interest, but a supervisor's misconduct regarding test cheating."  Opp. at 7.  Perhaps Severin is correct that the cited language did not expressly require Severin to report Dorcely to the SCI.  Perhaps the SCI focuses on large-scale corruption and criminality, hence its decision to refer Severin's complaint to the OSI, an internal investigative unit.  *See* Def. 56.1 ¶ 15; Pl. Counter 56.1 ¶ 15.  It does not matter.  Even if the SCI Reporting Obligations did not "expressly require[]" Severin to report Dorcely to the SCI, a teacher who reports his supervisor for misconduct in connection with a student's test clearly is "still [speaking] 'pursuant to official duties.'"  *Weintraub*, 593 F.3d at 202 (quoting *Garcetti*, 547 U.S. at 424).  As an "objective" and "practical" matter, a public school teacher undoubtedly would have a duty to report a principal for attempting to alter a Regents exam with the teacher looking on.  *Id.*

Severin stresses that the SCI is "an independent agency outside of the NYCDOE."  Opp. at 6.  Indeed, there appears to be no dispute on that score.  *See* Def. Mem. at 10, 82.  And the Second Circuit has made clear that it matters whether a public employee makes a complaint through an "internal" process, or he "voic[es] his grievance through channels available to citizens generally."  *Weintraub*, 593 F.3d at 204; *see also Matthews v. City of New York*, 779 F.3d 167, 176 (2d Cir. 2015) (public employee spoke as a citizen when he "chose a path that was available to ordinary citizens").  In *Weintraub*, the Second Circuit concluded that a teacher necessarily spoke as an employee when he "fil[ed] a grievance with his union," following an internal "dispute-resolution policy" that is not available to ordinary citizens.  *Weintraub*, 593 F.3d at 204.  Although reporting a principal's alleged misconduct to the SCI is not like writing "a letter to the editor," it might be similar to a complaint to an "inspector general."  *Id.*; *see Smith v. City of New York*, 130

F. Supp. 3d 819, 832 (S.D.N.Y. 2015) (complaint to SCI "arguably analogous to citizen speech"), *aff'd*, 664 F. App'x 45 (2d Cir. 2016).

Nevertheless, a "practical" inquiry in this case makes supremely clear that Severin spoke as an employee when he reported Dorcely.  In particular, Severin has explained that he raised the August 2014 incident with his union representative; he then reported it to the SCI because that is what the union representative told him to do.  *See* Severin Depo. at 57:4–17 ("I call[ed] SCI 'cause [the union representative] mention to me, 'Call SCI,' and that's what I did.").  That Severin went to his union representative and followed the process his union representative advised makes this case similar to *Weintraub*.  Moreover, based on Severin's own account of the conversation, the union representative advised Severin that he had a duty to report Dorcely's alleged misconduct.  *See* Severin Depo. at 57:13–20 (testifying that the union representative said, "You have to report it."; *see also Barclay v. Michalsky*, 368 F. App'x 266, 267, 268 (2d Cir. 2010) (upholding the conclusion on summary judgment that a public employee spoke as an employee, rather than a citizen, because she "conceded at her deposition that it was her responsibility to report" the misconduct she had reported).

In one case involving an SCI investigation, the court concluded that a teacher reporting mere "misconduct" speaks as an employee, while a teacher "reporting fraud, corruption, or criminal behavior" speaks as a citizen.  *Taylor v. New York City Dep't of Educ.*, No. 11-cv-7833 (AJN), 2012 WL 3890599, at *6–7 (S.D.N.Y. Sept. 6, 2012).  Severin explicitly maintains that "the conduct [he] reported here did not involve corrupt/criminal activity nor conflict of interest" but merely "a supervisor's misconduct."  Opp. at 7.  There is no dispute that Severin did not see Dorcely's alleged misconduct as "fraud, corruption, or criminal behavior."  *Taylor*, 2012 WL 3890599, at *7.  Indeed, Severin testified that he "didn't see it as anything."  Severin Depo. at

57:12–13.  And, as noted above, the view that the alleged misconduct was not corrupt or criminal is consistent with the decision of SCI to refer Severin's complaint to OSI.

Other factors support the conclusion that Severin spoke as an employee.  His report was based on knowledge he gained through his employment at UAA.  *Airday*, 131 F. Supp. 3d at 180. According to Severin, Dorcely called Severin into the August 2014 meeting with A.W. because Severin was a social studies teacher, and Dorcely wanted to change A.W.'s Global History exam. *See* Def. 56.1 ¶¶ 9, 10; Pl. Counter 56.1 ¶¶ 9, 10; Severin Depo. at 21:5–24.  And while Severin was not one of A.W.'s teachers or graders, Dorcely's alleged misconduct still generally concerned the subject matter of Severin's job.  *Airday*, 131 F. Supp. 3d at 180.  Indeed, any teacher would be reasonably "concern[ed] about his ability to properly execute his duties" if he believed the principal might alter students' exams after they were graded.  *Ross*, 693 F.3d at 306 (quoting *Weintraub*, 593 F.3d at 203).

Defendants "do not dispute that [Severin's] complaint touched on a matter of public concern."  Def. Mem. at 10.  And, of course, the public generally has an interest in whether New York City public school principals are altering state-wide standardized test scores.  However, it is far from clear that, in this context, Severin addressed a public concern.

"The heart of the matter is whether [Severin's] speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'"  *Ruotolo*, 514 F.3d at 189 (quoting *Lewis*, 165 F.3d at 163–64).  That is "a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record."  *Id.* (quoting *Lewis*, 165 F.3d at 163).  Severin's own testimony establishes that he reported the August 2014 incident because he was having problems with Dorcely.  Severin testified that, for months and months, he had "never bother[ed] to report" the August 2014 meeting because, in essence, he did

not have a problem with what had occurred.  *See* Severin Depo. at 56:16–19 ("it was water under the bridge").  But, "over a period of time," Severin began to feel that "Dorcely kept undermining [him]."  Severin Depo. at 56:19–20.  Severin then spoke to his union representative about his dealings with Dorcely, and the union representative suggested that "something must've happened" to make Dorcely turn on Severin.  Severin Depo. at 57:4–6.  "[T]he only thing [Severin] could think of [was] this [August 2014] incident."  Severin Depo. at 57:10–11.

This simply is not a case in which a teacher spoke out as citizen on a matter of public concern.  Indeed, even Severin was not concerned about Dorcely's alleged misconduct.  He "didn't see it as anything."  Severin Depo. at 57:12–13.  Severin was concerned about Severin.  He felt Dorcely was "undermining" him.  Severin Depo. at 56:19–20.  Severin raised that grievance the way public school teachers normally try to resolve employment disputes: he spoke to his union representative.  *See Weintraub*, 593 F.3d at 204.  Severin then called the SCI, not because he sought to exercise his First Amendment right to shine a light on corruption within a New York City public school, but because the union representative told Severin he was required to do so.  In the light of all of these considerations, the Court concludes, as a matter of law, that Severin did not speak as a citizen on a matter of public concern.  *Weintraub*, 593 F.3d at 202, 204.

"[T]hat is the end of the matter."  *Matthews*, 779 F.3d at 172.  Because Severin did not speak as a citizen on a matter of public concern, his report to the SCI was not protected by the First Amendment, and, as a matter of law, Severin cannot establish a claim for First Amendment retaliation.  *See id.*; *Agosto*, 982 F.3d at 94.  Accordingly, Defendants are entitled summary judgment dismissing Severin's sole remaining claim in this case.

**B. Any Reasonable Jury Would Find that Severin Would Have Been Fired Anyway.**

In the alternative, even if Severin's report to the SCI were protected speech, Defendants are entitled to summary judgment because no reasonable jury could fail to find that Severin would have been terminated in any event based his own misconduct. *See Anemone v. Metropolitan Transportation Authority*, 629 F.3d 97, 114 (2d Cir. 2011). In *Mount Healthy*, the Supreme Court explained that, even if a plaintiff establishes a *prima facie* case of First Amendment retaliation, the government is not liable if it can demonstrate "by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. County of Suffolk & John Gallagher*, 316 F.3d 368, 382 (2d Cir. 2003); *see Mount Healthy*, 429 U.S. at 287. This standard is satisfied where "a reasonable jury could not help but find that [the plaintiff] would have suffered the [same] adverse employment actions even in the absence" of the protected speech. *Anemone*, 629 F.3d at 114.

As explained above, Defendants previously argued in their motion for judgment on the pleadings that the Court should dismiss Severin's First Amendment retaliation claim based on the *Mount Healthy* defense. The Court declined to dismiss at the pleading stage, explaining that a *Mount Healthy* defense involves questions of fact and, thus, generally is not appropriate for resolution at the pleading stage. Opinion & Order at 14–15. The Court stressed that, on a motion for judgment on the pleadings, it was required to accept Severin's allegations as true and draw all reasonable inferences in his favor. Opinion & Order at 15–16.

The Second Circuit has, however, repeatedly upheld decisions to grant summary judgment based on a *Mount Healthy* defense where uncontroverted evidence established that the plaintiff's own misconduct justified his termination. *See Anemone*, 629 F.3d at 113–14 ("We affirm the district court's grant of summary judgment to Defendants on the *Mt. Healthy* ground."); *Heil v.*

20

*Santoro*, 147 F.3d 103, 111 (2d Cir. 1998); *Smith v. New York City Dep't of Educ.*, 524 F. App'x

730, 733 (2d Cir. 2013).  The Second Circuit has explained that the government employer can

avoid liability "even if there is evidence that the adverse employment action was motivated in part

by protected speech."  *Heil*, 147 F.3d at 110.  Severin has now had the benefit of discovery, and

the record establishes that "any reasonable jury would find that [Severin] would have been

terminated even absent any desire on the Defendants' part to punish him in retaliation for his

allegedly protected speech."  *Anemone*, 629 F.3d at 117.

Uncontroverted evidence shows that Severin: failed to attend mandatory meetings; failed

to submit his mid-term examination for review; failed to notify the school of his absences; failed

to submit lesson plans; failed to submit student grades; disparaged the school, the principal, and

the students; slept during class; and allowed his students to watch an inappropriate video and listen

to vulgar lyrics.  *See* Def. 56.1 ¶ 34; Pl. Counter 56.1 ¶ 34; First 3020-a Opinion at 19, 20–22, 22–

24, 24–25, 26–27, 28–29; Second 3020-a Opinion at 22–23.  Severin takes the position that,

although he does not dispute that he was found guilty of all of this misconduct, he does "not

necessarily" admit "to the truth or accuracy" of those findings.  Pl. Counter 56.1 ¶ 41.  But that is

not enough to create a dispute of fact.  *See D'Amico*, 132 F.3d at 149.

As an initial matter, as the Court explained in its earlier opinion, the factual findings from

Severin's two Section 3020-a hearings are "entitled to preclusive effect."  Opinion & Order at 13

(citing *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313

(2d Cir. 2005)).  The hearing officers conducted a total of sixteen days of hearings, at which

Severin was represented by counsel.  First 3020-a Opinion at 2; Second 3020-a Opinion at 2.

Based on the evidence at those hearings, including testimony from students, the hearing officers

found that Severin had engaged in numerous instances of misconduct because of his own

unwillingness to meet the demands of his position, unrelated to any animus Dorcely harbored against Severin.  *See* Second 3020-a Opinion at 36; First 3020-a Opinion at 30.

Moreover, having completed discovery in this litigation, Severin fails to offer any evidence to cast doubt on "the truth or accuracy" of the factual findings from the 3020-a hearings.  Pl. Counter 56.1 ¶ 41.  Severin does not raise any genuine dispute that he showed his students inappropriate content, made disparaging comments, slept during class, and failed to perform a variety of basic professional responsibilities.  While there is evidence that Dorcely was motivated to seek Severin's termination, Severin's own repeated and wide-ranging misconduct obviously justified his termination.  *See Heil*, 147 F.3d at 110; *Anemone*, 629 F.3d at 117.

Instead of raising a dispute that he engaged in sanctionable misconduct, Severin asks the Court to presume that he simply would have been permitted to carry on engaging in misconduct without consequence if Dorcely had not harbored ill will towards him.  But Severin is not entitled to the benefit of that unreasonable inference.  *See Heil*, 147 F.3d at 110 (holding that summary judgment was appropriate where the record established that the plaintiff had engaged in misconduct, and the plaintiff "presented no evidence to suggest" that the government employer "would not ordinarily have disciplined" an employee for such misconduct); *see also County of Suffolk*, 907 F.2d at 1318.  As such, Defendants are entitled to summary judgment based on their *Mount Healthy* defense.  *See Anemone*, 629 F.3d at 114, 117–18.

Because all of the defendants are entitled to summary judgment on the ground that Severin did not engage in protected speech and, in the alternative, on the *Mount Healthy* ground, the Court need not address the arguments that Prayor and Barnett were not involved in any alleged retaliation and are entitled to qualified immunity.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment [ECF No. 73] is GRANTED. The Clerk of Court respectfully is requested to terminate the motion pending at docket entry 73 and to close this case.

**SO ORDERED.**

**Date:  March 31, 2023**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**